# Exhibit A

CAUSE NO. D-1-GN-000096

| | |
|---|---|
| CAROLINE CLARK<br>     Plaintiff,<br>VS.<br><br>AUSTIN MONTESSORI SCHOOL,<br>INC.,<br>     Defendant. | ) IN THE DISTRICT COURT<br>)<br>) TRAVIS COUNTY, TEXAS<br>)<br>)<br>)<br>)<br>) 419TH JUDICIAL DISTRICT |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

ORAL VIDEOTAPED DEPOSITION OF

AMBER MILLER

AUGUST 11, 2011

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

ORAL VIDEOTAPED DEPOSITION of AMBER MILLER,
produced as a witness at the instance of the Plaintiff,
and duly sworn, was taken in the above-styled and
numbered cause on the 11th day of August, 2011, from
12:23 p.m. to 2:55 p.m., before Kimberlye A. Furr, RPR,
CSR, in and for the State of Texas, reported by machine
shorthand, at the offices of The Cook Law Firm, 919
Congress Avenue, Suite 1145, Austin, Texas, pursuant to
the Texas Rules of Civil Procedure

2

A P P E A R A N C E S

FOR THE PLAINTIFF:

Russell Scott Cook
State Bar No. 24040724
Melissa A. Jacobs
State Bar No. 24046144
The Cook Law Firm
919 Congress Avenue, Suite 1145
(512) 482-9556
(512) 597-3172 Fax

FOR THE DEFENDANT:

W. Patrick Garner
    -- and --
Stephanie O'Rourke
Cokinos, Bosien & Young
Four Houston Center
1221 Lamar Street, 16th Floor
Houston, Texas   77010
(713) 535-5500
(713) 535-5533 Fax

VIDEOGRAPHER:   Bill Burns

3

INDEX

Appearances.................................    2

AMBER MILLER

      Examination by Ms. Jacobs ..............    4

      Examination by Mr. Garner ..............   56

      Examination by Ms. Jacobs ..............   87

Signature and Changes.......................   95

Reporter's Certificate......................   96

Further Certification.......................   98

EXHIBITS

| NO. | DESCRIPTION | PAGE MARKED |
|---|---|---|
| 4 | Letter to parents from Mr. Goertz, via e-mail by Ms. Glasgow to Ms. Miller, dated May 24, 2010 | 27 |
| 5 | Letter to parents from Mr. Goertz, dated March 28, 2003 | 51 |

6

A.    I'm the Director of Admissions.

Q.    And what do you do as the Director of Admissions?

A.    I tour people around the school and host observations; I give evening presentations on Montessori to prospective parents; and I keep the waiting list and accept children into the school.

Q.    Do you have any other responsibilities?

A.    Well, I'm part of the administration team.

Q.    Okay.  And what do you mean by that?

A.    Well, there's a team of four people that make the decisions, most of the decisions, about the running of the school.

Q.    And who else is on that team besides yourself?

A.    Dawn Glasgow, Don Goertz, and John Snyder, currently.

Q.    During the 2009 to 2010 school year, who made up the administrative team?

A.    Dawn Glasgow, Donald Goertz, myself, and -- but John Snyder wasn't part of the administration team then.

Q.    So when did he become part of the team?

A.    At the beginning of last year.

Q.    Can you give me an example of some things

8

with if they were making hiring or staffing decisions?

A.    Well, of course we're getting feedback from whoever -- you know, depending on the level, whoever the person is that observes.  Like, in the Children's House we have a mentor and for the elementary we have a mentor, a person that observes and -- sorry, I'm not speaking up -- and they -- they're giving us feedback throughout the year.

Q.    So how did you first find out that Caroline was expecting?

A.    Well, a parent -- a prospective parent was observing in her classroom and when she finished her observation -- I always meet with prospective parents -- she finished her observation and she said, "I really don't want my child in that class next year because I would want to know who is going to substitute while she's out having her baby."

And I said, "She's not pregnant."

And she said, "Oh, yes, she is.  I was watching the way she was holding her belly."

And I said, "You know, she has a little bit of a belly and maybe she had her hand on her belly, but she's not pregnant."

And she said, "Oh, okay.  Well, I'm sorry.  I'm kind of embarrassed.  But, you know, people

11

A.    We had a meeting with her.  I don't remember the date, but we set up a time to meet with her.  And, meanwhile -- yeah, I don't remember the date, so...

Q.    **And why did you set up a time to meet with Caroline?**

A.    Because we wanted to talk about next year.

Q.    **Did you have any discussions with Caroline about her pregnancy between when she shared that news with you and then when you actually had that meeting?**

A.    Did I?  No.

Q.    **Are you aware of anyone else meeting with her?**

A.    No.

Q.    **Or talking about the pregnancy?**

A.    No.

Q.    **Okay.  So you were talking about you set up a time to meet with her and that you weren't exactly sure when that meeting was?**

A.    Yeah, I don't know the time line of...

Q.    **Okay.  And where was that meeting held?**

A.    In my office.

Q.    **And who was there?**

A.    Me, Caroline, and Dawn Glasgow.

Q.    **Do you remember what was discussed at that meeting?**

A.    Uh-huh.  I remember that we -- I had heard from -- we had -- Donna Romine was our campus coordinator and she had told Dawn that Caroline had said that she wished she had her job, Donna Romine's job, and so we were very excited to offer her that job, because Donna Romine had told us she wasn't coming back the next year; she was moving.  And so we thought that Caroline was going to be so excited that we were going to offer her the job that she wanted.

Q.    **So were you a part of the decision-making team to offer her the campus coordinator position?**

A.    Well, Dawn and I talked about it, yeah, ahead of time.

Q.    **Okay.  And what did you talk about in terms of --**

A.    How --

Q.    **-- offering her the position?**

A.    How great that position was because it had flexible hours and it would be less -- it's less responsibility, less hours, more flexible, but for the same pay and the same benefits.  It was very important to us that she be able to maintain the benefit of getting free tuition for her son, who was currently at the school.  And all guides get free tuition, so we wanted to be able to offer that to her also.

14

Q.    Okay.  So were you thinking of any other options for Caroline other than the campus coordinator position?

A.    Well, I thought that was the job she wanted, so, really, I was so excited that we were being able to offer her the job she wanted to have.

Q.    So you weren't considering that she would be able to come back as a guide?

A.    Well, at the time, because she had said that was the job she wanted, that was all I was really thinking about.  And she had already said that she would be gone from October to January and so that was -- we couldn't -- that didn't seem very workable.

Q.    Did she tell you that?

A.    Yes.

Q.    Okay.  So when did she tell you that?

A.    I don't remember.

Q.    Okay.  Because I had asked you earlier if you had had --

A.    Yeah.

Q.    -- any conversations with her about her pregnancy in between when she gave you --

A.    Yes, I know.

Q.    -- the news and when you had the meeting, so --

17

Q.    So was there anything that you said at that meeting?

A.    Maybe just I felt excited about the flexible hours and that aspect of it I thought was going to work really well for her.

Q.    And how did Caroline react?

A.    Not as excited as I had imagined she would be.  She said she really -- it was interesting and, yes, she had said that to Donna Romine, but she wanted to think about it.

Q.    Did she say --

A.    Which is understandable.

Q.    -- anything else?

        Do you think --

A.    Oh, sorry.

Q.    Did she say anything else that you can recollect?

A.    No.  That's basically -- it wasn't a very lengthy meeting.

Q.    Do you remember if she asked about whether or not the position of guide would be available to her for the following year?

A.    Oh, I think she did.

Q.    And who responded to her when she asked that?

A.    Dawn.

20

Q.    So --

A.    It was news to me.

Q.    Did you hear of anyone else hearing that questioning from parents or parents asking about it?

A.    No.

Q.    So going back to that meeting, so you had offered her the campus coordinator position; she said that she was going to think about it, is what you told me?

A.    Uh-huh.

Q.    So what was the next step that the school took in terms of the campus coordinator position and that offer with Caroline or any other plans for Caroline for the following year?

MR. GARNER:  Objection; form.

A.    I just remember we set up another meeting with Caroline.  That's all I can remember.

Q.    (By Ms. Jacobs) And did you set that up?

A.    Or Dawn Glasgow.  I can't remember.  One of us.

Q.    So how did the school share the news of her pregnancy with the parents?

A.    Don Goertz wrote a letter and Caroline wrote a letter to the parents.  That's how we always do it.

THE VIDEOGRAPHER:  Can you move your

23

Q.   And who would have told her that?

A.   Just -- I don't know.  Dawn.  Me.

Q.   Okay.  Do you recall --

A.   I'm not sure.  It's just -- the best way for parents to hear information is when they all hear it at the same time as opposed to some parents knowing and some parents not knowing -- I'm sorry -- some parents knowing and some parents not knowing.

Q.   Okay.  So can you recollect asking Caroline to withhold news about her pregnancy until the letter could go out?

A.   No.  But I don't think that would be unusual.

Q.   Would anyone have asked her not to touch her belly?

A.   I think I said that to her jokingly after she -- just, I mean, in a lighthearted, joking way.

Q.   Okay.  So you said that another meeting had been set up after the meeting where you offered her the campus coordinator position.  Do you recall having any conversations with Caroline about the pregnancy in between that first meeting and the second meeting?

A.   Do I recall?  No.

Q.   Do you -- did you talk to her at all about her pregnancy?

MR. GARNER:  Objection; form.

25

Dallas and she was really excited because Adam, her husband, was going to get a job there and they were going to get -- to live in her mother's rental house, I think, rent free or for not very much; and she was going to send Austin, her son, to a Montessori school in Dallas and she was super duper excited and said that -- we were happy for her.

Q.    All right.  Do you remember Dawn saying anything to Caroline at that meeting?

A.    I just remember we were both very excited for her because she was so happy.

Q.    Do you remember her being offered the position of campus coordinator at that meeting?

A.    She told us she had never even opened the packet, so she hadn't even looked at the job offer, because she had this other opportunity and she was going to get to be a stay-at-home mom, which she hadn't really gotten to do with Austin, and she was very exited.

Q.    Do you recollect her asking if what y'all were doing was legal?

MR. GARNER:  Objection; form.

A.    No.

Q.    (By Ms. Jacobs) Did you think that it was unreasonable for her to refuse to consider the offer

school about not -- the children not watching television and not being part of pop culture, and parents brought some concerns.

Q. Do you remember who those parents were?

A. Uh-huh.

Q. And who were they?

A. Well, I'm trying to remember. I'm not sure who came first, but I know I spoke with Tiffany Bilbe, who had two children in Caroline's class; and Sue Colbly, who also had two children.

Q. Were there any other parents who brought concerns about Caroline related to the school's culture?

A. Those were the only ones about the school culture.

Q. Did any other parents bring any other concerns about Caroline to you?

A. Yes. There was a parent who was concerned about if her child was actually working and getting all the lessons, and had those kind of concerns. And then one other parent, after she found out Caroline -- actually, two other parents, after they found out Caroline was pregnant after that first letter, I guess, they had concerns about the continuity of the class.

Q. Okay. And who was the parent of the child

32

who she had -- where the parent had expressed the concern that the child wasn't getting the lessons?

A.    Let's see, what's the parent's name?  The child is Awen [phonetic.]  Gretchen.  Gretchen.  I know the child's last name is Bishop.  I'm not 100 percent sure if that's Gretchen's last name.

Q.    Okay.  And can you think of any other parents who brought concerns about Caroline to you?

A.    Those are the only ones I can...

Q.    So who are the parents who brought a concern to you after that first letter went out?

A.    Alexandra's mom.  Her name is Patricia -- I can't remember their last name.  I can't remember their last name.  And the other one was Sadie's mom.  I can't remember her name either.

Q.    So can you recall, when did Alexandra's mom, or Patricia, bring a concern to you?

A.    I would guess it was sometime in April, but I don't remember.

Q.    And what did she tell you?

A.    That she was concerned with the transition if Caroline was out of the class for three months, or any months, really.  I don't actually remember any exact amount of time, but she was just concerned about a transition if Caroline was out of the class.

35

Charlotte as well?

A.    Probably.  I don't remember for sure, but probably.

Q.    So no other parents, other than Patricia and Sadie's mom, expressed concerns about the next year for the class?

MR. GARNER:  Objection; form.

Q.    (By Ms. Jacobs) Expressed concerns about Caroline related to her pregnancy?

MR. GARNER:  I'm going to object to form.

A.    They weren't concerned about her pregnancy.

Q.    (By Ms. Jacobs) What were they concerned about?

A.    They were concerned about transitions for their child.

Q.    Okay.  And when you say "transitions," can you explain that, please?

A.    That means any kind of transition; like, even -- that would mean if we put a new guide in there, if Caroline left on maternity leave.  Any transition is what they were concerned about.

Q.    So those are the only two parents that expressed a concern about transitions?

A.    They're the only two I can think of right

36

now.

            MR. GARNER:   The only two that expressed them to you.

            THE WITNESS:   Okay.

     A.    The only two that expressed them to me.

     Q.    (By Ms. Jacobs) All right.  So going back to -- you said there were other concerns that parents had brought to you about Caroline, not related to transitions.  Going back to Ms. Bilbe?

     A.    Oh, yeah.

     Q.    Okay.  So can you recall when she would have brought concerns to you about Caroline?

     A.    The first time would have been Caroline's first year.

     Q.    And what was that concern?

     A.    Not being part of the culture of Austin Montessori School.

     Q.    Was there anything specific?

     A.    I think there were some songs that she was singing with the children and -- that she didn't think fit in our school culture.

     Q.    Were there any other concerns that she brought to you at that time about Caroline, related to the culture of the school?

     A.    Well, I just remember the songs.

37

Q.    Okay.  And what did you do to address those concerns?

A.    I talked to Caroline and Charlotte, I guess. I'm trying to think.  It seems like the very first time I talked to Tiffany was the year before Charlotte started in her job as mentor, and we had another mentor at that time.

Q.    Okay.  So were there any other concerns that Ms. Bilbe brought to you at a later time about Caroline?

A.    I met with her other times but they were always -- her concerns were always about school culture kind of things, as far as I recall.

Q.    Can you tell me about the other aspects of culture that Ms. Bilbe was concerned about?

A.    It seems like there were -- she was singing a lot of Christmas songs, and the Bilbes are Jewish so she was offended one time about that.  There were some movements in some of the songs that I remember she had -- that seemed very pop culture, that the -- her little girls were coming home and doing them, that she felt were inappropriate for very young children.

Q.    So was the complaint about the Christmas songs the same complaint related to the other complaint you mentioned about the songs that you were telling me

38

about or is that a different --

A.   No, they were different songs.

And, also, just some activities that she had brought into the classroom that were things, like, more -- that children would do in traditional schools that weren't part of our school culture -- I can't remember -- making jack-o'-lanterns or something.

Q.   And what did you do to address those concerns?

A.   I talked to Caroline and I talked to the mentor.

Q.   Was there anything else that you did to address the concerns?

A.   (Witness moves head side to side.)

Q.   From what you -- from what you were able to observe, were the concerns addressed in the classroom after you talked to Caroline and Charlotte about those things?

A.   Uh-huh.

Q.   So these two more parents that you had mentioned -- Ms. Copley?

A.   Copley, yes.

Q.   Copley?

A.   Uh-huh.

Q.   What concern did she raise to you?

39

A.    Let's see, she -- her first concern was some conversation she had had with Caroline in which she was insistent that Caroline had lied to her about something and -- which I can't recall what it was now, but -- I mean, I can't recall what she said that Caroline had lied about.  I just can remember her being very emphatic about it.

Q.    **And did she raise any other concerns to you about Caroline?**

A.    Well, she had concerns about some -- also concerns about the songs, as did Tiffany Bilbe, so...

Q.    **So from what you said before, the concern about the songs was raised with Caroline and Charlotte and that that was addressed in the classroom?**

A.    Uh-huh.

Q.    **Were you able to address Ms. Copley's concern that she felt that she had been lied to?**

A.    Well, I certainly talked to Caroline about that and she explained it from her perspective, and so I felt like I understood better, getting both sides of the...

Q.    **Okay.  Did you feel like that situation got resolved then?**

A.    Well, I went back and talked to the mom and I felt that it was pretty resolved.  The mom still had

some strong feelings.

THE VIDEOGRAPHER:  You have about four minutes on the tape.

Q.    (By Ms. Jacobs) So were you able to -- did you take any more action in regard to the parent's feelings?

A.    About that situation?  (Witness moves head side to side.)

Q.    And then -- let's see, you mentioned Gretchen?

A.    Uh-huh.

Q.    Okay.  And concerns expressed about whether or not the child was getting the lessons.  How did you address that concern?

A.    I talked to Caroline.

Q.    And as far as you knew, was that concern resolved in the classroom?

A.    As far as I know.

MS. JACOBS:  Well, we'll go ahead and take a break now because we're at the end of the tape.

THE VIDEOGRAPHER:  We'll go off at 1:23.

(A short break was taken.)

THE VIDEOGRAPHER:  Okay.  We're back on.  This is the beginning of Tape 2.  It's 1:39.

Q.    (By Ms. Jacobs) So we were discussing some

41

concerns that had been brought to you by parents about Caroline.

A.    Yes.

Q.    So we had talked about concerns raised by five different parents.  Were there any other concerns that parents brought to you about Caroline?

A.    That's all I can recall.

Q.    And, for you, had all of those concerns been resolved?

MR. GARNER:  Objection; form.

Q.    (By Ms. Jacobs) Were there any concerns that you had about Caroline in the classroom -- I'm sorry, strike that.

Did -- after you had taken steps to address each parent's concerns, did those parents continue to bring those same concerns to you about Caroline?

A.    Well, Tiffany Bilbe and Sue Copley insisted that their children be moved to other classes.

Q.    So did you move their children?

A.    Yes.

Q.    And when did you move those children?

A.    At the beginning of what would have been Caroline's second year.  They didn't come back in her class.

42

Q.    So you had also mentioned that concerns had been brought to you by Gretchen?

A.    Uh-huh.

Q.    As far as you could --

A.    That was -- that was Caroline's second year that Gretchen spoke to me.

Q.    Okay.  So did -- can you tell me again what concern Gretchen had brought to you about Caroline?

A.    Lack of lessons being given to her daughter.

Q.    Okay.  And what did you do about that?

A.    I talked to Charlotte and Caroline.

Q.    Okay.  And after you talked to Charlotte and Caroline, did Gretchen bring any more concerns about that to you?

A.    No.

Q.    So other than those parents, were there any other parents that brought concerns about Caroline to you?

A.    Those were the only parents who had children in her class, that I can remember.  Sometimes parents, after their observations, would comment about -- you know, have comments about her classroom, as they do about classrooms that they observe, but for her classroom, it was more about it being -- "chaotic" would be the word that I would use.

43

Q.    Okay.    And when was -- when did a parent first report to you, after an observation, that they had thought that Caroline's room was chaotic?

A.    Off and on throughout the two -- for two years in the classroom.

Q.    Can you recall approximately how many times a parent told you that?

A.    Well, they wouldn't always use that exact -- those -- that exact word, but -- it would just be a wild guess. .

Do you want me to make a guess?

Q.    Yes.

A.    Okay.

MR. GARNER:    Objection; form.

Q.    (By Ms. Jacobs) Okay.    Can you tell me approximately how many times a parent brought to you a concern, after an observation, about what they saw as a chaotic classroom or some similar term?

A.    I mean, it will just be a guess.    I can't recall.    Many times.    But, you know, I don't know. Say 20, 25.

Q.    Approximately how many parents observed Caroline's classroom in those two years?

A.    Let's see, in those two years, approximately -- maybe 100.

44

Q.    Were there any other concerns that any of those other parents had raised with you after observing Caroline's classroom?

A.    That's what I remember.

Q.    So you said that not every parent used the word "chaotic."  What were some of the other ways they described her classroom?

A.    Very social, a lot of children wandering around, a lot of children not engaged in work, not very many children choosing to do work.  Those kinds of...

Q.    Okay.  And so the comments that you just shared with me that parents had shared with you about there being -- that it was -- the classroom was social, that children weren't engaged in work or were wandering around, those are included in the, you know, approximately 20 to 25 parents --

A.    Uh-huh.

Q.    -- inside that classroom?

Did you hear any negative comments from any of the other parents who had observed the classroom?

A.    Those were the negative comments that I recall.

Q.    Okay.  And did you address those concerns that the parents had brought you with Caroline?

52

Q.    Yes.

A.    Uh-huh.

Q.    Do you remember if she had asked to continue as a guide in the classroom the following year?

A.    I think originally that would have been her preference, it seems like.

Q.    And do you know who would have come up with a plan to have her return as an after-school leader?

A.    Let me think.  Me and Dawn and Angela together, as best I can recall.  Because I know Angela is still our after-school leader after all of these years, in a job she loves.  Because even though she's fully trained also, she's got the flexibility being in a job as an after-school leader.

Q.    Can you think of any other times that a guide who was expecting a new baby would have transitioned into a different position at the school since you've started working there?

A.    Well, I mean, sometimes people then want to stay home with their baby.  Let's see.  There's just been a variety of different -- we've had so many people have babies.

Q.    Okay.  Well, how long have you been with the school?

A.    Twenty-five years.

57

A.    No.

Q.    Did it have anything to do -- her pregnancy have anything to do with the decision to propose the campus coordinator position?

A.    No.

Q.    Was the reason why Austin Montessori School told Caroline Clark that she would be reassigned due to the amount of time that she was going to be away from work?

A.    Yes.

Q.    So if Caroline Clark came in and said that she needed to have back surgery and would not be able to work for 12 weeks due to her back surgery, y'all would have reassigned her to a different position?

A.    Correct.

Q.    Why?

A.    Because that would be too hard for the children to adjust to having their guide out of the class for that amount of time.

Q.    The same would be true of anyone else at Austin Montessori School as a home guide?  If they came to y'all before the school year started and said that they would be out for any significant period of time -- 12 weeks, as Caroline Clark told you that she wanted to be out --

58

MS. JACOBS:  Objection.

Q.    (By Mr. Garner) -- y'all would have reassigned her?

MS. JACOBS:  Objection; form.

Q.    (By Mr. Garner) Did Caroline Clark ever tell you that she wanted to be gone for 12 weeks?

A.    Yes, she did.

Q.    Based upon that representation to you, you believe that it was her intent to leave Austin Montessori School to care for her newborn child --

A.    Uh-huh.

Q.    -- for 12 weeks after the birth of her child?

A.    Uh-huh.  Yes.

Q.    And that 12 weeks would have fallen in the middle of the semester.  Correct?

A.    Yes.

Q.    That 12 weeks would have been through the heart of the semester?

A.    Yes.

Q.    Did Austin Montessori School have any coverage for another home guide to take Caroline Clark's place during the time she was off?

A.    No.

Q.    How important is it that a home guide be present throughout the entire school year for the

Amber Miller - 8/11/2011

59

children?

A.    Extremely important.

Q.    Why?  Why is that so important to Austin Montessori School?

A.    Consistency for the children.

Q.    When you say "consistency," what do you mean by "consistency"?  Just the same person being in the classroom?

A.    Well, the same person being in the classroom with the children.  These are very young children we're talking about, not -- you know, with the older children, it's a little different.

Q.    So they're very impressionable?

A.    That's right.  And they need that consistency with the same adult.  Plus, one of the reasons we have children in the same classroom, ideally with the same teacher, for a three-year cycle is that -- also that consistency of the same guide giving the children their lessons and maintaining a consistent environment.

Q.    So the same rules, the same schedule?

A.    That's right.  So they don't have to test new people to come into their --

Q.    The same way of doing things?

A.    Absolutely.

Q.    And that's important to a young kid.  Is that

right?

A.   Absolutely.

Q.   So if you take a home guide out of a situation for over three months -- or three months, 12 weeks -- it has been Austin Montessori School's experience that that is a significant impact on the development of the children?

A.   Yes.

Q.   Is it also a significant impact to the long-term effect on the home class -- or the class that those kids are in?

A.   Uh-huh.  Yes.

Q.   Because you're bringing in someone who -- someone new, who they may or may not be familiar with, that has different ways of doing things.  Is that right?

A.   Yes.

Q.   And that change can adversely affect these young children who are developing and getting into the routine.  Is that correct?

A.   Yes.

Q.   Was Austin Montessori School going to -- was it their plan to bring Caroline Clark back as a home guide the next year, when she could spend all of the time in the classroom that would be required of a home

62

different home guides and the way they did things.  Is that correct?

A.    Absolutely.

Q.    Because of some of the concerns that you've expressed here today, some of the concerns that some of the parents had and the way she handled things.  Is that right?

A.    Uh-huh.

Q.    So you kind of felt it was a win-win for Caroline because it was her idea, it would help her schedule, and she would get the knowledge and experience to expand her skill set to be a better home guide when she came back.  Is that right?

A.    Yeah.

Q.    Did her pregnancy have any bearing on Austin Montessori School's decision to move her into a different position?

A.    Nope.

Q.    It was just simply the fact that she was going to be gone -- by her representation -- 12 weeks?

A.    Yes.

Q.    If she had come back to you and said, "You know, I thought about it; I don't need 12 weeks.  You know, I've spoken to my husband and we've figured this out.  I think I can come back in three weeks" --

64

over a three-month time period.  Right?

A.    Yes.  It's a third of the school year.

Q.    And the Montessori philosophy, or the method, the Montessori method, is really a huge part of the home guide's position to do individual, one-on-one work with each child.  Is that correct?

A.    Correct.

Q.    And that's on -- is that on a daily basis?

A.    Well, she may not work individually with every child every day, but, yes.  I mean, that's how the lessons are given and she's doing follow-up work with them.

Q.    So unlike -- unlike like a public school -- I went to public school and, you know, I show up and my teacher, you know, had me, at that age level -- you know, pre-K, K, and 1st, all the way through 12th grade -- you know, for each subject, you had a different teacher, but in the elementary school, you had one teacher that pretty much you stuck with the entire time, but she taught to a class of, let's say, 25.  That's usually what -- in Texas, that's kind of a high level, but it's usually around 20 to 25.  Would you agree with that?

A.    Uh-huh.

Q.    That's a typical public school model?

68

taking a home guide out of the class for 12 weeks, that would be a significant impact upon these children?

A.   Yes.

Q.   And with that experience and that knowledge and that expertise, Austin Montessori School, you and Dawn, who is the head administer --

A.   Uh-huh.  Yes.

Q.   -- met and came to the decision that because Caroline Clark was going to be gone for 12 weeks, by her own admission -- or according to your testimony, she was going to be done for 12 weeks, that would have a significant impact upon the children?

A.   Yes.

Q.   And that, under the Austin Montessori School method, that that would not be something that would be best for the children.  Agreed?

A.   Agreed.

Q.   And, quite frankly, based upon the representations to you by Caroline Clark, that wouldn't -- that really isn't what Caroline Clark wanted.  Would you agree with that?

A.   Yes.

Q.   Because she wanted to stay with her child and care for her child?

A.   Uh-huh.

70

A.    Yes.

Q.    If it wasn't necessary, you would keep them in that position.  What are the factors that you and Dawn look to, to determine if it's necessary to reassign a person into a home room or home class?

A.    Well, it would be how long somebody was going to be out.

Q.    Okay.  Would the stability of the class have anything to do with that?  Would that be a factor?

A.    Oh, absolutely that, too, yes.

Q.    And based upon your testimony here today, would you agree with me that Caroline's class was not a stable class?

A.    Yes.

Q.    In fact, you've had a similar situation with a previous home guide, where it was a stable classroom?

A.    Yes.  She had been in that class for ten years.

Q.    And she was out for how long when she went out on -- to have her child?

A.    Well, for November and December, but, of course, there are a lot of holidays --

Q.    Okay.  So how many weeks --

A.    -- that --

Q.    -- how many weeks was the home guide out in

71

that instance?

A.    You know, it may have equaled about five, six -- five weeks, something like that.

Q.    And after -- and she came back to the classroom.  Correct?

A.    Uh-huh.

Q.    Is that a yes?

A.    Yes.

Q.    Okay.  After that period -- after that school year completed, did you determine that that limited amount of time, the five weeks that she took off, that was disruptive to the children's development and their progress at Austin Montessori School?

A.    Yes.  And she had a fully trained assistant.

Q.    Oh.  In fact, in that instance, the home guide that left, her assistant was also a home guide.  Correct?

A.    Yes.

Q.    And, in fact, that home guide that was her assistant was the previous home guide in that classroom.  Correct?

A.    No.  She was -- she had been a campus coordinator.

Q.    She had been a campus coordinator?

A.    Yes.

76

to figure out what Austin Montessori School was going to do to respond?

A.    Uh-huh.

Q.    Correct?

A.    Correct.

Q.    In doing so, based upon what Caroline told you about, you know, the time period that she wanted to take off, y'all developed this reassignment so she would have the flexibility to not only have the baby but also to have the flexibility after she came back, because of the time that is required with a newborn?

A.    Correct.

Q.    Would you agree with that?

A.    Oh, yes.

Q.    In fact, Dawn testified earlier that y'all were even talking about giving her the ability to bring the child to Austin Montessori School and have, like, a day care for her there so she could be close to the baby if that was what Caroline needed

A.    Yes.

Q.    Did Caroline ever suggest to you that that was something that she would be interested in?

A.    She -- it seems like she brought it up to Dawn.

Q.    Was that ever discussed, as to maybe possibly

limiting the time away from the class, or did Caroline stick to, "No, I want to be gone for 12 weeks"?

A.   I don't remember that being brought up as limiting, that I'm aware of.

Q.   Okay.  So as far as you knew and as far as Dawn Glasgow knew -- or Glasgow knew, that Carline Clark was still sticking with the 12 weeks that she wanted to be off?

A.   Yes.

Q.   Okay.  All right.  Now, in that first meeting, when y'all presented the campus coordinator position, y'all explained to -- I mean, y'all explained to Caroline what that position would entail?

A.   Uh-huh.

Q.   Is that correct?

A.   (Witness nods head.)

Q.   And based upon your testimony here today, that would be that it would provide her greater flexibility, give her a better schedule, she wouldn't have to work as long hours, which would provide her more time with her child?

A.   Right.

Q.   Was there any reduction in salary in connection with moving from that position to the other?

A.   Oh, no.

78

Q.    Was there any reduction in benefits at all?

A.    No.

Q.    So her child would still get the free tuition?

A.    Free tuition, uh-huh.

Q.    Even though that's typically only provided to --

A.    Guides.

Q.    -- home guides, y'all were going to extend the free tuition to her as a campus coordinator?

A.    Free after-school care.

Q.    Okay.

A.    Yes.

Q.    She heard this proposal and she told you that she wanted to go talk to her husband and consider it. Is that correct?

A.    Yeah.

Q.    When was that first meeting again?  Do you recall?

A.    (Laughing.)

Q.    Yeah, I know you're a little fuzzy about that.  But sometime in April.  Would you agree with that, that --

A.    Yes.

Q.    -- it was maybe sometime --

80

A.    Uh-huh.   Uh-huh.

Q.    She said, "Look, I'm not going to do the campus coordinator position.  Adam and I" -- Adam, her husband -- "and I have decided that we're going to move back to Dallas and we're going to live in my mom's rental place and I'm going to be able to say home with this child, unlike what I was able to do with the first one."  Correct?

A.    Correct.

Q.    Did she ever, at any time, seem upset that Austin Montessori School was not going to bring her back as a home guide?

A.    No, not at all.

Q.    Okay.  Did she ever complain that that was not an option?

A.    No.

Q.    If she had complained to you or Dawn in these meetings, would y'all have worked with her to try to come to some resolution to make her happy?

A.    Yeah.  We wanted her to be happy.

Q.    In fact, she was a return employee.  She was an employee back in the beginning?

A.    Uh-huh.

Q.    And then she left.  Do you remember why she left?  Why did she leave the first time?

96

CAUSE NO. D-1-GN-000096

CAROLINE CLARK ) IN THE DISTRICT COURT
    Plaintiff, )
VS. ) TRAVIS COUNTY, TEXAS
    )
AUSTIN MONTESSORI SCHOOL, )
INC., )
    Defendant. ) 419TH JUDICIAL DISTRICT

* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

REPORTER'S CERTIFICATION
ORAL VIDEOTAPED DEPOSITION OF AMBER MILLER
AUGUST 11, 2011

* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

I, Kimberlye A. Furr, CSR, RPR, in and for the State of Texas, hereby certify to the following:

That the witness, AMBER MILLER, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the deposition transcript was submitted on *August 24, 2011* to the witness or to the attorney for the witness for examination, signature, and return to me by *September 13, 2011* ;

That the amount of time used by each party at the deposition is as follows:

Ms. Jacobs: 1 hour, 52 Minutes

Mr. Garner: 40 Minutes

97

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes all parties of record:

Ms. Jacobs, Attorney for Plaintiff
Mr. Garner, Attorney for Defendant

I further certify that I am neither counsel for, related to, nor employed by any of the parties in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of this action.

Further certification requirements pursuant to Rule 203 of TRCP will be certified to after they have occurred.

Certified to by me on this 21st day of August, 2011.

_____
Kim Furr, CSR, RPR
CSR No. 6997, Expires 12/31/11

Firm Registration No. 528
3100 West Slaughter Lane, Suite 101
Austin, Texas   78748

(512) 320-8692 (Fax)

98

FURTHER CERTIFICATION UNDER RULE 203

The original deposition was/was not returned to the deposition officer on September 9, 2011 ;

If returned, the attached Changes and Signature page contains any changes and the reasons therefor;

If returned, the original deposition was delivered to Ms. Jacobs, Custodial Attorney;

That $ 556.30 is the deposition officer's charges to the Plaintiff for preparing the original deposition transcript and any copies of exhibits;

That the deposition was delivered in accordance with Rule 203.3 and that a copy of this certificate was served on all parties shown herein and filed with the Clerk.

Certified to by me on this 10th day of September , 2011.

Kim Furr, CSR, RPR
CSR No. 6997, Expires 12/31/11

Firm Registration No. 528
3100 West Slaughter Lane, Suite 101
Austin, Texas  78748

(512) 320-8692 (Fax)

94

CHANGES AND SIGNATURE

AMBER MILLER                                    AUGUST 11, 2011

PAGE LINE   CHANGE                              REASON

45   14   six year old      I would not have said 5 yr old

95

I, AMBER MILLER, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

AMBER MILLER

THE STATE OF Texas                    )  *Amber Miller*

COUNTY OF Travis                      )

Before me, Lois O'Brien, on this day personally appeared AMBER MILLER, known to me or proved to me on the oath of                    or through (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he/she executed the same for the purpose and consideration therein expressed.

Given under my hand and seal of office on this day of 2, September    , 2011.

*Lois O'Brien*

NOTARY PUBLIC IN AND FOR

THE STATE OF Texas

LOIS O'BRIEN
Notary Public, State of Texas
My Commission Expires
October 28, 2011

My Commission Expires: Oct. 28, 2011