# Exhibit C

CAUSE NO. D-1-GN-000096

| | |
|---|---|
| CAROLINE CLARK | ) IN THE DISTRICT COURT |
|     Plaintiff, | ) |
| VS. | ) TRAVIS COUNTY, TEXAS |
| | ) |
| AUSTIN MONTESSORI SCHOOL, | ) |
| INC., | ) |
|     Defendant. | ) 419TH JUDICIAL DISTRICT |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

ORAL VIDEOTAPED DEPOSITION OF

DAWN GLASGOW

AUGUST 11, 2011

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

ORAL VIDEOTAPED DEPOSITION of DAWN GLASGOW,
produced as a witness at the instance of the PLAINTIFF,
and duly sworn, was taken in the above-styled and
numbered cause on the 11th day of AUGUST, 2011, from
8:57 a.m. to 11:41 a.m., before Kimberlye A. Furr, RPR,
CSR, in and for the State of Texas, reported by machine
shorthand, at the offices of The Cook Law Firm, 919
Congress Avenue, Suite 1145, Austin, Texas, pursuant to
the Texas Rules of Civil Procedure

2

A P P E A R A N C E S

FOR THE PLAINTIFF:

Russell Scott Cook
State Bar No. 24040724
Melissa A. Jacobs
State Bar No. 24046144
The Cook Law Firm
919 Congress Avenue, Suite 1145
(512) 482-9556
(512) 597-3172 Fax

FOR THE DEFENDANT:

W. Patrick Garner
-- and --
Stephanie O'Rourke
Cokinos, Bosien & Young
Four Houston Center
1221 Lamar Street, 16th Floor
Houston, Texas   77010
(713) 535-5500
(713) 535-5533 Fax

VIDEOGRAPHER:   Bill Burns

Dawn Glasgow - 8/11/2011

3

I N D E X

Appearances................................    2

DAWN GLASGOW

     Examination by Mr. Cook ................    4

     Examination by Mr. Garner ..............   97

     Examination by Mr. Cook ................  115

Signature and Changes........................  118

Reporter's Certificate.......................  120

Further Certification........................  122

EXHIBITS

| NO. | DESCRIPTION | PAGE MARKED |
|---|---|---|
| 1 | Letter from Mr. Goertz to parents, dated March 26, 2010 | 74 |
| 2 | E-mail string between Ms. Glasgow and Ms. Clark, dated May 11, 2010 | 87 |
| 3 | Letter to parents from Ms. Clark | 88 |

was going to be a period of time that she was going to be out, estimated to be about three months, and in a Montessori classroom, the consistency of the adult in the classroom, when you're the guide, is very important, and it would have increased the instability in the classroom and been a -- you know, not been what we promised to offer the children and the families.

Q.    Is it fair to say that the contract was not offered to Ms. Clark for the guide position because she was going to be taking leave due to her pregnancy?

A.    Well, that she was going to be out of the classroom, yes.

Q.    Taking leave.  Correct?

MR. GARNER:  Objection; form.

Q.    (By Mr. Cook) Strike that question.

Why was she going to be out of the classroom?

A.    Well, because she wanted to take three months after she had her baby.

Q.    Three months of leave?

A.    Well, it was -- she was due at the beginning of October and she wanted to come back at the beginning of January.

Q.    So she was not offered --

A.    That --

working on that.  We work with guides as -- you know, that's -- we never want to make a transition with a guide; we want to work with them.

So it wasn't a stable situation where the -- the term we use is "normalized classroom" -- where the children were working independently and the classroom, you know, was consistently safe and they were working to the vision that we promised the parents and the -- when we accept them to the school.

And when you have some instability, you work consistently and without a break.  Like, you wouldn't have a time where you would not be working with the guide.  You wouldn't take several weeks or months off from working with them when you have instability because you would have more disruption in the room for the children.  And because it wasn't a stable classroom, it was necessary for us to have constant improvement and work with Caroline.  So that is also what played into it.

Q.    **Were there any other factors that played into the decision not to renew Ms. Clark's contract for the guide position for 2010, 2011?**

A.    Part of that instability was that the parents were -- not all of the parents but some of the parents, especially parents who had been with the school for

10

awhile; maybe they had older children and had had experience in other rooms -- so they were dissatisfied in some ways, but we were telling them that we were working on it with her.

Some requested to leave the room and did during her second year. And there was concern when she -- when it was announced that she was pregnant what was going to happen with the room and the children.

Q. Were there any other factors that went into that decision?

A. Not that I recall.

Q. Okay. I want to ask you a few questions about those factors you mentioned. And I think you answered this before, but I want to make it clear. If Ms. Clark had -- if it was not expected that she would be taking leave, she would have been offered a contract for the guide position for the 2000 [sic], 2011 year. Correct?

MR. GARNER: Objection; form.

A. I think we would have continued to work with her had she been willing to continue to work with us.

Q. (By Mr. Cook) Okay. You mentioned instability in Ms. Clark's classroom the first year that she returned to employment with Austin Montessori School.

12

the lack of the work they would expect to use.

And when we say "work," it's -- I mean, it's almost like playing for the children, but we refer to it as "work."

But, anyway, they just observed striking differences. But we felt like Caroline was willing to, you know, remember how it was at the school. She wanted her son to be at our school, not somewhere else. And so -- and she was somewhat responsive, but, you know, people can only change so much right away, so it was a -- it was kind of a constant observation and meeting.

Q.    Okay.  You mentioned -- you just testified to parents observing instability in the classroom and reporting that to you.  Is that correct?

A.    Some reported to me.  Most reported to Amber Miller.

Q.    Okay.  Did anyone working at Austin Montessori School observe, actively observe, Ms. Clark and instability in her classroom during the school year?

A.    Amber Miller did.

Q.    Okay.  Did she report that instability, or her observations of that instability, to you?

A.    Verbally.

33

A.    It was a group that discussed, but most of the conversations were between Amber Miller and me, with the final conversation with Don Goertz.  But, again, we would -- it was not a decision to not offer her a contract.  It would -- that would not have been considered.

Q.    (By Mr. Cook) But it was a decision not to offer her a contract for the position of guide?

A.    Right.

MR. GARNER:  Objection; form.

A.    Well -- well, the concern about the stability of the program for the children, with the absence, came up shortly after she -- verbally, again -- told us her plan for being out and returning in January.  And then she mentioned to our campus coordinator, who was leaving to move to Denver because her daughter was going to school there, that she would -- she said, "I want to do your job" and "What do you -- you know, what all do you do?"

And so the campus coordinator reported it to us.  And the campus coordinator was in a classroom for, I think, seven years prior to taking that position as well.  She was a trained guide.  So she gave her some information about it and then reported it to us.

was planning on taking three months of leave.  Is that correct?

A.    That she intended to return after the winter break, which would be January.

Q.    Was that following childbirth?  Was the leave following childbirth, before childbirth, or both sides of it?

A.    Following, is what I understood it to be.

Q.    Did she express her interest to work up until her childbirth?

A.    Yes.  I mean, from what I understood, that's what her intention was.

Q.    Do you know when her due date was?

A.    I can't remember, but I remember early October.

Q.    When did she tell you -- Did she tell you that she intended to return after winter break?

A.    Yes.

Q.    Okay.  Where did she tell you that?

A.    I don't recall.

Q.    In what context was that discussion?

A.    It was informal.  Initially, we had more conversations about -- When we were talking about -- talking to her about the campus coordinator position, there was still that idea of her not coming back until

Q. Is it fair to say the responsibilities of the guide position and the campus coordinator position are different?

A. Yes.

Q. Are the hours different?

A. They don't -- they weren't, historically, but they could be. We had -- we -- the hours for the campus coordinator position are set. You're not going to stay late because you have to meet with a parent. You're not going to have to come for parent meetings or coordinate them. So they're set.

So, historically, they were 8:00 to 4:00. The year before that, we had 8:00 to 5:00. And the way we would structure that in the contract is, you know, we have different line items for, you know, the different amount of time.

And we were wanting to have a position for Caroline that would be whatever would be -- would work for her, you know, best, and so we had it set what it was going to be. And I think that the contract that we prepared, which she never looked at -- I remember saying, "Don't you even want to look at it?" but she had already decided to move. But I just put all of it on there because then we would have a starting point for a conversation.

for a job they want to do, I guess.

Q. And the jobs are different. Correct?

A. They are, somewhat.

Q. So even though she -- Ms. Clark was going to be out of work, you didn't think she was being unreasonable for not wanting to accept an administrative position as to a guiding position?

A. Even though she -- can you ask that again?

Q. Even though her employment was ending with Austin Montessori School, do you think that Ms. Clark was being unreasonable wanting to continue guiding rather than fill an administrative position?

A. We didn't -- it wasn't our intention to end her employment at Austin Montessori School. It was our intention that she would stay there and then that she would ultimately return to the classroom, so it's not -- it wasn't even -- it wasn't even -- when she told us she was moving, it was to stay at home. That's what she told us, that she was going to move to Dallas and she was going to be able to stay in her mother's house, a rental house, and it would allow her the option -- or the -- it would allow her to be able to stay at home and -- which is not something she ever expected she would get to do, is what she told us, but she was happy to have -- you know, have that.

there's consistency in how lessons are presented -- when they're presented, what the transitions are like -- that the children don't worry about those things, so they're not distracted by those things because they know it's going to happen a certain way and they can focus on the work and they can put all of their energies in there and focus on that.

And we know that work -- that happens because we observe it. And when there's -- when there's, you know, instability, inconsistencies, change, it makes them worry about it and then they can't do the work.

Q. **Has Austin Montessori School ever witnessed a pregnant guide causing issues as to consistency or order?**

A. No.

MR. GARNER: Objection; form.

Q. (By Mr. Cook) Okay. **Has Austin Montessori School witnessed leave associated with pregnancy cause issues as to consistency?**

A. It didn't matter whether it was -- what the leave would be, but leave does cause inconsistencies. It's whether -- and instabilities, and it does affect the children. And then depending on where you start with what's stability and what the transition is, like

who is going to be there when that person is out, how long are they going to be out, that factors into how much disorder you will see.

Q. **Have employees ever been granted -- employees at Austin Montessori School ever been granted extended leave beyond the seven days permitted in the handbook?**

A. Have -- yes.

Q. **Okay. On what occasions?**

A. Well, there's the situations where people are sick more often than seven days. We had -- so that happens rarely for guides, but it does happen. It may go up to ten days, let's say, in a year. So that happens. We really want to talk to them about, is it just because they were sick or were there other things? You know, what -- those are instabilities too.

We had a guide two years before Caroline started -- two years ago, I'm sorry -- who was ill quite a bit and we weren't sure what it was and she didn't report to us what it was -- I don't know if she didn't know -- and she couldn't guarantee that she could come to work each day. And this went on for a period of weeks, and we couldn't renew her contract because she couldn't guarantee that she could come to work and it was too much instability.

And then there was a staff member this

64

past school year who found out she had cancer, and she was in an upper elementary classroom, and she had to go out to have surgery and, in her place, the guide that was formerly in that classroom came in because he was serving as the advisor for that level. And she was gone -- she was out of the classroom -- I would say it was four weeks. I would have to look it up to see. There was some instability, but because the guide that was in there before and who had worked with her the year previous was coming back, her classroom was already pretty consistent with the way it was before, so it was less so.

There was a guide two years prior to Caroline in that same room -- well, it was actually immediately before Caroline's year -- who had been in the classroom for ten years in that classroom; it was very stable. And she had a baby in November and in her -- the assistant in her room was a trained guide who went and substituted for her. And she came back in January, and it was an enormous amount of instability in the room and it was difficult and it wasn't the best choice for the children, but we hoped it would be because of the training and the trained guide being in the room; it just wasn't.

Q.    **Any other examples you can think of where**

guides or other employees took leave for more than seven days in a year?

A.    Out of the classroom?  There have been people who have been pregnant and had children, often around -- I mean, and come back into that same position, but it's usually -- they have usually been around summertime.  I mean, I don't think they scheduled it that way; it just happened to be.  And it could have been, like, along the lines of ten days. You know, it wasn't a very, very long time.  I could go back and try to figure out exactly when it was.

There was a guide who -- I was a parent at the school -- and she had a foot problem where she was having to miss a lot of work, and she did -- they didn't like that she wouldn't come back the next year because -- I wasn't here, so I don't know specifically what -- because she couldn't be there every day and do the work.  So it's very important that they're there, especially if the community isn't stable.

Q.    The last one you mentioned was a foot issue?

A.    Uh-huh.

Q.    Do you know how long that employee was out for work?

A.    I don't know because I wasn't working at the school, but I do know that -- I mean, it could have

Thanksgiving.

Q.   So did she combine the four weeks with, like, the Thanksgiving break to have more time, basically?

A.   Something like that, yeah.  Or it could have been spring break.  I can't remember, but it was around a holiday.

Q.   And she was allowed to return to work as a guide?

A.   She returned to work.

Q.   Okay.  How did things...

A.   Well, as I said, there was some instability, but because the person that was coming in there had been the guide in that room and actually had many more years of experience than she did and it was a stable community and it was older children, you know, it, you know, worked out.

Q.   Did any parents complain when the -- when Ms. Jarrel --

A.   They expressed concern, wanted to know what the plan was.  We had to meet with them throughout to make sure.  Any time there's a change, a child will come home with -- you know, with worry, like, "Oh, well, now we can't go into the closet, you know, to get our own pencil; we have to" -- you know, it's -- whatever it is, there's a disruption.

announced her pregnancy or after she took the leave? When did the parents become concerned?  Or both?

A.    During the leave, when we had the other person in, and then afterward.  Not -- we haven't ever experienced a pregnancy causing any disruption in our rooms.

Q.    Have you ever heard anyone -- did you hear anyone suggest to Ms. Clark that she should hide her pregnancy?

A.    I don't know if I heard that from Caroline's complaint, but I do know that the way we came to know that she was pregnant was that a potential -- I mean, a prospective parent was observing in the room and when she met with Amber afterwards, she said, "So what are you going to do when the guide is out, you know?"

And she goes, "What do you mean?"

And she said, "Well, she's pregnant."

And she said, "No, she's not."

And she said, "Oh.  Well, you know, I thought she was because she had her hand on her stomach and usually people who are overweight don't put their hands on their stomach."

And she goes, "Well, she's not."

And she -- so then Amber relayed that to Caroline, that story, and Caroline goes, "Well,

78.

guide was no longer available to her?

A.    She did ask that at some point.  She said, "Are you saying" -- something like, "Are you saying that it's not going to be possible for me to go back into Laurel Cottage this next year?"

And we said that, because she would be out for, you know, a period of time and that the class wasn't stable and that wasn't going to lend itself to being more stable, that it wasn't something that we could do to the children, like, because we couldn't promise what -- we couldn't fulfill our promises.

And it was somewhere at that point that she told us that she really liked being a guide, and we said, "Well, you know, you could still be a guide here; it's just, during this next year, you won't be here, you know, for that period of time."

And we really -- I think at some point, we even apologized for kind of not acknowledging that she really liked being a guide, you know, until she told us that.  Of course we knew that she preferred to be -- I mean, that she liked to be a guide, but we also thought that she was going to really like to do this because she told us -- I mean, she told Donna Romine that.

Q.    But it turned out, at least from that

even talked about, like, bringing her baby, because we could -- we said, "We could facilitate having a baby here, but you would have to have somebody to watch -- you know, in the campus coordinator position, you would have to have somebody here to be responsible while you were working, but, you know, the baby could be here."

So we thought it was that kind of conversation that she was having with Adam. But, anyway, she came back and said, "Adam and I have decided to move. You know, we're going to live in my mother's house and I get to stay home with the baby and Austin gets to go to St. Alcuin," which is where her mother used to work. She had too; she worked there too. So we were, like, "Wow, you really have this figured out."

Q.    Did she say anything else at that May meeting that you can remember?

A.    I asked, "Are you sure you don't want to even talk about -- like, look at the -- you know, the details of the position and talk about it?"

And she goes, "No, no. We've already decided."

She didn't even -- I specifically remember her not even opening it; like, just handing it right back. And...

99

assistant have covered for Ms. Clark?

A.    No.

Q.    Hypothetically, if someone came to you and said, you know, "I'm a military reservist and I'm slated to be sent overseas in October, so I'm going to be gone from October through January," and they told you this in this March or April, if you didn't have anybody to cover that, would you have proposed to move them from the house guide position so you could find someone to fill in to cover that span?

A.    The year.  We look at the school year as a whole year.  So if we know in advance -- we want to provide the most stability for the children, so yes, we would have found someone else to cover that full year.

Q.    If someone came to you the week before school and they broke a leg or, for any other reason, said that they were going to be gone or unavailable to be a house guide for 12 weeks, would you have attempted to reassign that person to get a house guide --

A.    Yes.

Q.    -- to be in that position?

A.    Yes.

Q.    And is it -- the reason for that being, the most important thing is the continuity of the classroom and the stability of the classroom?

year-to-year contract basis.  Correct?

A.    Yes.

Q.    Have there been instances where y'all have taken a house guide and reassigned them for the next year?

A.    Yes.

Q.    To a different position?

A.    Yes.

Q.    Same thing for assistants and --

A.    Oh, yes.  It's common.

Q.    -- campus coordinators?

A.    Yes.

Q.    It's just -- those people are put into the position that best suits the needs of the school and the students?

A.    And the -- well, the students and the school.

Q.    Okay.  So you would put the students at the top of the list before the --

A.    Right.

THE VIDEOGRAPHER:  You have three minutes on the tape.

MR. GARNER:  Okay.

Q.    (By Mr. Garner) Whose idea was it to bring forth the proposal to put Caroline Clark into a campus coordinator position?

A.    Well, it was her idea initially that made us think of it, and then when we heard that, we go:  Oh, my gosh, that would be -- that would be great.  She's got these amazing organizational skills.  She could sub in the classrooms.  It would provide the flexibility for her.  We could cover it.

Like, we'd all work together to cover it while she was out.  The classroom, you know, and the children would have stability.  I mean, that's what initiated it.  I'm not saying none of us would have ever thought of it, but, I mean, it came up that way first.

Q.    So if Ms. Clark came to you and said, "I need 12 weeks off," just -- regardless of the reason, Austin Montessori School still would have attempted to reassign her to a position to provide stability in the classroom?

A.    Right.

Q.    Was Austin Montessori School intending to bring her back as a house guide?

A.    Yes.

Q.    If she was able to stay in the classroom for the full term?

A.    Yes.

Q.    In fact, y'all had previously hired her as a

parent concerns, you have material making, you have conferences, things like that that are not the -- that are not part of the responsibilities of a campus coordinator.

Q.   So it's fair to say that the house guide requires a lot more time?

A.   Right.

Q.   So moving into the campus coordinator position would provide Ms. Clark -- or Mrs. Clark quite a bit more flexibility?

A.   Oh, definitely.

Q.   As far as scheduling?

A.   Uh-huh.

Q.   Duty tasks?

A.   Yes.

Q.   You know, she would -- not just scheduling her work hours, but scheduling the actual tasks that she performs?

A.   Right.

Q.   She would be able to do that at her freedom?

A.   Right.

Q.   So was it -- would you say it's less stressful?

A.   Well, yeah, it would be definitely less stressful.

Dawn Glasgow - 8/11/2011

112

classroom for 12 weeks?

A.    Right.

Q.    And the 12-week period, that was a period of time that Mrs. Clark told you that she was going to be out?

A.    Right.  Well, from the time -- the beginning of October, you know, when she was due, until January, returning from the January break.

Q.    Did you have any discussions with Mrs. Clark about the period of time and it being shortened for any reason, if she could?

A.    We didn't talk about that, but we did talk about, in that meeting in April, that it was the time she was going to be out.  I mean, that was the reason.  That is the reason.  I mean, it was not any other reason.  It's that the class isn't stable.  This requires continuous work.

Even if it had been stable, we knew that having the guide out introduced instability.  Having her out that amount of time would be very detrimental to what we were supposed to be offering the children.  And, I mean, that's the reason.

Q.    The proposal to move her into a campus coordinator position, did it -- would the campus coordinator position have less pay?

113

A.   No.

Q.   **Would it have less benefits in any way?**

A.   No.

Q.   **Is it a demotion?**

A.   No.

Q.   **Is it a lateral move?**

A.   We could -- I mean, I kind of look at it as a lateral move, but some people look at it as slightly -- somebody that knows what's going on everywhere, they know what's going on in all of the classrooms, they're in all of the classrooms, they can actually -- when they're substituting in the classrooms, they can offer feedback to the guides, like, "Oh, here's what happened here.  You might want to do this."

You know, just little things.  Sometimes it's easier to do that than it is to operate every single day.  So some people look at it that way.  It's somebody that really knows what's going on at the school, because they know that after so much exposure.

Q.   **If a house guide also serves as campus coordinator, or has served as a campus coordinator, would you agree that having that experience would provide her greater ability and greater experience to be a better house guide?**

A.   Right.  I remember thinking that.  I don't

120

CAUSE NO. D-1-GN-000096

CAROLINE CLARK                    )  IN THE DISTRICT COURT
        Plaintiff,                )
VS.                               )  TRAVIS COUNTY, TEXAS
                                  )
AUSTIN MONTESSORI SCHOOL,         )
INC.,                             )
        Defendant.                )  419TH JUDICIAL DISTRICT


* * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

REPORTER'S CERTIFICATION
ORAL VIDEOTAPED DEPOSITION OF DAWN GLASGOW
AUGUST 11, 2011

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * *


I, Kimberlye A. Furr, CSR, RPR, in and for the State of Texas, hereby certify to the following:

That the witness, DAWN GLASGOW, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the deposition transcript was submitted on _August 24, 2011_ to the witness or to the attorney for the witness for examination, signature, and return to me by _September 13, 2011_ ;

That the amount of time used by each party at the deposition is as follows:

Mr. Cook:  2 Hours, 19 Minutes

Mr. Garner:    22 Minutes

121

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes all parties of record:

Mr. Cook, Attorney for Plaintiff
Mr. Garner, Attorney for Defendant

I further certify that I am neither counsel for, related to, nor employed by any of the parties in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of this action.

Further certification requirements pursuant to Rule 203 of TRCP will be certified to after they have occurred.

Certified to by me on this 21st day of August, 2011.

_____
Kim Furr, CSR, RPR
CSR No. 6997, Expires 12/31/11

Firm Registration No. 528
3100 West Slaughter Lane, Suite 101
Austin, Texas   78748

(512) 320-8692 (Fax)

122

FURTHER CERTIFICATION UNDER RULE 203

The original deposition (was)/was not returned to the deposition officer on September 6, 2011 ;

If returned, the attached Changes and Signature page contains any changes and the reasons therefor;

If returned, the original deposition was delivered to Mr. Cook, Custodial Attorney;

That $780.70 is the deposition officer's charges to the Plaintiff for preparing the original deposition transcript and any copies of exhibits;

That the deposition was delivered in accordance with Rule 203.3 and that a copy of this certificate was served on all parties shown herein and filed with the Clerk.

Certified to by me on this 10th day of September , 2011.

_____
Kim Furr, CSR, RPR
CSR No. 6997, Expires 12/31/11

Firm Registration No. 528
3100 West Slaughter Lane, Suite 101
Austin, Texas  78748

(512) 320-8692 (Fax)

Dawn Glasgow - 8/11/2011



118

CHANGES AND SIGNATURE

DAWN GLASGOW                                    AUGUST 11, 2011

PAGE LINE   CHANGE                        REASON

NONE

Integrity Legal Support Solutions
www.integrity-texas.com

119

I, DAWN GLASGOW, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

DAWN GLASGOW

THE STATE OF  Texas        )

COUNTY OF  Travis          )

Before me, Lois O'Brien, on this day personally appeared DAWN GLASGOW, known to me or proved to me on the oath of                or through (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he/she executed the same for the purpose and consideration therein expressed.

Given under my hand and seal of office on this day of  2, September    , 2011.

LOIS O'BRIEN
Notary Public, State of Texas
My Commission Expires
October 28, 2011

Lois O'Brien

NOTARY PUBLIC IN AND FOR

THE STATE OF  Texas

My Commission Expires: Oct. 28, 2011