IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| CAROLINE CLARK,<br>Plaintiff, | §<br>§<br>§ | |
| V. | § | CIVIL ACTION NO. A-12-CA-007-SS |
| | § | |
| AUSTIN MONTESSORI SCHOOL, INC.,<br>Defendant. | §<br>§<br>§<br>§ | JURY TRIAL DEMANDED |

**PLAINTIFF'S RESPONSE**
**TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## I.  Introduction

Once Austin Montessori School found out that teacher Caroline Clark was expecting a baby, the School determined that it would not renew her contract for the following year. Defendant believes that its decision was justified, because parents had expressed concerns about Plaintiff's pregnancy and potential maternity leave.  But the law does not allow an employer to discriminate just because it makes business sense to do so.  Defendant also argues that because it offered to move Plaintiff into a different role, no adverse employment action occurred.  In doing so, Defendant relies on a hypertechnical interpretation of the meaning of an adverse employment action in the discrimination context and an outdated standard in the FMLA retaliation context. However, as discussed in this response, Defendant's actions violated the law, and summary judgment on Plaintiff claims under Chapter 21 of the Texas Labor Code, as well as for retaliation and interference pursuant to the Family and Medical Leave Act ("FMLA"), is not appropriate.[1]

---

[1] Although Defendant states that it "believes that it is entitled to summary judgment on all of Plaintiff's claims[,]" Defendant's motion addresses only Plaintiff's pregnancy discrimination and FMLA retaliation claims, and does not mention or address her FMLA interference claim.  Because Defendant has failed to "discharge its initial burden of informing the court of the basis for its motion and pointing to the absence of a genuine issue of material fact[]" as to Plaintiff's FMLA interference claim, summary judgment thereon is precluded.  *Ford-Evans v. Smith*, 206 Fed.Appx. 332, 335 (5th Cir. 2006) (noting that the Defendant's arguments with regard to the plaintiff's "FMLA retaliation claim would not apply to her interference claim.").

## II. <u>Factual Background</u>[2]

Soon after graduating from college, Plaintiff began working as an assistant in a primary level classroom at an Association Montessori International ("AMI") school in Dallas.[3] That school sponsored her AMI training, which involved three summers of courses and additional work during the school year, while also serving as an assistant.[4] After she received her AMI primary diploma in 1996, she taught three years there and later two years at a school in Richmond, Virginia as a primary lead teacher.[5] Plaintiff then sought a position with Defendant, based on its national reputation for strict adherence to AMI standards, and was hired in 2003.[6]

Defendant announced Plaintiff's hiring in conjunction with the departure of the classroom's current guide, Angela Eagle, who was pregnant, and her move to an after-school leader position later the coming fall.[7] Amber Miller, Defendant's Director of Admissions and a member of the administrative team, testified that it would have been Eagle's preference to return as a guide.[8]

Plaintiff resigned her position with Defendant at the end of the 2004-2005 school year to move to Dallas following her marriage.[9] There she worked one year as an assistant and then as guide in a primary class at an AMI school.[10] In the spring of 2008, Plaintiff sought to return to

---

[2] At the outset, Plaintiff objects to Defendant's alleged "Undisputed Facts." As may be seen in the evidence presented in this Response, many of those facts are fully disputed by the Plaintiff. Additionally, Defendant has in some instances misstated the testimony of Plaintiff. *See, e.g.,* Defendant's Motion for Summary Judgment ("MSJ"), ¶ 47, ¶ 61.

[3] Exhibit 10; Exhibit 3, Deposition of Caroline Clark, p.14:19-15:13; p.16:12-17:15. The AMI primary level classroom is also known as a children's house and serves children ages 3 to 6, with a teacher, or guide, and an assistant. Exhibit 1, Affidavit of Caroline Clark.

[4] Exhibit 1, Affidavit of Caroline Clark.

[5] Exhibit 3, Deposition of Caroline Clark, p.17:12-19:18; p.25:14-27:9.

[6] Exhibit 10; Exhibit 3, Deposition of Caroline Clark, p.27:5-30:1. The Richmond school was geared more toward AMS, a Montessori approach distinct from Plaintiff's training, certification, and experience in AMI. *Id*. at p.27:13-25; p.19:19-20:16.

[7] Exhibit 11.

[8] Exhibit 5, Deposition of Amber Miller, p.51:11-52:6; p.6:9-22.

[9] Exhibit 3, Deposition of Caroline Clark, p.35:14-36:9; Exhibit 12.

[10] Exhibit 3, Deposition of Caroline Clark, p.38:24-39:12; 39:20-40:8.

2

Defendant so that her son could attend school there, and was rehired.[11]  At the end of Plaintiff's first year, a parent of two students in her class asked to have her children moved to a different room after hearing that Plaintiff was planning to have more children.[12]  Another parent also expressed concern about that possibility.[13]

In February 2010, Plaintiff found out that she was pregnant.[14]  Right about the beginning of March 2010, while Plaintiff was still dealing with morning sickness, a prospective parent came to observe in her classroom.[15]  Following the observation, the parent told Miller that she did not want her child in Plaintiff's classroom because she would want to know who was substituting while Plaintiff was out to have her baby.[16]  Miller said that Plaintiff was not pregnant, but the parent commented that Plaintiff had had her hand on her belly.[17]  When Plaintiff stopped by Miller's office later that day, she shared this incident, and Plaintiff confirmed that she was pregnant.[18]  Charlotte Kroger, the mentor for Plaintiff and the other children's house guides, was also present.[19]  Plaintiff recalls that Kroger responded by saying "Oh my God, that's a problem."[20]  She also told Plaintiff not to touch her belly so parents would not suspect.[21]

On March 26, 2010, a letter went out to parents, signed by Defendant's Executive Director, Donald Goertz, announcing that Plaintiff was pregnant.[22]  The letter also stated:

We are working now to create a plan that will allow Caroline the opportunity to

---

[11] Exhibit 3, Deposition of Caroline Clark, p.11:22-12:2; p.45:5-46:7.
[12] Exhibit 1, Affidavit of Caroline Clark.
[13] *Id.*
[14] Exhibit 3, Deposition of Caroline Clark, p.83:3-83:9.
[15] Exhibit 1, Affidavit of Caroline Clark, Exhibit 5, Deposition of Amber Miller, p.8:9-9:10.
[16] Exhibit 5, Deposition of Amber Miller, p.8:9-9:3.
[17] *Id.* at p.8:11-9:4.
[18] *Id.* at p.9:4-10.
[19] *Id.* at p.9:4-15; p.45:8-46:9.
[20] Exhibit 3, Deposition of Caroline Clark, p.83:10-84:4.
[21] Exhibit 1, Affidavit of Caroline Clark; Clark, p.138:2-4.
[22] Exhibit 13.  It appears based on the letter that at some point Caroline shared that she was due in October, but neither she nor Glasgow nor Miller could be sure who she shared that with or when.

> spend time with her new baby as well as provide the best arrangement for the children of Laurel Cottage.  We reasoned that it was not necessary to withhold information about Caroline's pregnancy until we have the details finalized.

After this announcement, Dawn Glasgow, Defendant's Executive Administrator, reported that some parents expressed concern about what would happen with the room and the children.[23] Glasgow testified that she and Miller made the final decision not to renew Plaintiff's contract as a guide, with the approval of Goertz, and based on discussions with Kroger, and to instead offer Plaintiff a position as campus coordinator.[24]

After making that decision, Glasgow and Miller met on April 30, 2010 with Plaintiff.[25] As Plaintiff recalls, the meeting opened with Glasgow stating that "they're still talking about Janice."[26]  Janice Kearley had served as the guide in Laurel Cottage before Plaintiff.[27]  Kearley had given birth in November and returned to teaching after the winter break.[28]  She had insisted that she be allowed to leave at noon and have the baby in the classroom with her, and some of the parents had expressed concerns.[29]  During the meeting, Glasgow asked Plaintiff what her plans were.[30]  Plaintiff recalls responding that the baby was due in October and that she would like to come back in the new year, but that she did not have all the details yet, as she was just trying to get over her morning sickness.[31]  She had roughly figured that since her due date was October 27, 2010, she would have taken about six to eight weeks off if she came back after

---

[23] Exhibit 4, Deposition of Dawn Glasgow, p.10:6-8.  Exhibit 5, Deposition of Amber Miller, p.31:20-24; 32:7-36:1. However, Defendant had answered "None" in response to Plaintiff's interrogatory related to this point.  Exhibit 14, Defendant's Response to Plaintiff's Interrogatory No. 11.

[24] Exhibit 4, Deposition of Dawn Glasgow, p.32:22-33:9; p.35:7-23; p.37:11-38:5; p.75:24-77:1; Exhibit 5, Deposition of Amber Miller, p.7:15-8:8; Exhibit 14, Defendant's Response to Plaintiff's Interrogatory No. 3.

[25] Exhibit 4, Deposition of Dawn Glasgow, p.38:6-40:13.

[26] Exhibit 3, Deposition of Caroline Clark, p.114:115:23; p.138:12-24.  Glasgow acknowledges mentioning Janice. Exhibit 4, Deposition of Dawn Glasgow, p.81:14-25.

[27] Exhibit 1, Affidavit of Caroline Clark.

[28] Exhibit 5, Deposition of Amber Miller, p.55:16-18.

[29] Exhibit 1, Affidavit of Caroline Clark.

[30] Exhibit 3, Deposition of Caroline Clark, p.116:3-6.

[31] Exhibit 3, Deposition of Caroline Clark, p.116:5-21.

winter break, due to the holidays at that time of year.[32]  Glasgow and Miller also discussed an opening for the campus coordinator position with Plaintiff.[33]  She asked if her teaching position was still available to her, and Glasgow told her that it was not.[34]  Plaintiff recalls telling them that she wanted to teach, as that was all she knew how to do.[35]  Glasgow said they would not be able to replace Plaintiff, and that they could not afford to have families leaving.[36]

Following the meeting, Plaintiff emailed Glasgow asking why she could not come back as a guide, and what her other options were.[37]  By the end of the next week, she had received no response, and so Plaintiff, extremely upset about being denied the ability to return as a guide, decided to move to Dallas.[38]  On May 14, 2010, Glasgow and Miller met again with Plaintiff.[39]  During that meeting, Plaintiff asked if what they were doing was legal, and Glasgow told her that they thought that if they did what was best for everyone, everything would resolve itself.[40]

Plaintiff filed the instant civil action in state court on January 11, 2011, raising a pregnancy discrimination claim under Chapter 21 of the Texas Labor Code.  Plaintiff later amended her petition to add interference and retaliation claims under the Family and Medical Leave Act.  Defendant removed this action to federal court on January 4, 2012.[41]

---

[32] *Id.* at p.100:17-102:13.
[33] Exhibit 1, Affidavit of Caroline Clark, p.122:2-126:7.
[34] Exhibit 3, Deposition of Caroline Clark, p.122:2-19.; Exhibit 4, Deposition of Dawn Glasgow, p.77:2-78:11.
[35] Exhibit 3, Deposition of Caroline Clark, p.132:9-14.
[36] Exhibit 1, Affidavit of Caroline Clark. Caroline had asked why Elizabeth Suggs, who had just finished her AMI training, could not fill in for her, but they told her Elizabeth was not interested or ready, because she wanted to have a baby that year.  Exhibit 1, Affidavit of Caroline Clark.
[37] Exhibit 15; Exhibit 3, Deposition of Caroline Clark, p.144:13-16.
[38] Exhibit 1, Affidavit of Caroline Clark; Exhibit 16.
[39] Exhibit 1, Affidavit of Caroline Clark.
[40] Exhibit 1, Affidavit of Caroline Clark.
[41] *See* Docket Entry No. 1.

### III.  Summary Judgment Should Be Denied as to Plaintiff's Pregnancy Discrimination Claim

**A.      Analytical Framework for Summary Judgment of Plaintiff's Pregnancy Discrimination Claim**

To survive Defendant's summary judgment motion on Plaintiff's pregnancy discrimination claim, Plaintiff must present sufficient evidence—whether direct, circumstantial, or both—to create a genuine issue of material fact as to whether Defendant refused to renew her teaching contract on the basis of her sex or pregnancy.[42]  In evaluating circumstantial evidence of discrimination, courts utilize the burden-shifting framework set forth in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973).[43]  That framework ordinarily requires that the plaintiff first make a *prima facie* showing of discrimination, upon which the burden shifts to the employer to present evidence of a legitimate, non-discriminatory reason for the challenged employment practice.[44]  If the employer meets this burden of production, the burden then shifts back to the plaintiff to prove that the proffered reason is either a pretext for discrimination, or part of a "mixed motive," with a discriminatory reason at least in part a motivating factor.[45]  To satisfy its burden of production, the employer "must clearly set forth, through the introduction of admissible evidence, the reasons for" its conduct.[46]  "Summary judgment in employment discrimination cases is rarely appropriate."[47]  "Thus, 'once an employment discrimination case devolves into

---

[42] *See, e.g., Goldsmith v. Michael Baker Corp., et al.*, 1:07-CV-294, at *6 (W.D. Tex. Dec. 26, 2007) (Sparks, J.) (citing *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 222 (5th Cir. 2000); *Machinchick v. PB Power, Inc.*, 398 F.3d 345, 350 (5th Cir. 2000)) (a copy of the *Goldsmith* opinion is filed herewith).

[43] *See Goldsmith*, at *6 (citing *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 222 (5th Cir. 2000); *Machinchick v. PB Power, Inc.*, 398 F.3d 345, 350 (5th Cir. 2000)).

[44] *See Goldsmith,* at *9 (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000)).

[45] *Goldsmith*, at *9 (citing *Reeves*, 530 U.S. at 143; *Machinchick*, 398 F.3d at 352).

[46] *Tex. Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 255 (1981).  The Supreme Court also noted that "[a]n articulation not admitted into evidence will not suffice. Thus, the defendant cannot meet its burden merely through an answer to the complaint or by argument of counsel."  *Id.* at 255 n. 9

[47] *Hernandez v. City of Corpus Christi*, 820 F.Supp.2d 781, 800 (S.D. Tex. May 17, 2011) ("In rare circumstances, a defendant may be entitled to summary judgment 'if the record conclusively reveal[s] some other, nondiscriminatory reason for the [adverse] decision, or if the plaintiff create[s] only a weak issue of fact as to whether the employer's reason was untrue and there [is] abundant and uncontroverted independent evidence that no discrimination has

6

nebulous questions of motivation and intent, summary judgment upon the claims is rarely appropriate.'"[48]

## A.    Summary Judgment Should be Denied Because Plaintiff Has Direct Evidence of Pregnancy Discrimination

"[D]irect evidence includes any statement or document which shows on its face that an improper criterion served as a basis—not necessarily the sole basis, but *a* basis—for the adverse employment action."[49]  "In the employment discrimination context, where a plaintiff is able to produce direct evidence of discrimination, summary judgment is inapposite."[50]

In the Fifth Circuit, an employer's remarks may serve as direct evidence of discrimination if the offered comments are: 1) related to pregnancy; 2) proximate in time to the adverse employment action; 3) made by an individual with authority over the employment decision at issue; and 4) related to the employment decision at issue."[51]  When determining whether there is direct evidence in the summary judgment record, the Court must view the evidence in the light most favorable to the plaintiff, taking the record evidence and all reasonable inferences in her favor.[52]

In this case, Clark has direct evidence of pregnancy discrimination rendering summary judgment inappropriate.  Specifically:

- Kroger remarking "Oh my God, that's a problem" when Plaintiff shared the news of her

---

occurred.'") (citing *Acker v. Deboer, Inc*., 429 F.Supp.2d 828, 842–43 (N.D. Tex. 2006) (citing *Reeves*, 530 U.S. at 148 (2000)).

[48] *Hernandez*, 820 F.Supp.2d at 800 (quoting *Turco v. Hoechst Celanese Chem. Group, Inc*., 906 F.Supp. 1120, 1126 (S.D. Tex. 1995)).

[49] *Fabela v. Socorro Indep. Sch. Dist*., 329 F.3d 409, 415 (5th Cir. 2003) (emphasis in original) (citations omitted).

[50] *See Goldsmith*, at *8 (citing *Fierros v. Texas Dep't of Health*, 274 F.3d 187, 194-95 (5th Cir. 2001)).

[51] *See Goldsmith*, at *6-7 (quoting *Arismendez v. Nightingale Home Health Care, Inc*., 493 F.3d 602, 607-608 (5th Cir. 2007) (quoting *Brown v. CSC Logic, Inc.*, 82 F.3d 651, 655 (5th Cir. 1996)) (internal quotation marks omitted).

[52] *See Jones v. Robinson Property Group, L.P.*, 427 F.3d 987, 993 (5th Cir. 2005) ("Because this case is before us on summary judgment review, we are required to view the evidence in the light most favorable to Jones, taking the record evidence and all reasonable inferences therefrom in his favor.") (citing *Moore v. Willis Indep. Sch. Dist*., 233 F.3d 871, 874 (5th Cir. 2000)).  *See also Cocannouer v. Cadence Contract Servs., LLC*, 2009 WL 1140499, at *3-4 (W.D. Tex. Apr. 28, 2009) (noting also that "for summary judgment purposes, the Court must assume the truth of Plaintiff's allegations.") (citations omitted).

pregnancy[53]

- Kroger telling Clark not to touch her belly[54]

- Statements by Glasgow and Miller to Plaintiff that the campus coordinator position would make it easier to care for her newborn and better for Plaintiff.[55]

These comments reflect a bias against Plaintiff's pregnancy and express sex-based stereotypes related to childbirth, and were made by individuals with authority over the employment decisions at issue in the weeks prior to deciding that Plaintiff's teaching contract would not be renewed and at the time she was told about that decision[56]  These comments constitute direct evidence of pregnancy discrimination under Fifth Circuit and other federal jurisprudence.[57]  For that reason alone, summary judgment in this case should be denied.[58]

---

[53] Exhibit 3, Deposition of Caroline Clark, p.83:10-84:4.  Plaintiff says Kroger then recanted and made a joke, but also asked if that was what Plaintiff wanted.  *Id*. at p.84:5-16, p.94:4-95:1.  Defendant takes issue, irrelevantly, with her testimony that she did not report the comment, which was made in front of a member of the administrative team, Miller.  *See* Defendant's MSJ, at p.4, n.1. Another member of the administrative committee, Donald Goertz, also used the word "problem" in discussing Defendant's plan for Plaintiff following the birth of her child. Exhibit 6, Deposition of Donald Goertz, p.7:19-8:1.  *See also* Exhibit 4, Deposition of Dawn Glasgow, p.69:10-70:4; p.71:5-15.

[54] Exhibit 1, Affidavit of Caroline Clark; Exhibit 3, Deposition of Caroline Clark, p.138:2-4.  Miller admitted to having stated this as well, and tried to explain that she was joking.  Exhibit 5, Deposition of Amber Miller, p.9:4-18; p.22:21-23:16.  Whether this statement expresses animus toward pregnancy or was an innocuous joke is at best a question for the jury.  *See Sheehan v. Donlen Corp*. 173 F.3d 1039, 1045 (7th Cir. 1999) (citing *EEOC v. Century Broadcasting Corp*., 957 F.2d 1446, 1457 (7th Cir. 1992)).

[55] Exhibit 1, Affidavit of Caroline Clark; Exhibit 4, Deposition of Dawn Glasgow, p.60:4-5; p.85:17-18; p.105:3-108:9; Exhibit 5, Deposition of Amber Miller, p.76:6-14; p.77:10-22.  These statements reflect stereotypes that negatively question a woman's ability or commitment to work.  *See, e.g., Chadwick v. WellPoint, Inc*., 561 F.3d 38, 44-45 (1st Cir. 2009) (citing *Nev. Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 730 (2003); *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 120 (2nd Cir. 2004); *Lust v. Sealy, Inc*., 383 F.3d 580, 583 (7th Cir. 2004); *Santiago-Ramos v. Cent. P.R. Wireless Corp*., 217 F.3d 46, 57 (1st Cir. 2000); *Sheehan*, 173 F.3d at 1045)).

[56] Glasgow testified that she and Miller made the final decision not to renew Plaintiff's contract based on information from Kroger, and all three of these individuals have been identified by Defendant as contributing information regarding the contract nonrenewal decision and as involved in the decision to offer the campus coordinator position to Plaintiff.  *See supra* § II.

[57] *See, e.g., Goldsmith*, at *8.

[58] Where an employee offers direct evidence of discrimination, the burden shifts to the employer "to prove by a preponderance of the evidence that the same decision would have been made regardless of the discriminatory animus."  *Jones*, 427 F.3d at 992 (citation omitted).  Defendant has not met that burden here and likely cannot, based on Defendant's statements that it would have renewed Plaintiff's contract if she had not been planning to take leave during the school year.  Exhibit 4, Deposition of Dawn Glasgow, p.6:6-9; Exhibit 5, Deposition of Amber Miller, p.47:15-48:14.

**C.    How Plaintiff May Establish Her *Prima Facie* Case of Pregnancy Discrimination**

In addition to her direct evidence of pregnancy discrimination, Plaintiff also has substantial circumstantial evidence of discrimination. As stated above, Plaintiff may prove her case and avoid summary judgment with circumstantial evidence by satisfying the modified *McDonnell Douglas* framework utilized by the Fifth Circuit. Under this framework, Plaintiff must first establish a *prima facie* case. A plaintiff may establish a prima facie case of pregnancy discrimination by showing: (1) she was a member of a protected class; (2) she was qualified for the position she lost; (3) she suffered an adverse employment action; and (4) that other similarly situated employees were more favorably treated, **or** *that she was replaced by a person who is not a member of the protected class*.[59] To establish a *prima facie* case at summary judgment, a plaintiff need only make "a very minimal showing."[60] Defendant does not dispute that Plaintiff was pregnant, and the evidence shows that she was qualified for the position of guide and replaced by a non-pregnant individual.[61]

Defendant first argues that Clark cannot establish a *prima facie* case because she must show that "nonprotected class employees were not treated similarly."[62] This statement is false. Only one of the three cases that Defendant points to as the source for that particular formulation of the *prima facie* test actually states the test in that way.[63] In light of the variation even among

---

[59] *Adcock v. Sunquest Properties Inc.*, 421 Fed.Appx. 446, 448 (5th Cir. April 11, 2011) (assuming, *arguendo*, that plaintiff had established a prima facie case where she was replaced by a non-pregnant individual) (citing *Bauer v. Albemarle Corp.*, 169 F.3d 962, 966 (5th Cir.1999); *Urbano v. Cont'l Airlines, Inc.*, 138 F.3d 204, 206 (5th Cir. 1998)); *Buchanan-Rushing v. City of Royse City, Texas*, 794 F.Supp.2d 687, 690 (N.D. Tex. June 07, 2011) ("Alternatively, the plaintiff may meet her burden on the fourth element by showing she was replaced by someone who is not a member of the protected group.") (citing *McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007) (footnote omitted)).

[60] *Nichols v. Loral Vought Sys. Corp.*, 81 F.3d 38, 41 (5th Cir. 1996); *Lewis v. Home Depot U.S.A., Inc.*, 2007 WL 1100422, at *4 (W.D. Tex. Apr. 10, 2007).

[61] Defendant's MSJ, at p.11, ¶ 57; Exhibit 4, Deposition of Dawn Glasgow, p.6:6-9; p.10:14-21; 50:9-18; Exhibit 5, Deposition of Amber Miller, p.29:11-18 p.47:10-48:14; Exhibit 7, Deposition of Charlotte Kroger, p.15:18-21; Exhibit 8, Deposition of Patricia Oriti, p.23:16-23; p.24:19-22; Exhibit 6, Deposition of Donald Goertz, p.32:1-11.

[62] Defendant's MSJ, p.10, ¶ 54; p.16-17, ¶ 68.

[63] The only case Defendant cites that so states the prima facie test is *Farrington v. Sysco Food Services, Inc.*, 865

the cases cited by Defendant, it is clear that Defendant's focus on showing that non-protected individuals were treated differently is misplaced.[64] Moreover, the Supreme Court, as well as the Fifth Circuit, has emphasized that the "*prima facie* case method established in *McDonnell Douglas* test was 'never intended to be rigid, mechanized, or ritualistic.'"[65]

**C.    Defendant's Refusal to Renew Plaintiff's Teaching Contract Is an Adverse Employment Action Notwithstanding the Campus Coordinator Job Offer**

The only other element of the *prima facie* test with which Defendant takes issue is the third element, whether Plaintiff suffered an adverse employment action. In addressing this element, Defendant's motion omits analysis of Defendant's refusal to renew Plaintiff's teaching contract. This refusal itself constitutes an adverse employment action; a school's use of renewable annual contracts does not open a window of time at the end of each year to make personnel decisions that violate employment laws.[66] Throughout the litigation Defendant has worked to avoid acknowledging this.[67] Glasgow, for example, diligently tried to dodge such an

---

S.W.2d 247, 251 (Tex. App.–Hous. [1st Dist.],1993, writ denied), which cites *McDonnell–Douglas*, 411 U.S. at 802. In *McDonnell Douglas*, the Supreme Court noted that "[t]he facts necessarily will vary in Title VII cases, and the specification above of the prima facie proof required from respondent is not necessarily applicable in every respect to differing factual situations." *Id*. at 802 n.13. The merits of a flexible prima facie test are obvious. Otherwise, a defendant could escape liability for discriminating against an individual in one protected group merely because it also discriminated against individuals in a different protected group.

[64] *See Buchanan-Rushing*, 794 F.Supp.2d at 693 n.3 (discussing various methods by which a plaintiff may discharge her burden of establishing a prima facie case of intentional discrimination).

[65] *Johnson v. La.*, 351 F.3d 616, 622 (5th Cir. 2003) (quoting *U.S. Postal Service Bd. Of Governors v. Aikens*, 460 U.S. 711, 715 (1983)). *See also Jatoi v. Hurst-Euless-Bedford Hosp. Auth*., 807 F.2d 1214, 1219 (5th Cir. 1987).

[66] *Vicari v. Ysleta Indep. Sch. Dist*., 546 F.Supp.2d 387, 413 (W.D. Tex. 2008) (concluding that recommendation of contract non-renewal qualified as an adverse employment action, where school officials recommended non-renewal and school board adopted the recommendation); *Rico-Sanz v. State*, 2006 WL 3147730, at *7 (M.D. La. October 23, 2006) (critically dismantling defendant's argument that contract nonrenewal was not an adverse employment action) (citations omitted). *See also Lott v. Kenedy Indep. Sch. Dist.,* 2010 WL 1544503, at *5 (W.D. Tex. Apr. 16, 2010 (finding without discussion that plaintiff satisfied the prima facie test of sex discrimination where the alleged adverse employment action was the nonrenewal of her contract as the district's business manager); *Kautt v. Univ. of Tex. at San Antonio*, 2003 WL 22143279, at *5 (W.D. Tex. Sept. 16, 2003 (assuming without discussion that contract nonrenewal is adverse employment action). *Cf. Perry v. Sindermann*, 408 U.S. 593, 596 (1972) ("The first question presented is whether the respondent's lack of a contractual or tenure right to re-employment, taken alone, defeats his claim that the nonrenewal of his contract violated the First and Fourteenth Amendments. We hold that it does not."). That courts reach this finding makes sense in light of the fact that a failure to hire is actionable under anti-discrimination laws.

[67] For example, counsel for Defendant asked Plaintiff multiple times, in multiple ways, whether it was made clear to her at the April 30th meeting that she could not return as a guide. Exhibit 3, Deposition of Caroline Clark, p.126:8-

admission in her deposition,[68] but did acknowledge that returning as a guide was not an option for Plaintiff for the school year in which she was expected to give birth:

> Q. And at that time, she had already been told that she was not allowed to return as the guide for the 2010, 2011 school year?
> A. Well, at that time, she was offered the campus coordinator position.
> Q. And she had been told that she could not return as the guide for the 2010, 2011 year?
> A. For Laurel Cottage, yeah.[69]

Instead of grappling with the fact that the contract nonrenewal was an adverse employment action, Defendant proposes that its offer of the campus coordinator position was merely a reassignment not actionable under anti-discrimination laws.   This *post hoc* characterization of Defendant's actions sounds appealing but does not hold up under scrutiny. As Defendant acknowledges, transfers or reassignments may constitute adverse employment actions in certain circumstances.[70]  Specifically, the Fifth Circuit has recognized that an adverse employment action can include a transfer that does not result in a change in pay or benefits, if the transfer may be viewed as objectively worse and therefore a demotion.[71]  The Fifth Circuit has considered the following factors in determining whether a position is objectively worse, including whether it: (1) requires less responsibility; (2) is less interesting; (3) entails worse job duties; (4) requires less skill, education, or experience; (5) has less favorable work hours; (5) is less prestigious; (6) provides fewer opportunities for career advancement; (7) has been perceived as punitive.[72]  While the list is not exhaustive, and the Fifth Circuit and district courts within have determined that a position is objectively worse based on the presence of a few of those

---

133:7; 148:7-14; 148:15-150:18.   *See also* Exhibit 14, Defendant's Objections and Answers to First Set of Interrogatories, Interrogatory Responses Nos. 2, 3, and 4.

[68] *See, e.g.,* Exhibit 4, Deposition of Dawn Glasgow, p.77:2-78:11.

[69] *See, e.g.,* Exhibit 4, Deposition of Dawn Glasgow, p.117:11-18.

[70] Defendant's MSJ at p.13, ¶ 62.

[71] *See Alvarado v. Texas Rangers*, 492 F. 3d 605, 612-614 (5th Cir. 2007) (citations omitted).

[72] *See Alvarado*, 492 F. 3d at 612-614 (citations omitted)*; Lewallen v. City of Beaumont*, 394 Fed.Appx. 38, 43 (5th Cir. 2010) (finding that jury had sufficient evidence to decide that denial of transfer from detective to specialist position was adverse employment action where latter was "more intellectually challenging, has better benefits, has better work hours, and is widely recognized as more prestigious than the position of Specialist.") (citations omitted).

factors, nearly all of those factors are present here to some degree.[73]

As a starting point, both Defendant and Plaintiff perceive the role of guide as a vocation. As the School's Employee Handbook points out, being a guide "is a vocation and not a job; the guide works for love of children and not for money[.]"[74]  The School only hires guides with AMI certification.[75]  The training to become an AMI-certified guide is rigorous, and involves more training than is required for the other available form of Montessori certification.[76]  Plaintiff received her AMI Primary Diploma in 1998, after several summers of study, and work on assignments during the school year while she served as an assistant.[77]  The prestige of AMI certification is reflected in the fact that, according to Defendant, hiring an AMI-certified guide can potentially involve a nationwide search.[78]  In light of the rigors of obtaining certification, Plaintiff's twelve years of experience working in that area of certification, the prestige associated with working as a guide for the School, and the view that being a guide is a vocation, the objective basis is clear for Clark's having written, in regard to the campus coordinator role, that: "It was not what I envisioned for myself in coming to AMS."[79]

The objective basis for that view is further magnified by a review of the long list of largely administrative duties and responsibilities of a campus coordinator.  For example, the

---

[73] *See Alvarado*, 492 F. 3d at 612-614, 614, n.8 ("This list is not meant to be exhaustive, as there may well be other relevant objective factors, and no single factor is determinative. Rather, whether a transfer could be viewed as the objective equivalent of a promotion depends upon the totality of the circumstances in the particular case.").

[74] Exhibit 17.  *See also* Exhibit 7, Deposition of Charlotte Kroger, p.21:18-20; Exhibit 6, Deposition of Donald Goertz, p.34:6-22.

[75] Exhibit 4, Deposition of Dawn Glasgow, p.96:14-19; Exhibit 5, Deposition of Amber Miller, p.83:24-85:6; Exhibit 6, Deposition of Donald Goertz, p.30:18-31:5.

[76] Exhibit 5, Deposition of Amber Miller, p.83:24-85:6; *see also* Exhibit 6, Deposition of Donald Goertz, 30:18-31:5.

[77] Exhibit 3, Deposition of Caroline Clark, p.17:12-20:18; Exhibit 1, Affidavit of Caroline Clark.

[78] Exhibit 5, Deposition of Amber Miller, p.83:24-86:1; Exhibit 7, Deposition of Charlotte Kroger, p.13:21:14:1; Exhibit 3, Deposition of Caroline Clark, p.26:18-29:16.  That AMS attracted individuals from throughout the country to work as guides also suggests the prestige associated with working there as a guide.

[79] Exhibit 18; Exhibit 19.  This statement was made in a letter Glasgow had told Plaintiff that she needed to write to the parents telling them she would not be returning, which she agreed to do, as long as she could tell the truth. Exhibit 1, Affidavit of Caroline Clark.  The letter, as edited and approved by Glasgow, went out at the end of the school year.  Exhibit 4, Deposition of Dawn Glasgow, p. 88:17-92:2.

position would have required coordinating afterschool activities, maintenance requests, school pictures, and supply requests, and assisting with answering the phone.[80] These tasks bear little resemblance to the position of primary guide, which Glasgow described as follows:

> The Children's House guide position, you -- the guide would be responsible for that community of children and would interact with the parents in that community for conferences, would be responsible for doing the work that they were trained to do with the children that was consistent with the vision of Austin Montessori School. And to that end, they would have parent meetings that they would be responsible for coordinating and running. They would have conferences that they would be responsible for scheduling; of course all of the work in the classroom with the children; alerting the support people or the administration if there was a concern about a parent or a student. You know, so, basically, it was interacting with that community.[81]

The only limited area of overlap between the campus coordinator and guide positions is the requirement that the campus coordinator substitute as needed.[82] However, the campus includes classes not just in Plaintiff's area of primary certification and experience but also in upper and lower elementary and youngest children's classes, which require distinct certifications.[83] Both Plaintiff and Defendant have represented that the campus coordinator position was a nonteaching role.[84]

Further demonstrating that the campus coordinator position could be viewed as objectively worse, Amber Miller testified that it would involve less responsibility, and that because it would be more flexible and involve fewer hours, she would have more time with her child.[85] Glasgow described the position as less stressful, requiring less time, and having fewer responsibilities outside of work hours, and that Plaintiff would simply support a guide instead of

---

[80] Exhibit 20.
[81] Exhibit 4; Deposition of Dawn Glasgow, p.54:20-55:10.
[82] Exhibit 20.
[83] *See* Exhibit 21; Exhibit 22; Exhibit 3, Deposition of Caroline Clark, p.170:25-171:7.
[84] Exhibit 18; Exhibit 19; Exhibit 4, Deposition of Dawn Glasgow, p.88:17-92:2. *See also* Exhibit 9, Deposition of Sheilah Murphy, p.56:21-22.
[85] Exhibit 5, Deposition of Amber Miller, p.12:10-20; p.77:10:22.

actually manage a classroom herself.[86]

In sum, it is clear that compared to the position of guide, the position of campus coordinator relied significantly less on Plaintiff's experience, training, and certification, involved less responsibility, and many less interesting and less challenging low-level administrative tasks, and was less prestigious. For these reasons alone, this shift would have been an adverse employment action.[87]

However, there is also a factual dispute as to whether the two positions had equal benefits and hours. As a guide, Plaintiff's hours were 7:30 am to 4 pm.[88] As the campus coordinator position was initially proposed to her, Plaintiff understood that she would have had to work a split shift, from 7:30 am to 12:30 pm and then 2:30 to 5:30 pm, in order to get the same pay, or have the option of working part-time for less pay.[89] While the written contract ultimately presented to her included the same amount of pay and tangible benefits, the position would have entailed a changed schedule, from 8 am to 5 pm.[90] Working either the split shift or until 5 pm would have reduced her time available with her son after he finished with his school day.[91] Moreover, in light of the substantial distinctions in the jobs, as a campus coordinator Plaintiff

---

[86] Exhibit 4, Deposition of Dawn Glasgow, p.41:11-13; 105:18-107:24.

[87] *See, e.g., Cavazos v. Edgewood Indep. School Dist.*, 400 F.Supp.2d 948, 957-58 (W.D. Tex. 2005) (Rodriguez, J.) (finding, where a principal was transferred from one high school to another where she supervised far fewer students and employees, and where her highest pay grade available was two pay grades below that previously available, that "[f]rom an objective standpoint, a reasonable jury could determine that Mrs. Cavazos's new position was less prestigious or provided less room for advancement, and therefore constituted a demotion."). *See also Rodriguez v. Bd. of Ed. of Eastchester Union Free Sch. Dist.*, 620 F.2d 362, 364, 366 (2nd Cir. 1980) (finding that where art teacher had twenty years' of experience teaching at the junior high level and had focused her master's and doctoral studies on that level, her transfer to an elementary school "constitutes interference with a condition or privilege of employment adversely affecting her status within the meaning of [Title VII]."). In *Galabya v. N.Y. City Bd. Of Educ.*, 202 F.3d 636 (2nd Cir. 2000), a case cited by Defendant, the Second Circuit found that a teacher failed to establish that his transfer to another school constituted an adverse employment action. Its decision was based largely on the slimness of the evidentiary record supporting the plaintiff's *pro se* claim, especially as compared to the record in *Rodriguez. Galabya* is distinguishable from Plaintiff's case in many respects. For example, the teacher in *Galabya* did not present a detailed evidentiary record, was transferred from one teaching position to another in his area of certification, and did not present evidence of a discriminatory reason for the transfer.

[88] Exhibit 1, Affidavit of Caroline Clark.

[89] Exhibit 1, Affidavit of Caroline Clark.

[90] Exhibit 20; Exhibit 23.

[91] Exhibit 1, Affidavit of Caroline Clark.

would have been deprived of the significant nonmonetary benefits of working as a guide.[92]

The evidence shows that at the very least, a fact question exists as to whether the campus coordinator position can be objectively viewed as a demotion. This question therefore should be reserved for a jury to decide.[93]

**D.    Defendant Has Failed to Establish a Legitimate Non-Discriminatory Reason for Its Actions and Even If It Had, There is Substantial Evidence of Pretext**

Following Plaintiff's minimal showing of a *prima facie* case, Defendant bears the burden of establishing a legitimate, non-discriminatory reason for its adverse employment action.[94] Defendant has failed to do so here.

Defendant's *articulated* reason in the section of its Motion addressing a legitimate, non-discriminatory reason for its actions mentions only Plaintiff's expected leave, and not her pregnancy.[95]  But Defendant has repeatedly explained its actions with respect to Plaintiff in terms not just related to her expected leave but also based on her pregnancy, the expected birth of her child, and sex-based stereotypes regarding the care of a newborn.  For example, elsewhere in its Motion, Defendant refers to its "act of offering Plaintiff an alternative placement to accommodate her pregnancy and extended leave[.]"[96]  Defendant also asserts in its Motion that the "reassignment would give Plaintiff the leave she requested and the flexibility to care for the newborn upon return[]"and the "offer that was made to Plaintiff…provided greater flexibility

---

[92] Plaintiff is aware that the adverse employment action analysis is objective, but subjectively the position change would have been very objectionable to her as a teacher as well.  Exhibit 1, Affidavit of Caroline Clark; Exhibit 2. *Cf. Chalk v. U.S. Dist. Court Cent. Dist. of Cal.*, 840 F.2d 701, 709 (9th Cir. 1988) (recognizing the nonmonetary injury to a teacher moved from the classroom to administrative support position).

[93] *See, e.g., Watts v. City of Jackson*, 827 F.Supp.2d 724, at *6 (published pagination not available at time of filing) (S.D. Miss. 2011) (citing *Sharp,* 164 F.3d at 9330; *Davis v. McKinney,* 518 F.3d 304, 317 (5th Cir. 2008)); *Castleberg v. City of Dallas,* 2011 WL 2559521, at *4 (N.D. Tex. June 3, 2011) (analyzing whether denial of promotion constituted adverse employment action) (*citing Lewallen*, 394 Fed.Appx. at 43; *Alvarado*, 492 F.3d at 615).

[94] *Buchanan-Rushing*, 794 F.Supp.2d at 693.

[95] Defendant's MSJ, p.19, ¶ 73.

[96] Defendant's MSJ, p.13, ¶ 62.

and freedom to care for a newborn."[97]   This echoes Defendant's explanation to the EEOC that

Defendant worked on a plan for the 2010-2011 school year:

> in an effort to allow [Plaintiff] increased flexibility during her pregnancy, to care for her young son, to attend prenatal appointments, to take maternity leave, and to care for a new baby, while at the same time considering the best arrangement for and least disruption to the children in Complainant's classroom.[98]

Defendant also appears to suggest that it did not discriminate against Plaintiff because it

acted according to a strict policy on reassigning guides who plan extended leave.[99]   A fatal

problem with this claim is that the decision not to renew Plaintiff's teaching contract and offer

her a different position was made before Defendant had even asked Plaintiff about her plans for

maternity leave.[100]   Likewise, Defendant's asserted concerns about the potentially negative

impact on the children of leave and resulting failure to provide promised services are tied to an

amount of leave that Plaintiff proposed only *after* Defendant's decisions about her future

employment there were made.[101]

Even assuming, *arguendo,* that Defendant had established a legitimate non-

discriminatory reason, Plaintiff has substantial evidence of pretext.  The Fifth Circuit stated in

---

[97] Defendant's MSJ, p.6, ¶ 25; p.8, ¶ 44.

[98] Exhibit 24.

[99] *See* Defendant's MSJ, at p.18, ¶ 72.   But the testimony Defendant points to in support of this point actually refers only to Plaintiff and Eagle, both of whom were pregnant at the time Defendant decided not to renew their teaching contracts.  The only written policy Defendant has produced allows seven days of leave per year.  AMS 68-69.  That this was not a "strict" policy is reflected in evidence showing that guides were permitted to take foreseeable leave that exceeded this allotment.  Exhibit 26; Exhibit 27.

[100] *Turner v. Kan. City S. Ry. Co.*, 675 F.3d 887, 904 (5th Cir. 2012) (finding that defendant failed to satisfy its burden to establish a legitimate, non-discriminatory reason for its actions where the evidence presented did not show that those were the reasons that motivated the challenged decisions at the time they were made) (citing *Burdine*, 450 U.S. at 254–55; *Patrick v. Ridge*, 394 F.3d 311, 319 (5th Cir. 2004) ("As the ultimate issue is the employer's reasoning at the moment the questioned employment decision is made, a justification that could not have motivated the employer's decision is not evidence that tends to illuminate this ultimate issue and is therefore simply irrelevant at this stage of the inquiry.")).

[101] Notably, Defendant has neither pled nor established a business necessity defense under Tex. Labor Code § 21.115, or a bona fide occupational qualification defense under Tex. Labor Code § 21.119.  Also, at best these justifications are weakly supported.  Defendant's claims about the adverse impact on the children for the most part appear to be vague references to instability and inconsistencies, or hypothetical.  One specific disruption mentioned in regard to a teacher's leave was a worry expressed by a child that he or she could no longer go into the closet to get a pencil.  Exhibit 4, Deposition of Dawn Glasgow, p.66:12-67:25.

*Laxton v. Gap* that "oral statements exhibiting discriminatory animus may be used to demonstrate pretext[.]"[102] In particular, the Fifth Circuit stated in *Laxton v. Gap* that discriminatory animus could be inferred from negative remarks reflecting stereotypical presumptions about an employee's ability to fulfill job duties as a result of their pregnancy, and specifically assumptions about maternity leave.[103] That is exactly what the record reflects here. By the time Glasgow and Miller met with Plaintiff on April 30, 2010, Defendant had already decided that Plaintiff would not be allowed to return as a guide, even though prior to that meeting neither Miller nor Glasgow could testify specifically to having discussed Plaintiff's plans for leave following childbirth.[104] Even at the meeting, Plaintiff expressed that she did not have any firm plans regarding the length of her leave.[105] But the fact that alternative amounts of leave were not even open for discussion is reflected in Glasgow's references to her assumptions about the leave Plaintiff would take, and the skepticism Glasgow expressed about a woman's ability to return to the classroom within a few weeks of childbirth.[106] That Defendant's decision is based on a presumption is further underscored by how Glasgow's calculations of the amount of leave Plaintiff requested appear to be based on looking up when she gave birth, rather than the thoughts she had actually shared.[107] Additionally, Glasgow and Miller's testimony emphasized

---

[102] 333 F.3d 572, 583 (2003).

[103] *Id.* at 583-584 (citing *Maldonado v. U.S. Bank*, 186 F.3d 759, 767 (7th Cir. 1999); *Troy v. Bay State Computer Group, Inc.*, 141 F.3d 378, 381 (1st Cir.1998); *Deneen v. Nw. Airlines, Inc.*, 132 F.3d 431, 437 (8th Cir. 1998)).

[104] Exhibit 4, Deposition of Dawn Glasgow, p.42:24-46:1; Exhibit 5, Deposition of Amber Miller, p.22:1-16.  Miller testified that she had no specific recollection of discussing Plaintiff's prospective leave, but that Plaintiff probably told her at the April 30th meeting.  *Id.* at p.10:21-11:23, 14:1-16:14.  While Miller insisted repeatedly on direct examination that she had been told by Plaintiff that she wanted 12 weeks off, she later acknowledged Plaintiff had actually only said—at the April 30th meeting—October to January—but relying the time Plaintiff's baby was born rather than the actual due date—and acknowledging the 2 weeks of winter holidays and 3 days of Thanksgiving break.  *Id.* at p.58:5-13; p.86:14-22; 87:23-88:21; 89:4-17.

[105] Exhibit 1, Affidavit of Caroline Clark.

[106] Exhibit 4, Deposition of Dawn Glasgow, p.82:21-87:16.  Plaintiff disputes that she ever went to Dawn's office to tell her she'd be out for 3 months, as Glasgow claimed.  *Id.* at 86:19-87:12; Exhibit 1, Affidavit of Caroline Clark.  Glasgow's recollection of Plaintiff sharing her plans for being out was vague, and is not consistent with her asking Plaintiff about her plans at the time of the meeting, or the fact that Plaintiff had no specific plans even then.

[107] Exhibit 4, Deposition of Dawn Glasgow, p.47:12-19; 49:17-22.  Her calculations also omitted several weeks of

17

that the campus coordinator position would provide Plaintiff with more flexibility to care for her baby and be better for her.[108]  Miller suggested that the position would better accommodate the uncertainty of childbirth.[109]

In sum, it is clear from Defendant's own statements and arguments that Defendant impermissibly refused to renew Plaintiff's teaching contract because of her pregnancy, the expected birth of her child, sex-based stereotypes regarding the care of a newborn, and presumptions about her expected maternity leave.  Summary judgment on Plaintiff's pregnancy discrimination claim should be denied.[110]

### III.  Summary Judgment Should Be Denied as to Plaintiff's FMLA Retaliation Claims

### A.    Plaintiff's FMLA Retaliation Case Involves a Distinct Adverse Employment Action Analysis Easily Satisfied Here

The only part of Plaintiff's *prima facie* FMLA retaliation claim challenged in Defendant's motion is the adverse employment action element.[111]  In arguing that Plaintiff cannot show that she suffered an adverse employment action, Defendant does not cite to the standard that currently applies to such an analysis in the retaliation context, which is a distinct

---

holidays.

[108] Exhibit 4, Deposition of Dawn Glasgow, p.60:4-5; p.85:17-18; p.105:3-108:9; Exhibit 5, Deposition of Amber Miller, p.76:6-14; 77:10-22.

[109] Exhibit 5, Deposition of Amber Miller, p.73:3-24.

[110] *See Laxton*, 333 F.3d at 583; *Buchanan-Rushing*, 794 F.Supp.2d at 694 (finding that a reasonable jury could conclude that defendant's proffered reasons for plaintiff's termination—exhaustion of available leave and budget cuts—were pretext for discrimination where she was told she was being placed on light duty until after having her baby and she had been questioned about whether she should be on patrol and in uniform while pregnant).

[111] Defendant's motion recites the elements of a *prima facie* FMLA retaliation claim, but only addresses the adverse employment action element of such a claim.  The Fifth Circuit has explained that a movant possesses a burden at summary judgment and it is not enough to simply state that the non-movant lacks evidence on an element (or all elements) of its claim(s). *Ashe v. Corley*, 992 F.2d 540, 543 (5th Cir. 1993) (internal citations omitted) (quoting *Russ v. Int'l Paper Co*., 943 F.2d 589, 591-92 (5th Cir. 1991); citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 328 (1986)).  Defendant has also failed to follow the procedures outlined in Fed. R. Civ. P. 56, and in particular has failed to support its assertion as required under either of the methods prescribed by Fed. R. Civ. P. 56(c)(1). Plaintiff therefore has not addressed the first element of the *prima facie* case, and respectfully requests that the Court consider the fact undisputed for the purpose of the motion only, or provide Plaintiff with the opportunity to provide additional briefing and evidence regarding this element.  FED. R. CIV. P. 56(e)(1),(2).  The causal connection element would appear to be satisfied by Defendant's admission that its actions were caused by Plaintiff's protected activity, which includes leave following the birth of a child.  29 U.S.C.A § 2612(a)(1)(A).

standard from the showing in the discrimination context.[112]  In *McArdle v. Dell Products, LP,* the Fifth Circuit explained that the Supreme Court's decision in *Burlington Northern* altering the meaning of "adverse employment action" in the context of Title VII retaliation claims applied to FMLA retaliation claims.[113]  Thus in the FMLA retaliation context, an employee suffers an adverse employment action if "a reasonable employee would have found the challenged action materially adverse, which in this context means it might have dissuaded a reasonable worker from [engaging in FMLA protected activity]."[114]  "Whether a reasonable employee would view the challenged action as materially adverse involves questions of fact generally left for a jury to decide."[115]

As discussed above in section III, C, *supra*, Plaintiff has presented evidence showing that compared to the position of guide, the position of campus coordinator relied significantly less on Plaintiff's experience, training, and certification, involved less responsibility, and many less interesting and less challenging low-level administrative tasks, and was less prestigious. Additionally, the positions involved some difference in hours and would deprive her of significant intangible benefits.  Given this evidence showing that that the move to the campus coordinator position would have been materially adverse, summary judgment is precluded on Defendant's assertion that Plaintiff cannot establish an adverse employment action with respect

---

[112] To the extent that Defendant's motion suggests that Plaintiff must show an ultimate employment decision to satisfy that element, however, Defendant misstates the law, as discussed herein.  Also, Defendant argues that Plaintiff cannot establish an adverse employment action in violation of the FMLA in reference to an age discrimination case that discussed the factors a plaintiff must show to prove constructive discharge.  MSJ at p.13, ¶ 60 (citing *Brown v. Bunge Corp.*, 207 F.3d 776, 782-83 (5th Cir. 2000)).  Defendant's reliance on *Gunderson v. Neiman-Marcus Group, Inc.*, 982 F.Supp. 1231 (N.D. Tex. 1997), is also misplaced because the only issue the plaintiff had raised with the defendant's proposed reassignment was that it would be less financially advantageous, and the court rejected her evidence as speculative.  *Id.* at 1233-34, 1236, 1238.

[113] 293 Fed.Appx. 331, 337 (5th Cir. 2008).

[114] *McArdle*, 293 Fed.Appx. at 337.

[115] *Id.* at 337 (citing *Burlington*, 548 U.S. at 71–73; *Crawford v. Carroll*, 529 F.3d 961, 973 n. 13 (11th Cir. 2008) ("*Burlington* also strongly suggests that it is for a jury to decide whether anything more than the most petty and trivial actions against an employee should be considered 'materially adverse' to him and thus constitute adverse employment actions.").  *See also Garner v. Chevron Phillips Chem. Co., L.P.*, --- F.Supp.2d ----, 2011 WL 5967244, at *26 (S.D. Tex. November 29, 2011) (citing *McArdle*, 293 Fed.Appx. at 337).

to her FMLA retaliation claim.[116]

**B.    Defendant Acknowledges That Its Actions Were Taken Because of Plaintiff's Expected Maternity Leave and Therefore Cannot Establish a Legitimate, Nondiscriminatory Reason**

Following Plaintiff's minimal showing of a *prima facie* case, Defendant bears the burden of establishing a legitimate, non-discriminatory reason for its adverse employment action.[117] Defendant wholly fails to meet this burden because as described above, Defendant's proffered reason for its actions is that they were taken because of Plaintiff's expected maternity leave.[118] In sum, Defendant has admitted that Plaintiff's prospective maternity leave, which is protected under the FMLA, prompted its actions.

To the extent that Defendant may be arguing that it was justified in keeping Plaintiff from taking protected leave "to preserve the quality of the school program[]"[119] and "to serve and protect the best interests of the students[,]"[120] it bears noting that the FMLA contains no exception for Montessori schools.  The FMLA does have a specific section addressing leave for employees of public and private elementary and secondary schools, but that section does not apply here.[121]  Defendant simply has not demonstrated that it is entitled to discriminate, even if it makes business sense to do so.

## V.    Conclusion

For the reasons set forth in this response, Defendant's motion for summary judgment should be denied in its entirety.

---

[116] *See, e.g., Scott v. Grand Prairie Indep. Sch. Dist.*, 2012 WL 1361621, at *6 (N.D. Tex. Apr. 19, 2012) (denying motion to dismiss Title VII, TCHRA, and FMLA retaliation claims, and concluding, *inter alia*, that "it is likely that a reasonable employee in the plaintiff's position would have found the removal of the [advanced and gifted] classes to be materially adverse."); *McArdle*, 293 Fed.Appx. at 337.

[117] *McArdle*, 293 Fed.Appx. at 336.

[118] Defendant's MSJ, p.19, ¶ 73.

[119] Defendant's MSJ, ¶ 74.

[120] Defendant's MSJ, ¶ 5.

[121] 29 U.S.C. § 2618.  That section does not permit schools to transfer teachers to alternate positions because they plan to take a twelve-week block of maternity leave.

Respectfully Submitted,

**THE COOK LAW FIRM**

/s/ Melissa A. Jacobs

_____

Russell Scott Cook
State Bar No. 24040724
Melissa A. Jacobs
State Bar No. 24046144
919 Congress Avenue, Suite 1145
Austin, Texas 78701
Telephone: (512) 482-9556
Telecopier: (512) 597-3172

ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I hereby certify that on this 31st day of May, 2012, I filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Stephanie O'Rourke
Cokinos Bosien & Young
l0999 West IH-10, Ste. 800
San Antonio, TX 78230

/s/ Melissa A. Jacobs

_____

Melissa A. Jacobs

21