# Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| CAROLINE CLARK, | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. A-12-CA-007-SS |
| | § | |
| AUSTIN MONTESSORI SCHOOL, INC., | § | |
| Defendant. | § | JURY TRIAL DEMANDED |
| | § | |

## AFFIDAVIT OF CAROLINE CLARK

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| DALLAS COUNTY | § |

BEFORE ME, the undersigned authority, personally appeared Caroline Clark, who, by me duly sworn, testified as follows:

1.  "My name is Maria Carolina Clark. I am over eighteen years of age. I have personal knowledge of the facts contained in this affidavit. I am fully competent to make this Affidavit.

2.  To obtain my Association Montessori International ("AMI") teaching certification, I had to go through a 3 summer course from an AMI-affiliated training center. Also, during the school year after the first summer, I had to complete about 100 hours of classroom observation, and after the second year, I had to complete about 100 hours of student teaching. We also had to do other work during the school year as part of the training, such as theory papers and material making.

3.  My AMI certification is for the primary level, also known as a children's house. This is a mixed age classroom for 3-6 year olds, with a teacher, who is also known as a guide, and an assistant.

4.     Janice Kearley was the guide I replaced in Laurel Cottage. As was explained to me by Dawn Glasgow, Don Goertz, Amber Miller and Kearley herself, she had had her baby in November and then returned after the winter holidays. When she returned, she asked to be allowed to leave at noon, and to have the baby in the classroom, with her mother caring for the baby.

5.     At some point during the 2008-2009 school year, the mom of a student in my classroom, Elizabeth Schaeffer-Preston, pointedly asked me if I was intending to have more children. When I said yes she said something to the effect of "Oh no, not again. That will not be good." Her daughter was moved from my class for other reasons, though.

6.     At the end of the 2008-2009 school year, Amber told me that Tiffany Bilbe, a parent of two students in my class, asked to have her children moved to a different room after hearing that I was planning to have more children.

7.     I found out that I was pregnant in February 2010.

8.     When Amber reported to me that the parent observing in my class had thought I was pregnant, I said, I am pregnant, and I have been holding my belly, because I've been feeling sick. Charlotte told me not to touch my belly so much because the parents would suspect. On another occasion, I commented to Amber, my vests are getting tighter, when are we going to tell the parents? She may also have told me at that time not to touch my belly.

9.     At some point after my pregnancy was announced, Dawn told me that she had mentioned my pregnancy in talking to the parent of a student in my class. That student had a medical condition that required monitoring during the school day and

2

Dawn told me that she hoped that the news of my pregnancy would make the family decide to withdraw the student.

10.    Dawn Glasgow arranged a meeting with me and Amber Miller for April 30, 2010. Prior to this meeting I do not recall having any discussions with them about possible plans for maternity leave, and I know that I did not have any discussions with Dawn in her office about possible plans for maternity leave.

11.    During that meeting, they offered me the position of campus coordinator. There was nothing in paper. It was all verbal. As they proposed it, I understood that I would have had to work a split shift, from 7:30 am to 12:30 pm, and then 2:30 to 5:30 pm, in order to get the same pay. Another option they presented was that I could take on the position on a part time basis and split the role with another person. As a guide, my hours were 7:30 am to 4 pm. Working the split shift would have reduced my time with my son after he finished with his school day. They also discussed me possibly sharing the position, and working part-time for less pay.

12.    During the April 30th meeting, I told Dawn and Amber that I wanted to teach, that that was all that I knew how to do. Dawn told me that they would not be able to replace me. I asked during the meeting why Elizabeth Suggs, who was spending the year working to get her AMI certification, could not fill in for me. But Dawn and Amber told me that they thought Suggs was not interested or ready, because she wanted to have a baby that year.

13.    I was also told by Dawn during the meeting that they could not afford to have families leaving.

3

14. During the April 30th meeting, Amber told me that the campus coordinator position would be better because I would not have to take responsibility home. I was also told that it would be easier for me with this position to take care of the baby because I would have more time if I did it part-time, and because either way I would not have to take responsibility home. If you had to be gone for any reason for the baby, it would be more manageable because no one would have to worry about the teacher being gone and getting a sub or what would happen with the children. However, when I asked if I could bring the baby to work, Dawn was adamant that they will not make the same mistake again as they did with Janice and that they will definitely not allow me to bring my baby. They then suggested parents who might be able to care for my baby. Amber also suggested that if I took the position part time then Adam (my husband) could take care of the baby part time.

15. I sent Dawn an email to follow up on Sunday, May 2, 2010 asking about why I could not come back as a guide, for more clarity about the position they were offering, and what my other options were. By Thursday, May 6, 2010 I had received no response. I was extremely upset about being denied the ability to return as a guide. I also felt that there was no discussion to be had, because my only choices available were to take the campus coordinator position or not work at all. I was very sure that I did not want to be a campus coordinator. I did not like the administrative portion – answering phones, being on the computer, and assisting other members of the school's administration. Teaching allowed me to track the children's progress from pre-writing/reading to Writing and Reading. The Montessori teaching experience is unique in that way. It also allows me to form relationships with families as we work

4

together for the benefit of their children for at least 3 years. I love to sing songs and interact with the young children every day. It is what I look forward to about teaching the most on a daily basis. So I began planning to move to Dallas.

16. On Friday, May 7, 2010, which was a staff work day, I called the school to let them know I wasn't coming in that day. On that day, Dawn started calling me and leaving messages about needing to meet again.

17. I met again with Dawn and Amber on May 14, 2010. During that meeting, I asked them if what they were doing was legal, and Glasgow told me that they thought that if they did what was best for everyone, everything would resolve itself. At some point during the meeting, they said they were not covered by the FMLA. Glasgow also told me that I needed to write a letter to the parents telling them I would not be returning. I agreed to do so, as long as I could tell the truth.

18. At a meeting on May 14, 2010, a written offer for the campus coordinator position was given to me. It had a schedule of 8 am to 5 pm. The position also would have required night and weekend hours similar to the commitments that I had as a guide.

19. The Sunset/Jones campus of Austin Montessori School includes primary classes as well as elementary and youngest children's community classes, which both require distinct AMI certifications that I do not have.

20. My daughter was born on October 6, 2010, three weeks before her due date on October 27, 2010.

21. Exhibit 2 to Plaintiff's Response to Defendant's Motion for Summary Judgment is a true and correct copy of a Primary Teacher's Consultation Report from my personnel records at Lindsley Park Community School.

5

FURTHER AFFIANT SAYS NOT

SIGNED on this _31st_ day of May 2012.

_____
MARIA CAROLINA CLARK

SIGNED under oath before me on this _31st_ day of May 2012.

_____
Notary Public, State of Texas

Christina Gonzalez
Notary Public.
State of Texas
Comm. Exp. 03-03-15

6

# Exhibit 2



## ASSOCIATION MONTESSORI INTERNATIONAL - USA
410 Alexander Street
Rochester, NY 14607-1028
585-461-5920 • 585-461-0075 fax
montessori@amiusa.org • http://www.montessori-ami.org

# PRIMARY TEACHER'S CONSULTATION REPORT

Name of teacher:  Caroline Clark

Training center:  Cleveland

Year Graduated: '98      Age Level: 3 - 6

School name:  Lindsley Park Community School

School address: 722 Tenison Memorial Pkwy.
Dallas, TX 75223

Consultant's name:    Carol Alver

Date(s) of consultation:  March 31 & April 1, 2008

## CONSULTANT'S COMMENTS:

Caroline has been teaching for 9 years – 2 years with this class of 26 children.  Her assistant is Priscilla Rodarte. Priscilla oversees the breakfast procedure and helps with the clean up.  She is very quiet and stays mostly in the practical life area during the work period.  The classroom is large and bright with outdoor access to the small garden area.  The materials are neat, orderly and sequential.  The children begin choosing their tasks as soon as they finish breakfast and continue throughout the 3 hour morning.  Caroline gave several lessons including baric tablets, spindle boxes, discrimination tray, a small group singing, and a small group sound game.  She is very perceptive of the ebb and flow of the class.  There were periods when the noise level rose and then periods of calm.  Caroline gathers the children who have trouble making choices for small groups and then helps them make decisions for their individual work choices.  The children chose age appropriate activities and many of them worked almost the entire morning on one lesson.  Children demonstrated cooperation and collaboration and maintained prolonged interest in their chosen activities.

Some of the work choices by the children included: water color, animals of the world placed on the hemisphere map, sewing, parts of the leaf, classified cards, spindles, discrimination tray, moveable alphabet, food preparation, touch tablets, drawing flags, clock, cloth washing, binomial cube, wood polishing, decimal system and floor scrubbing.  The child doing wood polishing went through several items on the sensorial shelf starting with the cylinder blocks – polishing each cylinder and then moving on to color tablets etc.  Another child made a list of sea animals with the movable alphabet and then illustrated them with paper cut outs.  He worked all morning on his project which was beautiful.

Caroline and I met for a conference the afternoon and we discussed the following:
> **Special needs child:** One child with severe learning challenges was discussed in terms of her placement for next year.  She is 6 and still cannot count to 3.  She is physically tall and it is not recommend that she



*Founded in 1929 by Dr. Maria Montessori*

06/29/2011  15:30    2148277683                EAST DALLAS SCHOOL                    PAGE  02/02

Page 2
### PRIMARY TEACHER'S CONSULTATION REPORT

return to the primary class. However, she is not ready for elementary and the Charter school policies require that the program accommodate her needs – unless the parent chooses another service.

➢ **Noise level:** Although the noise level would rise, the children did continue their activities. Caroline would project her voice across the room occasionally and we discussed the effect this has on the children. It was suggested that she sit at the door and greet the children, remind them about leaving their outside voices at the door, thinking about how to move in the class, etc. and start the day off with a quiet and calm beginning.

➢ **Assistant:** Having a place for the assistant to sit when she is not needed was suggested. Guidelines for observation were given to the primary staff and discussion on how to help the assistants observe ensued as well.

➢ **Material making:** We discussed the need to have many more classified cards – especially for the spoken language lessons that are so needed with these children.

This class is functioning very well and Caroline has every right to be extremely proud of what she has enabled in the last two years. The challenges with these families are very real but the dedication of this teacher has shown that hard work and faith in the child allow for the development of each child's potential. It may be easy to get discouraged at times with the lack of stimulation in their home environments and the language barriers, but these children are developing at their pace and succeeding as they go. I commend Caroline who is very open to suggestions and committed to these children.

Consultant's signature:    *Carol A. Alver*

Carol Alver

For the academic year: 2007 - 2008                    Date:  April 1, 2008

*File: clark.doc*

# Exhibit 3

CAROLINE CLARK

September 16, 2011

Page 1

CAUSE NO. D-1-GN-11-000096

| | | |
|---|---|---|
| CAROLINE CLARK | ) | IN THE   DISTRICT   COURT |
| | ) | |
| Plaintiff(s), | ) | |
| | ) | |
| VS. | ) | 419TH JUDICIAL DISTRICT |
| | ) | |
| AUSTIN MONTESSORI SCHOOL, INC., | ) | |
| | ) | |
| | ) | |
| Defendant(s). | ) | TRAVIS   COUNTY,   TEXAS |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

ORAL AND VIDEOTAPED DEPOSITION OF

CAROLINE CLARK

SEPTEMBER 16, 2011

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

ORAL AND VIDEOTAPED DEPOSITION of CAROLINE CLARK, produced as a witness at the instance of the Defendant, and duly sworn, was taken in the above-styled and numbered cause on the 16th day of September, 2011, from 10:48 a.m. to 4:15 p.m., before Dicie Lee Eytcheson, CSR in and for the State of Texas, reported by machine shorthand, at the offices of THE COOK LAW FIRM, 919 Congress Avenue, Suite 1145, Austin, Texas 78701, pursuant to the Texas Rules of Civil Procedure and the provisions stated on the record or attached hereto.

Electronically signed by Dicie Eytcheson (301-362-425-8759)                4fceefd1-91c4-44c9-995b-2cac908dd802

CAROLINE CLARK                                         September 16, 2011

Page 9

A. -- December.

Q. Okay. Do you recall in particular when you moved to Dallas?

A. End of June 2010.

Q. Do you have a particular date? Last week? Second week?

A. About the third week.

Q. Okay. The house -- Is it a house on Leisure Drive?

A. It's a condo, yes.

Q. It's a condominium?

A. Yes.

Q. Did you own -- did you own or lease that condominium?

A. We rented it.

Q. Do you recall what date -- if you know, what date you entered into the lease for the property on Leisure?

A. It would be the end of June.

Q. Okay. When did you start negotiating the lease for Leisure Drive?

A. Negotiating?

Q. Yes.

A. Well, it was my mom's property so it was easy to get into the property.

Page 10

Q. Okay. So your mom owned the condominium?

A. Yes.

Q. Does your mom still own that condominium?

A. No.

Q. If you could -- Now you're married to Adam; is that correct?

A. Yes.

Q. That's your husband's name?

A. Yes.

Q. When -- If you recall, when did you and Adam decide to move to Dallas?

A. Well, it would have been after I found out -- I was trying to ask -- ask more about the position that I was being offered at Austin Montessori.

MR. GARNER: Okay. I'm going to object, nonresponsive.

Q. (BY MR. GARNER) And I'm going to do that every once in a while. You may hear the lawyers -- either your lawyers or -- or myself object.

Typically the Plaintiff counsel will object to form and -- under the Texas Rules of Civil Procedure for which this deposition is being taken. As far as my objections, most of my objections are going to be nonresponsive, which means I asked a question and you really didn't answer that question that I asked.

Page 11

A. Okay.

Q. And it's no offense to you; it's just something that I need to do as -- in representing my client.

But my question to you was, is, when did you and Adam decide to move to Dallas?

A. In May.

Q. In May of 2010?

A. May 2010.

Q. Okay. Prior to living at 11835 Leisure Drive in Dallas where did you and your husband and family reside?

A. 1807 Tartar Way, Austin, Texas, and I don't remember the Zip code.

Q. And did you lease or own that property?

A. We owned the property.

Q. Okay. Do you recall when you and your husband bought that property?

A. In 2008. Spring of 2008.

Q. Would that have been when you and your husband originally moved from Dallas to Austin?

A. Yes.

Q. Okay. And can you tell me why you and your family moved from Dallas to Austin --

A. I wanted --

Q. -- back in 2008?

Page 12

A. I wanted to put my son in Austin Montessori School.

Q. Okay. And in 2008, who was your husband working for?

A. Spectrum Building Products.

Q. And what does Spectrum Building Products do?

A. They provide -- or they manufacture and provide materials or -- in the -- materials for hospitals or restaurants.

Q. So is it a hospital supply company or is it a construction materials?

A. It's a construction materials company.

Q. Okay. Because it's my understanding Spectrum is a construction materials --

A. It --

Q. -- supplier?

A. It is.

Q. Okay. Do they have offices in Austin?

A. No.

Q. And he was working for Spectrum Building Products in Dallas, correct?

A. He had a virtual office; he worked from home.

Q. Okay. So when y'all moved from Dallas to Austin he continued to work for Spectrum?

A. Yes.

3 (Pages 9 to 12)

Electronically signed by Dicie Eytcheson (301-362-425-8759)                4fceefd1-91c4-44c9-995b-2cac908dd802

CAROLINE CLARK                                          September 16, 2011

Page 13

Q.  Does your husband still work for Spectrum?

A.  Yes.

Q.  Okay.  When you moved from Dallas to Austin and y'all purchased 1807 Tartar Way --

A.  Yes.

Q.  -- prior to purchasing that house in Dall- -- in Austin y'all lived in Dallas.  Where did you live in Dallas?

A.  5950 Lewis Street.

Q.  You're doing an excellent job, by the way; because I couldn't tell you all of these addresses from where I lived, but you're doing an excellent job.

Okay.  Did y'all own or rent that?

A.  We owned it.

Q.  Now, in -- how long did you live on Lewis Street?

A.  I think we had the property for four years.  I -- I'm not sure.

Q.  So 2004 until 2008, when you moved back to Austin?

A.  I'm sorry.  We had it until 2010.

Q.  Oh, you had the property until 2010?

A.  Yes.

Q.  It took you two years to sell it?

A.  We had -- it was leased.

Page 14

Q.  Oh, it was a lease?

I thought you owned the --

A.  No.  We were --

Q.  Oh.  You --

A.  -- leasing it.

Q.  -- leased it to somebody?

A.  And then we sold it in 2010.

Q.  I gotcha.

Okay.  All right.  Well, I -- you know, we've talked about your -- your location as far as residing and your background.  Let's -- let's talk a little bit about your education.

You were born back in 1972; where were you born?

A.  In the Philippines.

Q.  Okay.  When did you move to the mainland, the United States?

A.  When I was 21 years old.  Well, 20 years old.

Q.  And where did you do your college education?

A.  In the Philippines.

Q.  At what school?

A.  De La Salle University.

Q.  You're going to have to spell that one.

A.  D-E and -- De La Salle, L-A S-A-L-L-E, University.

Page 15

Q.  De La Salle?

A.  Yes.

Q.  Okay.  And is that a four year degree?

A.  It's a four year degree but I took it in three years.  Yes.

Q.  Okay.  And what was your degree in?

A.  Psychology.

Q.  Is that a BS?

A.  A BA.

Q.  A BA.  A Bachelor of Arts in Psychology?

A.  Yes.

Q.  When did you achieve your degree?

A.  In 1993.

Q.  And is that the same year that you moved to the United States?

A.  Yes, sir.

Q.  Can you tell me why you moved to the United States in 1993?

A.  My parents were living here and they wanted me to be with them.

Q.  When -- So you were born in the Philippines and you stayed in the Philippines until you got out of college?

A.  Yes.

Q.  When did your parents move to the United

Page 16

States?

A.  Probably a year before -- nine -- I guess 1992, '91.

Q.  So while you were in college?

A.  Yes.

Q.  When you moved to the United States where did you move to?

A.  To Dallas.

Q.  Okay.  That's where your parents were living at the time?

A.  Yes.

Q.  Okay.  When you got here in 1993, with your degree in psychology what did you -- you do?

A.  I was working as an assistant in a Montessori school.

Q.  Is that where you received your Montessori training?

A.  They sponsored me to go to my Montes- -- to get my Montessori training, yes.

Q.  Okay.  Well, let me ask you this: Why -- with a degree in psychology why did you decide to go work for a Montessori school?

A.  Well, with a degree in psychology you could go many ways.  I chose the teaching tract.  I had done my research.  I had done my student teaching in a special

4 (Pages 13 to 16)

Electronically signed by Dicie Eytcheson (301-362-425-8759)                    4fceefd1-91c4-44c9-995b-2cac908dd802

Page 17

education school; and special -- special education and Montessori go side by side, so I was interested in Montessori.

Q. Okay. So who did you go work for in Dallas?

A. St. Alcuin Montessori School.

Q. And how do you -- saint what?

A. Acluin, A-L-C-U-I-N.

Q. Okay. And do you remember where they're located?

A. Yes. 6144 Churchill Way street. I -- 75230, I think, is the Zip code.

Q. Okay. And when you were working at St. Alcuin the -- that was a -- as an assistant?

A. For five years as an assistant; and then for three years as a children's house guide.

Q. Okay. When you say "house guide," for the ladies and gentlemen of the jury Montessori schools are a little different than public schools --

A. Yes.

Q. -- will you agree with me?

A. Yes.

Q. Okay. Teachers in public school what -- what -- most people when they go to public school they have a teacher and then there may be a teacher's assistant; and in the Montessori context the teacher is

Page 18

called a house guide; is that correct?

A. Or -- or a guide, yes.

Q. Or a guide.

Okay. And the assistant to that would be what your --

A. The assistant.

Q. -- first position was which was as an assistant to a house guide?

A. Yes.

Q. Do you recall what grades that was for?

A. It was the same level; three to six year olds.

Q. Okay. Now, while you were at St. Alcuins the -- they decided to sponsor you to receive your Montessori training?

A. Yes.

Q. And when was that?

A. That was in 1996.

Q. Okay. So you spent three years as an assistant with St. Alcuin in Dallas?

A. Five years.

Q. Five years?

A. Yes.

Q. As an assistant?

A. Yes.

Q. Oh, because the two years that you were

Page 19

receiving your training you still served as an assistant?

A. Yes.

It was a summer program. So I go to training in the summer but still work during the school year.

Q. Okay. Well, let's talk about your Montessori training.

Where did you do your Montessori training?

A. Ohio Montessori Institute.

Q. And where is that located?

A. In Cleveland, Ohio.

Well, it was. It doesn't exist anymore. It's in -- was in Cleveland, Ohio.

Q. Okay. And do you remember what certificate you achieved?

A. I achieved an AMI certification, Montessori certification for three to six year olds.

Q. Okay. And when you say "AMI" could you tell the ladies and gentlemen of the jury what "AMI" means.

A. "AMI" is Association Montessori International. It's the -- the -- what Maria Montessori and her family herself started with, so to us that would be the most authentic Montessori training.

Q. Right. And -- and I know this and you know

Page 20

this but the ladies and gentlemen of the Jury don't know this. Could you tell the ladies and gentlemen of the Jury what the other certification is.

A. Well, there would be -- AMS is the one other major training, training.

Q. Okay. And what does "AMS" stand for?

A. I believe it stands for American Montessori Society but I'm not sure.

Q. Okay. So in America you would typically find two certifications; the AMI and the AMS, right?

A. Yes.

Q. And as far as Austin Montessori School is concerned and -- and you the AMI is the more desirable of the two certifications, would you agree with me on that?

A. Yes.

Q. Okay. And you achieved your certification when?

A. In 1998.

Q. Okay. In 1998, were you still working for St. Alcuin?

A. Yes, I was.

Q. Okay. So in 1996, you stopped serving as an assistant at St. Alcuin. What did you do at St. Alcuin between 1996 and 1998?

Kim Tindall & Associates, Inc. 645 Lockhill-Selma, Suite 200    San Antonio, Texas 78216
Phone (210) 697-3400                                  Fax (210) 697-3408

Electronically signed by Dicie Eytcheson (301-362-425-8759)                4fceefd1-91c4-44c9-995b-2cac908dd802

CAROLINE CLARK                                        September 16, 2011

Page 25

individual instruction of the child versus a class instruction.

MS. JACOBS: Objection. Form.

Q. (BY MR. GARNER) You can answer if you understand.

A. Well, for -- we -- we have the multiage group setting so you teach the children according to their readiness. It -- it -- not according to their age.

So if a three year old was ready for a particular lesson that maybe in a traditional setting would be for a four year old, you know, we wouldn't hinder that child from learning this particular activity.

Q. Okay. So after you -- when there was a change in the administration at St. Alcuin you said you didn't like it. Why didn't you like it?

MS. JACOBS: Objection. Form.

A. Why didn't I like the administration?

Q. (BY MR. GARNER) Yes.

A. I -- there were a lot of -- a lot of people had left the school. My direct boss left the school and I didn't feel that -- I just didn't feel that it was the place for me.

Q. Okay. Did you search for another job in Dallas and -- at another Montessori?

Page 26

A. Actually I contacted my former boss in Richmond, Virginia. Well, my former boss, he was my boss at St. Alcuin; he moved to Virginia and I contacted him in Virginia.

Q. Okay. And what did you ask him?

A. I -- I don't recall. I think I saw a job posting and I asked him if I could interview with -- with him.

Q. In Richmond, Virginia?

A. Yes, sir.

Q. Okay. Did you go interview for that position?

A. Yes, I did.

Q. Okay. Did you get that job?

A. Yes, I did.

Q. And did you go -- then go to Richmond, Virginia?

A. Yes.

Q. Okay. How long were you in Richmond, Virginia?

A. From 2001 to I think 2003.

Q. Okay. And that was at the Richmond Montessori School?

A. Yes.

Q. And what was your position at Richmond Montessori School?

A. Again, I was a children's house guide or lead

Page 27

teacher for three to six year olds.

Q. Do you recall how many children you had at that -- at Richmond Montessori?

A. I -- I don't remember.

Q. Okay. And you stayed at Richmond Montessori School until when? From 2001 --

A. To two thousand and -- 2001 -- 2003, I think.

Q. 2003?

A. Yes.

Q. Okay. And where did you go after you went -- left Richmond Montessori?

A. To Austin Montessori.

Q. Okay. Now, why did you decide to leave Richmond Montessori School?

A. I realized it wasn't what I expected a Montessori school to be.

Q. Okay. What do you expect a Montessori school to be?

A. To follow the AMI protocol which is to follow the -- our -- what we call our albums; that would be the curriculum for this -- the -- the -- the -- our curriculum for teaching the three to six year olds.

Q. And was Richmond Montessori School not following the AMI?

A. I think they were more geared towards AMS.

Page 28

Q. Okay. So how did you find yourself in Richmond, Virginia going to Austin Montessori School? How did you find out about Austin Montessori School?

A. I believe it was through an ad. You -- There's a website you go to, Montessori website you go to, to look for postings, job postings. I believe that's how I found it.

Q. Okay. What made you decide to come to Austin Montessori School versus any other posting that you may have seen?

A. It would have been closer to my family in Dallas. Aus- -- and Austin Montessori School is known throughout the U.S., known for its standards, so I wanted to work in a school that is, you know, known for its high standards.

Q. So Austin Montessori School is known nationally as a Montessori school with very high standards?

A. I believe so, yes.

Q. Okay. And those high standards being what?

A. The high standards in -- in following the Montessori philosophy.

Q. Okay. The AMI Montessori philosophy, correct?

A. Yes.

Q. Okay. What other decisions or what other factors did you consider in making -- applying to the

7 (Pages 25 to 28)

Electronically signed by Dicie Eytcheson (301-362-425-8759)          4fceefd1-91c4-44c9-995b-2cac908dd802

CAROLINE CLARK                                    September 16, 2011

Page 29

Austin Montessori School other than the high standards of Austin Montessori School and the location and the proximity to your family?

A. Those were my main goals. Those were my main considerations.

Q. Were there no postings in Dallas or Houston or San Antonio?

A. There were.

Q. Okay. Did you apply to those schools as well?

A. I did.

Q. Okay. Were you hired or accepted from any of those other schools?

A. I was, yes.

Q. And you also applied to Austin Montessori, obviously?

A. Yes.

Q. And --

A. So I --

Q. -- did you get a job offer from Austin Montessori?

A. Yes.

Q. When did you first come to Austin Montessori School?

A. I -- When did I first come as a teacher?

Q. As a teacher, a house guide.

Page 30

A. In -- the school year 2003-2004, I believe.

Q. Okay. I'm going to offer as an exhibit to your deposition -- it's a copy of your resume. We've got a copy for opposing counsel as well as you.

MR. GARNER: Can we mark this as -- do you remember what exhibit we're on?

MS. JACOBS: No.

MR. GARNER: Are we on --

MS. JACOBS: I don't know.

MR. GARNER: You don't know?

MS. JACOBS: I can look it up but I don't remember exactly.

MR. GARNER: Okay. The reason being is we started this venture and we've decided that we were going to do all of the exhibits in order.

MS. JACOBS: I --

MR. GARNER: Let's go off the record real quick and we can find out here.

THE VIDEOGRAPHER: Off record at 11:15 a.m.

(Off the record.)

THE VIDEOGRAPHER: Back on the record 11:16.

Q. (BY MR. GARNER) Okay. I'm going to hand you what has been previously marked as Exhibit 18 to one

Page 31

of the prior depositions, and it is a copy of, I believe, your resume.

Now, there's a lot of handwriting on this resume, and I think this is Donald Goertz's handwriting because it came from Austin Montessori School's files, but is this a -- a copy of your resume that you would have submitted to Austin Montessori School when you originally applied at Austin Montessori School in 2003?

A. Yes.

Q. Okay. Is everything on this resume true and accurate?

A. Yes.

MS. JACOBS: Objection. Form. I'm sorry. I know that's a little late. We don't --

MR. GARNER: Okay.

MS. JACOBS: -- the comments --

Q. (BY MR. GARNER) Now, other than the work history and experience listed on your resume do you have any other jobs or positions that you held during the time period before work -- coming to work for Austin Montessori School in 2003?

A. I'm sorry. I didn't get that.

Q. Okay. Are there any other jobs that are not listed on your resume that you had worked?

A. No.

Page 32

Q. Okay. So this is a complete work history of your work history before you came to Austin Montessori School in 2003?

A. Yes.

Q. Okay. Now, when you came to Austin Montessori School in 2003, what was your position?

A. I was the children's house guide.

Q. For the three to six year olds?

A. For the three to six year olds, yes.

Q. Do you recall who your supervisor was in 2003?

A. Supervisor? We don't use that term so I don't know.

Q. Okay. Well, why don't you explain to me who -- how the Austin Montessori School hierarchy or administration works.

Who's at the top?

A. I believe it would be Donald Goertz.

Q. Okay. And do you know what his position is?

MS. JACOBS: Objection. Form.

A. I --

MR. GARNER: What's the -- what's the basis of that objection?

MS. JACOBS: I mean, if you can just clarify for the time period that you're asking about for this question.

8 (Pages 29 to 32)

Electronically signed by Dicie Eytcheson (301-362-425-8759)                4fceefd1-91c4-44c9-995b-2cac908dd802

CAROLINE CLARK                                    September 16, 2011

Page 33

Q. (BY MR. GARNER) Okay. In 2003, do you know what Donald Goertz's position was?

A. I don't remember. Maybe he was the executive director.

Q. Okay.

A. I don't know.

Q. Okay. Was Mr. Goertz there on a day to day basis in 2003?

A. I didn't see him on a day to day basis.

Q. Okay. Who was your -- who was the lead person, the boss, the day to day of -- of the day-to-day operations of Austin Montessori School in 2003 --

MS. JACOBS: Objection. Form.

Q. (BY MR. GARNER) -- if you know?

A. It would be Dawn Glasgow or -- or Amber Miller.

Q. I don't know. I wasn't working there.

A. Okay.

Q. I'm asking you. I mean, and it's only if you recall.

I mean, do you -- did you have a supervisor at Austin Montessori School?

A. Because I feel that there's two parts: There's one that's the administrative part and then there's a -- maybe the pedago- -- not the pedagogical -- the one that's the administrative part and one would be

Page 34

pedagogical part, so --

Q. Okay. The pedagogical part -- when you talk about pedagogical you're talking about the education, the curriculum of the school?

A. Yes.

Q. Okay. So most people don't understand what pedagogical means, so why don't we call that curriculum?

A. The curriculum.

Q. Okay. Or the education of the students.

So what you're saying is Austin Montessori School was broken down to two ways: There was the education side and then there was the administrative side --

A. Yes.

Q. -- is that correct?

A. Yes.

Q. Okay. Who was the head of the educational or curriculum part of Austin Montessori School in 2003?

A. Our consultant at that time was Patricia Oriti, so --

Q. Okay. And on the administrative side it was Dawn Glasgow?

A. Yes.

Q. Okay. And who did you report to relating to curriculum issues?

Page 35

A. Amber Miller.

Q. Okay. And do you recall what Amber Miller's position was?

A. She was the admissions director.

Q. Okay. And is Ms. Miller also -- would she be considered your supervisor as far as someone you reported to?

A. Yes.

Q. In 2003, do you recall who your house guide assistant was?

A. In 2003, actually I don't. I don't remember.

Q. Okay. And -- and this isn't your first stint with Austin Montessori School. I mean, this is your first stint with Austin Montessori School. How long did you work for Austin Montessori School in two -- from 2003 until when?

A. Until 2005.

Q. Okay. And do you recall why you decided to leave Austin Montessori School in 2005?

A. I was going to get married.

Q. Okay. I'm going to hand you what is going to be marked as Exhibit 21.

MR. GARNER: Is that correct?

(Deposition Exhibit No. 21 marked.)

Q. (BY MR. GARNER) For the record, this is

Page 36

identified as AMS000185, and this is a letter dated January 12th, 2005, from Donald Goertz who is the executive director of Austin Montessori School.

In 2005, it looks like this is relating to your pending marriage to your husband now, correct?

A. Yes.

Q. And that was the decision why you left Austin Montessori School in 2005?

A. Yes.

Q. And from 2003 until 2005, when you served as a house guide for the first time, did you have any problems or issues with Austin Montessori School?

A. None that I remember.

Q. Okay. Did you enjoy your teaching experience or your house guide experience at Austin Montessori?

A. Yes.

Q. Do you recall any incidents that you would disagree with the administration or curriculum side of Austin Montessori School as to how they operated their business?

A. No.

Q. Okay. In 2005, when you left Austin Montessori School to get married -- and that's to your present husband Adam, correct?

A. Yes.

9 (Pages 33 to 36)

Electronically signed by Dicie Eytcheson (301-362-425-8759)                              4fceefd1-91c4-44c9-995b-2cac908dd802

Page 37

Q. Did you leave Austin at that time?

A. Yes.

Q. Okay. And that's when you went to Dallas?

A. Yes.

Q. Okay. Why did you decide to leave Austin and go to Dallas?

A. We wanted to start a family; and both our parents at that time were living in Dallas and we thought that they would be great support when we had children.

Q. When you left in 2005, were -- Well, let me ask you this: You ended the school year in 2005, and that would have been in May of 2005?

A. Yes.

Q. When did -- when did you and Adam get married?

A. In June.

Q. Okay. And so you left the school and moved back to Dallas to start a family?

A. Yes.

Q. And when did you first -- have your first child?

A. In 2006.

Q. Okay. And when was he born?

A. May 2006.

Q. Okay. When you moved to Dallas in 2006, I

Page 38

guess you would have been living on Lewis Street --

MS. JACOBS: Objection. Form.

Q. (BY MR. GARNER) -- is that correct?

A. Yes.

Q. Okay. And when you moved back to Dallas and moved to Lewis Street was your husband working at that time?

A. Yes.

Q. Who was he working for?

A. I don't -- I don't remember.

He was working with Spectrum Building Products but under a different firm; he wasn't directly employed by Spectrum Building Products.

Q. So he was like an independent representative?

A. Yes.

Q. Selling Spectrum Building Products?

A. Yes.

Q. And were you working at that time?

A. Yes.

Q. And who were you working for?

A. I -- Repeat that question.

Q. When you moved --

A. Working --

Q. When you moved back to Dallas did you -- were you employed by anyone?

Page 39

A. Yes.

Q. Who were you employed by?

A. Lindsley Park Community -- Community School.

Q. Do you know what your position was at Lindsley Park Community School?

A. I was a children's house guide for ages three to six years old.

Q. So I assume Lindsley Park Community School is also a Montessori school?

A. Yes.

Q. Is it an AMI or an AMS Montessori school?

A. It's an AMI Montessori school.

Q. Do you recall what your salary was at AMI -- at Lindsley Park Community School?

A. I don't remember.

Q. Do you recall what your salary was the first time you worked for Austin Montessori School?

A. I think it was around $30,000. I don't -- I'm not sure.

Q. Okay. How long did you work for Lindsley Park Community School?

A. It was about -- about -- for three years.

Q. So when did you start? In August of two thousand --

A. Five.

Page 40

Q. -- five?

A. Yes.

Q. And you stayed there until when?

A. 2008.

Q. May --

A. May.

Q. -- of 2008?

A. May of 2008.

Q. Okay. A lot of people don't understand how teachers are paid either, so I'm going to ask you how -- as a house guide or as a teacher for a Montessori school do you sign a yearly contract with the school you're working for?

MS. JACOBS: Objection. Form.

Q. (BY MR. GARNER) If you know.

A. It's a yearly, yes.

Q. So at the beginning of each year, school year that is, you sign a new, like, position contract for that school year?

A. Not for a new position.

Q. Okay. Well, let me ask it this way. If you -- you're going to be a house guide for Lindsley Park Community School prior to the school year starts you sign a contract with the school for that next school year, correct?

10 (Pages 37 to 40)

Electronically signed by Dicie Eytcheson (301-362-425-8759)                    4fceefd1-91c4-44c9-995b-2cac908dd802

CAROLINE CLARK                                    September 16, 2011

Page 45

Q. Okay. Would -- And what's your child's name?

A. ▆▆▆▆.

Q. ▆▆▆▆?

A. (Nods head.)

Q. Convenient. Did Austin Montessori School have a program for one year olds?

A. Yes, they did.

Q. Okay. And you wanted -- you and Adam had decided that you wanted ▆▆▆▆to go to Austin Montessori School to begin his education experience?

A. Yes.

Q. And you thought if they had a job opening that would be a perfect opportunity for you to come back to Austin, put ▆▆▆▆in Austin Montessori School and get a job there as well?

A. Yes.

Q. Okay. Do you recall when Austin Montessori School conveyed that offer to you as to the opening at Austin Montessori School?

A. I don't remember the exact month.

Q. Okay. I'm going to hand you what is going to be Exhibit 23.

(Deposition Exhibit No. 23 marked.)

Q. (BY MR. GARNER) For the record, this is AMS000188. This is dated April 24th, 2008. Let me

Page 46

give you a second to read that real quick; and you let me know when you're ready.

A. Okay. I'm ready.

Q. Okay. Would you agree with me that this is the offer letter from Austin Montessori School to you to come work for Austin Montessori School as a house guide?

A. Yes.

Q. And this details that when you're being hired by Austin Montessori School you will make $35- -- $39,000 per year?

A. Yes.

Q. And Austin Montessori School is also going to pay $2,500 in relocation costs?

A. Yes.

Q. It also details the other benefits and options you may have as a teacher at Austin Montessori School, does it not?

A. Yes.

Q. Including retirement?

A. Yes.

Q. Details the compensation package, all of that stuff, correct?

A. Yes.

Q. Okay. It also states that you -- it indicates that you understand and accept the duties and

Page 47

responsibilities of the position as set forth in the staff handbook.

A. Yes.

Q. Had you read the staff handbook prior to signing this letter on April 27th of 2008?

A. I didn't have it at that time, but I had it in 2003, two thousand -- when I -- when I first worked with them, yes.

Q. Okay. And so this letter essentially indicates that in the fall of 2008, when school starts, you're going to be at Austin Montessori School as a house guide?

A. Yes.

Q. Do you recall when you and your husband moved back to Austin?

A. I don't remember the exact time.

Q. Did you complete the school year at Lindsley Park --

A. I did.

Q. -- Community School?

A. I did.

Q. So you and your husband and ▆▆▆▆ (your son) moved back to Austin during the summer of 2008?

A. Yes.

Q. When you started in 2008, at Austin Montessori

Page 48

School was Dawn Glasgow still the head of the administration of Austin Montessori School?

A. Yes.

Q. And was Amber Miller still the director of admissions and over the house guides and curriculum of the Austin Montessori School?

A. Yes.

Q. Okay. So nothing had changed since the last time you would have been here?

A. Right.

Q. Don Goertz was still the executive director as well, correct?

A. Yes.

Q. Okay. Did you enjoy your teaching experience at Austin Montessori?

A. In general, yes.

Q. Okay. The -- Now, while you were at Austin Montessori School the second time, it's my understanding that ▆▆▆▆ got sick with RSV; is that correct?

A. Yes.

Q. And that took you some -- took some time away from you being in the classroom, correct?

A. Yes.

Q. And -- and let me -- let me talk a little bit about being a house guide.

12 (Pages 45 to 48)

Electronically signed by Dicie Eytcheson (301-362-425-8759)              4fceefd1-91c4-44c9-995b-2cac908dd802

CAROLINE CLARK                                September 16, 2011

Page 81

Q. Okay.

A. Yes.

Q. So when did you go talk to Ms. Miller?

A. Again, I --

MS. JACOBS: Objection. Form.

A. I don't remember.

Q. (BY MR. GARNER) Okay. Did you feel like Ms. Miller addressed your issues regarding Ms. Kroger?

A. I -- I felt that Amber's role was more of a listener. She wasn't there to address such concerns or issues, but she was there for us to whine to. She was -- you know, she was very supportive in that way; sometimes we just needed to express ourselves.

Q. Okay. Who would have been the person to address those issues?

A. Well, I guess it would be Charlotte herself and Patricia.

Q. Okay. Is it my understanding that you feel like those issues were not handled appropriately? Or were they handled appropriately?

A. They were handled appropriately.

Q. Okay. So there was no -- if -- if Ms. Oriti and Ms. Kroger had not addressed your concerns where would you have gone with any complaint or issue?

MS. JACOBS: Objection. Form.

Page 82

A. I don't even know. I --

Q. (BY MR. GARNER) Would you have gone --

A. -- thought --

Q. -- to Dawn Glasgow? Would she have been the next person to go to?

A. I don't think so.

Q. Okay. Who -- if -- If Ms. Oriti did not respond to your concerns or if Ms. Kroger did not respond to your concerns who would you have gone to at Austin Montessori School to express your concerns?

MS. JACOBS: Objection. Form.

A. Honestly I don't know. Because I -- I never had to think that far.

Q. (BY MR. GARNER) Okay. Nevertheless, all of those issues were resolved, correct?

A. Yes.

Q. Okay. Now, I know you know this, but just for the benefit of the gentlemen of the Jury you're suing Austin Montessori School for pregnancy discrimination, correct?

A. Yes.

Q. Okay. Why do you think -- In your words why do you think you have been discriminated by Austin Montessori School in connection with your pregnancy?

A. Well, when I first broke news of my pregnancy

Page 83

it was the reaction that I received.

Q. Okay. Well, let's break that down. When did you first find out you were pregnant?

A. When did I find out?

Q. Uh-huh.

A. Sometime in February. Sometime in February.

Q. Okay. February of 2010?

A. Yes.

Q. Okay. When was the first time you told anyone at Austin Montessori School that you were pregnant?

A. I don't remember the exact date.

Q. Do you remember who you told?

A. Yes.

Q. Who did you tell?

A. Amber and Charlotte.

Q. Did you tell them together --

A. They were in the same --

Q. -- or were they separate -- were they separate instances?

A. They were in the same room; I told them together.

Q. Okay. And how did the -- you say you were concerned about how they reacted. How did they react?

A. When I first said I was pregnant Charlotte

Page 84

said, "Oh, my God. That's a problem."

Q. That was Charlotte Kroger's first words was, "Oh, my God. That's a problem"?

A. Yes.

Q. Did you ask her why that was a problem?

A. I didn't ask her, but I -- I was in shock and so I said, "Excuse me," and at -- at that point she -- she -- she recanted her position --

Q. Okay.

A. -- her statement. I'm sorry.

Q. She recanted her statement that it was a problem?

A. Yes.

Q. What did she say after that?

A. I don't remember, but she made a joke about something.

Q. Is it that time that Ms. Kroger notified you that one of the parents had actually come up to her and asked if you were pregnant?

A. Yes. I think that's what prompted me to tell them that, in fact, I was pregnant.

Q. So a parent had come to you first and asked you if you were pregnant?

A. No. No. A parent had asked Amber if I was pregnant.

21 (Pages 81 to 84)

Kim Tindall & Associates, Inc. 645 Lockhill-Selma, Suite 200    San Antonio, Texas 78216
Phone (210) 697-3400                                          Fax (210) 697-3408

Electronically signed by Dicie Eytcheson (301-362-425-8759)                4fceefd1-91c4-44c9-995b-2cac908dd802

Page 93

Dawn Glasgow about your finding out that you were pregnant?

A. Did I go?

MS. JACOBS: Objection. Form.

Q. (BY MR. GARNER) Yeah. Did you --

A. I did not go.

Q. Did you go tell her that, Hey, Dawn, I'm pregnant?

A. No.

Q. Okay. Did you ever tell Don Goertz?

A. No.

Q. So is it fair to say that you only notified Charlotte Kroger and Amber Miller that you were pregnant?

A. Yes.

MS. JACOBS: Objection. Form.

Q. (BY MR. GARNER) Did you ever go to -- when Charlotte said, "Oh, my God. That's a problem," did you ask her what she meant by that?

MS. JACOBS: Objection. Form.

A. I did.

MR. GARNER: Okay. What's the basis of that objection?

MS. JACOBS: You already asked her about the -- whether she had responded to her or asked her

Page 94

again.

MR. GARNER: Okay. I don't think I asked that question so I'm going to ask again.

Q. (BY MR. GARNER) Did you ever ask Charlotte Kroger what she meant by, "Oh, my God. That's a problem"?

A. I'm sorry. I didn't ask her what she meant by that, but I -- I said, "Excuse me?" That was my response.

Q. Okay. And at that time she recanted?

A. Yes.

Q. How did she recant?

A. She said a joke, I don't remember the joke; and then she asked me, "Is this what you want?"

Q. Did you ask her what she meant by that?

A. I think I did.

Q. Okay. And how did she -- how did she react or how -- how did she respond?

A. How did she respond?

Q. Yeah. I mean, that could mean a number of different things, is this what you want. I mean, I -- I don't even know what that means when she says that. How did you take it?

A. I -- I didn't -- I -- Honestly, I was in such shock I didn't really -- I don't remember how I reacted

Page 95

or -- I was just -- I was in shock.

Q. Okay. Did Amber Miller react at that point in time, or did she say anything?

A. You know, I don't remember hearing anything from her at that time or I don't remember her facial expression.

Q. Did you ever go -- once that happened, did you ever go to Dawn Glasgow and say -- tell Dawn what happened?

A. No.

Q. Did you ever go to Don Goertz and let him know how Charlotte Kroger reacted or what Charlotte Kroger said?

A. No.

Q. Did you tell anybody?

A. I -- I told my husband.

Q. Okay. And how did your husband react?

A. He was -- he was upset.

Q. Okay. Did he suggest you go talk to somebody at Austin Montessori School about how Charlotte Kroger reacted?

A. No.

Q. I mean, did you complain to anybody at Austin Montessori School whether in the administration side or the pedagogical side about Charlotte Kroger's reaction

Page 96

or what she said to you?

A. No.

Q. Did anyone -- Prior to March 26th, 2010, did anyone prior to that ever express any concerns regarding your status as being pregnant at Austin Montessori School?

MS. JACOBS: Objection. Form.

A. What is March 26th? What have --

Q. I -- I'll -- I'll get to that in a minute. I'll -- I'll -- I'll show you that exhibit. I'm just trying to figure out a time line.

You know, did anybody at Austin Montessori School ever tell you that your pregnancy was going to be a problem?

MS. JACOBS: Objection. Form.

A. Charlotte did.

Q. (BY MR. GARNER) Okay. Anybody other than Charlotte?

MS. JACOBS: Objection. Form.

A. Nobody told me directly.

Q. (BY MR. GARNER) Okay. When you say, "Nobody told me directly," what do you mean by that? Did somebody imply that it was going to be a problem?

A. Just whenever I had to go to the doctor Dawn Glasgow, you know, yeah, it was -- she was not happy

24 (Pages 93 to 96)

Electronically signed by Dicie Eytcheson (301-362-425-8759)                    4fceefd1-91c4-44c9-995b-2cac908dd802

CAROLINE CLARK                                              September 16, 2011

Page 97

about my taking leave to go to the -- to my -- my gynecologist.

Q. Okay. Did she tell you why she had a problem with you leaving?

A. She said that the timing wasn't -- wasn't great.

Q. The timing in what way?

A. The appointment. My doctor's appointment.

Q. Like the time of the day that you had to --

A. The --

Q. -- be going?

A. The time of the day, yes.

Q. Okay. I mean, you had left work in many different instances before that for other doctor appointments, correct?

A. I was -- I had to take care of my son when he had RSV, yes.

Q. Okay. And was it -- did Dawn Glasgow say that she had concerns about you leaving the classroom at that time?

A. I didn't -- No, she didn't.

Q. Okay. So you think that Dawn Glasgow was saying that she had a problem with you going to your OB/GYN because you were pregnant or just the fact that you were going to be away from the classroom?

Page 98

A. I think the fact that I was going to be away from the classroom.

Q. I'm going to hand you what's marked as Exhibit 1 to the previous depositions.

Have you seen this document before?

A. Yes.

Q. Okay. And for the record, it's designated AMS000219; it's dated March 26th, 2010.

Would you agree with me that this is Donald Goertz's notification to the parents that you're pregnant?

A. Yes.

Q. Okay. And is there anything within this letter that expresses concern about you being pregnant?

MS. JACOBS: Objection. Form.

A. What is the question again?

Q. (BY MR. GARNER) Well, does this sound like the people at Austin Montessori School are upset that you're pregnant?

A. No.

Q. Okay. I mean, in fact, the first line says that it's exciting news that you're pregnant, correct?

A. Correct.

Q. And it says that you're expecting your baby in October; is that correct?

Page 99

A. Yes.

Q. Okay. Somebody had to have told Donald Goertz that you were pregnant, right; but it wasn't you, right?

A. Yes.

Q. Okay. Did you tell anybody that you were due in October?

A. I told Dawn Glasgow.

Q. Okay. When did you tell Dawn Glasgow that you were due in October?

A. At the meeting where she and -- she called for a meeting with her and Amber.

Q. Okay. And when was that meeting if you recall?

A. April 30th, 2010.

Q. Okay. Well, there's an inconsistency here and I need to clarify it then.

If you told Dawn Glasgow that you were due in October on April 30th, how could Don Goertz write a letter in March that you're due in October?

MS. JACOBS: Objection. Form.

A. I don't remember.

Q. (BY MR. GARNER) Could it have been that you told somebody that you were due in October at Austin Montessori School prior to April 30th?

A. It's possible.

Q. Okay. I just want to clarify that; because

Page 100

that doesn't make sense that Don Goertz would be sending a notice to all of the parents that you're pregnant and due in October if you hadn't told anybody that you were due in October; would you agree with me on that?

A. Yes.

Q. Okay. Now, in the second paragraph of Exhibit No. 1 it says, "We are working now to create a plan that will allow Caroline the opportunity to spend time with her new baby as well as provide the best arrangement for the children of Laurel Cottage."

Would you agree with me that Austin Montessori School always had the best interests of the children at heart?

MS. JACOBS: Objection. Form.

A. Yes.

Q. (BY MR. GARNER) Okay. Excuse me.

Did you ever tell anybody at Austin Montessori School that you wanted to take some time off after you had your child, your second child?

A. Did I tell anybody that I wanted to take some time off?

Q. Yes?

A. Yes.

Q. Okay. Who did you tell?

A. Amber and Dawn.

25 (Pages 97 to 100)

Electronically signed by Dicie Eytcheson (301-362-425-8759)                 4fceefd1-91c4-44c9-995b-2cac908dd802

CAROLINE CLARK                                    September 16, 2011

Page 101

Q. Okay. And do you recall how long you told them that you wanted to take off?

A. No.

Q. Okay. Do you -- it -- Would you dispute the fact that they contend you told them that you wanted to take twelve weeks off?

A. I would dispute that.

Q. Okay. So you never intended to take twelve weeks off?

MS. JACOBS: Objection. Form.

A. I never did.

Q. (BY MR. GARNER) Okay. Did you ever tell anybody at Austin Montessori School how much time you wanted to take off after the birth of your second child?

A. Well, I wanted to return in -- in the new year in January.

Q. Okay. So if you're due in October, do you recall when you were due in October?

A. The due date was October 27th.

Q. Okay. When did you actually have your second child?

A. October 6th.

Q. October 6th?

A. Yes.

Page 102

Q. And if you had taken off from October 6th until the end of January how many weeks would that be?

A. Four --

Q. Eleven weeks?

MS. JACOBS: Objection. Form.

Q. (BY MR. GARNER) Is that about right?

A. Well, there's two weeks -- two and a half weeks in December, and then two, three days in November so I would have to calculate. So -- so three weeks in October, three weeks of November -- six -- about eight weeks.

Q. (BY MR. GARNER) Eight weeks?

A. (Nods head.)

Q. Okay. Would you agree with me that a house guide being gone for eight weeks towards the end of a semester would be a disruption to the class?

A. It would be a -- a change, a big change, a transition.

Q. And would you agree with me that changes and transitions for that age group can be not beneficial to the children?

A. But it can be a great learning experience as well.

Q. Okay. Is that a "Yes" or a "No" to my question?

Page 103

MR. GARNER: Because I'm going to object to nonresponsive. That didn't really answer my question.

A. Okay. Ask me your question again.

Q. (BY MR. GARNER) Would you agree with me that it's a disruption to the classroom?

A. No.

Q. No?

You don't believe losing a teacher for eight weeks would be a disruption to the classroom?

A. You know, I -- I really believed in the support system that the school had in place there.

Q. Well, let me ask you about that support system.

Was the assistant that you had working with you, was that assistant -- what was that assistant's name?

A. Socorro.

Q. Socorro?

A. Yes.

Q. Was Socorro licensed as a house guide?

A. No.

Q. Okay. Were there any other house guides that could have taken over your class?

A. There was a person who was in training; and she would have returned summer of 2010 fully trained.

Page 104

MR. GARNER: That doesn't answer my question so I'm going to object to nonresponsive.

Q. (BY MR. GARNER) Did anybody at Austin Montessori School -- was there a licensed house guide that was ready to take over your class at that time period?

A. No.

MS. JACOBS: I don't want to interrupt you; but it's almost 1:00. If you're going to go for much longer I'm going to need a short lunch break.

MR. GARNER: Okay.

MS. JACOBS: Is there any time that you want to take it that's convenient for you?

MR. GARNER: What time is it now?

MS. JACOBS: It's 12:50.

MR. GARNER: Oh, it's 12:50? Yeah. Let's go ahead and take a break. Let's go off the record we'll take a -- how long do you need?

MS. JACOBS: I mean, I -- I brought something, so 20, 30 minutes.

MR. GARNER: Ms. Clark, how much do you need?

THE WITNESS: Twenty, 30 minutes is --

MR. GARNER: Thirty minutes?

THE WITNESS: Yes.

26 (Pages 101 to 104)

Electronically signed by Dicie Eytcheson (301-362-425-8759)                    4fceefd1-91c4-44c9-995b-2cac908dd802

Page 113

just --

MR. GARNER: Okay.

Q. (BY MR. GARNER) I'm going to hand you what is marked as Exhibit 26.

MR. GARNER: Can I get three copies of this? Or --

MS. JACOBS: Yes.

MR. GARNER: -- at least one. One to be marked and one to be -- that I can read.

MS. JACOBS: Can we go off the record.

MR. GARNER: Yeah. Yeah. That's fine. Let's go off the record.

THE VIDEOGRAPHER: Off record at 1:39.

(Off the record, and Deposition Exhibit No. 26 marked.)

THE VIDEOGRAPHER: We're back on the record at 1:53.

Q. (BY MR. GARNER) Okay. I'm going to hand you what has been marked as Exhibit --

MR. GARNER: What are we -- number on? Twenty-six?

Q. (BY MR. GARNER) -- which is identified as P085, and I had previously given you Exhibit 25; is that correct?

A. Yes.

Page 114

Q. Okay. And Exhibit 25 is dated May 24th, 2010, and it's my understanding --

Well, let me ask you this: Is this -- Exhibit 26, is this the letter that you submitted to the school to notify the parents of your pregnancy?

A. This is the letter I submitted to Dawn, yes.

Q. Okay. Do you remember when you submitted this letter to Dawn?

A. I don't -- I don't remember.

Q. Was it before or after the April 30th meeting?

A. It was after the April 30th.

Q. It was after?

A. Yes.

Q. Okay. Let's talk about the April 30th meeting.

How were you notified that Dawn Glasgow and Amber Miller wanted to meet with you on April 30th?

A. I don't remember if it was Dawn or Amber who said that they both wanted to meet with me --

Q. Okay.

A. -- after school hours.

Q. Okay.

A. After class.

Q. Where did you meet?

A. We met in Amber's office.

Q. Okay. And who was all present? You --

Page 115

A. Yeah.

Q. -- Dawn and Amber?

A. Yes.

Q. Okay. Do you know -- remember how that meeting started?

A. Yes.

Q. Why don't you tell me what happened in that meeting?

A. Well, I remember most of it.

Dawn started the meeting saying, "Oh, my God. Parents are still talking about Janice."

Q. Janice. Who is Janice?

A. Janice was the guide who used to be the children's house guide at Laurel Cottage and when she had her baby I took over.

Q. Okay. And is there any context in connection with that statement? I mean, why -- why would she start the meeting that way if you know?

A. I don't know.

Q. Okay. So it's your testimony here today that she started off with Dawn saying that everybody's still talking about Janice?

A. Yes.

Q. Okay. And Janice had been gone for three years?

Page 116

A. No. For less than two years.

Q. Less than two years.

Okay. And what -- what did she say after that?

A. I think at that point she asked me what my plans were.

Q. Okay. And what do you recall telling Ms. Glasgow and Ms. Miller?

A. As far as I remember, I think I said, "The baby's due in October. I'd like to come back in the new year."

Q. Okay. Anything else that you told them at that time?

A. I -- I remember saying -- you know, saying something to the effect that I -- I wasn't even -- I don't have all of the particular details yet; because I'm just trying to get over my morning sickness. I was very ill at that time.

Q. Uh-huh. Anything else?

A. That's -- that's what I remember from how that meeting started.

Q. Okay. Did they discuss anything that would affect the -- the rest of your contract for that year?

A. Not for that year, no.

Q. Okay. They didn't reduce your hours or

29 (Pages 113 to 116)

Electronically signed by Dicie Eytcheson (301-362-425-8759)            4fceefd1-91c4-44c9-995b-2cac908dd802

CAROLINE CLARK                                        September 16, 2011

Page 121

MS. JACOBS: Objection. Form.

Q. (BY MR. GARNER) I mean, tell me a little bit more about this conversation that you had with Donna Romine?

A. I don't remember the exact words I used, but I -- to a certain extent, I just -- I said, "What -- what is your role?"

Q. And how did she respond?

A. I don't -- I don't remember. I think she enumerated a number of responsibilities but I don't remember what she said.

Q. Okay. Since you don't remember what she said could it be that you expressed interest in the campus coordinator position to Donna Romine at that time?

MS. JACOBS: Objection. Form.

A. I did not express interest in that position.

Q. (BY MR. GARNER) Okay. That's your testimony here today but is that what you recall from that conversation that you didn't?

A. I did not express interest.

Q. Okay. So if Donna Romine testifies that you expressed interest in the campus coordinator position she would not be accurate about that?

A. Yeah.

MS. JACOBS: Objection. Form.

Page 122

A. Yes. She's not accurate.

Q. (BY MR. GARNER) Okay. When -- At the April 30th meeting when Dawn Glasgow and Amber Miller asked you about your interest in the campus coordinator position did you say, I'm not interested in that?

A. I did. I remember thinking, "I wonder why this is coming up."

Q. Did you ask them?

A. I said -- I remember asking, "What about the teaching position? Is that not available to me?"

Q. Okay. And is that how you worded it?

A. It's not verbatim, but that's -- to a certain extent that's how I said it.

Q. And how did they respond?

A. I -- I remember -- I just remember hearing Dawn say, "No."

Q. You just remember hearing Dawn say no?

A. Yes.

Q. Did -- At that time did Amber Miller or Dawn Glasgow tell you about the campus coordinator position?

A. You know, that meeting is very fuzzy now to me. At that time I remember feeling dizzy; I was just in shock.

Q. So could they have told you about the campus

Page 123

coordinator position, you just don't remember?

A. I don't think they told me what the -- what the -- what the responsibilities were at that meeting; I don't remember that.

Q. Do you recall them asking you what you wanted?

A. No.

Q. And you don't recall them asking you about -- or telling you about the campus coordinator position and detailing that it was less stressful than a house guide position?

A. Say -- say that again.

Q. Do you recall them telling you at that time -- When they were discussing the campus coordinator position with you, do you recall them telling you about how it would be less stressful than the house guide position?

A. I think there was a little bit of that --

Q. In fact in --

A. -- talk.

Q. -- in the context of that conversation didn't they also tell you that they recognize that you wanted to spend more time with your family?

A. No.

Q. Okay. Did they tell you that the campus coordinator position would require less time than the

Page 124

house guide position?

A. They never told me that, no.

Q. They never told you that?

A. No.

Q. Did they talk to you about the differences between a house guide and a campus coordinator?

A. I don't remember if they talked to me about that.

Q. Do you remember them telling you that it would be actually less work than a house guide position?

A. They never said less work.

Q. Did they tell you that there was more flexibility in the campus coordinator position than the house guide position?

A. Yes.

Q. Did they also tell you that it would be less physical or less strenuous than the house guide position?

A. No.

Q. Did they also talk to you about how as a house guide you're teaching one class; and in your case three to six year olds? Did they talk to you about being a campus coordinator the fact that it would give you additional experience in observing other house guides and the way they did their job?

31  (Pages 121 to 124)

Kim Tindall & Associates, Inc. 645 Lockhill-Selma, Suite 200    San Antonio, Texas 78216
Phone (210) 697-3400                                            Fax (210) 697-3408

Electronically signed by Dicie Eytcheson (301-362-425-8759)                    4fceefd1-91c4-44c9-995b-2cac908dd802

CAROLINE CLARK                                        September 16, 2011

Page 125

A. No.

Q. Did they talk about how you would have experience of going beyond the three to six year olds to -- for you to observe house guides in other age groups and how they conducted their classroom?

A. No.

Q. Is it that they didn't discuss it with you or you just don't remember?

MS. JACOBS: Objection. Form.

Q. (BY MR. GARNER) You can answer if you understand the question.

A. I don't remember them discussing it with me.

Q. Okay. Could that -- could that conversation have taken place and you just don't remember?

MS. JACOBS: Objection. Form. Can you --

A. I don't think so.

Q. (BY MR. GARNER) Okay. How long did this meeting last?

A. I'm not sure. I know it ended at -- ended late, around 5:30, but I don't remember what time it -- I -- I -- Actually I'm sorry. I don't know how long; but it was more than an hour, I think.

Q. Okay. Well, I've asked you about what they discussed with you in that hour and what we've covered has taken literally, you know, five minutes. What else

Page 126

do you recall from that meeting that they discussed with you?

A. It was -- Well, I also expressed, you know, I was tearful at that meeting.

Q. Okay. Why were you tearful?

A. I -- I did not want that position; I wanted to teach.

Q. Okay. At that time was it your understanding that they told you that you could not be a campus -- I mean, a house guide at that time?

A. Yes. For the next school year, yes.

Q. How did the meeting close?

Didn't they ask you to think about it? Or did you ask to think about it?

A. I -- I don't know if they asked me to think about it but I -- I do know I said that I would think about it.

Q. Okay. At that meeting do -- you understood that you weren't guaranteed a job for the next year, right?

A. I -- That's not how I took it.

Q. Well, you understood that you would have to sign a new contract for the next year?

A. Yes.

Q. Okay. And you understood that that was

Page 127

essentially a new job; every year is a new contract, right, we've already discussed that?

MS. JACOBS: Objection. Form.

A. Every year is a new contract, yes.

Q. (BY MR. GARNER) Okay. And you're not guaranteed an -- a position for the next year, are you?

A. I guess not. I don't know.

Q. Okay. At that time did they say that they were not going to renew your contract to be a house guide?

And I -- I want you to think about how I'm phrasing that question; because it's a very specific question.

My question is: You -- at that time on April 30th did they tell you that they were not going to allow you to come back as a house guide?

A. Yes.

Q. Okay. So when -- it's my understanding, based upon the testimony that's occurred thus far, on April 30th that Dawn Glasgow and Amber Miller left it with you to think about it; is that correct?

MS. JACOBS: Objection. Form.

A. What -- what do you mean? Think about what?

Q. (BY MR. GARNER) About the campus coordinator position and the house guide position, what you wanted

Page 128

to do.

A. Yes.

MS. JACOBS: Objection. Form.

Q. (BY MR. GARNER) Okay. So at the close of that meeting they asked you, We want you to think about what you want to do as to where you want to be next year, correct?

A. I don't remember them asking me that question.

Q. Okay. Well, how do you remember --

A. I --

Q. -- being closed?

A. I remember saying that I would think about it.

Q. Okay. And in fact, that wasn't the last meeting, was it?

A. No.

Q. Okay. There was a second meeting, right?

A. Yes.

Q. Okay. So you would agree with me that on April 30th it was still an open issue?

MS. JACOBS: Objection. Form.

A. What was an open issue?

Q. (BY MR. GARNER) That no determination had been made at that time, had there?

MS. JACOBS: Objection. Form.

A. Right.

32 (Pages 125 to 128)

Kim Tindall & Associates, Inc. 645 Lockhill-Selma, Suite 200    San Antonio, Texas 78216
Phone (210) 697-3400                                    Fax (210) 697-3408

Electronically signed by Dicie Eytcheson (301-362-425-8759)                4fceefd1-91c4-44c9-995b-2cac908dd802

CAROLINE CLARK                                                September 16, 2011

Page 129

Q. (BY MR. GARNER) Okay. So you would agree with that?

A. No determination as to --

Q. As to what you were going to come back as; whether it was as a house guide or a campus coordinator.

A. I think it was clear that I wasn't going back as house guide.

Q. Well, and I go back to the fact that it -- so it's your testimony that on April 30th Dawn Glasgow and Amber Miller told you that you could not come back as a house guide?

A. Yes.

Q. So why the second meeting? If you had to go back and think about it, what were you going to go think about?

A. You know, I don't -- at that time I just remember that it was big news to me. I -- I just remember that I needed to di- -- digest the information.

Q. Okay. Well, the reason why this is important to me and I think it's going to be important to the ladies and gentlemen of the Jury is, you've testified at this meeting that you were very emotional and -- and you admit that you don't remember everything that happened in this meeting; can we agree on that?

A. Yes.

Page 130

Q. And I'm tying to find out as much detail in your -- in your understanding of what happened at that meeting; and it's my understanding that at that meeting they came in and they -- you -- you think that they said, You can't come back as a house guide --

MS. JACOBS: Objection.

Q. (BY MR. GARNER) -- is that right?

A. They said that the position was not available to me, yes.

Q. Okay. As a house guide?

A. Yes.

Q. And they wanted to offer you a campus coordinator position?

A. Yes.

Q. Okay. But they were going to give you time to think about it?

MS. JACOBS: Objection. Form.

A. Yes.

Q. (BY MR. GARNER) Okay. What else in your recollection occurred at this meeting?

A. I -- I -- I was just very emotional and very tearful. That's really what I can remember at the moment; that I was just very upset at that time.

Q. Okay. And it's your testimony here today that they did not talk to you about the campus coordinator

Page 131

position and what it did?

A. Not specifically, no.

Q. Okay. They didn't talk about the duties and responsibilities of a campus coordinator?

A. I don't remember that, no.

Q. Did they talk about how you were going to be still a teacher; you just weren't going to be a house guide?

MS. JACOBS: Objection. Form.

A. I don't remember that.

Q. (BY MR. GARNER) Okay. Do you recall anything else that happened at this meeting?

A. I remember I explained that I was curious -- I asked Donna Romine out of curiosity.

Q. About the campus coordinator position?

A. Yes.

Q. Okay. And how did they respond?

A. You know, there was a lot of consoling and --

Q. Consoling? What do you mean?

A. Well, I was tearful, so, you know, they said -- they offered tissues. You know, they said, "Sorry. I thought this is what you wanted."

Q. Okay. And -- and why do you think they said, "Sorry. We thought this is what you wanted"?

A. I -- I don't know. I guess it would be because

Page 132

they assumed I want -- I was interested in that position.

Q. Okay. And why would you think that they assumed that?

A. I can only speculate; but I think it's because of what Donna Romine told them.

Q. Based upon your conversation with Donna Romine?

A. Yes.

Q. Did you ever -- well, at this -- at this April 30th meeting did you tell Amber and Dawn Glasgow -- Amber Miller and Dawn Glasgow that you wanted to be a house guide and only a house guide?

A. I -- I remember telling them that I -- I want to teach; that that's all I know what to do.

Q. Okay. And do you -- did you understand at that time that a campus coordinator position and a house guide are both teaching positions?

MS. JACOBS: Objection. Form.

A. No. That was not my understanding.

Q. (BY MR. GARNER) Okay. Were you ever told that they weren't teaching positions -- or that a campus coordinator was not a teaching position?

A. Tell me again.

Q. Were you ever told that a campus coordinator did not have any teaching responsibilities?

33 (Pages 129 to 132)

Electronically signed by Dicie Eytcheson (301-362-425-8759)                4fceefd1-91c4-44c9-995b-2cac908dd802

CAROLINE CLARK                                      September 16, 2011

Page 133

MS. JACOBS: Object. Form. I'm sorry. I need to strike that objection.

A. I was never told that.

Q. (BY MR. GARNER) And but you closed the meeting by saying you wanted to think about it and consider the campus coordinator position?

A. Yes.

Q. Okay. And as a result of that there was another meeting; was there not?

A. Yes.

Q. And when was that meeting; do you recall?

A. Two weeks after. About May --

Q. Around May 14th?

A. Yes.

Q. Okay. Let's talk about the time period between April 30th and May 14th. You can -- did you continue teaching?

A. Yes.

Q. At Laurel Cottage?

A. Yes.

Q. Okay. Did anyone at the school treat you any differently?

A. No.

Q. Okay. Did the conditions of your employment change during that time period?

Page 134

A. Not that I recall.

Q. Okay. Did anybody talk to you during that time period between May -- I mean, April 30th and May 14th (the second meeting) that you would not be offered a position as a house guide?

A. No. Nobody else talked to me about that.

Q. Okay. Did you talk to anybody else?

A. Just my husband.

Q. Okay. And when you talked to your husband (Adam) what were your conversations with your husband about it?

MS. JACOBS: Objection. It's -- conversations are privileged. I would object -- I'll let her go ahead and share generally but she will -- it's her husband, so they're privileged.

MR. GARNER: Okay.

Q. (BY MR. GARNER) You talked to your husband about it?

A. Yes.

Q. And what did you tell your husband?

A. I told him what they told me at the meeting.

Q. Okay. And how did he react?

A. I think he was reacting more to my reaction; he was trying to console me.

Q. Okay. And did y'all talk about the campus

Page 135

coordinator position?

A. Not really.

Q. Did you talk about --

Well, let me ask you this: What did you tell your husband happened at the meeting?

A. I think I remember telling him that they don't want me to teach the following year.

Q. Okay. Is that all you told him?

A. That they offered me a different position.

Q. Okay. Did you tell him why they offered you that other position?

A. I told him because I was pregnant.

Q. Okay. Did anybody tell you that the reason why they were offering you that was because you were pregnant?

A. That was my understanding.

Q. Okay. But nobody told you that?

A. Okay. Tell me the question again.

Q. Okay. Did anyone tell you that they were -- did Dawn or Amber tell you that they were offering you this position because you were pregnant?

A. At that time I believed so.

Q. Okay. That's -- All right.

MR. GARNER: Objection. Nonresponsive. That's not what my question is.

Page 136

Q. (BY MR. GARNER) My question is, is, did Dawn Glasgow or Amber Miller tell you the reason why they were offering you this campus coordinator position was because you were pregnant?

A. I don't remember. I --

Q. Okay. In fact, we had already discussed the fact that they told you that they thought that's what you wanted; isn't that correct?

A. I'm sorry. Clarify that for me. What --

Q. Well, didn't you already tell me that they told you that that's what you -- that's what they thought you wanted was to be a campus coordinator?

A. Yes.

Q. Okay. But you told your husband that they said it was because you were pregnant --

MS. JACOBS: Objection. Form.

Q. (BY MR. GARNER) -- is that correct?

A. Yes.

Q. Okay. But Dawn Glasgow and Amber Miller never said that, did they?

A. They never used those -- the -- that phrase, that -- that term.

Q. Okay. And no one from Monte- -- Austin Montessori School talked to you about it up until the next meeting?

34 (Pages 133 to 136)

Electronically signed by Dicie Eytcheson (301-362-425-8759)                    4fceefd1-91c4-44c9-995b-2cac908dd802

CAROLINE CLARK                                      September 16, 2011

Page 137

MS. JACOBS: Objection. Form.

A. Talked about what, please?

Q. (BY MR. GARNER) About the campus coordinator position or your position as a house guide for the next year.

A. Yes.

Q. Okay. And the next meeting that occurred was May 14th, 2010, right?

A. Yes.

Q. In that conversation with your husband, before that conversation with Dawn and Amber on May 14th, did you and your husband talk about moving to Dallas?

A. Ask me that question again.

Q. Prior to the second meeting did you and your husband discuss moving back to Dallas?

A. Before May 14th?

Q. Yes.

A. Yes.

Q. Okay. And was that because you believed that Austin Montessori School was not going to allow you to be a house guide or was that for some other reason?

A. It was for some other reason.

Q. What reason was that?

A. I felt that they were not going to be supportive of my pregnancy.

Page 138

Q. Okay. What made you think of that?

A. Well, other than Charlotte's response, it was also her instruction not to touch my belly and not to tell -- so that parents won't suspect.

Q. Okay. Isn't it true that during this April 30th meeting that Amber and Dawn also talked to you about the consistency of the classroom and the continuity with the children?

A. You know, it was based on the premise of what happened previously with Janice Kearley.

Q. And why do you say that?

A. Because that's how the meeting opened; that Dawn said, "Parents are still talking about Janice."

Q. Okay. Well, did -- after that initial statement did Janice ever come up again?

A. Yes.

Q. Okay. And what was said? Because you previously said you didn't remember anything else from that meeting and now you're saying Janice was brought up again. What did they say about Janice?

MS. JACOBS: Objection. Form.

A. That parents were still talking about her being -- her pregnancy and her leave and having the baby in the school.

Q. (BY MR. GARNER) Okay. So it's now your

Page 139

testimony, after rec- -- recalling more from that meeting, that Dawn Glasgow and Amber Miller talked about Janice -- what was her last name?

A. Kearley.

Q. -- Kearley? They talked about Janice Kearley being -- that the parents were talking about Janice Kearley being pregnant, correct?

A. I -- Yeah.

MS. JACOBS: Objection. Form.

A. Her pregnancy in general.

Q. (BY MR. GARNER) In general?

So it's your testimony that Dawn and Amber said that they were talking about Janice Kearley's pregnancy in general?

A. They were still talking about Janice's pregnancy, yes.

Q. Isn't it true that they were talking about Janice Kearley's leave from the classroom?

A. I think that also ties into what -- what was brought up that time.

Q. Okay. Would -- would you agree with me that Amber Miller and Dawn Glasgow were focusing on the amount of time that you were going to be gone -- or Janice Kearley was going to be absent from the classroom?

Page 140

MS. JACOBS: Objection. Form.

A. No. That was not my understanding.

Q. (BY MR. GARNER) Okay. Did they talk to you about how much time you were going to be absent from the classroom?

A. They asked me in the beginning what my plans were.

Q. Okay. And at that time you told them that you were due in October and that you wanted to stay out until the beginning of the next year --

A. Yeah.

Q. -- correct?

A. Yes.

Q. Okay. And did they at that time express any opinion, concern, or was there any discussion about the amount of time that you would be gone from the classroom?

A. I don't remember.

Q. Okay. Your statement that your discussion with your husband before April 14th, 2010, the second meeting, was that you --

MS. JACOBS: May.

Q. (BY MR. GARNER) -- were concerned that Austin Montessori School would not be supportive --

MS. JACOBS: Objection. Form.

35 (Pages 137 to 140)

Kim Tindall & Associates, Inc. 645 Lockhill-Selma, Suite 200    San Antonio, Texas 78216
Phone (210) 697-3400                                          Fax (210) 697-3408

Electronically signed by Dicie Eytcheson (301-362-425-8759)                4fceefd1-91c4-44c9-995b-2cac908dd802

CAROLINE CLARK                                                    September 16, 2011

Page 141

Q. (BY MR. GARNER) -- in your pregnancy and that's why you and your husband were discussing moving back to Dallas?

A. Yes.

Q. Is that the only reason why, that you and your husband were considering moving back to Dallas?

A. I'm sure that's not the only reason why. I'm trying to recall. Well, that I wasn't going to be able to teach.

Q. Okay. Did you discuss at all about moving closer back to your family?

A. I think that was just -- that was after the fact, you know, that I wasn't going to be able to teach.

Q. Okay. Did you at any time prior to May 14th, 2010, discuss with your husband (Adam) about what a campus coordinator did?

A. I don't recall.

Q. Did you ever speak with Adam or anybody else about going back to Austin Montessori School and discussing options as to what would be available to you?

A. Yes.

Q. Okay. Who did you discuss that with?

A. With my husband.

Q. Okay. When did that happen?

A. I don't remember the exact dates.

Page 142

Q. Was that before a -- May 14th, 2010?

A. Yes. It's -- it was in between April 30th and May 14th.

Q. Okay. And what did you and your husband decide to do with regard to going back to Austin Montessori School and discussing options?

A. I -- I was going to ask if there were other positions available to me.

Q. Okay. And did you ever tell Austin Montessori School that you were interested in other positions at Austin Montessori School?

A. I e-mailed Dawn. I asked her what other options are available to me other than campus coordinator. I e-mailed her -- In the same e-mail I asked her, what -- is there -- what are the responsibilities of a campus coordinator.

Q. Okay. And do you recall when that e-mail was sent?

A. I only remember it was between April 30th and -- Oh, wait. Between -- before May 7th.

Q. Before May 7th?

A. Yes.

MR. GARNER: Has that been produced?

MS. JACOBS: She doesn't have copies of her e-mail from the school. The school has her e-mail,

Page 143

so I'm not sure. I mean, we've -- I certainly haven't seen it.

Q. (BY MR. GARNER) Let me ask you this: Do you still have that e-mail account?

A. I don't have access to my e-mail account.

Q. Okay. Did you print out a copy of that e-mail that you say you sent to the Austin Montessori School and Dawn Glasgow before May 7th?

A. I never did, no.

Q. Did you ever talk to Dawn -- Dawn Glasgow over the phone or in person about other options?

A. I remember we were on the phone and she just said, "Let's meet"; but she didn't tell me in detail anything else.

Q. And --

A. That we would just meet.

Q. -- in fact, that meeting was the meeting that occurred; that meeting that Dawn Glasgow wanted you to have with her was the May 14th, 2010, meeting, correct?

A. Yes.

Q. Okay. Where did that meeting occur?

A. In Amber's office.

Q. Okay. And who was present for that meeting?

A. Dawn Glasgow and Amber Miller.

Q. Okay. And what occurred? What occurred? How

Page 144

did that meeting start, let me ask it that way. How did that meeting start on May 14th?

A. I don't know how it started, but -- I don't remember how it started.

Q. At that time did you talk to Dawn and Amber about options that were available to you?

A. No. At that time I -- I had decided to move to Dallas.

Q. Okay. So at that May 14th meeting you had decided that it was time that you were not going to come back to Austin Montessori School?

A. Yes.

Q. Okay. So you never asked Austin Montessori School about any options that were available to you?

MS. JACOBS: Objection. Form.

A. I asked in an e-mail prior to May 14th.

Q. (BY MR. GARNER) Right. And the response to that e-mail was a telephone conversation with Dawn Glasgow to say, Let's have a meeting?

A. Yes.

Q. Okay. And that meeting occurred on April -- I May 14th, right?

A. Yes.

Q. Okay. And at that meeting you walked into Amber's office and you told them that you and your

36 (Pages 141 to 144)

Kim Tindall & Associates, Inc. 645 Lockhill-Selma, Suite 200    San Antonio, Texas 78216
Phone (210) 697-3400                                                Fax (210) 697-3408

Electronically signed by Dicie Eytcheson (301-362-425-8759)                4fceefd1-91c4-44c9-995b-2cac908dd802

CAROLINE CLARK                                    September 16, 2011

Page 145

husband were moving to Dallas?

A. Something like that, yes.

Q. Okay. I'm going to hand you what is being marked as Exhibit 27.

(Deposition Exhibit No. 27 marked.)

A. Okay.

MR. GARNER: Oh, you know what? This is already an exhibit.

MS. JACOBS: That's all right.

MR. GARNER: That's okay.

MS. JACOBS: We can have duplicates.

MR. GARNER: It's also Exhibit 16. I missed it. That's my fault. I'd blame it on my help but unfortunately my help actually did do it, so it's -- it -- it all falls on me. They -- so we've got a -- we've got a duplicate exhibit here.

Q. (BY MR. GARNER) They -- Have you seen this before?

A. Yes.

Q. Okay. This was actually handed to you at that May 14th meeting; was it not?

A. Yes.

Q. But you already told -- Prior to looking at this, you had already told Dawn and Amber that you and your husband were moving to Dallas; isn't that true?

Page 146

A. Yes.

Q. Okay. And in this offer that you had already told them you weren't coming back, that's essentially the same salary and benefits that you would have had as a home guide; is it not?

A. It looks like it, yes.

Q. Okay. Did you --

A. Oh.

Q. -- think about maybe going back and talking to your husband to say, They're offering me the same salary and benefits for next year, and did you consider taking this position?

A. Yes. For practical reasons, yes.

Q. You did consider it?

A. Yes. We talked about it, yes.

Q. Okay. Is there a reason why you didn't accept this?

A. I wanted to teach.

Q. Okay. But you had already told -- Before you even talked to your husband about this, you told Austin Montessori School that you were moving to Dallas and you weren't coming back?

MS. JACOBS: Objection. Form.

Q. (BY MR. GARNER) Isn't that right?

A. Before I saw this?

Page 147

Q. When you walked in on May 14th, 2010, you had -- you and your husband had made the decision that you were moving to Dallas, correct?

A. Yes.

Q. Okay. And that is prior to anyone telling you that you weren't coming back as a home guide and the only thing available to you was campus coordinator position?

MS. JACOBS: Objection. Form.

A. Repeat that question.

Q. (BY MR. GARNER) Okay.

A. Can you break this down, please.

Q. All right. I'm going to -- I'm going to put it to you this way: Is it true or not, okay, on May 14th, 2010, you walked into that meeting knowing that you and your husband and ▆▆▆▆and your family were moving to Dallas?

A. Yes.

Q. And it was your intention walking into that May 14th meeting that -- to notify Austin Montessori School that you were not going to return as an employee of Austin Montessori School?

A. Yes.

Q. Regardless of what position you were in --

A. No.

Page 148

Q. -- you were not going to return to Austin Montessori School?

A. Not regardless. I -- if -- I understood that I could not teach anymore.

Q. Okay.

A. And that was the basis of my decision.

Q. I understand that you think that you were told that you could not come back as a home guide; but as of April 30th, 2010, isn't it true that no one told you that you could not come back; that they thought you wanted to come back as a campus coordinator?

MS. JACOBS: Objection. Form.

A. I asked if the option to teach was available and they said no.

Q. (BY MR. GARNER) Okay. When you said option to teach, did you say "option to come back as a home guide" or "option to teach"?

MS. JACOBS: Objection. Form.

A. Option to teach at Laurel Cottage.

Q. (BY MR. GARNER) Okay. And it's your testimony here today that they said, no, that was not available?

A. Yes.

Q. And did they tell you why that was not available?

37 (Pages 145 to 148)

Electronically signed by Dicie Eytcheson (301-362-425-8759)                4fceefd1-91c4-44c9-995b-2cac908dd802

Page 149

A. All I remember is hearing Dawn say, "People are still talking about Janice Kearley."

Q. Okay. That's not responsive to my question.

My question to you is, is, did you ask them why it was not an option for you to come back as the house guide at Laurel Cottage?

A. I don't remember asking them that question.

Q. Okay. Do you remember anyone telling you that it was not an option for you to return to Laurel Cottage as the house guide?

MS. JACOBS: Objection. Form. This question has been asked and answered I think at least four times.

MR. GARNER: I'm getting multiple -- and I'm getting different answers.

A. Okay. Ask me that question again, please.

Q. (BY MR. GARNER) Okay. Did anyone at that April 30th meeting tell you, specifically, you were not going to be able to come back as the house guide for Laurel Cottage the next year?

A. They -- I'm so sorry. Ask me again one more time.

Q. Okay. It's a very specific question.

Okay. Did anyone in that meeting on April 30th, 2010, Amber Miller or Dawn Glasgow,

Page 150

specifically tell you, Caroline Clark, you are not going to be able to come back as the house guide at Laurel Cottage for the next year?

MS. JACOBS: Objection. Form.

A. Yes.

Q. (BY MR. GARNER) Okay. And they put it in those specific terms?

MS. JACOBS: Objection. Form.

A. Not in those specific terms.

Q. (BY MR. GARNER) Okay. What do you, specifically, recall what they told you as to that belief that you had?

A. I remember asking what about the option of teaching. I -- I gestured my -- the office is across from my classroom. I remember gesturing towards my classroom. I remember asking, "What about the option to teach," and I said, "is that available to me," and Dawn said, "No."

Q. (BY MR. GARNER) Okay. And did she tell you why?

A. I believe she -- I'm trying to remember. She -- she said that they weren't going to be able to replace me.

Q. When you were going to be out after having your child?

Page 151

A. Yes.

Q. Okay. So it didn't have anything to do with up until the point you had the baby, it was aft- -- the time off that you were requesting until coming back the next year?

A. I -- I don't understand.

Q. Okay. Did Dawn Glasgow ever say, specifically, that the reason why they weren't offering you the option to teach was because you were pregnant?

A. No.

Q. Okay. When you received Exhibit 27 and Exhibit 16 you took this home and you discussed it with your husband?

A. No. I --

Q. Because the decision had already been made --

A. Well, it --

Q. -- that y'all were moving back to Dallas?

A. It wasn't given to me until May 14th.

Q. Right. I'm talking about on May 14th --

A. Correct.

Q. -- the decision had already been made to move to Dallas?

A. Yes.

Q. Okay. When you got this on May 14th, did you go back to your husband and say, This is the option?

Page 152

A. I don't remember. I don't think so.

Q. Did you ever give this to your husband?

A. No.

Q. Okay. Did anyone in the April 30th or May 14th meeting say once you are able to return to the classroom on a consistent basis that you would be able to return to be a house guide or be able to teach?

MS. JACOBS: Objection. Form.

A. No.

Q. (BY MR. GARNER) No?

A. No.

Q. So on May 14th --

Well, let me ask you this: At that May 14th meeting, did you even look at this letter?

A. Yes, I did.

Q. Did -- Was it before or after you told them that you were moving to Dallas?

A. I don't remember the specifics.

Q. Okay. If the testimony from Dawn Glasgow and Amber Miller is that you never looked at this at that meeting and that you walked in and said, Adam and I have decided to move to Dallas, would you dispute that?

A. I would -- I -- I looked -- I saw this. This looks familiar to me.

Q. Well, I know you saw it, but if you -- the

38 (Pages 149 to 152)

Electronically signed by Dicie Eytcheson (301-362-425-8759)                    4fceefd1-91c4-44c9-995b-2cac908dd802

CAROLINE CLARK                                          September 16, 2011

Page 169

Q. (BY MR. GARNER) -- is that correct?
A. Where does it say that?
Q. I'm talking about the lawsuit.
    In the lawsuit that you filed against Austin Montessori is it true that you contend that Austin Montessori School fired you?
A. They did not renew my teaching position.
Q. Okay. So they didn't fire you?
A. They didn't fire me.
Q. Okay. Would you agree with me that Austin Montessori School was free not to renew your contract for the next year?
A. Yes.
Q. You previously stated that you and Adam and ████████moved to Dallas in late June of 2010?
A. Yes.
Q. Okay. Your husband was still working for the company he was working for?
A. Yes.
Q. Did you seek employment for the next school year?
A. I did.
Q. Okay. Where did you -- where did you go to work for the 2010-2011 school year?
A. At East Dallas Community School.

Page 170

Q. And what was your position at East Dallas Community School?
A. I was a parent educator and I was also an office clerk.
Q. A parent educator. What is a parent educator?
A. We work with families. Basically we work directly with parents to give them support as to how to raise their children, develop -- in a -- in developmentally-appropriate ways for children under three years old.
Q. Okay. Did you apply at East Dallas Community School to be a home guide?
A. When?
Q. In 2010.
A. I asked if --
Q. And what did they say?
A. There was none available.
Q. Was there none available or is there -- is that what the reason why they gave you is that there were no positions available at that time?
A. There's --
    MS. JACOBS: Objection. Form.
A. There's -- there were only two classrooms. There's none available at that time.
Q. (BY MR. GARNER) Okay. And what two

Page 171

classrooms were there?
A. There were only two children's house level classrooms.
Q. Okay. Did you inquire about being a home guide for any other age group?
A. I'm not qualified to teach any other age group, no.
Q. Did you apply for any other home guide positions in the Dallas area for the 2010-2011 school year?
A. I inquired if there were any positions.
    MR. GARNER: Okay. I'm going to object to nonresponsive.
Q. (BY MR. GARNER) Okay. My question to you is, is, did you ever apply, fill out an application to serve as a house guide for any other Montessori school for the school year of 2010-2011?
A. No.
Q. Okay. Why not?
A. Actually on the day that we were moving to Dallas I got a phone call being offered a -- this position of parent educator.
    MR. GARNER: Okay. I'm going to object to nonresponsive only to the extent that --
Q. (BY MR. GARNER) Is it your testimony here

Page 172

today that you decided to take the parent educator position rather than seek a home guide position?
A. No.
Q. Okay. Because it was my understanding that the reason why you left Austin Montessori School is because you wanted to be a teacher. Is a parent teacher -- a parent educator a teacher? It's not a home guide, is it?
    MS. JACOBS: Objection.
A. It's not a home --
    MS. JACOBS: Form.
A. It's not a home guide.
Q. (BY MR. GARNER) Okay. Can you explain to me then why you would apply and accept the parent educator position at East Dallas if it wasn't a teaching position?
A. Because I didn't want to put my son in the public school where we were living at and if I had accepted this position he would automatically have a position in that charter school which was also a Montessori school.
Q. Isn't it true that if you had decided to take the campus coordinator position in Austin Montessori School your son ████████could have still gone to Austin Montessori School?

43  (Pages 169 to 172)

Electronically signed by Dicie Eytcheson (301-362-425-8759)                     4fceefd1-91c4-44c9-995b-2cac908dd802

CAROLINE CLARK                                    September 16, 2011

Page 212

CHANGES AND SIGNATURE

WITNESS: CAROLINE CLARK          DATE OF DEPO: 9/16/2011

PAGE      LINE      CHANGE                    REASON

12        5        "SPECTRUM" should be spelled "SPECTRIM"

16        24       "tract" should be spelled "track"

17        7        "Arluin" should be spelled "ALCUIN"

19        10       "Ohio Montessori Institute" should read "Ohio Montessori Training Institute"
→ reason: to correct the record

31        25       Add: "other than a few part
32        24       time jobs I worked from time to time in addition to the positions listed on my resume"

39        6        Add "My first year, I was an assistant to the children's house guide      reason: correct the record

84        20       "yes" should be "no". It was amber who shared with me that a prospective parent who had observed in my classroom had asked her if I was pregnant    Reason: correct the record

185       14       "20" should be "10" / correct the record

185       18       "a salary" should be "hourly" reason: correct the record

198       12       Anna should be spelld "Ana"

CAROLINE CLARK                                      September 16, 2011

Page 213

I, CAROLINE CLARK, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

_____
CAROLINE CLARK, Witness

THE STATE OF TEXAS )

COUNTY OF DALLAS )

Before me, EDITH MONTOYA , on this day personally appeared CAROLINE CLARK, known to me (or proved to me under oath or through _____ ) (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this 18th day of OCTOBER , 2011 .

EDITH J. MONTOYA
MY COMMISSION EXPIRES
August 27, 2014

_____
NOTARY PUBLIC IN AND FOR

THE STATE OF TEXAS .

CAROLINE CLARK                                    September 16, 2011

CAUSE NO. D-1-GN-11-000096

CAROLINE CLARK                    )  IN THE  DISTRICT  COURT
                                  )
          Plaintiff(s),           )
                                  )
VS.                               )  419TH JUDICIAL DISTRICT
                                  )
AUSTIN MONTESSORI SCHOOL,         )
INC.,                             )
                                  )
          Defendant(s).           )  TRAVIS  COUNTY,  TEXAS

REPORTER'S CERTIFICATION
DEPOSITION OF CAROLINE CLARK
SEPTEMBER 16, 2011

I, Dicie Lee Eytcheson, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, CAROLINE CLARK, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the deposition transcript was submitted on _____9-28-11_____ to the witness or to the attorney for the Plaintiff for examination, signature, and return to me by ____10-31-11____;

That the amount of time used by each party at the deposition is as follows:

          W. Patrick Garner - 03hr:40min

That pursuant to information given to the

Electronically signed by Dicie Eytcheson (301-362-425-8759)        4fceefd1-91c4-44c9-995b-2cac908dd302

CAROLINE CLARK

September 16, 2011

Page 215

deposition officer at the time said testimony was taken, the following includes counsel for all parties of record:

Melissa A. Jacobs/Russell Scott Cook, Attorney for Plaintiff(s),

W. Patrick Garner/Stephanie O'Rourke, Attorney for Defendant(s), AUSTIN MONTESSORI SCHOOL, INC.

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Further certification requirements pursuant to Rule 203 of TRCP will be certified to after they have occurred.

Certified to by me this 27th day of September, 2011.

DICIE LEE EYTCHESON, Texas CSR 3203
Expiration Date: 12/31/12
Firm Registration No. 631
Kim Tindall & Associates, Inc.
645 Lockhill Selma, Suite 200
San Antonio, Texas 78216
(210) 697-3400

Kim Tindall & Associates, Inc.    645 Lockhill-Selma, Suite 200    San Antonio, Texas 78216
Phone (210) 697-3400    Fax (210) 697-3408

Electronically signed by Dicie Eytcheson (301-362-425-8759)    4fceefd1-91c4-44c9-995b-2cac908dd802

CAROLINE CLARK

September 16, 2011

Page 216

FURTHER CERTIFICATION UNDER RULE 203 TRCP

The original deposition was/was not returned to the deposition officer on _____ 10-13-11 _____;

If returned, the attached Changes and Signature page contains any changes and the reasons therefor;

If returned, the original deposition was delivered to W. PATRICK CARNER, Custodial Attorney;

That $ 1344.60 is the deposition officer's charges to the Defendant for preparing the original deposition transcript and any copies of exhibits;

That the deposition was delivered in accordance with Rule 203.3, and that a copy of this certificate was served on all parties shown herein and filed with the Clerk.

Certified to by me this 14th day of _____ Nov. _____, 2011.

By BW

DICIE LEE EYTCHESON, Texas CSR 5392
Expiration Date: 12/31/12
Firm Registration No. 631
Kim Tindall & Associates, Inc.
645 Lockhill Selma, Suite 200
San Antonio, Texas 78216
(210) 697-3400

Electronically signed by Dicie Eytcheson (301-362-425-8759)    4fceefd1-91c4-44c9-995b-2cac908dd802

# Exhibit 4

CAUSE NO. D-1-GN-000096

| | |
|---|---|
| CAROLINE CLARK | ) IN THE DISTRICT COURT |
|     Plaintiff, | ) |
| VS. | ) TRAVIS COUNTY, TEXAS |
| | ) |
| AUSTIN MONTESSORI SCHOOL, | ) |
| INC., | ) |
|     Defendant. | ) 419TH JUDICIAL DISTRICT |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

ORAL VIDEOTAPED DEPOSITION OF

DAWN GLASGOW

AUGUST 11, 2011

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

ORAL VIDEOTAPED DEPOSITION of DAWN GLASGOW, produced as a witness at the instance of the PLAINTIFF, and duly sworn, was taken in the above-styled and numbered cause on the 11th day of AUGUST, 2011, from 8:57 a.m. to 11:41 a.m., before Kimberlye A. Furr, RPR, CSR, in and for the State of Texas, reported by machine shorthand, at the offices of The Cook Law Firm, 919 Congress Avenue, Suite 1145, Austin, Texas, pursuant to the Texas Rules of Civil Procedure

6

Q. Strike that. Ms. Clark was not offered the contract position of guide because she was going to take three months' leave following her pregnancy. Correct?

A. Yes.

Q. Okay. If she had not -- if she was not expected to take leave, would she have been provided with a contract as guide for the 2010, 2011 year?

A. Yes.

Q. Ms. Clark's taking -- her intention to take leave following her pregnancy was the motivating factor for Austin Montessori School not to renew her contract for the guide position for the 2010, 2011 year?

MR. GARNER: Objection; form.

A. Oh, wait, could you say that again --

Q. Sure.

A. -- because it's long at the beginning.

Q. (By Mr. Cook) The three months of leave that Ms. Clark was going to take following her pregnancy, that leave was the motivating factor for Austin Montessori school's decision not to renew her contract as guide for the 2010 to 2011 year?

MR. GARNER: Objection; form.

A. It was the -- it was -- it made it difficult to continue the work and provide the stability to the

7

children having a guide out for that long, so it was one of the factors.

Q. Well --

A. But it was -- but it was a big factor because having -- we're only in school for nine months, so having a guide out for three months is long.

But when you say didn't renew her, we did offer her a contract where she can be involved in the classroom and be -- and be able to return to the classroom when she could be in the classroom consistently without a break so we would provide the stability to the children that we promised we would.

MR. COOK: Objection; nonresponsive.

Q. (By Mr. Cook) There were factors in the decision not to renew Ms. Clark's contract -- Correct -- for the guide position in the 2010 --

A. Right.

Q. -- 2011 year. Correct?

A. Right.

Q. Okay. One thing I've got to say: Let me finish my question before you answer and I need to do the same. It's like a conversation so it's natural for us to interrupt each other, but we really need to finish our questions and answers.

There were several -- or there were

8

reasons why Austin Montessori School decided not to renew Ms. Clark's contract as to the guide position for 2010, 2011?

A. Uh-huh.

Q. Is that a yes?

A. Yes.

Q. Okay. One of those factors was the fact that Ms. Clark was going to take leave following her pregnancy. Correct?

A. Yes.

Q. Was that a motivating factor in the decision not to renew Ms. Clark's contract for the 2010, 2011 year for the position of guide?

A. For the position of guide, yes.

Q. Okay. You mentioned that it was one of other factors.

A. Uh-huh.

Q. What other factors were considered by Austin Montessori School in the decision not to renew Ms. Clark's contract for the position of guide for the year 2010, 2011?

A. She had been in that position for -- this was the second year for that community and there was quite a bit of instability prior to that current year. You know, her first year was very unstable and we were

9

working on that. We work with guides as -- you know, that's -- we never want to make a transition with a guide; we want to work with them.

So it wasn't a stable situation where the -- the term we use is "normalized classroom" -- where the children were working independently and the classroom, you know, was consistently safe and they were working to the vision that we promised the parents and the -- when we accept them to the school.

And when you have some instability, you work consistently and without a break. Like, you wouldn't have a time where you would not be working with the guide. You wouldn't take several weeks or months off from working with them when you have instability because you would have more disruption in the room for the children. And because it wasn't a stable classroom, it was necessary for us to have constant improvement and work with Caroline. So that is also what played into it.

Q. Were there any other factors that played into the decision not to renew Ms. Clark's contract for the guide position for 2010, 2011?

A. Part of that instability was that the parents were -- not all of the parents but some of the parents, especially parents who had been with the school for

10

awhile; maybe they had older children and had had experience in other rooms -- so they were dissatisfied in some ways, but we were telling them that we were working on it with her.

Some requested to leave the room and did during her second year. And there was concern when she -- when it was announced that she was pregnant what was going to happen with the room and the children.

Q.  Were there any other factors that went into that decision?

A.  Not that I recall.

Q.  Okay.  I want to ask you a few questions about those factors you mentioned.  And I think you answered this before, but I want to make it clear.  If Ms. Clark had -- if it was not expected that she would be taking leave, she would have been offered a contract for the guide position for the 2000 [sic], 2011 year. Correct?

MR. GARNER:  Objection; form.

A.  I think we would have continued to work with her had she been willing to continue to work with us.

Q.  (By Mr. Cook) Okay.  You mentioned instability in Ms. Clark's classroom the first year that she returned to employment with Austin Montessori School.

11

A.  Uh-huh.

Q.  I think that was the 2008 to 2009 school year?

A.  Okay.

Q.  Is that correct?

A.  Yes.  Because 2010, 2011 is the first year she wasn't there, so that's correct.

Q.  And I thought that she had worked a couple of years.  So did she work the 2007, 2008 school year? No.

A.  No.

Q.  Okay.  What -- why was Ms. Clark's classroom unstable during the 2008, 2009 school year?

A.  From -- well, I should first say that I get the information from the people that consult and advise her, so -- and then I get information from parents.

And from the information I had, the experiences that she had or the way of working she had further developed when she wasn't at Austin Montessori School, when she was at -- I believe she was at East Dallas Community School, weren't consistent with the way that we were working in the room or that we work with the children.  And when parents would observe, they would observe these differences.  Sometimes it was language, sometimes it was activities, sometimes it was

12

the lack of the work they would expect to use.

And when we say "work," it's -- I mean, it's almost like playing for the children, but we refer to it as "work."

But, anyway, they just observed striking differences.  But we felt like Caroline was willing to, you know, remember how it was at the school.  She wanted her son to be at our school, not somewhere else. And so -- and she was somewhat responsive, but, you know, people can only change so much right away, so it was a -- it was kind of a constant observation and meeting.

Q.  Okay.  You mentioned -- you just testified to parents observing instability in the classroom and reporting that to you.  Is that correct?

A.  Some reported to me.  Most reported to Amber Miller.

Q.  Okay.  Did anyone working at Austin Montessori School observe, actively observe, Ms. Clark and instability in her classroom during the school year?

A.  Amber Miller did.

Q.  Okay.  Did she report that instability, or her observations of that instability, to you?

A.  Verbally.

13

Q.  What did she say?

A.  I don't remember specifically, but it was all along the same lines that I just said.

Q.  Along the same lines of -- that the language activities and lack of work in her classroom were not consistent with what Austin Montessori School expected?

A.  Right.

Q.  Okay.  She told you that orally, but not in writing?

A.  Yes.

Q.  She never sent you an e-mail about that?

A.  Not that I recall.

Q.  Okay.  On how many occasions did she speak to you about that during that school year?

A.  I can't recall.

Q.  More than ten?  Less than ten?

A.  Probably more than ten.

Q.  More than 20?  Less than 20?

A.  Maybe 20.  There's quite a few classrooms.

Q.  Did you take any notes about Ms. Miller's observations of Ms. Clark's classroom?

A.  Not that I recall or could find.  I feel like I probably did, but I keep a notepad and, when the year passes, I recycle it.  It really is more action items for me; like, what is it that I need to do to support

14

them?

Q. What documentation, if any, exists in the entire school regarding the instability in Ms. Clark's classroom during the 2009, 2010 school year?

A. Only what we've made available already.

Q. And what is that?

A. It would be e-mail exchanges, possibly, and -- pretty much e-mail exchanges.

Q. Okay. You mentioned that you destroyed kind of your personal notes, or recycled them --

A. Just recycled them.

Q. -- at the end of the school year?

A. Or maybe the following year. But I went through to try to find them. I mean, I didn't find anything that was, you know, detailed or specific that -- It might say, "Look up a NAMTA conference for Caroline on classroom management," you know, things like that. But that would -- it would say that about other people for language. It wasn't anything unusual.

Q. But you did review some notes from the 2009, 2010 school year that you had kept?

A. Well, I don't think I did have -- maybe I did and that's all it said. I can't remember.

Q. Well, do you still have a copy of those -- that notebook?

16

Q. Did any of them document their observations in writing?

A. Not to me. And Amber didn't think they did to her, but after our conversation yesterday, she was going to go more thoroughly through her e-mail to see if anyone wrote anything.

They more frequently will ask for a meeting and then -- a formal meeting would be with her. With me, they would stop in my office in the morning and say, "What should I do?"

Q. Okay. So just yesterday, Ms. Miller decided that she was going to go back and look at her e-mail accounts to find more documentation as to complaints about Ms. Clark?

A. She felt like she did that already, and when I was telling -- when we were having a conversation, I said, "Well, this one parent, she likes to write things down, so are you sure she didn't?"

And she goes, "Well, I looked but I'll go look again and see."

Q. But as far as you know, you're not aware of any written documentation that was provided to you from parents complaining about instability in Ms. Clark's classroom?

A. Correct.

15

A. 2009, 2010? It's more than one notebook, but I'm sure I have one.

Q. Okay. What would have happened to the other ones?

A. I'd just throw it in the recycling.

Q. When do you think you threw it in the recycling?

A. Usually I do that in the summer when I'm clearing out.

Q. So that would have been this summer probably?

A. No, no. I'm sure -- It was before any of this came up, because I tried to find everything I could. And I think this was in the summer before. I mean, it was just last summer.

Q. Summer of 2010?

A. Right. That's when this came up. That's when I tried to find everything.

Q. Okay. You mentioned that parents conveyed to you issues they had from their observations of Ms. Clark's classroom?

A. Uh-huh.

Q. Is that yes?

A. Yes.

Q. Okay.

A. I'm sorry.

17

Q. Are you aware of any complaints made by any parents in writing as to Ms. Clark's classroom?

A. I'm not aware.

Q. Did they make you aware of their issues with Ms. Clark verbally?

A. Yes.

Q. Did they make -- how else did they make you aware of their issues with Ms. Clark?

A. You know, in a school, parents will talk at birthday parties, and so sometimes people would say, oh, we were at this party and so-and-so, you know, was -- they started talking about the classroom.

But I don't remember the specifics of those because I try not to put a lot of weight into it. I feel like if parents want to say something, they'll come to me directly. So I heard that that was happening, but I didn't follow up on that myself.

Q. Did any parents come to you directly to talk about Ms. Clark?

A. Yes, just stop in my office and say, "What should I do?"

One specific thing I remember is -- which might, you know, seem silly to people who aren't familiar with the Montessori classroom -- but there were Halloween, like, coloring sheets, you know, with

18

pumpkins that she had, and that's just something that's not consistent with the culture of our school. It's not anything that we think is horribly harmful to the children, but it's just something you would never see in any of our classrooms.

We don't like to bring attention to different -- at that age, different holidays, you know, and things to try to throw them off of what they're supposed to be doing. That's already a distraction enough for them, you know, in their regular life.

So that was one thing I remember somebody coming in.

Q.   Do you remember which parent came to you and complained about the -- was it a pumpkin drawing or --

A.   Yeah.

Q.   I'm sorry --

A.   Yes. That was Tiffany Bilbe.

THE REPORTER:  What was the last name?

THE WITNESS:  Bilbe, B-I-L-B-E.

Q.   (By Mr. Cook) Did she come to you in your office?

A.   Yes. But I have -- my office is in the main office, just right after you walk in the door, and so at arrival time -- meaning, when the people are dropping off their children -- they might come in for

19

other things and then, if they really want to talk to me about something, they might -- or they have some kind of concern -- "Who do I talk to about this?" -- they'll come in.

Q.   So I imagine, if my math is right, that would have been sometime around October of 2009?

A.   It would have been 2008. It was her first year.

Q.   That's why I asked. Okay.

A.   Yeah.

Q.   It would have been October of 2008. Correct?

A.   Right.

Q.   And it would have been probably within a couple weeks of Halloween, I assume --

A.   Right.

Q.   -- or the month of Halloween?

A.   Maybe even the week before.

Q.   Okay. Can you remember what Ms. Bilbe's specific complaint was?

A.   It was that that was just an example of how she's not -- that Caroline wasn't reflecting the culture of the school.

Q.   And it was due to what you explained earlier about the Halloween drawings?

A.   That's what I remember specifically, but she

20

may have mentioned other things.

Q.   Can you name any other things that she mentioned?

A.   No, not that I can remember specifically.

Q.   Okay. Can you think of any other occasions where Ms. Bilbe complained or brought concerns to you about Ms. Clark?

A.   No, not to me directly, because, at that point, we had already put her in contact with Amber, and I believe they would have those conversations.

Q.   Are you aware of any complaints she brought to Ms. Miller about Ms. Clark?

A.   I do know she brought complaints. I couldn't tell you specifically all of them. I could -- I mean, not specifically. I couldn't tell you with 100 percent accuracy what they were. I know in general, so...

Q.   Well, tell me what you know.

A.   That her children weren't progressing in their work, that she did not have a good relationship with Caroline. She felt like there -- when she brought an issue, there was a -- you know, some kind of defense or excuse for why it wasn't really a problem, so she didn't want to handle it with Caroline.

Because that's what we always do; we want the parent to talk to the teacher, and that's the

21

relationship.

She didn't want her children to stay in the class and so there was a decision made to move her oldest one up to the next level before it would be preferable and to move the other child to another classroom and start her third child in that same classroom with the one we moved.

Q.   Did Ms. Bilbe ever -- to your knowledge, did Ms. Bilbe ever express any concerns about Ms. Clark's intentions to have children or her pregnancy?

A.   Not that I know of.

Q.   Did she express any concerns about Ms. Clark taking leave?

A.   She wasn't in the class anymore.

Q.   Besides Ms. Bilbe, did any other parents raise concerns about Ms. Clark to you, in person?

A.   Not that I can remember.

Q.   Are you aware of other parents that made complaints to Ms. Miller about Ms. Clark?

A.   Yes.

Q.   Which parents?

A.   I won't be able to remember every one, but I do know Elizabeth Schaeffer was one. Sue Colby [phonetic] was one. Gosh, I can't remember them all.

Q.   Can you remember any besides Ms. Schaeffer

30

have spoken to her and whether she kept doing it. I know I observed it quite often and I think I observed it after I would have expected she would have been spoken to about it.

Q. Well, do you know that or are you guessing?

A. I'm guessing.

Q. Okay. Can you think of a specific instance where Ms. Clark was warned about something -- or not necessarily warned -- talked to about something where she didn't fix the problem?

A. Can I -- I can't recall specifically, but I wasn't the one working with her on that.

Q. You mentioned that one of the issues that the parents and the administration of Austin Montessori School had with Ms. Clark was that she did not have a normalized classroom. What does that mean?

A. "Normalized," in Montessori -- you know, it's kind of a word they just came up with and it helped to describe this, where the children could choose work independently, become engaged in the work, and be -- and that the guide would know how to give the next lesson to lead them to the next work and that they wouldn't -- they wouldn't fall apart and try to do things -- you know, be bored and try to do things with -- you know, that a distracted child would do.

31

Ask -- later, ask Charlotte Kroger and she can tell you, give you a much better description.

Q. Well, can you give me an example of why Ms. Clark's classroom was failing to be a normalized classroom?

A. Because the children didn't have enough practice doing concentrated, individual work. So if she wasn't doing a group lesson, then it would be very -- a group, then it would be very difficult for them to know how to do work individually.

Q. Okay. Was this stemming from her engaging in too much group activity or was it stemming from her not properly working with the children once they were doing the individualized activity?

A. That's -- both.

Q. Both. Can you think of a specific time when she was -- anyone talked to Ms. Clark about her failure to maintain a normalized classroom?

A. It was a continued discussion.

Q. Can you think of any documentation of that discussion?

A. No. There -- it wasn't the practice of our school to document anything.

Q. You mentioned the term "consistently safe" classroom? Did you?

32

A. Maybe.

Q. Well, let me ask it --

A. I certainly want that.

Q. -- this way: Does the term "consistently safe classroom" mean anything to you?

A. Well, that there's a -- that the children all feel safe; you know, they don't feel like there's one or two or three or four children that don't have to follow the same procedures and rules that they do, so they could be at risk; like maybe they'll build a tower and it's going to get kicked over or something like that. I might have used it in that way.

Q. Okay. Well, did Ms. Clark's classroom, did it fail to be consistently safe for the children?

A. In that way, where you feel like your work is safe.

Q. Okay. Your -- the individualized work project that the child is working on?

A. Uh-huh.

Q. Is that a yes?

A. Yes. I'm sorry.

Q. Okay. Who made the decision not to renew Ms. Clark's contract for the position of guide in 2010, 2011?

MR. GARNER: Objection; form.

33

A. It was a group that discussed, but most of the conversations were between Amber Miller and me, with the final conversation with Don Goertz. But, again, we would -- it was not a decision to not offer her a contract. It would -- that would not have been considered.

Q. (By Mr. Cook) But it was a decision not to offer her a contract for the position of guide?

A. Right.

MR. GARNER: Objection; form.

A. Well -- well, the concern about the stability of the program for the children, with the absence, came up shortly after she -- verbally, again -- told us her plan for being out and returning in January. And then she mentioned to our campus coordinator, who was leaving to move to Denver because her daughter was going to school there, that she would -- she said, "I want to do your job" and "What do you -- you know, what all do you do?"

And so the campus coordinator reported it to us. And the campus coordinator was in a classroom for, I think, seven years prior to taking that position as well. She was a trained guide. So she gave her some information about it and then reported it to us.

34

Q. (By Mr. Cook) Who was the campus coordinator?

A. Donna Romine.

Q. Can you say the last name again?

A. Romine, R-O-M-I-N-E.

Q. When did Ms. -- how did Ms. Romine make that known to the school?

A. What?

Q. Good question.

How did Ms. Romine make the fact that Ms. Clark had spoken to her about the campus coordinator known to the school?

A. She told Amber and she told me.

Q. When did she tell you?

A. I don't remember the date, but it was after Caroline had announced her pregnancy.

Q. Where did she tell you?

A. I don't recall.

Q. Was there anyone else that was a witness to that conversation?

A. I don't recall.

Q. Where does Ms. Romine reside now?

A. In Colorado.

Q. Do you know where in Colorado?

A. I don't remember, but I know there's a

35

Montessori high school in the town.

Q. Okay.

A. I could look it up. I have it.

Q. I'm sure the school has her address in Colorado somewhere?

A. Yes. And her e-mail.

Q. Okay. You mentioned that the discussions -- or the decision regarding not renewing Ms. Clark's contract as to the position of guide was discussed by a group of people.

A. Well --

MR. GARNER: Objection; form.

A. -- Amber Miller and me.

Q. (By Mr. Cook) Okay. Was anyone else -- did anyone discuss it?

A. Not that aspect of it.

Q. So did anyone discuss any other aspect of it?

A. The continued support that Caroline would need to be able to continue to improve and offer the program that we tell the parents we're going to offer for their children.

Q. Who took part in those discussions?

A. Patricia Oriti and Charlotte Kroger.

Q. Were you a party to those discussions?

A. Some of them.

36

Q. Tell me what occurred during those discussions. What was said?

A. I don't remember specifically, but the idea was that she would need regular observations and regular meetings, that she would -- there was this idea that she would take two steps forward, you know -- or three steps forward, two steps back, that as it became more -- if things were stressful, it was more difficult to hear the responses.

And what I'm thinking of specifically there was, there's a child in the class that had diabetes, and what we did to help with that was -- well, initially, Caroline said, "We can -- I can take care of this with my assistant." And we went ahead and let her and that caused her a lot of stress that we didn't really know about until we started to recognize that she was, you know, not really -- not really cooperative in the other areas.

So, anyway, we put extra administrative help in helping with that child with diabetes; that there would be someone to come in and test. And I became the contact with the parent, rather than her, on that issue. We had some changes in school policy. So, anyway --

I forget now what the question was.

37

Q. I was asking you about the discussions you had with -- or that you were a party to with Patricia Oriti and Charlotte Kroger.

A. Right. What kind of support she would need to continue to improve. It would need to be regular. We would need to have regular meetings. And there was also a thought that we might need to have a meeting with the parents who continued to express concern, saying, "Look, we have a plan for working, you know, on these things."

Q. Were these discussions with Ms. Oriti and Ms. Kroger, were they before or after Ms. Clark announced that she was pregnant?

A. Well, they were -- we had them ongoing, but when you were asking about what -- who specifically had conversations that might have affected our thoughts about offering her the campus coordinator position.

Q. Ultimately, Ms. Miller, yourself, and Mr. Goertz decided not to renew Ms. Clark's contract for the position of guide?

MR. GARNER: Objection; form.

A. Ultimately? It was Amber and me with the information from the others, and then we had a final -- really, a final -- just informed Don Goertz and asked if he had any concerns about that. He's not really

Dawn Glasgow – 8/11/2011

38

involved in the day-to-day operations.

Q. (By Mr. Cook) Basically, is it fair to say that you and Amber Miller made the decision and then you got -- sought the approval of Mr. Goertz?

A. I guess that's correct.

Q. Okay. When was the decision made, to the best of your knowledge, not to renew Ms. Clark's contract as to the position of guide?

A. It would have --

MR. GARNER: Objection; form.

A. It would have been right before we met with her.

Q. (By Mr. Cook) Okay. Is that around April 30th of 2010 -- 2009?

A. I would guess that's right. I don't have the dates but I know I could look it up.

Q. Okay. Did you and Ms. Miller have a meeting?

A. With Caroline?

Q. Prior to meeting with Ms. Clark.

A. Oh. I'm sure we did.

Q. Do you remember the meeting?

A. We had many meetings about, you know, not just specifically her but other -- I don't remember a meeting that -- where, "We have got to talk about just this issue," no.

39

Q. So you don't remember a meeting where you just talked about the issue of not renewing Ms. Clark's contract as to the position of guide?

MR. GARNER: Objection; form.

A. I'm sure we had one.

Q. (By Mr. Cook) But you don't remember the specifics of it?

A. Not -- no, not every word we said.

Q. Well, do you remember any word you said?

A. Oh. Yes. We talked about that the duration of time that, you know, she would not be in the classroom and the fact that there wasn't -- the assistant in the room was not a trained person and that we wouldn't be able to work with her during the period that she was out; we would not be able to provide for the children what we said we would.

Q. Anything else you can remember discussing with Ms. Miller regarding --

A. Well, we --

Q. -- not renewing --

A. Yes.

Q. -- Ms. Clark's contract?

A. We talked a lot about the possibility of making the campus coordinator position work to fit whatever needs, you know, Caroline had; that we had

40

this person leaving, but we had other people that were interested in that position -- or helping in that position part time, and we said, well, we could -- this could be configured to work any way she wanted it to be. And so we did talk -- we actually talked probably more about that.

Q. Why did you think that --

A. Right --

Q. Did I interrupt you?

A. I'm sorry. Right --

Q. I'm sorry.

A. Right before the meeting with Caroline, that's what we probably talked more about.

Q. Why did you think that Ms. Clark would be a good fit for the position of campus coordinator?

A. She's very organized. She would have the responsibility of substituting in the classrooms and she would have been capable of doing that. A substitute would look at: What has the guide that's in there been working on with the children? How do I keep that going for the day that they're out?

And she's -- she can take information clearly, so when people come in and need some help from her, she will understand it and she'll know quickly what to do to help. She would have been excellent in

41

that position.

Q. Were you concerned about her filling that position given the fact that she had struggled being a guide and that you considered her to be one of the worst guides at the school?

MR. GARNER: Objection; form.

A. All of the guides that we hire at the school are -- I think are above average, so I just don't want that to make it look like she's the worst guide ever.

Did we have a concern about that? No, because her responsibilities would be in supporting a classroom that another guide was managing. That would have been one of the responsibilities.

Q. (By Mr. Cook) Is it fair to say that the responsibilities between being a guide and being a campus coordinator are very different?

A. There's overlap, but yes, they are different.

Q. Okay. Austin Montessori School gave Ms. Clark a loan. Is that correct?

A. Yes.

Q. Did that play any role in the decision not to renew her contract?

A. No.

Q. Ms. Clark had to miss some time due to her father's death in the 2008, 2009 school year. Is that

42

correct?

A. Yes.

Q. Did that play any role in the Austin Montessori School decision not to renew her contract?

A. No.

MR. GARNER: Objection; form.

Q. (By Mr. Cook) Ms. Clark took an approved trip to the Philippines during the 2008, 2009 school year. Is that correct?

A. Yes. I mean, I know she took it; I can't remember when it was.

Q. Did that play any role in the decision not to renew Ms. Clark's contract for the position of guide?

MR. GARNER: Objection; form.

A. The thing about her being out is not that -- We approved it, you know, because she told us ahead of time about the event. I believe she ended up going then because her father died. But it gave us information about what would happen, you know, during the periods that she was out; that the classroom was very, very unstable. I can't say that we didn't think of that, but it wasn't because she was out, because she asked for the time. It wasn't that.

Q. (By Mr. Cook) You testified earlier that Ms. Clark told you or someone at the school that she

43

was planning on taking three months of leave. Is that correct?

A. That she intended to return after the winter break, which would be January.

Q. Was that following childbirth? Was the leave following childbirth, before childbirth, or both sides of it?

A. Following, is what I understood it to be.

Q. Did she express her interest to work up until her childbirth?

A. Yes. I mean, from what I understood, that's what her intention was.

Q. Do you know when her due date was?

A. I can't remember, but I remember early October.

Q. When did she tell you -- Did she tell you that she intended to return after winter break?

A. Yes.

Q. Okay. Where did she tell you that?

A. I don't recall.

Q. In what context was that discussion?

A. It was informal. Initially, we had more conversations about -- When we were talking about -- talking to her about the campus coordinator position, there was still that idea of her not coming back until

44

January. I mean, that's sort of what's taken for granted. She spoke to other people about it, too, that that was the plan.

Q. Is that when it came up that she intended to return after winter break, was in conjunction with talking about the campus coordinator position?

A. Oh, no, no. She told me before that.

Q. Did you ask her, or did anyone at Austin Montessori School ask her, to take a shorter break than what she was saying that she would take for leave?

A. Not that I recall.

Q. Why not?

A. I don't know.

Q. Did -- is it fair to say that you assumed that Ms. Clark would require that amount of leave following a childbirth?

A. I don't -- I don't know. Not like that.

Q. Does Austin Montessori School have a policy for leave following childbirth, as far as its employees?

A. No. Our only leave policy is for sick and personal time, and there's seven days allotted.

Q. If you had told Ms. Clark, "You can only take one week off for childbirth and then you need to come back," and Ms. Clark had said okay, would she have had

45

her contract renewed for the 2010, 2011 year?

MR. GARNER: Objection; form.

A. I wouldn't have done that because I know, from having children myself, that you can't physically come back that -- and I -- yeah, I just wouldn't have done that.

Q. (By Mr. Cook) What about two weeks after childbirth?

A. I wouldn't have done that.

Q. You wouldn't have let her return two weeks after childbirth?

MR. GARNER: Objection; form.

A. I -- it would have -- it would be very unusual. I mean, a doctor would have to approve it. I wouldn't have thought like that. Let's put it that way.

Q. (By Mr. Cook) But if it had been approved by a doctor to return immediately following childbirth, would you have allowed Ms. Clark to do so?

MR. GARNER: Objection; form.

A. I can't say. I don't -- I mean, I know that we have an assistant right now who is out pregnant and she wants to come back earlier and her doctor won't give her, in advance, that information. I mean, her

46

doctor won't. Her doctor says, "I can't even tell you for sure that you will be back before eight weeks, but after you have the baby, we can see."

So I wouldn't have thought that way because I know that -- in my mind, that that's not possible for a doctor to agree to that ahead of time.

Q. (By Mr. Cook) Well, what do you think is the quickest amount of time that a doctor will agree to allow a woman to return to work following childbirth?

MR. GARNER: Objection; form.

A. I don't -- I mean, I only know from my own experience.

Q. (By Mr. Cook) I'll ask you a few background questions about yourself. I do this for every witness so this isn't personal -- although it is personal.

Will you state your full name for the record?

A. Dawn Glasgow.

Q. Where is your address?

A. You want my address?

Q. Home address, yes.

A. 5648 Oak Boulevard, Austin.

THE REPORTER: What boulevard?

47

THE WITNESS: Oak Boulevard.

Q. (By Mr. Cook) Zip code?

A. 78735.

Q. Do you plan on moving out of Texas any time soon or away from the Austin area?

A. No.

Q. Okay. Have you ever testified before in a lawsuit?

A. No.

Q. Have you ever given your deposition before?

A. No.

Q. Did you review any documents in preparation for your deposition here today?

A. Very few.

Q. Which documents did you review?

A. I wanted to try to figure out if I could tell when Caroline actually had the baby and all I could tell is, it was around a conference time that one of our staff members went to. So I looked that up. I looked up when we offered the position to someone else, the campus coordinator position. I looked up -- and now I can't remember exactly, but it was the first Friday in May of that year that she left. I looked up that curriculum development day because Caroline didn't come to work that day. I wanted to know when that was.

48

I was trying to refresh my memory a little bit, but I was assured that, if there was something that you knew about that I had given you, you would be able to...

Q. I assume you met with your lawyer or a lawyer yesterday?

A. We met briefly, since we had never been to a deposition.

Q. Did you talk to any of your coworkers about the deposition, or anybody else, where a lawyer wasn't present?

A. Only that we would be having it and I didn't know how long it would take.

Q. Okay. What was the -- why were you looking at the first Friday in May as to the curriculum development?

A. We were trying to -- we had an informal conversation with Caroline, you know, where we didn't have anything written down initially, when we talked about -- talked to her about not returning as the guide but coming back as the campus coordinator.

And the motivation for having that be informal was that we were actually, I guess, excited to tell her that we had this great position that she had expressed interest in, that we could make be however

49

she wanted it to be. You know, it could be early to early, it could be early to late, it could be late to late, whatever would work for her.

And then I was planning to write it up, you know, as a contract, so we had to have a follow-up meeting, but we weren't able to have that follow-up meeting. She was in the classroom and had conferences, and so I expected to have it on that Friday, because it was a curriculum development day, when no students were there, but she didn't come to work, so we couldn't have it until the next week.

And there also was a period of time where she wasn't wanting to talk to me, because I think she was trying to figure out what she was going to do, and so I wanted to try to get a handle on that time frame.

Q. Why were you looking up when she had her baby?

A. I don't know. It just came up of when -- you know, you asked me also when was she due and I remembered early October and I wanted to know specifically what that was.

Q. Did you find it -- were y'all put on notice when she had her baby or --

A. No. But one of our teachers went to a

50

conference, a Montessori conference, and there were people there that know -- it's kind of a small world --

Q. Yeah, I got you.

A. -- and they told her -- they told us that she -- so she told us, but she didn't send it in an e-mail; she just said it.

Q. Do you know when she had her baby?

A. No, I didn't know specifically.

Q. Okay. That's fine. Who replaced Ms. Clark's position in the 2010, 2011 school year?

A. Her name is Jesse Jahnke.

Q. Was she pregnant at the time she replaced that position?

A. Was Caroline?

Q. Ms. Jahnke.

A. Was she pregnant?

Q. Yes.

A. No.

Q. Are you aware of any other lawsuits that have been filed against Austin Montessori School involving discrimination?

A. No.

Q. Or employment contracts?

A. No.

Q. Are you aware of any EEOC complaints --

51

A. No.

Q. -- other than this one in this case?

A. No.

Q. Okay.

A. I'm sorry to interrupt.

Q. Are you aware of any complaints of discrimination or issues of pregnancy discrimination that have been raised at Austin Montessori School?

A. No.

Q. Okay.

MR. COOK: I think we've got to take a quick break to change the tape, so if you want to use the rest room or talk to your lawyer, you can.

We'll go off the record.

THE VIDEOGRAPHER: We'll end Tape 1 and go off at 9:54.

(A short break was taken.)

THE VIDEOGRAPHER: We're back on the record. This is the beginning of Tape 2. It's 10:11.

Q. (By Mr. Cook) Ms. Glasgow, who is responsible for the leave policies at Austin Montessori School?

A. For establishing them?

Q. Yes.

A. Well, they haven't been changed since I

52

started working there, but I would assume that it would be voted on by the board. I'm not sure how we change them.

Q. Do you know why there's no maternity leave policy at Austin Montessori School?

A. No. I guess it's just considered like any other leave.

Q. Okay. Do you know why it's considered like any other leave?

A. Because it's like any other leave.

Q. Okay. What is your position currently at Austin Montessori School?

A. The title is administrative executive, and I'm kind of a business manager, responsible for some HR functions. I do all the accounts payable, some staff liaisons kind of work. I kind of report to Don Goertz, so, you know, anything that comes up.

Q. Have you had that same position for the last five years?

A. Yes.

Q. The last ten years?

A. Nine.

Q. Is that how long you've been working at Austin Montessori School?

A. Yes.

53

Q. Do your kids go to Austin Montessori School?

A. Yes.

Q. Okay. Have you heard the term "pregnancy discrimination" before?

A. Before today? Yes.

Q. What does "pregnancy discrimination" -- or how would you define "pregnancy discrimination"?

MR. GARNER: Objection; form.

A. How would I -- what is my understanding from memory?

Q. (By Mr. Cook) Or just what do you think it is?

A. Like, treating somebody differently because they're pregnant?

Q. Okay. Do you know that there's a law against pregnancy discrimination?

A. Uh-huh.

Q. Is that a yes?

A. Yes.

Q. Okay. Did you know that there was a law against pregnancy discrimination before we filed this lawsuit?

A. I assumed there would be. I mean, I didn't know, you know, specifically that it was titled that, but...

54

Q.  Had you ever been trained on discrimination in the workplace?
A.  Not formally.
Q.  Are there -- is there HR training, or Human Resources training, for anyone as to discrimination at Austin Montessori School, that you know of?
A.  Well, we have a handbook that says, you know, not -- discrimination and harassment, that we don't, you know, discriminate for any reason or -- and it just explains what harassment is.  And so, I mean, that would be the extent of it.
Q.  Okay.  What were the differences between the cottage -- was it the "cottage guide" position?  Is that the correct term?
A.  The Children's House guide position.
Q.  Children's -- Children's House guide position.  Why don't you tell me the differences between the Children's House guide position and the campus coordinator position.
A.  Okay.  The Children's House guide position, you -- the guide would be responsible for that community of children and would interact with the parents in that community for conferences, would be responsible for doing the work that they were trained to do with the children that was consistent with the

55

vision of Austin Montessori School.
And to that end, they would have parent meetings that they would be responsible for coordinating and running.  They would have conferences that they would be responsible for scheduling; of course all of the work in the classroom with the children; alerting the support people or the administration if there was a concern about a parent or a student.  You know, so, basically, it was interacting with that community.
And the campus coordinator would be interacting with many of the parents in the community and all of the staff; substituting in classrooms that had people absent, you know, for illness; and also coordinating all of the activities that pertain to multiple classrooms, such as team sports or parent education or -- there's now this Children's Lending Library.
Because the campus coordinator is a trained guide, it helps, when parents come in with just general questions, they can answer them better than I can even.  So they're kind of on that end of -- we have two offices at our school, and that end of the campus, they come in for observations, and so they would interact with prospective and current parents.

56

Q.  Is it fair to say the responsibilities of the guide position and the campus coordinator position are different?
A.  Yes.
Q.  Are the hours different?
A.  They don't -- they weren't, historically, but they could be.  We had -- we -- the hours for the campus coordinator position are set.  You're not going to stay late because you have to meet with a parent.  You're not going to have to come for parent meetings or coordinate them.  So they're set.
So, historically, they were 8:00 to 4:00.  The year before that, we had 8:00 to 5:00.  And the way we would structure that in the contract is, you know, we have different line items for, you know, the different amount of time.
And we were wanting to have a position for Caroline that would be whatever would be -- would work for her, you know, best, and so we had it set what it was going to be.  And I think that the contract that we prepared, which she never looked at -- I remember saying, "Don't you even want to look at it?" but she had already decided to move.  But I just put all of it on there because then we would have a starting point for a conversation.

57

Q.  Austin Montessori School, I assume it requires certain qualifications in the teachers that come there.  Is that correct?
A.  That's right.
Q.  Are there specific tests or certificates that teachers need to possess to be able to be qualified to teach at Austin Montessori School?
A.  Yes.
Q.  Was Ms. Clark qualified to be a guide at Austin Montessori School?
A.  Yes.
Q.  Is enthusiasm for the teaching position one of the characteristics that Austin Montessori School looks for in prospective guides?
A.  I think the love of the children and this particular way of working with them is --
Q.  What about a love of teaching?
A.  Well, they're not really teachers; they're guides, so --
Q.  What about a love of guiding?
A.  In the Montessori fashion.
Q.  Okay.  But you would agree -- and you know this way better than me, but you would agree that guides have to have an interest and a desire to be a guide to be a successful guide in the Montessori

58

environment?

A. Well, they certainly have to have that, among other things.

Q. Okay. And Ms. Clark had that? She liked being a guide and she wanted to be a guide. Is that correct?

A. That's right.

Q. Can you understand why she would not want to fill the campus coordinator position and want to be a guide instead?

A. Can I understand? I understood why she -- I mean, she told us why she wanted to -- or that she wanted to be a guide more than she wanted an administrative position.

Q. And do you understand -- do you under -- do you agree with that decision?

A. It's not really --

MR. GARNER: Objection; form.

A. -- anything for me to agree to. I mean, it's --

Q. (By Mr. Cook) But is it --

A. -- that's what she felt.

Q. But, I mean, is it reasonable to want to be a guide rather than a campus coordinator?

A. Oh, I'm sure. Yeah, people have preferences

59

for a job they want to do, I guess.

Q. And the jobs are different. Correct?

A. They are, somewhat.

Q. So even though she -- Ms. Clark was going to be out of work, you didn't think she was being unreasonable for not wanting to accept an administrative position as to a guiding position?

A. Even though she -- can you ask that again?

Q. Even though her employment was ending with Austin Montessori School, do you think that Ms. Clark was being unreasonable wanting to continue guiding rather than fill an administrative position?

A. We didn't -- it wasn't our intention to end her employment at Austin Montessori School. It was our intention that she would stay there and then that she would ultimately return to the classroom, so it's not -- it wasn't even -- it wasn't even -- when she told us she was moving, it was to stay at home. That's what she told us, that she was going to move to Dallas and she was going to be able to stay in her mother's house, a rental house, and it would allow her the option -- or the -- it would allow her to be able to stay at home and -- which is not something she ever expected she would get to do, is what she told us, but she was happy to have -- you know, have that.

60

Q. Was Ms. Clark happy that her employment was ending with Austin Montessori School?

MR. GARNER: Objection; form.

A. We didn't end her employment. We offered her a position that would, you know, work better for her and provide for the children what we say we're going to do.

Q. (By Mr. Cook) But her employment did end with Austin Montessori School?

A. At her -- at her decision.

MR. COOK: Objection; nonresponsive.

Q. (By Mr. Cook) My question is: Her employment did end with Austin Montessori School. Correct?

A. She ended her employment at Austin Montessori School, yeah.

MR. COOK: Objection; nonresponsive.

Q. (By Mr. Cook) The question is: At some point in time, she stopped working at Austin --

MR. GARNER: You can keep asking the question, but you've got your answer.

A. She --

MR. COOK: I'll keep asking it.

A. At some point, she was no longer employed at Austin Montessori School.

61

Q. (By Mr. Cook) Was she happy with the fact that she was no longer employed with Austin Montessori School?

MR. GARNER: Objection; form.

A. We thought she was making the choice that she -- that was better for her, that she wanted to be -- able to be home and this was the way she could do it.

Q. Okay.

A. I mean, that's what she told us.

Q. (By Mr. Cook) So she seemed, to you, happy that she was leaving Austin Montessori School?

A. She seemed happy that she was going to be able to be home with her children. That's what she told us.

Q. I want you to talk about the importance of consistency and order to the Montessori classroom. Okay. Let me start -- and I'll strike that question.

Are consistency and order important to the Montessori classroom?

A. Yes.

Q. Why are they important?

A. Because children can work independently when they're so sure of the way things are going to be and what's available to them. So we believe that, when

66

been that she was trying to come into work but that she wasn't going to be able to commit to it the next year and so she didn't come back. But she didn't come back because of not being able to be there with the foot issue.

Q. Who was the individual that had the baby in November and came back in January?

A. Janice Curly.

Q. And was that about in the 2008, 2009 time period, somewhere around there?

A. No. I think it was 2007, 2008.

Q. Okay. The staff member that had cancer, what was the name of that staff member?

A. ▓▓▓▓▓▓.

Q. Was she a guide?

A. Yes.

Q. In what kind of classroom?

A. An upper elementary classroom, nine- to 12-year-olds.

Q. And did she request leave before going out for cancer treatment?

A. She just had surgery. She didn't have treatment, but, I mean, other than that -- but she did. I mean, we worked -- and it ended up being over a holiday break so that she could -- I think it was

67

Thanksgiving.

Q. So did she combine the four weeks with, like, the Thanksgiving break to have more time, basically?

A. Something like that, yeah. Or it could have been spring break. I can't remember, but it was around a holiday.

Q. And she was allowed to return to work as a guide?

A. She returned to work.

Q. Okay. How did things...

A. Well, as I said, there was some instability, but because the person that was coming in there had been the guide in that room and actually had many more years of experience than she did and it was a stable community and it was older children, you know, it, you know, worked out.

Q. Did any parents complain when the -- when ▓▓▓▓▓▓-

A. They expressed concern, wanted to know what the plan was. We had to meet with them throughout to make sure. Any time there's a change, a child will come home with -- you know, with worry, like, "Oh, well, now we can't go into the closet, you know, to get our own pencil; we have to" -- you know, it's -- whatever it is, there's a disruption.

68

Q. Were there any issues from parents or complaints from parents regarding Ms. Curly, Janice Curly?

A. Yes. Yes.

Q. And what were those complaints and issues?

A. That there was, you know, instability, inconsistencies, from what they -- what we, you know, had promised them. It didn't go very well. I mean, it was too long for somebody to be out, for the guide to be out. An assistant, that would be different; they're just supporting the guide.

We didn't expect it to be that way because it was a very stable room and she had so much experience and the person that she had coming in -- or the person that was assisting her was trained. We didn't expect there to be as much disruption, but it was pretty substantial.

Q. Did any parents pull their children from her class?

A. Amber Miller might know, but I don't. I think they -- I think I remember people wanting to know what the plan was the next year because they didn't want to have their child start in there if it wasn't going to be better.

Q. Okay. Were the parents concerned after she

69

announced her pregnancy or after she took the leave? When did the parents become concerned? Or both?

A. During the leave, when we had the other person in, and then afterward. Not -- we haven't ever experienced a pregnancy causing any disruption in our rooms.

Q. Have you ever heard anyone -- did you hear anyone suggest to Ms. Clark that she should hide her pregnancy?

A. I don't know if I heard that from Caroline's complaint, but I do know that the way we came to know that she was pregnant was that a potential -- I mean, a prospective parent was observing in the room and when she met with Amber afterwards, she said, "So what are you going to do when the guide is out, you know?"

And she goes, "What do you mean?"

And she said, "Well, she's pregnant."

And she said, "No, she's not."

And she said, "Oh. Well, you know, I thought she was because she had her hand on her stomach and usually people who are overweight don't put their hands on their stomach."

And she goes, "Well, she's not."

And she -- so then Amber relayed that to Caroline, that story, and Caroline goes, "Well,

Dawn Glasgow - 8/11/2011

70

actually, I am pregnant."

And, she -- you know, it was kind of -- she goes, "Oh, my gosh, I'm going to have to let parent" -- and, anyway, "Congratulations."

I wasn't there. But that's -- the only thing we could think is that maybe something was said there, but I don't know of it. I didn't say it, I didn't witness it, and I only heard it when we got the, whatever, the notice from Caroline.

Q. Okay. Did you ever hear anyone suggest to the plaintiff that her pregnancy was going to be a problem?

A. I had heard that someone had said that, but then when I asked her if she said that, she said she didn't, so I don't know where I heard that from either. Maybe from Caroline during that period.

Q. Okay. You would have heard it from someone that was an employee of Austin Montessori School. Correct?

A. Well, I would think that maybe I heard it from Caroline; like, maybe she said it to -- but, you know, I don't know. I do know I have heard of that, but I don't know how I came to know.

Q. Okay.

A. If we thought every pregnancy was a problem

71

at the school, we would be in big trouble because people have babies all the time. We don't think of it as a problem at all.

MR. COOK: Objection; nonresponsive.

Q. (By Mr. Cook) What was the overall reaction to Ms. Clark's pregnancy?

A. From?

Q. The school.

MR. GARNER: Objection; form.

A. Well, I mean, we just -- initially?

Q. (By Mr. Cook) (Nods head.)

A. Just, like, well, some people say, "Wow, I didn't know she was going to have another one." It's like, "Oh, you know, congratulations." That was the initial response.

Q. When do you think you found out -- I mean, you found out about it from Ms. Miller. Correct?

A. No. Yeah. Oh, yes, that's right, I did. I did.

Q. When do you think -- I mean, I'm not looking for the exact day and time, but can you estimate when you found out that from Ms. Miller?

A. Okay. If she had the baby in October -- maybe, like, February. Maybe March. I feel like she was a little bit further along, you know.

72

Q. In response to Ms. Clark notifying the school and you that she was going to have a baby, what did the school do? What course of action did it take?

A. She didn't actually tell me; Amber did. And then the next time I saw her, you know, I kind of expected that she would, but she didn't, and so I just said, "Congratulations, I heard the news."

Oh, and it was in early arrival -- her son would come to the early arrival, so at 7:30, and sometimes I would be doing that job because I come early if somebody is out, so I was in there and so I was telling her congratulations, but I didn't want -- we didn't want to talk too loud because I didn't know if she told her son. You know, I didn't know the situation.

And -- but she said, "Yeah, and maybe -- I'm thinking that maybe I want to work this summer by doing a summer program for the students, for the Children's House students," and she wanted to know if she could use the classroom. I said that would be great. In fact, the founder of the school has always wanted us to do summer programs, and Caroline had particular experience running one in Dallas so she would have been great at that. And I said, "Yeah. Like, tell me how you think it should go. That would

73

be really good to do."

And I think it was in the vein of, "Oh, having a baby is going to cost more money" kind of thing. And she wanted to do -- she had been wanting to do the program and this would be a good time because it was before she had two children, you know, at home in the summers. So we had that conversation at the same time, but that was it. That's what we did initially.

So what we do when we find out a guide is pregnant is, we say -- or a staff member, we say, "Okay, well, we want to let the parents in the community know," because you don't want them to think that -- or you don't want some to know and not others and then them saying, "Why aren't they saying anything? Is there anything wrong?"

So we usually try to do that with having a letter from the guide and from the school. I don't remember how -- I mean, I'm sure we could look at the notes and find out how that played out, but it's always done in collaboration so that we know everybody agrees to the message that goes. And so we did that.

But I think that took some time; I remember thinking, like, longer than it should have, just really because we were busy with other things, maybe a couple of weeks. So that's really what we did

74

at first.

Q.   What happened with the summer program?

A.   She talked to me later that she just didn't have time to figure it out.  She was too busy, you know.  It wasn't anything we were requiring her to do.  It just would have been great if she had wanted to.

(Deposition Exhibit No. 1 was marked for identification.)

Q.   (By Mr. Cook) Ms. Glasgow, I'm going to give you what's been marked as Exhibit 1 to your deposition.  Is this the notification that the school sent out to the parents regarding --

A.   Yes.

Q.   -- Ms. Clark's pregnancy?

A.   Yes.

Q.   Why did they -- why did the school send this notice out to the parents?

A.   Because when a guide is pregnant, it's visibly obvious and we want them to know that they can talk to their child about it; you know, that they're going to wonder and that we -- you know, that it -- I don't know, it's kind of a small community; you know, you want to keep people in the loop, just like you would know if your, you know, family member was pregnant.

75

And we like everybody to get the same message, so it's not like, oh, some people know because they're, you know, tight in with the people at the school and some people don't because they don't have that kind of relationship.

Q.   Has the school ever found, or have you ever found, the fact that a teacher is pregnant to be one of those kind of distractions you said for the children in the classroom that prevents them from kind of the individualized work that you were talking about?

A.   No.  No, not at all.  In fact, we -- it's really great because we -- for children to have that, you know, information in a very natural way that's not like, oh, here's a pregnant person and this is a person who just had a baby, you know.  It's sort of, oh, I know my teacher was pregnant.

So the guide usually comes up with simple things to say, "Yes, there's a baby growing, you know, in here," things like that, or, "You were in your mother's stomach."  Or if they weren't, if they were adopted, you could say, you know, "Babies grow in people's -- in women's stomachs."

So not at all.

Q.   Who drafted this letter that's been marked as Exhibit 1?

76

A.   I can't remember exactly, but typically how we do one of these letters is, I find another one that we sent out that's similar and we start with that as a template and then, you know, modify it based on the particulars.  So it could have been me to start, but then Don always reviews it and then Caroline would have as well.

Q.   In this, it talks about:  We are working now to create a plan that will allow Caroline the opportunity to spend time with her new baby as well as provide the best arrangement for the children of Laurel Cottage.

Is that correct?

A.   Right.

Q.   Is it fair to say that, as of March 26, 2010, Austin Montessori School was trying to think about what to do for the upcoming school year?

A.   Yes.

Q.   Okay.  And, specifically, what to do with the fact that Ms. Clark might be missing work due to her pregnancy?

A.   No, not that she --

MR. GARNER:  Objection; form.

A.   -- would be missing work due to her pregnancy, but that she would be staying home after

77

because she was going to be taking leave.

Q.   (By Mr. Cook) Okay.  It was after this letter that's been marked as Exhibit 1 that you had a sit-down meeting with Ms. Clark to discuss the possibility of the campus coordinator position.  Is that correct?

A.   Yes.

Q.   Do you know when that meeting was with Ms. Clark?

A.   I think it was in -- later in April.

Q.   Tell me what happened.  And who was at that meeting?

A.   Amber Miller, Caroline, and me.

Q.   Tell me what was said at that meeting.

A.   Gosh, I don't remember how it would have started.  You know, probably small talk.  I try to think about those things, too, before we go into a meeting.  But we most likely started by telling her that we wanted to offer her the position of campus coordinator; that we had heard that she expressed interest in it and we were really excited about that because she has, you know, these unique skills and she's trained as well.  And then it -- yeah, we talked about it that way.  That's the way we started it.

Q.   Okay.  Did Ms. Clark ask if the position of

78

guide was no longer available to her?

A.   She did ask that at some point.  She said, "Are you saying" -- something like, "Are you saying that it's not going to be possible for me to go back into Laurel Cottage this next year?"

And we said that, because she would be out for, you know, a period of time and that the class wasn't stable and that wasn't going to lend itself to being more stable, that it wasn't something that we could do to the children, like, because we couldn't promise what -- we couldn't fulfill our promises.

And it was somewhere at that point that she told us that she really liked being a guide, and we said, "Well, you know, you could still be a guide here; it's just, during this next year, you won't be here, you know, for that period of time."

And we really -- I think at some point, we even apologized for kind of not acknowledging that she really liked being a guide, you know, until she told us.  Of course we knew that she preferred to be -- I mean, that she liked to be a guide, but we also thought that she was going to really like to do this because she told us -- I mean, she told Donna Romine that.

Q.   But it turned out, at least from that

79

meeting, that you were wrong about that?

A.   Well --

MR. GARNER:  Objection; form.

A.   I don't -- she didn't do the position, so I don't know that she wouldn't have liked it.  I still think she would have, but she wasn't feeling that it was what she wanted to do as much as being in the classroom.  However, then she decided not to be in any classroom in the -- at least that was her plan.  That's what she told us.

Q.   (By Mr. Cook) When did she tell you that?

A.   We had another meeting.  I think it was in early May.  It was after that curriculum development day.

Q.   The first -- after the first Friday of May?

A.   I think so.

Q.   Okay.

A.   And she -- I could look up the dates on that, because we had an exchange on e-mail about when we were meeting.  But she -- we sat down and we thought we were going to talk more about the campus coordinator position, because she was kind of -- wanted to go home and talk to Adam and think about, you know, the position.  And we thought she was thinking more about whether she wanted to work in the morning or the -- we

80

even talked about, like, bringing her baby, because we could -- we said, "We could facilitate having a baby here, but you would have to have somebody to watch -- you know, in the campus coordinator position, you would have to have somebody here to be responsible while you were working, but, you know, the baby could be here."

So we thought it was that kind of conversation that she was having with Adam.  But, anyway, she came back and said, "Adam and I have decided to move.  You know, we're going to live in my mother's house and I get to stay home with the baby and Austin gets to go to St. Alcuin," which is where her mother used to work.  She had too; she worked there too.  So we were, like, "Wow, you really have this figured out."

Q.   Did she say anything else at that May meeting that you can remember?

A.   I asked, "Are you sure you don't want to even talk about -- like, look at the -- you know, the details of the position and talk about it?"

And she goes, "No, no.  We've already decided."

She didn't even -- I specifically remember her not even opening it; like, just handing it right back.  And...

81

Q.   Do you remember her saying anything else at that meeting?

A.   No.  I mean, I'm sure she did but I don't remember what it was.

Q.   Okay.  Did she -- did she ask if what the school was doing was legal?

A.   I don't remember that.

Q.   Okay.  Going back to the April meeting that preceded this, have you testified as to everything you can remember Ms. Clark stating at that meeting?

A.   Well, all I could remember.  I mean, if you said, "Did she say this?" I might remember that.  But, I mean, that's all I remember now.

Q.   Did you mention, in that April meeting with Ms. Clark, that people were still talking about Janice?

A.   Oh.  I don't know if I said people were still talking about Janice, but we still recognized the -- oh, maybe I did say that parents still remembered that -- I mean, that period of time that she was out as being very disruptive and that we did too and that it was the most ideal of circumstances prior to her leaving -- Janice -- and it was a shorter time and it still was not good; that we knew that being out that long of a time would be extremely difficult for the classroom and the children.

82

Q.   When did you discuss with Ms. Clark the length of her prospective leave?

A.   You know, we talked about it several times, even in that meeting in April, but I couldn't find anything in writing, like in an e-mail or anything. We talked about it prior to that, just her coming in the office and talking to me and in that meeting. It was sort of just something that was kind of part of the information we were considering.

Q.   Okay. Why did the length of her leave matter?

A.   Well, okay, so if somebody was going to be sick for a week, that's disruptive to the room but the children kind of -- they -- it takes awhile for things to start falling apart, but over a longer time, it's very disruptive.

Now, in her case, being gone a week was probably pretty disruptive in the room because the room already wasn't stable; they were already a little on edge with, you know, the day a guide wasn't there.

Q.   Earlier, you testified that you couldn't imagine any time period after Ms. Clark being -- you know, any period of leave after a childbirth that would be acceptable, given the circumstances at the Montessori School.

83

A.   Oh, I don't remember saying that.

Q.   Okay.

A.   What did I say?

Q.   Is there -- would there have been a period of leave following Ms. Clark's childbirth that would have been permissible?

A.   You mean if Caroline had come to us and said she needed to be out -- regardless of whether she was pregnant, she needed to be out for a period of time, would we have still offered her a contract; what time would that be?

We would have had to have a conversation about that. I would think -- like, my idea would be, like, if it was a month, I mean, it would be difficult, but, you know, a month would be kind of something you feel like you could patch together. That's just my -- it would have taken input from lots of other people.

Q.   But your opinion is that it would have been acceptable for Ms. Clark to have taken a month of leave following her pregnancy and then she would have been able to return?

A.   I mean, that -- I mean, for, again, any kind of leave.

Q.   Did you give that option to Ms. Clark that, "Hey, if you take one month leave, you can return as

84

guide"?

A.   That wasn't brought up. It wasn't a conversation.

Q.   Why not?

A.   I don't know. I guess you could say, why didn't Caroline say, "What if I only took a month?" It just wasn't part of our conversation. I don't know.

Q.   Well, you were talking about she was talking about the amount of time she was planning on taking off. Correct? Is that correct?

A.   Well, we weren't -- we were talking about the time that she was going to be out, but never varying from her plan. So, I mean, I guess, to us, it never seemed like that was a plan that was going to vary, that was going to change.

Q.   Well, did you ever ask her if it was changeable?

A.   I don't recall.

Q.   But, basically, you're saying, if Ms. Clark had come to you and said, "I'm planning on taking a month off following my childbirth," that would have been acceptable?

MR. GARNER: Objection; form.

A.   It didn't have anything to do with having, you know, the baby, and it just had to do with the

85

amount of time being off. And it was never -- it was never discussed that it would be ever anything less than the -- all the way through the winter break.

I mean, I could go back now and go, oh, yeah, well, maybe I should have written some things down too, but we just didn't. It just didn't come up. It was just always assumed it was going to be three months, by her and by us.

Q.   (By Mr. Cook) Considering that one month would have been acceptable to the school and three months was unacceptable, do you think it was fair not to give that alternative to Ms. Clark?

A.   I don't know.

MR. GARNER: Objection; form.

A.   Again, we weren't offering her -- we weren't letting her go. We wanted her to stay at the school. We wanted her to stay in a position that would still be beneficial to -- it would be beneficial to her, to the school, and still meet the needs of the children, so we weren't thinking that way. We weren't thinking, oh, my gosh, we have to think of all these different ways that Caroline won't move to Dallas. You know, we still wanted her to be there and thought she would be.

Q.   (By Mr. Cook) Then why didn't you propose a one-month leave so that she could stay at the

86

school and remain in the guide position?

A. We wanted her to stay at the school in the campus coordinator position. We didn't have any conversations. We had that one in April. She planned all the moving and then we planned another one to talk about that position, and that was it. I mean, we had that one meeting with her and, after that meeting, she decided to move.

Q. So were there not multiple conversations about the amount of time she was going to take off for leave?

A. There were conversations that we had where it was assumed she was going to be out that long, but there was only one conversation about her not returning to that guide position but doing the campus coordinator position. And the reason behind it, that there was going to be too much time where she wouldn't be there and it would be unstable.

Q. Was there a -- I mean, you're talking about both sides assuming -- you've testified that both sides assumed that she would be out for three months. Correct?

A. Right.

Q. Was there a meeting where she stated, "I'm going to be out for three months"?

87

A. She told me that, but I wouldn't call it -- I don't know if I want to say it was a meeting, but she came into my office and told me that.

Q. When did she do that?

A. It was sometime after she told us she was pregnant. I don't remember the days.

Q. And what did you say in response to her comment that, "I'm going to be out for three months"?

A. I'm sure I go, "Oh, okay;" you know, just what -- What does that look like, you know? And then I probably reported it to Amber and then -- I think she even told Amber. Amber can tell you that.

Q. Are you aware of any discussion or any offer by anyone in Austin Montessori School for Ms. Clark to take a shorter leave than what she had proposed?

A. I'm not aware of that.

Q. I may have asked this, and if I did, I apologize, but who was at that second meeting in May, following the first Friday in May?

A. Amber, Miller, me, and Caroline.

Q. Okay.

(Deposition Exhibit No. 2 was marked for identification.)

Q. (By Mr. Cook) I'll give you what's been marked as Exhibit 2 to your deposition. Does this

88

refresh your recollection as to when that meeting in May took place?

A. Yes.

Q. What day did that meeting in May take place?

A. Well, if this is Tuesday, the 11th and 12th...

THE REPORTER: I'm sorry?

A. The 14th.

Q. Okay.

A. May 14th.

Q. (By Mr. Cook) That was the second meeting you had with Ms. Clark --

A. Yes.

Q. -- with Ms. Miller?

A. Right.

Q. Okay.

(Deposition Exhibit No. 3 was marked for identification.)

Q. (By Mr. Cook) I've handed you what's been marked as Exhibit 3 to your deposition, Ms. Glasgow. Do you know what this document is?

A. Yes. It's the letter we sent out to the families once Caroline had decided she wasn't returning.

Q. Did the school actually send out this letter?

89

A. Uh-huh, along with a letter from -- I believe it would have gone out along with a letter from Don Goertz.

Q. Who drafted this letter?

A. Caroline.

Q. She did the -- well, did she work off a draft that someone else had drafted?

A. No.

Q. She came up with this totally on her own?

A. Uh-huh. But we probably had a conversation about it, you know, like, "Oh, well, what about this?" or -- I don't remember the details, but I remember having that conversation with her. And the same with the letter from Don.

Q. Did -- was this letter provided -- obviously it was provided to the school before it was sent out. Is that correct?

A. Oh, yes.

Q. Was it approved by the school before it was sent out?

A. We -- I mean, approved? I mean, if we would have -- you know, we might not have said -- if we were writing it -- you know, sometimes you write it in your own best interests. But this was a letter from Caroline and it was important for her to know that --

90

for her to let the families know that she wasn't returning to the guide position, which is why, you know -- so I wouldn't say that we approved it; although, we did review it to make sure it wasn't incorrect.

Q. Did Austin Montessori School, or anyone else at Montessori School, propose any changes to any drafts of any letters?

A. Oh, I'm sure.

Q. Okay. And how would that -- would they have done that by e-mail?

A. Well, if they had done it by e-mail, I probably would have printed it and given it, because I did everything I could kind find, so I probably just went over and talked to her.

Q. Okay. And proposed some changes to her letter?

A. Uh-huh, or talked to her on the phone.

Q. Okay.

A. Yeah.

Q. Can you remember any specific concerns you had with her original draft of her letter?

A. Yeah. One of them was, she said something about she and Adam were waiting so long to tell that they were pregnant, and I go, "What? Why are you

91

saying that? Nobody was stopping you from telling people you were pregnant."

And she goes, "Oh, okay."

So it says -- that's why this says: Adam and I have waited so long and so patiently for this moment.

It was kind of combined in one sentence to tell you, "And that we were waiting so long to get pregnant" -- or something like that. So, anyway, we changed that. I say "we" because it was she and I.

Q. Any other changes you made to this letter in Exhibit 3?

A. That's the only one I remember. Let me read it real quick and we will see.

Q. Sure.

A. I feel like there was probably a little bit of discussion about the second paragraph, but we didn't -- I don't think we changed anything. I remember talking to someone, maybe Amber and maybe Don, about how Caroline really wanted the families to know that she wasn't just leaving them, you know. It's important that they be able to -- the guides really want to maintain that authenticity with the parents. They don't want them to think that they had another plan all along, you know. So I thought that that was a

92

genuine thing she should be allowed to write in this letter. And I'm sure she had conversations with people too.

Q. How many campuses does Austin Montessori School have?

A. Three.

Q. Where are they?

A. The main campus is -- the main office is 5006 Sunset Trail. It's at Sunset Trail and Jones Road, Southwest Austin. The middle school is Southwest Austin also, but more toward Oak Hill off of 290. And that's just one class by itself.

And then we have a Great Northern Campus, which is at -- near 2222 and Mopac, and it has two Children's Houses and one early elementary class.

Q. How many employees does Austin Montessori School have?

A. You know, it varies from 45 to 48, about.

Q. Okay.

A. I don't know right now, but it's somewhere around there.

Q. How many independent contractors does the school employ?

A. We have Patricia Oriti and Charlotte Kroger and -- I mean, like, there's a -- sometimes there's

93

this computer guy that comes, but he's not as regularly scheduled, Don Porter. We have -- oh, let's see. There's, like, computer people too.

Oh, sometimes just Montessori people will come -- will ask, "Will you come in and do a consultation with one of our levels," in coordination with a mentor, so it's not just one person always. And so that -- I don't -- like, Jenny Hoagland is one person. If I looked at our 1099 list, I could tell you.

Q. Are there -- are you in charge of TWC quarterly reports, by chance?

A. Well, I don't have to -- I mean, our payroll company does it.

Q. Oh, okay.

A. But I know what it is.

Q. Okay.

A. Yeah.

Q. Are there any part-time employees in addition to the people you've mentioned?

A. Well, that includes part-time employees.

Q. Okay. Does Austin Montessori School have any plans to expand or grow bigger?

A. No, not with the current structure. There will probably be a change in structure, where they'll

94

have a larger board and a -- currently, we're a founder-run school, so when they go to a head of school, I mean, it's possible that that will happen, but not now.

Q. Any plans to hire more teaches?

A. No.

Q. Any reason why there's no plans to hire more teachers?

A. The administrative structure isn't set up to manage more classrooms, I guess you could say.

Q. Is there -- is there -- in the administrative structure, is there a specific limit on the number of employees --

A. No.

Q. -- at Austin Montessori School?

A. No. And the facilities also don't allow us to -- and the economy isn't such that they want to give moneys to -- money to nonprofits or schools, and we're both, so...

MR. COOK: If you'll give me just a couple of minutes to talk with my colleague here.

THE WITNESS: Okay.

MR. COOK: We'll go off the record and I may come back with a couple of follow-up questions, but I'm pretty much done.

95

MR. GARNER: Okay.

THE VIDEOGRAPHER: Okay. We'll go off at 11:04.

(A short break was taken.)

THE VIDEOGRAPHER: We're back on the record. It's 11:13.

Q. (By Mr. Cook) Ms. Glasgow, do you remember a guide or an employee named ▬▬▬▬ missing work because of a back injury?

A. Oh, yes, I do remember that.

Q. Okay. Was she a guide?

A. She was a guide.

Q. Was her name ▬▬▬

A. It was -- at the time, it was ▬▬▬▬. She changed her name. Yeah.

Q. Is she still working for --

A. No.

Q. -- Austin Montessori School?

A. No, she's not.

Q. What period of time did she work for Austin Montessori School, roughly?

A. Let's see, she probably stopped in, like, two-thousand -- oh, oh -- 2007 maybe was her last year. I believe she worked at the school for 15 years.

Q. Oh, wow.

96

A. Yeah.

Q. Where was she a guide?

A. In the early elementary classroom.

Q. Okay. What age group is that?

A. Six- to nine-year-olds.

Q. Six to nine. Okay. Did she miss a period of work because of a back injury?

A. She did.

Q. Do you know how much time she missed?

A. I could look it up, because I was there. It was -- it was a number of weeks.

Q. Okay.

A. I don't think she intended for it to be that long, and I do -- we had a guide who was trained -- she was not an AMI-trained guide, which, we don't hire AMS-trained guides anymore -- it's a different certification -- but she was an AMS-trained guide, but because of her history with the school, she was still staying. There was this idea she would get trained. And we happened to have another AMS-trained guide in the campus coordinator position at the time and she came in to be the sub.

But what I remember about that is that she actually had a tumor on her back or something like that. It wasn't, like, an injury at work or an injury

97

outside of it. So she had the surgery and she expected to be back, and we ended up -- it ended up being more of, the doctor said she could come back, and we had to go and say, "Look, if you don't come back now, we're going to have to replace you mid-year, so we got her to come back, you know, to work.

Q. Do you know how many weeks she missed from work?

A. I could look it up, but I don't remember.

Q. But she was allowed to return to work after taking leave?

A. Well, because she went out in the middle of the year. Like, it was a sudden thing. It was -- we didn't have -- it's very difficult to find guides in the middle of the year. And we had somebody in there but, as I said before, it's still disruptive.

MR. COOK: Okay. I'll pass the witness.

MR. GARNER: I just have a couple of questions.

EXAMINATION

QUESTIONS BY MR. GARNER:

Q. Dawn, let me ask you this with regard to Caroline's position: Did Caroline's pregnancy, was it a factor in determining whether you kept her in a house guide position or not?

102

A.   Well, it was her idea initially that made us think of it, and then when we heard that, we go: Oh, my gosh, that would be -- that would be great. She's got these amazing organizational skills. She could sub in the classrooms. It would provide the flexibility for her. We could cover it.

Like, we'd all work together to cover it while she was out. The classroom, you know, and the children would have stability. I mean, that's what initiated it. I'm not saying none of us would have ever thought of it, but, I mean, it came up that way first.

Q.   So if Ms. Clark came to you and said, "I need 12 weeks off," just -- regardless of the reason, Austin Montessori School still would have attempted to reassign her to a position to provide stability in the classroom?

A.   Right.

Q.   Was Austin Montessori School intending to bring her back as a house guide?

A.   Yes.

Q.   If she was able to stay in the classroom for the full term?

A.   Yes.

Q.   In fact, y'all had previously hired her as a

103

house guide at a previous instance?

A.   Right.

Q.   And y'all hired her back after an extended leave period?

A.   Two years. Yes.

Q.   When, if you recall, do you recall Ms. Clark telling you that she was going to Dallas?

A.   She told us -- The first time or the second time?

Q.   Let's say the first time. Well, in this instance --

A.   Oh.

Q.   -- relating to her last position.

A.   It was at that meeting on the 14th of May.

Q.   Is that when you proposed the campus coordinator position?

A.   No. We proposed that in April, and then she said she wanted to go back and talk to her husband about it. And then we were supposed to have another meeting where we talked about more of the details and it was -- it took some time to schedule that, because she didn't come to work on that CD day and she was -- really, she wasn't responding to my calls. And I even called her and said, "Caroline, we can't just not talk; we have to talk."

104

And she was -- I realized later that what she was doing was trying to figure out what she was doing, what she was going to do, make a final decision about Dallas.

MR. GARNER:   Well, let's change the tape.

THE VIDEOGRAPHER:   Okay. We'll go off, then, at 11:24.

(A short break was taken.)

THE VIDEOGRAPHER:   All right. We're back on. It's 11:26. This is Tape 3.

Q.   (By Mr. Garner) So when Austin Montessori School first proposed the campus coordinator position, y'all did that, what y'all believed, at her insistence?

A.   At her idea.

Q.   Her idea?

A.   Right.

Q.   So you thought it was her idea and that's why y'all proposed it?

A.   We thought it was her idea and we thought it was a good opportunity for her and it would -- you know, we still would be providing consistency in the classroom.

Q.   What were the factors in providing the -- or

105

offering the campus coordinator position?

A.   What does that mean?

Q.   Well, I mean, for instance, the differences between a campus coordinator position and a house guide.

A.   Oh.

Q.   Why don't we talk about the differences between the two positions.

A.   Okay. I kind of covered it as best I could, when -- earlier, when I said that you have more interaction with a wider variety of parents you have more -- and staff members. You have more visibility in all of the classrooms -- into all of the classrooms. You coordinate parent education events. You coordinate campus-wide events.

Q.   Well, for instance, is the scheduling different?

A.   There was a possibility for it to be different, but it didn't need to be different. I -- we felt like -- I mean, we do feel like -- and we know because we had a guide who was in that position prior to offering it to Caroline -- that it had -- you have much fewer responsibilities outside of your work hours than you do when you're a guide.

When you're a guide, you have, you know,

106

parent concerns, you have material making, you have conferences, things like that that are not the -- that are not part of the responsibilities of a campus coordinator.

Q. So it's fair to say that the house guide requires a lot more time?

A. Right.

Q. So moving into the campus coordinator position would provide Ms. Clark -- or Mrs. Clark quite a bit more flexibility?

A. Oh, definitely.

Q. As far as scheduling?

A. Uh-huh.

Q. Duty tasks?

A. Yes.

Q. You know, she would -- not just scheduling her work hours, but scheduling the actual tasks that she performs?

A. Right.

Q. She would be able to do that at her freedom?

A. Right.

Q. So was it -- would you say it's less stressful?

A. Well, yeah, it would be definitely less stressful.

107

Q. And her work hours would be much more flexible --

A. Yes.

Q. -- than a house guide?

A. Right.

Q. Would you agree with that?
You've had four children?

A. Yes.

Q. Having a newborn is no easy task. Sometimes you're required to stay home with the kid no matter what happens, I mean, whether it's sick or any other reason. Correct?

A. Right.

Q. Was it Austin Montessori School's belief that this would provide Mrs. Clark quite a bit more flexibility in her scheduling and her hours as well as her tasks?

A. Well, it would provide her without that worry about the stability of the classroom. So, I mean, you can take off if your child is sick in the classroom just like you can in the campus coordinator, but in the campus coordinator position, I mean, she has the flexibility to still -- you know, to get the work done in that -- in the time that she can.
We also had talked to her about -- in

108

that first meeting -- having, you know, her baby on campus. And, you know, we were even talking about parents volunteering to help assist, you know, with the baby while she was doing her work. And that wouldn't have been possible in the classroom because you can't have a bunch of parents and other adults in there. We could have still had a place outside of the classroom and she could have had the access, but not in there all the time.

Q. And that was discussed with Mrs. Clark?

A. It was discussed in that first meeting where we were saying, "Wow, we thought these were the same reasons you were thinking of it."

Q. And how did Mrs. Clark respond?

A. I mean, she -- we actually talked a little bit about the baby being in there, in the campus coordinator's office; like: How would that work? Would she have to have somebody? And how did Cheryl do it? How did Janice do it?
And we just explained to her too.

Q. If she had been a house guide -- and using opposing counsel's hypothetical, if she had been still a house guide and she had had the baby and she says, "Look, after two weeks, I'm coming back but I'd like the baby to be at the school," would Austin Montessori

109

School have said okay?

A. Yeah. Not in the room. The baby couldn't be in the room all the time. During transitions, we probably could have let that happen, you know, over the noon transition, but it could be -- We had a sunroom near her classroom; that, you know, as long as she had somebody to care for the baby, we wound find a space. And we did talk about that in that meeting in April, too; that, you know, we would provide a place for her to have the baby and somebody to care for it.

Q. So the first meeting when you proposed -- Austin Montessori School proposed this campus coordinator position, a decision was not made, or Mrs. Clark didn't convey a decision, at that time, did she?

A. No.

Q. Okay. And the second meeting, that's when Mrs. Clark told you that she would not be interested in taking the campus coordinator position?

A. Right.

Q. Once she did not -- once she decided that she didn't want the campus coordinator position, was there any conversations about her coming back as a house guide? I mean, did she propose anything at that point in time?

110

A.   No.  She was -- already had planned to move.

Q.   At that time, Mrs. Clark --

A.   In May.

Q.   At that time, Mrs. Clark, in that second meeting, when she told you that she was not going to accept a position, she told you that she was moving to Dallas?

A.   That's right.

Q.   Did you or anyone else in that meeting discuss her coming back in, you know, in some capacity as a house guide; you know, try to work it out?

A.   No.

Q.   Why not?

A.   She told us she was moving, that they had planned -- they had it all worked out.  Adam was already accepted in another school.  I mean, we were really surprised at all that had happened in the period of time since we had that first meeting, that she was going to stay in her mom's house; that she had more friends up there that had children, you know, young children, and, you know, could provide support.  Her family was there.  Adam's work was there more often than it was in Austin, and that had kind of reversed from when they moved originally.  He would be more available.

111

It just worked for them all the way around.  I mean, it really did seem like -- it seemed ideal for her at that point in time.  You know, it's -- I think she thought so, too; I really do.  You know, she's a smart person and she's organized and -- yeah.

Q.   When did Austin Montessori School offer a new position for the campus coordinator position?

A.   You mean once Caroline said she didn't want it?

Q.   Yeah.

A.   At the end of June.

Q.   Okay.  So she refused in mid-May?

A.   May 14th, yeah.

Q.   So it took you a month and a half to find that replacement?

A.   Yeah.  Well, yeah.  It was somebody that had worked at the school before.

Q.   Okay.  So I want to be perfectly clear about this.  It's not the fact that Ms. Clark -- Mrs. Clark was pregnant as to the reason why she was offered a different position?

A.   Correct.

Q.   The reason for her being moved into a different position -- or a proposed new position was the fact that she was not going to be able to be in the

112

classroom for 12 weeks?

A.   Right.

Q.   And the 12-week period, that was a period of time that Mrs. Clark told you that she was going to be out?

A.   Right.  Well, from the time -- the beginning of October, you know, when she was due, until January, returning from the January break.

Q.   Did you have any discussions with Mrs. Clark about the period of time and it being shortened for any reason, if she could?

A.   We didn't talk about that, but we did talk about, in that meeting in April, that it was the time she was going to be out.  I mean, that was the reason.  That is the reason.  I mean, it was not any other reason.  It's that the class isn't stable.  This requires continuous work.

Even if it had been stable, we knew that having the guide out introduced instability.  Having her out that amount of time would be very detrimental to what we were supposed to be offering the children.  And, I mean, that's the reason.

Q.   The proposal to move her into a campus coordinator position, did it -- would the campus coordinator position have less pay?

113

A.   No.

Q.   Would it have less benefits in any way?

A.   No.

Q.   Is it a demotion?

A.   No.

Q.   Is it a lateral move?

A.   We could -- I mean, I kind of look at it as a lateral move, but some people look at it as slightly -- somebody that knows what's going on everywhere, they know what's going on in all of the classrooms, they're in all of the classrooms, they can actually -- when they're substituting in the classrooms, they can offer feedback to the guides, like, "Oh, here's what happened here.  You might want to do this."

You know, just little things.  Sometimes it's easier to do that than it is to operate every single day.  So some people look at it that way.  It's somebody that really knows what's going on at the school, because they know that after so much exposure.

Q.   If a house guide also serves as campus coordinator, or has served as a campus coordinator, would you agree that having that experience would provide her greater ability and greater experience to be a better house guide?

A.   Right.  I remember thinking that.  I don't

114

know if we ever had a conversation with each other, you know, with Amber or anyone else that was talking about this, but I remember thinking, she's going to have more exposure to the -- more of the culture of the school; like, what do we do if somebody drops off a Whataburger for their elementary child, you know? We have the food guidelines. We have a process for what you do if you forget your lunch.

You know, we have all these things and there's reasons for it. Sometimes you don't know what those reasons are, so it's hard to adopt the practice if you don't really believe that it's a good idea, but if you know the reasons, you do. So we felt like she would have more exposure to that and, you know, become reintegrated in that way as well.

Q. So Austin Montessori School also considered this an opportunity to Mrs. Clark to possibly improve her skills as a house guide?

A. In the ways that, you know, she had some trouble, right. Some of the ways, right.

Q. And, again, it was also Austin Montessori School's intent to bring her back as a house guide when she could stay in the classroom for the extended period of time required --

A. Right.

115

Q. -- to provide stability to the children?

A. Right.

MR. GARNER: Okay. I don't have any further questions.

EXAMINATION

QUESTIONS BY MR. COOK:

Q. Does Austin Montessori School consider substitute teachers to be employees?

A. Our substitute teacher mostly is the campus coordinator. I can't think of an instance where we have brought somebody else in that wasn't already, you know, an employee or -- employee in some other capacity.

Q. Okay. So it's not outside substitute teachers?

A. No. It really doesn't work. Yeah, it doesn't work that way.

Q. Do you remember an individual by the name of ███████████?

A. Yes.

Q. What is her position with the school?

A. She took the campus coordinator position when Caroline decided not to do it and now she is actually working until she has her baby, because she's pregnant, and she wants to stay home with her baby afterwards.

116

So she's just working -- I think she's due in the end of September, so right now, she's helping.

Q. She's currently the campus coordinator?

A. No. She's helping. She's just -- she's helping us during transition. She's helping with substituting. It's just -- she didn't want to commit to the whole year and so we just have her working until the end of September.

Q. She was campus coordinator prior to her pregnancy?

A. Well, and during. And she went off in the summer to finish her master's degree at Loyola and then she came back and she worked in the office and then she's just helping us with that, so...

Q. Was she given the option to maintain her role as campus coordinator?

A. I mean, that would have been an option. She didn't want to. She told us, when she was pregnant, that she wanted to stay home. But, I mean, it would have been an option for her.

Q. Did Ms. Clark ever tell you that she felt like she was being punished for being pregnant?

A. I don't know that she said that. I feel like she told some people that. And I -- gosh, I can't remember. I feel like I would have talked to her about

117

that, but there was that period of time where we didn't talk, you know, where we couldn't make a time to meet or she -- you know, actually, I wasn't hearing from her and then we had trouble making time to meet.

Q. Do you think that statement is consistent with being happy about leaving Austin Montessori School?

A. I think -- she was being punished for being pregnant -- I think that, at the time she decided to move to Dallas, that she was happy about that decision.

Q. And at that time, she had already been told that she was not allowed to return as the guide for the 2010, 2011 school year?

A. Well, at that time, she was offered the campus coordinator position.

Q. And she had been told that she could not return as the guide for the 2010, 2011 year?

A. For Laurel Cottage, yeah.

MR. COOK: Pass the witness.

MR. GARNER: No further questions.

MR. COOK: All right. Thank you very much for your time.

THE WITNESS: Sure.

THE VIDEOGRAPHER: Then we'll go off at 11:41.

122

FURTHER CERTIFICATION UNDER RULE 203

The original deposition (was)/was not returned to the deposition officer on September 6, 2011 ;

If returned, the attached Changes and Signature page contains any changes and the reasons therefor;

If returned, the original deposition was delivered to Mr. Cook, Custodial Attorney;

That $780.70 is the deposition officer's charges to the Plaintiff for preparing the original deposition transcript and any copies of exhibits;

That the deposition was delivered in accordance with Rule 203.3 and that a copy of this certificate was served on all parties shown herein and filed with the Clerk.

Certified to by me on this 10th day of September , 2011.


Kim Furr, CSR, RPR
CSR No. 6997, Expires 12/31/11

Firm Registration No. 528
3100 West Slaughter Lane, Suite 101
Austin, Texas  78748

(512) 320-8692 (Fax)

118

CHANGES AND SIGNATURE

DAWN GLASGOW                                      AUGUST 11, 2011

PAGE LINE   CHANGE                                REASON

NONE

119

I, DAWN GLASGOW, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

DAWN GLASGOW

THE STATE OF Texas    )

COUNTY OF Travis    )

Before me, Lois O'Brien, on this day personally appeared DAWN GLASGOW, known to me or proved to me on the oath of                    or through (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he/she executed the same for the purpose and consideration therein expressed.

Given under my hand and seal of office on this day of 2, September    , 2011.

LOIS O'BRIEN
Notary Public, State of Texas
My Commission Expires
October 28, 2011

Lois O'Brien

NOTARY PUBLIC IN AND FOR

THE STATE OF Texas

My Commission Expires: Oct. 28, 2011

120

CAUSE NO. D-1-GN-000096

CAROLINE CLARK                    ) IN THE DISTRICT COURT
        Plaintiff,                )
VS.                               ) TRAVIS COUNTY, TEXAS
                                  )
AUSTIN MONTESSORI SCHOOL,         )
INC.,                             )
        Defendant.                ) 419TH JUDICIAL DISTRICT

* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

REPORTER'S CERTIFICATION
ORAL VIDEOTAPED DEPOSITION OF DAWN GLASGOW
AUGUST 11, 2011

* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

    I, Kimberlye A. Furr, CSR, RPR, in and for the State of Texas, hereby certify to the following:

    That the witness, DAWN GLASGOW, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

    That the deposition transcript was submitted on _August 24, 2011_    to the witness or to the attorney for the witness for examination, signature, and return to me by _September 13, 2011_  ;

    That the amount of time used by each party at the deposition is as follows:

    Mr. Cook:  2 Hours, 19 Minutes

    Mr. Garner:    22 Minutes

121

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes all parties of record:

Mr. Cook, Attorney for Plaintiff
Mr. Garner, Attorney for Defendant

I further certify that I am neither counsel for, related to, nor employed by any of the parties in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of this action.

Further certification requirements pursuant to Rule 203 of TRCP will be certified to after they have occurred.

Certified to by me on this 21st day of August, 2011.

_____
Kim Furr, CSR, RPR
CSR No. 6997, Expires 12/31/11

Firm Registration No. 528
3100 West Slaughter Lane, Suite 101
Austin, Texas  78748

(512) 320-8692 (Fax)