# Exhibit 5

CAUSE NO. D-1-GN-000096

| | |
|---|---|
| CAROLINE CLARK | ) IN THE DISTRICT COURT |
|     Plaintiff, | ) |
| VS. | ) TRAVIS COUNTY, TEXAS |
| | ) |
| AUSTIN MONTESSORI SCHOOL, | ) |
| INC., | ) |
|     Defendant. | ) 419TH JUDICIAL DISTRICT |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

ORAL VIDEOTAPED DEPOSITION OF

AMBER MILLER

AUGUST 11, 2011

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

ORAL VIDEOTAPED DEPOSITION of AMBER MILLER, produced as a witness at the instance of the Plaintiff, and duly sworn, was taken in the above-styled and numbered cause on the 11th day of August, 2011, from 12:23 p.m. to 2:55 p.m., before Kimberlye A. Furr, RPR, CSR, in and for the State of Texas, reported by machine shorthand, at the offices of The Cook Law Firm, 919 Congress Avenue, Suite 1145, Austin, Texas, pursuant to the Texas Rules of Civil Procedure

6

A. I'm the Director of Admissions.

Q. And what do you do as the Director of Admissions?

A. I tour people around the school and host observations; I give evening presentations on Montessori to prospective parents; and I keep the waiting list and accept children into the school.

Q. Do you have any other responsibilities?

A. Well, I'm part of the administration team.

Q. Okay. And what do you mean by that?

A. Well, there's a team of four people that make the decisions, most of the decisions, about the running of the school.

Q. And who else is on that team besides yourself?

A. Dawn Glasgow, Don Goertz, and John Snyder, currently.

Q. During the 2009 to 2010 school year, who made up the administrative team?

A. Dawn Glasgow, Donald Goertz, myself, and -- but John Snyder wasn't part of the administration team then.

Q. So when did he become part of the team?

A. At the beginning of last year.

Q. Can you give me an example of some things

7

that the administrative team makes decisions about?

A. Oh, just everything from, if we're going to do repairs -- I mean, you know, certain repairs or what -- or buy something for a classroom, those kinds of decisions. We have other people that observe in the classrooms, and so sometimes, you know, we'll talk about their observations.

Q. So who, generally, is in charge of things like hiring and staffing decisions?

A. Dawn Glasgow and Donald Goertz.

THE REPORTER: Could you speak up for me, please?

THE WITNESS: Oh. Dawn Glasgow and Donald Goertz.

Q. (By Ms. Jacobs) And do you have a role as well in hiring and staffing decisions?

A. A minor role.

Q. Why do you say "minor role"?

A. I don't make the final decision. I just give -- I can give my opinion, but I don't make a -- any kind of final decision. They make that.

Q. Do they regularly consult you on hiring and staffing decisions?

A. Uh-huh.

Q. Is there anyone else that they would consult

8

with if they were making hiring or staffing decisions?

A. Well, of course we're getting feedback from whoever -- you know, depending on the level, whoever the person is that observes. Like, in the Children's House we have a mentor and for the elementary we have a mentor, a person that observes and -- sorry, I'm not speaking up -- and they -- they're giving us feedback throughout the year.

Q. So how did you first find out that Caroline was expecting?

A. Well, a parent -- a prospective parent was observing in her classroom and when she finished her observation -- I always meet with prospective parents -- she finished her observation and she said, "I really don't want my child in that class next year because I would want to know who is going to substitute while she's out having her baby."

And I said, "She's not pregnant."

And she said, "Oh, yes, she is. I was watching the way she was holding her belly."

And I said, "You know, she has a little bit of a belly and maybe she had her hand on her belly, but she's not pregnant."

And she said, "Oh, okay. Well, I'm sorry. I'm kind of embarrassed. But, you know, people

9

usually who are a little chubby don't hold their bellies in the same way as someone who is pregnant holds their belly."

So, anyway, that was that. And so Caroline came into my office after class that day and I told her what the observers had said, in kind of a joking way, because I didn't think she was pregnant. And, I mean, she didn't look pregnant or anything, to me, and she hadn't mentioned being pregnant, so -- and she said, "Oh, well, I am pregnant."

Q. And was anyone else there when she told you that?

A. Charlotte Kroger.

Q. And anyone else?

A. No.

Q. And so how did you respond when she told you that?

A. I said, "Congratulations."

Q. Do you remember what Charlotte said?

A. No, I don't recall.

Q. Was there anything else that y'all talked about after she had told you that?

A. No. She was -- oh, because it was afternoon departure, so she was hurrying to get back to her class because she still had extended day children there.

10

Q. And did you hear Charlotte say anything to her?

A. I can't remember. I mean, maybe she said "congratulations," also. I'm not sure.

Q. Did you ever hear Charlotte say, in relation to the news about the pregnancy, that that's going to be a problem?

A. No.

Q. So after you heard that, did you share Caroline's news with anyone about her pregnancy?

A. I told Dawn Glasgow.

Q. And when did you share that with Dawn?

A. That same day.

Q. And what did Dawn say when you told her?

A. I don't remember.

Q. Do you remember just generally what her reaction appeared to be?

A. I mean, like, that she was excited for Caroline because Caroline had said she wanted to have another child, so...

Q. Okay. So when was the -- Was there a time that you discussed the pregnancy again with Caroline?

A. Uh-huh.

Q. When was the next time that you discussed it with her?

11

A. We had a meeting with her. I don't remember the date, but we set up a time to meet with her. And, meanwhile -- yeah, I don't remember the date, so...

Q. And why did you set up a time to meet with Caroline?

A. Because we wanted to talk about next year.

Q. Did you have any discussions with Caroline about her pregnancy between when she shared that news with you and then when you actually had that meeting?

A. Did I? No.

Q. Are you aware of anyone else meeting with her?

A. No.

Q. Or talking about the pregnancy?

A. No.

Q. Okay. So you were talking about you set up a time to meet with her and that you weren't exactly sure when that meeting was?

A. Yeah, I don't know the time line of...

Q. Okay. And where was that meeting held?

A. In my office.

Q. And who was there?

A. Me, Caroline, and Dawn Glasgow.

Q. Do you remember what was discussed at that meeting?

12

A. Uh-huh. I remember that we -- I had heard from -- we had -- Donna Romine was our campus coordinator and she had told Dawn that Caroline had said that she wished she had her job, Donna Romine's job, and so we were very excited to offer her that job, because Donna Romine had told us she wasn't coming back the next year; she was moving. And so we thought that Caroline was going to be so excited that we were going to offer her the job that she wanted.

Q. So were you a part of the decision-making team to offer her the campus coordinator position?

A. Well, Dawn and I talked about it, yeah, ahead of time.

Q. Okay. And what did you talk about in terms of --

A. How --

Q. -- offering her the position?

A. How great that position was because it had flexible hours and it would be less -- it's less responsibility, less hours, more flexible, but for the same pay and the same benefits. It was very important to us that she be able to maintain the benefit of getting free tuition for her son, who was currently at the school. And all guides get free tuition, so we wanted to be able to offer that to her also.

13

Q. And how many conversations did you have about offering that campus coordinator position between when you found out that Caroline was expecting and when you actually had the meeting?

A. How many conversations I had with --

Q. Dawn.

A. -- with Dawn?

Q. About the campus coordinator position.

A. I only remember one.

Q. And how did that idea come up? Did you specifically meet about Caroline and what you were going to do for next year?

A. No. I think it just came up when we were meeting about other things, and then Dawn put together the packet. That's not really my job.

Q. So you only had that one conversation before the meeting with Caroline about the campus coordinator position. Did you ever --

A. That's all I remember.

Q. Oh, that's all you remember. Okay. Could there have been more conversations?

A. Well, I know we didn't have any sit-down meeting just to talk about that. So, I mean, it's possible we could have mentioned it more than once, but not that I remember.

14

Q.  Okay.  So were you thinking of any other options for Caroline other than the campus coordinator position?

A.  Well, I thought that was the job she wanted, so, really, I was so excited that we were being able to offer her the job she wanted to have.

Q.  So you weren't considering that she would be able to come back as a guide?

A.  Well, at the time, because she had said that was the job she wanted, that was all I was really thinking about.  And she had already said that she would be gone from October to January and so that was -- we couldn't -- that didn't seem very workable.

Q.  Did she tell you that?

A.  Yes.

Q.  Okay.  So when did she tell you that?

A.  I don't remember.

Q.  Okay.  Because I had asked you earlier if you had had --

A.  Yeah.

Q.  -- any conversations with her about her pregnancy in between when she gave you --

A.  Yes, I know.

Q.  -- the news and when you had the meeting, so --

15

A.  I know I know that --

Q.  Uh-huh.

A.  I'm sorry.

Q.  But do you know when she might have told you?

A.  You know, she would often just stop by my office to say something after class, so it must have been just sometime -- I don't really recall.

Q.  So do you think it was before that meeting?

A.  Yeah.  No.  No, wait a minute.  When did I know that?

THE REPORTER:  I'm sorry, I have to hear you.

THE WITNESS:  Oh.

A.  When did I know that?  I can't recall.

Q.  (By Ms. Jacobs) Is there anything that might help you recall that information?

A.  I can't think of what would help me.

Q.  Okay.  Can you --

A.  I can't recall.

Q.  Can you recall back to any other just informal conversations that you might have had with Caroline just where she may be stopping by the office, or any other situation like that, in between when she shared the news of her pregnancy and when you had that meeting?

16

A.  I mean, it may be at that meeting she told me.  I mean, maybe I didn't know before then.  I don't remember.

Q.  Did it seem to you that someone would just -- I mean, that it would be normal for someone to just casually walk by your office and say that they were going to plan to take time off from October through January?

MR. GARNER:  Objection; form.

A.  Does it seem what?

Q.  (By Ms. Jacobs) Well, I'm just really trying to get at when she might have told you this.

A.  I'm thinking now that she probably told me in the meeting I had with Dawn Glasgow.  Really, all I remember -- I mean mostly what I remember about that was just how excited I felt to offer her the job that I thought she wanted.

Q.  So can you remember what was said at that meeting?

A.  Other than telling her about the job?

Q.  Yes.

A.  I mean -- do you mean what was her reaction?

Q.  You know, who was the one who actually offered her that position?

A.  Dawn.

17

Q.  So was there anything that you said at that meeting?

A.  Maybe just I felt excited about the flexible hours and that aspect of it I thought was going to work really well for her.

Q.  And how did Caroline react?

A.  Not as excited as I had imagined she would be.  She said she really -- it was interesting and, yes, she had said that to Donna Romine, but she wanted to think about it.

Q.  Did she say --

A.  Which is understandable.

Q.  -- anything else?

Do you think --

A.  Oh, sorry.

Q.  Did she say anything else that you can recollect?

A.  No.  That's basically -- it wasn't a very lengthy meeting.

Q.  Do you remember if she asked about whether or not the position of guide would be available to her for the following year?

A.  Oh, I think she did.

Q.  And who responded to her when she asked that?

A.  Dawn.

18

Q.   And what did Dawn tell her?

A.   She said -- I know she said we were concerned about -- she must have stated then what her idea was of how long she would be out, and I think Dawn was concerned about that, the length of time.

Q.   Okay.  So what did Dawn tell Caroline when she asked whether or not the position of guide would be available for her the next year?

A.   She didn't say yes or no.  I mean, she just said that -- because we had really come there to talk about the campus coordinator job, not the classroom job, so that hadn't really been something we had given any thought to because we thought she wanted the campus coordinator job.

Q.   Was there any other reason that you wanted to speak with her only about the campus coordinator job and not the possibility of returning as a guide?

A.   Well, we hadn't had -- I mean, that came as a surprise, so...

Q.   So at that meeting, were you working under the assumption that she would not be returning as a guide?

A.   I thought she didn't want to.

Q.   Well, when she reacted and she wasn't as excited as you thought, did that change your feelings

19

about whether or not she wanted to return as a guide?

A.   Yeah.

MR. GARNER:  Objection; form.

Q.   (By Ms. Jacobs) But when she reacted that way, did you think that she might want to return as a guide?

A.   Well, there was that possibility.  She also said she wanted to go away and think about it.

Q.   Did the fact that she had talked to you about what leave you said that she had shared, did that make you think that she wanted to return as a guide?

A.   Yeah, the fact that she said her thought of coming -- if she returned as a guide, that she would be out from October, when she had the baby, until January.

Q.   So backing up a little bit from that meeting, I guess you had said that you had asked Caroline -- or mentioned what the parent had shared.  Had any other parents mentioned to you that they thought that Caroline might be expecting?

A.   No.

Q.   Had you heard any speculation about whether she was expecting, from any parents?

A.   No.

Q.   No staff members?

A.   Huh-uh.

20

Q.   So --

A.   It was news to me.

Q.   Did you hear of anyone else hearing that questioning from parents or parents asking about it?

A.   No.

Q.   So going back to that meeting, so you had offered her the campus coordinator position; she said that she was going to think about it, is what you told me?

A.   Uh-huh.

Q.   So what was the next step that the school took in terms of the campus coordinator position and that offer with Caroline or any other plans for Caroline for the following year?

MR. GARNER:  Objection; form.

A.   I just remember we set up another meeting with Caroline.  That's all I can remember.

Q.   (By Ms. Jacobs) And did you set that up?

A.   Or Dawn Glasgow.  I can't remember.  One of us.

Q.   So how did the school share the news of her pregnancy with the parents?

A.   Don Goertz wrote a letter and Caroline wrote a letter to the parents.  That's how we always do it.

THE VIDEOGRAPHER:  Can you move your

21

microphone up just a little bit higher?  Thank you.

MS. JACOBS:  So your exhibit has not been marked, but it's the same as Exhibit 1.

MR. GARNER:  It's the same one.

THE WITNESS:  Okay.

Q.   (By Ms. Jacobs) So you've just been handed Exhibit 1.  Can you tell me what this is, please?

A.   It's a letter from Don Goertz announcing that Caroline is pregnant.

Q.   Okay.  And do you remember this letter having gone out before or after that meeting where you offered the campus coordinator position?

A.   I think it must have gone out before, because it seems like the letter went out as soon as possible to let parents know.  We don't like parents to hear things through a rumor mill.  We prefer to be -- to get information out as quickly as possible.  But, like I said, I don't remember the dates of the meeting, so I'm not 100 percent sure on that.

Q.   Were you involved at all in drafting this letter?

A.   No.

Q.   Were you involved at all in making sure that it went out?

A.   No.

22

Q.   Just looking at the letter, the second paragraph, it says:  We are working now to create a plan that will allow Caroline the opportunity to spend time with her new baby as well as provide the best arrangement for the children of Laurel Cottage.  We reasoned that it was not necessary to withhold the information about Caroline's pregnancy until we have the details finalized.

So were you working on that plan that's referenced here in the letter?

A.   I think that -- a plan?  I don't know; when I read this, I think that it's just we wanted to get the information out.  We -- you know, if Caroline took the campus coordinator job, then we don't -- you know, we don't know exactly what's going to happen for the classroom next year, so Dawn is being vague about...

Q.   Do you remember about when she shared the news of her pregnancy with you?

A.   I guess it was before March 26th, or whenever that letter is, but I don't remember exactly.

Q.   Okay.  Do you remember hearing anyone ask her to withhold her information or news about her pregnancy until a letter could go out?

A.   Yeah, I guess that would be -- that would make sense.

23

Q.   And who would have told her that?

A.   Just -- I don't know.  Dawn.  Me.

Q.   Okay.  Do you recall --

A.   I'm not sure.  It's just -- the best way for parents to hear information is when they all hear it at the same time as opposed to some parents knowing and some parents not knowing -- I'm sorry -- some parents knowing and some parents not knowing.

Q.   Okay.  So can you recollect asking Caroline to withhold news about her pregnancy until the letter could go out?

A.   No.  But I don't think that would be unusual.

Q.   Would anyone have asked her not to touch her belly?

A.   I think I said that to her jokingly after she -- just, I mean, in a lighthearted, joking way.

Q.   Okay.  So you said that another meeting had been set up after the meeting where you offered her the campus coordinator position.  Do you recall having any conversations with Caroline about the pregnancy in between that first meeting and the second meeting?

A.   Do I recall?  No.

Q.   Do you -- did you talk to her at all about her pregnancy?

MR. GARNER:  Objection; form.

24

A.   Not that I remember.

Q.   (By Ms. Jacobs) So can you tell me around when that second meeting was?

A.   No.  I have no idea.

Q.   I'm handing you Exhibit 2.  Can you tell me what this is?

A.   It looks like Dawn Glasgow setting up a meeting with Caroline.

Q.   Do you think that this is the meeting that was that second meeting that you were talking about?

A.   Probably.

Q.   So just looking at that e-mail, can you figure out about when that second meeting was?

A.   Yeah.

Q.   When would it have been?

A.   Friday, May 14th.

Q.   Okay.  And then can you tell me who was at that meeting?

A.   Me, Dawn, and Caroline.

Q.   And what was said at that meeting?

A.   Okay, now, that meeting, I'm fuzzier about.  I don't have as clear a recollection.

Q.   Do you remember anything that was said at that meeting?

A.   Caroline said that she had decided to move to

25

Dallas and she was really excited because Adam, her husband, was going to get a job there and they were going to get -- to live in her mother's rental house, I think, rent free or for not very much; and she was going to send Austin, her son, to a Montessori school in Dallas and she was super duper excited and said that -- we were happy for her.

Q.   All right.  Do you remember Dawn saying anything to Caroline at that meeting?

A.   I just remember we were both very excited for her because she was so happy.

Q.   Do you remember her being offered the position of campus coordinator at that meeting?

A.   She told us she had never even opened the packet, so she hadn't even looked at the job offer, because she had this other opportunity and she was going to get to be a stay-at-home mom, which she hadn't really gotten to do with Austin, and she was very exited.

Q.   Do you recollect her asking if what y'all were doing was legal?

MR. GARNER:  Objection; form.

A.   No.

Q.   (By Ms. Jacobs) Did you think that it was unreasonable for her to refuse to consider the offer

26

of campus coordinator?

A. No. I was happy for her.

Q. Do you think that there would be any reason why she would not have been interested in the campus coordinator position?

A. No.

Q. Can you think of anything that she would have ever said that would make you think why she would not want the campus coordinator position?

A. No.

MR. GARNER: Can you -- can I hear that back?

(Material read back as requested.)

MR. GARNER: Okay.

A. No.

Q. (By Ms. Jacobs) Okay. So at that meeting that was May 14th, did -- was it discussed about the idea of sending a letter out to the parents to inform them of what would be happening for the following school year, in terms of who would be the guide or whether or not Caroline would still be there?

A. I don't remember. I mean, it's possible, but I don't remember that being discussed.

Q. I'm going to hand you what's been marked as

27

Exhibit 3.

A. Okay.

Q. I'll give you a moment to read over that.

A. So when did this go out? I don't see a date on it.

MR. GARNER: She's not going to tell you.

THE WITNESS: Oh.

MS. JACOBS: It's my day to ask the questions.

MR. GARNER: She asks the questions.

THE WITNESS: Oh, I'm sorry.

MR. GARNER: You just answer them.

THE WITNESS: I'm sorry. I'm sorry. Okay.

(Deposition Exhibit No. 4 was marked for identification.)

Q. (By Ms. Jacobs) I'm also going to hand you what's been marked as Exhibit 4. I'll give you a chance to read that.

A. Okay.

Q. So can you tell me what Exhibit 4 is?

A. A letter from Don Goertz.

Q. And can you read the subject line to me?

MR. GARNER: Wait a minute. I'm sorry.

28

You said a letter from Donald Goertz?

THE WITNESS: Yeah.

MR. GARNER: Okay.

THE WITNESS: Isn't that -- doesn't it say "Sincerely, Don Goertz"?

Q. (By Ms. Jacobs) Okay. So --

MR. GARNER: I'm looking from the front and it says from Dawn Glasgow, so that's all.

THE WITNESS: Oh, okay.

Q. (By Ms. Jacobs) So can you read the subject line to me?

A. "Get Caroline to review."

Q. So is it fair to say that this is an e-mail of the draft of a letter that's signed -- or it looks like it's signed by Don Goertz?

A. Uh-huh.

Q. And it's from Dawn Glasgow?

MR. GARNER: Objection; form.

A. Would you repeat the question?

Q. (By Ms. Jacobs) Okay. So this is a letter or a draft of a letter.

A. Uh-huh.

Q. It's an e-mail that's from Dawn Glasgow, and the subject line says, "Get Caroline to review"?

A. Uh-huh.

29

Q. Do you recollect whether or not you had Caroline review this?

A. I am -- did I get her to review it? I don't recollect.

Q. Do you remember doing anything with this e-mail?

A. Nope, I don't.

Q. Do you know if this letter went out to the parents of Laurel Cottage?

A. No, I don't, unfortunately.

Q. Do you know if a guide was hired for Laurel Cottage to replace Caroline?

A. Yeah.

Q. And who replaced her?

A. Jesse Jahnke.

Q. And was she expecting, or pregnant, at the time that she took over as guide?

A. No.

Q. We've talked about the two meetings that you had with Caroline and with Dawn also there, and you told me about how Caroline shared the news of her pregnancy with you when you had asked her about it. Can you recollect any other conversations that you might have had about Caroline's pregnancy?

MR. GARNER: Objection; form.

**30**

A. No.

Q. (By Ms. Jacobs) If parents of the school have a concern about a guide, who do they usually go to?

MR. GARNER: Objection; form.

A. Often they come to me.

Q. (By Ms. Jacobs) What are some typical concerns that parents bring to you?

A. Oh, that their child's guide is not giving their child enough lessons in the Montessori materials; that, you know, they will have concerns about -- if they have observed and the class seems chaotic, they might have a concern; or if their child comes home saying so-and-so hit me, said something to me or -- those kinds of things.

Q. Do you recall parents ever bringing concerns to you about Caroline?

A. Uh-huh.

Q. What concerns about Caroline were brought to you?

A. Several parents were concerned that she wasn't -- well, as -- what they said was, part of the Austin Montessori School culture. She was more traditional school in her teaching methods and ways of being with children. We have a certain culture at the

**31**

school about not -- the children not watching television and not being part of pop culture, and parents brought some concerns.

Q. Do you remember who those parents were?

A. Uh-huh.

Q. And who were they?

A. Well, I'm trying to remember. I'm not sure who came first, but I know I spoke with Tiffany Bilbe, who had two children in Caroline's class; and Sue Colby, who also had two children.

Q. Were there any other parents who brought concerns about Caroline related to the school's culture?

A. Those were the only ones about the school culture.

Q. Did any other parents bring any other concerns about Caroline to you?

A. Yes. There was a parent who was concerned about if her child was actually working and getting all the lessons, and had those kind of concerns. And then one other parent, after she found out Caroline -- actually, two other parents, after they found out Caroline was pregnant after that first letter, I guess, they had concerns about the continuity of the class.

Q. Okay. And who was the parent of the child

**32**

who she had -- where the parent had expressed the concern that the child wasn't getting the lessons?

A. Let's see, what's the parent's name? The child is ▮▮▮phonetic.] ▮▮▮▮▮▮ I know the child's last name is ▮▮▮. I'm not 100 percent sure if that's ▮▮▮ last name.

Q. Okay. And can you think of any other parents who brought concerns about Caroline to you?

A. Those are the only ones I can...

Q. So who are the parents who brought a concern to you after that first letter went out?

A. ▮▮▮▮ mom. Her name is Patricia -- I can't remember their last name. I can't remember their last name. And the other one was ▮▮▮ mom. I can't remember her name either.

Q. So can you recall, when did ▮▮▮▮ mom, or Patricia, bring a concern to you?

A. I would guess it was sometime in April, but I don't remember.

Q. And what did she tell you?

A. That she was concerned with the transition if Caroline was out of the class for three months, or any months, really. I don't actually remember any exact amount of time, but she was just concerned about a transition if Caroline was out of the class.

**33**

Q. Okay. And what about -- and ▮▮▮ mom was the other parent?

A. Uh-huh.

Q. And what did she say?

A. She was also concerned about any transition.

Q. Do you remember when she brought that concern to you?

A. It seems like it was later, so maybe it was early May or -- I don't really recall for sure.

Q. Okay. And so what did you tell Patricia after she raised that concern to you?

A. I think we decided to move ▮▮▮▮ to another class. He had already moved to Austin from Europe and had had a huge transition. He didn't really speak English and so we just thought it would be best for him to move into another class and, therefore, avoid any kind of transition.

Q. And when you say "we decided" to move the child, who are you referring to?

A. Oh. Me and the mother. The mother and I.

Q. Did you consult with anyone else at the school?

A. I don't think so.

Q. And did you share Patricia's concern with anyone else at the school?

**34**

A. I'm sure I -- with Caroline.

Q. Anyone else?

A. No, not that I remember.

Q. Did you tell Dawn?

A. At some point, I'm sure I did. I don't generally move children around without letting her know that I was making a move.

Q. Okay. And then going to the concern that ███ mom had raised, how did you address that concern?

A. I just listened. We didn't -- I don't remember really talking about anything we would do. I just listened to her concern.

Q. Did you share anything with her to try to alleviate her concern?

A. I don't recall. I would be making it up if I -- I don't recall what I said --

Q. And did --

A. -- what all I said.

Q. Did you share that concern with anyone else at the school?

A. I'm sure with Caroline and with Dawn. Oh, and probably Charlotte. Probably Charlotte. She's our mentor.

Q. Did you share Patricia's concern with

**35**

Charlotte as well?

A. Probably. I don't remember for sure, but probably.

Q. So no other parents, other than Patricia and ███ mom, expressed concerns about the next year for the class?

MR. GARNER: Objection; form.

Q. (By Ms. Jacobs) Expressed concerns about Caroline related to her pregnancy?

MR. GARNER: I'm going to object to form.

A. They weren't concerned about her pregnancy.

Q. (By Ms. Jacobs) What were they concerned about?

A. They were concerned about transitions for their child.

Q. Okay. And when you say "transitions," can you explain that, please?

A. That means any kind of transition; like, even -- that would mean if we put a new guide in there, if Caroline left on maternity leave. Any transition is what they were concerned about.

Q. So those are the only two parents that expressed a concern about transitions?

A. They're the only two I can think of right

**36**

now.

MR. GARNER: The only two that expressed them to you.

THE WITNESS: Okay.

A. The only two that expressed them to me.

Q. (By Ms. Jacobs) All right. So going back to -- you said there were other concerns that parents had brought to you about Caroline, not related to transitions. Going back to Ms. Bilbe?

A. Oh, yeah.

Q. Okay. So can you recall when she would have brought concerns to you about Caroline?

A. The first time would have been Caroline's first year.

Q. And what was that concern?

A. Not being part of the culture of Austin Montessori School.

Q. Was there anything specific?

A. I think there were some songs that she was singing with the children and -- that she didn't think fit in our school culture.

Q. Were there any other concerns that she brought to you at that time about Caroline, related to the culture of the school?

A. Well, I just remember the songs.

**37**

Q. Okay. And what did you do to address those concerns?

A. I talked to Caroline and Charlotte, I guess. I'm trying to think. It seems like the very first time I talked to Tiffany was the year before Charlotte started in her job as mentor, and we had another mentor at that time.

Q. Okay. So were there any other concerns that Ms. Bilbe brought to you at a later time about Caroline?

A. I met with her other times but they were always -- her concerns were always about school culture kind of things, as far as I recall.

Q. Can you tell me about the other aspects of culture that Ms. Bilbe was concerned about?

A. It seems like there were -- she was singing a lot of Christmas songs, and the Bilbes are Jewish so she was offended one time about that. There were some movements in some of the songs that I remember she had -- that seemed very pop cultury, that the -- her little girls were coming home and doing them, that she felt were inappropriate for very young children.

Q. So was the complaint about the Christmas songs the same complaint related to the other complaint you mentioned about the songs that you were telling me

42

Q. So you had also mentioned that concerns had been brought to you by Gretchen?

A. Uh-huh.

Q. As far as you could --

A. That was -- that was Caroline's second year that Gretchen spoke to me.

Q. Okay. So did -- can you tell me again what concern Gretchen had brought to you about Caroline?

A. Lack of lessons being given to her daughter.

Q. Okay. And what did you do about that?

A. I talked to Charlotte and Caroline.

Q. Okay. And after you talked to Charlotte and Caroline, did Gretchen bring any more concerns about that to you?

A. No.

Q. So other than those parents, were there any other parents that brought concerns about Caroline to you?

A. Those were the only parents who had children in her class, that I can remember. Sometimes parents, after their observations, would comment about -- you know, have comments about her classroom, as they do about classrooms that they observe, but for her classroom, it was more about it being -- "chaotic" would be the word that I would use.

43

Q. Okay. And when was -- when did a parent first report to you, after an observation, that they had thought that Caroline's room was chaotic?

A. Off and on throughout the two -- for two years in the classroom.

Q. Can you recall approximately how many times a parent told you that?

A. Well, they wouldn't always use that exact -- those -- that exact word, but -- it would just be a wild guess.

Do you want me to make a guess?

Q. Yes.

A. Okay.

MR. GARNER: Objection; form.

Q. (By Ms. Jacobs) Okay. Can you tell me approximately how many times a parent brought to you a concern, after an observation, about what they saw as a chaotic classroom or some similar term?

A. I mean, it will just be a guess. I can't recall. Many times. But, you know, I don't know. Say 20, 25.

Q. Approximately how many parents observed Caroline's classroom in those two years?

A. Let's see, in those two years, approximately -- maybe 100.

44

Q. Were there any other concerns that any of those other parents had raised with you after observing Caroline's classroom?

A. That's what I remember.

Q. So you said that not every parent used the word "chaotic." What were some of the other ways they described her classroom?

A. Very social, a lot of children wandering around, a lot of children not engaged in work, not very many children choosing to do work. Those kinds of...

Q. Okay. And so the comments that you just shared with me that parents had shared with you about there being -- that it was -- the classroom was social, that children weren't engaged in work or were wandering around, those are included in the, you know, approximately 20 to 25 parents --

A. Uh-huh.

Q. -- inside that classroom?

Did you hear any negative comments from any of the other parents who had observed the classroom?

A. Those were the negative comments that I recall.

Q. Okay. And did you address those concerns that the parents had brought you with Caroline?

45

A. Uh-huh.

Q. Okay. With anyone else?

A. I'm sure the mentor.

Q. Okay. And what did you do about those concerns other than talking to Caroline and the mentor?

A. That's it. That's my job, is just to inform the guide, the person that works with the guide.

Q. Okay. And what is -- The mentor is Charlotte Kroger?

A. Uh-huh.

Q. And what is her role at the school?

A. She's the mentor for the Children's House guides, so all of the five guides that work with three- to five-year-old children.

Q. Okay.

A. She observes their classes, usually weekly.

Q. So Charlotte observes each Children's House --

A. Uh-huh.

Q. -- guide weekly?

A. Yeah.

Q. Okay. And what does she do based on her observations?

A. She meets with the guide. And her job is really to take them where they are and work with them

46

on their -- on their weak areas and help to keep them improving.

Q.   And does she share those observations with anyone other than the guide?

A.   Well, I'm trying remember.  We're doing things a little differently now than we did back then, so I'm trying to remember.  I mean, mainly, just with the guide.  Sometimes I might meet with Charlotte and the guide.

Q.   All right.  So you've talked about how parents would observe in the classroom and would sometimes share things with you and sometimes parents would bring concerns to you?

A.   Uh-huh.

Q.   And that occasionally Charlotte would share her observations with you?

A.   And the guide.

Q.   And the guide.  Was there any other way that you would have had familiarity with Caroline's work in the classroom?

A.   Well, I'm in and out of the classrooms, so -- going in and out with observers.

Q.   So do you ever take time yourself to observe in the classroom?

A.   Sometimes.

47

Q.   Did you observe Caroline at all, the -- during the 2009 and 2010 school year?

A.   Maybe once.

Q.   Do you remember when that was?

A.   I have no idea.  It seems like early on.

Q.   Did you do that for any particular reason?

A.   Well, the guides like me to come in their room and observe, so if I have a free moment sometimes.  People often invite me.

Q.   So based on all of those ways in which you've shared with me that you gained familiarity with Caroline's work in the classroom, do you feel like she was qualified to be a guide?

A.   Uh-huh.

Q.   Was there any concern that you had -- based on anything that parents had shared with you or anything that Charlotte had shared with you or your own observations -- that would have made you concerned about having Caroline back as a guide for the 2010, 2011 school year other than the issue with possible transitions related to maternity leave?

A.   I wasn't concerned about maternity leave.

Q.   Okay.  Okay.  Was there any reason that you would not have wanted Caroline to come back as a guide for the 2010 to 2011 school year?

48

A.   Caroline had -- definitely had some skills that she needed to work on, but certainly there was no question about -- that she was coming back, in my mind.

Q.   Okay.  So there was no reason, related to Caroline's performance in the classroom, that she could not have returned as a guide for the 2010 and 2011 school year?

A.   I mean, there are definitely things that were needing to be worked on, but that's part of Charlotte's job.

Q.   But none of those things that she needed to work on were things that she couldn't continue to work on as a guide the following school year?

A.   Yeah.

Q.   Can you tell me about Donna Goertz's role in the school?

A.   She does parent -- a lot of parent education and staff development.

Q.   How often would you say she's on campus?

A.   Now or back then?

Q.   Now.

A.   Now.  Maybe two or three times a week.

Q.   All right.  What about during the 2009 to 2010 school year?

A.   She was probably there every day.

49

Q.   Also, based on your observations of Caroline, did you see that she had any particular strengths as a guide?

A.   Uh-huh.

Q.   What were some of those strengths that you saw?

A.   I mean, I -- she knew the materials, she knew how to set up a classroom, she genuinely liked the children and the parents.

Q.   So are -- you had mentioned the waiting pool when you told me about your background.  Can you tell me a little bit more about that, please?

A.   Like, what is...

Q.   What is the waiting pool?

A.   Just people waiting to -- I mean, children who are waiting to be placed in classrooms.

MR. GARNER:  A waiting list?

THE WITNESS:  Yeah.

A.   I said "waiting list."  You called it a "waiting pool."

Q.   (By Ms. Jacobs) Okay.  Well, do you have children on a waiting list right now for the Children's House classrooms?

A.   Uh-huh.

Q.   Did you have children on a waiting list

50

during the 2009 to 2010 school year?

A. Yes.

Q. Okay.

A. I mean, during the school year or --

Q. During the 2009 to 2010 school year, did you have children on the waiting list?

A. I mean, there's always children waiting to be placed for the following year. Sometimes if you're trying to place somebody during the school year, it's a little harder because then a lot of those children already are placed somewhere else.

Q. Did you ever have children who are on the waiting list for the Children's House who are not offered a spot for the following school year?

A. Uh-huh. Yes. Sorry.

Q. Do you know if, during the 2009 to 2010 school year, you had children on the waiting list for the Children's House who were not able to be placed for the 2010 to 2011 school year?

A. I don't recall.

Q. Is there any way you would be able to figure that out?

A. Right this minute?

Q. No. Just generally, is there any way to figure that out?

51

A. Oh, to look back in time and see who was on the waiting list --

Q. Are there any --

A. -- for 2009, 2010?

Q. Are there any documents that would be able to help you figure that out?

A. Possibly. I could possibly look at the waiting list back that far. It's possible.

(Deposition Exhibit No. 5 was marked for identification.)

Q. (By Ms. Jacobs) I'm going to hand you what's been marked as, I believe, Exhibit 5. And I apologize, it's not very easy to read; this is what we got. I'll give you a moment to read it.

A. Okay. I think I have the gist of it. It's kind of hard to read.

Q. Okay. Can you tell me what this document is?

A. It looks like it's a letter from Don Goertz announcing that Caroline is taking over Angela's classroom.

Q. And were you working at the school at this time?

A. Uh-huh.

Q. Okay. Do you recall Angela's departure?

A. Her departure? Oh, from the classroom?

52

Q. Yes.

A. Uh-huh.

Q. Do you remember if she had asked to continue as a guide in the classroom the following year?

A. I think originally that would have been her preference, it seems like.

Q. And do you know who would have come up with a plan to have her return as an after-school leader?

A. Let me think. Me and Dawn and Angela together, as best I can recall. Because I know Angela is still our after-school leader after all of these years, in a job she loves. Because even though she's fully trained also, she's got the flexibility being in a job as an after-school leader.

Q. Can you think of any other times that a guide who was expecting a new baby would have transitioned into a different position at the school since you've started working there?

A. Well, I mean, sometimes people then want to stay home with their baby. Let's see. There's just been a variety of different -- we've had so many people have babies.

Q. Okay. Well, how long have you been with the school?

A. Twenty-five years.

53

Q. So --

A. We've had guides, assistants, after-school leaders, campus coordinators have babies.

Q. Since you've been at the school a long time, we'll try to take this year by year. Can you recollect anyone --

A. (Laughing.)

Q. Not for the whole 25 years. Can you recall anyone --

A. That's good. I'm having trouble remembering two years ago.

Q. Can you recall anyone in the last year taking more than seven days' leave?

A. Like, 2010 --

Q. The last school year.

A. -- 2011, taking more than seven days?

Oh, it -- Kadie Beasley; it seems like she took three weeks. She had her baby over the summer and missed the first three weeks of school.

Q. And when was that?

A. I think this last school year.

Q. So that would have been in the 2010 or 2011?

A. Oh, no, it must have -- it must have been the year before. It must have been the year before. No, wait. I think her baby was -- no, she must be two. It

must have been the year before.

Q. Okay. All right. Can you think of anyone just in this last 2010 to 2011 school year who took more than seven days' leave, any guides?

A. Can you give me a hint? I can't think of...

Q. Can you think of anyone in the last five years who has taken more than seven days of leave?

A. Yeah. I mean, I mentioned Kadie. She had a baby.

Q. Anyone else?

A. John. But he's in a more flexible role.

Q. What is John's role?

A. He's the mentor -- oh, the last year, he was the mentor for the elementary. Now he's assistant to the Executive Director. And he just found out he had ALS, so...

Q. So how much leave has he taken?

A. I don't know. He has just missed chunks of time going to lots of doctors' appointments and things like that.

Q. Was the leave that he was taking the reason why he is now going to be serving as the assistant to the Executive Director?

A. No. Just a change of -- people change roles at the school all the time.

Q. Okay. Any other people that have taken more than seven days' leave in the last five years?

A. I mean, I'm the wrong person to ask. That's not part of my job.

Q. Can you tell me about the leave that Janice Curly took?

A. Well, she's been a stay-at-home mom until last year. She assisted at our adolescent community, but she took -- I mean, she quit her job and took three years off.

Oh, you mean when she was in the classroom?

Q. Can you tell me --

A. Is that what you mean?

Q. -- about -- sorry, strike that.

Did Janice Curly take maternity leave?

A. She was off for two months having a baby, yes.

Q. And what happened when she came back into the classroom?

A. What happened?

Q. Did parents ever bring any concerns to you after she came back into the classroom?

A. Yes. Parents had concerns over the transition.

Q. Can you remember approximately how many parents brought concerns to you?

A. Actually very few at the time. The next year, people mentioned concerns, but at the time, I didn't hear a peep out of anybody.

Q. When you talk about "at the time," what time are you referring to?

A. When she came back. Because that's what you asked me.

Q. But you said they brought you concerns the next year?

A. Well, I mean, I just heard rumors and stuff.

Q. Did parents bring any concerns directly to you?

A. No. Actually, Caroline told me about concerns that they had told her, but they didn't come directly to me.

MS. JACOBS: Okay. I'll pass the witness.

MR. GARNER: Just a couple of questions.

EXAMINATION

QUESTIONS BY MR. GARNER:

Q. In the -- did -- well, let me ask it this way: Did Caroline Clark's pregnancy have anything to do with her not being assigned as a home guide?

A. No.

Q. Did it have anything to do -- her pregnancy have anything to do with the decision to propose the campus coordinator position?

A. No.

Q. Was the reason why Austin Montessori School told Caroline Clark that she would be reassigned due to the amount of time that she was going to be away from work?

A. Yes.

Q. So if Caroline Clark came in and said that she needed to have back surgery and would not be able to work for 12 weeks due to her back surgery, y'all would have reassigned her to a different position?

A. Correct.

Q. Why?

A. Because that would be too hard for the children to adjust to having their guide out of the class for that amount of time.

Q. The same would be true of anyone else at Austin Montessori School as a home guide? If they came to y'all before the school year started and said that they would be out for any significant period of time -- 12 weeks, as Caroline Clark told you that she wanted to be out --

58

MS. JACOBS: Objection.

Q. (By Mr. Garner) -- y'all would have reassigned her?

MS. JACOBS: Objection; form.

Q. (By Mr. Garner) Did Caroline Clark ever tell you that she wanted to be gone for 12 weeks?

A. Yes, she did.

Q. Based upon that representation to you, you believe that it was her intent to leave Austin Montessori School to care for her newborn child --

A. Uh-huh.

Q. -- for 12 weeks after the birth of her child?

A. Uh-huh. Yes.

Q. And that 12 weeks would have fallen in the middle of the semester. Correct?

A. Yes.

Q. That 12 weeks would have been through the heart of the semester?

A. Yes.

Q. Did Austin Montessori School have any coverage for another home guide to take Caroline Clark's place during the time she was off?

A. No.

Q. How important is it that a home guide be present throughout the entire school year for the

59

children?

A. Extremely important.

Q. Why? Why is that so important to Austin Montessori School?

A. Consistency for the children.

Q. When you say "consistency," what do you mean by "consistency"? Just the same person being in the classroom?

A. Well, the same person being in the classroom with the children. These are very young children we're talking about, not -- you know, with the older children, it's a little different.

Q. So they're very impressionable?

A. That's right. And they need that consistency with the same adult. Plus, one of the reasons we have children in the same classroom, ideally with the same teacher, for a three-year cycle is that -- also that consistency of the same guide giving the children their lessons and maintaining a consistent environment.

Q. So the same rules, the same schedule?

A. That's right. So they don't have to test new people to come into their --

Q. The same way of doing things?

A. Absolutely.

Q. And that's important to a young kid. Is that

60

right?

A. Absolutely.

Q. So if you take a home guide out of a situation for over three months -- or three months, 12 weeks -- it has been Austin Montessori School's experience that that is a significant impact on the development of the children?

A. Yes.

Q. Is it also a significant impact to the long-term effect on the home class -- or the class that those kids are in?

A. Uh-huh. Yes.

Q. Because you're bringing in someone who -- someone new, who they may or may not be familiar with, that has different ways of doing things. Is that right?

A. Yes.

Q. And that change can adversely affect these young children who are developing and getting into the routine. Is that correct?

A. Yes.

Q. Was Austin Montessori School going to -- was it their plan to bring Caroline Clark back as a home guide the next year, when she could spend all of the time in the classroom that would be required of a home

61

guide?

A. Absolutely, if we had an opening. Absolutely.

Q. Okay. And it was your anticipation that, when she went off to be a -- at her idea -- I mean, you thought it was her idea to become a campus counselor. Correct?

A. Campus coordinator, yep.

Q. A campus coordinator?

A. Yes.

Q. And as a campus coordinator, that would provide her more flexibility in her schedule, would it not?

A. Yes.

Q. She would be able to observe all of the other home guides --

A. Yes. And --

Q. -- and the way --

A. -- substitute.

Q. -- and the way that they handled their home room?

A. Yep.

Q. And you, as the admissions coordinator and kind of a supervisor of these folks, you believe that Caroline could have benefited from exposure to

70

A. Yes.

Q. If it wasn't necessary, you would keep them in that position. What are the factors that you and Dawn look to, to determine if it's necessary to reassign a person into a home room or home class?

A. Well, it would be how long somebody was going to be out.

Q. Okay. Would the stability of the class have anything to do with that? Would that be a factor?

A. Oh, absolutely that, too, yes.

Q. And based upon your testimony here today, would you agree with me that Caroline's class was not a stable class?

A. Yes.

Q. In fact, you've had a similar situation with a previous home guide, where it was a stable classroom?

A. Yes. She had been in that class for ten years.

Q. And she was out for how long when she went out on -- to have her child?

A. Well, for November and December, but, of course, there are a lot of holidays --

Q. Okay. So how many weeks --

A. -- that --

Q. -- how many weeks was the home guide out in

71

that instance?

A. You know, it may have equaled about five, six -- five weeks, something like that.

Q. And after -- and she came back to the classroom. Correct?

A. Uh-huh.

Q. Is that a yes?

A. Yes.

Q. Okay. After that period -- after that school year completed, did you determine that that limited amount of time, the five weeks that she took off, that was disruptive to the children's development and their progress at Austin Montessori School?

A. Yes. And she had a fully trained assistant.

Q. Oh. In fact, in that instance, the home guide that left, her assistant was also a home guide. Correct?

A. Yes.

Q. And, in fact, that home guide that was her assistant was the previous home guide in that classroom. Correct?

A. No. She was -- she had been a campus coordinator.

Q. She had been a campus coordinator?

A. Yes.

72

Q. So she was familiar with the children and the children were familiar with them -- with her?

A. But she was her assistant that whole year.

Q. But she was a licensed, certified home guide?

A. Yes, absolutely.

Q. And even in that instance, where you had someone that was qualified and had the knowledge, expertise, and experience to come in, it was extremely disruptive to that classroom's development and progress over the school year?

A. That's what I heard.

Q. And that was just in five weeks?

A. Yes. That's what I heard.

Q. And if the jury believes you, it's again your testimony that Caroline Clark came to you and said she wanted to take 12 weeks off --

A. Yes.

Q. -- after the birth of her child?

And her birth was scheduled -- or she was due in October?

A. Right.

Q. Is that right?

So we're talking about October, November, and December?

A. Yes.

73

Q. Agreed?

A. Uh-huh.

Q. Having children myself -- not me, personally, but my wife having children -- and you having children and being experienced as a mother, you understand that children don't necessarily arrive on schedule?

A. Yes.

Q. So -- and this was Caroline's second child?

A. Yes.

Q. So just because she was due in September -- I mean, in October, the baby could have been in September. Correct?

A. Yes.

Q. Or November?

A. Correct.

Q. So there's a lot of uncertainty as to when this child is going to arrive. Would you agree with that?

A. Yes.

Q. So you could be looking at -- for 12 weeks beginning in September or 12 weeks beginning in November. Would that have been a factor to determine whether she could have stayed within her position?

A. Yes.

Q. Because if it were later, the more it gets

Amber Miller – 8/11/2011

74

into the Christmas break, and those are weeks that the children wouldn't be in the classroom anyway?

A.   Right.

Q.   So you can take that amount of time off the impact of the schedule.  Would you agree with that?

A.   Yes.

Q.   So taking that into account, it really isn't the pregnancy itself that is contributing, or any factor, with regard to the decision to move her from one position into another.  Would you agree with that?

A.   I would agree.

Q.   It's simply the amount of time that she is going to be gone from the classroom that would affect the home -- her ability to perform as a home guide and its effect on the children and their development and progress?

A.   Correct.

Q.   You know, going back to the two meetings that Caroline Clark and you and Dawn had, she announced that she was pregnant -- well, I'll tell you what, she didn't announce that she was pregnant; a parent came to you and asked you whether she was pregnant.  Correct?

A.   Correct.

Q.   In fact, you told her she wasn't pregnant?

A.   Yes.

75

Q.   Is that right?

A.   That's right.

Q.   And you explained that earlier.  Once you found out she was pregnant, there were some questions about, you know, hiding the pregnancy.  Did anyone at Austin Montessori School tell her to hide her pregnancy?

A.   No.

Q.   In fact, pregnancy is a pretty regular occurrence around Austin Montessori School.  Is that right?

A.   Yes.

Q.   As a matter of fact, over the past three or four years, y'all have had five or six people go out on maternity leave.  Is that right?

A.   Yes.

Q.   Coincidence maybe, but in those instances, most of those women had their children over the summer, so there was no impact upon the class?

A.   Right.

Q.   Would you agree with that?

A.   Yes.

Q.   But in those two meetings, once y'all found out that Caroline was pregnant, y'all obviously congratulated her on the good news.  Then y'all tried

76

to figure out what Austin Montessori School was going to do to respond?

A.   Uh-huh.

Q.   Correct?

A.   Correct.

Q.   In doing so, based upon what Caroline told you about, you know, the time period that she wanted to take off, y'all developed this reassignment so she would have the flexibility to not only have the baby but also to have the flexibility after she came back, because of the time that is required with a newborn?

A.   Correct.

Q.   Would you agree with that?

A.   Oh, yes.

Q.   In fact, Dawn testified earlier that y'all were even talking about giving her the ability to bring the child to Austin Montessori School and have, like, a day care for her there so she could be close to the baby if that was what Caroline needed

A.   Yes.

Q.   Did Caroline ever suggest to you that that was something that she would be interested in?

A.   She -- it seems like she brought it up to Dawn.

Q.   Was that ever discussed, as to maybe possibly

77

limiting the time away from the class, or did Caroline stick to, "No, I want to be gone for 12 weeks"?

A.   I don't remember that being brought up as limiting, that I'm aware of.

Q.   Okay.  So as far as you knew and as far as Dawn Glasgow knew -- or Glasgow knew, that Carline Clark was still sticking with the 12 weeks that she wanted to be off?

A.   Yes.

Q.   Okay.  All right.  Now, in that first meeting, when y'all presented the campus coordinator position, y'all explained to -- I mean, y'all explained to Caroline what that position would entail?

A.   Uh-huh.

Q.   Is that correct?

A.   (Witness nods head.)

Q.   And based upon your testimony here today, that would be that it would provide her greater flexibility, give her a better schedule, she wouldn't have to work as long hours, which would provide her more time with her child?

A.   Right.

Q.   Was there any reduction in salary in connection with moving from that position to the other?

A.   Oh, no.

82

A.   She -- it was Donna Romine that she said she wanted to be the campus coordinator to.

Q.   Okay.  Did Donna Romine ever tell you why?

A.   Not that I remember.

Q.   Okay.  But, nonetheless, in the second meeting, when she rejects the campus coordinator position, she never expressed any anger or disappointment to you about Austin Montessori School's proposal?

A.   No.  In fact, she hugged me before she left and she said that she wanted us to be on really good terms and that she wanted to see us at Montessori conferences and we would all --

Q.   At that point --

A.   -- be on good terms.

Q.   At that point in time, did y'all say, "Hey, look, if you're ever looking for another position, if you find yourself in Austin, come back and see us; we'd love to have you"?

A.   I don't know that we said that, but certainly that was our intent.  I mean --

Q.   Right.  You had already hired her once before.  I mean --

A.   Exactly.

Q.   And there was nothing in the past that would

83

indicate that you wouldn't hire her back again?

A.   Right.

Q.   But she never came back and said, "You know what, I just don't think this is fair.  I shouldn't have to leave my position as a home guide."  Did she ever say that to you?

A.   No.

Q.   Did she ever say, "Look, I really, really want to stay as a home guide.  Let's see if we can figure something out"?

A.   Not to me.

Q.   In fact, you and Dawn Glasgow had tried to figure that out, correct, that -- if there was a way to keep her in the classroom?

A.   I don't recall.

Q.   I mean, would you agree with me that public school teachers are -- there are a lot of public school teachers?  Would you agree with that; there are a lot of certified teachers?

A.   Yes.

Q.   Are there a lot of Montessori School home -- certified home guides?

A.   No.

Q.   Okay.  And there are two types of Montessori certificates?

84

A.   Uh-huh.

Q.   What are those?

A.   AMI, which is Association Montessori International, and AMS, which is the American Montessori Society.

Q.   And Austin Montessori School desires the AMS certification --

A.   AMI.

Q.   -- the AMI certification?

A.   But we can only hire AMI guides.

Q.   Based upon your charter?

A.   Our certification.

Q.   Okay.  Your certification?

A.   Uh-huh.

Q.   And Caroline is AMI certified?

A.   Yes.

Q.   Is it harder to find AMI certified folks?

A.   Yes.

Q.   Is it harder to --

A.   Just recently, they started a training in Texas, but up until just a few years ago, there was no training even in Texas.

Q.   Okay.  AMS is a lot more common?

A.   Yes.

Q.   But you can't hire home guides as AMS?

85

A.   No.

Q.   AMI is a lot more specialized certification?  And, as you stated, they're a lot harder --

A.   It's the original.

Q.   Okay.  And they're a lot harder to come by?

A.   Yes.

Q.   When -- if Caroline had come in and said, "You know what, I really, really want to be a home guide," Austin Montessori School didn't have an AMI-certified home guide just to step in, in Caroline's absence, did they?

A.   No.

Q.   How long did it take -- The last time you sought out resumes and tried to hire AMI-certified home guides, how long does it take to -- how long does that process take?

A.   Well, typically, you would want to start looking -- well, ideally, a year ahead of time at least.  No later than January.

Q.   Because AMI-certified teachers, they have contracts with their Montessori schools --

A.   And it would --

Q.   -- and those are year contracts.  Right?

A.   -- really, mostly be bringing someone from out of -- at least out of city, if not out of state, to

86

come.

Q. And you wanted to talk to that person, interview that person, and see what that person is like?

A. Yes.

Q. And, in fact, that was what encouraged you to hire Caroline the second time, because you had already seen her before?

A. Yeah.

Q. Correct?

A. Absolutely.

THE VIDEOGRAPHER: Five minutes.

MR. GARNER: Okay.

Q. (By Mr. Garner) So, you know, just in summary, you know, Caroline Clark's pregnancy had no influence as to Austin Montessori School's decision to move her into a different position, did it?

A. Correct.

Q. In fact, the only factor was the fact that she was going to be gone -- by her own statements to you, she was going to be gone for 12 weeks?

A. Correct.

Q. And that would have disrupted the classroom?

A. (Witness nods head.)

Q. And if Caroline or any other home guide had

87

come to you and said that "I'm going to be gone for 12 weeks during the semester," y'all, as Austin Montessori School, would have found someone else to operate and act as the home guide for that class for that school year?

A. Yes.

Q. It doesn't matter what the reason is; it's just the fact that they're not going to be there?

A. Right.

MR. GARNER: Okay. I don't have any further questions.

MS. JACOBS: Okay. I'm going to have some follow-up questions.

MR. GARNER: Okay. Do you want to change tapes?

THE VIDEOGRAPHER: Okay. We'll go off the record at 12:39.

(A short break was taken.)

THE VIDEOGRAPHER: We're back on now and it's 2:49 and this is the beginning of Tape 2.

EXAMINATION

QUESTIONS BY MS. JACOBS:

Q. Did Caroline tell you that she wanted to be out for 12 weeks?

A. Well, her baby was due in early October and

88

she said she wanted to come back in January.

MS. JACOBS: Objection; nonresponsive.

Q. (By Ms. Jacobs) Did she tell you that she wanted to be out for 12 weeks?

A. From -- she said she was going to be out from October to January.

MS. JACOBS: Objection; nonresponsive again.

Q. (By Ms. Jacobs) Did she tell you that she would be out for 12 weeks?

MR. GARNER: I'm going to object to form, as asked and answered.

MS. JACOBS: I haven't gotten an answer yet.

MR. GARNER: Well, I think she did. She told you October to January, and that's 12 weeks, so...

MS. JACOBS: That could actually be more or fewer than 12 weeks, depending.

Q. (By Ms. Jacobs) Did she tell you -- ever specifically use the term "12 weeks"?

A. No. She said October to January.

Q. (By Ms. Jacobs) Okay. Was there -- was the fact that there was uncertainty -- excuse me -- uncertainty about the time of childbirth that contributed to the decision to offer her a campus

89

coordinator position in lieu of renewing her teaching contract?

A. No.

Q. And when you talk about her being out from October to January, how many actual weeks of leave would that have been, including the breaks around the winter holidays and Thanksgiving holidays?

A. Well, there would have been two weeks off at the winter break and three days off for Thanksgiving.

Q. So when did she tell you that she wanted to be off from October to January?

A. That meeting that we had -- the first -- that first meeting.

Q. So by "the first meeting," you were talking about the time where she was being offered a campus coordinator position?

A. Uh-huh.

Q. I'm sure Counsel will correct me if I'm wrong -- that you talked about having met with Dawn about the campus coordinator position?

A. Uh-huh. Uh-huh.

Q. Was that before the meeting that you had with Caroline to offer her that position?

A. Was it when Dawn and I talked about offering her the campus coordinator position?

90

Q. Yes.

A. Yeah, it was before.

Q. Okay. All right. So at that point, did you and Dawn discuss the possibility of Caroline coming back as a guide?

A. All I remember is that Caroline had said to Donna Romine that she wanted that job and that's what Dawn and I talked about.

Q. Okay. Do you just not recall whether or not you talked about the possibility of her coming back as a guide or are you sure that you did not talk about that only because you were talking about the campus coordinator position?

A. That's --

MR. GARNER: Objection; form.

A. That's what I recall talking about, was the campus coordinator.

Q. (By Ms. Jacobs) Okay. Could you have talked about whether or not she would be able to return at that meeting?

MR. GARNER: Objection; form.

A. I don't --

MR. GARNER: I'm going to instruct her not to answer. Return as what?

MS. JACOBS: Okay.

91

MR. GARNER: You just said "return," and that's real --

MS. JACOBS: I understand.

MR. GARNER: -- vague.

Q. (By Ms. Jacobs) So at that meeting where you offered her the campus coordinator position, with Dawn Glasgow, so can you tell me again how she reacted when you shared that with her?

A. Well, she wasn't as excited as I thought she'd be.

Q. So earlier, we discussed that you had thought that it would be a win-win situation for her to return as the campus coordinator?

A. Uh-huh.

Q. So when you saw how she reacted that way, did you still feel like it would have been a win-win situation?

A. Uh-huh. Oh, yeah, because she was going to go away and talk to her husband, too. I still felt at that point that she would -- she was going to take that job.

Q. And so you had -- if she had come back to you and said that she did want to return as a guide, would that have been something that you and Dawn would have considered?

92

A. Uh-huh.

Q. Did you ever mention that as a possibility to her?

A. No, because our next meeting, she told us she was leaving the school.

Q. Was Elizabeth Suggs AMI certified during the 2009 and 2010 school year?

A. No.

Q. When did she complete her certification?

A. I think it was the end of that year. Maybe at the end of that year.

Q. So she would have been AMI certified during the 2010 to 2011 school year?

A. Yeah.

Q. So she could have provided coverage for the class of Laurel Cottage?

A. I mean, I guess, you know, that would have been Elizabeth. I don't know.

Q. Okay. So were you able to have someone in place as a guide at Laurel Collage at the beginning of the 2010 to 2011 school year?

A. Uh-huh.

Q. And when did you start that search process?

A. Very late. Very late, so we didn't hire anyone until the summer.

93

Q. So approximately how long did it take for you to find a guide to put in Laurel Cottage?

A. It took several months, so we probably started in May.

Q. Okay. Do you know whether or not Caroline stayed home and did not work during the 2010 to 2011 school year?

A. I don't know.

MS. JACOBS: That's all I have.

MR. GARNER: Okay. No further questions.

THE VIDEOGRAPHER: Okay. We'll go off at 2:55.

94

CHANGES AND SIGNATURE

AMBER MILLER                                    AUGUST 11, 2011

PAGE LINE   CHANGE                              REASON

45   14   six year old      I would not have said Syrullo

Amber Miller - 8/11/2011

95

I, AMBER MILLER, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

                                        AMBER MILLER

THE STATE OF Texas        )  *Amber Miller*

COUNTY OF Travis          )

Before me, Lois O'Brien, on this day personally appeared AMBER MILLER, known to me or proved to me on the oath of              or through (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he/she executed the same for the purpose and consideration therein expressed.

Given under my hand and seal of office on this day of 2, September    , 2011.

                                *Lois O'Brien*

┌─────────────────────────┐
│       LOIS O'BRIEN       │
│ Notary Public, State of Texas │
│   My Commission Expires   │
│     October 28, 2011      │
└─────────────────────────┘

NOTARY PUBLIC IN AND FOR

THE STATE OF Texas

My Commission Expires: Oct. 28, 2011

Integrity Legal Support Solutions
www.integrity-texas.com

96

CAUSE NO. D-1-GN-000096

| | |
|---|---|
| CAROLINE CLARK | ) IN THE DISTRICT COURT |
|     Plaintiff, | ) |
| VS. | ) TRAVIS COUNTY, TEXAS |
| | ) |
| AUSTIN MONTESSORI SCHOOL, | ) |
| INC., | ) |
|     Defendant. | ) 419TH JUDICIAL DISTRICT |

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

REPORTER'S CERTIFICATION
ORAL VIDEOTAPED DEPOSITION OF AMBER MILLER
AUGUST 11, 2011

* * * * * * * * * * * * * * * * * * * * * * * * * * * *


I, Kimberlye A. Furr, CSR, RPR, in and for the State of Texas, hereby certify to the following:

That the witness, AMBER MILLER, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the deposition transcript was submitted on August 24, 2011 to the witness or to the attorney for the witness for examination, signature, and return to me by September 13, 2011 ;

That the amount of time used by each party at the deposition is as follows:

Ms. Jacobs:  1 hour, 52 Minutes

Mr. Garner:    40 Minutes

97

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes all parties of record:

        Ms. Jacobs, Attorney for Plaintiff
        Mr. Garner, Attorney for Defendant

        I further certify that I am neither counsel for, related to, nor employed by any of the parties in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of this action.

        Further certification requirements pursuant to Rule 203 of TRCP will be certified to after they have occurred.

        Certified to by me on this 21st day of August, 2011.

_____
Kim Furr, CSR, RPR
CSR No. 6997, Expires 12/31/11

Firm Registration No. 528
3100 West Slaughter Lane, Suite 101
Austin, Texas   78748

(512) 320-8692 (Fax)

98

FURTHER CERTIFICATION UNDER RULE 203

The original deposition was/was not returned to the deposition officer on September 5, 2011 ;

If returned, the attached Changes and Signature page contains any changes and the reasons therefor;

If returned, the original deposition was delivered to Ms. Jacobs, Custodial Attorney;

That $556.30 is the deposition officer's charges to the Plaintiff for preparing the original deposition transcript and any copies of exhibits;

That the deposition was delivered in accordance with Rule 203.3 and that a copy of this certificate was served on all parties shown herein and filed with the Clerk.

Certified to by me on this 10th day of September , 2011.

Kim Furr, CSR, RPR
CSR No. 6997, Expires 12/31/11

Firm Registration No. 528
3100 West Slaughter Lane, Suite 101
Austin, Texas  78748

(512) 320-8692 (Fax)

# Exhibit 6

CAUSE NO. D-1-GN-11-000096

CAROLINE CLARK,                    )    IN THE DISTRICT COURT
          Plaintiff.               )
                                   )
vs.                                )    TRAVIS COUNTY, TEXAS
                                   )
AUSTIN MONTESSORI SCHOOL,          )
INC.,                              )
          Defendant.               )    419TH JUDICIAL DISTRICT

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

ORAL DEPOSITION OF

DONALD GOERTZ

AUGUST 12, 2011

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

ORAL DEPOSITION OF DONALD GOERTZ, produced as a witness at the instance of the Plaintiff and duly sworn, was taken in the above-styled and numbered cause on August 12, 2011, from 11:36 a.m. to 12:37 p.m., before Lauren M. Morrison, Certified Shorthand Reporter in and for the State of Texas, reported by computerized stenotype machine at the offices of The Cook Law Firm, 919 Congress Avenue, Suite 1145, Austin, Texas 78701, pursuant to the Texas Rules of Civil Procedure and the provisions stated on the record or attached hereto.

Donald Goertz - 8/12/2011

---

**6**

her act- -- recreate her actual words, but I assume she said Caroline's pregnant. I don't -- I don't really know.

Q   Okay. Do you remember how you responded?

A   I'm trying to think how I might have responded. My response, most likely, given circumstances, I would have said, so what's -- what's -- what's the -- what's the program? What's the plan?

Q   Okay. And do you remember what Dawn told you regarding the program?

A   At that point -- you know, see, I don't even know how much we talked. I doubt that we -- that we sat down and had a formal meeting. I suspect that Dawn said Caroline's pregnant, and I said well, let's -- what -- you know, what's next? But I -- I have no further -- I can't -- all I could try to do is reconstruct something, but it would be based on likelihood rather than actual words.

Q   Okay. I'm going to hand you what's been marked as Exhibit 1 (tenders document).

A   (Reviewing document.)
Okay.

Q   Can you please tell me what this is an exhibit of?

A   This is a letter from me to the parents of the

---

**7**

school in her -- in Caroline's class in which we indicate that she is pregnant and that we're trying -- working to create a plan that will allow her to spend time with her baby as well as provide the best arrangement for the children of Laurel Cottage, which is her classroom.

Q   Okay. And were you --

A   And we asked the parents to join us in congratulating her on her good news.

Q   Okay. Were you -- did you write this letter?

A   I did.

Q   Okay. Were you at that time working on creating the plan to allow Caroline the time to spend with her new baby and provide the best arrangement for the children of Laurel Cottage?

A   No, I wasn't.

Q   Do you know who was?

A   Dawn and Amber.

Q   Do you know who made the determination that there should be a plan to allow Caroline the opportunity to spend time with her new baby as well as provide the best arrangement for the children of Laurel Cottage?

A   I mean, that's what we would always do for anybody in the school who had any kind of a problem. We would always try to figure out a way for them to

---

**8**

continue functioning.

Q   Okay. So, you told me that Dawn and Amber were working on that plan that's referenced here in the letter?

A   That's my assumption, yes. Uh-huh.

Q   Did Dawn or Amber ever come up with a plan, as far as you know?

A   The only thing I know is that at one point I was -- after this, obviously -- I was told that Caroline had suggested that since she was going to be out of her classroom for 12 weeks, that it would be in the best interest of the children if, perhaps, she could move to the campus coordinator position since that is not a good thing for the children to -- and, of course, she would know that -- and since we had that as a possibility for her, at some point, Dawn offered her a contract as the campus coordinator. That's the best of my recollection.

Q   Okay. So, you told me that you were told that Caroline had suggested that --

A   This is what I was told.

Q   Okay. And who told you that?

A   Dawn, or Amber, or the two, uh-huh. It seems to be Car- -- someone said, Caroline wants to be the campus coordinator. I can -- that sounds like the words that I heard.

---

**9**

Q   Were there any other options for Caroline?

A   Well, if there were, we didn't explore them because we didn't -- we didn't feel the need to.

Q   Okay. So, did Dawn or Amber ever share with you Caroline's response to their offer to her of the campus coordinator position?

A   Next -- the next thing I heard was that Caroline said she was not coming back, she was moving to Dallas, that she had decided to leave the school.

Q   Did anyone tell you why she had decided to do that?

A   No.

Q   And who told you that she was not coming back?

A   Dawn.

(Exhibit No. 16 marked)

Q   I'm going to hand you what's been marked as Exhibit 16 (tenders document).

A   (Reviewing document.)
Okay.

Q   Can you please tell me what this is an exhibit of?

A   This was the contract that we offered to Caroline --

Q   Okay.

A   -- for -- as campus coordinator; it includes

---

26

than seven day's leave in the last five years for any reason?

A   If there has been, I can't recall it off the top of my head.

Q   Okay. And then you talked about how when you were just explaining what 'every situation is different' meant to you that there were different factors that you took into account. Was one of the factors -- or is one of the factors the parents of the school?

A   You mean --

MR. GARNER: Objection. Form.

A   Yeah, I don't know what that means.

Q.   (BY MS. JACOBS) Well, you had -- you had earlier suggested one reason that you were not interested in expanding the school was the stress --

A   Oh.

Q   -- associated with 350 students and 700 parents, and you talked about how one of the factors you take into consideration is what's best for the children.

Do the parents, or any interest that you can think of for the parents, or anything having to do with the parents play any role?

MR. GARNER: Objection. Form.

A   I don't -- I don't think so. I mean. . .

Q.   (BY MS. JACOBS) Okay.

27

A   I don't know what that means.

Q   Let me hand you what's been marked as Exhibit 5 (tenders document).

A   (Reviewing document.)

Okay.

Q   Can you tell me what this is an exhibit of?

A   This was regarding Angela Eagle, who was pregnant, and so this regard -- this is regarding her future with the school. No, it's not, actually. It says -- this is not. It's. . . (mumbling).

It's a letter about the change, that Caroline is going to replace Angela because Angela is not going to be back in the classroom. She's not going to be back in the classroom because she's going to be at home with her baby.

Q   Okay. Did you write this letter?

A   Well, I signed it. It looks like I wrote it.

Q   Okay. Do you remember Angela Eagle leaving and --

A   Yeah, I do.

Q   -- (inaudible) this time?

A   Uh-huh. Uh-huh.

Q   Okay. Do you know whether or not she wanted to continue as a guide for the year that her baby was born?

A   You know, you can't be out for 12 weeks, it's

28

not in the best interest of the children. We offered Angela a position as the casita leader, after-school leader, so that she wouldn't have to leave the school. She took it; she's still there.

Q   Okay. Have there been any other times that you can remember where -- if a guide's -- or if the birth of her child was expected during the school year, that you offered a different position than what you did with Angela and with Caroline?

MR. GARNER: Objection. Form.

A   I can't recall any.

(Exhibit No. 18 marked)

Q.   (BY MS. JACOBS) I'm handing you what's been marked as Exhibit 18 (tenders document).

(Exhibit No. 19 marked)

A   (Reviewing document.)

Uh-huh.

Q   And I'm going to hand you what's been marked as Exhibit 19 (tenders document).

A   Okay (reviewing document).

MR. GARNER: Can I have a 19?

MS. JACOBS: (tenders document.)

MR. GARNER: Thank you.

A   Okay.

Q.   (BY MS. JACOBS) Can you tell me what

29

Exhibit 18 is an exhibit of?

A   It looks like Caroline Aguilar's resume that she sent at the time she applied -- initially applied for the job in 9/2003.

Q   Do you know if any of the handwritten notes on her resume are your notes?

A   I believe they're all mine.

Q   Okay. What stood out about her resume to you?

A   She seemed relatively experienced.

Q   Okay. Experienced in what?

A   In conducting -- working with small children.

Q   All right. In what context, based on her resume, was she working with small children?

A   Well --

MR. GARNER: Objection. Form.

A   -- it says she was at the Richmond Montessori School for two years, she was at the St. Aleuin Montessori School for three years, she was at -- an assistant -- something director --

MR. GARNER: Adventure camp director.

A   Okay. Working with children for, what is that, two years, that she was an assistant teacher for five years, and that she was a special ed teacher one year.

That's a lot of years, lot of different places. So, she would know the importance of continuity

Donald Goertz - 8/12/2011

30

and the adverse impact of discontinuity in children's lives of a 12-week break.

Q. (BY MS. JACOBS) Okay. Can you tell me what Exhibit 19 is an exhibit?

A 19 appears to be Caroline thanking me for having us to her -- having her to our home when she came down for an interview from Dallas, and for showing her around, and talking about the wonderful things she's heard about Austin Montessori School, and then detailing her plans about her return. And then there's a reply from me about -- well, no, I guess that's prior. Prior to that is my suggesting some articles that she read.

Q Okay. Can you tell me the date of this e-mail?

A 1/13/03. So, that would be January the 13th, 2003.

Q Okay. And can you please read the last sentence of your e-mail?

A Let's see. "We are very AMI, and it pleases us greatly to know that this is important to you."

Q Okay. And for someone who's not familiar with the Montessori, can you explain what that sentence would mean?

A It means that there are different gradations within a Montessori, that there is another society which has a different kind of training that involves less

31

training and so forth, as opposed to AMI, of which we are a member and which accredits us. And that accreditation is very important to us, and to our school, and to our parents because it is the blue ribbon of Montessori education.

Q Okay. And so what does it mean to be very AMI? Does it just have to do with --

A That means that you know what AMI, the criteria, the principles, the standards, and that you adhere to them.

Q Okay. And what would be some examples of how those standards are adhered to, again, for a person who's not --

A Well, for example, the -- there's, I think, the 3-hour work period, which is -- occur -- takes place in the mornings and in the classrooms in which children -- for example, you would not bring in an outside instructor during that period because you would break the children's concent- -- concentration. You wouldn't have Spanish lessons, for example, during that time, you wouldn't bring in an expert in something and talk about this or that. Because what you're trying to do is build focus in the children, and to allow them to develop to their fullest capacity their interests and their natural inborn drive to learn and to know.

32

Q Okay. So, when you -- were you involved in the decision, then, to hire Caroline when she first came in 2003?

A Uh-huh. Yes.

Q Okay. So, you had determined that she was qualified as a teacher for your school at that time?

A Yes.

Q Okay. Did that opinion of her as being qualified to teach at your school ever change while she was at this school?

A No.

Q Okay. Did you ever have any issues with her performance as a guide at your school?

A I did not have any issues with her. There were -- with every guide who comes to our school, there is a developmental process regardless of the amount of training and experience that you have that everybody goes through, and some move along more quickly, and some move more slowly, but everyone receives a lot of support, a lot of observation, and a lot of developmental evolutionary -- academically evolutionary support.

(Exhibit No. 20 marked)

Q Okay. I'm going to hand you what's been marked as Exhibit 20 (tenders document).

33

A (Reviewing document.)
Okay.

Q Can you tell me what this is an exhibit of?

A This is from the school staff handbook and it is a discussion of the relationship between the classroom guide and the parents from the parents' perspective.

Q Okay. Do you know who wrote this?

A No, I'm not sure who wrote this.

Q Okay. Let's see. Underneath the heading, Between Parent and Guide, the Parents' Perspective, can you please read that first sentence in the first paragraph there?

A "When I advise my own adult children in their relationships with my grandchildren's guides, I emphasize certain basic principles. Let your child's guide know how much you admire her vocation and how clearly you understand the injustice of her low salary. Admire her talents."
How many sentences did you say?

Q Just one.

A Oh.

Q All right. And then going to the second paragraph, in the middle do you see the sentence "and yes, you're right, this is a vocation and not a job?"

34

A  "And yes, you're right, this is a vocation and not a job. The guide works for love of children and not for money, but if you want the guide to remain dedicated and idealistic, give her all the support and admiration you can."

Q  Okay. So, would you agree with the statement that "being a guide is a vocation and not a job?"

A  Absolutely.

Q  Okay. Why do you say that?

A  The -- because society is made up of many different kinds of work, and I think we are all driven to work. We don't -- and I think there are those of us who are driven less to work for the sake of -- of monetary gain than for the benefit of society and the ben- -- the long-term benefit that comes through working with small children. And when you look at it from that perspective, it's clearly not just a job; it is a vocation. In a sense -- I don't mean in a sense that it's a divine calling. The word "vocation" suggests calling. I don't mean that at all. But I mean that it is something -- it is an inner drive, if you want, that supersedes, transcends the mere moment of money.

Q  Okay. I wanted to pick up on something we had talked about earlier.

You had said that Donna was a member of

35

the administrative team during the 2009 to 2010 school year?

A  Uh-huh.

Q  Do you know what her involvement was with the administrative committee at that time?

A  What -- what do you mean? She sat in on meetings and -- and we discussed, you know, the things we discussed, and it -- tuition, guides' performances, you know, certain needs, grounds needs, all kinds of things.

Q  So, at that time, she was part of the decision-making process on issues that would come before the administrative committee?

A  That's right.

Q  Okay. Earlier you had also mentioned after talking to me about how Dawn or Amber had shared the news of Caroline's pregnancy, that, you know, they had been working on a plan, and that you would always work on a plan for anyone in the school with a problem to find a way to help them continue functioning.

Did you view pregnancy as a problem?

MR. GARNER: Objection. Form.

A  Of course not.

Q.  (BY MS. JACOBS)  Have you ever received any training about laws prohibiting discrimination in the

36

workplace?

A  No.

Q  Okay. Do you know anything about laws prohibiting discrimination in the workplace?

A  No.

Q  Okay. Does the school have any policies in place to ensure that no discrimination occurs in the workplace?

MR. GARNER: Objection. Form.

Q.  (BY MS. JACOBS)  Do you know whether this school has any policies in place to ensure that no discrimination occurs in the workplace?

MR. GARNER: Same question. Same objection. Objection. Form.

Q.  (BY MS. JACOBS)  Are you aware of any policies related to discrimination in the workplace at this school?

MR. GARNER: Objection. Form.

Go ahead, if you can answer.

A  You'd have to talk to Dawn, she handles those issues.

MS. JACOBS: Okay. I'll pass the witness.

MR. GARNER: I've got to think for a second.

I'll tell you what, I'm going to reserve

37

all of our questions for the time of trial. We have no questions.

(Deposition concluded at 12:37 p.m.)

Donald Goertz - 8/12/2011

40

CAUSE NO. D-1-GN-11-000096

CAROLINE CLARK,                  )    IN THE DISTRICT COURT
            Plaintiff.           )
                                 )
vs.                              )    TRAVIS COUNTY, TEXAS
                                 )
AUSTIN MONTESSORI SCHOOL,        )
INC.,                            )
            Defendant.           )    419TH JUDICIAL DISTRICT

*************************************

REPORTER'S CERTIFICATE

ORAL DEPOSITION OF DONALD GOERTZ

AUGUST 12, 2011

*************************************

I, LAUREN M. MORRISON, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, DONALD GOERTZ, was duly sworn and that the transcript of the deposition is a true record of the testimony given by the witness;

That the deposition transcript was duly submitted on _August 31, 2011_ to the witness or to the attorney for the witness for examination, signature, and return to me by _September 20, 2011_ .

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes all parties of record and the amount of time used by each party at the time of the

Donald Goertz - 8/12/2011

41

deposition:

Ms. Jacobs (1h0m)
     Attorney for Plaintiff
Mr. Garner (0h0m)
     Attorney for Defendant

That a copy of this certificate was served on all parties shown herein on ___November 3, 2011___ and filed with the Clerk.

I further certify that I am neither counsel for, related to, nor employed by any of the parties in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of this action.

Further certification requirements pursuant to Rule 203 of the Texas Code of Civil Procedure will be complied with after they have occurred.

Certified to by me on this 30th day of August, 2011.

_Lauren Morrison_

LAUREN M. MORRISON, CSR
Texas CSR 8909
Expiration:  12/31/2011
Integrity Legal Support Solutions
Firm Registration No. 528
3100 West Slaughter Lane, Ste. A-101
Austin, Texas 78748
(512) 320-8690
(512) 320-8692 (Fax)

42

FURTHER CERTIFICATION UNDER TRCP RULE 203

The original deposition (was)/was-not returned to the deposition officer on _September 16, 2011_ .

If returned, the attached Changes and Signature page(s) contain(s) any changes and the reasons therefor.

If returned, the original deposition was delivered to Ms. Jacobs, Custodial Attorney.

$ _232.50_ is the deposition officer's charges to the Plaintiff for preparing the original deposition and any copies of exhibits;

The deposition was delivered in accordance with Rule 203.3, and a copy of this certificate, served on all parties shown herein, was filed with the Clerk.

Certified to by me on this ___3rd___ day of _November_ , _2011_ .

_Lauren Morrison_

LAUREN M. MORRISON, CSR
Texas CSR 8909
Expiration: 12/31/2011
Integrity Legal Support Solutions
Firm Registration No. 528
3100 West Slaughter Lane, Ste. A-101
Austin, Texas 78748
(512) 320-8690
(512) 320-8692 (Fax)

# Exhibit 7

CAUSE NO. D-1-GN-000096

CAROLINE CLARK ) IN THE DISTRICT COURT
    Plaintiff, )
VS. ) TRAVIS COUNTY, TEXAS
  )
AUSTIN MONTESSORI SCHOOL, )
INC., )
    Defendant. ) 419TH JUDICIAL DISTRICT

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

ORAL VIDEOTAPED DEPOSITION OF

CHARLOTTE KROGER

AUGUST 11, 2011

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

ORAL VIDEOTAPED DEPOSITION of CHARLOTTE KROGER, produced as a witness at the instance of the Plaintiff, and duly sworn, was taken in the above-styled and numbered cause on the 11th day of August, 2011, from 3:10 p.m. to 3:50 p.m., before Kimberlye A. Furr, RPR, CSR, in and for the State of Texas, reported by machine shorthand, at the offices of The Cook Law Firm, 919 Congress Avenue, Suite 1145, Austin, Texas, pursuant to the Texas Rules of Civil Procedure

10

Q. Okay. Do you remember having any conversations with anyone about Caroline's pregnancy in between when she made the announcement and when this letter went out?

A. No. No.

MR. GARNER: Can we take a quick -- go off the record real quick?

MS. JACOBS: Uh-huh.

THE VIDEOGRAPHER: Okay. We'll go off at 3:18.

(A short break was taken.)

THE VIDEOGRAPHER: Okay. We're back on. It's still 3:18.

Q. (By Ms. Jacobs) So you can't recall having any discussions with anyone about Caroline's pregnancy --

A. That's correct.

Q. -- in between her announcement and the date of this letter?

A. That's correct.

Q. At any point, did Caroline tell you about any plans that she might have had for maternity leave?

A. No, she did not.

Q. Did you ever hear about any plans that Caroline had --

11

A. No. No.

Q. -- for taking maternity leave?

A. No. No.

(Deposition Exhibit No. 6 was marked for identification.)

Q. (By Ms. Jacobs) I'm going to hand you what's been marked as Exhibit 6.

A. Okay. Okay.

Q. Can you tell me what this is an exhibit of?

A. This is me responding to an observation in Caroline's room and ideas I have.

Q. Okay. Can you tell me a little bit more about what was going on in the classroom at this time that led you to write this e-mail?

A. I'll try, from what's here. I do many, many observations. The first part is us just trying to get together. And Austin, her son, was having asthma difficulties and so we were having -- it was difficult to pinpoint a time for us to meet.

And then Caroline -- the rest is to put Caroline at ease with my role in the room, as I'm only there to support her, and that can be difficult, but I have some ideas on ways to help her.

Q. When did you start working as the mentor?

A. Two years. I've been two years.

12

Q. So can you remember approximately when you started?

A. It was -- it had to have been August of '08. I think it's '08. '08? '09? '09. Sorry, '09.

Q. Okay. I guess this is really the second-to-the-last paragraph from the bottom, the last part. See, it's when you're -- where you're talking about -- what you had said is, you were trying to encourage her and --

A. Right.

Q. -- at the end you say: It is doubly hard for a mom, but not impossible.

What did you mean by that?

A. Austin. Just Austin and his pulling her time, you know; for us to get together, is all. I can't think of anything else I would have to say about it.

"Doubly hard for a mom, but not impossible." I really can't say what my thoughts were at that time on that.

Q. Okay. Following that e-mail, would you describe -- sorry, strike that.

A. Okay.

Q. Tell me about how your relationship with Caroline unfolded from -- beginning from the time of

13

this e-mail.

A. Okay. And this was when? November '09.

In the beginning, Caroline was nervous about having me in the room, and I think we got better, but she never completely was at ease with having me observe in the room. But that's not terribly uncommon, because I was nervous when I was a guide in the room and the consultant or mentor came in to observe my room, so that's not a highly uncommon thing.

Caroline seemed to appreciate my advice. I don't think she always -- it seemed that Caroline sometimes didn't want to do the steps it took to do the things that I asked, the things -- the suggestions that I made and so forth. But we were able to talk about that. I enjoyed working with Caroline.

Q. Moving a little bit away from that, had you served as a mentor at any other Montessori schools --

A. No.

Q. -- prior to when you were --

A. No.

Q. What is your background with Montessori?

A. I received my training in 1994 in Portland, Oregon from an AMI training course, and I worked three years in Providence Montessori School there. And in 1997, I moved to Austin after an interview with Donald

14

Goertz, and I was hired at Austin Montessori School. And I worked there until I retired in '08, in that one little classroom, Redbud Cottage, as a Children's House guide.

Q. And prior to that at the school in Providence, did you work as a guide?

A. No. That was my first time.

Q. Your first time?

A. To be a guide in a room.

Q. In Providence or at the --

A. In Providence. Providence, I began my career as a Montessori guide.

Q. So based on your work as a guide and then your work as a mentor, what did you think of Caroline as a guide?

A. I thought Caroline had potential as a guide, but I really felt that she often either lacked the time or lacked the initiative to really strive to do the things that would make better order in the room, organization in the room. She seemed skittish to me, skittish and wary. Although, we had open conversation and open dialog. We were able to talk with each other.

Q. When you say "wary," what did she seem to be wary of?

A. I think just being observed. And, I mean,

15

it's a hard thing for guides to be observed.

Q. Did you think that there was any reason that she should not have continued working as a guide at the school, based on her performance in the classroom?

A. I thought that Caroline and I had a lot of work to do to get her to a certain level of work in the room; as far as organization, focus, getting lessons quicker to children. There were things that I wanted to help her and support her in.

Q. Did you think that she was performing well enough that she could return as a guide?

A. I don't think I can make that decision, that choice, or that -- no, that's not part of my job. But I do share observations, but I can't say whether she can -- she should return or not.

Q. Okay.

A. Yeah.

Q. Based on your observations, was she qualified to serve as a guide in the classroom?

A. Yes. Yes. We have all degrees of guides, of expertise.

Q. Did Caroline ever tell you that she did not want to return as a guide for the 2010, 2011 school year?

A. No.

16

Q. Did you ever hear her tell anyone that she didn't want to return as a guide?

A. No.

(Deposition Exhibit No. 7 was marked for identification.)

Q. (By Ms. Jacobs) I'm going to hand you what's been marked as Exhibit 7.

A. Okay. Yes.

Q. Okay. Can you tell me what this exhibit is?

A. It's an e-mail between Patricia and me, from me, discussing my observations I had -- probably very closely before the e-mail was sent out -- in Laurel Cottage and my thoughts.

Q. Can you tell me a little bit about what was going on in the classroom at this time, based on the e-mail?

A. I can tell you impressions I remember. Caroline seemed distracted. She seemed more and more distracted. Children were quick to fall into disorder. I worried that lessons weren't coming quick enough, because disorder in children in a Montessori classroom is a clear indication children are not connected to their work. So if they're connected to their work and they're doing their work one-on-one, which is what the bottom line is for us, there's order in the room, and

17

there was a lack of that.

Q. Can you tell me what you meant in the last two sentences of the second-to-the-last paragraph?

A. Second to the last? Yes. I just think that she was more distracted.

MR. GARNER: Can I, for the benefit of the record, since this is on video, can you read the last two sentences --

THE WITNESS: Okay.

MR. GARNER: -- in the second-to-the-last paragraph?

A. [Reading] I'm trying my best to walk lightly, to recognize her role as guide and to do so with sincerity and respect. But it is my belief that she has already left the room. Her focus is the new baby. Because Caroline was so nervous about my presence, just being observed and -- I really -- because I'm a former guide, autonomy in a classroom is really important, so when we have to work with a mentor -- and I worked with a mentor the whole I was in the classroom -- it's not an easy task.

And so as a mentor, we walk knowing that that's their classroom but that we want to support them as much as we can. So I want to take into consideration how Caroline feels; at the same time, do

18

the job that I have to do, and I wanted to do it with respect for her. That's what that means.

And on the other, I think Caroline was distracted by the pregnancy. That's the sense I got, was that she wasn't on target. I could -- you can see it in a guide when she's fully there and focused. It's very clear. But you can also tell when they're not present with you and they're distracted in some way.

Q. Okay. And that --

A. And I guess I made that -- attributed it to part of that, knowing that, having two babies myself, how that can happen.

Q. So was there any other indication that your impression of her being distracted was because of the baby?

A. No. It -- the only thing is, is that she seemed more distracted than normal. She was a -- she was distracted, Caroline was, but more than normal since the baby. A lot of it I could take from how she guarded herself a lot, her hands on her tummy, and she was very, very focused on the baby. And I'm not saying that's wrong, but that's the way I saw it.

Q. Okay. And starting from approximately when did you get the impression that she was distracted?

A. Well, I can't make any dates or anything, but

19

it must have been about -- around this time. You know, I just would have to -- I don't know, not a definite.

Q. Did you see any strengths in Caroline's work as a guide?

A. Any?

Q. Strengths.

A. Strengths? Yes, I did. I did see strengths in her work.

Q. What were some of those strengths that you saw?

A. I think it was -- obviously, she cared for the children. I think it was -- I loved the idea that she had a culture to bring to it that was not like everybody's else's, being Philippine, I believe it was. But, anyway, she could sing songs with them that -- and so forth, in another language, so she had -- in Spanish. That's what it was. And she -- I think Caroline liked her work, but I think that Caroline found it difficult to -- she liked the social room. Let me put it that way. She liked the social room and we, at this level of Montessori, really want to focus on one-to-one lessons. And that's where I was working with her the most.

Q. All right. Did you play any role in the decision to offer her the position of campus

20

coordinator?

A. No, not at all.

Q. How did you find out that she was being offered the position of campus coordinator?

A. Oh, I don't even remember it. I'm -- I really don't even remember that being done.

Q. You talked about how, you know, you thought that she really loved the children.

A. Yes.

Q. Do you know anything about what the campus coordinator at the school does?

A. A little bit. It's -- it would -- it has a lot more freedom, in that they move about the campus a lot. They take care of forms, like incident forms, for State things. They're a business end of keeping things coordinated so that -- because guides are in the classroom; they can't get out and go do these things.

For instance, a campus coordinator would be the person that I would -- would help me make a telephone call if a child was injured, because I couldn't leave the room or anything like that. They do -- it depends on the -- whether that is a trained guide who is in that position or not. If they're a trained guide in that position, then they do more things; like they may teach a class, an evening class

21

on some phase of Montessori.

I'm trying to think. Because I've never been a campus coordinator, I can only talk about -- I know they schedule things. They're -- they -- I know Elizabeth, who was our last coordinator, did soccer -- some sort of soccer team, arranged that. That's pretty much the extent of my knowledge of campus coordinators.

Q. Okay. Do you think it was reasonable for Caroline to not want to take a campus coordinator position?

A. I don't know. I don't know. I guess that would depend on Caroline. I do know that -- oh, there is one thing. A trained guide as a campus coordinator would sometimes sub in a classroom. They would sub in the room. That would be a -- I don't know how to answer that question because I don't know what Caroline's thoughts were.

Q. Do you think being a guide is following a vocation?

A. It's my career and vocation, yes.

Q. So can you understand why someone who, if they did think of being a guide as a vocation, would only want to be a guide and would not be interested in a position that had more administrative duties?

MR. GARNER: Objection; form.

32

CHANGES AND SIGNATURE

CHARLOTTE KROGER                          AUGUST 11, 2011

PAGE LINE   CHANGE                        REASON

7   17,18   particular children sometimes need support
            more than once a week            [unclear]
26   25     variables (instead of variations) [different word]

33

I, CHARLOTTE KROGER, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

*Charlotte B. Kroger*

CHARLOTTE KROGER

THE STATE OF Texas            )

COUNTY OF Travis              )

Before me, *Lois O'Brien*, on this day personally appeared CHARLOTTE KROGER, known to me or proved to me on the oath of                or through (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he/she executed the same for the purpose and consideration therein expressed.

Given under my hand and seal of office on this day of 31 , August , 2011.

LOIS O'BRIEN
Notary Public, State of Texas
My Commission Expires
October 28, 2011

*Lois O'Brien*

NOTARY PUBLIC IN AND FOR

THE STATE OF Texas

My Commission Expires: Oct. 28, 2011

34

CAUSE NO. D-1-GN-000096

CAROLINE CLARK                    ) IN THE DISTRICT COURT
        Plaintiff,                )
VS.                               ) TRAVIS COUNTY, TEXAS
                                  )
AUSTIN MONTESSORI SCHOOL,         )
INC.,                             )
        Defendant.                ) 419TH JUDICIAL DISTRICT

* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

REPORTER'S CERTIFICATION
ORAL VIDEOTAPED DEPOSITION OF CHARLOTTE KROGER
AUGUST 11, 2011

* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

I, Kimberlye A. Furr, CSR, RPR, in and for the State of Texas, hereby certify to the following:

That the witness, CHARLOTTE KROGER, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the deposition transcript was submitted on August 24, 2011 to the witness or to the attorney for the witness for examination, signature, and return to me by September 13, 2011;

That the amount of time used by each party at the deposition is as follows:

Ms. Jacobs:  40 Minutes

That pursuant to information given to the

deposition officer at the time said testimony was taken, the following includes all parties of record:

Ms. Jacobs, Attorney for Plaintiff
Mr. Garner, Attorney for Defendant

I further certify that I am neither counsel for, related to, nor employed by any of the parties in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of this action.

Further certification requirements pursuant to Rule 203 of TRCP will be certified to after they have occurred.

Certified to by me on this 21st day of August, 2011.

_____
Kim Furr, CSR, RPR
CSR No. 6997, Expires 12/31/11

Firm Registration No. 528
3100 West Slaughter Lane, Suite 101
Austin, Texas  78748
(512) 320-8690
(512) 320-8692 (Fax)

36

FURTHER CERTIFICATION UNDER RULE 203

The original deposition was/was not returned to the deposition officer on September 8, 2011 ;

If returned, the attached Changes and Signature page contains any changes and the reasons therefor;

If returned, the original deposition was delivered to Ms. Jacobs, Custodial Attorney;

That $249.40 is the deposition officer's charges to the Plaintiff for preparing the original deposition transcript and any copies of exhibits;

That the deposition was delivered in accordance with Rule 203.3 and that a copy of this certificate was served on all parties shown herein and filed with the Clerk.

Certified to by me on this 10th day of September , 2011.


Kim Furr, CSR, RPR
CSR No. 6997, Expires 12/31/11

Firm Registration No. 528
3100 West Slaughter Lane, Suite 101
Austin, Texas  78748
(512) 320-8690
(512) 320-8692 (Fax)

# Exhibit 8

CAUSE NO. D-1-GN-11-000096

CAROLINE CLARK,            )   IN THE DISTRICT COURT
            Plaintiff.    )
                          )
vs.                       )   TRAVIS COUNTY, TEXAS
                          )
AUSTIN MONTESSORI SCHOOL, )
INC.                      )
            Defendant.    )   419TH JUDICIAL DISTRICT

* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

ORAL DEPOSITION OF

PATRICIA ORITI

AUGUST 12, 2011

* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

ORAL DEPOSITION OF PATRICIA ORITI, produced as a witness at the instance of the Plaintiff and duly sworn, was taken in the above-styled and numbered cause on August 12, 2011, from 10:20 a.m. to 11:13 a.m., before Lauren M. Morrison, Certified Shorthand Reporter in and for the State of Texas, reported by computerized stenotype machine at the offices of The Cook Law Firm, 919 Congress Avenue, Suite 1145, Austin, Texas 78701, pursuant to the Texas Rules of Civil Procedure and the provisions stated on the record or attached hereto.

22

observations of other children's house guides?

A    Occasionally.

Q    Can you recall any other e-mails that Charlotte sent you, including her observations of Caroline during this 2009 to 2010 school year?

A    I don't recall.

Q    Okay. So, would you say that this is more e-mails regarding a children's house guide than you would have received during this year, less, or about the same?

A    There -- that's a hard question to ask -- answer. Probably about the same.

Q    Okay. Did you have any telephone conversations with Charlotte regarding Caroline?

A    Not specifically Caroline, but we periodically spoke on the phone, and so she would tell me about all of the children's house classes that she observed.

Q    Okay. Including Caroline's?

A    Uh-huh. Yes.

Q    Okay. And what did she tell you about Caroline?

A    She would tell me what her observations were, what the children's work -- work was happening, what help she was -- support she was giving Caroline to work with the children.

23

Q    And what did Charlotte tell you about the other children's house guides?

A    It would be the same procedure. She would tell me what work was being done by the children -- I mean, the (indecipherable) of it. She didn't tell me every single piece of work that each child was doing, but just a general idea, and her focal points with the children's house guides.

Q    Okay. Did you ever personally observe Caroline in the classroom?

A    Yes.

Q    When did you observe Caroline?

A    I don't remember the exact dates. Usually, I would observe the children's house guides once or twice a year.

Q    Okay. And based on your personal observations of Caroline, the e-mails that you received from Charlotte, and your conversations with Charlotte, did you feel like Caroline was qualified to be a guide?

A    She was qualified in her training, in her certification, and she -- she -- we -- Charlotte was working with her, as she does with all the children's house guides, to improve her practice.

Q    So, did anything about Caroline compared to the other children's house guides particularly stand out to

24

you just based on your conversations with Charlotte, the e-mails you received, and your personal observations?

MR. GARNER: Objection. Form.

You can answer.

A    Well, each guide has their strengths and weaknesses, and my role and Charlotte's role is to really help them to the next step. So, that's very consistent through our practice with the -- with the guides.

Q.    (BY MS. JACOBS) Did you see anything in your personal observations of Caroline in the classroom that would have led you to think that she should not continue as a guide at the school?

A    We always strive to keep the guides in their -- in their role. That's -- it's not part of my work or Charlotte's work to make any -- make that decision.

Q    Okay.

MS. JACOBS: Objection. Nonresponsive.

Q.    (BY MS. JACOBS) Did you see anything in Caroline's performance in the classroom that would have led you to think that she should not return as a guide?

A    No.

(Exhibit No. 14 marked)

Q    I'm going to hand you what's been marked as Exhibit 14 (tenders document).

25

A    (Reviewing document.)

Q    Okay. Can you please tell me what this is an exhibit of?

A    This is a series of e-mails from Charlotte -- one is from Charlotte, one is from me, and one is from Leslie, and another from Dawn. Charlotte sent on March 2nd, 2010 to Amber, and it's regarding a child who was in Laurel Cottage and they're the meetings with her family.

(Exhibit No. 15 marked)

Q    Okay. I'm going to hand you what's been marked as Exhibit 15 (tenders document).

A    (Reviewing document.)

Q    Can you tell me what this is an exhibit of, please?

A    This is an e-mail sent by Charlotte Kroger on April 7th, 2010 with copies to Dawn Glascow, Amber, Caroline, and me regarding meeting with a child's parents.

Q    Okay. And whose classroom was this child in?

A    He was in Laurel Cottage, Caroline Clark's.

Q    Okay. And were you part of developing any of the plans or ideas discussed --

A    No.

Q    -- in this e-mail?

Patricia Oriti - 8/12/2011

29

CHANGES AND SIGNATURE

PAGE LINE    CHANGE                              REASON

28    11-13    Yes, I did send 2          Exhibit 1 - both from
               e-mails prior to the           An. Greity
               deposition                 Exhibit 7 - e-mail
                                          sent 4-15-10

30

SIGNATURE

I, PATRICIA ORITI, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

_____
PATRICIA ORITI

THE STATE OF _Washington_ )

COUNTY OF _Pierce,_ )

Before me, _Carolyn A. Fleming_ , on this day personally appeared PATRICIA ORITI, known to me or proved to me on the oath of _____ or through _drivers license_ (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he/she executed the same for the purpose and consideration therein expressed.

Given under my hand and seal of office on this _9th_ day of _September_ , _2011_ .

_____
NOTARY PUBLIC IN AND FOR

THE STATE OF _WA_

My Commission Expires: _01/29/2014_

Integrity Legal Support Solutions

31

CAUSE NO. D-1-GN-11-000096

CAROLINE CLARK,               )    IN THE DISTRICT COURT
            Plaintiff.        )
                              )
vs.                           )    TRAVIS COUNTY, TEXAS
                              )
AUSTIN MONTESSORI SCHOOL,     )
INC.                          )
                              )
            Defendant.        )    419TH JUDICIAL DISTRICT

*************************************

REPORTER'S CERTIFICATE

ORAL DEPOSITION OF PATRICIA ORITI

AUGUST 12, 2011

*************************************

I, LAUREN M. MORRISON, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, PATRICIA ORITI, was duly sworn and that the transcript of the deposition is a true record of the testimony given by the witness;

That the deposition transcript was duly submitted on _____August 31, 2011_____ to the witness or to the attorney for the witness for examination, signature, and return to me by _____September 20, 2011_____.

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes all parties of record and the amount

32

of time used by each party at the time of the deposition:

     Ms. Jacobs (0h53m)
         Attorney for Plaintiff
     Mr. Garner (0h0m)
         Attorney for Defendant

That a copy of this certificate was served on all parties shown herein on _November 3, 2011_ and filed with the Clerk.

I further certify that I am neither counsel for, related to, nor employed by any of the parties in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of this action.

Further certification requirements pursuant to Rule 203 of the Texas Code of Civil Procedure will be complied with after they have occurred.

Certified to by me on this 30th day of August, 2011.

_Lauren Morrison_

LAUREN M. MORRISON, CSR
Texas CSR 8909
Expiration:  12/31/2011
Integrity Legal Support Solutions
Firm Registration No. 528
3100 West Slaughter Lane, Ste. A-101
Austin, Texas 78748
(512) 320-8690
(512) 320-8692 (Fax)

33

FURTHER CERTIFICATION UNDER TRCP RULE 203

The original deposition was/was not returned to the deposition officer on _September 16, 2011_ .

If returned, the attached Changes and Signature page(s) contain(s) any changes and the reasons therefor.

If returned, the original deposition was delivered to Ms. Jacobs, Custodial Attorney.

$305.35 is the deposition officer's charges to the Plaintiff for preparing the original deposition and any copies of exhibits;

The deposition was delivered in accordance with Rule 203.3, and a copy of this certificate, served on all parties shown herein, was filed with the Clerk.

Certified to by me on this ___3rd___ day of _November_ , _2011_ .


_Lauren Morrison_
LAUREN M. MORRISON, CSR
Texas CSR 8909
Expiration: 12/31/2011
Integrity Legal Support Solutions
Firm Registration No. 528
3100 West Slaughter Lane, Ste. A-101
Austin, Texas 78748
(512) 320-8690
(512) 320-8692 (Fax)

# Exhibit 9

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

CAROLINE CLARK,              )
    Plaintiff            )
                       )
vs.                    )   CIVIL ACTION NO.
                    )   A-12-CA-007-SS
AUSTIN MONTESSORI SCHOOL,  )
INC.,                )
    Defendant            )

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

ORAL DEPOSITION OF

SHEILAH MURPHY

FEBRUARY 27, 2012

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

ORAL DEPOSITION OF SHEILAH MURPHY, produced as a witness at the instance of the Plaintiff and duly sworn, was taken in the above-styled and numbered cause on the 27th day of February, 2012, from 12:53 p.m. to 2:24 p.m., before Kim Furr, RPR, Certified Shorthand Reporter in and for the State of Texas, reported by computerized stenotype machine at the offices of The Cook Law Firm, 919 Congress Avenue, Suite 1145, Austin, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

54

A. Yes.

Q. And you designed the curriculum for the Occupations and Humanities units?

A. Yes.

Q. But in doing so, you followed guidelines for the Occupations and Humanities units that were given to you by the other Adolescent Community teachers?

MR. GONZALES: Objection; form.

A. There was a basic -- a general framework for the Occupations and Humanities.

Q. (By Ms. Jacobs) And you also --

A. And goals.

Q. And the rules that applied to the students in the Adolescent Community during other classes during their school day also applied during the classes that you were teaching?

A. Sure.

Q. Okay. Did you do anything to prepare for your deposition today?

A. No.

Q. Did you speak with anyone about the deposition today?

A. Yeah. I spoke with Dawn and Roland.

Q. Okay. Is Mr. Gonzales your attorney?

A. No.

55

Q. Can you tell me what you and Mr. Gonzales spoke about?

A. Yeah. He told me that, if you, like, spoke a lot of questions quickly, that I could ask you to slow down and that I should take my time and not answer until I felt like I understood what was being asked and just to tell the truth and...

Q. Was this conversation that you had with Mr. Gonzales in Austin?

A. Yes.

Q. And where did that meeting take place?

A. Starbucks across the street.

Q. And at what time?

A. 12:30.

Q. For about how long did you meet?

A. Fifteen minutes, 20 minutes.

Q. Did you speak with anyone else about the deposition?

A. Dawn.

Q. And what did you and Dawn talk about in regard to the deposition?

A. Well, I ran into her one time at the office when I was doing something for my daughter at the school, and she had heard I had been deposed. And I didn't even know what the case was or who this teacher

56

was. I didn't even know anything about it. I didn't know why I had been deposed. And so she just gave me a quick update on what the case was.

And then when I met her -- and then I ran into her at a memorial service last night and said I was -- I mean, on Saturday -- and told her I was being deposed today. And then she called today and asked if I could meet at 12:30, and then she just told me what it had been like when she had been deposed and Lucinda, the bus driver, and that she didn't think it would take very long and...

Q. And what did Ms. Glasgow speak to you about when she was giving you what you called the -- or referred to as the "update" on the case?

A. Right. I guess "update" isn't the correct word. She just told me why I was being deposed and she said that there was a teacher at the school -- Carolyn, or Caroline -- and that she -- I don't even remember all of the details, but I know -- something about that she had decided to leave the job and she moved to Dallas and then she wanted to come back and the school offered her a different position that was nonteaching and that she was suing the school. That's about all the details I got on it.

Q. Did she tell you anything else about

57

Ms. Clark?

A. Is Ms. Clark the teacher who is suing?

Q. Did she tell you anything else about the plaintiff in this case?

A. No.

Q. Did she tell you anything else about the lawsuit?

A. I asked some questions like, you know: How long has this been going on?

And she told me that they had liability insurance, but they didn't think their company was going to settle and that she didn't see any basis for the former teacher's lawsuit.

Q. Did she tell you --

A. And she was reassuring that it wasn't -- that I was being deposed but it wasn't going to be a problem because I was so clearly a contract worker, so...

Q. Did she tell you anything else about the lawsuit?

A. Not that I can think of.

Q. Did she tell you anything else about her deposition?

A. Just that it took all day.

Q. Okay. Anything else you can remember?

A. No.

**62**

I, SHEILAH MURPHY, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

_____

SHEILAH MURPHY

THE STATE OF _____)

COUNTY OF _____)

Before me, _____, on this day personally appeared SHEILAH MURPHY, known to me or proved to me on the oath of _____ or through _____ (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he/she executed the same for the purpose and consideration therein expressed.

Given under my hand and seal of office on this _____ day of _____, _____.

NOTARY PUBLIC IN AND FOR

THE STATE OF _____

My Commission Expires: _____

**64**

I further certify that I am neither attorney or counsel for, related to, nor employed by any parties to the action in which this testimony was taken and, further, I am not a relative or employee of any counsel employed by the parties hereto or financially interested in the action.

SUBSCRIBED AND SWORN TO under my hand and seal of office on this the 5th day of March, 2012.

_____

Kim Furr, CSR, RPR
Texas CSR 6997
Expiration: 12/31/2013
Integrity Legal Support Solutions
Firm Registration No. 528
3100 West Slaughter Lane, Suite 101
Austin, Texas 78748
(512) 320-8690
(512) 320-8692 (Fax)

**63**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

CAROLINE CLARK,            )
    Plaintiff            )
                          )
vs.                       ) CIVIL ACTION NO.
                          ) A-12-CA-007-SS
AUSTIN MONTESSORI SCHOOL,  )
INC.,                     )
    Defendant             )

*****************************************************

REPORTER'S CERTIFICATE
ORAL DEPOSITION OF SHEILAH MURPHY
FEBRUARY 27, 2012

*****************************************************

I, Kim Furr, RPR, Certified Shorthand Reporter in and for the State of Texas, do hereby certify that the witness was duly sworn by me; that the facts stated in the foregoing pages are true and correct; that the said witness did make the above and foregoing answers in response to questions propounded as shown; that I did, in shorthand, report said proceedings; and that the above and foregoing typewritten pages contain a full, true, and correct transcription of my shorthand notes taken on said occasion.