IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| CAROLINE CLARK, | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. A-12-CA-007-SS |
| | § | |
| AUSTIN MONTESSORI SCHOOL, INC., | § | |
| Defendant. | § | JURY TRIAL DEMANDED |
| | § | |

## PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

### I.   Introduction

Defendant denies that it is an employer subject to the requirements of the Family and Medical Leave Act ("FMLA"), based on Defendant's claim that it has fewer than 50 employees. Defendant acknowledges that it had 48 or 49 employees during the relevant time periods, 2009 and 2010.[1]  However, a number of other individuals also worked for Defendant during that time. While Defendant classified all those others as "independent contractors," many are actually "employees" under the FMLA's broad definition of that term.  Combining Defendant's admitted employees with those properly classified as employees under the FMLA brings Defendant to the 50-employee minimum that triggers coverage under the FMLA.  Plaintiff Caroline Clark now moves for partial summary judgment on this issue, respectfully requesting that the Court find that Defendant meets the 50-employee threshold under the FMLA as a matter of law.

### II.    The FMLA's 50-Employee Requirement

At issue in this action is whether Defendant is an "employer" as that term is defined by the FMLA.  Specifically, Defendant contends that it did not have the minimum number of

---

[1] Defendant reported that it had between 50 and 56 employees for three quarters of 2009 to the Internal Revenue Service.  Exhibit 25.

1

employees to meet the definition of an "employer" under the FMLA.[2]  The FMLA defines an "employer" as:

> any person engaged in commerce or in any industry or activity affecting commerce who employs 50 or more employees for each working day during each of 20 or more calendar workweeks in the current or preceding calendar year[.][3]

Defendant therefore is an "employer" within the meaning of the FMLA if Defendant had at least 50 employees during any 20 weeks of 2009 or 2010.[4]

FMLA regulations provide for the use of the payroll method in making this determination.[5]  Under the FMLA regulations, "[a]ny employee whose name appears on the employer's payroll will be considered employed each working day of the calendar week, and must be counted whether or not any compensation is received for the week."[6]  In addition, individuals on paid or unpaid leave "are counted as long as the employer has a reasonable expectation that the employee will later return to active employment."[7]  "Employees of educational institutions who are employed permanently or who are under contract are

---

[2] Defendant also contends, based on its assertion that it had less than 50 employees, that Plaintiff was not an "eligible employee" under the FMLA.  Exhibit 2, Defendant's Response to Plaintiff's Third Set of Interrogatories, No. 24.  29 U.S.C. § 2611(2)(B)(ii) (excluding from the definition of "eligible employee" any individual who does not work for an employer with at least 50 employees).

[3] 29 U.S.C. § 2611(4) (a)(i).  Defendant, a corporation, clearly meets the definition of "person." *See* 29 U.S.C. § 2611(8) ("The term 'person' has the same meaning given such term in section 203(a) of this title."); 29 U.S.C. § 203(a) ("Person" means a[] . . . corporation[.]").  And, "[f]or purposes of the FMLA, employers who meet the 50-employee coverage test are deemed to be engaged in commerce or in an industry or activity affecting commerce."  29 C.F.R. § 825.104(b).

[4] 29 U.S.C.A. § 2611(4)(A)(i).

[5] 29 C.F.R. § 825.105(e) ("A private employer is covered if it maintained 50 or more employees on the payroll during 20 or more calendar workweeks (not necessarily consecutive workweeks) in either the current or the preceding calendar year.").  *See also Walters v. Metro. Educ. Enters.*, 519 U.S. 202 (1997) (describing the payroll method).

[6] 29 C.F.R. § 825.105(b).

[7] 29 C.F.R. § 825.105(c).

"maintained on the payroll" during any portion of the year when school is not in session."[8]  Part-time employees and full-time employees are included in the total employee count.[9]   The 20 weeks need not be consecutive.[10]

### III.   Defendant Has Admitted That It Had at Least 48 or 49 Employees During 2009 and 2010

Defendant has produced bimonthly payroll reports for some pay periods of 2009 and 2010.[11]  The bimonthly payroll reports for 2009 each show the same 49 employees for 5 pay periods, spanning the period from January 1, 2009 through June 30, 2009.[12]  The two bimonthly payroll reports for the fall of 2009 likewise show 49 employees.[13]  Payroll reports covering each pay period from August 16, 2010 through December 31, 2010, a period which spans 20 calendar weeks, each show at least 48 employees.[14]  The pay period of March 16 through 31, 2010 shows 50 employees.[15]   Defendant has also produced earnings records for all of 2009 and January through August 2010, which show that Defendant had 49 employees for at least 20 weeks in 2009, and at least 48 employees for at least 20 weeks of 2010.[16]

---

[8] 29 C.F.R. § 825.111(c) (citing 29 C.F.R. 825.105(c)).

[9] *See, e.g.*, 29 C.F.R. § 825.105(c).

[10] 29 C.F.R. § 825.105(e)

[11] Exhibit 29; Exhibit 30; Exhibit 31.

[12] Exhibit 29.  Plaintiff's count excludes Aguirre, who left in December 2008.  Exhibit 21.

[13] Exhibit 29.  Defendant's payroll report for September 30, 2009 actually shows 56 employees paid, but includes six individuals who were terminated from the payroll previously and the elimination of one of John Snyder's dual roles, positions which previously appear to have been counted separately.  Exhibit 11; Exhibit 22.

[14] Exhibit 31.

[15] Exhibit 30.  The ten active but unpaid employees listed are still counted as employees under the FMLA.  29 C.F.R. 825.105(c); 29 C.F.R. § 825.111(c).

[16] Exhibit 32; Exhibit 33.  These voluminous earnings records were produced by the Defendant on the same date that this motion is being filed.  While Plaintiff has not yet had the opportunity to create a complete summary, she will endeavor to submit one with her response to Defendant's motion for summary judgment, also filed today.  In support of that motion, Defendant has submitted a summary that also shows 49 employees for at least 20 weeks of 2009, and at least 48 employees for at least 20 weeks of 2010.  *See* Docket Entry No. 28, Exhibit B.

Defendant, through its corporate representative, testified that its payroll records would demonstrate who Defendant considered to be an employee for each pay period.[17] Defendant has therefore admitted that it had at least 49 employees for 20 or more weeks of 2009, and 48 or more for 20 or more weeks of 2010.

Should Defendant make any effort to challenge this number of employees, Plaintiff would direct the Court's attention to Defendant's quarterly reports to the Internal Revenue Service ("IRS") for 2009 and 2010 regarding the number of its employees. In 2009, Defendant reported its number of employees to the IRS as 50 for the first and second quarters of the year, 56 for the third quarter, and 49 for the fourth quarter.[18] For 2010, Defendant reported 48 or 49 employees for each quarter to the IRS.[19] Defendant's corporate representative testified that the IRS reports were generated on the basis of Defendant's payroll.[20] Defendant had the opportunity, through the deposition of its corporate representative, to explain any inaccuracies in these reports.[21] Defendant did not do so.[22]

---

[17] Exhibit 4, Corporate Representative Deposition ("Corp. Rep."), p.34:2-35:10; 42:1-47:4; 48:5-17; 61:16-22.

[18] Exhibit 25.

[19] Exhibit 26; Exhibit 27.

[20] Exhibit 4, Corp. Rep., p.30:11-31:2.

[21] Specifically, Defendant's corporate representative was designated to provide testimony regarding the number of and names of employees listed on Defendant's IRS Form 941s in 2009 and 2010. *See* Exhibit 3, Items Nos. 11 & 12 of Plaintiff's Notice of Intention to Take Oral Deposition of the Corporate Representative of Defendant Austin Montessori School, Inc. She testified that she did not review the IRS Form 941s prior to the deposition. Exhibit 4, Corp. Rep., p.11:19-25.

[22] Exhibit 4, Corp. Rep., p.27:1-5; 112:23-114:8. Defendant also could not explain discrepancies in the IRS forms and the TWC reports, despite being designated to testify on that topic. Exhibit 4, Corp. Rep., p.28:10-30:22; Exhibit 3, Plaintiff's Notice of Intention to Take Oral Deposition of the Corporate Representative of Austin Montessori School, Inc., Items Nos. 13-14. Defendant had reported its number of employees to the TWC as 50 for four months of 2009 and as 48 or 49 for all other months except July. Exhibit 19. For 2010, Defendant reported between 47 and 48 employees for most months to the TWC. Exhibit 20; Exhibit 26; Exhibit 27. There should be no discrepancy between the numbers reported to the IRS and the TWC, as both the IRS and TWC

4

Defendant also admitted through interrogatory responses that it had 48 or 49 employees during 2009 and 2010. Defendant produced three staff lists that Defendant compiled—one for the spring of 2009, one for the 2009-2010 school year, and one for the fall of 2010—in response to interrogatories requesting that Defendant identify all individuals classified by Defendant as employees and independent contractors in 2009 and 2010.[23] In those lists, Defendant indicated which of those individuals are designated as employees, and if not, provided a brief note explaining why Defendant does not classify the individual as an employee.[24] Those lists contain 49 employees for the spring of 2009, 48 for the 2009-2010 school year, and 49 for the fall of 2010.[25] Defendant's corporate representative, who compiled the lists herself, agreed that they were generally correct but noted a few errors.[26] Only two affect the overall number of individuals Defendant considered to be employees at that time.[27] The 2009-2010 list should include 49 employees, because Gilberto Miranda was omitted.[28] The fall of 2010 list should include only 48 employees, because Glasgow testified that she should have listed Patricia Oriti as an independent contractor.[29] Furthermore, the individuals in these lists are included in

---

reports require that an employer count the number of employees on the 12th day of the reporting month. *See, e.g.,* Exhibit 24; Exhibit 25.

[23] Exhibit 1, Defendant's Responses to Plaintiff's Second Set of Interrogatories, Nos. 14 and 15; Exhibit 5; Exhibit 4, Corp. Rep., p.38:9-39:23.

[24] Exhibit 5.

[25] *Id.*

[26] Exhibit 4, Corp. Rep., p.40:3-46:13; p.54:17-60:8; p.63:12-68:12.

[27] The list for January to June 6, 2009 includes Adam Aguirre, who actually left Defendant at the end of December 2008 and was replaced by Gilberto Miranda, who was omitted from the list, leaving the total number unaffected. Exhibit 4, Corp. Rep., p.41:14-23; Exhibit 21; Exhibit 22.

[28] Exhibit 4, Corp. Rep., p.68:19-69:3; Exhibits 15, 16, 20, 22 & 23; Exhibit 4, Corp. Rep., p.68:19-69:3.

[29] Exhibit 4, Corp. Rep., p.63:22-64:3; 68:13-15.

Defendant's staff directories, created at the beginning of each school year, and annual reports, compiled after the end of the school year.[30]

### IV.  Other Individuals Working for Defendant<br>Are Properly Classified as "Employees" Under the FMLA

**A.    The FMLA's Broad Definition of "Employee"**

Because Defendant payroll records reflect that it had at least 49 employees for 2009 and at least 48 employees for 2010, Defendant is an "employer" under the FMLA if it had one additional employee in 2009 or two additional employees in 2010.

The Family and Medical Leave Act ("FMLA") defines an "employee" based on the definition of "employee" under the Fair Labor Standards Act ("FLSA").[31]  The FLSA defines "employee" as "any individual employed by an employer," and "employ" as "to suffer or permit to work."[32]  "The definition of employee under the FLSA is particularly broad."[33]  The FLSA stretches the meaning of employee to cover some parties who might not qualify as such under a

---

[30] Exhibits 12-14; Exhibit 4, Corp. Rep., p.204:4-25; 206:22-209:17.

[31] *See Lumar v. St. John the Baptist Parish*, 2002 WL 500477, at *3 (E.D. La., Apr. 2, 2002) ("Under the FMLA, the definition of "employee" is given the same meaning as that set forth in § 203 of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et seq.") (citing 29 U.S.C. § 2611(3)).  That section of the FMLA provides as follows:

> (3) Employ; employee; State
> The terms "employ", "employee", and "State" have the same meanings given
> such terms in subsections (c), (e), and (g) of section 203 of this title.

29 U.S.C. § 2611(3).

[32] 29 U.S.C. § 203(e)(1) ("employee"); 29 U.S.C. § 203(g) ("employ").

[33] *Hopkins v. Cornerstone America*, 545 F.3d 338, 343 (5th Cir. 2008) (citing *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992)).  Likewise, the definition of "employ" is broad. *See Rutherford Ford Corp. v. McComb*, 331 U.S. 722, 728 (1947).  Highlighting the breadth of the definition of "employee" under the FLSA compared to that of other statutes,  the Fifth Circuit noted in *Hopkins* that:

> it is clearly possible for [the plaintiff] to be an employee under the FLSA even if
> he actually believes himself to be an independent contractor.  As the court below
> acknowledged, "[a] person's subjective opinion that he is a businessman rather
> than an employee does not change his status" for purposes of the FLSA.

545 F.3d at 343 (quoting *Brock v. Mr. W Fireworks, Inc.*, 814 F.2d 1042, 1049 (5th Cir. 1987)).

strict application of traditional agency law principles.[34]   In fact, it is clear that the definition of

employment as it relates to the FLSA is the broadest definition that has ever been included in one

act.[35]   Moreover, "[i]n enacting the FMLA, legislative history reveals that Congress was aware

of the breadth of the FLSA definition of employee and purposely chose to adopt that

definition."[36]

Because the FMLA uses this broad definition of employee, individuals working for an

employer may be "employees," even if classified by the employer as "independent contractors."

In determining whether a worker qualifies as an employee under the FLSA, courts "focus on

whether, as a matter of economic reality, the worker is economically dependent upon the alleged

employer or is instead in business for himself."[37]   Five non-exhaustive factors guide the

economic realities inquiry:

> (1)  the degree of control exercised by the alleged employer;
> (2)  the extent of the relative investments of the worker and the alleged employer;
> (3)  the degree to which the worker's opportunity for profit or loss is determined by the alleged employer;
> (4)  the skill and initiative required in performing the job; and

---

[34] *Nationwide Mut. Ins. Co.*, 503 U.S. at 326.  Highlighting the breadth of the definition of "employee" under the FLSA compared to that of other statutes,  the Fifth Circuit noted in *Hopkins* that:

> it is clearly possible for [the plaintiff] to be an employee under the FLSA even if
> he actually believes himself to be an independent contractor. As the court below
> acknowledged, "[a] person's subjective opinion that he is a businessman rather
> than an employee does not change his status" for purposes of the FLSA.

545 F.3d at 343 (quoting *Mr. W Fireworks*, 814 F.2d at 1049).

[35] *Shultz v. Hinojosa*, 432 F.2d 259, 264 (5th Cir. 1970) (quotation marks omitted) (citing *United States v. Rosenwasser*, 323 U.S. 360, 363, n.4).

[36] *Lumar*, 2002 WL 500477, at *3 (citing *Duckworth v. Pratt & Whitney, Inc.*, 152 F.3d 1, 7 (1st Cir. 1998)).

[37] *Hopkins*, 545 F.3d at 343 (citing *Herman v. Express Sixty-Minutes Delivery Serv., Inc.*, 161 F.3d 299, 303 (5th Cir. 1998)).  The economic realities test is acknowledged as more expansive than the more traditional common law right of control test.  *Diggs v. Harris Hosp. Methodist, Inc.*, 847 F.2d 270, 272 n.1 (5th Cir. 1988).

(5)   the permanency of the relationship.[38]

"No single factor is determinative."[39]  "Rather, each factor is a tool used to gauge the economic dependence of the alleged employee, and each must be applied with this ultimate concept in mind."[40]  The ultimate conclusion that an individual is an employee within the meaning of the FLSA is a legal, and not a factual, determination.[41]

Below, Plaintiff addresses the economic realities inquiry with respect to three individuals Defendant classified as "independent contractors:" Lucinda Castillo, Defendant's shuttle bus driver, Calvin Carter, Defendant's former caretaker, and Sheilah Murphy, who worked as a part-time instructor in Defendant's middle school.  That inquiry reveals that these individuals, and others who have worked in the same positions, are employees under the FMLA.

**B.      Lucinda Castillo, Defendant's Shuttle Bus Driver**

Defendant provides a shuttle bus service that runs among Defendant's three campuses before and after school.[42]  "The purpose is to provide transportation for older children who live north."[43]  In 2009 and the beginning of 2010, Defendant classified its shuttle bus drivers as employees.[44]  However, when Defendant hired a new shuttle bus driver, Lucinda Castillo, in February 2010, she was classified as an "independent contractor."[45]  Glasgow, testifying as Defendant's corporate representative, explained that at the time Castillo was hired, the issue of her position's classification arose and the accountant discussed various factors from an IRS list

---

[38] *Hopkins*, 545 F.3d at 343 (citing *Herman*, 161 F.3d at 303).

[39] *Hopkins*, 545 F.3d at 343 (citing *Mr. W Fireworks, Inc.*, 814 F.2d at 1043-44).

[40] *Hopkins*, 545 F.3d at 343 (citing *Mr. W Fireworks, Inc.*, 814 F.2d at 1043-44).

[41] *Cromwell v. Driftwood Elec. Contractors, Inc.*, 348 F. App'x 57, 59 (5th Cir. 2009) (citing *Mr. W Fireworks, Inc.*, 814 F.2d at 1045; *Beliz v. W.H. McLeod & Sons Packing Co.*, 765 F.2d 1317, 1327 & n. 24 (5th Cir. 1985)).

[42] Exhibit 28.

[43] *Id*.

[44] Exhibit 5; Exhibit 4, Corp. Rep., p.40:12-18; 55:7-11.

[45] Exhibit 6, Deposition of Lucinda Castillo ("Castillo"), p.5:4-9; Exhibit 5.

with Glasgow.[46]   According to Glasgow, she and the accountant concluded that the position should be an independent contractor "because they're just – they get their own training, they're the expert in driving the bus[.] [47]   Glasgow was designated as Defendant's corporate representative on the facts on which Defendant's employee and independent contractor classifications were based.[48]   The only reason she could give as to why Defendant considered Castillo to be an independent contractor was "[b]ecause she is a person who decides how she is going to drive the bus."[49]

The facts surrounding Castillo's work for Defendant clearly indicate that she should be classified as an employee.   Castillo interviewed for the position with Dawn Glasgow after hearing about an opening from a friend.[50]   At the time she was hired, Castillo had no prior experience driving a bus, no license other than an ordinary driver's license, and no training as a bus driver.[51]   Defendant required her to view an online training about "how do you let people out and that kind of thing."[52]   This summer, Defendant was informed by its insurance company that the driver should have a commercial driver's license, and Defendant directed Castillo to obtain one.[53]

Defendant established the schedule by which Castillo must pick up and drop off students at each of its three campuses in the morning and the afternoon.[54]   Defendant provided Castillo with the route, but allows her to use a different one as long as she arrives and departs to and from

---

[46] Exhibit 4, Corp. Rep., p.17:17-22:5.
[47] Exhibit 4, Corp. Rep., p.19:4-15.
[48] *See* Exhibit 3, Item Nos. 2 & 3 of Plaintiff's Notice of Intention to Take Oral Deposition of the Corporate Representative of Defendant Austin Montessori School, Inc.
[49] Exhibit 4, Corp. Rep. p.134:2-135:17; p.137:8-138:5.
[50] Exhibit 6, Castillo, p.5:10-6:18.
[51] *Id*. at p.21:16-22:6
[52] Exhibit 4, Corp. Rep. 126:25-127:8; 131:5-9.
[53] *Id*. at p.126:10-24; 133:15-134:1.
[54] *Id*. at p.128:20-129:3, Exhibit 28.

each campus according to Defendant's schedule.[55] Defendant charges students' families directly for use of the service.[56] Defendant in turn pays Castillo an hourly wage for her work, based on a set number of hours to drive the route each day.[57] Defendant owns the bus that Castillo drives and Defendant is responsible for the bus's insurance, registration, and maintenance.[58] Castillo fuels the bus using Defendant's credit card.[59]

Defendant has established rules and guidelines applicable to the student riders and the driver.[60] Castillo is also expected to follow unwritten guidelines; for example, she was told not to give doughnuts to the students.[61] In addition, Castillo is required to follow a checklist Defendant directed her to print before driving the shuttle bus each day.[62] Castillo also had to keep track of which students rode the bus and provide that information to Defendant.[63] Castillo had not missed a day of work, but Defendant is responsible for finding someone to take her place in the event that she cannot.[64] She was not hired for any specific period of time, and Defendant expects her to return for the 2012-13 school year.[65]

### 1. Degree of Control

The first factor of the economic realities inquiry is the degree of control exercised by the alleged employer. "The Fifth Circuit has made clear that '[c]ontrol is only significant when it shows an individual exerts such a control over a meaningful part of the business that she stands

---

[55] Exhibit 4, Corp. Rep., p.129:24-130:20.
[56] Exhibit 6, Castillo, p.8:18-13:21; Exhibit 4, Corp. Rep., 120:11-13.
[57] Exhibit 6, Castillo, p.7:2-21; Exhibit 4, Corp. Rep., p.119:22-120:10.
[58] Exhibit 6, Castillo, p.17:25-18:3-7; 22:7-17; Exhibit 4, Corp. Rep. p. 127:23-128:17.
[59] Exhibit 6, Castillo, p.18:19-23; 19:20-25; 21:1-2.
[60] Exhibit 28.
[61] Exhibit 4, Corp. Rep., p.125:9-126:7.
[62] Exhibit 4, Corp. Rep., p.124:15-125:8.
[63] Exhibit 4, Corp. Rep., p.133:2-14.
[64] Exhibit 6, Castillo, p.22:20-23:8.
[65] Exhibit 4, Corp. Rep., p.119:9-24.

as a separate economic entity.'"[66] Defendant controls every economic aspect of the shuttle bus service offered to students.  Castillo's choices are largely limited to choices such as when to brake and change lanes.[67] She must follow the law, comply with Defendant's schedule, and "be totally involved with driving safely."[68] The very limited choices she is permitted to make do not in any way suggest that she operates independently.[69] This factor thus points to employee status.

    2.      *Relative Investments of the Worker and Alleged Employer*

The second factor is the extent of the relative investments of the worker and the alleged employer; this factor focuses on the relative expenses incurred by the worker and the alleged employer related to the work at issue.[70] Defendant is exclusively responsible for the expenses associated with its shuttle bus service.  This factor therefore weighs in favor of employee status.

    3.      *Degree to Which Opportunity for Profit or Loss Is Controlled by Defendant*

The third factor is the degree to which the worker's opportunity for profit or loss is determined by the alleged employer.  The opportunity for profit or loss is only present where a worker has invested capital in his or her job, and not just his or her time; the money he or she makes is simply analogous to earned wages.[71] As discussed above, Castillo made no capital

---

[66] *Lang v. DirecTV*, 801 F.Supp.2d 532, 536-37 (E.D. La. 2011) (quoting *Hopkins*, 545 F.3d at 343 (quoting *Mr. W Fireworks, Inc*., 814 F.2d at 1049).

[67] Exhibit 4, Corp. Rep. p.134:2-135:17 (referring to Castillo's ability to decide matters such as when to change lanes, her speed, and how hard to brake).

[68] Exhibit 4, Corp. Rep., p.136:24-137:1; Exhibit 28.

[69] *See, e.g., Reich v. Circle C. Investments, Inc*., 998 F.2d 324, 327 (5th Cir. 1993) (finding that the control factor weighed in favor of employee status because club exercised a great deal of control over dancers, nothwithstanding the fact that the dancers controlled their own dance routines); *Hopkins*, 545 F.3d at 343 ("'The lack of supervision over minor regular tasks cannot be bootstrapped into an appearance of real independence.'") (quoting *Mr. W Fireworks, Inc*., 814 F.2d at 1049).

[70] *See Express Sixty-Minutes Delivery Serv.*, 161 F.3d at 304 (analyzing this factor by comparing capital investment of drivers and delivery service); *Circle C. Investments, Inc*., 998 F.2d at 327.

[71] *See, e.g., Mr. W. Fireworks*, 814 F.2d at 1050–51 (distinguishing profit is the gain realized on a business over and above capital expenditures from a return based only on labor, which is more

investment in her job as a shuttle bus driver, and thus has no opportunity for profit or loss. Defendant absorbs the loss associated with the service.[72] This factor accordingly points to employee status.

4.    *Skill and Initiative Required in Performing the Job*

The fourth factor in the economic realities inquiry is the skill and initiative required in performing the job. The skill factor here points to employee status, as Castillo had no more skill beyond that of an ordinary driver when she was hired and received very little training.[73] Initiative in the economic realities inquiry context relates to the ability to exercise economic initiative over an enterprise to generate more business, such as through the ability to affect advertising and pricing.[74] Castillo had no ability to exercise initiative in this sense. This factor thus also points to employee status.

5.    *Permanency of the Relationship*

The fifth factor addresses the permanency of the relationship between the individual and the alleged employee. Castillo was hired for an indefinite period, similar to that of an at-will employee. This factor thus clearly indicates employee status.[75]

6.    *Conclusion*

Each of the five factors of the economic realities test indicates clearly that Castillo, like the shuttle bus drivers before her, is an "employee" under the FMLA as a matter of law. To the extent that Defendant would now challenge its prior designation of its former shuttle bus drivers,

---

properly classified as wages rather than profit) (citations omitted).

[72] Exhibit 4, Corp. Rep., p.120:9-121:3.

[73] Exhibit 6, Castillo, p.21:13-22:6. *See also Express Sixty-Minutes Delivery Serv.*, 161 F.3d at 305.

[74] *See, e.g., Usery v. Pilgrim Equip. Co., Inc.*, 527 F.2d 1308, 1314-15 (5th Cir. 1976); *Lang*, 801 F.Supp.2d at 539-40.

[75] *See, e.g., Pilgrim Equip. Co., Inc.*, 527 F.2d at 1314 (finding permanency where operators worked under routinely renewed annual contracts).

Kjersti Wheeler and Judy Johnson, as employees, and could properly do so, the economic realities analysis yields the same result. The only notable distinction is that Johnson (and perhaps Wheeler) had previously driven a school bus and had a license to do so.[76] All of these shuttle bus drivers were economically dependent on Defendant for their jobs, rather than in business for themselves.

**C.    Calvin Carter, Defendant's Former Caretaker**

Defendant has a number of caretakers who provide janitorial services at two of Defendant's three campuses.[77] Calvin Carter worked as a caretaker at Defendant's Great Northern campus from 1989 through the end of the 2009-2010 school year.[78] He did not recall discussing pay at his initial interview, but recalled that the newspaper ad for the job offered $50 a week to start.[79] Carter testified that he never asked for an increase in pay, but would get raises from time to time, without notice; he guessed that it was because Defendant liked his work.[80] At the time Carter stopped working for Defendant, he was earning $800 paid bimonthly.[81] He had a list of tasks to complete for Defendant, which took him approximately 3 hours a night to do.[82] If he did work beyond that list of tasks he had to complete for Defendant, he could not earn extra money.[83] Carter did not own a janitorial services business or perform cleaning services for any other entity.[84] He never hired anyone to assist him with the work.[85] If he could not come in to

---

[76] Exhibit 4, Corp. Rep., p.131:17-132:14.
[77] Exhibit 4, Corp. Rep., p.71:5-74:9.
[78] Exhibit 7, Deposition of Calvin Carter ("Carter"), p.6:21-7:8.
[79] *Id.* at p.13:21-14:1.
[80] *Id.* at p.18:4-23.
[81] *Id.* at p.17:6-18.
[82] *Id.* at p.24:12-15.
[83] *Id.* at p.17:6-18; 26:16-27:13; 29:9-16; Exhibit 4, Corp. Rep., p.83:10-14.
[84] Exhibit 7, Carter, p.29:24-30:16; p.35:24-36:8.
[85] *Id.* at p.19:19-25; 27:20-28:14.

work, he did not send someone in his place, but would call Defendant, who would find someone else to perform the work.[86]

Defendant provided all of the cleaning equipment or supplies Carter needed, or reimbursed him for any supplies he purchased.[87]  Defendant selected cleaning products that it considered "reasonable to have in an environment around children[]" and compliant with health department requirements for child care centers.[88]  If caretakers used different cleaning products, Defendant instructed them to use the products Defendant had selected and supplied.[89]  Carter could only work after 5:30 pm, and around Defendant's evening event schedule.[90]

### 1.    Control

Defendant's operations required a clean environment.[91]  Defendant hired Carter and other caretakers to maintain that environment and further its own operations.  Carter had some control over the manner in which he performed his assigned custodial tasks and choices about when to work outside of school hours.  But his ability to make choices about how and precisely when to complete his tasks does not show that he could be considered a separate economic entity.[92]

### 2.    Relative Investments of the Worker and the Alleged Employer

With respect to the second factor, Defendant is responsible for all the expenses associated with cleaning the school.  Carter made no capital investment in his job.  This factor therefore weighs in favor of employee status.

---

[86] *Id.* at p.20:11-21:2.

[87] Exhibit 7, Carter, p.25:20-26:15.

[88] Exhibit 4, Corp. Rep., p.83:25-84:10.  Defendant's corporate representative tried to stress that she personally did not care what cleaning products the caretakers used as long as they worked. *Id.* at 83:25- 89:2.  But Defendant apparently did.  *Id.*; *see also* Exhibit 9.

[89] Exhibit 4, Corp. Rep., p.84:11-88:19.

[90] Exhibit 4, Corp. Rep., p.91:22-92:11; Exhibit 7, Carter, p.22:10-23:7.

[91] *See, e.g.*, Exhibit 10.

[92] *See, e.g., Circle C. Investments, Inc.*, 998 F.2d at 327; *Hopkins*, 545 F.3d at 343-44.

14

### 3. *Degree to Which Opportunity for Profit or Loss Is Controlled by Defendant*

In light of the fact that Carter expended nothing on his job other than his time, and Defendant paid for all cleaning supplies and equipment, this factor points to employee status.

### 4. *Skill and Initiative*

With respect to skill, "[j]anitorial building maintenance, i.e. cleaning floors, carpets, is not considered to be labor which requires a high degree of skill or technical expertise."[93] It is evident, based on Carter's deposition testimony and the fact that he worked for Defendant for more than two decades and received raises without asking for them, that he worked industriously and did his job well. It is also clear that the cleaning work he performed is both important and necessary to Defendant.[94] But this does not demonstrate that he had the ability to exercise initiative. Performing "routine work which requires industry and efficiency is not indicative of independence and nonemployee status."[95] Moreover, Carter testified that the work took him about the same amount of time each night, and that it was whether the building was dirty that affected the amount of time.[96] The custodial work Carter performed for Defendant simply was not "an enterprise whose success actually depended upon his initiative, judgment and foresight."[97] This factor thus favors employee status.

---

[93] *Quinteros v. Sparkle Cleaning, Inc*., 532 F.Supp.2d 762, 770 (D. Md. 2008).

[94] *See, e.g*., Exhibit 10.

[95] *Pilgrim Equipment Co*., 527 F.2d at 1314.

[96] Exhibit 7, Carter, p.16:4:9; 24:8-15.

[97] *See, e.g., Reich v. Priba Corp*., 890 F. Supp. 586, 593 (N.D. Tex. 1995) ("Defendants argue that what a particular entertainer earns in tips is directly related to that entertainer's initiative and skill in performing. This argument, however, is true in any employment relationship: an individual can always improve her chances for greater earnings by using initiative and skill to perform to the best of her ability. Hickey accordingly considered initiative, not in the sense of performing well, but in the sense of engaging in those activities that tended to expand the sales representative's client base, goodwill, and contracting possibilities.") (citing *Hickey v. Arkla Indus., Inc*., 699 F.2d 748, 752 (5th Cir. 1983)).

15

*5.*      *Permanency of the Relationship*

The fifth factor, the permanency of the relationship, clearly points to employee status: Carter worked for Defendant for more than two decades.

*6.*      *Conclusion*

Each of the five factors of the economic realities test indicates clearly that Carter was an "employee" under the FMLA.[98]  Defendant's other three caretakers during 2009 and 2010— Francisca Tejeda, Miguel Reyes, and Cleotilde Maldonado—should also be included in the total employee count, as their jobs with Defendant were substantially similar to Carter's.[99]

**D.      Sheilah Murphy, Part-Time Instructor**

Sheilah Murphy worked as a part-time instructor for the full 2010-2011 school year, as well as part of the fall and spring of the 2011-2012 school year.  Murphy testified that Defendant hired her to teach a course, Humanities and Occupations, taught in four units, each lasting 6 weeks, in Defendant's Adolescent Community.[100]  Defendant informed her that it had a budget of $10,000 available to pay her, and that it could not pay her more than $25 per hour.[101]  As teaching and preparation for the Humanities and Occupations course would not take up the full 400 hours, Defendant worked with Murphy to ensure that she could perform additional tasks to work the full 400 hours.[102]  Those additional tasks included supervising students after her course

---

[98] *See, e.g., Circle C. Investments, Inc.*, 998 F.2d at 327-28.

[99] Tejeda worked for Defendant from prior to 2001 through the present, Maldonado from 2007 through the present, and Miguel Reyes from 2008 or 2009 through the end of 2011.  Exhibit 4, Corp. Rep., p.72:4-73:11.  They had the same job duties as Carter, but cleaned Defendant's main campus.  *Id.* at p.184:4-186:19.  Glasgow thought that Reyes and Maldonado had experience working for Austin ISD, but was not sure.  *Id.* at p.184:22-185:16.  Defendant has produced IRS Form 1099s for each as individuals rather than entities.  Exhibits 17-18.

[100] Exhibit 8, Deposition of Sheilah Murphy ("Murphy"), p.9:8-10:8; 12:14-14:2

[101] *Id.* at p.9:10-15.

[102] *Id.* at p.9:8-11:3

until their departure, teaching Italian and physical education, and driving for field trips.[103] For one of the Humanities units, small groups of students rotated among Murphy and three of the other Adolescent Community instructors.[104] Murphy and one of the other Adolescent Community instructors each taught a group of students for the Occupations units.[105] Murphy could not control the hours of the classes she taught; she simply had the option to teach courses at the times Defendant had already set aside for them, or not teach.[106] Defendant expected Murphy to follow many of the same guidelines as other Adolescent Community instructors, including dress code and calling in if she could not come.[107] Murphy worked in close coordination and cooperation with the other adolescent community instructors.[108] Defendant allowed Murphy to design the content of the courses, in conformity with Defendant's philosophy and manner of working with students and a number of other parameters set by Defendant.[109]

### 1.    Control

Defendant, as a school, runs what is in effect an educational enterprise. Murphy's work as a part-time instructor was in furtherance of that enterprise; she did not operate as a separate economic entity.[110] Murphy had some control over the content of the courses she taught, but that such control was no greater than that of the other employee-instructors in the Adolescent Community is evidenced by the fact that Murphy was in many cases simply working alongside

---

[103] *Id.* at p.9:16-10:5; 20:21-21:11.
[104] *Id.* at p.25:23-27:11.
[105] *Id.* at p.27:6-19.
[106] *Id.* at p.44:23-45:15; 52:11-53:2; 59:16-60:9.
[107] *Id.* at p.44:7-18.
[108] *See id.* at p.42:13-46:5.
[109] *Id.* at p.23:12-22; 32:12-22; 35:1-36:19.
[110] Murphy in fact testified that she could not make decisions about how the school was run. Exhibit 7, Murphy, p.38:13-40:18; 51:7-15.

17

them.  In short, Murphy's pedagogical discretion does not equate with economic control over Defendant's business.[111]

### 2.    *Relative Investments*

Defendant furnished the facilities in which Murphy taught and any supplies she needed. Murphy did not make any capital investment in her job.  In contrast, Defendant charges music instructors who work on-site a small fee per student for use of the space.[112]  This factor therefore weighs in favor of employee status.

### 3.    *Degree to Which Opportunity for Profit or Loss Is Controlled by Defendant*

Murphy invested little if any in her job.  Defendant retained control over all the economic aspects of its operations; for example, whether enrollment in the Adolescent Community increased or decreased, Murphy's pay remained the same.  Murphy thus had no opportunity for profit or loss, and this factor weighs in favor of employee status.

### 4.    *Skill and Initiative*

With respect to skill, there is evidence in both directions.  Murphy has an undergraduate degree in English and American Studies and a master's degree in English, and teaching experience at the university level in English and Italian.[113]  Some of her responsibilities in the Adolescent Community undoubtedly drew on those specialized skills and experience, but that does not differentiate her from the other employee-instructors in the Adolescent Community. Moreover, some of the courses she taught have no discernible relationship to her educational

---

[111] *See, e.g., Circle C. Investments, Inc*., 998 F.2d at 327; *Hopkins*, 545 F.3d at 343.
[112] Exhibit 4, Corp. Rep., p.49:7-50:6.
[113] Exhibit 8, Murphy, p.11:14-12:13.

18

background and prior teaching experience,[114] and she also performed tasks that were simply ancillary to any other instructor's job, such as supervisory duties.

In regard to initiative, Murphy was teaching, not operating "an enterprise whose success actually depended upon [her] initiative, judgment and foresight."[115] On the balance, Murphy's role was much more similar to that of the wage-earning instructors in the Adolescent Community, albeit on a part-time basis, rather than the role of an independent entrepreneur. This factor thus points to employee status.

### 5.    *Permanency of the Relationship*

The permanency of the relationship factor is mixed. Her initial teaching agreement was for one school year. However, she returned for a second year before ultimately deciding to leave the position, for a number of reasons.[116] Courts have found that similar working time periods demonstrated permanency.[117]

### 6.    *Conclusion*

As a whole, the factors of the economic reality analysis weigh in favor of employee status with respect to Murphy. The permanency factor is mixed. Also, Murphy has specialized skills and retained some discretion over her teaching. However, her work in that regard was not readily distinguishable in those respects from the other instructors in the Adolescent Community.

---

[114] Murphy testified that she taught units on health and fitness, farm economy, and composting, plus fitness boot camp and Argentine tango. Exhibit 8, Murphy, p.10:7-14; 23:14-25:14; 32:23-33:9. Such courses do not obviously relate to her background and experience, though is not clear whether she acquired specialized skills in those areas through other means.

[115] *See, e.g., Priba Corp.*, 890 F. Supp. at 593.

[116] Exhibit 8, Murphy, p.41:4-20.

[117] *Cromwell v. Driftwood*, 348 Fed.Appx. 57, 60 (discussing various factors relevant to permanency analysis and finding permanency where plaintiffs worked full-time exclusively for defendants for 11 months and did not have a temporary, project-by-project, on-again-off-again relationship with purported employers) (citing *Carrell v. Sunland Const., Inc.*, 998 F.2d 330 (5th Cir. 1993); *Robicheaux v. Radcliff Material, Inc.*, 697 F.2d 662 (5th Cir. 1983)); *Pilgrim Equipment Co.*, 527 F.2d at 1314 (renewable annual contracts evidence of permanency).

Murphy simply performed a more limited scope of duties, attributable largely to her part-time status. She had no control over Defendant's operations economically, made little or no capital investment in her work, had no opportunity for profit or loss, and no ability to exercise initiative. On the whole, Murphy was economically dependent on Defendant, rather than in business for herself. She was therefore an "employee" under the FMLA.[118]

**E.      Defendant's Employee Counts Including Castillo, Murphy, and Carter**

Adding Carter to the 49 employees on Defendant's payroll in 2009, Defendant had at least 50 employees for at least 20 weeks of 2009. Adding Carter, Castillo, and Murphy to the 48 employees on Defendant's payroll for 2010, Defendant also had at least 50 employees for at least 20 weeks of 2010.[119]

## V. <u>Conclusion</u>

For the reasons set forth in this motion and based on the evidence attached hereto, no genuine issue of material fact exists with respect to whether Defendant had at least 50 employees, as defined by the FMLA, for at least 20 calendar weeks of 2009 and 2010. Plaintiff therefore respectfully seeks summary judgment on this issue.

---

[118] Murphy was hired prior to the start of the 2010-2011 school year. Exhibit 8, Murphy, p.17:10-18:4; Exhibit 11; Exhibit 4, Corp. Rep., p.204:10-25.

[119] Plaintiff also believes that Defendant has other individuals working for it who, while classified as independent contractors, are also "employees" under the FLSA, including Leslie Grove, Defendant's school counselor and elementary coordinator, and Charlotte Kroger, Defendant's Children's House mentor. A full discussion of the factors related to their employment, however, would add considerably and possibly unnecessarily to the length of this motion.

Respectfully Submitted,

**THE COOK LAW FIRM**

/s/ Melissa A. Jacobs

_____

Russell Scott Cook
scook@rcooklaw.com
State Bar No. 24040724
Melissa A. Jacobs
mjacobs@rcooklaw.com
State Bar No. 24046144
919 Congress Avenue, Suite 1145
Austin, Texas 78701
Telephone: (512) 482-9556
Telecopier: (512) 597-3172

ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I hereby certify that on this 31st day of July, 2012, I filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Stephanie O'Rourke
Bryan P. Marshall
Cokinos Bosien & Young
l0999 West IH-10, Ste. 800
San Antonio, TX 78230

/s/ Melissa A. Jacobs

_____

Melissa A. Jacobs

21