Exhibit 4

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| CAROLINE CLARK, | ◆ | |
|      Plaintiff, | ◆ | CIVIL ACTION |
| | ◆ | |
| VS. | ◆ | NO. A-12-CA-007-SS |
| | ◆ | |
| AUSTIN MONTESSORI SCHOOL, | ◆ | JURY TRIAL DEMANDED |
| INC., | ◆ | |
|      Defendant. | ◆ | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

ORAL DEPOSITION OF THE CORPORATE REPRESENTATIVE

OF AUSTIN MONTESSORI SCHOOL, INC.,

DAWN GLASGOW

JULY 26, 2012

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

ORAL DEPOSITION OF DAWN GLASGOW, produced as a witness at the instance of the Plaintiff, and duly sworn, was taken in the above-styled and numbered cause on the 26th day of July, 2012, from 10:00 a.m. to 4:05 p.m., before Cynthia Warren, Certified Shorthand Reporter in and for the State of Texas, reported by machine shorthand, at the offices of The Cook Law Firm, 919 Congress Avenue, Suite 1145, Austin, Texas 78701, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

APPEARANCES

FOR THE PLAINTIFF:

MR. RUSSELL SCOTT COOK
MS. MELISSA A. JACOBS
THE COOK LAW FIRM
919 Congress Avenue, Suite 1145
Austin, Texas 78701
Telephone: 512-482-9556
Fax: 512-597-3172
E-mail: scook@rcooklaw.com

FOR THE DEFENDANT:

MR. BRYAN P. MARSHALL
COKINOS, BOSIEN & YOUNG
10999 IH-10 West, Suite 800
San Antonio, Texas 78230
Telephone: 210-293-8700
Fax: 210-293-8733
E-mail: bmarshall@cbylaw.com

ALSO PRESENT:
Ms. Jordan Warshauer

---

INDEX

|                                          | PAGE |
| ---------------------------------------- | ---- |
| Appearances                              | 2    |
| DAWN GLASGOW                             |      |
| Examination by Mr. Cook                  | 5    |
| Examination by Mr. Marshall              | 209  |
| Further Examination by Mr. Cook          | 210  |
| Changes and Corrections                  | 211  |
| Signature                                | 212  |
| Reporter's Certificate                   | 213  |

EXHIBITS

| NO. DESCRIPTION | PAGE REFERENCED |
| --- | --- |
| Exhibit 1 | 5 |
| Plaintiff's Notice of Intention to Take Oral Deposition of the Corporate Representative of Austin Montessori School, Inc. | |
| Exhibit 2 | 12 |
| Defendant's Objections and Answers to Plaintiff's Third Set of Interrogatories | |
| Exhibit 3 | 34 |
| Payroll Registers, Bates Nos. AMS 000766 - 000835 | |
| Exhibit 4 | 38 |
| Listing of employees and independent contractors, January - June 6, 2009 | |
| Exhibit 5 | 104 |
| Expenses by Vendor Summary, August 2009 through July 2010 | |

---

EXHIBITS (cont'd)

| NO. DESCRIPTION | PAGE REFERENCED |
| --- | --- |
| Exhibit 6 | 114 |
| TWC Employer's Quarterly Report, 3/28/11 | |
| Exhibit 7 | 190 |
| TWC Employer's Quarterly Report, 3/28/11 | |
| Exhibit 8 | 207 |
| Annual Report, 2010-2011 | |
| Exhibit 9 | 208 |
| Annual Report, 2009-2010 | |
| Exhibit 10 | 209 |
| Annual Report, 2008-2009 | |

---

(Exhibit No. 1 marked.)

DAWN GLASGOW,
having been first duly sworn, testified as follows:

EXAMINATION

QUESTIONS BY MR. COOK:

Q. Hi, Ms. Glasgow. Will you please state your full name for the record?

A. Dawn Delise Glasgow.

Q. And what is your position with Austin Montessori School?

A. Administrative executive.

Q. Ms. Glasgow, you understand you've been designated as a corporate representative on behalf of Austin Montessori School, Inc. here today; is that correct?

A. Yes.

Q. And you've been designated to testify on a number of topics; is that correct?

A. Yes.

Q. Do you have some understanding of what the Federal Rules of Civil Procedure obligate you to testify about here today?

A. I don't think so.

Q. Okay. I'm going to give you what's been marked as Exhibit 1. And let me ask you this. Do you

Dawn Glasgow as Corp. Rep. - 7/26/2012

10

them anymore because we're not clients.

Q. ADP, when you were a client of ADP they would have sent you written reports with payroll, correct?

A. Yes.

Q. And ADP would have sent quarterly reports, correct?

A. Yes.

Q. And ADP would have sent end-of-year reports; is that correct?

A. Yes.

Q. And it's true that those records would have indicated basically every paycheck that went to the employees of AMS; is that correct?

A. Yes.

Q. And when I say AMS today, you know what I'm talking about?

A. Yes.

Q. Austin Montessori School, Inc., correct?

A. Yes.

Q. Did you go back and look at any of the written reports that ADP had issued to AMS?

A. Yes.

Q. Does AMS have complete copies of the reports that ADP sent in 2009 and 2010?

A. No. We were missing some.

11

Q. And what reports was AMS missing during that time period?

A. I can't remember. Some from 2009.

Q. And when you say the reports were missing, are you talking about the bimonthly payroll reports or any of the quarterly reports?

A. Bimonthly. Maybe the quarterly. I didn't look at all the quarterly reports.

Q. Okay. In 2009 and 2010 did ADP pay independent contractors through either ADP or AmCheck?

A. No.

Q. It's fair to say that individuals that were paid through AmCheck or ADP AMS considered to be employees of AMS?

A. Correct.

Q. To be clear, that was for the time period 2009 and 2010, correct?

A. Yes.

Q. Besides looking at payroll reports from ADP and AmCheck, what other documents did you review in preparation for your testimony here today?

A. I can't recall any other documents.

Q. Did you review any 941 reports filed with the IRS?

A. No.

12

Q. Did you review any TWC quarterly reports filed with the TWC?

A. No.

Q. And you know what TWC stands for, Texas Workforce Commission?

A. Yes.

(Exhibit No. 2 marked.)

Q. Ms. Glasgow, I'm going to hand you what's been marked as Exhibit 2. And before I get to that, I'll put that aside for a second. Were there any other preparations that you made for your testimony here today besides reviewing the documents that you've already told me about?

A. Well, I talked to my attorney.

Q. Did you talk to anyone else besides your attorney in preparation for your testimony here today?

A. No.

Q. So you reviewed payroll reports from AMS, from ADP, and AmCheck, and you talked to your attorney. That was the scope of your preparation for your testimony here today?

A. That's what I remember.

Q. Okay. Now you can take a look at Exhibit 2. I want you to turn to the -- do you recognize what Exhibit 2 is?

13

A. Yes.

Q. And if you turn to the last page, I believe it's a document with your signature stating that the answers provided in Exhibit 2 are true and correct to the best of your knowledge; is that correct?

A. Yes.

Q. Do you remember signing off on these answers?

A. I remember signing this. I'd have to look to see what the questions were.

Q. Okay. Well, why don't you do that briefly because I'm going to ask a question about Interrogatory No. 24.

(Witness peruses document.)

Q. Have you had a chance to review the answer to Interrogatory No. 24?

A. Yes.

Q. And the answer which you signed to the best of your knowledge as true and correct was that the defendant is not an employer as that term is defined by the Family Medical Leave Act because it did not have 50 or more employees in each of 20 or more calendar weeks in 2009 or 2010; is that correct?

A. Yes.

Q. And that answer is correct to the best of your knowledge?

Dawn Glasgow as Corp. Rep. - 7/26/2012

14

A. Yes.

Q. Okay. You understand that it's AMS's contention in this lawsuit that it is not an employer under FMLA because it did not have a requisite number of employees; is that correct?

A. Yes.

Q. Okay. And I assume since that's the corporation's position, that there were less than 50 employees during the relevant time periods that the corporation has some definition as to what an employee is; is that correct?

A. Not documented, but. . .

Q. Whether documented or not, the corporation has some understanding of who is an employee and who is not; is that correct?

A. Yes.

Q. How does the corporation define who is an employee and who is not that provides work for AMS?

A. The person that provides us the most input on that is our CPA and we review what the need is for a specialist, I guess you might say, and when we would need -- what kind of help we need and we review with her if that's an independent contractor.

Q. On behalf of the corporation, do you have any understanding sitting here today as to what factors are

15

considered in determining -- in AMS determining who is an employee and who is an independent contractor?

A. Yes.

Q. And what are those factors?

A. Whether we tell them how to do their job or even have the ability or right to tell them how to do their job and whether they would listen or have the -- have the requirement to.

Q. Okay. What other factors?

A. I think there are factors as to where they do their job. I don't -- I wasn't really aware of that until this lawsuit, although she was, our CPA. And that's -- I mean, that's what I can remember.

Q. Who is your -- who is AMS's CPA?

A. Michele Sweeten.

Q. Is she here in Austin?

A. Yes. She advises us so that we file the proper -- that we're doing the right thing.

Q. Okay. And --

A. With respect to the law.

Q. I imagine what you were about to say was so that you file the correct documents with the IRS and the Texas Workforce Commission?

A. Correct, but we don't file any -- I mean, our payroll company files everything with Texas Workforce

16

Commission.

Q. And with the IRS?

A. All the W-2s. Our CPA helps us prepare the 1099s.

Q. I assume that AmCheck and ADP do the 941s?

A. Yes.

Q. You understand what a 941 is?

A. Yes.

Q. Okay. You've told me that the factors AMS considers in determining whether someone is an employee is whether you tell them how to do their job, whether AMS has the ability has the tell them how to do their job, whether or not the recipient listens to how to do their job, and the location of where they do their job; is that correct?

A. Not just tell them how but control their job.

Q. Are there any other factors AMS uses in determining whether someone is an employee or independent contractor?

A. One way that's sort of easy is if they are independent contractors already for other companies, if they are -- have their own businesses. It's not really our determination, it's just what it is.

Q. So in that case, AMS relies on determinations made by other employers?

17

A. Not so much that. They approach us already with their plan.

Q. So is AMS -- in complying with the law, does AMS rely on what the independent contractor, prospective employee is saying how they want to be paid?

A. No, we always review with our CPA and look at it, but if they already are doing it that way, if they're already -- we already know that they have a routine and a way of working that tells us that they can effectively do their job without -- that they'll be good contractors.

Q. Are there any other factors that -- on behalf of the corporation, are there any other factors that AMS considers in determining whether someone is an employee or an independent contractor?

A. Not that I can think of.

Q. Does the CPA provide you with her opinions as to whether or not an individual is an employee or an independent contractor in writing?

A. She has a document from the IRS that has kind of a list of things that help you determine, and she asks those questions and then says whether they're an independent contractor. I mean, it's just a review.

Q. Is it in writing?

A. The IRS -- I think it's IRS publication. I

Dawn Glasgow as Corp. Rep. - 7/26/2012

18

can't remember the number.

Q. No, I understand the IRS publication you're talking about, but you said that she looks at that publication and gives you advice; is that correct?

A. Yes.

Q. Does she do that in writing?

A. No.

Q. Are there any communications regarding whether someone is an employee or an independent contractor in writing with your accountant?

A. Not that I can recall.

Q. Is this something that happens once a year, once every two years? How often does this meeting with the accountant occur where certain employees, independent contractors are discussed?

A. She comes and meets with us at least quarterly, and if there's a question at that time that we're bringing on somebody that's an independent contractor in a position that's different than we've -- like maybe a new expert, then we would ask. But if it's just the same people operating in the same capacity or a different person operating in a capacity that a previous independent contractor operated, then we wouldn't bring it up again. It's the same thing.

Q. Okay. So if someone was classified as an

19

employee before and you had a new person coming on to fill that position, you would classify them as an employee without further review?

A. Actually that did happen with a driver of the shuttle when we -- the person we had in that position was leaving and we were looking for somebody else and Michele happened to be working with us on our quarterly reports, and so we were -- she goes over our payroll reports too, and that was when we determined that really the shuttle driver was always -- should have been classified as an independent contractor all along and that's how we should do it because they're just -- they get their own training, they're the expert in driving the bus, and so that's when we made that change was one of those meetings.

So for the guide positions, sure, we don't bring those up again, but for that position we did change from having that person classified as an employee to an independent contractor at her recommendation.

Q. How long have you worked with this accountant?

A. Probably about seven years.

Q. So I assume for --

A. Maybe.

Q. As far as the bus driver position, I assume for a number of years she looked at that position and

20

approved that it should be considered an employee rather than an independent contractor?

A. No, we don't review every single person and say are we classifying them properly. But in addition to that, in previous years the person who drove the shuttle was -- operated in another capacity too. They were maybe an assistant in a classroom so we combined positions. So it wouldn't have come up because we had -- that person was an employee and then they also drove the shuttle.

Q. So are you saying that your accountant doesn't review every position every time?

A. No, she does not.

Q. Okay. How often does she review the positions that are being submitted as independent contractors or employees to the IRS?

A. On request.

Q. On request. Isn't that one of her job functions as an accountant, to look at these positions and determine whether or not they're correct?

MR. MARSHALL: Objection, speculation.

Q. (By Mr. Cook) Strike that question. Is that one of the reasons why you hire an accountant, is to make sure that you're complying with the law as far as these classifications?

21

A. She does it on request, but once she said that a position is a contracting position and we don't change it, it stays the same. But she's never -- I guess there's never been a risk that we've seen of classifying someone as an employee when they were really a contractor. I mean, that wouldn't get you in trouble with the IRS, so I guess we've never looked at it as a need to review every single position that were employees and said that they needed to be contractors. It was only when we happened to have this conversation about the shuttle and that's when she said this is -- she went over the list and we determined that. And, I mean, that was a couple of years ago.

Q. Is what you're saying is that AMS's priority is to make sure that independent -- or that an -- independent contractors are not misclassified, that AMS is not worried if an employee is misclassified because there's no tax penalties for that?

A. I wouldn't say we're not worried about it. I'm just trying to explain why we wouldn't have reviewed every single position.

Q. If the bus driver was classified as an employee before, why did you decide to review that specific position with your accountant?

A. She happened to be there when we were making a

Dawn Glasgow as Corp. Rep. - 7/26/2012

**22**

transition. We were pulling someone off the payroll, and I think it probably had to do with correcting a pay and then pulling her off and terminating her. Sometimes we make mistakes when submitting. Otherwise, it probably would have not come up.

Q. Did you ask her to specifically review that specific position as to whether it was an independent contractor or employee?

A. I don't know if I asked her. She -- there was probably some question about an hourly -- putting hours in or a certain amount. I don't know that I asked her. It just came up.

Q. Well, did she ask you about the job duties of the bus driver?

A. Yes.

Q. And what was -- tell me about that discussion.

A. It's really hard to remember. I think it all pertained to the questions on the -- what classified an independent contractor.

Q. Has AMS sought any advice on whether or not certain individuals are employees or independent contractors as defined by the FMLA?

A. Sought any advice? No, I don't recall.

Q. What is your understanding on behalf of the corporation of how an employee is defined under the

**23**

FMLA?

A. Oh, let's see, under FMLA, an employee works -- we have the right to control and direct their work. They work on location or within a certain mileage from the location. They work at least a certain number of weeks in a year. And I can't -- that's what I can recall.

Q. Let me clarify that question because I think it was -- I think there's a couple of parts to it. You understand that for an entity to be covered it has to have a certain number of employees?

A. To be covered?

Q. By the FMLA.

A. Oh, yes.

Q. And you understand that that number is 50 for a certain period of time per calendar year?

A. For a certain period of time, for a certain number of weeks, yes.

Q. Okay. And when did you come to that understanding?

A. Through this lawsuit.

Q. Before this lawsuit did the corporation have any understanding regarding FMLA coverage?

A. I personally knew because I've worked at large corporations and I had went out on leave under FMLA, so

**24**

I was familiar with it.

Q. Did the corporation have any understanding of the requirement that it would be covered by the FMLA if it had 50 or more employees for 20 or more calendar weeks in a given year?

A. No.

Q. Did the company make any efforts before this lawsuit to count the number of employees it had to determine whether or not it was covered by the FMLA?

A. No.

Q. In hindsight, though, the company has made that count and has calculated and argues it has less than 50 employees in 2009 and 2010 for 20 or more calendar weeks in a year; is that correct?

A. Yes.

Q. How does -- in making that calculation and counting the number of employees for FMLA coverage, how is the corporation defining the term employee under the FMLA?

A. Someone that we hired for a specific position, that we directed and controlled, that worked on location, and that we had the right to direct and control, that we had the right to hire and fire.

Q. Anything else? Any other factors that the corporation has used to count the number of employees to

**25**

determine FMLA coverage for 2009 and 2010?

A. Not that I can think of.

Q. You've said a few times that directing and controlling the work is one of the factors AMS uses in determining whether or not someone is an employee; is that correct?

A. I've said that.

Q. Including under the FMLA?

A. Yes.

Q. What does the corporation mean by the term direct and control work?

A. If you work here you will do this job in this way. If you -- if we just change our mind, you have to change the way you're doing it if you agree to keep working here. We have the right to, for instance, in a classroom add children as long as we're not violating other laws like too many children in a room, things like that.

Q. I know the corporation has made efforts to determine whether or not certain individuals are employees or independent contractors for tax purposes and for TWC purposes, but before this lawsuit did the corporation ever make efforts to determine whether certain jobs were independent contractors or employees under the FMLA?

Dawn Glasgow as Corp. Rep. - 7/26/2012

A. Under FMLA, no.

Q. Does the corporation consider itself to be covered by the FMLA as we sit here today?

A. No.

Q. On behalf of the corporation has the corporation ever been covered by the FMLA?

A. Not that I --

MR. MARSHALL: Objection, speculation.

A. Not since I've been there.

Q. (By Mr. Cook) Has the corporation made efforts to avoid being covered by the FMLA?

MR. MARSHALL: Objection, speculation.

A. No. No.

Q. (By Mr. Cook) There was no purposeful consideration to let's keep our employees less than 50 to avoid the FMLA?

A. No.

MR. MARSHALL: Speculation, objection.

Q. (By Mr. Cook) You understand that one of the issues in this lawsuit among many is that AMS decided not to renew the contract with Caroline Clark; is that correct?

A. That's not correct. We offered her another contract position. She declined.

Q. You understand that one of the issues in this case is that you did not renew her teaching contract as a guide; is that correct?

A. That's correct.

Q. Okay. If AMS had been covered by the FMLA, would you have done anything different in regard to not offering her a contract as a guide?

MR. MARSHALL: Objection, speculation.

A. No, we would probably -- there are probably some forms that -- like notices that we should have -- would have given if had we been subject to FMLA. That's what we would have done differently.

Q. (By Mr. Cook) But even if the corporation were subject to FMLA, they still would have failed to renew her teaching contract?

MR. MARSHALL: Objection, speculation.

A. Would have chosen to offer her the other position.

Q. (By Mr. Cook) Which resulted also in not giving her a contract with a teaching position?

A. Yes.

Q. Okay. On behalf of the corporation, are you aware of any reports to the IRS in the past few years that have been incorrect in regard to the number of employees employed by the corporation?

A. No, I'm not aware of any.

Q. And that's partly because the corporation makes efforts to ensure that those are accurate by hiring an accountant; is that correct?

A. Yes, that's one of the ways and having a payroll company.

Q. Are there any other ways the corporation ensures that the information provided to the IRS is accurate?

A. Not that I can think of.

Q. On behalf of the corporation, are you aware of any reports to the Texas Workforce Commission that are inaccurate?

A. Well, sometimes when we submit payroll, like especially when we switch to a different payroll company, you could terminate an employee, for instance, in a -- on the last payroll company, if you terminated an employee while you were submitting payroll they didn't get paid, like you put the termination date and they wouldn't get paid. With the other payroll company -- I might have them reversed -- you might terminate them but they got paid for that pay period but they really weren't there and then you have to do a correction. And I don't know -- I never would go back to the Texas Workforce Commission report and see did they show up in this month because of that mistake or --

anyway, that's the only mistake that would show up in there, is that some kind of error in submitting payroll due to not understanding. And I didn't do the payroll for 2009. We had a different person doing it and those things could have happened and maybe they weren't corrected in the same way. That's the only mistake that would happen.

Q. Who was the person in charge of payroll in 2009?

A. Janna Banks. She might not have done it for all of 2009 but for a lot of it.

Q. You started having responsibility over payroll at some point in 2009 and throughout 2010, correct?

A. Yes.

Q. Did you review the reports before they were sent to the IRS or the TWC?

A. No.

Q. Did you review them after they were sent to the IRS or the TWC?

A. No.

Q. You've had a chance to review them since that time, though; is that correct?

A. I've had a chance, yes.

Q. And you said there may be mistakes in the TWC, and my specific question on behalf of the company, are

Dawn Glasgow as Corp. Rep. - 7/26/2012

30

you aware of any mistakes in the TWC reports?

A. No.

Q. And you had a chance to review those in the last few days; is that correct?

A. I had the chance. I always have the chance to review them, but I did not review them.

Q. You did not review the TWC reports in preparation for this deposition?

A. No, I just familiarized myself with what FMLA was.

Q. On behalf of the corporation, does the corporation define employee differently when it's reporting the number of employees to the IRS and when it's reporting the number of employees to the TWC?

A. No. We don't report either one of those things directly from -- it goes through our payroll company.

Q. On behalf of the corporation, though?

A. Right. Right. No.

Q. Ultimately the corporation is responsible for the papers that get filed with the IRS and the TWC, correct?

A. Yes. There's no -- I guess I was saying that because there's no opportunity for error because only employees are reported to the payroll company and they report to the TWC and to the IRS that information. So

31

it's not me sitting in my office filling out a form incorrectly.

Q. Besides getting advice from the accountant on whether certain individuals are employees or independent contractors, has the corporation sought any other professional advice as far as those classifications?

A. No.

Q. If you'll turn to Exhibit 1. If you look at number 2 in the notice of deposition, you've been designated to testify as to the names of each individual in defendant's payroll in each week of 2009, the classification of those individuals by defendant as employees or independent contractors, and the facts on which those classifications were based. Do you see that?

A. Uh-huh. Yes.

Q. Are you prepared and able to testify as to number 2 on Exhibit 1?

A. To the best of my memory.

Q. Okay. Well, does your memory allow you to testify to all those individuals that were on the payroll in 2009?

A. I will not be able to recall all of the names of the individuals on the payroll in 2009.

Q. Well, did you make efforts to look at documents

32

that would enable you to testify to number 2?

A. Yes, I looked at the documents, but I can't remember all of the names.

Q. I want you to name the individuals on -- are you going to be able to testify as to which individuals were on the payroll for each week in 2009?

A. No.

Q. Did you make any preparations or efforts that you can testify as to that today?

A. Not -- I cannot recall specifically every person that was on the payroll for each week in 2009.

Q. Did you look at information in preparing for this deposition which provided you with the names on defendant's payroll for each week in 2009?

A. I looked at information and -- but it's not in a way that I could remember all of -- that wasn't -- I was familiarizing myself with it, not trying to commit it to memory.

Q. What documents did you look at that showed you the individuals on defendant's payroll for each week of 2009?

A. The payroll register reports that I was telling you about.

MR. COOK: And we can talk about this after a break, but I think those need to be produced.

33

MR. MARSHALL: Uh-huh.

MR. COOK: As soon as possible.

MR. MARSHALL: I've got a -- I actually have a copy. We had to get them from -- we didn't have them -- well, we had a bad copy in our possession, but we got a brand-new copy. There's a gap in it, though. I've got a copy here today, which I can give you.

MR. COOK: That would be great, especially if she used it to refresh her memory.

MR. MARSHALL: She used it -- so there is a gap in it, though. It's a small gap.

MR. COOK: We'll deal with that during a break.

MR. MARSHALL: Now, these are Bates'd, and I want to put on the record that I don't think the Bates are going to remain the same.

MR. COOK: That's fine.

MR. MARSHALL: So just for the record --

MR. COOK: The record, the Bates labels --

MR. MARSHALL: Are inaccurate. Are not official yet.

MR. COOK: Let's go off the record for a few minutes.

(Recess taken from 10:39 a.m. to 10:56 a.m.)

Dawn Glasgow as Corp. Rep. - 7/26/2012

**34**

(Exhibit No. 3 marked.)

Q. (By Mr. Cook) Ms. Glasgow, we're back from break. Before break your attorney handed me what I've marked as Exhibit 3 and these are payroll records from ADP; is that correct?

A. That's correct -- well, this is a report from AmCheck at the back.

Q. And I know these aren't going to be the actual Bates labels we use, but for the purposes of asking about this document you're talking about AMS 823 to 835?

A. Yes.

Q. That's from AmCheck?

A. Yes.

Q. And what does that show, 823 to 835?

A. It shows the checks that were issued to employees from the time AmCheck starting doing our payroll through 2010. So it looks like 7/30 to 12/31 of 2010.

Q. Is this a complete record from AmCheck?

A. For this report. This is one of the ones I requested that shows the employee, the check number, the check date and the pay, the gross pay for that that's blacked out.

Q. Does 823 to 835 reflect employees as defined by the corporation that were paid during these time

**35**

periods?

A. These -- yes, these were the employees.

Q. In simple terms, this doesn't reflect independent contractors or non-employees that were getting paid?

A. Correct.

Q. Correct meaning no, it's not paying independent contractors or non-employees?

A. It's not -- there are no independent contractors or non-employees listed on this report.

Q. Thank you. And how did you get 823 to 835?

A. I went to the AmCheck website and pulled a report.

Q. Okay. So you have the ability to pull this report for every week after -- every payroll period after you became a client of AmCheck?

A. Correct.

Q. So if there's gaps in 823 to 835, and I don't have a chance to look at it right now, you would be able to fill those gaps easily from your computer?

A. Yes.

Q. AMS 766 through AMS 822 are payroll reports from ADP, correct?

A. Yes.

Q. And how did you get these?

**36**

A. I called ADP service center and they -- I requested these reports and they sent me an e-mail where I could download a file.

Q. Okay. What did you specifically request?

A. The payroll register reports.

Q. Okay. Is the payroll register reports the bimonthly payroll report --

A. Yes.

Q. -- which is exhibited in part by page 1 of this 766?

A. Yes.

Q. Okay. So you got what you requested?

A. Well, it sounds like there are gaps, so --

Q. But I'm talking about the form of the document is what you specifically requested?

A. Yes.

Q. Okay. And they provided you with some but not all of the relevant data for the relevant time period?

A. I'm assuming they have. I didn't review these in detail. I'm assuming it's all there. I asked for the payroll register reports and I've gotten some of them.

Q. You asked for 2009 and 2010?

A. Yes.

Q. Okay. And you did that by contacting ADP?

**37**

A. Yes.

Q. Did they charge you for this?

A. They told me they typically do but she wouldn't this time, so. . .

Q. Sounds very much like ADP.

A. I know. So I didn't feel like I could rush her too much when I wasn't getting it, but --

Q. You said they e-mailed you. Was it a link with a password?

A. Yes, it was a link where I had to go in and create a password and retrieve the document.

Q. Did you actually get access through that link to the database?

A. No, just this document.

Q. And was it a PDF?

A. It was a TIFF file and I converted it to a PDF.

Q. The whole thing was one TIFF file?

A. Yes, I think so. Yes.

Q. Okay. You converted to a PDF, pressed print?

A. Uh-huh.

Q. I'm just trying to make sure how we got from there to here.

A. Yes.

Q. Okay. And so if they sent you incomplete information, the original TIFF file was incomplete?

38

A. That's right.

Q. And did you review this document or these documents in preparation for your testimony here today?

A. No.

Q. Have you looked through them at all?

A. Briefly, like -- yes, briefly.

Q. Does it change -- do these documents change any of your positions on behalf of the corporation as to whether or not AMS is covered by the FMLA during 2009 and 2010?

A. No.

Q. No, okay. You've testified you're unable to testify sitting here today as to which employees were paid as employees for every work week in 2009 and 2010; is that correct?

A. That's correct.

Q. I may have a tool that may help us, maybe not.

(Exhibit No. 4 marked.)

Q. I hand you what's been marked as Exhibit 4 to the deposition, Ms. Glasgow. Do you recognize Exhibit 4?

A. Yes.

Q. This is a document that was produced by your lawyers in this case to our side; is that correct?

A. I did it.

39

Q. You did it. I assume you gave it to your lawyers and they produced it to our side of this case; is that correct?

A. Yes. Yes.

Q. You created Exhibit 4; is that correct?

A. Yes.

Q. What is Exhibit 4 then?

A. I think I took all -- I think there was a question about who were the people on the list, on the contact list that we distribute stuff on it, and I think what I did is I took all of them and said what they did and what their position was. So during January to June these were the people that showed up on the list and what -- then what they did. It doesn't mean that everyone worked all of those weeks; it just means these are people that are on the list so they worked at some point.

Q. When you say they're on the list, what list are you talking about?

A. We distribute a contact list for -- to all of our staff and it has -- just has staff members and it has people who they might need to have the phone number for, if that makes sense.

Q. Well, let me ask you this. On Exhibit 4 we're looking at the first page, it's January to June 6 of

40

2009.

A. Right.

Q. There's 49 individuals listed in the category as employee; is that correct?

A. On this list, yes.

Q. Is it correct in general?

A. Oh, let me make sure.

MR. MARSHALL: Take your time.

A. The only two things I see on this page that don't look correct is Mandy Klein never really changed her name so she's really Amanda Weeks, but she was listed on that list -- contact list. And then Kjersti Burkham, I have her listed as employee because that's the way we were paying her during that time, but she's that shuttle driver thing that we probably should have had her as -- but we had her as employee, but we probably should have had her as a contractor based on our information from our CPA.

Q. Okay. Well, let's leave out Ms. Burkham. For the other 48 individuals listed as employee, the corporation would agree that those were employees for the corporation between January and June 6 of 2009?

A. I don't know that it was every week. Sometime during that period.

Q. So let me ask it a little bit differently then.

41

For the periods they worked, whether it was every week or not every week, the individuals with the except [sic] of Ms. Burkham listed between 1 and 49 on here were employees of the corporation?

A. For some period during January to June of 2009, yes.

Q. Okay. None of these employees with the exception of maybe Ms. Burkham were independent contractors that provided services for the corporation between January and June 6 of 2009. And when I say -- the people I'm talking about between 1 and 49.

A. None of them except for Ms. Burkham. I just -- I remembered Adam. I don't think he was an employee. Adam Aguirre, I think he left in December and I mistakenly put him on here. I was going to look at the payroll record here. Adam Aguirre, he graduated. Yes. See, that's an example of one of those people. He never worked in January, Aguirre, Adam Aguirre, number 2.

Q. He was replaced by someone; is that correct?

A. Yes. Let's see, who was he replaced by?

Q. Is it Gilberto Miranda?

A. Okay, maybe so. Well, I don't -- let me look, hold on. Possibly. That sounds right.

Q. I'm sorry to take everyone's time, but I think we have to do this for the record. And what I want to

42

do is, I'm going to go down by name and I want you to agree on behalf of the corporation whether these individuals were employees of the corporation at any time between January and June 6 of 2009. Okay?

A. Okay.

Q. And you understand I'm not asking whether they worked every week; I'm just saying were they considered employees by the corporation at some point in time between January and June 6 of 2009.

A. Yes, I understand.

Q. Socorro Aguilar?

A. Yes.

Q. Adam Aguirre?

A. No.

Q. Joseph Aken?

A. Yes.

Q. Janna Banks?

A. Yes.

Q. Kadie Beasley?

A. Yes.

Q. Erin Boardman?

A. Yes.

Q. Sonal Bowness?

A. Yes.

Q. Eric Breeding?

43

A. Yes.

Q. Amanda Brown?

A. Yes.

Q. Donna Bryant Goertz?

A. Yes.

Q. Kjersti Burkham?

A. Well, we classified her as an employee at that time.

Q. Caroline Clark?

A. Yes.

Q. Mary Ann Collins?

A. Yes.

Q. Johnnie Denton?

A. Yes.

Q. Angela Eagle?

A. Yes.

Q. Brandi Fischer?

A. Yes.

Q. Lori Friedman?

A. Yes.

Q. Jesse Gevirtz?

A. Yes.

Q. Dawn Glasgow?

A. Yes.

Q. Donald Goertz?

44

A. Yes.

Q. Kate Hearne?

A. Yes.

Q. Jackie Howard?

A. Yes.

Q. Lynn Hunt?

A. Yes.

Q. Kelly Jarrell?

A. Yes.

Q. Mandy Klein?

A. Yes.

Q. Gwen Logan?

A. Yes.

Q. Thomas Logan?

A. Yes.

Q. Natalie London?

A. Yes.

Q. Mary Long Geil?

A. Yes.

Q. Amy Mahnken?

A. Yes.

Q. Sasha Marble?

A. Yes.

Q. Veronique Mareen?

A. Yes.

45

Q. Cheryl McGee?

A. Yes.

Q. Amber Miller?

A. Yes.

Q. Valerie Monda?

A. Yes.

Q. Lois O'Brien?

A. Yes.

Q. Jerry Pippins?

A. Yes.

Q. Nick Pippins?

A. Yes.

Q. Lindsay Porter?

A. Yes.

Q. Erik Rivas-Rivas?

A. Yes.

Q. Donna Romine?

A. Yes.

Q. Margarita Ruiz?

A. Yes.

Q. Francoise Sansoni?

A. Yes.

Q. Jennifer Schiller?

A. Yes.

Q. Nancy Scott?

46

A. Yes.

Q. Bill Sneed?

A. Yes.

Q. John Snyder?

A. Yes.

Q. Yvonne Solorio?

A. Yes.

Q. Elizabeth Suggs?

A. Yes.

Q. And one of those people, their name changed. Can you remind for the record?

A. Mandy Klein is actually Amanda Weeks. Sasha Marble is actually Leslie Marble.

Q. Now, on behalf of the corporation, I understand that you dispute whether or not Kjersti Burkham was an employee or not, but for the remaining individuals that you've named, is the best way to determine whether or not they were on the payroll of the company to look at the records that are exhibited by Exhibit 3?

A. Yes.

Q. Is there any other way we can determine whether or not someone was on the payroll during that time period?

A. No.

Q. So to determine -- for my side to determine who

47

was on the payroll each week, we're going to need complete records of what's exhibited by Exhibit 3; is that correct?

A. Yes, and that will give you every two weeks. Every week? When someone new is hired we have to go back to their hire date to know.

Q. For this time period that we've looked at, January to June 6, 2009, can you think of any of these individuals that weren't working at the beginning of January?

A. Possibly Elizabeth Suggs.

Q. I think if you look at Exhibit 3, she's listed as being paid as an employee in the first week of January.

A. Okay. I just know she didn't work the whole year in that capacity, but I'd have to go back and look at the payroll records to know. And -- oh, and she's Sharon Elizabeth Suggs.

Q. Besides the -- for the period January to June 6, 2009, are there any other individuals the corporation considered as employees other than what we've just discussed?

A. Well, Gilberto Miranda was a new hire.

Q. And he would have been an employee at some time between January and June 6 of 2009?

48

A. Yes.

Q. To determine whether or not he worked each week or biweekly, we need to look at the pay records?

A. Yes.

Q. So is it fair to say that between January and June 6, 2009, 48 employees worked for the company at some point in time?

A. Yes, I think so.

Q. Well, we got to do better than that. I'm asking you in your opinion on behalf of the corporation as to whether that's correct.

A. This list was created based on that contact sheet. To know for sure I would have to look at the payroll records.

Q. The payroll records will be determinative of which employees were employed during this time period?

A. Yes.

Q. So there may be employees on the payroll records that aren't listed here. Is that possible?

A. That's possible. It's also possible the opposite, but not that I can remember.

Q. Okay. Now, below 49 there's one, two, three, four, five, six -- seven individuals listed on the first page of Exhibit 4.

A. Yes.

49

Q. Did the corporation -- does the corporation consider those individuals to be independent contractors?

A. Not all of them.

Q. Which individuals on that are not considered to be independent contractors?

A. Jenny Chang, Debra Groves, Stephanie Hunt, Brooks Whitmore, Leah Zeger, those people.

Q. What does the corporation consider them to be?

A. Independent music teachers.

Q. So is that different than an independent contractor?

A. We don't -- we're not involved in any way in paying them or setting their rates or knowing the rates or knowing who signs up. They just use our space.

Q. And that was Jenny Chang, Debra Groves, Stephanie Hunt, Brooks Whitmore, and Leah Zeger; is that correct?

A. Correct.

Q. The music folks?

A. Yes.

Q. And does the corporation consider Leslie Grove and Calvin Carter to be independent contractors?

A. Yes.

Q. Does the corporation compensate the music folks

50

at all?

A. No.

Q. Do the music folks compensate the corporation at all?

A. Yes. They pay a small amount per student per month for the use of the space and it's all self-reporting. I mean, we don't keep track of it. They tell us.

Q. Do they have any guidelines as far as Montessori standards that they need to follow in performing the services for your students?

A. They have certain times that are available to do the lessons.

MR. COOK: Objection, nonresponsive.

Q. (By Mr. Cook) One of the things I've learned in this case is that there's rigorous standards for an AMI school; is that correct?

A. Yes.

Q. And I assume that AMS ensures that the individuals that are interacting with its students follow those standards; is that correct?

A. At least they don't contradict them, yes.

Q. What does the school do to ensure that the music teachers aren't contradicting AMI standards when they provide services to the students?

51

A. They are all trained in the Suzuki method and that's it.

Q. Okay. Tell me what that is.

A. It's -- I'm not trained in that nor did I receive instruction, but I believe it is a more natural way of learning music where you use your ear. Rather than learning like the names of the notes, you hear it.

Q. It's a method that AMS believes is consistent with AMI standards?

A. Yes, consistent with Austin Montessori School.

Q. Are there standards of Austin Montessori School that are inconsistent with AMI standards?

A. AMI has never made a statement about music instruction as far as I know, so I can't say it was their standard.

Q. Sure. But you can -- I assume in your position you can determine whether or not the Suzuki standards are consistent with AMI standards.

A. We don't contradict AMI standards, so it wouldn't be inconsistent with AMI standards.

Q. Is AMS free to do what it wants as long as it's not contradicting AMI standards?

A. Well, and the health department standards and the fire, you know, any law.

Q. Sure. But putting aside police and fire

52

regulations and things like that.

A. And all laws, yes.

Q. Okay. And I understand that. I guess my question I'm getting at is, does AMS follow strict guidelines by AMI or does AMI just kind of provide a general framework for how AMS is to do the work it does on behalf of children?

A. There are strict standards and then there are areas that aren't specifically detailed on how you do it and that's where the differences in schools come into play, how they decide to do those areas that are not specifically defined.

Q. So it's fair to say that every school that operates under AMI standards doesn't do things the same way?

A. Exactly.

Q. Is there a set of written guidelines of AMI standards that the schools look to to make sure they're following AMI?

A. Yes.

Q. Is that a yes?

A. Yes.

Q. Is that a textbook, is it a set of textbooks? What does that look like?

A. It's -- no, it's not. It's a list of some

53

specific things and then some things that say -- and the guides will be AMI trained and operate in the way that's consistent with what's in their albums. Albums are like a set of law books, I guess. It just says you do this this way, you do this this way, you do this first, this second. Now, I don't know what all of that is because I'm not trained. So we have AMI people come and review and we also have consultants who are specifically trained who come and see is that the way we're operating.

Q. And they look at the albums to determine what the standards are?

A. They know the albums so they --

Q. Is the albums a set of -- is it a physical thing?

A. Yes, physical thing.

Q. Okay. And it's AMI's publication?

A. It's not -- it's kind of like the secret, you only get the albums if you're trained. They don't want people just getting them and going off and. . .

Q. But it's a set of books?

A. That they create, yes.

Q. Are there any other guidelines besides what is in the albums?

A. Yes, there's all of Maria Montessori's

Dawn Glasgow as Corp. Rep. - 7/26/2012

54

writings, there's interpretations of her writings, there's -- yes, there's lots of written.

Q. Besides Maria Montessori's writings and the albums, what other major publications provide the rules for AMI?

A. Trainers can write their interpretations of her writings and the practices and that can sometimes change what's in the album. There could be reinterpretations and then something gets pulled and changed or reordered or. . .

Q. Has the AMS published or created any of its own interpretations of AMI standards in written form?

A. We have a staff handbook that probably does that on some -- in some areas, but it's not anything that's been accepted by AMI as reinterpretation or anything like that.

Q. Let's go back to Exhibit 4. Go to the second page. And again on the second page of Exhibit 4 it lists 48 individuals as employee for the time period August 2009 to June 2010; is that correct?

A. Yes.

Q. And I -- to clarify, you've testified that doesn't mean that they worked every single week during this time period?

A. Yes.

55

Q. Let me ask it a little bit differently, though. Are you aware of any of these individuals on the second page of Exhibit 4 listed between 1 and 48 that only worked part of the school year?

A. Possibly Janna Banks. I can't remember when she left. Erin Dean left, but I can't remember exactly when. Judy Johnson was the same situation as Kjersti Burkham and she did leave, but I can't remember when that was either. Oh, and Judy Johnson, they're both listed -- oh wait, Judy and -- yeah, Kjersti, that's right. There are a lot of people that rotate in and out, especially in assistant positions.

Q. Let me ask you again. We'll do the list thing, but what I want to know is whether the corporation considered the individuals I'm going to read out as employees for FMLA purposes during this time period. Okay?

A. For some part of it.

Q. Yes.

A. Okay.

Q. Between August 2009 and June 2010. You understand my question?

A. Yes.

Q. Okay. And so that question as to whether or not they were employees under that FMLA at some period

56

during August 2009 and June 2010. Socorro Aguilar?

A. Yes.

Q. Joseph Aken?

A. Yes.

Q. Janna Banks?

A. Yes.

Q. Kadie Beasley?

A. Yes.

Q. Erin Boardman?

A. Yes.

Q. Sonal Bowness?

A. Yes.

Q. Margie Breckwoldt?

A. Yes.

Q. Amanda Brown?

A. Yes.

Q. Donna Bryant Goertz?

A. Yes.

Q. Caroline Clark?

A. Yes.

Q. Mary Ann Collins?

A. Yes.

Q. Rachel Davison?

A. Yes.

Q. Erin Dean?

57

A. Yes.

Q. Johnnie Denton?

A. Yes.

Q. Angela Eagle?

A. Yes.

Q. Brandi Fischer?

A. Yes.

Q. Lori Friedman?

A. Yes.

Q. Jesse Gevirtz?

A. Yes.

Q. Dawn Glasgow?

A. Yes.

Q. Donald Goertz?

A. Yes.

Q. Megan Haley?

A. Yes.

Q. Kate Hearne?

A. Yes.

Q. Lynn Hunt?

A. Yes.

Q. Kelly Jarrell?

A. Yes.

Q. Judy Johnson?

A. Well, we classified her as an employee at that

58

time.

Q. Rebecca Kaiser?

A. Yes.

Q. Mandy Klein?

A. Yes.

Q. Gwen Logan?

A. Yes.

Q. Thomas Logan?

A. Yes.

Q. Natalie London?

A. Yes.

Q. Mary Long Geil?

A. Yes.

Q. Amy Mahnken?

A. Yes.

Q. Sasha Marble?

A. Yes.

Q. Veronique Mareen?

A. Yes.

Q. Melanie Matkin?

A. Yes.

Q. Cheryl McGee?

A. Yes.

Q. Amber Miller?

A. Yes.

59

Q. Valerie Monda?

A. Yes.

Q. Lois O'Brien?

A. Yes.

Q. Callie Osborne?

A. Yes.

Q. Jerry Pippins?

A. Yes.

Q. Erik Rivas-Rivas?

A. Yes.

Q. Donna Romine?

A. Yes.

Q. Margarita Ruiz?

A. Yes.

Q. Bill Sneed?

A. Yes.

Q. John Snyder?

A. Yes.

Q. Yvonne Solorio?

A. Yes.

Q. Kate Swope?

A. Yes.

MR. COOK: Staying awake, Bryan?

MR. MARSHALL: Yeah, kind of expected this.

60

Q. (By Mr. Cook) The 48 individuals that we just discussed with the exception of you made an issue regarding Judy Johnson --

A. Yes.

Q. -- the corporation didn't consider any of those 48 people with the exception of maybe Judy Johnson as independent contractors?

A. That's correct.

Q. And they don't consider any of those 48 besides maybe Judy Johnson to be independent contractors today?

A. That's correct.

Q. Was Judy Johnson the only bus driver during this time period of the school year?

A. I can't remember when Lucinda started.

Q. Has the school ever -- the corporation ever had two bus drivers at the same time?

A. No.

Q. Okay. So they only have one bus driver?

A. Yes.

Q. Okay. And do the bus drivers do anything besides drive the bus?

A. Not since -- I mean, not -- no.

Q. Have any bus drivers ever done anything besides drive the bus?

A. Yes.

61

Q. Which ones?

A. I don't know their names. They had them combined years ago.

Q. Was that before your time?

A. I think so. It could have been at the very beginning when I started working, there may have been somebody that had overlap.

Q. And when did you begin working?

A. In 2002. 2002.

Q. Is it fair to say, then, in 2009 and 2010 -- actually, strike that.

Is it fair to say that after 2005 the bus driver's only function for the school was driving the bus?

A. That's fair to say.

Q. During August 2009 and June 2010 are you aware of any other employees that may have worked for the company even for one week besides that are listed on page 2 of Exhibit 4?

A. Not that I can think of.

Q. But again, the payroll records will prove that?

A. Yes.

Q. And just to clarify the record, I asked you a long list of questions about who was an employee on page 1 of Exhibit 4?

62

A.   Right.

Q.   You understood when I was asking that question I meant employee as it's defined by the FMLA?

A.   Yes.

Q.   Okay.  Which is the same question I asked as to page 2.

A.   But don't employees -- I can't be sure that they worked 20 weeks.

Q.   And I'm not -- I'm not asking that question. I'm asking that in -- as to the definition as used to determine whether or not there's 50 or more, that's what I'm talking about.  Does that make sense?

A.   Okay.

Q.   And when you say okay you got to answer me, does that make sense to you?

A.   Not really.

MR. MARSHALL:  I thought when you started with the list on page 1 that you said people that AMS considers employees.

MR. COOK:  Yes.

MR. MARSHALL:  Okay.

Q.   (By Mr. Cook)  On page 2 I said AMS considers employees under the FMLA and what I meant was I meant to ask the same question on page 1.

A.   Oh.  Well, when they're hired and they haven't

63

worked one day and we hire them as employees, that would meet the definition of FMLA, but I get kind of confused about when the 20 weeks comes in.  I think that's when a corporation is subject to FMLA, not whether an employee is defined.

Q.   And what I'm just meaning is for the purposes of counting the number of employees, AMS's definition of employee.

A.   Yes, that -- the ones we went over is --

Q.   So we're on the same page on 1 and 2?

A.   Yes.

Q.   Okay.  Go to page 3 of Exhibit 4.  And again, this is between the time period August and December 2010.  And there's a number between 1 and 49. My question is for the purposes of counting employees under the FMLA, did these individuals listed between 1 and 49, were they employees at some point between August and December of 2010?

A.   Yes.  I just noticed there's an error where -- oh, it's the whole thing.  It's first name, last name, not last name, first name.

Q.   Okay.  Is there anyone in this 49 that is not -- was not an employee for the purposes of counting employees?

A.   Oh, yeah, Patricia Oriti is listed up here, but

64

she's not an employee and never has been.  I don't know why -- that must have just been a -- she's listed down here as a consultant.  I don't know why she's on here.

Q.   We're going to go through each of the names --

A.   Yeah.

Q.   -- but go ahead and look and see if there's anyone else.

A.   I think what I did is I converted it to -- anyway, it doesn't matter.

Q.   So for the purposes of counting employees under the FMLA, I'm going to read you a list and I want to know if the corporation considered these employees at some point in time between August and December of 2010.

A.   Okay.

Q.   Alexis Harper?

A.   Yes.

Q.   Amanda Brown?

A.   Yes.

Q.   Amber Miller?

A.   Yes.

Q.   Amy Mahnken?

A.   Yes.

Q.   Angela Eagle?

A.   Yes.

Q.   Bill Sneed?

65

A.   Yes.

Q.   Brandi Fischer?

A.   Yes.

Q.   Callie Osborne?

A.   Yes.

Q.   Caroline Golden?

A.   Yes.

Q.   Cheryl McGee?

A.   Yes.

Q.   Daniel Murphy?

A.   Yes.

Q.   Dawn Glasgow?

A.   Yes.

Q.   Donald Goertz?

A.   Yes.

Q.   Donna Bryant Goertz?

A.   Yes.

Q.   Elizabeth Padron?

A.   Yes.

Q.   Elizabeth Suggs?

A.   Yes.

Q.   Erik Rivas-Rivas?

A.   Yes.

Q.   Erin Boardman?

A.   Yes.

66

Q. Gwen Logan?
A. Yes.
Q. Janice Kearley?
A. Yes.
Q. Jennifer Suarez?
A. Yes.
Q. Jerry Pippins?
A. Yes.
Q. Jesse Gevirtz?
A. Yes.
Q. Jesse Jahnke?
A. Yes.
Q. John Snyder?
A. Yes.
Q. Johnnie Denton?
A. Yes.
Q. Joseph Aken?
A. Yes.
Q. Kadie Beasley?
A. Yes.
Q. Kate Hearne?
A. Yes.
Q. Kelly Jarrell?
A. Yes.
Q. Lois O'Brien?

67

A. Yes.
Q. Lori Friedman?
A. Yes.
Q. Lynn Hunt?
A. Yes.
Q. Mandy Klein?
A. Yes.
Q. Margarita Ruiz?
A. Yes.
Q. Mary Collins?
A. Yes.
Q. Mary Long Geil?
A. Yes.
Q. Mary Ann Collins?
A. Yes.
Q. Meg Haley?
A. Yes.
Q. Melanie Matkin?
A. Yes.
Q. Natalie London?
A. Yes.
Q. Patricia Oriti?
A. No.
Q. Sasha Marble?
A. Yes.

68

Q. Socorro Aguilar?
A. Yes.
Q. Sonal Bowness?
A. Yes.
Q. Thomas Logan?
A. Yes.
Q. Valerie Monda?
A. Yes.
Q. Veronique Mareen?
A. Yes.
Q. Yvonne Solorio?
A. Yes.
Q. It's the corporation's position that Patricia Oriti has never been an employee?
A. Yes.
Q. Did the corporation seek outside advice in that decision that she was never an employee?
A. Not that -- I never did. Not that I'm aware.
Q. For the entire Exhibit 4 are you aware of anybody that was either an employee or an independent contractor that worked for the corporation in 2009 and 2010 that's not listed on Exhibit 4?
A. Well, let me see. I think Gilberto Miranda should be on somewhere. He was kind of an in-and-out fill-in-the-blank employee. So --

69

Q. So he may need to be added to the employee list?
A. Yes.
Q. Okay. Did your husband work for AMS or provide services for AMS at some point in time?
A. He did. He did IT support.
Q. Was he the computer guy you were referring to in your deposition?
A. Well, I'm not sure because we had Donald Porter start and I don't know what I said.
Q. That's all right. You referred to a computer guy that may or may not have been your husband, but what services does your husband or has your husband provided for the school?
A. Computer repair, IT support, network support.
Q. How often has he provided work for the school?
A. Over the years? Rarely and reluctantly. I don't know.
Q. Is rarely once a month, once a year?
A. During the period where we didn't have anyone else it might have been once every other month, but we since have a contract with an IT support company and we have a person on the side we can call every now and then.
Q. Okay. In determining who the corporation

70

considered who was employees during the relevant time period, you've said the best way to do that is to look at the payroll records submitted to ADP and AmCheck; is that correct?

A. Yes.

Q. You've also said that you think that a couple of the representations were incorrect; is that also correct?

A. Yes.

Q. And you named specifically maybe Patricia Oriti?

A. She's not on the payroll records.

Q. Okay. Strike her.

Who was the person you said that shouldn't have been on the payroll records listed as an employee?

A. Judy Johnson and Kjersti Wheeler; and then she got married and she was Kjersti Burkham.

Q. The shuttle bus drivers?

A. Yes.

Q. Besides the shuttle bus drivers, are there any other individuals on the payroll records listed as employees that shouldn't have been employees as defined by the FMLA?

A. Not that I'm aware.

Q. And what I'll probably get you to do during a

71

break is to go through and look at what we've got and see if there are any employees on there that shouldn't have been classified as employees.

A. Okay.

Q. Who is Mr. Calvin Carter?

A. He was the janitor at the Great Northern Campus.

Q. Were there janitors at other campuses?

A. Yes.

Q. How many other campuses do you have?

A. Two others. Three total.

Q. When did Mr. Carter begin working for the corporation?

A. Prior to 2001.

Q. Okay. Well, okay, a long-term worker for the corporation?

A. He just provided janitorial services.

Q. And I'm not getting into that, but he provided services for a long time --

A. Yes.

Q. -- for the corporation? From 2001 -- is he still working for the corporation?

A. No.

Q. When did he stop working for the corporation?

A. Probably 2010.

72

Q. So Mr. Carter provided services to the corporation between 2001 and 2010?

A. Yes.

Q. Who were the individuals that provided services at the other campuses? When I say services, janitorial services.

A. Okay. During that time period I think Miguel Reyes, Francesca Tejeda, Cleotilde Maldonado.

Q. Can you repeat that last name?

A. Cleotilde Maldonado, M-A-L-D-O-N-A-D-O.

Q. When you say this time period, are you talking about 2009 to 2010 or are you talking about 2001 to 2010?

A. Oh, no, 2009 and 2010.

Q. How long did Mr. Reyes work for the corporation, provide services for the corporation?

A. I can't remember when he started. Maybe 2008, 2009 and up until maybe December of 2011 or something like that.

Q. What about Mr. Tejeda?

A. Prior to 2000 -- it's a female, Francesca.

Q. Ms. Tejeda.

A. Prior to 2001 when I started she was already doing janitorial work.

Q. Is she still working, providing services for

73

the corporation?

A. Uh-huh. And -- yeah.

Q. And Mr. Maldonado?

A. Ms.

Q. Ms. Maldonado. My Spanish first names are messing up.

A. Maybe 2007 or I can't remember the start date, but it was prior to this.

Q. Is Ms. Maldonado still working for the corporation?

A. Yes.

Q. Was there a Juan Maldonado?

A. Oh, Juan. Oh, no, Juan and Francesca are married.

Q. Does Mr. Tejeda provide services for the corporation?

A. He has a business called -- I can't remember, where they do our floors and he may -- I feel certain he helps do the janitorial, do the cleaning. I'm not there when it happens, I don't know, but the contract is with her.

Q. Mr. Reyes, where does he work or where did he work?

A. The main campus. I can't remember what buildings he did.

74

Q.  Ms. Tejeda, where does she work?
A.  The main campus.
Q.  Ms. Maldonado, where did she work?
A.  Main campus.
Q.  There's a Great Northern Campus, there's a main campus, there's a third campus, correct?
A.  Yes.
Q.  Who provided janitorial services --
A.  The students.
Q.  The students?
A.  They -- yeah, they clean.
Q.  Why does that campus have the students clean as opposed to the others?
A.  They have to learn how to clean sometime.
Q.  I agree with that, but why at the other two campuses?
A.  Several years ago we had regular janitorial services and they weren't satisfied, the students weren't.  They thought it was a waste of money, so they said they would do it themselves and it's just sort of become something they did.
Q.  Okay.
MR. MARSHALL:  Don't worry, no child labor laws are being violated.  What are their phone numbers?
THE WITNESS:  They got jobs.  They have

75

managers, the trash manager.
Q.  (By Mr. Cook)  Okay.  Did Mr. Carter work alone?
A.  As far as I know.  We only contracted with him.  If he had other people helping him, it wasn't anything.
Q.  Did you have a written contract with Mr. Carter?
A.  I never had one.  There was agreed upon, like he would tell us how much he was going to charge each year.  It would be per building.  I mean, that was how it was estimated, I guess.
Q.  And when I say you have a contract, I mean has the corporation ever had a contract with Calvin Carter?
A.  A written contract, not that I'm aware of.
Q.  And what services did he provide for the corporation?
A.  He would take out the trash and mop the floor and clean the bathrooms.
Q.  Any other services he provided?
A.  I mean, not that I'm aware of.  I mean, he might have dusted fans or something.  I don't know.
Q.  Did he work on a daily basis during the work week?
A.  Yes.
Q.  Did he work on the weekends?

76

A.  Well, on a Friday, like we just had to be cleaned by Monday so he may have.
Q.  Did he have keys to the school?
A.  Yes.
Q.  You would agree that the kind of work he did was not specialized work?
A.  Well, actually I think it is, after I've seen -- when the students first started cleaning they weren't very good at it, so it does turn out that the people who do that type of work know how to do it thoroughly and efficiently.  So I think it is specialized, it's just not -- maybe it's not difficult to learn.
Q.  The job duties you gave me was taking out the trash.  How is taking out the trash specialized work?
A.  Well, you -- like you have to know it's important to take it out every day and put a liner in and tie the liner up.  I mean, that's just an example.  Mopping the floor and you have to sweep it, you have to mop it, you have to get the corners, you don't leave a bunch of stuff in the corner.  You don't really know how it's done until you see it done improperly.
Q.  You think mopping the floor is specialized work?
A.  Yeah.  I don't think people are born knowing

77

how to do it, so they learn and they become good at it.
Q.  How long do you think it takes to learn to mop the floor effectively?
MR. MARSHALL:  Objection, speculation.
A.  I guess it varies on the individual.
Q.  (By Mr. Cook)  In general, how long do you think it takes to learn to mop the floor effectively?
MR. MARSHALL:  Same objection.
A.  Well, I mean, it's the same thing.  If you try to teach a 15-year-old how to mop the floor it might take two months.  If you teach me, I can do it right away, but, I mean, it really is specialized.  I mean, have you -- maybe you're not familiar with people cleaning your office, but if you've got somebody that didn't know what they were doing and say yeah, I vacuum my own floor at home and they came in here, it would be terrible.
Q.  (By Mr. Cook)  Fortunately I'm familiar with this office, including last night, but --
A.  Well, I've had to do that before when something happened in our office.  We don't have cleaners that come regularly in the summer because there's not as much, but we had somebody coming to tour the school and we had to clean it and I thought ah, it will take me 30 minutes.  It took forever because I'm not attuned to

82

up, $200 per room per month, something like that.

Q.   And he would engage in an oral contract with the corporation?

A.   He would, yes.

Q.   And it would be for the entire school year, correct?

A.   Yes.

Q.   Did he ever interact with the children?

A.   No.

Q.   Was he told not to interact with the children?

A.   He wasn't there when the children were there.

Q.   Did Mr. Carter own his own business?

A.   I'm not aware of that.

Q.   Did he work for someone else?

A.   I know that he worked for the University of Texas for a period of time, but I don't know if he was still working for them when I started working at the school.

Q.   Let me ask it this way.  When he worked for the corporation, were you aware of him working for anyone else?

A.   I was not aware of that.

Q.   Did Mr. Carter ever get sick or have to miss work for any reason?

A.   He got sick and he would usually have a

83

relative or someone come do it.  I wouldn't always be aware of that, maybe the maintenance director would be.  He actually did have a business where he mowed lawns too.  I don't know how I knew that.

Q.   When did he do that?

A.   At some period while he was working for us.

Q.   In 2009 or 2010?

A.   Yes.

Q.   Did Calvin Carter ever get bonuses?

A.   Not that I can remember.

Q.   Was there any way for him to earn anything more than whatever the set rate was that he would get paid in a month?

A.   Not that I remember.  I mean, no.

Q.   Okay.  I assume he used cleaning supplies?

A.   Yes.

Q.   Does the AMI have standards for supplies or materials that are used in schools?

A.   No.

Q.   They do not?  Does AMS?

A.   Oh, I'm sorry, I was referring to cleaning supplies.  They do have standards about materials that are used.  They don't have standards about cleaning supplies that are used.

Q.   Does AMS have standards about cleaning

84

supplies, like organic or --

A.   Yes, but it's not documented that we do.

Q.   And how do you know they have standards then?

A.   Because I know that like Amber or Donna would go through and look at what cleaning products -- this happened some years ago and they'd say he can't use this, and so we had to spend some amount of time finding out what health department requirements for child care centers and still complied with what they thought was reasonable to have in an environment around children.

Q.   Is it fair to say that the corporation determined which materials -- which cleaning materials would be used at the schools?

A.   Which cleaning materials we would purchase to use at the school, yeah.

Q.   And those were the materials that were used by individuals like Mr. Carter?

A.   Well, no.  What the cleaning people -- this is why I say kind of specialized.  They would from time to time decide that whatever it was we were providing wasn't working well enough and they would use their own things to get it more thoroughly cleaned.

Q.   Okay.

A.   And we would notice this sometimes because it smelled and sometimes just because they would say, oh,

85

we can't use that all the time.  We'd say no, we don't want to use bleach or whatever around them.

Q.   So you had approved materials for them to use, but sometimes they would use what they wanted to; is that correct?

A.   That's right.  That's right.

Q.   And on occasion if you didn't like that you would tell them no, don't use that?

A.   Like I wouldn't tell them.  It might be the maintenance director.

Q.   Someone would tell them we don't want you using that material?

A.   Right.

Q.   Did they follow your -- the school's instructions?

A.   Probably not.  Probably not.

Q.   Were they ever reprimanded or threatened with not following the school's instructions?

A.   No.

Q.   Did you ever worry about health code guidelines being --

A.   They were never violating health code guidelines.

Q.   Okay.  Well, did the school not care that they were telling them to do one thing and they were doing

Case 1:12-cv-00007-SS    Document 29-2    Filed 07/31/12    Page 22 of 42

Dawn Glasgow as Corp. Rep. - 7/26/2012

86

something else?

A. Not everybody cared as much about the materials that were used to clean as other -- as some.

Q. But some did?

A. Uh-huh. If they cared enough, then they would put a stop to it, but they didn't.

Q. They didn't put a stop to it?

A. Right.

Q. But they tried to put a stop to it?

A. They tried to make it be that the materials they would prefer to be used for cleaning was used most of the time.

Q. And was that the case?

A. Yes.

Q. And that was because they instructed the janitorial service that this is what we prefer you use most of the time?

A. It's because that's what was available.

Q. That's what they bought for the janitorial services?

A. Right.

Q. And on occasion they would get outside those guidelines and someone from the school would tell them no, you need to use what we approved?

A. Not always, sometimes.

87

Q. That wasn't the general rule?

A. No.

Q. The general rule is that they used the products that the school provided for them, correct?

A. Right.

Q. And that includes Mr. Carter?

A. Yes.

Q. Did Mr. Carter buy the products he used at the school?

A. Only if he wanted to use something different.

Q. Which you said is an exception to the general rule?

A. Right.

Q. And would he get reimbursed if he purchased that?

A. No.

Q. There wasn't a lot of incentive for them to use their own products if they weren't getting paid back for them; is that correct?

A. Well, they wanted -- well, you would think, but they wanted it to be clean. Like they were -- they wanted to use the product that they knew worked, so that's why they would use their own products.

Q. Well, I assume they had the ability to come ask you-all to use a different product; is that correct?

88

A. Certainly they could come and tell us, but they didn't. That's not the way they worked. They just did it in secret so that they could get it clean.

Q. Okay. They spent money out of their own pocket in secret?

A. Yeah.

Q. Without seeking reimbursement?

A. Well, bleach, like a dollar a gallon. Yes, they did.

Q. And how do you know that?

A. How do I know that they used it?

Q. In secret.

A. Because they would -- you could smell it some of the time.

Q. And would you go talk to them when you could smell it?

A. I didn't.

Q. Did someone in the corporation go talk to them?

A. I think Jerry Pippins did and then he would say well, they want to use it because it's what works.

Q. And what would the school do in response to that?

A. Probably tell them to use what was in the cabinet but not -- I wanted it to be clean too, and if they used it every now and then and it wasn't harmful

89

for children or it wasn't anything that was against any health guidelines I didn't care.

Q. How did you ensure that it wasn't harmful -- what they were using wasn't harmful to children and wasn't against health guidelines, especially if they were using materials in secret?

A. How did I ensure that? They cleaned for other schools and a couple of them were janitors at -- for AISD. They knew what was acceptable and bleach is not harmful. I mean, over time, like if a child is coming into contact with it, yes, but they weren't. They weren't there at the same time.

Q. Mr. Carter didn't work for any other schools?

A. No.

Q. How did you ensure that the materials that Mr. Carter was using were within code and were not harmful to the children?

A. We provided -- we gave him instruction on what to use and we provided it. We weren't there when he used it. I happened to know that he used other things.

Q. Those other things that he used, how did you ensure that they weren't against code and didn't harm the children?

A. I couldn't be sure.

Q. Is there a possibility that he has used things

90

which have harmed the children or have been against code over the last two years?

A. There's no possibility that he used things that harm the children.

Q. How do you know that?

A. Because none of the children were harmed.

Q. Okay. Did Mr. Carter ever provide less than satisfactory work for the school? I'll put this in more simple terms. Was it ever not cleaned up well?

A. Sometimes there would be things like, oh, you didn't put a liner in the trash can and like everybody wanted liners in the trash can. So if there wasn't a liner in the trash can you would hear about it. So we would just make sure there were more liners or whatever it was.

Q. Was there ever like a checklist or anything about what he was supposed to do?

A. There was a checklist that was provided by a cleaning contracting company that we went over with -- like with the maintenance director to say what are the things in here we want to be done and so we would have that. Really, we had it more for the staff so that they knew what was expected to be done and what wasn't because sometimes they would say the window is all dirty. Well, they don't do the windows, you do the

91

windows.

Q. Sure.

A. So I think that's why we created it, because there was this confusion with the staff of some things like that.

Q. My question is, how did Calvin Carter know what he was supposed to do?

A. He was working there when I started, so I don't know.

Q. Is it safe to assume that someone told him what he was expected to do?

A. Yes.

Q. Was there anyone that was specifically in charge of making sure Mr. Carter did his work?

A. Jerry Pippins was responsible for communicating with him if things -- if there was something that he needed to know about, like, oh, a meeting is going to be really early today, is it possible for you to come early or things like that or if he was out of supplies or if there was some question. So Jerry Pippins was the one that communicated.

Q. Were there guidelines on when Mr. Carter could work at the school?

A. Just after the children left.

Q. Which was what time?

92

A. 5:30.

Q. So he could work at the school any day after 5:30?

A. Yeah, prior to the next morning.

Q. But not every day because sometimes the school had functions after 5:30; is that correct?

A. Right.

Q. And then the school would inform him you can't come in until a later time?

A. No, just that either don't clean this classroom because we wouldn't use the whole campus.

Q. Why is Mr. Carter no longer working for the company?

A. He was really retiring.

Q. But he was a long-term worker?

A. Uh-huh.

Q. Ten years for the corporation?

A. Yeah.

Q. Okay.

A. Yes.

Q. Why -- on behalf of the corporation, why does Austin Montessori School, Inc. consider Mr. Carter to have been an independent contractor?

A. He controlled his own work. He was the expert in cleaning.

93

Q. Any other reasons why the corporation considers Mr. Carter to have been an independent contractor?

A. That's what I -- that's enough.

Q. Did you discuss -- I guess he was classified as an independent contractor before you came to the corporation?

A. Yes.

Q. Do you know who was involved in making the initial decision that he should be classified as independent contractor rather than an employee?

A. No.

Q. Has your accountant ever reviewed whether this classification is correct or incorrect?

A. I believe she has, not for Calvin but for other people. For instance, Francesca Tejeda and her husband have the company. I can't remember the name of it, but -- so we pay them in the summer when they do the floors as a company and she's contracted to do the cleaning.

Q. Why did the accountant review those two individuals and not Mr. Carter?

A. I think because anytime somebody is paid in two different ways like an employee and a -- for instance, Jerry Pippins is an employee but he also has a -- in the summers he does contracting work with a building

110

circumstances where Mr. Carter had to deviate from the just arrive at 5:30 and do whatever you want?

A. Only on the days where there were parent meetings in a certain room.

Q. He would clean those first and then --

A. Right.

Q. -- stay out of the way and clean the other rooms?

A. Yeah.

Q. Did you ever do a background check on Mr. Carter?

A. Yes.

Q. Why?

A. Because you do all volunteer -- like he would be considered volunteer whenever we check.

Q. Why would he be considered a volunteer?

A. We communicated to the parents that anybody that was on campus, even in a contract capacity, we would do a check on.

Q. Okay. To ensure the safety of the children?

A. Yeah, even if they weren't around. Some question came up and so we just decided to do it. We have a license with the Texas Department of Family and Protective Services and so it was just easy enough to throw him in.

111

Q. Do you do background checks on the other people that substituted in his stead?

A. No.

Q. Why not?

A. I don't even know their names. Often I wasn't aware of when it happened.

Q. Were you concerned that there were people on campus at the Great Northern Campus that you had not conducted a background check on?

A. No, because they weren't there when the children -- it was more of a -- to I guess appease the parents than it was because we were really concerned. It wasn't a requirement with the Texas Department of Family and Protective Services.

Q. Did he do the same routine every single night?

A. I don't know.

Q. Did he clean the same rooms every single night?

A. Yes.

Q. Okay. Were there ever occasions where he didn't have to clean certain rooms because that school had gone on a field trip or something like that, or that class?

A. That was never communicated. It was -- we never said don't clean on this day. It's just the arrangement was clean every day every room.

112

Q. Earlier you testified that Mr. Carter exercised control over how he did his work. I want you to explain to the jury how Mr. Carter exercised control over how he did his work.

A. He decided how he was going to get it clean and in what order and what he would use, just how he did it.

Q. Okay. As to taking out the trash, how did he exercise control over taking out the trash?

A. He decided when he would do it, how he would do it, whether he would put it all in one bag and leave it there, whether he would take it home. I mean, I have no idea.

Q. Okay. How did he exercise control over how he mopped the floor?

A. What order, how he did it, did he sweep first, then mop. I mean, how -- however he wanted to do it and in whatever order he wanted to do it in and what equipment he used to do it with and all of that.

Q. Okay. How did he exercise control over cleaning bathrooms?

A. Just the same thing. He decided exactly how it would be done, with what.

Q. You understand that the school provided quarterly reports to the TWC and IRS each quarter?

A. Yes.

113

Q. Can you explain on behalf of the corporation why the number of employees that were represented to the IRS and the TWC for certain quarters were different?

A. I can't tell you. I don't create those reports, they come from the payroll company.

Q. Does the corporation take responsibility for those reports?

A. Well, ultimately we must, but they must have a preparer signature. It doesn't make sense that they would be different since it's an automated system.

Q. If you'll look at Exhibit 1, which is the notice of deposition, and if you'll look at subject number 13. Are you able to testify on behalf of the corporation as to number 13?

A. No, because I'm not aware of any.

Q. Did you make any efforts to be able to testify on number 13?

A. No, I wasn't aware that there would be any difference.

Q. Did you look at them?

A. I didn't. I looked at what they were.

Q. So you can't testify because you didn't see that the numbers were different; is that correct?

A. Right.

Q. Are you aware that they're different?

114

A. No.

Q. Okay. As far as the IRS 941s, were those generated off of the payroll reports that are exhibited in Exhibit 4?

A. The payroll company produced the reports.

Q. The payroll company produced the TWC reports also?

A. Yes.

MR. COOK: I don't mean to be flippant when I throw those things to you.

MR. MARSHALL: That's okay.

(Exhibit No. 6 marked.)

Q. (By Mr. Cook) I hand you what's been marked as Exhibit 6. And what I'm going to ask, and we can go off the record to do this, it's going to take a little bit of time, is what I want to know is if there's anyone that's listed on these reports to the TWC that the corporation does not consider to be employees as it's defined for accounting purposes under the FMLA. Does that make sense?

A. But for that period? Because I would need to look at the payroll reports.

Q. Well --

A. Because this shows people who are employed in January, but it could be -- like you could hire somebody

115

the first week of January and the last week of January and then they're both in there.

Q. And I'm not concerned about the period of time they worked; I just want to know if the people listed --

A. Have they ever been employees?

Q. Have they ever -- well, at any time during the period for which they're listed were they employees for the purposes of accounting under the FMLA?

A. I guess that's what I'd have to see the payroll reports for.

Q. And why do you think you would need to see the payroll reports?

A. Like I was wondering is Adam Aguirre going to show up on one of these because of that -- they showed up on that one payroll report but really he wasn't, he was terminated. So, I mean, I'm just -- I just don't know for sure.

Q. Let me ask it this way. Without regard to time period, we'll just say the time period is 2009 and 2010. Okay?

A. Okay.

Q. Can you go through this and name anyone who was not an employee in 2009 or 2010 for the purposes of accounting under the FMLA?

A. Okay.

116

MR. COOK: We can go off the record now.

(Recess taken from 1:33 p.m. to 1:36 p.m.)

Q. (By Mr. Cook) Ms. Glasgow, we took a short break off the record for you to review what's been marked as Exhibit 6 to your deposition; is that correct?

A. Yes.

Q. And the question on the table was, were there any -- period 2009 and 2010 anyone listed on this report was not an employee -- was not considered an employee by the corporation for the purposes of counting under the FMLA?

A. Well, Kjersti Wheeler and Judy Johnson for the same reasons we reported before.

Q. Okay.

A. But also Gilberto Miranda shows up on all of these, but I'm fairly certain if we review the payroll records he didn't work all of that time but instead of taking him off and putting him on she must have left him on.

Q. Okay. He was left on the payroll, he wasn't working?

A. Like an unpaid, unpaid, unpaid, because he goes -- he's just kind of a temporary seasonal worker.

Q. What do you mean by that?

A. He goes on -- he worked as an after-school

117

leader for a long time and he goes on tour. So if we really want someone with his experience to come in and work for a period of time in a position, then we'll -- then we would have him work and then he might leave and then he might come back and say do you need some extra help. And if our enrollment is up in our after school, we might get him, that kind of thing.

Q. Any other issues you saw in this Exhibit 6?

A. Not that I could see.

Q. Were there any individuals on Exhibit 6, and feel free to take your time again in looking on this, that were employees but changed to independent contractors or that were independent contractors who changed to employees?

A. Well, Jerry Pippins also acts as an independent contractor when he does contracting work, but that's ongoing.

Q. He does dual-nature work?

A. He doesn't change. He does dual, yes.

Q. He's an employee and an independent contractor according to the corporation?

A. I'm trying to think about Gilberto Miranda. I think he did -- maybe he drove the bus or he did something that was contract. I can't remember what he did, but he did something contract related.

118

Q. But if he's on this timesheet --

A. But maybe not during this period. I'm just saying at some point he did. He's also got some music background so maybe he did something related to that. Not that I can tell from this, not that I can tell from my memory in looking at this list.

Q. Okay. Let's talk about the bus driver position. And I want to talk about for the last five years, so starting around 2007. Has there been -- since 2007 has there been one bus driver at a time driving the buses for the schools?

A. Yes.

Q. And that bus driver drives students to and from all three campuses?

A. Yes.

Q. Okay. And in 2007 who was that bus driver?

A. I don't remember.

Q. 2008?

A. Maybe Kjersti.

Q. Okay. 2009?

A. Kjersti, I think, or part Kjersti and part Judy.

Q. 2010?

A. Judy and then Lucinda, I think.

Q. And you're talking about Lucinda Castillo?

119

A. Yes.

Q. And Kjersti and Judy were both identified or labeled by the corporation as employees?

A. Right, at the time they were working.

Q. And when Ms. Castillo came on, the corporation decided to change the labeling of that from employee to independent contractor?

A. Yes.

Q. Does Ms. Castillo still work for the company?

A. We expect she will.

Q. So she has worked from roughly 2010 into the foreseeable future?

A. Sometime in the late spring of 2010.

Q. Okay. So the first part of 2010?

A. No, she started -- yeah, sometime in the late spring of 2010 is when she started.

Q. She works there now and as far as the corporation is concerned, she's going to work there ongoing into the future?

A. Well, near future I guess.

Q. Okay. Is she hired per school year?

A. No, just we have an arrangement for the time and the amount and there's no contract for school year or anything.

Q. What is the arrangement for time and amount?

120

A. It's guaranteed three hours a day or 15 hours a week is what it is and a certain amount per hour, something like that.

Q. Okay. And when you guarantee her 15 hours, is that --

A. It means she -- it almost never takes that, but you're going to get -- like the arrangement is that much.

Q. Okay. And does the school pay her?

A. The school pays -- yeah.

Q. Does the school charge the parents of students that ride the bus?

A. Yes.

Q. And how does it charge the students -- the parents of the students that ride the bus?

A. There's a certain amount for round trip and then there's a certain amount that's a little bit higher for one way.

Q. Does the school make money on that?

A. Nope.

Q. Does the school lose money on that?

A. Yes.

Q. Do you know how much they charge the parents of the students for a one-way trip?

A. It's like $65 a month or something like that.

121

Q. And then 130 for round trip or less?

A. Less. Maybe it's more for one way. I can't remember.

Q. How many students ride the bus on a regular daily basis?

A. Between 10 and 20, depending on the route.

Q. Is there a maximum number of students that are allowed on the shuttle bus?

A. 22.

Q. And what is that maximum number determined by?

A. The capacity.

Q. The label on the bus?

A. Yes, seat belts.

Q. I assume it's the shuttle bus for children and that it has certain -- there are certain guidelines that apply to it; is that correct?

A. Like the bus has to meet certain requirements?

Q. Yes.

A. Uh-huh.

Q. What are those requirements?

A. I don't know.

Q. Don't know?

A. No.

Q. Is there someone at the school that makes sure those regulations are followed?

122

A. It was purchased meeting those, like -- because it met those requirements.

Q. Okay. Now, I think I saw a document, and let me see if I have it, that the school is issued rules for the shuttle bus?

A. Yeah, the students.

Q. While I'm looking for it, why don't you tell me what those rules are.

A. Don't shout, only talk to the person next to you, no eating or drinking on the bus, no electronics, things like that, arrive on time.

Q. Okay. Who's responsible for enforcing those rules?

A. Well, see, that's the tricky thing is when the person is driving the bus they can't do any of that, but they can report if there's somebody that's -- or if there's knowledge that the group is not --

Q. Complying?

A. -- complying and then we have to have somebody else ride or talk to the group. But the thing is we tell the parents of the children that if they're not able to abide by them they just can't ride because the bus -- the person driving the bus only can do that.

Q. How does the bus driver know whether or not the rules are being violated?

123

A. She can't know specifically, just if there's wrappers still on the bus later or children tell on each other, she hears someone and recognizes their voice.

Q. Another question. How does she know what the rules are in the first place?

A. She has a copy of that.

Q. The school provided her with a copy of the rules for the students on the bus?

A. Right.

Q. The school bus driver interacts with the children, correct?

A. Right.

Q. Okay. On a daily basis, at least the ones that ride the bus?

A. Right.

Q. Okay. How does the school ensure that AMI standards and the Montessori standards are met in regards to the bus driver's interactions with the students?

A. It's very difficult.

Q. Okay. Well, tell me how that works.

A. You almost can't. We try to include her in any -- like she's welcome to attend any staff meetings we have so she can hear. If we hear of some concern from -- it's often a child will tell if there's

124

something -- for instance, one time she got doughnuts for everybody. We don't do that. So anyway, we got report of that. Things like that, we'll just try to talk to her. But we realize and the parents realize that this is not going to be the perfect environment. We're going to do our best, but it's just not.

Q. Well, do you give her -- I guess you've had a few bus drivers. Do you give them any Montessori 101 lessons or anything like that?

A. Just we give them a copy of the handbook so they can see what we're communicating to families so they have an idea what it's about. But no, I mean, if you ask Lucinda what does Montessori do, she wouldn't know, I mean, what do you do in a Montessori school.

Q. Do you provide her with any specific rules that she needs to follow in the operation of the bus?

A. No, but there is a checklist that she has that -- like I don't know what it is. It's like you walk around and make sure the lights work and that kind of thing.

Q. Where does she get the checklist?

A. I think from Region 13 has -- like the AISD has a Region 13 training so they have some information on their website about that.

Q. I assume the school directed her to that?

125

A. Told her where it would be available and we found out from the previous -- from -- oh, we had -- I know who it was. It was Onna Haynes. She's the one that told us about that site.

Q. Okay. So when Ms. Castillo started, you said you need to print out this checklist and follow this checklist?

A. Yeah, we want to make sure that she did that.

Q. Doughnut example, one of the children -- did this happen with Ms. Castillo?

A. What?

Q. The doughnut incident.

A. Oh, yes. Yes.

Q. Okay. Children, I assume, told their parents or one of the teachers we had doughnuts on the way to school?

A. Really what happened is one of the children was upset that they weren't on the bus when they got the doughnuts. They told their parent. They told their parent I should have gone yesterday, they got doughnuts. So that's how we found out.

Q. And that's not consistent with some standard or idea of AMS?

A. No. Right.

Q. And so then did you have a meeting with

126

Ms. Castillo to discuss that?

A. Yeah, I just talked to her the next day.

Q. And said don't bring doughnuts?

A. I said oh, I said we don't have any doughnuts. If you ever have a question about anything like that just ask me, but it's better just not to give them anything.

Q. Okay. And she complied with that?

A. Well, I haven't heard otherwise, but. . .

Q. Okay. Is she required to have a commercial driver's license?

A. She is now. That bus does not require a commercial -- required by us to have one. The bus does not -- it's a Ford-350 chassis, which doesn't require you to have commercial. And because we're not going to people's homes, like there's these little nuances, but our insurance provider said that it's close enough to where you should just have it.

Q. Okay.

A. So she's obtaining it this summer.

Q. But in the past years up until now the school has allowed her to drive the bus without a commercial driver's license?

A. Yes. Yes.

Q. Was Ms. Castillo trained in bus driving?

127

A. She did some online thing about like how to -- like the checklist thing, there was some online how do you let people out and that kind of thing. It's like a --

Q. Did the school point her to those --

A. In the same way we did with the list.

Q. How did the school come to hire Ms. Castillo as the bus driver?

A. I had a friend that works for AISD and she knew about her because I think she worked driving a van for their special ed program. I can't remember the details. And so she said do you want me to tell her about the ad. Like we had an ad and she just applied.

Q. What were the -- did you place the ad in the newspaper, Craigslist?

A. Craigslist.

Q. What were the requirements the company put in the ad on Craigslist?

A. I can't remember.

Q. Were there any requirements?

A. Experience driving children, experience with children, something like that.

Q. Okay. Austin Montessori School owns the bus she drives, correct?

A. Yes.

128

Q. Austin Montessori School pays for the gas that goes into the bus?

A. Yes.

Q. If repairs are needed to the bus, Austin Montessori School pays for those repairs?

A. Yes.

Q. Austin Montessori School pays -- strike that. Austin Montessori School has title over the bus that she drives?

A. Yes.

Q. They pay for registration fees, inspection fees?

A. Yes.

Q. Okay. Is there someone that deals with making sure the bus is inspected, compliant with all the regulations that go with any typical bus?

A. Jerry Pippins.

Q. And that's one of his job duties?

A. Yes.

Q. Okay. How does the driver determine who it should pick up and how it should pick up students?

A. There's a -- that is the job, that you drive over here, these people get on, you just keep track of who got on, and then you drive -- you leave at a certain time, you drive to -- there's a schedule.

129

Q. Yeah, so if I'm a bus driver joining your school, do you hand me that schedule?

A. Yes.

Q. And so it indicates -- indicated to Ms. Castillo the order in which she picks people up?

A. Right.

Q. When she picks them up, who she picks up?

A. Told her what the job was, yes.

Q. But does it specifically list the order in which she's supposed to pick students up?

A. Right, because that's the job.

Q. But she's not able to say well, I want to pick up Johnny Smith first rather than Brian Thomas first?

A. We don't pick up children at their homes. They -- it just goes from one campus to another.

Q. So that's the transportation, is the parents would have to drop them off at one campus and you would transfer them from the south campus to the north campus? Is that the point of the bus service?

A. Right. Right. From one campus to another, yeah.

Q. Do you tell her how she should drive?

A. No.

Q. Do you tell her the route she should take?

A. There's only one route you could drive from

Case 1:12-cv-00007-SS    Document 29-2    Filed 07/31/12    Page 29 of 42

Dawn Glasgow as Corp. Rep. - 7/26/2012

130

south to north. There's very little -- I mean, I guess if she wants to take different roads, as long as it gets there in the time it doesn't matter to me.

MR. COOK: Objection, nonresponsive.

Q. (By Mr. Cook) Did the school tell her which route she should drive to get from one campus to the other?

A. Inasmuch as we provide a map.

Q. With the route?

A. Well, I mean, it doesn't matter, the route doesn't matter. Where it goes, from one campus to the other by the times, that's what matters.

Q. But she is provided with the route?

A. Right.

Q. Did you ever tell her that it doesn't matter if she follows the route or not?

A. Yes. In fact, we've talked about with traffic that there are other ways to get there as you become more familiar. It's her choice. But the times are important.

Q. The school pays for the bus's insurance?

A. Yes.

Q. Does Ms. Castillo pay for anything out of pocket in regard to the bus?

A. Doughnuts.

131

Q. Not anymore.

A. Yeah. She -- I don't think anything else. I mean, I can't think of anything she would buy, but maybe she has and hasn't told me.

Q. Besides the online training that the school directed Ms. Castillo to pursue before becoming a driver, are you aware of any other training she's had as a driver?

A. I'm not aware.

Q. If Ms. Castillo -- has Ms. Castillo ever worked?

A. Has she ever worked?

Q. That's an after-lunch question. Has she ever been unable to work because of sickness or some other reason?

A. Not that I'm aware of.

Q. Who preceded Ms. Castillo?

A. Judy Johnson.

Q. What were the difference in job duties between Ms. Johnson and Ms. Castillo?

A. There weren't any.

Q. Identical job duties?

A. Yes.

Q. Okay.

A. And she was a licensed bus driver and had

132

driven an AISD school bus, didn't want to do that schedule anymore.

Q. Okay. Why not?

A. It was -- she just didn't want to have that schedule.

Q. Oh, you said she did not want to have that schedule?

A. Judy Johnson didn't want to do AISD schedule any longer.

Q. And who preceded Ms. Johnson?

A. Kjersti Wheeler.

Q. Were her job duties any different than Ms. Johnson or Ms. Castillo's?

A. No.

Q. Did Ms. Castillo have a point of contact or supervisor at the school?

A. Probably me, yeah.

Q. Okay. And how often do you interact with Ms. Castillo?

A. I would tell her hi each day if she walked by my office and I was there, but I didn't talk to her about it.

Q. If there was a problem on the bus, how would she let you know about the problem?

A. She would -- might come in a little early

133

before her route and ask me a question.

Q. Did she have any paperwork she had to fill out like --

A. No.

Q. Not on a weekly basis or anything like that?

A. There was a -- she would give a list of who rode, like her attendance log, in case people were riding that weren't signed up, weren't paying.

Q. And who did she turn that in to?

A. Lois.

Q. Who is Lois?

A. She's the office manager. She bills people.

Q. Did that ever happen?

A. Yeah, I'm sure.

Q. Who told Ms. Castillo to get her CDL?

A. I did.

Q. And you said the insurance company told you to do that?

A. Well, they have a -- like we have a contact and they have a -- I don't know if it's the loss prevention people but somebody, I thought it was the same people who come out and inspect the playground. There's different people that review different things. They want to know if you have a corporal punishment policy, things like that. And so this came up and he said we

134

should just go ahead and do it.

Q. On behalf of the corporation, why is Ms. Castillo considered to be an independent contractor?

A. Because she is a person who decides how she is going to drive the bus.

Q. Do you think she has more freedom and control than a guide does at the school?

A. Freedom to control how she drives the bus, yes.

Q. How she does her work?

A. Yes.

Q. Besides what you just stated, are there any other reasons why the corporation believes she should be labeled as an independent contractor?

A. Not that I can think of.

Q. What ways -- you say that she decides how to drive the bus, correct?

A. Uh-huh.

Q. What ways does she choose from in deciding how to drive a bus between two locations?

A. I don't know all the details of driving a bus.

Q. Can you name any way she chooses between multiple options and how she drives the bus between two locations?

MR. MARSHALL: Objection, speculation.

A. I mean, it's just a bunch of details about

135

driving a vehicle and driving a bus and speed and what lane and whether she puts on her brake hard, where she puts her blinker on, I mean, all of that.

Q. (By Mr. Cook) So are those the ways she chooses how she operates the bus?

A. Some of them.

Q. When she changes lanes, whether or not she uses blinkers?

A. All of that and more.

MR. MARSHALL: Objection, speculation.

A. I don't know. I mean, I'm not a bus driver.

Q. (By Mr. Cook) Okay. Well, but there had to be some basis for you deciding that she had control over her work, correct?

A. Right, because I'm not there and she's doing it every day by herself and deciding how it goes and she has the expertise.

Q. Do you think that as a bus driver she makes a lot more decisions as to what she has to do in getting between two locations as opposed to a guide throughout their day?

MR. MARSHALL: Objection, speculation.

A. But I can tell the guide how they need to do something. We can as a school. I can say this is how you need to do this. I don't do that with her.

136

Q. (By Mr. Cook) Well, give me an example of something you tell a guide how to do.

A. How to have the children hang up their wraps, how to do snack, how to communicate with parents, how to -- I mean, how to do meetings, everything.

Q. How do you instruct the guides on how to do snack?

A. Every step of snack, like I don't personally do it, but that's why we have people with particular expertise to come in and give advice and then we direct the guides to follow it and we can do that.

Q. In giving snack, do the guides have any freedom in the choices they make?

MR. MARSHALL: Objection, vague.

Q. (By Mr. Cook) I'll start with, do they get to choose what kind of snack they give the children?

A. Within limits.

Q. Sure. Do they get to decide when they give the children a snack within limits?

A. No.

Q. Do they get to decide where in the classroom they provide snack within limits?

A. Well, the limits are pretty definitive, so. . .

Q. Do you expect Ms. Castillo to obey all traffic laws?

137

A. Yes.

Q. Has anyone else driven the students besides Ms. Castillo, Ms. Johnson, and Ms. -- her last name?

A. Wheeler.

Q. -- Wheeler within this time period, the last three years?

A. Not that I can remember.

Q. And if I asked this question, I apologize, and your counsel can object asked and answered. But besides deciding how she's going to drive the bus, are there any other reasons on behalf of the corporation that the corporation believes she should be designated as an independent contractor?

MR. MARSHALL: Objection, asked and answered.

A. I can't think of them, but I happen to know for this position that we went over a list of questions with the CPA, but I just can't think of all the --

Q. (By Mr. Cook) You were designated to testify today on behalf of the corporation why certain individuals are labeled independent contractors and why they're labeled employees, correct?

A. Uh-huh.

Q. Is that a yes?

A. Yes.

138

Q. And even though you were designated, the only thing you can say is that she had the right to control how she drove between two set locations; is that correct?

A. That's the only thing I can say right now, yes.

Q. Before you changed the bus driver position from an employee to independent contractor, did bus drivers get benefits?

A. No.

Q. Does Ms. Castillo drive any other buses?

A. Not that I'm aware of.

Q. Does she have any other occupation besides what she does for your company?

A. I think she --

MR. MARSHALL: Objection, speculation.

Q. (By Mr. Cook) To your knowledge and the company's knowledge.

A. I've heard her talk about cleaning houses.

Q. Let's talk about Ms. Murphy. Who is Sheila Murphy?

A. She is a parent at the school who did some occupation work at our adolescent community.

Q. A parent at the school that did occupation work at a certain campus?

A. Yes, at our adolescent community at the middle

139

school.

Q. Okay. I keep not hearing the last thing you said, I'm sorry. And what kind of work did she do for the company?

A. She was contracted to do, I think, three or four humanity or occupation units during a year that we had a need for that and we didn't have the expertise in-house.

Q. What is an occupation unit?

A. I can't really -- I can only describe it as sort of a made-up lesson plan that requires hands-on involvement and an end product by the students and it's several days a week for a period of six weeks.

Q. Is this a class?

A. Yeah, it's like a class.

Q. Was she considered a guide?

A. No.

Q. Okay.

A. She was considered -- I mean, she wasn't -- she was considered a specialist because she had certain knowledge, she has broad knowledge in fact, which was why it was appealing; and so we would say can you do a unit on this and she would plan it, do it, and have an end product.

Q. I'm going to have to get a little explanation

140

because I didn't go to Montessori school and so I may not understand this, but basically the students are in classrooms with guides, correct, in general?

A. In general, yes, but at the adolescent community it's a little different.

Q. Tell me about the adolescent community then.

A. So the adolescent community is seventh, eighth, and ninth grade, and they have a series of -- I mean, they have regular classes in math and -- it's actually a little different now, but then it was math and language and foreign language and then all of the other subject areas and all of the, what do you call it, the other real-life experience with the subjects that they had in the mornings happen during humanities and occupations and those happen in the afternoons several days a week.

Q. Okay. In the morning they take math, foreign language, and one other?

A. Like other language classes.

Q. And does one guide teach them or do multiple guides teach them?

A. There's four instructors there and one of them is mainly -- oh, and then there's farm work. I'm just the wrong person to give you the details on this. One person manages mostly the farms, a farm work, and it's not academic related. The other three teach math,

141

language, and Spanish, and they also do humanities and occupation blocks. Well, they create these blocks and do them, and this one year we wanted to see if we could get specialists to come in -- the idea was that we would get various specialists to come in for certain blocks, like maybe there's somebody that has some experience with water, maybe there's some engineer, and we would get them to come in and do a block on water and they would create the curriculum and -- well, then Sheila came to our attention because she was -- had stopped working at U.T. and she had some time and she said hey, if there's anything I can be of assistance with, and so we thought oh, well, maybe we can just see if she'll do these specialist blocks. So. . .

Q. And what did she teach specifically?

A. I can't remember. I don't know if I knew.

Q. Is teaching a fair word?

A. Well, Montessori, you're more making the information available and by helping them come to their conclusion, but she planned the information, the initial information, how it would be presented, they -- what the children would work on, and then what they would need to -- like the end product, not that there's always one end product but she would help them come up with an end product that would show their mastery.

Dawn Glasgow as Corp. Rep. - 7/26/2012

182

start changing all our titles to director of this or that.

Q. Okay. And was Amanda Brown in that position?

A. She's at the Great Northern Campus where we have three classrooms. It's a little bit different responsibility there.

Q. And what is her responsibilities there?

A. She is the only nonteaching position there and so she has all the responsibilities of licensing, interactions with health department, and all those kinds of license accreditation. She also subs and she -- let's see, what else does she do. All parent interactions. There is no other office there.

Q. Rachel Davies, who is she?

A. Davison?

Q. Davison.

A. She was an instructor at the middle school, a full-time instructor there. One year we had 50-something children and she was just out of college, I believe.

Q. Was she teaching the occupations?

A. We had it set up a little differently then and so she helped the other teachers when they had larger groups.

Q. Was she considered an employee or an

183

independent contractor?

A. She was an employee.

Q. Why was she labeled an employee?

A. What? I'm sorry.

Q. I'm sorry. Why did the corporation consider her to be an employee rather than an independent contractor?

A. Because we told her how to do -- she wasn't skilled in any particular way. She just graduated from college, but she went to a Great Books school and had some sort of alternative background and so we thought she could be helpful and useful in assisting in our other classes.

Q. How often did Donald Porter work for the school?

A. Oh, just like maybe once every other week he might come in for a couple of hours, maybe less than that.

Q. Did guides ever drive the shuttle bus?

A. No, not that I ever have known.

Q. Did anyone besides the shuttle bus operator drive the shuttle bus?

A. In the past they had someone drive and, like, the far past, even before my children were there, they had someone drive that also did -- I don't know if they

184

did -- I guess they did do after school, maybe they assisted in the classroom. The executive director started driving the bus. That was the first job he had.

Q. Are the job duties -- earlier we talked about Mr. -- we talked about Calvin Carter, correct?

A. Yes.

Q. And you said there are other janitors including Francesca Tejeda?

A. Tejeda.

Q. Her husband, Juan Tejeda. Cleotilde Maldonado; is that correct?

A. Yes.

Q. And was there anyone else that provided janitorial services for the school?

A. Miguel Reyes. That's all I can remember.

Q. Did they have the same job duties as Calvin Carter?

A. Pretty much. They had different classrooms so the materials might be in another spot.

Q. Did Juan and Francesca work together?

A. As far as I know.

Q. Where did Mr. Miguel Reyes work?

A. I don't know. Oh, you mean -- at the main campus. I don't remember what rooms he did.

Q. He used materials provided by the school?

185

A. Yes.

Q. Materials meaning both things like mops, brooms, and the cleaning solutions?

A. Yes.

Q. And he had to go to work after 5:30?

A. Yes.

Q. And was he paid on an hourly basis?

A. No, it was the same, certain amount per room per month.

Q. Okay. And how long did he work for the school?

A. He just stopped working not that long ago.

Q. Did he have his own cleaning business outside of the school?

A. I don't know. I don't know what he did. I think he and -- I have this idea that he and Cleo worked for AISD, but I can't really remember.

Q. Okay. Do you have personal knowledge of what Mr. Reyes or Mr. Maldonado did outside of working for Austin Montessori School?

A. No.

Q. Okay. Where did -- did Cleo work at the main campus also?

A. Yes.

Q. And he used the materials given by the school?

A. Yes.

186

Q.   He was paid per classroom on a monthly basis?

A.   She.

Q.   She?

A.   Yes.

Q.   On behalf of the corporation, why do you believe that Miguel Reyes and Cleotilde Maldonado are independent contractors rather than employees?

A.   Same reasons, Calvin Carter.

Q.   Any other reasons besides why you believe Mr. Carter is an independent contractor?

A.   No.

Q.   Francesca Tejeda, same question.  On behalf of the corporation, why do you believe she's an independent contractor?

A.   For the same reasons.

Q.   As Calvin Carter?

A.   Yes.

Q.   Miguel Reyes and Cleotilde Maldonado?

A.   Yes.

Q.   Who is Paul McDermott [phonetic]?

A.   Paula.

Q.   Paula, I'm sorry.

A.   She was a parent at the school who -- I believe she was getting her graduate degree in something related to Latino culture or something, and she was interested

187

in us having a Spanish integration program in our classrooms so she put together this plan that she helped to incorporate into our school, which consisted of having assistants speak Spanish if they were fluent in the classroom and she did these little classes for the assistants where she taught them songs.

Q.   How long did she work for AMS?

A.   She did that work during one school year, but it was like -- she would do a little bit at the beginning of the year.  She might come once a week and do a little class.  It was really -- she put together the plan and asked to be compensated a certain amount to do it.  And our founder is fluent and they have a house in San Miguel and she's really interested in having Spanish integration so she wanted us to pursue it.

Q.   So one school year basically?

A.   I think so, but I guess the 1099s would show for sure.  Maybe one and a half.

Q.   Okay.  No more than once a week?

A.   No.  Like at the beginning of the year she might have met with people since it was -- since it was when the teachers weren't with students, but she didn't come to the school more than once a week.

Q.   Naomi Caballero?

A.   She was hired for a very short time.  We have

188

to do a background check and a fingerprint check, and the background check showed she was fine, her fingerprint check did not so she had to go.

Q.   What was she hired to do?

A.   She was going to be after-school assistant.

Q.   She was hired to be an employee?

A.   Yes.

Q.   Did she actually work any time?

A.   Not with children.

Q.   Did she work for the --

A.   The school, yeah.

Q.   For the school?

A.   Maybe one pay period, maybe two.  I can't remember.  It seems like it doesn't take that long to get that fingerprint thing back.

Q.   Mr. Gilberto Miranda, I know we discussed him briefly.  What was his position with the school?

A.   He had -- previously had been an after-school leader for our elementary and when he went on -- when he started to just do music, he had some time that he would be available and if it coincided with a need, like we had a gap where we hadn't hired anybody yet and we were looking, we might ask him if he could work.

Q.   But at all times he provided work for the school the school considered him to be an employee?

189

A.   Yes.  Yes.

Q.   Did any of the individuals that served as janitors at the school, did any of them have to make investments in regard to their work?

A.   Not that I can recall, not that I knew of.

Q.   Did Ms. Castillo have to make any investments as to the school bus or her work?

A.   I don't think so.

Q.   Did Ms. Murphy have to make any investments as to her work?

A.   Not that I'm aware.  She may have.  She may have purchased some supplies or --

Q.   If she had purchased supplies, would she have been reimbursed for those supplies?

A.   If it was supplies that were required for working with the children, yes.  If it was stuff she was using to prepare, she might have just paid for it.  I just wouldn't know.

Q.   Did Ms. Murphy ever drive for field trips?

A.   I think she said she took a group of students somewhere.  She drove for upper elementary as a volunteer parent for years, and I think she did go somewhere with them as part of that course.

Q.   Did she have any training in driving a school bus?

198

or anything like that. She was observing, making recommendations, and observing and making recommendations. She wasn't responsible for us making sure that those were followed.

Q. Were her job duties laid out in that contract she submitted?

A. Yeah, I think it was she might have chosen to do more observations than she said, but she said I would observe once a week or once every other week, whatever it was, and I would provide a written report, yeah.

Q. And that was in the initial contract?

A. Yes.

Q. And there was dialogue between the parties on what those job duties were going to be?

A. Well, she wrote them out and we accepted them was kind of how it was. And then every year she does it because she wants to make sure that we're not -- that we're clear. There's -- well --

Q. Does the contract set up a minimum number of times she has to be in the classroom per week?

A. It doesn't say a minimum number of times. I think it just says she's agreeing to do this and for this amount of money.

Q. Okay. And what is she agreeing to do?

A. Well, I can't remember the hours. I think

199

it's -- I think it's once every other week and then provide a written report and meet with the guides at least once a month.

Q. That doesn't come out to 20 hours a week?

A. Well, yeah, because she could observe for three hours, I mean, and there's five classes and there's two after-school classes, seven, yeah. And she agreed to meet with the assistants maybe three times a semester over lunch and she -- yeah, so she does that.

Q. So what she's going to do is set out in the contract that's signed at the beginning of the year?

A. Yes.

Q. And she sticks by that and that equates to about 20 hours a week?

A. Right. And then there's a clause at the bottom that says if you ask her to do anything outside the contract, she may or may not agree to it but it's going to cost more.

Q. Good thing to have, right?

A. Yeah.

Q. Okay. And you say that she decides when she does her work, but I assume that there's some limitations on that because she's got to be there during the school day, correct?

A. Right, certainly.

200

Q. And if she has to watch specific guides or assistants, that's going to be dictated by when those guides or assistants are having a certain class, correct?

A. Well, they're all there Monday through Friday 8:00 to 4:00. One thing that she doesn't want to do ever is get up early. So she's not going to come before 9:30. She just says I'm never going to see that beginning of the morning.

Q. Is that in the contract?

A. Uh-huh.

Q. So does she actually put the times that she's going to be in the --

A. She just said she won't come early.

Q. Okay.

A. And she won't sub.

Q. Is that what she puts in the contract, I won't come early?

A. Yeah, and she won't sub. So --

Q. I want to see that contract.

What was Ms. Suggs doing in 2009 for the school?

A. She wasn't there. She was getting her training. She might have worked in the beginning of the year but then she went and did her training.

201

Q. What was she performing work doing?

A. I think she might have been an assistant in the elementary.

Q. The corporation would have considered her an employee?

A. Yes.

Q. For the time she worked at the school in 2009?

A. Right. Right.

Q. Who is the ultimate person responsible for the independent contractor, employee classification at AMS?

A. Me.

Q. And you get advice from the accountant?

A. Yes.

Q. Do you get advice from anyone else besides the accountant?

A. No.

MR. COOK: I think I'm getting near the end.

MR. MARSHALL: Famous last words.

MR. COOK: What I'd like to do -- we can go off the record.

(Recess taken from 3:38 p.m. to 3:51 p.m.)

Q. (By Mr. Cook) Ms. Glasgow, during the break you had a chance to review Exhibit 3 and so my question to you is, are there any individuals listed in Exhibit 3

202

in all the various records, the payroll records, with ADP and AmCheck, are there any individuals listed in those payroll records that the corporation considers are not employees?

A. Kjersti Wheeler, Adam Aguirre, and Judy Johnson.

Q. And why does the corporation believe that Adam Aguirre is not an employee?

A. In 2009 and 2010 he showed up on there on the record mistakenly.

Q. Okay.

A. He's in the first payroll record.

Q. In 2010 you said?

A. Wasn't it 2009? I think it's 2009.

Q. Did you actually find Adam Aguirre's name within Exhibit 3?

A. Yes, that's why I included it. I think it's on the first one, January.

Q. Here, I'll give it to you. I'm going to hand you back Exhibit 3 and let me know where Adam Aguirre is in Exhibit 3.

A. He's on AMS 000769. It says terminated, but he might have had a pay, that mess-up. So I just -- he's on the list. He wasn't an employee in 2009.

Q. Okay.

204

purposes of counting employees under the FMLA according to your corporation?

A. Yes.

Q. Okay. When are the staff listings made?

A. The contact list, so the phone numbers?

MR. MARSHALL: Yeah, I think we called them the staff listings.

A. That one? We do that before the first staff meeting at the beginning of the year.

Q. (By Mr. Cook) I'm not going to make this an exhibit, but I want to show you what's labeled AMS 231. This is a document produced by your counsel in this case.

A. Yes.

Q. So that's your understanding of what a staff listing is?

A. Yes, that's our --

Q. When does the corporation make those staff listings?

A. We do that before the first staff meeting of the year so maybe the second week of August. And then if we don't have everybody hired by that time or set, we might do another one the next month.

Q. In September sometime?

A. Yes.

203

A. He left at the end of December.

Q. Was he on the payroll in 2009?

A. No, he was gone. Mistake.

MR. MARSHALL: Can I clarify something? The end of December of '08.

THE WITNESS: '08, yes.

Q. (By Mr. Cook) Was Mr. Aguirre ever replaced?

A. Yes. Gilberto Miranda.

Q. And the corporation's position as to Judy Johnson was that she was an independent contractor rather than an employee?

A. Yes.

Q. The reasons we've discussed?

A. Yes.

Q. And the first person you mentioned was?

A. Kjersti Wheeler.

Q. And it's the corporation's position that she was not an employee but rather an independent contractor?

A. Yes.

Q. And that's because she was a bus driver?

A. Yes.

Q. Okay. The reasons we've discussed before.

Besides those three individuals, everyone else listed in Exhibit 3 is in fact an employee for the

205

Q. And what does the staff list reflect?

A. People -- it's a combination of people who are in the classroom and then people you might need to contact or want to contact.

Q. It includes employees?

A. Includes employees or contractors or the musicians, just anybody. Really, it's anybody in the office who might want to call somebody too.

MR. COOK: I'll pass the witness. I do want to have an agreement on the record -- we can go off the record to discuss the agreement, but I'm just making sure we have all the payroll records. Let's go off the record for a second.

(Discussion off the record.)

MR. COOK: Counsel for the defendant and plaintiff just spoke about an agreement on the record as far as production. Given the importance of these documents, defendants are going to agree to produce all remaining ADP payroll reports exhibited by Exhibit No. 3 for the years 2009 and 2010 as soon as possible, no later than two weeks. If you can't do it in two weeks, counsel will revisit over telephone and find another deadline in the near future, given the importance of these documents. Is that agreed?

MR. MARSHALL: That is agreed with the

206

understanding that we are, like I said, at the mercy of ADP and AmCheck, but I certainly agree to produce those documents as soon as we get them.

MR. COOK: Okay. And on AmCheck, defendant will agree to produce the payroll report, bimonthly payroll report, for all periods when you were using AmCheck within 2009 and 2010, which I think is actually just limited to 2010.

THE WITNESS: Yes.

MR. COOK: And we can do that within the next few days?

THE WITNESS: Yes.

MR. MARSHALL: Agreed.

MR. COOK: Agreed by Monday?

MR. MARSHALL: Yeah, I would think so, absolutely.

While we're doing agreements, because we're under the federal rules we have to go ahead and make it clear on the record that we're going to read and sign.

MR. COOK: Okay.

Q. (By Mr. Cook) I got one more question for you, Ms. Glasgow. When are annual reports printed?

A. We don't print them anymore. I think we printed one. Yeah, that's right. Now we just have a

207

PDF. And that was the first one we ever did and we had it done, like, maybe nine months after the period ended and it was the same for this year. Now we're hoping that the coming year we'll have it done sooner.

Q. So the reports are generated after the end of the year?

A. After the end of the fiscal year, which is the end of July 31st.

Q. And so the staff -- that it reflects the staff from the previous year?

A. Yes, and it's -- I can't even remember what's on there, but it could just be everybody who's worked at the school. I'm not sure.

Q. When in 2009 and 2010 to the best of your knowledge were these generated? Would it be, like, January or February?

A. Or maybe even March. I can tell by looking at the date on the PDF.

Q. Oh, let me show you.

(Exhibit No. 8 marked.)

A. It was just much later than you would expect.

Q. Let me give you Exhibit 8. Do you know when this Exhibit 8 was generated?

A. It doesn't -- oh, 2011. Okay, so this would have been done in 2012. So this is the latest one?

208

Q. I can't tell you that.

A. Yeah, '12. I know, it's crazy. Is this the one with the tree for the money? Yeah, this would have been done like in March or April, just -- yes, it's the one we just finished.

Q. So that was generated in March?

A. Of 2012.

Q. Of 2012. It reflects staff during the school year of 2010 to 2011?

A. Yes. Let me see what that says. Yeah, these are kind of like everybody that worked at the school.

Q. During that school year?

A. Right, it's not -- well, anyway.

Q. Go ahead.

A. It's not staff for the purposes of determining employees or independent contractors.

Q. But this does reflect who provided work for the school during that school year?

A. Right.

(Exhibit No. 9 marked.)

Q. Same question for Exhibit 9. When was it generated?

A. It would have been in 2011, the spring of 2011.

Q. And that reflects staff for the 2009-2010 school year?

209

A. Yes.

Q. People who worked for the school during the school year?

A. Yes, or did some work.

(Exhibit No. 10 marked.)

Q. Same question for 2008 to 2009, when was it generated?

A. Spring of 2010.

Q. And it reflects the staff for the 2008, 2009 school year?

A. And people that did some kind of work at the school.

Q. Okay. During that school year?

A. Yes. Well, I guess the exception, it has the board of directors on here under our staff, but I've never even laid eyes on Marianne Palotti, so she's never --

MR. COOK: All right. We'll pass the witness.

EXAMINATION

QUESTIONS BY MR. MARSHALL:

Q. Ms. Glasgow, for the years 2009 and 2010 for the purposes of determining who worked for AMS and when they worked for AMS, what do you rely on?

A. The payroll registers and my memory since the

Case 1:12-cv-00007-SS    Document 29-2    Filed 07/31/12    Page 37 of 42

Dawn Glasgow as Corp. Rep. - 7/26/2012

210

payroll registers are for bimonthly.

MR. MARSHALL: Pass the witness.

FURTHER EXAMINATION

QUESTIONS BY MR. COOK:

Q.  The payroll registers your counsel is talking about is Exhibit No. 3?

A.  Yes.

Q.  Or is exhibited by Exhibit No. 3?

A.  Yes.

MR. COOK: Pass the witness.

MR. MARSHALL: No questions.

(DEPOSITION CONCLUDED)

---

212

SIGNATURE

I, DAWN GLASGOW, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted on the previous page.

_____

DAWN GLASGOW

STATE OF _____

COUNTY OF _____

Before me, _____, on this day personally appears DAWN GLASGOW, known to me (or proved to me under oath or through _____) (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this _____ day of _____, 2012.

_____

NOTARY PUBLIC IN AND FOR

THE STATE OF _____

COMMISSION EXPIRES: _____

---

211

CHANGES AND CORRECTIONS

WITNESS NAME: DAWN GLASGOW        DATE: JULY 26, 2012

Reason Codes:  (1) to clarify the record; (2) to conform to the facts; (3) to correct a transcription error; (4) other (please explain).

PAGE   LINE   CHANGE                REASON CODE

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

---

213

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

CAROLINE CLARK,                �
    Plaintiff,        �  CIVIL ACTION
                      �
VS.                   �  NO. A-12-CA-007-SS
                      �
AUSTIN MONTESSORI SCHOOL,   �  JURY TRIAL DEMANDED
INC.,                 �
    Defendant.        �

REPORTER'S CERTIFICATION
DEPOSITION OF THE CORPORATE REPRESENTATIVE
OF AUSTIN MONTESSORI SCHOOL, INC., DAWN GLASGOW
JULY 26, 2012

I, Cynthia Warren, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, DAWN GLASGOW, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the deposition transcript was submitted on _____, to the witness or to the attorney for the witness for examination, signature and return to me by _____;

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes counsel for all parties of record:

214

Mr. Russell Scott Clark and Ms. Melissa A. Jacobs, Attorneys for the Plaintiff;

Mr. Bryan P. Marshall, Attorney for the Defendant;

That $_____ is the deposition officer's charges to the Plaintiff for preparing the original deposition transcript and any copies of exhibits;

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Certified to by me this 30th day of July, 2012.

_____
CYNTHIA WARREN, Texas CSR 4597
Expires 12/31/13
INTEGRITY LEGAL SUPPORT SOLUTIONS
Firm Registration No. 528
3100 West Slaughter Lane, Suite A-101
Austin, Texas  78748
512-320-8690
512-320-8692 (Fax)

# Exhibit 5

AMS 000237

| January – June 6, 2009 | | | |
|---|---|---|---|
| Number | Last Name | First Name | Position | |
| 1 | Aguilar | Socorro | Children's House Casita Leader | employee |
| 2 | Aguirre | Adam | Clubhouse Leader and Casita Assistant | employee |
| 3 | Aken | Joseph | Early Elementary Guide | employee |
| 4 | Banks | Janna | Director of Business Operations | employee |
| 5 | Beasley | Kadie | Youngest Children's Guide | employee |
| 6 | Boardman | Erin | Assistant | employee |
| 7 | Bowness | Sonal | Librarian/Communications Coordinator | employee |
| 8 | Breeding | Eric | Assistant/Club Mundi Leader | employee |
| 9 | Brown | Amanda | Campus Coordinator | employee |
| 10 | Bryant Goertz | Donna | Founder/Director | employee |
| 11 | Burnham | Kjersti | Shuttle/Bus Driver | employee |
| 12 | Clark | Caroline | Children's House Guide | employee |
| 13 | Collins | Mary Ann | Assistant | employee |
| 14 | Denton | Johnnie | Upper Elementary Guide | employee |
| 15 | Eagle | Angela | Casita Leader | employee |
| 16 | Fischer | Brandi | Assistant | employee |
| 17 | Friedman | Lori | Communications/Development | employee |
| 18 | Gevirtz | Jesse | Instructor | employee |
| 19 | Glasgow | Dawn | Administrative Executive | employee |
| 20 | Goertz | Donald | Executive Director | employee |
| 21 | Hearne | Kate | Assistant | employee |
| 22 | Howard | Jackie | Assistant | employee |
| 23 | Hunt | Lynn | Casita Assistant | employee |
| 24 | Jarrell | Kelly | Assistant | employee |
| 25 | Klein | Mandy | Clubhouse Leader/Childcare Licensing Directo | employee |
| 26 | Logan | Gwen | Parent Infant Education | employee |
| 27 | Logan | Thomas | Guide | employee |
| 28 | London | Natalie | Assistant | employee |
| 29 | Long Geil | Mary | Early Elementary Guide | employee |
| 30 | Mahnken | Amy | Assistant/Clubhouse Assistant | employee |
| 31 | Marble | Sasha | Assistant | employee |
| 32 | Mareen | Veronique | Instructor | employee |
| 33 | McGee | Cheryl | Children's House Coordinator | employee |
| 34 | Miller | Amber | Director of Admissions/Parent Liaison | employee |
| 35 | Monda | Valerie | Children's House Guide | employee |
| 36 | O'Brien | Lois | Office Manager | employee |
| 37 | Pippins | Jerry | Maintenance Supervisor | employee |
| 38 | Pippins | Nick | Assistant | employee |
| 39 | Porter | Lindsay | Assistant | employee |
| 40 | Rivas-Rivas | Erik | Early Elementary Guide | employee |
| 41 | Romine | Donna | Director of Campus Operations | employee |
| 42 | Ruiz | Margarita | Youngest Children's Guide | employee |
| 43 | Sansoni | Francoise | Children's House Guide | employee |
| 44 | Schiller | Jennifer | Assistant | employee |
| 45 | Scott | Nancy | Children's House Guide | employee |
| 46 | Sneed | Bill | Instructor | employee |
| 47 | Snyder | John | Upper Elementary Guide/ Upper Elementary | employee |
| 48 | Solorio | Yvonne | Children's House Guide | employee |
| 49 | Suggs | Elizabeth | Administrative Assistant | employee |
| | Chang | Jenny | Piano | provides independent services and contracts directly with parents |
| | Grove | Leslie | Elementary Coordinator/School Counselor | 1099-provides independent services--an independent licensed therapist with her own practice |
| | Groves | Debra | Piano | provides independent services and contracts directly with parents |
| | Hunt | Stephanie | Strings | provides independent services and contracts directly with parents |
| | Whitmore | Brooks | Piano | provides independent services and contracts directly with parents |
| | Zeger | Leah | Strings | provides independent services and contracts directly with parents |
| | Carter | Calvin | Caretaker | 1099-provides independent janitorial services--other janitors do too but we only put Calvin on the list because staff sometime call him directly if there is a cleaning schedule adjustment request. |

AMS 000238

| Number | Last Name | First Name | Position | |
|---|---|---|---|---|
| August 2009 - June 2010 | | | | |
| 1 | Aguilar | Socorro | Children's House Casita Leader | employee |
| 2 | Aken | Joseph | Early Elementary Guide | employee |
| 3 | Banks | Janna | Director of Business Operations | employee |
| 4 | Beasley | Kadie | Youngest Children's Guide | employee |
| 5 | Boardman | Erin | Assistant | employee |
| 6 | Bowness | Sonal | Librarian/Communications Coordinator | employee |
| 7 | Breckwoldt | Margie | Assistant | employee |
| 8 | Brown | Amanda | Campus Coordinator | employee |
| 9 | Bryant Goertz | Donna | Founder/Director | employee |
| 10 | Clark | Caroline | Children's House Guide | employee |
| 11 | Collins | Mary Ann | Assistant | employee |
| 12 | Davison | Rachel | Instructor | employee |
| 13 | Dean | Erin | Assistant | employee |
| 14 | Denton | Johnnie | Upper Elementary Guide | employee |
| 15 | Eagle | Angela | Casita Leader | employee |
| 16 | Fischer | Brandi | Assistant | employee |
| 17 | Friedman | Lori | Assistant to Director of Admissions | employee |
| 18 | Gevirtz | Jesse | Instructor | employee |
| 19 | Glasgow | Dawn | Administrative Executive | employee |
| 20 | Goertz | Donald | Executive Director | employee |
| 21 | Haley | Megan | Assistant | employee |
| 22 | Hearne | Kate | Assistant | employee |
| 23 | Hunt | Lynn | Casita Assistant | employee |
| 24 | Jarrell | Kelly | Upper Elementary Guide | employee |
| 25 | Johnson | Judy | Shuttle/Bus Driver | employee |
| 26 | Kaiser | Rebecca | Clubhouse Leader and Casita Assistant | employee |
| 27 | Klein | Mandy | Clubhouse Leader/Childcare Licensing Director | employee |
| 28 | Logan | Gwen | Parent Infant Education/Club Mundi | employee |
| 29 | Logan | Thomas | Guide | employee |
| 30 | London | Natalie | Children's House Guide | employee |
| 31 | Long Geil | Mary | Early Elementary Guide | employee |
| 32 | Mahnken | Amy | Assistant/Clubhouse Assistant | employee |
| 33 | Marble | Sasha | Assistant | employee |
| 34 | Mareen | Veronique | Instructor | employee |
| 35 | Matkin | Melanie | Assistant | employee |
| 36 | McGee | Cheryl | Children's House Guide | employee |
| 37 | Miller | Amber | Director of Admissions/Parent Liaison | employee |
| 38 | Monda | Valerie | Children's House Guide | employee |
| 39 | O'Brien | Lois | Office Manager | employee |
| 40 | Osborne | Callie | Assistant | employee |
| 41 | Pippins | Jerry | Maintenance Supervisor | employee |
| 42 | Rivas-Rivas | Erik | Early Elementary Guide | employee |
| 43 | Romine | Donna | Director of Campus Operations | employee |
| 44 | Ruiz | Margarita | Youngest Children's Guide | employee |
| 45 | Sneed | Bill | Instructor | employee |
| 46 | Snyder | John | Elementary Coordinator | employee |
| 47 | Solorio | Yvonne | Children's House Guide | employee |
| 48 | Swope | Kate | Assistant | employee |
| | | | | |
| | Carter | Calvin | Caretaker | 1099-provides independent janitorial services--other janitors do too but we only put Calvin on the list because staff sometime call him directly if there is a cleaning schedule adjustment request. |
| | Grove | Leslie | School Counselor | 1099-provides independent services--an independent licensed therapist with her own practice |
| | Groves | Debra | Piano | provides independent services and contracts directly with parents |
| | Hunt | Stephanie | Strings | provides independent services and contracts directly with parents |
| | Charlotte | Kroger | Children's House Mentor/Consultant | 1099-provides independent Montessori consulting services per contract |
| | Oriti | Patricia | Consultant | 1099-provides independent Montessori consulting services--lives in Gig Harbor, WA |
| | Whitmore | Brooks | Piano | provides independent services and contracts directly with parents |
| | Zeger | Leah | Strings | provides independent services and contracts directly with parents |

AMS 000239

| Aug - Dec 2010 | | | | |
|---|---|---|---|---|
| Number | Last Name | First Name | Position | |
| 1 | Alexis | Harper | Clubhouse Leader | employee |
| 2 | Amanda | Brown | Campus Coordinator | employee |
| 3 | Amber | Miller | Director of Admissions/Parent Liaison | employee |
| 4 | Amy | Mahnken | Assistant | employee |
| 5 | Angela | Eagle | Casita Leader | employee |
| 6 | Bill | Sneed | Instructor | employee |
| 7 | Brandi | Fischer | Assistant | employee |
| 8 | Callie | Osborne | Assistant | employee |
| 9 | Caroline | Golden | Assistant | employee |
| 10 | Cheryl | McGee | Children's House Guide | employee |
| 11 | Daniel | Murphy | Clubhouse Assistant | employee |
| 12 | Dawn | Glasgow | Administrative Executive | employee |
| 13 | Donald | Goertz | Executive Director | employee |
| 14 | Donna Bryant | Goertz | Founder/Director Emeriti | employee |
| 15 | Elizabeth | Padron | Assistant | employee |
| 16 | Elizabeth | Suggs | Campus Coordinator-PT | employee |
| 17 | Erik | Rivas-Rivas | Early Elementary Guide | employee |
| 18 | Erin | Boardman | Campus Coordinator-PT-afternoon | employee |
| 19 | Gwen | Logan | Parent Infant Education/Club Mundi | employee |
| 20 | Janice | Kearley | Assistant - morning | employee |
| 21 | Jennifer | Suarez | Assistant | employee |
| 22 | Jerry | Pippins | Maintenance Supervisor | employee |
| 23 | Jesse | Gevirtz | Instructor | employee |
| 24 | Jesse | Jahnke | Children's House Guide | employee |
| 25 | John | Snyder | Elementary | employee |
| 26 | Johnnie | Denton | Upper Elementary Guide | employee |
| 27 | Joseph | Aken | Early Elementary Guide | employee |
| 28 | Kadie | Beasley | Youngest Children's Guide | employee |
| 29 | Kate | Hearne | Assistant | employee |
| 30 | Kelly | Jarrell | Upper Elementary Guide | employee |
| 31 | Lois | O'Brien | Office Manager | employee |
| 32 | Lori | Friedman | Assistant to Director of Admissions | employee |
| 33 | Lynn | Hunt | Casita Assistant | employee |
| 34 | Mandy | Klein | Clubhouse Leader/Childcare Licensing Director | employee |
| 35 | Margarita | Ruiz | Youngest Children's Guide | employee |
| 36 | Mary | Collins | Assistant | employee |
| 37 | Mary | Long Geil | Early Elementary Guide | employee |
| 38 | Mary Ann | Collins | Assistant | employee |
| 39 | Meg | Haley | Children's House Casita Leader | employee |
| 40 | Melanie | Matkin | Assistant | employee |
| 41 | Natalie | London | Children's House Guide | employee |
| 42 | Patricia | Oriti | Consultant | employee |
| 43 | Sasha | Marble | Assistant | employee |
| 44 | Socorro | Aguilar | Assistant | employee |
| 45 | Sonal | Bowness | Librarian/Communications Coordinator | employee |
| 46 | Thomas | Logan | Instructor | employee |
| 47 | Valerie | Monda | Children's House Guide | employee |
| 48 | Veronique | Mareen | Instructor | employee |
| 49 | Yvonne | Soloria | Children's House Guide | employee |
| | Brooks | Whitmore | Piano | provides independent services and contracts directly with parents |
| | Charlotte | Kroger | Children's House Mentor/Consultant | 1099-provides independent Montessori consulting services per contract |
| | Debra | Groves | Piano | provides independent services and contracts directly with parents |
| | Lani | Hamilton | Strings | provides independent services and contracts directly with parents |
| | Leslie | Grove | School Counselor | 1099-provides independent services--an independent licensed therapist with her own practice |
| | Lucinda | Castillo | Shuttle/Bus Driver | provides independent transportation services |
| | Megan | Canney | Strings | provides independent services and contracts directly with parents |
| | Sheilah | Murphy | Instructor – PT | 1099 provides independent services related to occupation/curriculum sessions. We contracted with Sheilah to cover subject areas where expertise was lacking in periodic 6-week blocks |