# Exhibit 6

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

CAROLINE CLARK,                     )
        Plaintiff                   )
                                    )
vs.                                 )   CIVIL ACTION NO.
                                    )   A-12-CA-007-SS
AUSTIN MONTESSORI SCHOOL,           )
INC.,                               )
        Defendant                   )


*******************************************************

ORAL DEPOSITION OF

LUCINDA CASTILLO

FEBRUARY 27, 2012

*******************************************************


        ORAL DEPOSITION OF LUCINDA CASTILLO, produced

as a witness at the instance of the Plaintiff and

duly sworn, was taken in the above-styled and

numbered cause on the 27th day of February, 2012,

from 10:05 a.m. to 10:44 a.m., before Kim Furr, RPR,

Certified Shorthand Reporter in and for the State of

Texas, reported by computerized stenotype machine at

the offices of The Cook Law Firm, 919 Congress

Avenue, Suite 1145, Austin, Texas, pursuant to the

Federal Rules of Civil Procedure and the provisions

stated on the record or attached hereto.

Lucinda Castillo - 2/27/2012

**Page 2**

APPEARANCES

FOR PLAINTIFF:
Russell Scott Cook
State Bar No. 24040724
- and -
Melissa A. Jacobs
State Bar No. 24046144
The Cook Law Firm
919 Congress Avenue
Suite 1145
Austin, Texas 78701
(512) 482-9556
(512) 597-3172 (Fax)

FOR DEFENDANT:
Roland E. Gonzales
Cokinos, Bolien & Young
10999 West IH-10
Suite 800
San Antonio, Texas 78230
(210) 293-8700
(210) 293-8733 (Fax)

**Page 3**

I N D E X

Appearances.................................. 2
LUCINDA CASTILLO
    Examination by Ms. Jacobs ...............    4
    Examination by Mr. Gonzales .............   25
    Examination by Ms. Jacobs ...............   27
    Examination by Mr. Gonzales .............   28
    Examination by Ms. Jacobs ...............   29
Signature and Changes........................   31
Reporter's Certificate.......................   33

NO EXHIBITS MARKED

**Page 4**

LUCINDA CASTILLO, having been first duly sworn, testified as follows:

EXAMINATION

QUESTIONS BY MS. JACOBS:

Q. Ms. Castillo, thank you for coming today. Would you please state your full name for the record.

A. Lucinda Condarco Castillo.

Q. Ms. Castillo, you and I just met for the first time a few minutes ago. Correct?

A. Yes.

Q. You know that I'm an attorney representing the plaintiff, Caroline Clark, in this lawsuit?

A. Yes.

Q. Have you ever had your deposition taken before?

A. No.

Q. Do you understand that the answers that you give here today are just like testifying in front of a judge or jury?

A. Yes.

Q. And that violating the oath you just took to tell the truth is punishable by a federal criminal penalty?

A. Yes.

Q. If I ask you a question today that you don't

**Page 5**

understand, would you please stop me and let me know that you don't understand the question?

A. Sure.

Q. Can you please give me what your job title is at Austin Montessori school?

A. Shuttle bus driver.

Q. And when did you start working as a shuttle bus driver?

A. In February, I believe, of 2010.

Q. Can you please tell me how you got your job as a shuttle bus driver?

A. Through a friend.

Q. And who was that?

A. My friend Paula Cox.

Q. And she told you that there was an opening?

A. Yes.

Q. And how did she know that there was that opening?

A. Through her friend Dawn Glasgow.

THE REPORTER: Donna who?

THE WITNESS: Dawn.

THE REPORTER: Oh, Dawn, okay.

Q. (By Ms. Jacobs) Did you fill out an application?

A. No.

**6**

Q.  What did you do to get the job there?
A.  I interviewed in person.
Q.  And how did you get that set up?
A.  I made the appointment with Dawn.
Q.  And can you tell me what kind of questions were asked at the interview, what you remember from it?
      MR. GONZALES:  Objection; form.
Q.  (By Ms. Jacobs) Can you just tell me what kind of questions were asked of you at the interview?
      MR. GONZALES:  Objection; form.
A.  I don't remember.  Let's see.  Well, if I wanted to drive a bus and if I was a skilled driver or in what -- if I was available to drive during the week and -- just the basic questions.
Q.  (By Ms. Jacobs) Did you get a job offer during that interview?
A.  Yes.
      MR. GONZALES:  Objection; form.
Q.  (By Ms. Jacobs) Okay.  And what was the offer?
A.  I don't know -- I don't understand what you want to --
Q.  What were the conditions of the job going to be?

**7**

      MR. GONZALES:  Objection; form.
Q.  (By Ms. Jacobs) When you were given an offer of the job, what were the words that were spoken to you?
A.  I don't remember.  Just if I could -- if I would be available to drive a bus for the school.
Q.  Did you talk about pay?
A.  Yes.
Q.  What did you talk about in terms of pay?
A.  How many hours it was going to take and the pay per hour was $16 an hour.
Q.  And what did you find out about the hours that the job would be?
      MS. JACOBS:  Objection; form.
A.  At the time of the interview?
Q.  (By Ms. Jacobs) Yes.
A.  Yes.
Q.  And what were the hours for your job going to be?
      MR. GONZALES:  Objection; form.
A.  An hour each way.  Three hours a day.
Q.  (By Ms. Jacobs) Did you get any written --
I guess strike that.
      Did you get a letter of appointment for your job?

**8**

A.  No.
Q.  Did you get a contract for your job?
A.  No.
Q.  During the interview, did you talk about how long you would work as a bus driver?
A.  No.
Q.  Did you ever talk about a specific length of time that you would work?
A.  No.
      MR. GONZALES:  Objection; form.
Q.  (By Ms. Jacobs) You told me about how you were offered $16 an hour and it's an hour each way.
A.  Yes.
Q.  Can you tell me just a little bit about what it is that you're doing during those three hours?
      MR. GONZALES:  Object to the form of the question.
A.  I get to the main office, and it takes me about 30 minutes to get to the North Austin location, and I have to be there right before 8:00.  At 8:00, I get the students on the bus and we turn around and head back south and go to the main office; drop off those children and then head to the Gaines Creek campus and drop off the high school students and then go back to the main office.

**9**

Q.  (By Ms. Jacobs) So which of those locations is the main office at?
A.  Sunset Drive.
Q.  Okay.  So from there, you head north?
A.  I head north to Great Northern Boulevard.
Q.  And then you say you go south?
A.  Uh-huh, at 8:00.  I leave promptly at 8:00 and head back south to the Sunset Drive campus, drop off those children and pick up other children, then take them to the Gaines Creek campus.  Then I head back -- then I turn around and go back to the main office.
Q.  And what is the time that you usually get to the Gaines Creek office, approximately?
A.  About 8:30.
Q.  And usually about what time do you leave the main office?
A.  I just go and park the bus, drop off the mail and then go home.
Q.  I'm sorry, what time do you usually get to the main office to start your morning?
A.  In the morning?  I like to get there early, so I usually get there about 7:30 -- or 7:15, actually, because I leave at -- it depends if -- you know, I take my time and get there -- most of the time, it's been about 7:15, so it takes me about 30 minutes to get to

10

the Great Northern location.

Q. And so from the Great Northern location, you go to the main office at Sunset?

A. Yes.

Q. And about what time do you usually arrive there?

A. About 8:30.

Q. Then what about the Gaines Creek?

A. It's only, like, a five-minute drive. It's not far.

Q. And did you determine what time you would start in the mornings?

A. Uh-huh.

Q. And did you determine what time you would arrive at the Great Northern location?

A. No. That's already a set time. I have to be there before 8:00.

Q. And what about the main office, what time do you have to be there?

MR. GONZALES: Objection; form.

A. In the morning or in the afternoon?

Q. (By Ms. Jacobs) Yes, in the morning.

A. It doesn't matter. The object is to get to the Great Northern before 8:00.

Q. And then in the morning --

11

(Cell phone interruption.)

A. Uh-oh, sorry.

Q. (By Ms. Jacobs) Is there any particular time that you have to be at the Gaines Creek location in the morning?

A. Yes. Right after I drop off the first group of children, I immediately pick up the ones that are waiting for me and then I take them to Gaines Creek, and they've got to be there by 8:30.

Q. And for this route that you described to me that you follow in the morning, did you determine what that route would be?

A. It's -- no.

Q. Did someone tell you what that route would be?

A. Yes.

Q. Who told you?

A. Dawn.

Q. So on a typical day, what time would you usually arrive back at the main office by?

MR. GONZALES: Objection; form.

A. In the morning?

Q. (By Ms. Jacobs) (Nods head.)

A. 8:35.

Q. After your morning route, when do your driving duties start up again on a typical day?

12

MR. GONZALES: Objection to the form of the question.

A. 2:30.

Q. (By Ms. Jacobs) And can you tell me about the afternoon route?

A. I get to the school -- well, I leave my house around 2:30 to get there before 3:00. 3:00 is when I have to leave the campus, drive to Gaines Creek to pick up the afternoon students, and then I go back to the Sunset Drive to drop off those students and pick up other students and then head to Great Northern.

Q. What time do you usually arrive at the Gaines Creek location after you leave the main office?

A. 3:10. 3:05, 3:10. It depends on traffic.

Q. Is there a particular time you have to be there by?

A. Before 3:20.

Q. And then is there a particular time that you have to be back at the main office after you do the pickup at Gaines Creek?

A. Right after that.

Q. And then from the main office to the Great Northern campus, is there a particular time that you have to arrive at Great Northern?

A. I usually arrive around 3:50.

13

Q. Do you have to be there by 3:50?

A. No.

MR. GONZALES: Objection; form.

Q. (By Ms. Jacobs) Is there any time that you have to be there by?

MR. GONZALES: Objection; form.

A. Not in the afternoon.

Q. (By Ms. Jacobs) Now, for that last -- is that the last leg of the route in the afternoon from Sunset to Great Northern?

A. Yes.

Q. Do you have children with you for that last leg of the route?

A. Yes.

Q. So is there any particular time that you have to have those children back to the Great Northern campus?

A. Before 4:00. Yes.

Q. And who determined that you needed to be back there by 4:00?

A. The school.

Q. So when I'm reviewing my notes, it looks like doing the morning route and the afternoon route takes somewhere around two hours.

A. An hour and a half, depending on traffic.

14

Q. So how do you keep track of your time that you're working?

A. I log it in.

Q. And where do you log it in?

A. On a check-in list that I carry on the bus.

Q. So when you -- can you describe for me what happens when you arrive -- your car arrives on the campus? Do you go straight to the bus to sign in?

A. Yes.

MR. GONZALES: Objection; form.

Q. (By Ms. Jacobs) And then after you've signed in, what do you do next?

A. Take off, do the route.

Q. And so, typically, what time do you usually sign off in the morning after finishing the route?

MR. GONZALES: Objection; form.

A. After I park the bus.

Q. (By Ms. Jacobs) Is there any typical range of times?

A. I don't understand what you're wanting --

THE REPORTER: Can you speak up for me?

THE WITNESS: Okay. Sure.

Q. (By Ms. Jacobs) So I guess I -- in my notes, I saw that you said that typically y'all arrive back around 8:35 in the morning.

15

A. Yes.

Q. So would you say that your time that you log out is typically around 8:35?

A. Most of the time.

Q. When you say "most of the time" --

A. Sometimes if I don't -- if there's an accident or something that delays me, then it fluctuates five to ten minutes.

Q. And then what about in the afternoon, what time do you typically get back from doing the route?

A. Afternoon traffic is worse than the morning, I think, so a 10- to 15-minute fluctuation in the afternoon, but usually arrive around 4:35, 4:40.

Q. So are you responsible for making sure the kids get on and off the bus?

A. Yes.

Q. Do you follow a particular routine in getting the children on and off the bus?

A. It becomes routine every day.

Q. So do you typically stay in the driver's seat or do you get off the bus to help the children on and off the --

MR. GONZALES: Objection; form.

A. I stay on the seat.

Q. (By Ms. Jacobs) Does anyone help them get

16

on and off the bus?

A. They're old enough to do it for themselves.

Q. Are there any rules about the children's behavior while they're on the bus?

A. Yes.

Q. What are those rules?

A. Stay seated in their seat, buckle up, no loud talking, no electronics. They can only speak softly with the student next to them. They're all well behaved.

Q. And then did you determine what those rules would be?

A. I have a bus safety rules sheet that we follow.

Q. Okay. When you say "bus safety rules sheet that we follow," what are you referring to?

A. It was just rules that were in the manual that was given to me.

Q. And who gave you that manual?

A. The school.

Q. What else is in that manual?

A. That's it. Well, it's not necessarily a manual. It's just a school -- a binder that I put together and that -- and the sheets were already in the manual, but the binder broke and so I just got a

17

replacement binder.

Q. Okay. So were there any other sheets that you put in there besides the rules?

A. The log-in sheet.

Q. Was there anything other than the log-in sheets and the rules?

A. No.

Q. And how soon -- sorry, strike that. Do you have to turn the long-in sheet in to get paid?

A. No. No, but I turn it in on a monthly basis, once it runs out of room.

Q. So when you say that you get paid for three hours a day, that's regardless of what your actual log-in and log-out times are?

A. Yes.

MR. GONZALES: Objection; form.

Q. (By Ms. Jacobs) Have you ever had any behavioral problems with any of the children on the bus?

A. No.

Q. Have you ever had any issues at all related to driving the bus?

A. No.

Q. So who is in charge of maintaining the bus?

18

A. The school maintenance guy.

Q. And who is that?

A. Jerry.

Q. So the bus is not your bus?

A. No.

Q. The bus is the school's bus?

A. Yes.

Q. Do you ever have to communicate with Mr. Pippins to let him know that some kind of maintenance is needed for the bus?

A. Yes.

Q. Can you describe an example of a time you've done that?

A. When, recently, I filled up the bus with gas, he asked me to let him know when I fill up so that he could put gas treatment in the bus. And it's in pretty good shape, so it's not -- he hasn't done that much maintenance to it.

Q. So in addition to driving the route in the morning and driving the route in the afternoon, is that one of your other duties, is to make sure that the bus has enough gas?

A. Yes.

MR. GONZALES: Objection; form.

Q. (By Ms. Jacobs) Do you have any other

19

duties?

A. Not at the school.

Q. What about related to the bus?

A. Related to the bus? Let's see. Well, making sure all of the seat belts are all pulled out, because when the kids get off, they bunch up, and so I just rearrange the seat belts and sweep the bus and keep it tidy.

Q. (By Ms. Jacobs) And do you sweep the bus every day?

A. Yes.

Q. Do you do that both in the morning and the afternoon?

A. Sometimes. It depends if the kids have lots of -- if they have gravel in their shoes and -- it depends.

Q. And what about pulling out the seat belts, do you do that --

A. I do that daily.

Q. And when you go to get gas for the bus, how do you pay for the gas?

A. With a school credit card.

Q. Other than gas, is there anything else that you buy for the bus?

A. No.

20

Q. Is there anything else you have to buy to do your job?

A. No.

Q. Do you have a supervisor at the school?

A. Dawn.

Q. What kind of supervision does Dawn provide over your work?

A. Well, if I -- I mean, we haven't really had to. I'm pretty much self-sufficient and I drive -- just drive the bus.

Q. Do you ever speak with Dawn?

A. Every day.

Q. And do you usually speak with her before or after the morning route or before or after the afternoon route?

A. Before the afternoon route, most of the time.

Q. And can you describe what you talk about with her that's related to the bus --

MR. GONZALES: Objection; form.

Q. (By Ms. Jacobs) -- or the route?

MR. GONZALES: Objection; form.

A. Just everyday -- just small talk, really.

Q. (By Ms. Jacobs) So do you let her know each time you go to get gas?

A. I don't need to.

21

Q. Do you have to turn in a receipt for the gas?

A. Yes.

Q. Who do you turn in your receipt to?

A. To the receptionist.

Q. If the -- have you ever had to let Mr. Pippins know that the bus needs any kind of maintenance?

A. Yes.

Q. And so when you do need to let him know that, do you also share that information with Dawn?

A. No.

Q. And how do you let Mr. Pippins know?

A. Text or verbal.

Q. Did the school give you any kind of training in driving the bus?

A. No.

Q. How did -- or what kind of training do you have to drive a bus?

A. I'm a skilled driver. I'm an adult. I know how to drive something big like that.

Q. Do you have a special kind of license?

A. No. What do you mean by -- a Texas driver's license?

Q. Yeah, a Texas driver's license.

A. Yes.

Q. You don't have a CDL?

22

A. No.

Q. You know that's a commercial driver's license?

A. I do.

Q. Have you ever done any training related to driving a school bus?

A. No.

Q. Are you responsible for maintaining the bus's registration?

A. No.

Q. Do you know who is responsible for maintaining the registration?

A. The school.

Q. Are you responsible for maintaining insurance for the bus?

A. No.

Q. Do you know who is responsible for that?

A. The school.

Q. Have you ever had to miss a day of work?

A. No.

Q. If you were to need to miss a day of work, would you be able to send someone else to drive the bus?

A. Yes.

Q. Who would you send?

A. Oh, I don't know a particular person, but with enough notice, they would find someone to do it.

23

Q. So you would find someone or the school would find someone?

MR. GONZALES: Objection; form.

A. No, the school.

Q. (By Ms. Jacobs) Is there any particular procedure that you would need to follow if you were not able to come in?

A. I haven't had to, so I don't know.

Q. Have you ever been told of a procedure that you would need to follow in case you can't come in?

A. No.

Q. Do you have any other jobs right now?

A. Odd jobs.

Q. Do any of your other jobs involve driving a bus?

A. No.

Q. Do any of your other jobs involve driving at the job other than just driving to and from the job?

A. Wait, repeat that again.

Q. I'm sorry, that was confusing.

Do any of your jobs actually involve driving as a part of the job?

A. Just to and from, yeah.

Q. But not for the actual job?

A. Right.

24

Q. How do you think your job benefits Austin Montessori School?

MR. GONZALES: Objection; form.

A. It's rewarding. And, I mean, that's -- I feel privileged to drive the bus.

Q. (By Ms. Jacobs) Do the -- do you know if the school provides the shuttle service free of charge or do the parents have to pay for their children to drive -- or to ride?

MR. GONZALES: Objection; form.

A. I think they have to pay, but I don't know how much.

MS. JACOBS: If we can just take a quick break.

MR. GONZALES: Sure.

(A short break was taken.)

Q. (By Ms. Jacobs) If you were to decide that you no longer wanted to continue working for Austin Montessori School, would you have to pay any kind of a penalty --

A. No.

Q. -- to leave your job?

What did you do to prepare for this deposition today?

A. Nothing.

25

MS. JACOBS: That's all that I have right now. I pass the witness.

EXAMINATION
QUESTIONS BY MR. GONZALES:

Q. Just a few quick questions, Ms. Castillo. My name is Roland Gonzales. I'm an attorney with Cokinos, Bosien & Young and we represent Austin Montessori School. You testified earlier that you were hired to drive a bus route. Correct?

A. Correct.

Q. Now, if you do not drive that bus route, you do not get paid. Correct?

A. I still get paid.

Q. Well, in other words, if you were not to show up for work one day to drive the bus route, you wouldn't get paid for that day. Correct?

A. No, I would not get paid.

Q. So you get no paid sick leave --

A. No.

Q. -- is that correct?

And you have no 401(k). Correct?

A. No.

Q. You testified earlier regarding a schedule for the bus route. Correct?

A. Correct.

30

MR. GONZALES: I have nothing further for today.

32

I, LUCINDA CASTILLO, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

_____

LUCINDA CASTILLO

THE STATE OF _____)

COUNTY OF _____)

Before me, _____, on this day personally appeared LUCINDA CASTILLO, known to me or proved to me on the oath of _____ or through _____ (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he/she executed the same for the purpose and consideration therein expressed.

Given under my hand and seal of office on this _____ day of _____, _____.

NOTARY PUBLIC IN AND FOR
THE STATE OF _____

My Commission Expires: _____

31

CHANGES AND SIGNATURE

LUCINDA CASTILLO                    FEBRUARY 27, 2012

PAGE LINE  CHANGE                    REASON

33

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

CAROLINE CLARK,              )
    Plaintiff                )
                             )
vs.                          ) CIVIL ACTION NO.
                             ) A-12-CA-007-SS
AUSTIN MONTESSORI SCHOOL,    )
INC.,                        )
    Defendant                )

*****************************************************

REPORTER'S CERTIFICATE
ORAL DEPOSITION OF LUCINDA CASTILLO
FEBRUARY 27, 2012

*****************************************************

I, Kim Furr, RPR, Certified Shorthand Reporter in and for the State of Texas, do hereby certify that the witness was duly sworn by me; that the facts stated in the foregoing pages are true and correct; that the said witness did make the above and foregoing answers in response to questions propounded as shown; that I did, in shorthand, report said proceedings; and that the above and foregoing typewritten pages contain a full, true, and correct transcription of my shorthand notes taken on said occasion.

31

CHANGES AND SIGNATURE

LUCINDA CASTILLO                              FEBRUARY 27, 2012

PAGE LINE   CHANGE                           REASON



NONE

32

I, LUCINDA CASTILLO, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

*Lucinda Castillo*

LUCINDA CASTILLO

THE STATE OF ___Texas___ )

COUNTY OF ___Travis___ )

Before me, ~~Lucinda Castillo~~ Lois O'Brien RO 3-26-12, on this day personally appeared LUCINDA CASTILLO, known to me or proved to me on the oath of _____ or through _____ (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he/she executed the same for the purpose and consideration therein expressed.

Given under my hand and seal of office on this ___26th___ day of ___March___, ___2012___.

LOIS O'BRIEN
NOTARY PUBLIC STATE OF TEXAS
COMMISSION EXPIRES:
10-28-2015

*Lois O'Brien*

NOTARY PUBLIC IN AND FOR

THE STATE OF ___Texas___

My Commission Expires: ___Oct. 28, 2015___

Lucinda Castillo - 2/27/2012

33

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

CAROLINE CLARK,                        )
     Plaintiff                      )
                             )
vs.                                    )    CIVIL ACTION NO.
                             )    A-12-CA-007-SS
AUSTIN MONTESSORI SCHOOL,               )
INC.,                                  )
     Defendant                      )

*******************************************************

REPORTER'S CERTIFICATE

ORAL DEPOSITION OF LUCINDA CASTILLO

FEBRUARY 27, 2012

*******************************************************

    I, Kim Furr, RPR, Certified Shorthand Reporter in and for the State of Texas, do hereby certify that the witness was duly sworn by me; that the facts stated in the foregoing pages are true and correct; that the said witness did make the above and foregoing answers in response to questions propounded as shown; that I did, in shorthand, report said proceedings; and that the above and foregoing typewritten pages contain a full, true, and correct transcription of my shorthand notes taken on said occasion.

34

I further certify that I am neither attorney or counsel for, related to, nor employed by any parties to the action in which this testimony was taken and, further, I am not a relative or employee of any counsel employed by the parties hereto or financially interested in the action.

SUBSCRIBED AND SWORN TO under my hand and seal of office on this the 5th day of March, 2012.

Kim Furr, CSR, RPR
Texas CSR 6997
Expiration: 12/31/2013
Integrity Legal Support Solutions
Firm Registration No. 528
3100 West Slaughter Lane, Suite 101
Austin, Texas  78748
(512) 320-8690
(512) 320-8692 (Fax)

# Exhibit 7

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

CAROLINE CLARK,                     )
  Plaintiff               )
                                    )
vs.                                 )   CIVIL ACTION NO.
                                    )   A-12-CA-007-SS
AUSTIN MONTESSORI SCHOOL,           )
INC.,                               )
  Defendant               )

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

ORAL DEPOSITION

CALVIN CARTER

FEBRUARY 28, 2012

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*


ORAL DEPOSITION OF CALVIN CARTER, produced as a witness at the instance of the Plaintiff and duly sworn, was taken in the above-styled and numbered cause on the 28th day of February, 2012, from 9:00 a.m. to 9:50 a.m., before Kim Furr, RPR, Certified Shorthand Reporter in and for the State of Texas, reported by computerized stenotype machine at the offices of The Cook Law Firm, 919 Congress Avenue, Suite 1145, Austin, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

**Page 2**

APPEARANCES

FOR PLAINTIFF:
Russell Scott Cook
State Bar No. 24040724
- and -
Melissa A. Jacobs
State Bar No. 24046144
The Cook Law Firm
919 Congress Avenue
Suite 1145
Austin, Texas  78701
(512) 482-9556
(512) 597-3172 (Fax)

FOR DEFENDANT:
Roland E. Gonzales
Cokinos, Bolien & Young
10999 West IH-10
Suite 800
San Antonio, Texas  78230
(210) 293-8700
(210) 293-8733 (Fax)

**Page 3**

INDEX

Appearances.................................. 2
CALVIN CARTER
    Examination by Ms. Jacobs ...............    4
    Examination by Mr. Gonzales .............   34
    Examination by Ms. Jacobs ...............   35
    Examination by Mr. Gonzales .............   36
    Examination by Ms. Jacobs ...............   37
    Examination by Mr. Gonzales .............   38
Signature and Changes........................ 39
Reporter's Certificate....................... 41

NO EXHIBITS MARKED

**Page 4**

CALVIN CARTER,
having been first duly sworn, testified as follows:

EXAMINATION

QUESTIONS BY MS. JACOBS:

Q. Mr. Carter, thank you very much for coming today. Would you please state your full name for the record.

A. Calvin Bernard Carter.

Q. Mr. Carter, you and I just met for the first time a few minutes ago. Correct?

A. Correct.

Q. Have you ever had your deposition taken before?

A. No.

Q. Okay. You know that I'm the attorney representing the plaintiff, Caroline Clark, in this action?

A. I do now.

Q. Do you understand that the answers you give here today are just like testifying in front of a judge or a jury?

A. Yes.

Q. And that violating the oath you just took to tell the truth is punishable by a federal criminal penalty?

**Page 5**

A. Yes.

Q. If I ask you a question today that you think you don't understand, would you please stop me and let me know that you don't understand the question?

A. Yes, I will.

Q. Thank you.

You and I haven't had any telephone conversations about this case. Is that correct?

A. That's correct.

Q. You did talk to someone from this office, though?

A. Yes.

Q. That conversation was only about scheduling this deposition, though, correct, and not about the nature of the case?

A. That's correct.

Q. Did you receive a subpoena to appear here today?

A. Yes, I did.

Q. Did you receive a witness fee?

A. Yes.

Q. Did you receive mileage for you drive from your residence today?

A. No.

Q. What was the quantity of the check that you

6

received?

A.   $47, I think.

Q.   And what is your current address?

A.   6303 Waynesburg Cove.

Q.   Are you currently working for Austin Montessori School?

A.   No, I'm not.

Q.   Have you ever worked for Austin Montessori School?

A.   Yes, I have.

Q.   What was your position when you were working --

MR. GONZALES:  Objection; form.

Q.   (By Ms. Jacobs) -- for Austin Montessori School?

MR. GONZALES:  Objection; assumes facts not established.

A.   Well, my position was, like, a caretaker -- they called me a caretaker, but actually I just cleaned the building up.

Q.   (By Ms. Jacobs) And when did you work as a caretaker for Austin Montessori School?

A.   I think I started working there in 1989, all the way -- halfway through 2010.  Twenty-two years or 21 years.

7

Q.   Can you remember approximately when, in 2010, you stopped work there?

A.   It was at the end of the spring term. Actually, I -- at the end of the school in -- during the summer, that's when the kids were out, and normally I would just come back out there and start the next year in August or September, depending.  And I just decided that I had had enough.

Q.   When you said you decided you had had enough, what did you mean?

A.   Well, my knees were really hurting me bad, and the prior -- in that same year, I had missed several days because my knees were hurting so bad, I just couldn't do it.  And then was -- and I felt bad having to call in and say, you know, "I can't work today.  My legs are hurting."

So I decided to give it up.

Q.   For that time from 1989 until 2010, did you ever work in any other position at Austin Montessori school?

A.   No, I didn't.

Q.   Did you have any other jobs during that time?

A.   I had my regular full-time job.

Q.   What was your regular full-time job?

A.   It was at the University of Texas.

8

Q.   And what did you do there?

A.   I started out as a mail clerk and ended up as a supervisor of mail services.

Q.   And when -- are you still working there?

A.   No, I'm not.

Q.   When did you stop working there?

A.   Five years ago.  I worked there 27 years, 28 years.

Q.   Was is that 2006 or 2007?

A.   Uh-huh.

Q.   Which year?

A.   I'm really -- all I know is, I worked there 27, 28 years.  It was five years ago.  I'll tell you I retired five years ago from there.

Q.   And for that last year that you were working there, what were your hours?

A.   It was, like, 7:30 to 4:00.

Q.   And then while you were working at Austin Montessori School, what were your hours?

MR. GONZALES:  Objection; form. Objection; assumes facts not established.

THE WITNESS:  Am I supposed to answer that?

MR. GONZALES:  You can.

A.   I didn't have any set hours.  As long as the

9

building was clean before the next day.  You know, I could go out there at 1:00 at night.  It just depended on when I got out there.  It was usually early.

Q.   (By Ms. Jacobs) What time did you typically arrive at Austin Montessori School?

A.   I would say around 5:00, rough guess.

Q.   Would you typically go from your job at UT over to the school?

A.   Yes, I would.

Q.   So, typically, you would start around 5:00 p.m.?

A.   For the most part, yes.

Q.   Was there -- can you remember any circumstances that would have changed that start time for you?

A.   No.

Q.   And then --

A.   If I got out there a little early, I would have started a little early.  If I got out there later, then I started later.  I wasn't on a clock.  There was no time clock or anything.

Q.   Was there any particular time that -- I'm sorry, strike that.

Could you have gone to start your work at 2:00 in the afternoon?

10

A. No.

Q. What time were you able to start working?

A. When I left my regular job to go out there, I started working.

Q. After you stopped working at your job at UT, could you have gone to the school at any time of day to start your work?

A. No.

Q. What was the earliest you could start your work?

A. Whenever school was out, out there.

Q. And what time was that?

A. I really don't know the school hours. I just -- the kids -- the parents picked them up, and sometimes there were kids out there when I was working; I'll put it that way. So there was no -- because that's like a day care-type school, and they stayed there until the parents came and picked them up.

And I could still work, because they were mostly there in the classrooms, and I would start on one end of the school and then work toward the front. That way, by the time I got to that area, they would be gone.

Q. So once you stopped working at UT, did you ever start your job at Austin Montessori School before 4:00 p.m.?

11

A. No.

Q. Did you ever start before 5:00 p.m.?

A. Yes.

Q. Did anyone tell you that you could not start before 4:00 p.m.?

A. No. Before 4:00 p.m.?

Q. Correct.

A. I never started before 4:00 p.m.

Q. And why was that?

A. Because I didn't want to. There was too much -- because was too many kids still out there, and they would just slow me down and get in -- be in my way.

Q. Okay. How did you get your job at Austin Montessori School?

A. I saw an ad in the paper and I applied for it. The lady that hired me, she's deceased now. Her name was Beverly Hoffman. But that was a long time ago.

Q. Did you have an interview?

A. Yes, I did.

Q. And I realize that it was quite some time ago, but do you remember what she told you at the interview?

A. Well, actually, she walked me through -- that's when they had a school on Alpine Street in South Austin, and I met her over there. And she showed me the school and told me the things that I needed to

12

do. And I said yes, I'd take the job.

Q. Do you recall what some of those things were that she showed you that you would need to do for that job?

A. Cleaning the floors, sweeping and mopping, cleaning the desktops, emptying the trash. Those are the basic -- you know, the basics. And then whatever I saw that needed to be done.

Q. And by that, what do you mean, anything that you "saw that needed to be done"?

A. If something just looked -- didn't look clean, I'd go ahead and do it. I mean, with little children, you have -- you know, they have stuff here and there. I'd pick up stuff off the floor that I knew that shouldn't be on the floor, and put it in the proper place. But I wasn't required to do that, but that's what I did.

Q. Were you asked to do any kind of maintenance work, in addition to the cleaning?

A. The only maintenance work that I did -- I don't know if it's maintenance, but I changed the lightbulbs when that needed to be done. If there was a toilet that was stopped up or something like that, they had plungers, where I would, you know, try to take care of that. But if I couldn't, then they would call people

13

out there to do those kind of things.

Q. As part of your cleaning tasks that you described for me, like the sweeping and mopping, were you also required to clean the rest rooms?

A. Yes, I was.

Q. Can you remember anything else that Ms. Hoffman told you at the interview?

A. Not really.

Q. Did she talk about how much the job would pay?

A. Oh, way back then? It didn't pay very much. I was desperate for money then. I think...

MR. GONZALES: Sir, let me just jump in. Nobody is asking you to guess.

THE WITNESS: Right.

MR. GONZALES: If you don't know --

A. I'm not really positive. I can't say for sure.

Q. (By Ms. Jacobs) Okay. Do you remember how you found out what the pay would be?

A. When I got paid the first time.

Q. So you may or may not have had a conversation with Ms. Hoffman during the interview about your pay, but you can't recall?

A. I think in the paper -- the newspaper, from that -- in this ad, I think it said, like, $50 a week,

14

something like that.

Q. And if you can recall, from the beginning of your employment --

MR. GONZALES: Objection.

Q. (By Ms. Jacobs) Strike that.

If you can recall, from the beginning of the time you started working for Austin Montessori School, what did you have to do in order to receive your pay, in terms of, did you have to submit a time card?

A. Initially, when I first started, I would give Ms. Hoffman my hours that I put in. But after I got to their present location on North -- what's that -- Great Northern is where that school is now -- I was just on a set -- like, a salary. I didn't have to give time or submit anything. Every two weeks, my check was there in my mailbox.

Q. So you say that initially, you did turn in your time?

A. Yeah, to Beverly Hoffman. But that was, like, the second -- the first year, the second year maybe, at most. And then after that, I guess they had confidence in me, and then they just -- as long as I did the job right, they didn't have any problems with paying me.

Q. And so in the beginning, how much were you paid per hour?

15

MR. GONZALES: Objection; assumes facts not established and mischaracterizes evidence.

A. I wasn't paid by the hour. I was paid by the job; put it that way.

Q. (By Ms. Jacobs) And -- but you still had to turn in your hours?

A. Yes, at the very beginning.

Q. Do you know why you had to turn in hours if you weren't being paid an hourly rate?

A. I don't know if I was paid an hourly rate or not.

Q. So you don't know whether you were paid by the job or by the hour?

MR. GONZALES: Objection; he just said he was paid by the job.

MS. JACOBS: I believe he said -- can we go back and read the testimony, please? Just the last couple of questions.

(Material read back as requested.)

Q. (By Mr. Gonzales) So there's seems to be some different testimony that, on one hand, you said that you were paid by the job, but you also said that you weren't sure if you were paid an hourly rate.

A. Right. I don't know -- I considered it by the

16

job.

Q. (By Ms. Jacobs) You considered it by the job?

A. Right. If I went to school and it wasn't very dirty and I got through, you know, faster than normally it would take me if it was a dirty building, then that's the way I look at it, by the job. I mean, I couldn't just stay there and -- I wasn't out there "X" amount at one time and then leave at the same time every night.

Q. But you were still initially required to turn in your hours?

A. Yeah.

Q. Okay. So after approximately one or two years, you moved from the campus on Alpine over to the Great Northern campus?

A. No. They had --

Q. Do you remember --

A. -- another campus. They had another campus. It was in northeast Austin. I want to say it was on Wheeler Street, I think, but I'm not 100 percent sure of the name of that street. I stayed there, and then they closed that school and that's when I went to Great Northern.

Q. Now, while you were doing the caretaking work at Wheeler, did you have to turn in your hours?

17

A. No.

Q. And so after you moved to Wheeler and then, later on, to the Great Northern campus, you never turned in your hours?

A. That's correct.

Q. How much were you earning in 2010 at the time you left Austin Montessori School?

MR. GONZALES: Objection; vague.

A. $800 a month.

Q. (By Ms. Jacobs) And how frequently were you paid?

A. Every two weeks.

Q. Every two weeks. Did you receive -- how much was each check?

A. $400.

Q. So was that every two weeks or was that bimonthly?

A. $400 bimonthly.

Q. Do you remember ever receiving any sort of written agreement regarding your employment with Austin -- I'm sorry, strike that.

Did you ever receive any kind of written agreement regarding your work for Austin Montessori School?

A. No.

18

Q.  So just looking at my notes, it seems like you obviously, at certain points, received an increase in pay while you were working at Austin Montessori School. Did you ever ask for an increase in pay?

A.  No.

Q.  How did you get those increases in pay?

A.  They just told me, "You're going to get a raise."

Q.  And who told you?

A.  When Beverly was there, she would tell me. I don't -- then, you know, they changed the lady that -- I forget her name now, too. They never really just told me. They just gave it to me, to my -- the best of my recollection.

Q.  So Ms. Hoffman would tell you that you were going to get more pay back --

A.  She only did that, like, when I was at the Alpine School, but after that, no. They just figured I was doing a good job and gave me a raise. That's the way I saw it. I was there 21, 22 years, so...

Q.  So no one ever told you that, but that's what you assumed?

A.  Yeah.

Q.  Okay. So going back to the times that you would approximately begin your work at Austin Montessori

19

School, you said that generally, it was around 5:00?

MR. GONZALES:  Object to the form of the question.

A.  I would say that's around -- roughly guessing, yeah, because I didn't have a time clock. I didn't look at the clock. It just was about that time.

Q.  (By Ms. Jacobs) So if you started about 5:00 p.m., how long did it usually take for you to finish your work?

A.  Two-and-a-half or three hours.

Q.  So do you recall usually what time you would leave?

MR. GONZALES:  Objection; vague.

Q.  (By Ms. Jacobs) Do you recall typically what time you would leave the school after finishing your work?

A.  I'd say around 8:00 maybe, just rough guessing. I'm not really sure.

Q.  Did you ever bring anyone to help you with your work?

A.  Occasionally.

Q.  And who would you bring to help you?

A.  A friend.

Q.  And did your friend help you for free?

A.  Yes.

20

Q.  Were there ever occasions where you would do the cleaning, outside of the evening hours that you described as being sort of the typical arrival time?

MR. GONZALES:  Objection; asked and answered. He told us earlier that he would come and go as he pleased.

Q.  (By Ms. Jacobs) So were there ever occasions where you would, say, arrive at midnight?

A.  There may have been one or two occasions in all the years that I would go real late at night.

Q.  (By Ms. Jacobs) So you had mentioned that there were a few times during the last school year where, because of your knees, you weren't able to come in?

A.  Right.

Q.  So did you -- I think you had mentioned that you had to call in.

A.  Right. I did call.

Q.  Who would you call?

A.  I'd call one of the teachers at the school to let them know I wasn't coming in and I'd call the maintenance guy and then I would call the main office -- that's in South Austin -- or whoever I could get in touch with, to let them know I wasn't going to make it in, and they found somebody to cover it.

21

Q.  Did you ever send someone in your place?

A.  No.

Q.  And when you refer to a person in maintenance, who was that?

A.  Who, now?

Q.  A person in maintenance.

A.  Oh, shoot, I've got his number on my cell phone, and I don't have my cell phone.

Q.  Okay.

A.  But he does the -- he's the general maintenance man for all of the schools.

Q.  Is that Mr. Pippins?

A.  Yes. Jerry Pippins.

Q.  Was there any particular teacher that you would try to call?

A.  Mary.

Q.  And in the main office, was there anyone in particular that you would talk to?

A.  Yeah, but I can't think of her name. She was the one that was writing checks for me the last few years.

Q.  Dawn Glasgow?

A.  No, it wasn't Dawn. Whoever there -- the person that they left -- you know -- well, it may have been Dawn Glasgow. It could have been her.

22

Q.  Did teachers ever call you to ask you to adjust your cleaning schedule?

A.  No.

Q.  Did anyone in the administration ever call you to ask you to adjust your cleaning schedule?

A.  No.

Q.  Did Mr. Pippins ever call you to ask you to adjust your cleaning schedule?

A.  No.

Q.  Were there ever any changes to your schedule made that were made at the request of someone from the school?

MR. GONZALES:  Objection; asked and answered.

A.  The only thing that I can say different to what I've just answered you is that occasionally, they would have meetings out there, parents meetings -- parents and teacher meetings or whatever, and they might would ask me to, you know, come in a little late -- or they had -- you know, they had little plays with their kids and all that stuff, and I'd go in late.  But they would let -- they would be there, and I'd know, before they would -- to do those, schedule those events, so...

Q.  (By Ms. Jacobs) And how did you know that?

A.  They had a calendar with everything that they

23

were going to do for the month.

Q.  Did someone give that to you, or did --

A.  Yeah, they gave me a calendar.

Q.  And who is "they"?

A.  The office manager out there at the Great Northern.  They put a calendar in my mailbox.  It was a yearly calendar that they had.  They still do that, I assume.

Q.  So did you have a mailbox at the --

A.  I had a mailbox.

Q.  Other than the calendar, did you receive anything else in that mailbox?

A.  My paycheck.

Q.  Anything else?

A.  If I asked for some small supplies, they might would just stick them in there, but...

Q.  Did the cleaning tasks that Ms. Hoffman had asked you to do ever change during the time that you were working at Austin Montessori School?

MR. GONZALES:  Objection to the form of the question, and it mischaracterizes evidence.

A.  No.  I never changed my routine.

Q.  (By Ms. Jacobs) So the whole time you were there, the tasks that you --

A.  Well, I had -- when I got out to

24

Great Northern, it was a lot bigger school, and I had more things to do.  I had to figure out ways to do them, on my own, so that's what I did.

Q.  So what were those other things?

A.  They were the same things.  There was just more of it.  The school was a lot bigger than the one where I started.

Q.  Earlier, you had talked about that it generally took you about two-and-a-half to three hours to get your work done.

A.  Uh-huh.

Q.  Is that at the time that you stopped working at Austin Montessori School, it took you about two-and-a-half to three hours?

A.  More like three.

Q.  Three?  Okay.  And when you had been working at the first location that you worked at, about how long did it take you to --

A.  A couple of hours.

Q.  What about at the second location?

A.  Same.  A couple of hours.  It was small.

Q.  But it ended up taking you more time when you went to the Great Northern campus?

A.  Yeah, because the layout of the building was different.  And the way to get, you know, water for your

25

mop bucket and all that stuff, it was pretty tough, because you did everything -- you worked from the outside.  You didn't put the water bucket inside of the building.  At least I didn't.  I don't know, whoever is doing it now, they might have figured out a way, but I didn't -- it was easier for me to leave the mop bucket outside -- even when it was raining and freezing cold, to have the mop bucket outside and take it from unit to unit.  There was four units.  And that's what I did.

Q.  When you first started at the Great Northern campus, about how many hours did it take you to get all of the tasks completed each night?

A.  It didn't take quite as long, because when I first started out there, they had a dance studio out there that wasn't even owned by them.  I don't think that school was owned by them.  So part of that building was used for those dance class people, and the other part was for the student -- you know, teaching and all that stuff.

Q.  So in order to do the mopping and sweeping, for example, I'm assuming that you needed brooms, the mop bucket you mentioned --

A.  Dust mop and all that kind of stuff.

Q.  Did you bring those?

A.  They provided all of that.

26

Q. Was there anything that you provided?
A. No.
Q. And how did you go about making sure that they had those materials available for you?
A. I would tell the office manager that I'm running low on this, I'm running low on that. And they would have it out there.
Q. And what about other cleaning supplies, like soap? Who supplied that, things like that?
A. They supplied all of the soaps, everything.
Q. Did you ever purchase anything to use to do your cleaning?
A. I purchased a couple of little items, but I forwarded -- I left them the receipts for it, and the they reimbursed me for what I did spend on it.
Q. Were you required to follow any particular rules in completing your cleaning tasks?
A. What kind of rules?
Q. Just -- I mean, did the school give you any rules that you needed to follow?
A. Well, I had a list of the things that I was supposed to do.
Q. And who gave you that list?
A. I don't remember exactly who gave it to me.
Q. Did you keep the list with you, or was that

27

something that you kept at the school?
A. I kept it at the school.
Q. Where at the school did you keep it?
A. In the storage unit.
Q. Was that list still there when you left the school?
A. I don't remember seeing it.
Q. And can you remember what that list contained?
A. Well, just things that I do every night. I guess they gave it to me so that -- until you got used to -- well, at least I figured that once you got used to it, you didn't need to look at it anymore. So that's what it was.
Q. Did they ask you to follow any particular address code or wear a uniform?
A. No.
Q. And no one from Austin Montessori School gave you any training in how to do the cleaning tasks?
A. No.
Q. Other than the friend that you mentioned that you sometimes had brought with you, did anyone else ever assist you in your cleaning tasks?
A. A couple of times, yeah.
Q. And who would assist you?
A. A couple of friends, every now and then. If I

28

needed to be somewhere earlier, and I knew I could get through faster, then I would take someone there with me.
Q. And did you ever pay any of those individuals?
A. No.
Q. Did the school ever provide you with anyone to assist you?
A. No.
Q. Based on what you were receiving in your pay, do you feel like you would have been able to pay someone to assist you with your cleaning tasks?
MR. GONZALES: Objection; speculation.
A. That, I don't know. I don't think so, because I needed every penny that I got, so they did it as friends, being friends.
Q. (By Ms. Jacobs) Was anyone else working in the caretaker role at the campus that you were working at, that you're aware of?
A. No.
Q. Do you know if the school had individuals working in the caretaker role that you had at other campuses?
A. No.
Q. Did any problems or issues ever arise for you in doing your work at Austin Montessori School?
A. Nope.

29

Q. At the time you left, did you have a supervisor at Austin Montessori School?
A. No.
Q. Do you feel like at any time that you were working at Austin Montessori School, that someone was your supervisor?
MR. GONZALES: Objection; asked and answered.
A. No. If I can -- if I might say that if they needed -- if any of the teachers out there needed something special done, they would ask me to do it, but it was besides what I normally would do, yes.
MR. GONZALES: Objection; nonresponsive.
Q. (By Ms. Jacobs) Did you ever get paid extra to do any extra tasks?
A. No.
Q. After you stopped working at UT but you were continuing with your caretaking duty at Austin Montessori School, did you have any other jobs during that time?
A. No.
MR. GONZALES: Object to the form of the question.
Q. (By Ms. Jacobs) Are you the owner of a business?

**30**

A. No.

Q. Have you ever been the owner of a business?

A. That, I can't say 100 percent yes or 100 percent no. I used to do -- I used to do lawn service work with my dad. That was years ago. He retired; I just kept doing it. I guess it was my business. I don't know.

Q. Was that during the time that you were working for Austin Montessori School?

A. Yeah. But I only did it on the weekends.

Q. And how did you get paid for doing that work?

A. Cash, checks, whatever.

Q. If people paid you with checks, did they make them out to you individually or to the name of the business?

A. To me.

Q. Did you do anything to prepare for your deposition today?

A. No.

Q. Did you look at any documents?

A. No.

Q. Did you speak with Mr. Gonzales to prepare for your deposition today?

A. No.

Q. Have you spoken to anyone at Austin Montessori

**31**

School about this deposition?

A. No, I haven't.

Q. About this lawsuit?

A. Nope.

MS. JACOBS: I'm just going to go off the record for a few minutes and take a quick break.

MR. GONZALES: Okay.

(A short break was taken.)

Q. (By Ms. Jacobs) Mr. Carter, you had described how -- at the beginning of the deposition -- you decided not to come back for this school year as a caretaker.

A. For 2010.

Q. For 2010?

A. Uh-huh.

Q. Or for 2011 to 2012?

A. I quit working there 2010.

Q. Okay. And who did you inform of your decision to not come back?

A. I called Jerry Pippins because everybody was on summer vacation, and I was able to get through to him because he has a cell phone, and I talked to him more than anybody else.

Q. And can you describe for me what you told him?

A. I just told him I wouldn't be back.

**32**

Q. And what did he tell you?

A. As a matter of fact, I told everybody out there that I probably wouldn't be back because my knees were just killing me. I couldn't do it.

Q. And what did Mr. Pippins tell you when you told him that?

A. I think he told -- I'm thinking -- well, I'm sure that he would have told his supervisor, or the people that were over him or paying him, that I wouldn't be back; maybe to start looking for someone else for the summer, because this was during the summer months.

MR. GONZALES: Objection; nonresponsive.

Q. (By Ms. Jacobs) And why do you think that?

A. Because he was the one I got in touch with.

Q. Did he -- do you remember him telling you anything during that conversation?

MR. GONZALES: Objection; asked and answered.

A. No, other than, you know, "Sorry you can't be back." Because they all -- well, none of them wanted me to leave there. I guess I was supposed to stay all -- they wanted me to stay forever. They would never want me to leave, so...

Q. (By Ms. Jacobs) And you didn't have to pay any kind of penalty for leaving your job there?

**33**

A. No.

Q. During the time that you performed the caretaking tasks for Austin Montessori School, did you ever receive a W-2?

MR. GONZALES: Objection.

A. Yeah, I received a W-2.

Q. (By Ms. Jacobs) What did you receive a W-2?

A. Every year, I received one in January, the first part of February.

Q. Do you recall whether you received a W-2 or a 1099?

A. I don't know. What's the difference?

Q. For your work at UT, do you recall whether you received a W-2 or a 1099?

A. Those numbers don't mean anything to me. I know every year I'd get those things in the mail stating how much money they took out of my check, out of my pay, and this and that, and that's what I'd file with the IRS.

Q. Do you always prepare your own taxes?

A. I don't.

Q. During the time that you were receiving a form related to your taxes from Austin Montessori School, who was preparing your taxes?

**34**

A. I had a tax accountant.

MS. JACOBS: I'll pass the witness.

EXAMINATION

QUESTIONS BY MR. GONZALES:

Q. Mr. Carter, my name is Roland Gonzales. I'm an attorney with Cokinos, Bosien & Young and we represent Austin Montessori School in the lawsuit that's been filed against them. Thanks for being here this morning.

Mr. Carter, is it fair to say that you don't know the difference between a W-2 and a 1099?

A. I don't.

Q. (By Ms. Jacobs) So, earlier when you testified that you received a W-2, you're really not sure -- you really can't tell whether that was a W-2. Correct?

A. Right, because the Internal Revenue states all these little numbers at the top, and I don't know the difference. That's why I hired an accountant to do my taxes.

Q. In all fairness, I don't completely understand it myself.

Mr. Carter, the calendar that you referred to earlier was not a calendar of your schedule. Correct?

**35**

A. Right.

Q. In other words, it was a calendar that was given to you so that you would see the school's calendar. Correct?

A. Correct.

Q. And you testified that that was a calendar of plays and parent-teacher meetings and that sort of thing?

A. Correct.

Q. Mr. Carter, you testified earlier that while you were working at Austin Montessori School, you had a couple of other different jobs. Correct?

A. Correct.

Q. And in fact, if you had wanted to clean other schools during the same time period, you had that option. Correct?

A. Yes.

Q. You wouldn't have to seek the approval of Austin Montessori School. Correct?

A. That's correct.

MR. GONZALES: I'll pass the witness.

EXAMINATION

QUESTIONS BY MS. JACOBS:

Q. Did you ever do any other cleaning work during the time that you were working full time for UT and also

**36**

doing caretaking work for Austin Montessori School?

A. No. Well, other than my lawn service business, my -- you know, I consider it a business. But that was only on weekends.

Q. Practically speaking, do you think that you could have done any other cleaning work during the week in addition to your full-time job?

A. No, I could not have.

MS. JACOBS: Pass the witness.

EXAMINATION

QUESTIONS BY MR. GONZALES:

Q. But, mr. Carter, the option was always yours? In other words -- well, let me rephrase that.

The option to take on other cleaning jobs was always your option. Correct?

MS. JACOBS: Objection; asked and answered.

A. That's correct.

Q. (By Mr. Gonzales) So you could rearrange the hours in which you cleaned the Austin Montessori School to accommodate cleaning another school if you had wanted to. Correct?

A. Correct.

Q. But there was nothing that the Austin Montessori School did to prevent that. Correct?

**37**

A. That's correct.

EXAMINATION

QUESTIONS BY MS. JACOBS:

Q. Were there any hours during the --

MR. GONZALES: I didn't pass the witness.

MS. JACOBS: I'm sorry.

MR. GONZALES: All right, I'll pass the witness, but I'll reserve a little time for followup.

EXAMINATION

QUESTIONS BY MS. JACOBS:

Q. Were there any hours during the day that you could not do your cleaning work at Austin Montessori School?

A. Could you -- Hang on. Just -- could you repeat what you said?

Q. Could you have done the cleaning work for Austin Montessori School during the school day?

A. No.

Q. So what were the hours, as best you understand, that you could not perform the caretaking work for Austin Montessori School?

A. Well, I just assumed that I couldn't do it when the kids were there, until school was out. And I didn't know the -- I didn't know what time they started school, I didn't know what time they were out of school.

41

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

CAROLINE CLARK,                        )
      Plaintiff                        )
                                       )
vs.                                    )   CIVIL ACTION NO.
                                       )   A-12-CA-007-SS
AUSTIN MONTESSORI SCHOOL,              )
INC.,                                  )
      Defendant                        )

*******************************************************

REPORTER'S CERTIFICATE

ORAL DEPOSITION OF CALVIN CARTER

FEBRUARY 28, 2012

*******************************************************

      I, Kim Furr, RPR, Certified Shorthand Reporter
in and for the State of Texas, do hereby certify
that the witness was duly sworn by me; that the
facts stated in the foregoing pages are true and
correct; that the said witness did make the above
and foregoing answers in response to questions
propounded as shown; that I did, in shorthand,
report said proceedings; and that the above and
foregoing typewritten pages contain a full, true,
and correct transcription of my shorthand notes
taken on said occasion.

42

I further certify that I am neither attorney or counsel for, related to, nor employed by any parties to the action in which this testimony was taken and, further, I am not a relative or employee of any counsel employed by the parties hereto or financially interested in the action.

SUBSCRIBED AND SWORN TO under my hand and seal of office on this the 9th day of March, 2012.

Kim Furr, CSR, RPR
Texas CSR 6997
Expiration: 12/31/2013
Integrity Legal Support Solutions
Firm Registration No. 528
3100 West Slaughter Lane, Suite 101
Austin, Texas  78748
(512) 320-8690
(512) 320-8692 (Fax)



**COKINOS BOSIEN & YOUNG**
*Attorneys at Law*

10999 West IH-10
Suite 370
San Antonio, Texas 78230

210.293.8700
Fax: 210.293.8733
www.cbylaw.com

April 4, 2012

*Via Regular Mail*

Steven B. Wheeler
Production Manager
Integrity Legal Support Solutions
3100 West Slaughter Lane, Suite A-1-1
Austin, Texas 78748

Re:    No. D-1-GN-11-000096
       *Caroline Clark v. Austin Montessori School, Inc.*
       In the 419th Judicial District Court, Travis County, Texas

Dear Mr. Wheeler:

Enclosed you will find the original deposition transcripts of Lucinda Castillo and Leslie Grove with duly executed Changes and Signature Page. Additionally, enclosed you will find the original deposition transcripts of Sheila Murphy and Calvin Carter. Ms. Murphy and Mr. Carter did not advise of any changes to their deposition testimony.

Sincerely,

COKINOS, BOSIEN & YOUNG

Steven D. Settles
Board Certified Paralegal - Civil Trial Law
Texas Board of Legal Specialization

/sds
SOR\4087-002\Clark\Correspondence\integrity legal support re transcripts 04-04-12

Enclosures

Houston   713.535.5500   •   Dallas-Ft. Worth   817.635.3600   •   Beaumont   409.892.1515
A Professional Corporation

# Exhibit 8

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

CAROLINE CLARK,                    )
    Plaintiff                  )
                                   )
vs.                                )    CIVIL ACTION NO.
                                   )    A-12-CA-007-SS
AUSTIN MONTESSORI SCHOOL,          )
INC.,                              )
    Defendant                  )


* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

ORAL DEPOSITION OF

SHEILAH MURPHY

FEBRUARY 27, 2012

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *


ORAL DEPOSITION OF SHEILAH MURPHY, produced as a witness at the instance of the Plaintiff and duly sworn, was taken in the above-styled and numbered cause on the 27th day of February, 2012, from 12:53 p.m. to 2:24 p.m., before Kim Furr, RPR, Certified Shorthand Reporter in and for the State of Texas, reported by computerized stenotype machine at the offices of The Cook Law Firm, 919 Congress Avenue, Suite 1145, Austin, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

APPEARANCES

FOR PLAINTIFF:

Russell Scott Cook
State Bar No. 24040724
- and -
Melissa A. Jacobs
State Bar No. 24046144
The Cook Law Firm
919 Congress Avenue
Suite 1145
Austin, Texas  78701
(512) 482-9556
(512) 597-3172 (Fax)

FOR DEFENDANT:

Roland E. Gonzales
Cokinos, Bolien & Young
10999 West IH-10
Suite 800
San Antonio, Texas  78230
(210) 293-8700
(210) 293-8733 (Fax)

I N D E X

Appearances.................................     2
SHEILAH MURPHY
  Examination by Ms. Jacobs ...............     4
  Examination by Mr. Gonzales .............    48
  Examination by Ms. Jacobs ...............    53
  Examination by Mr. Gonzales .............    58
  Examination by Ms. Jacobs ...............    59
Signature and Changes........................    61
Reporter's Certificate.......................    63

NO EXHIBITS MARKED

SHEILAH MURPHY, having been first duly sworn, testified as follows:

EXAMINATION

QUESTIONS BY MS. JACOBS:

Q. Ms. Murphy, thank you for coming today. Would you please state your full name for the record.

A. Sheilah Maureen Murphy.

Q. Ms. Murphy, you and I just met for the first time a few minutes ago. Is that correct?

A. Uh-huh.

Q. You know that I'm an attorney representing the plaintiff, Caroline Clark, in this lawsuit?

A. Uh-huh.

Q. Have you ever had your deposition taken before?

A. No.

Q. Do you understand that the answers that you give here today are just like testifying in front of a judge or a jury?

A. Yes.

Q. And that violating that oath you just took to tell the truth is punishable by a federal criminal penalty?

A. Yes.

Q. Okay. If I ask you a question today that you think you don't understand, would you please stop me and let me know that you don't understand the question?

A. Yes.

Q. You and I have not had any telephone conversations about this case. Is that --

A. No.

Q. -- correct?
You did talk to someone from this office, though, about this deposition?

A. Somebody called me to schedule it.

Q. But the conversation was only about scheduling this deposition and --

A. Yeah, uh-huh.

Q. There was no discussion of the --

A. The case?

Q. -- nature of the case?

A. No.

Q. Did you receive a subpoena to appear here today?

A. Yes.

Q. Did you receive a witness fee?

A. Yes.

Q. Did you receive mileage for your drive from your residence to this office here today?

A. No.

6

Q. What is your current address?

A. 4301 Sinclair Avenue, and the zip is 78756.

Q. Do you have your own business?

MR. GONZALES: Objection; form.

A. Do I have my own business? I'm not sure what that means, do I have my own business.

Q. (By Ms. Jacobs) Are you the owner of a business?

A. No.

Q. Have you ever been the owner of a business?

A. No.

Q. Are you currently working for Austin Montessori School?

A. No.

Q. What was your position while you were working for Austin Montessori School?

A. I was a part-time instructor.

Q. When did you work as a part-time instructor at the Austin Montessori School?

A. I worked the whole school year last year, fall to spring. And then this year, I started in the fall. I worked a couple of months and then told them that I wasn't going to work anymore. But I did come back this last month of February and teach two hours a week each week, so I taught about eight hours, more or less, this

7

month.

Q. And I'm sorry, just to clarify, you said that you started working in the fall of this year. And when did you --

A. Yeah, I worked -- I began working at Austin Montessori last fall, the fall of 2010, and I worked part time with them for that entire school year. And then I started again this fall, and I worked about two months. I don't remember exactly when it was that I stopped.

I was hired to do these six-week units of either Occupations and Humanities, and after I did the first one, and there would have been a three-week break before I would have started teaching the next one, I told them that I wasn't going to be able to come back to do the next one.

But we left on very good terms. And I told them that I would be willing to come back and teach these Italian classes in February if they wanted, and so that's what I did.

Q. So when you started this fall -- so in 2011, you did one six-week block?

A. Uh-huh.

Q. And then you did not do another six-week block after that?

8

A. Right.

Q. But you did teach this month of February?

A. Right. I'd go in there about two mornings a week and teach, like, a 45-minute class. Last week, I taught two hour-and-a-half classes.

Q. I'm sorry, you taught two classes of 45 minutes each or --

A. Yeah. I think for about three weeks, I taught on a Tuesday and a Thursday from 11:15 to 12:00 -- or 11:15 to 11:55, technically. And then this last week, because they didn't have school on Friday and the students wanted me to come extra, I taught for about an hour and a half on -- it wasn't -- I'm sorry, it wasn't Tuesdays and Thursdays; it was Wednesdays and Fridays. I taught on Wednesday and Friday for an hour and a half each last week.

Q. Okay. I wrote down here that it's from 11:15 to 11:55, so it was --

A. The first three weeks. And then Monday and Wednesday -- I mean, sorry, Wednesday and Friday -- it was going to be Tuesdays and Thursdays and then I changed it from Wednesdays and Fridays.

And then last week, the students wanted some more before they left for their trip to Rome, and so I came in at 10:25 and taught until 11:55 on both

9

Wednesday and Friday.

Q. Going back to last school year, can you tell me what your teaching was --

MR. GONZALES: Objection; form.

Sorry.

Q. (By Ms. Jacobs) -- during that year?

A. Can I tell you what my teaching was?

Q. (By Ms. Jacobs) Yes. What were you teaching last year?

A. What I was I teaching, okay. I was hired to teach the six-week units called Occupations and Humanities. And when I talked with Dawn Glasgow and Amber about starting to work there last fall, they told me the school had a budget of $10,000 to pay me and that the most they could pay me per hour was $25 an hour.

And I agreed to that, and so we figured that would mean I would have 400 hours for the school year. The Occupations and Humanities alone did not take up all that 400 hours, so with the four teachers in the middle school, we worked out -- the four middle school teachers and I worked out other ways in which I could fill in the rest of the hours, which included staying a little afterwards to be with the students for the departure time.

And I taught two PE units on Fridays. I

Sheilah Murphy - 2/27/2012

taught Italian last year. You know, there were a number of -- a couple of times, I came in and drove for field trips that the students did. And the teachers were working with me so that I could get the full 400 hours during the school year. Yeah, things like that.

But the main reason I was hired was for those -- Their need was specifically to teach those four Occupations and Humanities units.

Q. When you're referring to four units --

A. Each one was about six weeks long. And let's see, what did I teach? The first one was on health and fitness, the second one was farm economy, the third one was composting, and the fourth one was a humanities unit.

And I had a lot of freedom to design the courses as I wanted, with the understanding of how -- you know, what their philosophy was and how they worked with the students.

So I would get paid for my hours -- those 400 hours included my time preparing the classes at home. They gave me -- we had agreed upon a certain number of hours. I think it was 15 hours' prep time for each of those six-week units, but if I needed a little more time or whatever, I -- they -- so anything extra that I did beyond those four units, we agreed together,

you know, that I would do this in ways that would be beneficial to them and the students, help them out, and also ways that would help me get the full 400 hours.

MR. GONZALES: I'm going to object to that last response as nonresponsive.

Q. (By Ms. Jacobs) And then what six-week unit did you teach, in terms of content, for this fall?

A. This fall, it was one of the -- what did I teach? Oh, it was one of the Occupations units, and it was, again, health and fitness.

Q. Are you working at all right now?

A. No.

Q. Do you have a college degree?

A. Yes.

Q. What's your degree in?

A. My undergraduate degree is in English and American Studies.

Q. Have you worked as a teacher at anyplace other than Austin Montessori School?

A. Yes.

Q. Where else have you worked as a teacher?

A. I was a lecturer at UT for eight years in Italian, with the Department of French and Italian.

Q. Do you have a graduate degree?

A. Yes. I have an MA in English.

Q. Where else have you worked as a teacher?

A. Let's see, I -- well, when I was a graduate student, I was an English instructor at the University of Houston and I taught private Italian lessons when I was living in Italy.

Q. Any other work as a teacher?

A. Let me think. Oh, as a graduate student. As a teaching assistant, also, before I was an instructor.

Q. Do you have any certifications to teach?

A. No.

Q. Do you have any Montessori training?

A. No.

Q. How did you get your job at Austin Montessori School?

MR. GONZALES: Objection; form.

A. Well, it was kind of a long process. All three of my children had gone to the school and I had, for eight years, volunteered at the lower elementary every Friday afternoon, singing with the children, and that had gone really well.

And then when my oldest child was in upper elementary and I wasn't very happy with the situation with the teacher, I used to go in and have meetings with Amber. And at that time, Amber said, "You

know, you should really consider working at Austin Montessori School."

And I said, "Well, I don't want to go through the training."

And she said, "Well, the middle school, you don't have to go through the training to teach Montessori at the middle school."

I didn't want to go through the Montessori training -- or I couldn't. It just was not possible. And so when I knew that my job was probably going to end at UT because of budget cuts, I went in and talked to her and said, "I don't even know what I want to do. I'm not sure I want to go straight back into another job or another work situation. I -- you know, I'm not sure, but I just came in to talk with you."

And then -- so we had a discussion and then she got back in touch with me and said, "Actually, the middle school does need someone to teach these courses. We couldn't give you, you know, a lot of hours. We couldn't pay you a lot."

And I said, "Well, I don't really want to work a lot."

And I told her what my ideal schedule would be and it kind of matched. And so then I went in and met with the teachers, the four teachers at the

14

middle school, in two separate meetings and so we all just agreed to give it a try.

MR. GONZALES: To the extent that that was nonresponsive, I'll object.

Q. (By Ms. Jacobs) When did you stop working as a lecturer at the University?

A. Let's see, this will be spring of 2012, last year was spring of 2011, so I finished teaching in the spring of 2010 and then I started at Austin Montessori in the fall of 2010.

Q. Referring to the conversation you said that you had with Amber, where she spoke with you and said that the school did need someone, can you tell me everything you remember about that conversation?

A. Okay. Let me think. I know that I had two different meetings with her in the office. The first one was the one that I had initiated when I told her that my work at UT was going to end and I was just exploring the possibility of -- you know, that there might be something available at the Montessori School. And so then the next meeting would have been when she contacted me. I don't even remember if I went in or we talked on the phone. I don't remember the details.

Q. What do you remember her saying during that conversation?

15

A. I can't tell you literally word for word what she said. I can tell you the understanding I came away with.

Q. What was the understanding you came away with?

A. The understanding that I came away with was that they were very excited to have me working at the middle school and that the teachers wanted to meet me and that what they needed help with was the Occupations and the Humanities.

And I expressed some reservations about teaching Occupations and I just felt that they were encouraging and not misleading me in any way as to what to expect. They were fairly apologetic that they weren't able to pay me any more.

And I viewed it as just sort of an opportunity to try out something, that there wasn't -- you know, without making any kind of a long-term commitment.

Q. And when you're referring to "they" in that...

A. I talk about sort of the school in general as represented by Amber, and then Dawn, too. Dawn wasn't a part of the original conversation, but at some point Dawn was a part of the conversations, and also the teachers at the middle school after I met with them.

There wasn't, like, a set -- like, it's

16

not like they had a job description and then I interviewed and then they hired me. It was more sort of figuring out how they could use me.

Q. Can you tell me about the first meeting that you had with the middle school teachers?

A. Let's see, the first meeting I had, I believe I met with Bill and Veronique and they just asked about my background and my experience and they talked about their school and the philosophy at the Adolescent Community and about what the Occupations and Humanities were like and asked me what my schedule was like and what I was wanting to do and what kind of hours I would be available and how else they might be able to, outside of the Occupations and Humanities, give me more hours. And it was just a "getting to know each other" meeting.

And then the second meeting was with Tom and Jesse, because I think they may have been out of town, so that's why I had two separate meetings. And it was basically the same kind of thing; getting to know them and their sensing that I was on the same page as they were philosophically and that they thought I would work well with the students, that sort of thing.

MR. GONZALES: To the extent that that was nonresponsive, I object.

17

Q. (By Ms. Jacobs) Did you feel like the meetings that you just described to me were interviews?

MR. GONZALES: Objection; form.

A. I guess.

Q. (By Ms. Jacobs) Did you have a firm job offer prior to those meetings?

MR. GONZALES: Objection; form.

A. No.

Q. (By Ms. Jacobs) When did you receive a firm job offer?

MR. GONZALES: Objection; form.

A. It was all pretty laid back. So I think what happened, if I remember -- well, let me wait and figure this out so I can tell you accurately.

At the meeting -- at the two meetings with the teacher, they told me when the start days were and approximately when they would need me to begin. They kind of gave me their schedule in the fall.

And then I think I e-mailed Dawn and Amber and said, "So am I going to start? Am I hired?"

And then I had some e-mail contact with the teachers to give me the exact date of when I would start and we had a meeting -- oh, I came and we -- they scheduled a few days for me to come in before the school

18

year started to meet with them and get more information about the Occupations and the Humanities that I was going to be teaching; to do, you know, preparation and so forth and pin down dates and...

MS. O'ROURKE: I'll object to the nonresponsive portion of the last response.

Q. (By Ms. Jacobs) Who did you meet with for those few days?

A. The four teachers.

Q. And do you remember if you received a response from Dawn or Amber to the e-mail that you described, where you asked if you were going to start?

A. Again, I can't remember literally what happened. My memory of what happened was that they were reassuring that the teachers really liked me and wanted me to work there and that I would work out the hours with the teachers.

Q. So how was it determined that you would be paid $10,000 for 400 hours?

MR. GONZALES: Objection; form.

A. Dawn had told me apologetically that all the school could pay me was $25 an hour and that they had a $10,000 budget, and so I did the math and calculated that that meant I would have 400 hours there. And so when I talked with the teachers, we worked together to

19

come up with a schedule that would give me 400 hours.

Q. (By Ms. Jacobs) So you were told that you would be paid $25 an hour prior to those meetings with the teachers that you described to me?

MR. GONZALES: Objection; leading.

A. I believe that the discussion about money came after I met with the teachers.

Q. (By Ms. Jacobs) Who did you discuss money with?

A. I'm pretty sure it was Dawn. Yes, Dawn is the one who told me that they could pay me $25 an hour and they had a $10,000 budget.

Q. Is that Dawn Glasgow?

A. Yes.

Q. And did you have a meeting with her to discuss that?

A. No.

Q. Did you discuss that with her over the phone?

A. Over the phone or e-mail, one or the other. We did most of our communication through e-mail.

Q. Have you saved any of your e-mail correspondence with anyone from the school?

A. I doubt it.

Q. How did you work out your schedule with the teachers?

20

A. Well, they told me that what they most needed another part-time teacher for was to teach the Occupations and the Humanities, and those were on Tuesday, Wednesday, Thursday afternoons at a set time, so that part was fixed and that worked for me. I told them that that was convenient for me; that was the time that I wanted to teach.

And then beyond that, for the remaining hours, they asked -- they were very open, asking me when I wanted to teach, and then they would try to come -- you know, then they would work with me to find areas where they needed me to help, such as teaching some of the Friday afternoon PE classes or staying after the class -- the actual class time of the Occupations or Humanities was over, for that last 45 minutes to do prep work, grading, and then also to do the departure with the students.

MR. GONZALES: To the extent that the last answer included information that was nonresponsive, I'll object.

Q. (By Ms. Jacobs) For the times that you would stay for the 45 minutes after teaching the Occupations unit, were you actively supervising the children or were you only working on your prep work?

A. Most of the time -- it was up to me, actually.

21

It was considered by the teachers as time for me to get my prep work done, and I -- but I had a desk in the room, and when I didn't have work -- prep work I needed to do or when I wanted to, I could go around and be involved and help out with the cleaning or watching out with the kids. It was pretty flexible. And then at the departure, I did have -- what was the word you used?

Q. What was -- You were responsible for supervising them?

A. I was responsible for supervising them at departure, which was the last 10, 15 minutes.

Q. So during the 45 minutes where you could either do prep work or could be involved, was there another teacher present in the classroom at that time?

A. Yeah.

Q. While you were teaching in the Occupations unit, was there another teacher in the classroom?

A. Well, sometimes we were in separate classrooms and, in that instance, I would be alone with the students. Much of the time, the students were in various parts of the campus and there was a lot of flow so there might be another teacher in the room also.

Q. Did you have an assistant?

A. No.

Q. You talked about the 45 minutes after the

22

teaching that you did in the Occupations unit but prior to the departure. Did you have any other designated time to do prep work?

A. Yes. They had me coming in a half hour before I started teaching -- which was considered prep time -- if I wanted. Or I could -- if I didn't need that prep time, I could -- it was my choice how to spend that time. And then I was also paid, as I told you, to do prep time, as needed, at home.

Q. Did you have to follow any particular procedures during departure of the students?

A. Let's see. I was -- it was explained to me that I was to keep an eye on the students, make sure they stayed in this particular space that was designated for waiting for their parents to pick them up. And then at a certain point, if there were any students who hadn't been picked up yet, I was to walk back with them to another bench area where they were to wait for their parents. And that was it.

Q. And if you had to walk a student to the other area, did you have to stay with that student?

A. No, because that was at the end of the school day, after the school day was over.

Q. Were there any other procedures you followed with respect to departure of the students?

23

MR. GONZALES: Objection to form.

A. Not that I can think of. I just walked out with the students and waited with them for their parents to pick them up. It wasn't too complicated.

Q. (By Ms. Jacobs) And who had told you what you needed to do for the departure with the students?

A. I believe it was Veronique who walked out there with me and showed me and explained to me.

THE REPORTER: Are you saying "Monique"?

THE WITNESS: Veronique.

Q. (By Ms. Jacobs) Can you describe the content of each of the units that you taught?

A. Okay. The first one, health and fitness -- first off, let me just say there's a lot of flexibility for how I wanted to create the course. The basic idea was that there was going to be connections with science and that there would be hands-on experiential activities for the kids and that there would be a component where they were creating some kind of final project to present and contribute to the rest of the school. And within those parameters, I had a lot of flexibility.

And so the course that I created had a section about nutrition, exercise, the heart and circulatory system, the sleep cycle. And the students

24

did a variety of reports on subjects such as drug/alcohol abuse, depression -- oh, what were some of the other subjects -- vitamins and minerals, a variety of topics under the category of health and fitness.

We did fitness testing. We did activities. They made a video of -- an exercise video, and they did presentations to the school, and they made posters. So that was the first one, health and fitness.

The second one, which was farm economy, was a Humanities unit, as opposed to Occupations. So the Humanities, they didn't necessarily need to be science related. They were maybe more -- a little more Social Studies, even though they were called Humanities. But, again, it was very flexible. These weren't their hard-core subjects that they had in the morning.

These were more interdisciplinary, more loose, much more focused on experiences for the kids. So I took them to Boggy Creek Farm. And we took another field trip to Coyote Creek Farms, which -- they have -- they sell eggs at Whole Foods, organic eggs, and -- because the students here have a farm, so there was a lot of interest in that.

And then the students did research projects on various topics, like GMOs, farmers markets, co-ops, farm subsidies. Someone did a report on George

25

Washington Carver. So that was that one.

And then the third unit was another Occupations unit and that was on composting. And as you can imagine, they were -- you know, we went out and looked at the compost that we had and how we could improve it and I incorporated lessons about the physics of composting and a little bit -- they did some soil testing, for example.

We looked at -- we studied the whole cycle of composting and decomposition and the invertebrates and so forth that live in the composting. And they made posters, they made a movie, one student made a rap song. I'm trying to remember what else we did. Let's see. Well, you get the gist of it, I think.

MR. GONZALES: I'll object to the nonresponsive portion of that entire last response.

Q. (By Ms. Jacobs) And the final unit?

A. So what was the question again? Maybe I'm just giving -- answering too much. What was the question?

Q. I wanted to know the content of each unit.

A. Okay, the content. Okay.

And then the last one was a Humanities unit, where the four teachers worked together and we each prepared several lessons to give to all four groups

26

of the students -- they rotated among us -- with the overriding question of: What does it mean to be human?

And they each had a different emphasis, the three teachers. My emphasis was focusing on aiding the students with writing. And so in the two sessions I did with all of the students, at some point we talked about how to narrow down a topic, come up with a topic sentence, all sorts of just writing issues: composition, outlining, that sort of thing.

And then I worked with a group of students individually to help them with their projects, to help provide websites that would give information for their research, or library books, and I would sit with some of them individually. They would turn in drafts and I would make corrections, give it back to them, try to help keep them on task for that.

MR. GONZALES: So, again, I'll object to any nonresponsive portion of that entire last response.

Q. (By Ms. Jacobs) And you said that your emphasis for that unit was on writing. What were the emphases for the other three teachers?

A. Well, all of the teachers -- the students in the school were divided among the four of us, so each of us had a group of students whom we helped, whom we followed along in the process of writing their paper.

27

But each of the teachers had different things that they gave presentations on for those two different sessions, and I don't remember most of them, but -- I have guesses, but I don't remember exactly what they all did now.

Q. And who are the three other teachers?

A. Bill Sneed, Jesse Gevirtz, and Tom Logan. Veronique also taught the Occupations classes, so there were five of us teaching Occupations classes, but only the four of us, without Veronique, teaching the Humanities.

Q. You side said Veronique was also teaching Occupations?

A. The two six-week Occupations units, she also had a group of students. She did not have a group of students, technically, that she was doing Humanities with, but students would rotate out to work with her on the farm while we were doing Humanities. So that was what her role was at that time.

Q. Did you have to do any kind of grading of students' work?

A. Did I have to do any grading? I didn't have to do grading. It was up to me to decide if I wanted to put a numerical evaluation on the top of their pages. The school does not give out letter grades, although,

28

from what I understand, maybe when the ninth graders transfer to high school, they do get letter grades so that they can get credit at the schools they transfer to.

But my understanding was that it was certainly okay to do that. And my understanding was that the other teachers -- at least most of them, some of the time -- were giving numerical evaluations.

Q. Were you required to evaluate the students' work in any way in the courses that you were teaching.

A. Was I required to? Yes. They asked me to write up a little statement about how each student did in each -- in the unit; the students who were under me for each of those six units, kind of a sentence or two. Actually that -- I know they did that this year, because they started doing progress reports this year, written progress reports, so I know I did that this year.

Last year, I did it on a more informal level, because I would write up a sentence or two about each student and pass it on to them so that, when they met with the parents at the conferences, they could talk about how they had done in my sections, but it was informal. It wasn't like I had -- that was a part -- I didn't have any kind of a job description where I had to fill out evaluations or anything like that.

29

Q. And then with respect to the statement that you had to start doing for this year -- or did you have to do a statement this year?

MR. GONZALES: Objection; form.

A. They asked me to. This year, they told me that they were going to start doing progress reports for all of the students, and so they asked if I could write a couple of sentences about each student, evaluating -- giving them my input on how they had done in the class.

Q. (By Ms. Jacobs) Okay. And who is "they"?

A. The other teachers. It may have been -- it may have been Bill who asked me to do that particular thing, because I think he was in charge of the progress reports or was putting them together.

Q. Did you ever see a finished progress report for a student?

A. No.

Q. So while you were teaching the Occupations and Humanities units, what was the time that you had to teach?

MR. GONZALES: Objection; form.

A. When I was teaching the Occupations and Humanities, what was the time I had to teach? Let's see.

MR. GONZALES: Do you understand the

30

question, before you answer?

A. You want to know what the time of the day was?

Q. (By Ms. Jacobs) Yes.

A. When I would be teaching either the Occupations or the Humanities during those six-week periods?

Q. Yes.

A. It would end at 2:45, which meant it started at 1:00. It started at 1:00. 1:00 to 2:45.

Q. You had mentioned that you were to arrive 30 minutes early. Is that correct?

MR. GONZALES: Objection; form.

A. Last year, that was the schedule we agreed upon, that I would come a half hour early and I would have that half hour to prepare, make photocopies, do whatever I needed to do. This year, they were trying to help me to get more hours so they had me coming at 12:30 and -- no. Let's see. Yeah, before, I was coming at 12:30.

This year, I was coming at 12:00 and I was sitting outside with the students from 12:00 to 12:30 during their outside play time. Or, no, let's see, how was that? The outside play time was maybe from 12:30 to 1:00, so I was coming in at 12:00 and having a half hour for prep time, photocopying, whatever I

31

needed, and then I was outside for a half hour with the students.

MR. GONZALES: To the extent that the last response was nonresponsive, I'll object.

Q. (By Ms. Jacobs) And you had told me that you stayed for 45 minutes after finishing your teaching of the Occupations or Humanities unit?

A. Right. It ended at 2:45 and I was there until 3:30.

Q. And did you do the departure every day that you were at the school teaching your Occupations or Humanities unit?

A. Yes.

Q. And how long did you stay for the departure?

A. Well, the departure was over by 3:30, so it was ten minutes, 15 minutes max. We would go outside maybe at 3:20 and their parents would have picked them up by 3:30.

Q. Last year, were any of your children still attending Austin Montessori School?

A. Yes.

MR. GONZALES: Objection; form.

Q. (By Ms. Jacobs) Did you receive any sort of tuition discount?

A. No.

32

Q. Going back to the Occupations and Humanities units that you were describing for me, the content of what you were teaching, did you coordinate any of the content with the other teachers?

MR. GONZALES: Objection; form.

A. Did I coordinate the content with the teachers? Well, I'm not sure what you mean exactly by that.

Q. (By Ms. Jacobs) Okay. Did you ever discuss with the teachers the content that you were going to be teaching?

A. Yes. We had some preliminary meetings at the beginning of the year where they gave me a basic idea of what the goals were of each of these units. But there was a lot of flexibility and I would informally -- during those periods of time when I wasn't the half hour here or the half hour there, when I wasn't actually teaching the class, there were opportunities for me to informally tell them what I was doing, check in with them, see if they thought that sounded good, ask them questions. And they were, you know, supportive and would answer my questions whenever I had them.

Q. So when you were teaching the physical fitness lessons that you described, was that last year?

A. Yes.

33

Q. And can you tell me about those classes that you were teaching?

MR. GONZALES: Objection; form.

A. Yes. The first one was, I believe, a five-week PE unit, which meant five Friday afternoons, and I was teaching Argentine tango to a group of the students. And then the second unit I taught in the spring was either five or six Friday afternoons, something like that, of fitness boot camp.

Q. (By Ms. Jacobs) And when did you teach that five-week unit --

A. What time of the day?

Q. -- that Argentine tango?

A. On Friday?

Q. Yes.

A. It was at the end of the day. So I think the Argentine tango class, they only had me coming in for an hour of the PE, although PE lasts longer than that, because they paid me -- they asked me what I would charge to teach the tango, or the PE unit, and so I told them that I would need, I don't remember, at least a few hours of prep to prepare for teaching what -- how I was going to teach it to the students.

And so they just had me come in and do an hour, and the rest of the time -- I believe PE is maybe

Sheilah Murphy - 2/27/2012

an hour and a half, an hour and 45 minutes, on Friday afternoons when they have it, so the rest of time, they would be under the supervision of a different teacher. I was only coming for an hour.

For the fitness boot camp, I did the whole time, and I think it may have been from 1:00 to 2:45, something like that.

Q. When you were talking about the first unit, you said that they wanted to know how much you would charge for it. Who is "they"?

A. The teachers, because I think at the time, they were -- they had a discretionary fund, where they could fund maybe -- I don't know exactly -- field trips and things that wasn't in the actual budget.

And so at the time, maybe they were thinking that they were going to pay me with their own budget, outside of the school budget. I don't know if they ended up doing that. I don't think they did. I think I just turned in the hours like I normally do. But that's why they asked me what I would charge for that particular one.

Q. And which teachers asked you that?

A. Bill is possibly the one who asked me. I believe Bill asked me, because he's sort of the unofficial head of PE.

Q. Were there any particular guidelines that you had to follow in developing either of those two units for physical fitness?

A. There were no written guidelines. There was an understanding that I knew how Montessori worked and that the children would be involved and it would be a positive experience and I would be firm but flexible in keeping things under control, but, no, there were no written guidelines. There was no meeting expressly telling me how to conduct the PE sessions. I had informally asked them about how they had done PE sessions in the past so I understood what was expected.

Q. You've referred a few times, I guess, to the Montessori philosophy -- is that correct -- or your understanding of Montessori?

A. Uh-huh.

Q. Can you tell me what that is?

A. Uh-huh. Yeah, and I would think specifically for the Gaines Creek for the Adolescent Community. But it is a very respectful attitude towards the students, where you're nurturing the whole child and not simply focusing on academic achievement, where it's very process oriented and where, as much as possible, you try to help the student take the lead in exploring topics. It's very experiential as much as possible.

There's -- always speaking kindly and respectfully, and if there have to be consequences for undesirable behavior, it's not viewed as punishment so much as consequences. Those are some examples.

Q. And how did you develop that understanding of Montessori?

A. Well, for one thing, being a parent at the school for so many years and going to parent's meetings and reading literature that the school provides over the years, but also in my initial meetings with the teachers, they talked about how the middle school -- how the -- it's actually called the "Adolescent Community" -- how the Adolescent Community operates and what their model was and what they were trying to do.

And they shared with me some literature that I could photocopy and read. They gave me sort of a basic outline structure for the Occupations and the Humanities so that I could understand what the parameters were, what the goals were.

Q. While you were teaching, did you ever have any issues with a student that you needed assistance resolving?

MR. GONZALES: Objection; form.

A. Did I ever have -- what was the words that you used?

Q. (By Ms. Jacobs) Any issues with any students that you --

A. Any issues with any students that I needed help resolving?

MR. GONZALES: Objection; form.

A. Let me think. I wouldn't -- I would say that there were not any instances where I needed help resolving issues with a student. There were certainly times when I felt free to talk to the other teachers about students whom I felt maybe some concern or I wasn't sure how to best interact with them, and they would listen and maybe give a suggestion or talk about how they had done it or maybe give me some more information about that child and what their experiences with that student had been so that I could have more information to work with.

But I never felt I needed to, but I was certainly able to, and I took advantage of the opportunity to discuss, with the other teachers, the students.

Q. (By Ms. Jacobs) Did any member of the administration ever come and observe you in the classroom while you were teaching?

MR. GONZALES: Objection; form.

A. Nobody from the administration came to observe

Sheilah Murphy - 2/27/2012

**38**

me while I was teaching. There was one time when Don Goertz was bringing a visitor to the school to show them around and I happened to be there with the students doing the fitness boot camp and so they came in. But there was never a time when one of the administration came in for the purpose of observing my teaching.

Q. (By Ms. Jacobs) Did any of the other teachers in the Adolescent Community ever observe your teaching expressly for the purpose of observing and not just because they also happened to be in the classroom?

A. No.

Q. Okay. Did you receive any kind of an evaluation of your performance?

A. Informally, they would tell me periodically what a good job they thought I was doing and how much they appreciated that I was there. And at the end of the year, I had a meeting with them where I was invited to give them my feedback about how the year had gone and they all gave me a lot of positive feedback about how I had done. But the meeting wasn't set up as an evaluation meeting; I had asked for it. So, no.

Q. And who was at that meeting?

A. The three other teachers -- the four other teachers, sorry.

**39**

Q. And why did you ask for that meeting?

A. There were things about how my experience at the school had gone and how the school was run that I wanted to discuss with them. I had ideas about how things might be different or how I might -- how my skills and talents might be more utilized, so I wanted to talk with them about that.

Q. And so what were those ideas that you shared with them?

A. Well, one of my thoughts was, for example, that I thought we would have an easier time with the students if there was more consistency among all of the teachers in terms of enforcing some of the rules. For example, the use of laptops; there were rules about how and when and where laptops could be used that everybody understood and some times the rules were more enforced than at others or sometimes some teachers enforced them more than others, and I had an opportunity at that meeting to say that I thought that if everybody consistently enforced the rules in the same way, then we would waste less time having to negotiate with students or enforce rules.

That's an example of the kind of thing that I talked about. And they were very open to that, and they agreed with me on a lot of the things I brought

**40**

up, so it was very positive. They're always working to try to make things better.

Q. Were there any other ideas that you shared with them?

A. I'm sure. I have lots of opinions and ideas. Yes. They were mostly along those same sorts of lines -- sort of lines. Instances where I might have students get up to have to go to the -- you know, say they had to go to the bathroom or get a pen or a notebook, when I would have liked there to be more enforcement that you get all of your supplies before you go to the classroom, and then if you don't have them, you know, you don't get up.

But they were all minor things. They were -- I had some questions about how -- some of the things they had done that I hadn't understood and I had never had an opportunity to discuss with them, and so I asked those and they explained.

I don't remember a lot of specifics. There were -- they had talked with me about helping out with their theater week program for the next year and I had wanted some clarification about what my role would be in that, and so we talked more about that. Those are the kinds of things we talked about.

Q. Did you end up helping out with the theater

**41**

week?

A. No, because I left this year early, before they had theater week.

Q. Why did you leave the school?

A. I left the school because it wasn't what I wanted to do. I tried it out, and there were a lot of things I liked about it a lot, but it didn't look like they were going to have the money anytime in the near future to hire me full time. And, truthfully, with three kids, you know, I wouldn't be able to do the field trips and everything that -- the out-of-town trips that they do with the students, anyway, to work full time.

I wasn't making that much money. I wasn't getting benefits, which I knew going into, but long term, that probably wasn't going to work out for me. And I wanted to -- I saw an opportunity to have a period of time when I didn't have to work, where I could explore some of my other interests and figure out what I wanted to do with the rest of my life. And it just wasn't quite the right fit for me.

MR. GONZALES: To the extent that any of that last response was nonresponsive, I'll object.

Q. (By Ms. Jacobs) We've been going for a while, actually. Would you like a break at all?

A. No, because I'd like just to get this over

42

with as soon as possible.

MR. GONZALES: You know, if you're amenable to one, I wouldn't mind grabbing some water.

MS. JACOBS: Yeah, that's fine.

THE WITNESS: Yeah. Sure, yeah.

(A short break was taken.)

Q. (By Ms. Jacobs) You had kind of described that there were some rules related to the use of the students' laptops in the classroom, or mentioned that there were some rules related to laptop --

A. The school's laptops. The students didn't have laptops.

Q. Yeah. Okay. Were there any other rules that governed the students' behavior while you were teaching in the classroom?

MR. GONZALES: Objection; form.

A. Sure. A school is going to have lots of rules. I mean, they had a dress code. They had, you know, expectations for behavior. They had jobs that they had to do to clean the school. There were places in the schoolyard they weren't supposed to go without adult supervision and things like that. But the rules weren't any different when I was there.

Q. (By Ms. Jacobs) Okay. While you were teaching your course on Occupations or your course

43

on Humanities or the physical fitness classes, were you responsible for enforcing the rules?

MR. GONZALES: I'll object to the form.

A. When I first started teaching, when I met with the teachers, they explained to me how the school operates and what their expectations for me were in terms of my behavior: being there on time, being respectful to the students, those sorts of things. I understood that I would be the adult with the students at that time, I guess you could say, enforcing the rules. Sure. I mean, it wasn't ever spelled out for me, but -- Tell me your question again.

Q. (By Ms. Jacobs) How did you...

MR. GONZALES: And I'll object as nonresponsive.

Q. (By Ms. Jacobs) My understanding, from what you said, is that you were responsible for enforcing the rules while you were teaching a course?

MR. GONZALES: Objection; form.

A. Sure. I guess. Yeah, that's my understanding. That's what a teacher does when they have students they're in charge of.

Q. (By Ms. Jacobs) Now, you were referring to the fact that, in one of the meetings before you

44

started teaching, the other teachers let you know what their expectations of you were, including arriving on time and being respectful of the students. Is that correct?

MR. GONZALES: Objection; form.

A. Yes.

Q. (By Ms. Jacobs) Were there any other guidelines they gave you at that time --

MR. GONZALES: Objection; form.

Q. (By Ms. Jacobs) -- for your behavior?

A. There were other guidelines. I don't remember all of them. There was nothing surprising. They were all the kinds of guidelines that you would expect, in terms of: If I wasn't going to be able to make it to school, to communicate with them directly instead of through another student, those kinds of things; calling ahead of time; that I would follow the dress code, those sorts of things.

Q. Were there ever any days where you were not able to come in at a time that you were scheduled to teach?

A. No.

Q. So were you required to follow a particular schedule for teaching for the first six-week block of this school year that you taught?

45

MR. GONZALES: Objection; form.

A. I wasn't required to do anything, in the sense that they told me what they needed, which was someone to teach these Occupations and Humanities, and they were at these already established times on Tuesday, Wednesday, Thursday afternoons; could I teach that, was I interested in doing that.

And so yes, I did have to be there at those times because that's what I had agreed to. And so your question was, did I have to be there at other times? Is that --

Q. (By Ms. Jacobs) Yes, just for --

A. Yeah, I needed to be there at those times. That's -- I told them I would. I didn't sign a contract but I told them that I would do that.

Q. Were you required to submit any kind of documentation of the hours that you worked in order to get paid?

A. I would e-mail Veronique with my hours, that I would keep in a calendar that she gave me, and then she would e-mail them on to Dawn and then I would get my check in the mail.

Q. Were you paid according to a set schedule?

MR. GONZALES: Objection; form.

A. I got paid $25 an hour for the hours that I

46

was there at the school and the hours at home where I did prep work, and so I would write down the times. And I guess Veronique may have looked sometimes at the beginning to make sure that I -- that they corresponded to when I was actually there, but...

Q. (By Ms. Jacobs) So did you have to submit your hours in any particular frequency of time, such as once a month or twice a month or anything like that?

A. Well, I would submit them a few days before Dawn cut the checks so that I could get paid, so that was usually two times a month. I mean, that was two times a month, right. And however many hours I worked that time, I would -- it would vary. There would be some periods where I wouldn't work at all, so I wouldn't submit anything that time.

Q. Did you have a supervisor while you were teaching at Austin Montessori School?

A. No.

Q. For the 2010 school year, did you receive a W-2 or a 1099 from the Austin Montessori School?

A. A 1099.

Q. And what about for the 2011 school year, did you have a 1099 or a W-2?

A. I got a 1099.

47

Q. While you were working as a lecturer at UT, did you receive a W-2 or a 1099?

A. A W-2.

THE WITNESS: A W-2 is for an employee, right, with benefits? A W-2?

A. It was a W-2, yes.

Q. (By Ms. Jacobs) Did you feel like you were an employee of Austin Montessori School while you were working there?

MR. GONZALES: Objection; form.

A. What does that mean, "employee," exactly?

Q. (By Ms. Jacobs) What's your understanding of the word "employee"?

A. I was an hourly worker there, so I wasn't a regular employee at the school, in the sense that I didn't go to the staff meetings or anything like that. I was a part-time instructor, so I was a contract worker.

Q. Did you feel like you should have received a W-2 for your work at Austin Montessori School?

MR. GONZALES: Objection; form.

A. No.

Q. (By Ms. Jacobs) What do you base that opinion on?

A. Because I wasn't working even half-time and I

48

didn't get benefits.

Q. Do you feel like the teaching that you did at Austin Montessori School was of value to the school?

MR. GONZALES: Objection; form.

A. Absolutely.

Q. (By Ms. Jacobs) Why?

A. Because I helped facilitate the students' learning and they had positive experiences with me.

Q. For each of those six-week blocks that you were teaching, if for any reason you were not able to have finished one of those blocks, would you have had to pay anything to the school if you couldn't finish teaching?

A. I can't answer that. There was no discussion about that. I would never have left in the middle of a six-week unit.

MS. JACOBS: Can we just go off the record for a minute?

MR. GONZALES: That's fine.

(A short break was taken.)

MS. JACOBS: I'll pass the witness.

EXAMINATION

QUESTIONS BY MR. GONZALES:

Q. Ms. Murphy, my name is Roland Gonzales. I'm an attorney with Cokinos, Bosien & Young and we

49

represent Austin Montessori School in the lawsuit that's been filed against them. I have just a few questions for you.

A. Okay.

Q. I believe you testified earlier that you were hired to teach discrete six-week units. Is that correct?

A. Right.

Q. So is it fair to think of those discrete -- is it okay if I refer to those discrete units as "projects"?

A. Okay.

Q. You were paid hourly when you were hired to work in those projects. Correct?

A. Uh-huh.

Q. And so if you didn't work, you didn't get paid. Correct?

A. Right.

Q. So you had no paid time off?

A. No.

Q. No paid vacation?

A. No.

Q. No sick days. Correct?

A. No.

Q. No 401(k)?

50

A. No.

Q. Or any other sort of -- what somebody might call an "employee benefit," that you can think of. Correct?

A. No.

Q. Now, while you were working in those six-week projects, were you able to take on other work?

A. I could have if I wanted to.

Q. And could that have been similar-type work as what you were performing for Austin Montessori School?

A. I could have done any work I wanted to. They had no say.

Q. So is that a yes?

A. Yes.

Q. You testified earlier that you discussed some of your opinions regarding some of the students and some of the procedures for the students. Correct?

A. Uh-huh.

Q. Is that a yes?

A. Yes.

Q. Okay.

A. I'm sorry.

Q. And I'm sorry, it's important for the court reporter.

A. Okay.

51

Q. Is it fair to say that those were merely your opinions while you were working?

A. Yes.

MS. JACOBS: Objection; form.

Q. (By Mr. Gonzales) So, in other words, you were never a decision -- strike that.

You were never a policymaker at Austin Montessori School. Is that correct?

MS. JACOBS: Objection; form.

A. That's right. I did not make decisions about how the school was going to be run or the structure of the classes or anything like that.

Q. (By Mr. Gonzales) So if you articulated an opinion, it was just merely speaking your mind?

A. That's right, yes.

Q. Now, when you would agree to teach for a six-week project, you negotiated an hourly rate with Austin Montessori School. Is that correct?

MS. JACOBS: Objection; mischaracterizes her testimony.

A. They told me what they could afford to pay and I agreed to it.

Q. (By Mr. Gonzales) And so is it fair to say that, when you've taught in the past, you've negotiated a rate for your teaching?

52

MS. JACOBS: Objection; form.

A. When I have taught in the past, I was on a salary. I had a contract and they told me what the salary was going to be and I accepted it.

Q. (By Mr. Gonzales) And where was that?

A. At the University of Texas.

Q. And based on that experience, is it fair to say that that was wholly distinct from your experience at Austin Montessori School?

A. Yes.

Q. When you agreed to teach the six-week units, who decided when you would be available to teach those units?

A. They told me the schedule for the units and I was amenable to that. So who decided? They proposed and I accepted. You're talking just about the Occupations and Humanities. Is that right?

MR. GONZALES: Objection; nonresponsive.

Q. (By Mr. Gonzales) But I'll tell you what -- When you agreed to teach the six-week units, you designed the curriculum. Correct?

A. Yes.

Q. And did you use mostly your materials to create that curriculum?

A. Most of the materials were things I got from

53

the Internet and then I photocopied them at the school or they were things that I made up.

Q. You were asked a question earlier about whether or not you would have to pay any money if you were to stop working during a six-week unit. As far as you know, there was no financial penalty for stopping work during one of those units. Correct?

A. Correct.

MR. GONZALES: I'll pass the witness for now. I may have a quick followup after that.

MS. JACOBS: I have a few quick things. I'd like to go off the record for a minute because I want to review some of the testimony.

MR. GONZALES: Okay.

EXAMINATION

QUESTIONS BY MS. JACOBS:

Q. Did you have control over the instruction that you provided in the Humanities and Occupations units that you were teaching?

A. Yes.

Q. Did you have control over the instruction that you were providing during the physical fitness classes?

A. Yes.

Q. And you designed the curriculum for those physical fitness classes?

58

Q. Other than the conversations that you've described for me with Mr. Gonzales and Ms. Glasgow, did you do anything else to prepare for your deposition today?

A. No.

Q. Did you review any documents?

A. No.

MS. JACOBS: I pass the witness.

EXAMINATION

QUESTIONS BY MR. GONZALES:

Q. Earlier, you spoke of designated prep time for some of the classes. Correct?

A. (Nods head.)

Q. Now, that designated prep time was by virtue of the six-week unit that you agreed to teach. Correct?

A. Uh-huh.

Q. So, in other words, nobody told you that you had to be there at a certain time; it was by virtue of the class itself. Correct?

A. By virtue of the class itself?

Q. In other words, by virtue of the class that you agreed to teach --

A. The prep hours were for the class I agreed to teach. The only times they were really concerned about my being there were to teach those classes. The other

59

times I was there was really to help me get the extra hours.

Q. And did anybody tell you that you -- did anybody tell you when to show up and when to leave?

A. No. They suggested a schedule to me that included the hours of the Occupations and Humanities and had some extra time at the beginning and the end, and they asked if that would work for me and I said yes.

Q. So you were in control of that schedule, then?

A. Yes.

Q. Have you told the truth today?

A. Yes.

MR. GONZALES: I'll pass the witness.

EXAMINATION

QUESTIONS BY MS. JACOBS:

Q. If you had not been available to teach the Humanities or an Occupations unit in the afternoon, could the school have shifted it to the morning?

A. No.

Q. So if you were going to teach for the school an Occupation and Humanities unit, you had to teach during the times that they already had set for those courses?

A. Yes. Those hours that I taught for the Occupations and Humanities were nonnegotiable.

60

Q. Okay. What about the physical fitness courses?

A. That was my choice to teach those. They asked me if I wanted to and I said sure. But they were set on Friday afternoons.

Q. Okay. So were the hours for those physical fitness courses your choice?

A. It was my choice to accept to do it, but the hours were set.

MS. JACOBS: Pass the witness.

MR. GONZALES: I have nothing further for today.

61

CHANGES AND SIGNATURE

SHEILAH MURPHY                    FEBRUARY 27, 2012

PAGE LINE  CHANGE                    REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

62

I, SHEILAH MURPHY, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

_____
SHEILAH MURPHY

THE STATE OF _____)

COUNTY OF _____)

Before me, _____, on this day personally appeared SHEILAH MURPHY, known to me or proved to me on the oath of _____ or through _____ (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he/she executed the same for the purpose and consideration therein expressed.

Given under my hand and seal of office on this _____ day of _____, _____.


NOTARY PUBLIC IN AND FOR

THE STATE OF _____

My Commission Expires: _____

64

I further certify that I am neither attorney or counsel for, related to, nor employed by any parties to the action in which this testimony was taken and, further, I am not a relative or employee of any counsel employed by the parties hereto or financially interested in the action.

SUBSCRIBED AND SWORN TO under my hand and seal of office on this the 5th day of March, 2012.


_____
Kim Furr, CSR, RPR
Texas CSR 6997
Expiration: 12/31/2013
Integrity Legal Support Solutions
Firm Registration No. 528
3100 West Slaughter Lane, Suite 101
Austin, Texas 78748
(512) 320-8690
(512) 320-8692 (Fax)

63

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

CAROLINE CLARK,               )
    Plaintiff              )
                           )
vs.                   ) CIVIL ACTION NO.
                      ) A-12-CA-007-SS
AUSTIN MONTESSORI SCHOOL,    )
INC.,                    )
    Defendant            )


*****************************************************
        REPORTER'S CERTIFICATE
    ORAL DEPOSITION OF SHEILAH MURPHY
        FEBRUARY 27, 2012
*****************************************************

I, Kim Furr, RPR, Certified Shorthand Reporter in and for the State of Texas, do hereby certify that the witness was duly sworn by me; that the facts stated in the foregoing pages are true and correct; that the said witness did make the above and foregoing answers in response to questions propounded as shown; that I did, in shorthand, report said proceedings; and that the above and foregoing typewritten pages contain a full, true, and correct transcription of my shorthand notes taken on said occasion.

Sheilah Murphy - 2/27/2012

63

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

CAROLINE CLARK,                    )
        Plaintiff                  )
                                   )
vs.                                )  CIVIL ACTION NO.
                                   )  A-12-CA-007-SS
AUSTIN MONTESSORI SCHOOL,          )
INC.,                              )
        Defendant                  )


*******************************************************

REPORTER'S CERTIFICATE

ORAL DEPOSITION OF SHEILAH MURPHY

FEBRUARY 27, 2012

*******************************************************


        I, Kim Furr, RPR, Certified Shorthand Reporter

in and for the State of Texas, do hereby certify

that the witness was duly sworn by me; that the

facts stated in the foregoing pages are true and

correct; that the said witness did make the above

and foregoing answers in response to questions

propounded as shown; that I did, in shorthand,

report said proceedings; and that the above and

foregoing typewritten pages contain a full, true,

and correct transcription of my shorthand notes

taken on said occasion.

64

I further certify that I am neither attorney or counsel for, related to, nor employed by any parties to the action in which this testimony was taken and, further, I am not a relative or employee of any counsel employed by the parties hereto or financially interested in the action.

SUBSCRIBED AND SWORN TO under my hand and seal of office on this the 5th day of March, 2012.

Kim Furr, CSR, RPR
Texas CSR 6997
Expiration: 12/31/2013
Integrity Legal Support Solutions
Firm Registration No. 528
3100 West Slaughter Lane, Suite 101
Austin, Texas  78748
(512) 320-8690
(512) 320-8692 (Fax)

# Exhibit 9

# THE PREPARED ENVIRONMENT AND THE DISTRACTION OF SCENT

As a part of the animal kingdom, we humans respond to scent both consciously and unconsciously. As adults working with young children we must bring ourselves to a very sensitive awareness of the effect our scent has not only on the children, but also on their parents and our colleagues. Because scent evokes such a strong involuntary response in others, it is important for us to maintain a neutral presence in this regard.

When a person is in good health, fresh sweat, less than eight hours old, generally has little odor and calls forth no negative reaction in others. Old perspiration, especially when it has brewed overnight, can produce anything from a mild revulsion to a dramatic recoiling in others. Our reaction to strong unpleasant odors is a valuable instinctive mechanism that protects us from exposure to bacteria in food, in human illnesses, and in decaying matter. It is important for us to preserve the integrity of this normal, healthy, and involuntary response in children, other adults, and ourselves.

An important part of our work in preserving the sensitivity to odors is keeping the environment free of offensive odors whether they come from old water in flower vases, old food, old garbage, stale dishtowels, dirty mops, or old perspiration. In the case of old perspiration, we owe it to one another to bathe thoroughly our underarms, feet, and genitals every twenty-four hours. We strongly advise against the use of antibacterial soaps that the medical community has warned are harmful in that they break down nature's protective shield of beneficial bacteria characteristic of healthy skin. The use of ordinary soap is sufficient. We recommend the use of safe, unscented under arm deodorants, not those questionable antiperspirants, to ensure that the stronger perspiration from this region of the body remains bacteria and odor free.

Strong cosmetic scents can be just as offensive as old body odor, and can even cause headaches to those around us. It is important to help the children retain their sensitivity to the scents of cosmetics and fragrances as a part of their protective mechanism against chemicals. As a part of the prepared environment, our aim is for our sensorial presence to be neutral enough not to distract the children, whether consciously or unconsciously, and compete with the sensorial materials and other activities designed to call them to engagement and concentration. The pleasant and comforting scent of a clean human body warmly emitting healthy subliminal scents is our aim for the Montessori classroom.

# Exhibit 10

# CLEANLINESS OF THE ENVIRONMENT

The cleanliness of the environments, especially the bathrooms, is an essential basic element of the prepared environment. Each guide and after school leader is responsible for reviewing the environment daily for the level of cleanliness and communicating with the janitor any improvements needed. For help communicating in Spanish, speak to Donna. If further help is necessary to ensure the cleanliness of the classrooms for the children, please speak to Amber to clarify what can be expected.

Check to see that:

- The porches, sidewalks, and driveways are swept once a week.

- The floors are swept and spot mopped daily.

- The floors are thoroughly mopped once a week.

- The wastebaskets are emptied daily.

- The toilets, their rings top and bottom, their seat covers top and bottom, their inner and outer bowls, and their bases, the wash basins, and bathroom floors around the toilets are carefully washed with disinfectant daily.

# CARE OF THE ENVIRONMENT IN THE ELEMENTARY

Nine to twelve-year-olds straighten and dust the classroom themselves. They prepare their own environment each day. The adults oversee this. When the adults are not able to orchestrate the care of the environment through the children they must do it themselves. The environment must be prepared. NO GUIDE IS TO LEAVE THE CLASSROOM FOR THE DAY UNTIL IT HAS BEEN PREPARED.

The guide must keep the classroom fully supplied so that the children can find what they need in the cabinets and closets. The guide plans and oversees that the children check and replenish all supplies daily. If the guide is not able to orchestrate the supplying of the classroom through the children, she/he must do it. The classroom must be supplied. NO GUIDE IS TO LEAVE THE CLASSROOM FOR THE DAY UNTIL IT HAS BEEN SUPPLIED.

The children's work must be in order, filed in their folders and notebooks. The guide must regularly review the children's work with the children present.