# EXHIBIT G

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| CAROLINE CLARK,<br>    Plaintiff | )<br>)<br>) |
| vs. | ) CIVIL ACTION NO.<br>) A-12-CA-007-SS |
| AUSTIN MONTESSORI SCHOOL,<br>INC.,<br>    Defendant | )<br>)<br>) |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF

SHEILAH MURPHY

FEBRUARY 27, 2012

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF SHEILAH MURPHY, produced as a witness at the instance of the Plaintiff and duly sworn, was taken in the above-styled and numbered cause on the 27th day of February, 2012, from 12:53 p.m. to 2:24 p.m., before Kim Furr, RPR, Certified Shorthand Reporter in and for the State of Texas, reported by computerized stenotype machine at the offices of The Cook Law Firm, 919 Congress Avenue, Suite 1145, Austin, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

1  taught Italian last year.  You know, there were a number
2  of -- a couple of times, I came in and drove for field
3  trips that the students did.  And the teachers were
4  working with me so that I could get the full 400 hours
5  during the school year.  Yeah, things like that.
6           But the main reason I was hired was for
7  those -- Their need was specifically to teach those four
8  Occupations and Humanities units.
9     Q.   **When you're referring to four units --**
10    A.   Each one was about six weeks long.  And let's
11 see, what did I teach?  The first one was on health and
12 fitness, the second one was farm economy, the third one
13 was composting, and the fourth one was a humanities
14 unit.
15           And I had a lot of freedom to design the
16 courses as I wanted, with the understanding of how --
17 you know, what their philosophy was and how they worked
18 with the students.
19           So I would get paid for my hours -- those
20 400 hours included my time preparing the classes at
21 home.  They gave me -- we had agreed upon a certain
22 number of hours.  I think it was 15 hours' prep time for
23 each of those six-week units, but if I needed a little
24 more time or whatever, I -- they -- so anything extra
25 that I did beyond those four units, we agreed together,

1  A.  Well, they told me that what they most needed
2  another part-time teacher for was to teach the
3  Occupations and the Humanities, and those were on
4  Tuesday, Wednesday, Thursday afternoons at a set time,
5  so that part was fixed and that worked for me.  I told
6  them that that was convenient for me; that was the time
7  that I wanted to teach.
8       And then beyond that, for the remaining
9  hours, they asked -- they were very open, asking me when
10 I wanted to teach, and then they would try to come --
11 you know, then they would work with me to find areas
12 where they needed me to help, such as teaching some of
13 the Friday afternoon PE classes or staying after the
14 class -- the actual class time of the Occupations or
15 Humanities was over, for that last 45 minutes to do prep
16 work, grading, and then also to do the departure with
17 the students.
18      MR. GONZALES:  To the extent that the
19 last answer included information that was nonresponsive,
20 I'll object.
21  Q.  (By Ms. Jacobs) For the times that you
22 would stay for the 45 minutes after teaching the
23 Occupations unit, were you actively supervising the
24 children or were you only working on your prep work?
25  A.  Most of the time -- it was up to me, actually.

1 teaching that you did in the Occupations unit but prior
2 to the departure. Did you have any other designated
3 time to do prep work?
4    A.   Yes. They had me coming in a half hour before
5 I started teaching -- which was considered prep time --
6 if I wanted. Or I could -- if I didn't need that prep
7 time, I could -- it was my choice how to spend that
8 time. And then I was also paid, as I told you, to do
9 prep time, as needed, at home.
10   Q.   Did you have to follow any particular
11 procedures during departure of the students?
12   A.   Let's see. I was -- it was explained to me
13 that I was to keep an eye on the students, make sure
14 they stayed in this particular space that was designated
15 for waiting for their parents to pick them up. And then
16 at a certain point, if there were any students who
17 hadn't been picked up yet, I was to walk back with them
18 to another bench area where they were to wait for their
19 parents. And that was it.
20   Q.   And if you had to walk a student to the other
21 area, did you have to stay with that student?
22   A.   No, because that was at the end of the school
23 day, after the school day was over.
24   Q.   Were there any other procedures you followed
25 with respect to departure of the students?

1  me while I was teaching.  There was one time when Don
2  Goertz was bringing a visitor to the school to show them
3  around and I happened to be there with the students
4  doing the fitness boot camp and so they came in.  But
5  there was never a time when one of the administration
6  came in for the purpose of observing my teaching.
7       Q.   **(By Ms. Jacobs) Did any of the other**
8  **teachers in the Adolescent Community ever observe**
9  **your teaching expressly for the purpose of observing**
10 **and not just because they also happened to be in the**
11 **classroom?**
12      A.   No.
13      Q.   **Okay.  Did you receive any kind of an**
14 **evaluation of your performance?**
15      A.   Informally, they would tell me periodically
16 what a good job they thought I was doing and how much
17 they appreciated that I was there.  And at the end of
18 the year, I had a meeting with them where I was invited
19 to give them my feedback about how the year had gone and
20 they all gave me a lot of positive feedback about how I
21 had done.  But the meeting wasn't set up as an
22 evaluation meeting; I had asked for it.  So, no.
23      Q.   **And who was at that meeting?**
24      A.   The three other teachers -- the four other
25 teachers, sorry.

1   A.  No.

2   Q.  Or any other sort of -- what somebody might
3   call an "employee benefit," that you can think of.
4   Correct?

5   A.  No.

6   Q.  Now, while you were working in those six-week
7   projects, were you able to take on other work?

8   A.  I could have if I wanted to.

9   Q.  And could that have been similar-type work as
10  what you were performing for Austin Montessori School?

11  A.  I could have done any work I wanted to.  They
12  had no say.

13  Q.  So is that a yes?

14  A.  Yes.

15  Q.  You testified earlier that you discussed some
16  of your opinions regarding some of the students and some
17  of the procedures for the students.  Correct?

18  A.  Uh-huh.

19  Q.  Is that a yes?

20  A.  Yes.

21  Q.  Okay.

22  A.  I'm sorry.

23  Q.  And I'm sorry, it's important for the court
24  reporter.

25  A.  Okay.

1   A.   Yes.

2   Q.   And you designed the curriculum for the
3   Occupations and Humanities units?

4   A.   Yes.

5   Q.   But in doing so, you followed guidelines for
6   the Occupations and Humanities units that were given to
7   you by the other Adolescent Community teachers?

8          MR. GONZALES:   Objection; form.

9   A.   There was a basic -- a general framework for
10  the Occupations and Humanities.

11  Q.   (By Ms. Jacobs) And you also --

12  A.   And goals.

13  Q.   And the rules that applied to the students in
14  the Adolescent Community during other classes during
15  their school day also applied during the classes that
16  you were teaching?

17  A.   Sure.

18  Q.   Okay. Did you do anything to prepare for your
19  deposition today?

20  A.   No.

21  Q.   Did you speak with anyone about the deposition
22  today?

23  A.   Yeah. I spoke with Dawn and Roland.

24  Q.   Okay. Is Mr. Gonzales your attorney?

25  A.   No.

1  Q.  Can you tell me what you and Mr. Gonzales
2  spoke about?
3  A.  Yeah. He told me that, if you, like, spoke a
4  lot of questions quickly, that I could ask you to slow
5  down and that I should take my time and not answer until
6  I felt like I understood what was being asked and just
7  to tell the truth and...
8  Q.  Was this conversation that you had with
9  Mr. Gonzales in Austin?
10 A.  Yes.
11 Q.  And where did that meeting take place?
12 A.  Starbucks across the street.
13 Q.  And at what time?
14 A.  12:30.
15 Q.  For about how long did you meet?
16 A.  Fifteen minutes, 20 minutes.
17 Q.  Did you speak with anyone else about the
18 deposition?
19 A.  Dawn.
20 Q.  And what did you and Dawn talk about in regard
21 to the deposition?
22 A.  Well, I ran into her one time at the office
23 when I was doing something for my daughter at the
24 school, and she had heard I had been deposed. And I
25 didn't even know what the case was or who this teacher

1  times I was there was really to help me get the extra
2  hours.
3      Q.  And did anybody tell you that you -- did
4  anybody tell you when to show up and when to leave?
5      A.  No.  They suggested a schedule to me that
6  included the hours of the Occupations and Humanities and
7  had some extra time at the beginning and the end, and
8  they asked if that would work for me and I said yes.
9      Q.  So you were in control of that schedule, then?
10     A.  Yes.
11     Q.  Have you told the truth today?
12     A.  Yes.
13         MR. GONZALES:  I'll pass the witness.
14                    EXAMINATION
15 QUESTIONS BY MS. JACOBS:
16     Q.  If you had not been available to teach the
17 Humanities or an Occupations unit in the afternoon,
18 could the school have shifted it to the morning?
19     A.  No.
20     Q.  So if you were going to teach for the school
21 an Occupation and Humanities unit, you had to teach
22 during the times that they already had set for those
23 courses?
24     A.  Yes.  Those hours that I taught for the
25 Occupations and Humanities were nonnegotiable.

64

1        I further certify that I am neither attorney or
2   counsel for, related to, nor employed by any parties
3   to the action in which this testimony was taken and,
4   further, I am not a relative or employee of any
5   counsel employed by the parties hereto or
6   financially interested in the action.

8        SUBSCRIBED AND SWORN TO under my hand and seal
9   of office on this the 5th day of March, 2012.

*[signature: Kim Furr]*

Kim Furr, CSR, RPR
Texas CSR 6997
Expiration: 12/31/2013
Integrity Legal Support Solutions
Firm Registration No. 528
3100 West Slaughter Lane, Suite 101
Austin, Texas  78748
(512) 320-8690
(512) 320-8692 (Fax)