IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| CAROLINE CLARK, | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. A-12-CA-007-SS |
| | § | |
| AUSTIN MONTESSORI SCHOOL, INC., | § | |
| Defendant. | § | JURY TRIAL DEMANDED |
| | § | |

**PLAINTIFF'S RESPONSE TO
DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

## I. Introduction

Defendant has filed a cross-motion for partial summary judgment on the issue of the number of employees. Specifically, Defendant asserts that Plaintiff cannot establish her Family and Medical Leave Act ("FMLA") retaliation claim because she cannot produce evidence showing that Defendant was an "employer" under the FMLA with the requisite 50 employees. However, Plaintiff has presented substantial evidence in her cross-motion establishing that Defendant had the requisite number of employees to trigger FMLA coverage as a matter of law. This evidence also easily satisfies Plaintiff's burden with respect to Defendant's cross-motion to demonstrate the existence of a genuine issue of material fact on the issue. For this and other reasons discussed below, Defendant has not and cannot show that it is entitled to summary judgment.

## II. Defendant Has Failed to Discharge Its Summary Judgment Burden

Federal Rule of Civil Procedure 56(c)(1) provides that:

A party asserting that a fact cannot be . . . genuinely disputed must support the assertion by:

(A) citing to particular parts of materials in the record, including depositions,

1

> documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Rather than following this procedure, Defendant simply points generally to Glasgow's affidavit as support for the position that Defendant did not employ 50 or more employees during any workweek of 2009 or 2010.[1]  This does not satisfy Defendant's burden to cite to particular parts of materials in the record or show that those cited materials establish the absence of a genuine issue of material fact.  Additionally, as described in Plaintiff's motion to strike filed herewith, many portions of Glasgow's affidavit are not proper summary judgment evidence. Furthermore, Defendant's motion overlooks the FMLA's definition of the term "employee" by reference to the definition of "employee" in the Fair Labor Standards Act ("FLSA").[2]  Instead, Defendant urges the Court to base its analysis on the inapplicable Title VII definition of that term.  Defendant has therefore wholly failed to meet its burden to show that it is entitled to summary judgment as a matter of law on the first element of Plaintiff's FMLA retaliation claim. [3]

Nonetheless, in an abundance of caution, Plaintiff below recounts the substantial evidence demonstrating that Defendant is not entitled to summary judgment on this issue.

---

[1] *See* Defendant's Partial MSJ at 6.

[2] Section 2611(3) of the FMLA provides "[t]he terms "employ", "employee", and "State" have the same meanings given such terms in subsections (c), (e), and (g) of section 203 of this title."

[3] The first element of Plaintiff's FMLA claim also requires a showing that Plaintiff is an "eligible employee," but Defendant's motion does not specifically address that issue outside of Defendant's argument that it is not an "employer" under the FMLA.  In addition, in response to an interrogatory on Defendant's contention that Plaintiff is not an "eligible employee," Defendant cites only its assertion that it is not an "employer" under the FMLA.  *See* Exhibit A, Defendant's Objections and Answers to Plaintiff's Third Set of Interrogatories, No. 23. Accordingly, the body of Plaintiff's motion focuses on Defendant's assertion that it is not an "employer," although there is ample evidence in the record to show that Plaintiff is an "eligible employee" under the FMLA.

2

Plaintiff begins by setting forth the correct legal framework for determining whether Defendant had the requisite 50 employees.

### III.  The Proper Legal Framework for Analyzing the Number of Employees

**A.    Employees Counted By the Payroll Method**

FMLA regulations provide for the use of the payroll method in determining the number of employees.[4]  Under the FMLA regulations, "[a]ny employee whose name appears on the employer's payroll will be considered employed each working day of the calendar week, and must be counted whether or not any compensation is received for the week."[5]  In addition, individuals on paid or unpaid leave "are counted as long as the employer has a reasonable expectation that the employee will later return to active employment."[6]  "Employees of educational institutions who are employed permanently or who are under contract are "maintained on the payroll" during any portion of the year when school is not in session."[7]  Part-time employees and full-time employees are included in the total employee count.[8]  The 20 weeks need not be consecutive.[9]

**B.    Other Workers Encompassed Within the FMLA's Broad Definition of "Employee"**

An employer's payroll is not the exclusive source for determining the number of its employees under the FMLA.  An employer may also have workers who, while classified as "independent contractors" and not included on the payroll, are nonetheless "employees" under the FMLA. The FMLA explicitly defines an "employee" by the FLSA's definition of

---

[4] 29 C.F.R. § 825.105(e).  *See also Walters v. Metro. Educ. Enters.*, 519 U.S. 202 (1997).

[5] 29 C.F.R. § 825.105(b).

[6] 29 C.F.R. § 825.105(c).

[7] 29 C.F.R. § 825.111(c) (citing 29 C.F.R. 825.105(c)).

[8] *See, e.g.*, 29 C.F.R. § 825.105(c).

[9] 29 C.F.R. § 825.105(e).

"employee."[10]  "The definition of employee under the FLSA is particularly broad."[11]  The FLSA stretches the meaning of employee to cover some parties who might not qualify as such under a strict application of traditional agency law principles.[12]  In fact, it is clear that the definition of employment as it relates to the FLSA is the broadest definition that has ever been included in one act.[13]  Moreover, "[i]n enacting the FMLA, legislative history reveals that Congress was aware of the breadth of the FLSA definition of employee and purposely chose to adopt that definition."[14]

Because the FMLA uses this broad definition of employee, individuals working for an employer may be "employees," even if classified by the employer as "independent contractors."[15]  In determining whether a worker is as an employee under the FLSA, courts "focus on whether, as a matter of economic reality, the worker is economically dependent upon the alleged employer or is instead in business for himself."[16]  Five non-exhaustive factors guide the economic realities inquiry:

>     (1)   the degree of control exercised by the alleged employer;

---

[10] 29 U.S.C. § 2611(3).  *See also Lumar v. St. John the Baptist Parish*, 2002 WL 500477, at *3 (E.D. La. Apr. 2, 2002).

[11] *Hopkins v. Cornerstone America*, 545 F.3d 338, 343 (5th Cir. 2008) (citing *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992)).  Likewise, the definition of "employ" is broad. *See Rutherford Ford Corp. v. McComb*, 331 U.S. 722, 728 (1947).

[12] *Nationwide Mut. Ins. Co.*, 503 U.S. at 326.

[13] *Shultz v. Hinojosa*, 432 F.2d 259, 264 (5th Cir. 1970) (quotation marks omitted) (citing *United States v. Rosenwasser*, 323 U.S. 360, 363 n.4).

[14] *Lumar*, 2002 WL 500477, at *3 (citing *Duckworth v. Pratt & Whitney, Inc.*, 152 F.3d 1, 7 (1st Cir. 1998)).

[15] *Cf. In re FedEx Ground Package. Sys., Inc.*, 2012 WL 1430956, at *30-31 (N.D. Ind. Apr. 24, 2012) (citing the Seventh Circuit's FLSA economic realities test as the standard for evaluating whether class members were independent contractors, as classified by defendant, or as employees eligible for FMLA benefits) (citing *Sec'y of Labor v. Lauritzen*, 835 F.2d 1529, 1534–35 (7th Cir. 1987)).

[16] *Hopkins*, 545 F.3d at 343 (citing *Herman v. Express Sixty-Minutes Delivery Serv., Inc.*, 161 F.3d 299, 303 (5th Cir. 1998)).  *See also Diggs v. Harris Hosp. Methodist, Inc.*, 847 F.2d 270, 272 n.1 (5th Cir. 1988).

(2)   the extent of the relative investments of the worker and the alleged employer;

(3)   the degree to which the worker's opportunity for profit or loss is determined by the alleged employer;

(4)   the skill and initiative required in performing the job; and

(5)   the permanency of the relationship.[17]

"No single factor is determinative."[18] "Rather, each factor is a tool used to gauge the economic dependence of the alleged employee, and each must be applied with this ultimate concept in mind."[19]

Instead of acknowledging the FMLA's definition of the term "employee," Defendant asserts that two cases, *Grim Hotel* and *Broussard,* supply the applicable analyses for determining whether Defendant had the requisite 50 employees. Specifically, Defendant cites the portion of *Grim Hotel* that analyzes whether a particular individual was an "employer" under § 203(d) of the FLSA, and thus individually liable for FLSA violations committed by his companies.[20] That is a distinct analysis from whether an individual is an "employee" as defined by § 203(e) of the FLSA and incorporated by the FMLA. *Broussard* is even farther off the mark, as it addresses the distinct definition of "employee" under Title VII.[21] While the Title VII employee analysis is also guided by an economic realities test, that test is distinct from, and narrower than, the FLSA economic realities test; thus, an individual who is an independent contractor under Title VII nevertheless may be an employee under the FLSA.[22] Policy reasons also support looking beyond an entity's payroll and at potentially misclassified independent contractors to determine the

---

[17] *Hopkins*, 545 F.3d at 343 (citing *Herman*, 161 F.3d at 303).

[18] *Hopkins*, 545 F.3d at 343 (citing *Brock v. Mr. W Fireworks, Inc.,* 814 F.2d 1042, 1043-44 (5th Cir. 1987)).

[19] *Hopkins*, 545 F.3d at 343 (citing *Mr. W Fireworks, Inc.*, 814 F.2d at 1043-44).

[20] *Donovan v. Grim Hotel Co.*, 747 F.2d 966, 968-69; 971-72 (5th Cir. 1984).

[21] *See, e.g.*, *Broussard v. L.H. Bossier, Inc.*, 789 F.2d 1158, 1160 (5th Cir. 1986) (analyzing definition of employee at 42 U.S.C. § 2000e(f)).

[22] *Hopkins,* 545 F.3d at 343 (citing *Nationwide Mut.*, 503 U.S. at 326).

number of employees.[23]

### IV. Defendant's Earnings Records Do Not Capture All Employees on Its Payroll

Defendant supports its motion by pointing to earnings records that show when its admitted employees received paychecks. These records do show that Defendant had *at least* 49 employees for at least 20 weeks in 2009, and *at least* 48 employees for at least 20 weeks of 2010.[24] But these records do not prove that those are the only employees Defendant had on its payroll during that time.[25] Counting employees under the payroll method, as discussed above, does not simply mean counting the employees who received paychecks, but also includes active employees.[26] The bimonthly payroll registers Defendant initially produced (which were incomplete) show tallies both of employees paid as well as active employees, and many show a

---

[23] *Cf. Craig v. FedEx Ground Package Sys., Inc*., --- F.3d ----, 2012 WL 2862030, at *6 (7th Cir. July 12, 2012) (certifying question of drivers' employment status under Kansas law to Kansas Supreme Court, noting the importance of the question in light of the economic incentives for employers to use independent contractors and that misclassifying employees as independent contractors denies them access to certain benefits and protections, and results in significant costs to government) (citing JILL PEDIGO HALL, LEVELING THE PLAYING FIELD FOR EMPLOYERS? 53 No. 6 DRI FOR THE DEFENSE 45 (June 2011); TODD D. SAVELAND, FEDEX'S NEW "EMPLOYEES": THEIR DISGRUNTLED INDEPENDENT CONTRACTORS, 36 TRANSP. L.J. 95, 96 (2009); 156 CONG. REC. S7135–01, S7136 (daily ed. Sept. 15, 2010); 156 CONG. REC. S7135–01, S7136 (daily ed. Sept. 15, 2010)).

[24] Pursuant to Federal Rule of Evidence 1006, Plaintiff has attached a summary of Defendant's produced payroll records to her motion. *See* Exhibit B; Exhibit D. Because some of the records identify employees only by their employee number and not by their name, Plaintiff has also included a chart linking names with employee numbers. *See* Exhibit C. Plaintiff has also attached Defendant's earnings records, organized alphabetically by employee. *See* Exhibit E.

[25] As Defendant has acknowledged, the summary of the earnings records attached to Defendant's summary judgment motion contains errors. For example, Defendant's summary omits Erin Dean for August 2009 through January 1, 2010, even though the earnings records show that she received paychecks throughout that time period, and Gilberto Miranda for pay periods from November 30, 2009 through the end of December. Exhibit D (AMS 923, 973, 1023, 1072, 964). If Dean and Miranda had been included in Defendant's summary, Defendant's tally for some of those time periods would have been 50 employees.

[26] Supra III, A.

6

total of 50 employees.[27]   However, for reasons that are not clear, the bimonthly payroll registers Defendant later produced reflect different tallies for the same pay periods.  For example, the initial payroll register Defendant produced for June 16 through June 30, 2009, shows a total of 50 employees paid, and 3 terminated employees paid.[28]  But the second version produced omits six individuals included on the earlier version produced, and totals of 32 employees paid, 15 active employees not paid, and no terminated employees paid.[29]

Furthermore, Defendant reported having 50 employees for four months of 2009 to the TWC.[30]   And Defendant's quarterly reports to the Internal Revenue Service ("IRS") for 2009 show at least 50 employees for the first three quarters of 2009.[31]   Defendant's corporate representative testified that the IRS reports were generated on the basis of Defendant's payroll.[32] Defendant had the opportunity to explain any inaccuracies in these reports through the deposition of its corporate representative, but did not do so.[33]   Under these circumstances, Defendant's cannot show it is entitled to summary judgment based on its earnings records.

### V.  Others Individuals Working for Defendant Are Properly Classified as "Employees" Under the FMLA

Defendant also cannot show the absence of a genuine issue of material fact on the number of employees in light of the evidence Plaintiff presented in her cross-motion showing

---

[27] *See* Exhibits 29 & 30 to Plaintiff's Motion for Partial Summary Judgment, Docket Entry No. 29 (AMS 770, 775, 780, 786, 792, 799, 806 and 812).  All references hereinafter to exhibits by number are to the exhibits to Plaintiff's Motion for Partial Summary Judgment, Docket Entry No. 29.  Lettered exhibits are attached hereto.

[28] *See* Exhibit 29 (AMS 787-792).

[29] *See* Exhibit D (AMS 1258-1262).

[30] *See* Exhibit 19.

[31] Exhibit 25.  For the fourth quarter of 2009, Defendant reported 49 employees to the IRS, and 48 or 49 employees for each quarter of 2010.  *Id.*; Exhibit 26; Exhibit 27.

[32] Exhibit 4, Corporate Representative Deposition (hereinafter, "Corp. Rep."), p.30:11-31:2.

[33] *See* Exhibit 3, Items Nos. 11 & 12 of Plaintiff's Notice of Intention to Take Oral Deposition of the Corporate Representative of Defendant Austin Montessori School, Inc. ("Plaintiff's Notice"); Exhibit 4, Corp. Rep., p.27:1-5; 112:23-114:8.

that a number of Defendant's "independent contractors" should be classified as "employees" as a matter of law.  Plaintiff recounts that evidence below, and also shows that a genuine issue of material fact exists with respect to the "employee" status of another independent contractor, Charlotte Kroger.

### A.    Lucinda Castillo, Defendant's Shuttle Bus Driver

Defendant provides a shuttle bus service that runs among Defendant's three campuses before and after school; "[t]he purpose is to provide transportation for older children who live north."[34]  In 2009 and the beginning of 2010, Defendant classified its shuttle bus drivers as employees.[35]  However, when Defendant hired a new shuttle bus driver, Lucinda Castillo, in February 2010, she was classified as an "independent contractor."[36]  Glasgow, testifying as Defendant's corporate representative, explained that at the time Castillo was hired, the issue of her position's classification arose and the accountant discussed various factors from an IRS list with Glasgow.[37]  According to Glasgow, she and the accountant concluded that the position should be an independent contractor "because they're just – they get their own training, they're the expert in driving the bus[.] [38]  Glasgow was designated as Defendant's corporate representative on the facts on which Defendant's employee and independent contractor classifications were based.[39]  The only reason she could give as to why Defendant considered Castillo to be an independent contractor was "[b]ecause she is a person who decides how she is going to drive the bus."[40]

---

[34] Exhibit 28.
[35] Exhibit 5; Exhibit 4, Corp. Rep., p.40:12-18; 55:7-11.
[36] Exhibit 6, Deposition of Lucinda Castillo ("Castillo"), p.5:4-9; Exhibit 5.
[37] Exhibit 4, Corp. Rep., p.17:17-22:5.
[38] *Id*. at p.19:4-15.
[39] *See* Exhibit 3, Item Nos. 2 & 3 of Plaintiff's Notice.
[40] Exhibit 4, Corp. Rep. p.134:2-135:17; p.137:8-138:5.

The facts surrounding Castillo's work for Defendant clearly indicate that she should be classified as an employee. Castillo interviewed for the position with Dawn Glasgow after hearing about an opening from a friend.[41] At the time she was hired, Castillo had no prior experience driving a bus, no license other than an ordinary driver's license, and no training as a bus driver.[42] Defendant required her to view an online training about "how do you let people out and that kind of thing."[43] This summer, Defendant was informed by its insurance company that the driver should have a commercial driver's license, and Defendant directed Castillo to obtain one.[44]

Defendant established the schedule by which Castillo must pick up and drop off students at each of its three campuses in the morning and the afternoon.[45] Defendant provided Castillo with the route, but allows her to use a different one as long as she arrives and departs to and from each campus according to Defendant's schedule.[46] Defendant charges students' families directly for use of the service.[47] Defendant in turn pays Castillo an hourly wage for her work, based on a set number of hours to drive the route each day.[48] Defendant owns the bus that Castillo drives and Defendant is responsible for the bus's insurance, registration, and maintenance.[49] Castillo fuels the bus using Defendant's credit card.[50]

Defendant has established rules and guidelines applicable to the student riders and the

---

[41] Exhibit 6, Castillo, p.5:10-6:18.
[42] *Id*. at p.21:16-22:6
[43] Exhibit 4, Corp. Rep. 126:25-127:8; 131:5-9.
[44] *Id*. at p.126:10-24; 133:15-134:1.
[45] *Id*. at p.128:20-129:3, Exhibit 28.
[46] Exhibit 4, Corp. Rep., p.129:24-130:20.
[47] Exhibit 6, Castillo, p.8:18-13:21; Exhibit 4, Corp. Rep., 120:11-13.
[48] Exhibit 6, Castillo, p.7:2-21; Exhibit 4, Corp. Rep., p.119:22-120:10.
[49] Exhibit 6, Castillo, p.17:25-18:3-7; 22:7-17; Exhibit 4, Corp. Rep. p.127:23-128:17.
[50] Exhibit 6, Castillo, p.18:19-23; 19:20-25; 21:1-2.

driver.[51]  Castillo is also expected to follow unwritten guidelines; for example, she was told not to give doughnuts to the students.[52]  In addition, Castillo is required to follow a checklist, which Defendant directed her to print, before driving the shuttle bus each day.[53]  Castillo also had to keep track of which students rode the bus and provide that information to Defendant.[54]  Castillo had not missed a day of work, but Defendant is responsible for finding someone to take her place in the event that she cannot.[55]  She was not hired for any specific period of time, and Defendant expects her to return for the 2012-13 school year.[56]

### 1.    Degree of Control

The first factor of the economic realities inquiry is the degree of control exercised by the alleged employer.  "The Fifth Circuit has made clear that '[c]ontrol is only significant when it shows an individual exerts such a control over a meaningful part of the business that she stands as a separate economic entity.'"[57]  Defendant controls every economic aspect of the shuttle bus service offered to students.  Castillo's choices are largely limited to choices such as when to brake and change lanes.[58]  She must follow the law, comply with Defendant's schedule, and "be totally involved with driving safely."[59]  The very limited choices she is permitted to make do not in any way suggest that she operates independently.[60]  This factor thus points to employee status.

---

[51] Exhibit 28.

[52] Exhibit 4, Corp. Rep., p.125:9-126:7.

[53] Exhibit 4, Corp. Rep., p.124:15-125:8.

[54] Exhibit 4, Corp. Rep., p.133:2-14.

[55] Exhibit 6, Castillo, p.22:20-23:8.

[56] Exhibit 4, Corp. Rep., p.119:9-24.

[57] *Lang v. DirecTV*, 801 F.Supp.2d 532, 536-37 (E.D. La. 2011) (quoting *Hopkins*, 545 F.3d at 343 (quoting *Mr. W Fireworks, Inc.*, 814 F.2d at 1049)).

[58] Exhibit 4, Corp. Rep. p.134:2-135:17 (referring to Castillo's ability to decide matters such as when to change lanes, her speed, and how hard to brake).

[59] Exhibit 4, Corp. Rep., p.136:24-137:1; Exhibit 28.

[60] *See, e.g., Reich v. Circle C. Investments, Inc.*, 998 F.2d 324, 327 (5th Cir. 1993); *Hopkins*, 545 F.3d at 343 (quoting *Mr. W Fireworks, Inc.*, 814 F.2d at 1049).

### 2. *Relative Investments of the Worker and Alleged Employer*

The second factor is the extent of the relative investments of the worker and the alleged employer; this factor focuses on the relative expenses incurred by the worker and the alleged employer related to the work at issue.[61] Defendant is exclusively responsible for the expenses associated with its shuttle bus service. This factor therefore weighs in favor of employee status.

### 3. *Degree to Which Opportunity for Profit or Loss Is Controlled by Defendant*

The third factor is the degree to which the worker's opportunity for profit or loss is determined by the alleged employer. The opportunity for profit or loss is only present where a worker has invested capital in his or her job, and not just his or her time; the money he or she makes is simply analogous to earned wages.[62] As discussed above, Castillo made no capital investment in her job as a shuttle bus driver, and thus has no opportunity for profit or loss. Defendant absorbs the loss associated with the service.[63] This factor accordingly points to employee status.

### 4. *Skill and Initiative Required in Performing the Job*

The fourth factor in the economic realities inquiry is the skill and initiative required in performing the job. The skill factor here points to employee status, as Castillo had no more skill beyond that of an ordinary driver when she was hired and received very little training.[64] Initiative in the economic realities inquiry context relates to the ability to exercise economic initiative over an enterprise to generate more business, such as through the ability to affect

---

[61] *See Express Sixty-Minutes Delivery Serv.*, 161 F.3d at 304 (analyzing this factor by comparing capital investment of drivers and delivery service); *Circle C. Investments, Inc.*, 998 F.2d at 327.

[62] *See, e.g., Mr. W. Fireworks*, 814 F.2d at 1050–51 (distinguishing profit is the gain realized on a business over and above capital expenditures from a return based only on labor, which is more properly classified as wages rather than profit) (citations omitted).

[63] Exhibit 4, Corp. Rep., p.120:9-121:3.

[64] Exhibit 6, Castillo, p.21:13-22:6. *See also Express Sixty-Minutes Delivery*, 161 F.3d at 305.

11

advertising and pricing.[65]  Castillo had no ability to exercise initiative in this sense.  This factor thus also points to employee status.

> 5.    *Permanency of the Relationship*

The fifth factor addresses the permanency of the relationship between the individual and the alleged employee.  Castillo was hired for an indefinite period, similar to that of an at-will employee.  This factor thus clearly indicates employee status.[66]

In sum, each of the five factors of the economic realities test indicates clearly that Castillo, like the shuttle bus drivers before her, is an "employee" under the FMLA as a matter of law.[67]  All of these shuttle bus drivers were economically dependent on Defendant for their jobs, rather than in business for themselves.

## C.    Calvin Carter, Defendant's Former Caretaker

Defendant has a number of caretakers who provide janitorial services at two of Defendant's three campuses.[68]  Calvin Carter worked as a caretaker at Defendant's Great Northern campus from 1989 through the end of the 2009-2010 school year.[69]  He did not recall discussing pay at his initial interview, but recalled that the newspaper ad for the job offered $50 a

---

[65] *See, e.g., Usery v. Pilgrim Equip. Co., Inc.*, 527 F.2d 1308, 1314-15 (5th Cir. 1976); *Lang*, 801 F.Supp.2d at 539-40.

[66] *See, e.g., Pilgrim Equip. Co., Inc.*, 527 F.2d at 1314 (finding permanency where operators worked under routinely renewed annual contracts).

[67] It is not exactly clear what Glasgow meant by ¶ 5 of her affidavit, which Plaintiff has moved to strike.  Defendant's motion does not specifically challenge Defendant's prior designation of its former shuttle bus drivers, Kjersti Wheeler and Judy Johnson, as employees, nor cite any authority that allows an employer to engage in post-hoc cherry-picking with respect to its payroll after an individual brings suit under the FMLA.  However, even if Defendant could do so, the economic realities analysis yields the same result with respect to Johnson and Wheeler.  The only notable distinction between them and Castillo is that Johnson (and perhaps Wheeler) had previously driven a school bus and had a license to do so.  *See* Exhibit 4, Corp. Rep., p.131:17-132:14.

[68] Exhibit 4, Corp. Rep., p.71:5-74:9.

[69] Exhibit 7, Deposition of Calvin Carter ("Carter"), p.6:21-7:8.

week to start.[70]    Carter testified that he never asked for an increase in pay, but would get raises from time to time, without notice; he guessed that it was because Defendant liked his work.[71]    At the time Carter stopped working for Defendant, he was earning $800 paid bimonthly.[72]    He had a list of tasks to complete for Defendant, which took him approximately 3 hours a night to do.[73]    If he did work beyond that list of tasks he had to complete for Defendant, he could not earn extra money.[74]    Carter did not own a janitorial services business or perform cleaning services for any other entity.[75]    He never hired anyone to assist him with the work.[76]    If he could not come in to work, he did not send someone in his place, but would call Defendant, who would find someone else to perform the work.[77]

Defendant provided all of the cleaning equipment or supplies Carter needed, or reimbursed him for any supplies he purchased.[78]    Defendant selected cleaning products that it considered "reasonable to have in an environment around children[]" and compliant with health department requirements for child care centers.[79]    If caretakers used different cleaning products, Defendant instructed them to use the products Defendant had selected and supplied.[80]    Carter could only work after 5:30 pm, and around Defendant's evening event schedule.[81]

*1.    Control*

Defendant's operations required a clean environment; Defendant hired Carter and other

---

[70] *Id.* at p.13:21-14:1.
[71] *Id.* at p.18:4-23.
[72] *Id.* at p.17:6-18.
[73] *Id.* at p.24:12-15.
[74] *Id.* at p.17:6-18; 26:16-27:13; 29:9-16; Exhibit 4, Corp. Rep., p.83:10-14.
[75] Exhibit 7, Carter, p.29:24-30:16; p.35:24-36:8.
[76] *Id.* at p.19:19-25; 27:20-28:14.
[77] *Id.* at p.20:11-21:2.
[78] *Id*. at p.25:20-26:15.
[79] Exhibit 4, Corp. Rep., p.83:25-84:10.
[80] *Id*. at p.84:11-88:19.
[81] *Id*. at p.91:22-92:11; Exhibit 7, Carter, p.22:10-23:7.

caretakers to maintain that environment and further its own operations.[82]   Carter had some control over the manner in which he performed his assigned custodial tasks and choices about when to work outside of school hours.  But his ability to make choices about how and precisely when to complete his tasks does not show that he could be considered a separate economic entity.

2.     *Relative Investments of the Worker and the Alleged Employer*

With respect to the second factor, Defendant is responsible for all the expenses associated with cleaning the school.  Carter made no capital investment in his job.  This factor therefore weighs in favor of employee status.

3.     *Degree to Which Opportunity for Profit or Loss Is Controlled by Defendant*

In light of the fact that Carter expended nothing on his job other than his time, and Defendant paid for all cleaning supplies and equipment, this factor points to employee status.

4.     *Skill and Initiative*

With respect to skill, "[j]anitorial building maintenance, i.e. cleaning floors, carpets, is not considered to be labor which requires a high degree of skill or technical expertise."[83]  It is evident, based on Carter's deposition testimony and the fact that he worked for Defendant for more than two decades and received raises without asking for them, that he worked industriously and did his job well.  It is also clear that the cleaning work he performed is both important and necessary to Defendant.[84]  But this does not demonstrate that he had the ability to exercise initiative.  Performing "routine work which requires industry and efficiency is not indicative of

---

[82] *See, e.g.*, Exhibit 10.
[83] *Quinteros v. Sparkle Cleaning, Inc.*, 532 F.Supp.2d 762, 770 (D. Md. 2008).
[84] *See, e.g.*, Exhibit 10.

14

independence and nonemployee status."[85]  Moreover, Carter testified that the work took him about the same amount of time each night, and that it was whether the building was dirty that affected the amount of time.[86]  The custodial work Carter performed for Defendant simply was not "an enterprise whose success actually depended upon his initiative, judgment and foresight."[87]  This factor thus favors employee status.

### 5.      Permanency of the Relationship

The fifth factor, the permanency of the relationship, clearly points to employee status: Carter worked for Defendant for more than two decades.

In conclusion, each of the five factors of the economic realities test indicates clearly that Carter was an "employee" under the FMLA.[88]  Defendant's other three caretakers during 2009 and 2010—Francisca Tejeda, Miguel Reyes, and Cleotilde Maldonado—should also be included in the total employee count, as their jobs with Defendant were substantially similar to Carter's.[89]

## D.      Sheilah Murphy, Part-Time Instructor

Sheilah Murphy worked as a part-time instructor for the full 2010-2011 school year, as well as part of the fall and spring of the 2011-2012 school year.[90]  Murphy testified that Defendant hired her to teach a course, Humanities and Occupations, taught in four units, each

---

[85] *Pilgrim Equipment Co.*, 527 F.2d at 1314.

[86] Exhibit 7, Carter, p.16:4:9; 24:8-15.

[87] *See, e.g., Reich v. Priba Corp.*, 890 F. Supp. 586, 593 (N.D. Tex. 1995) (citing *Hickey v. Arkla Indus., Inc.*, 699 F.2d 748, 752 (5th Cir. 1983)).

[88] *See, e.g., Circle C. Investments, Inc.*, 998 F.2d at 327-28.

[89] Tejeda worked for Defendant from prior to 2001 through the present, Maldonado from 2007 through the present, and Reyes from 2008 or 2009 through the end of 2011.  *See* Exhibit 4, Corp. Rep., p.72:4-73:11.  They had the same job duties as Carter, but cleaned Defendant's main campus.  *Id*. at p.184:4-186:19.  Glasgow thought that Reyes and Maldonado had experience working for Austin ISD, but was not sure.  *Id*. at p.184:22-185:16.  Defendant has produced IRS Form 1099s for each as individuals rather than entities.  *See* Exhibits 17-18.

[90] Exhibit 8, Deposition of Sheilah Murphy ("Murphy"), p.6:15-7:9; Exhibit 11.

15

lasting 6 weeks, in Defendant's Adolescent Community.[91]  Defendant informed her that it had a budget of $10,000 available to pay her, and that it could not pay her more than $25 per hour.[92] As teaching and preparation for the Humanities and Occupations course would not take up the full 400 hours, Defendant worked with Murphy to ensure that she could perform additional tasks to work the full 400 hours.[93]  Those additional tasks included supervising students after her course until their departure, teaching Italian and physical education, and driving for field trips.[94] For one of the Humanities units, small groups of students rotated among Murphy and three of the other Adolescent Community instructors.[95]  Murphy and one of the other Adolescent Community instructors each taught a group of students for the Occupations units.[96]  Murphy could not control the hours of the classes she taught; she simply had the option to teach courses at the times Defendant had already set aside for them, or not teach.[97]  Defendant expected Murphy to follow many of the same guidelines as other Adolescent Community instructors, including dress code and calling in if she could not come.[98]  Murphy worked in close coordination and cooperation with the other adolescent community instructors.[99]  Defendant allowed Murphy to design the content of the courses, in conformity with Defendant's philosophy and manner of working with students and a number of other parameters set by Defendant.[100]

### 1.    Control

Defendant, as a school, runs what is in effect an educational enterprise.  Murphy's work

---

[91] Exhibit 8, Murphy, p.9:8-10:8; 12:14-14:2.

[92] *Id*. at p.9:10-15.

[93] *Id*. at p.9:8-11:3

[94] *Id*. at p.9:16-10:5; 20:21-21:11.

[95] *Id*. at p.25:23-27:11.

[96] *Id*. at p.27:6-19.

[97] *Id*. at p.44:23-45:15; 52:11-53:2; 59:16-60:9.

[98] *Id*. at p.44:7-18.

[99] *See id*. at p.42:13-46:5.

[100] *Id*. at p.23:12-22; 32:12-22; 35:1-36:19.

as a part-time instructor was in furtherance of that enterprise; she did not operate as a separate economic entity and could not decide how the school was run.[101]  Murphy had some control over the content of the courses she taught, but such control was no greater than that of the other employee-instructors in the Adolescent Community is evidenced by the fact that Murphy was in many cases simply working alongside them.  In short, Murphy's pedagogical discretion does not equate with economic control over Defendant's business.

### 2.  Relative Investments

Defendant furnished the facilities in which Murphy taught and any supplies she needed. Murphy did not make any capital investment in her job.  In contrast, Defendant charges music instructors who work on-site a small fee per student for use of the space.[102]  This factor therefore weighs in favor of employee status.

### 3.  Degree to Which Opportunity for Profit or Loss Is Controlled by Defendant

Murphy invested little if any in her job.  Defendant retained control over all the economic aspects of its operations; for example, whether enrollment in the Adolescent Community increased or decreased, Murphy's pay remained the same.  Murphy thus had no opportunity for profit or loss, and this factor weighs in favor of employee status.

### 4.  Skill and Initiative

With respect to skill, there is evidence in both directions.  Murphy has an undergraduate degree in English and American Studies and a master's degree in English, and teaching experience at the university level in English and Italian.[103]  Some of her responsibilities in the Adolescent Community undoubtedly drew on those specialized skills and experience, but that

---

[101] Exhibit 7, Murphy, p.38:13-40:18; 51:7-15.
[102] Exhibit 4, Corp. Rep., p.49:7-50:6.
[103] Exhibit 8, Murphy, p.11:14-12:13.

17

does not differentiate her from the other employee-instructors in the Adolescent Community. Moreover, some of the courses she taught have no discernible relationship to her educational background and prior teaching experience,[104] and she also performed tasks that were simply ancillary to any other instructor's job, such as supervisory duties.

In regard to initiative, Murphy was teaching, not operating an enterprise whose success actually depended on her initiative, judgment and foresight.  On the balance, Murphy's role was much more similar to that of the wage-earning instructors in the Adolescent Community, albeit on a part-time basis, rather than the role of an independent entrepreneur.   This factor thus points to employee status.

### 5.    *Permanency of the Relationship*

The permanency of the relationship factor is mixed.  Her initial teaching agreement was for one full school year.  She then returned for a second year before ultimately deciding to leave the position, for a number of reasons.[105]  Courts have found that similar working time periods demonstrated permanency.[106]

As a whole, the factors of the economic reality analysis weigh in favor of employee status with respect to Murphy.  The permanency factor is mixed.  Also, Murphy has specialized skills and retained some discretion over her teaching.   However, her work was not readily distinguishable in those respects from that performed by the other instructors in the Adolescent Community.  Murphy simply performed a more limited scope of duties, attributable largely to

---

[104] Murphy testified that she taught units on health and fitness, farm economy, and composting, plus fitness boot camp and Argentine tango.  Exhibit 8, Murphy, p.10:7-14; 23:14-25:14; 32:23-33:9.  Such courses do not obviously relate to her background and experience, though is not clear whether she acquired specialized skills in those areas through other means.
[105] Exhibit 8, Murphy, p.41:4-20.
[106] *Cromwell v. Driftwood*, 348 Fed.Appx. 57, 60 (5th Cir. 2009) (citations omitted); *Pilgrim Equipment Co.*, 527 F.2d at 1314 (renewable annual contracts evidence of permanency).

18

her part-time status.  She had no control over Defendant's operations economically, made little or no capital investment in her work, had no opportunity for profit or loss, and no ability to exercise initiative.  On the whole, Murphy was economically dependent on Defendant, rather than in business for herself.  She was therefore an "employee" under the FMLA.

**D.    Charlotte Kroger**

Kroger works for Defendant as a mentor to the Children's House guides.[107]  Previously a guide herself with Defendant for eleven years, she became a mentor in 2009 after retiring from the classroom.[108]  Kroger observes each of the Children's House guides approximately once a week and discusses her observations once a week or more with Defendant's Director of Admissions.[109]   She also shares her recommendations with the guides and leads meetings of Children's House guides and assistants.[110]  She attends parent education classes conducted by guides and sits in on meetings related to children needing extra support in the classroom.[111]  She also plays a role in personnel decisions, both in interviewing prospective assistants and contributing to the personnel decisions made by Defendant with respect to Plaintiff.[112]  She works about 20 hours per week or more for Defendant and does not work as a mentor for any other school.[113]

With respect to the factor of control, there is no evidence that Kroger has control over a part of Defendant's business showing that she stands as a separate economic entity.  She does retain some limited discretion over her schedule and any additional tasks Defendant asks her to

---

[107] Exhibit E, Deposition of Charlotte Kroger ("Kroger"), p.5:24-6:1.

[108] *Id*. at p.13:22-14:4; 11:24-12:4.

[109] *Id*. at p.6:1-14; 7:10-18.

[110] Exhibit F, Deposition of Caroline Clark, p.86:86:18-87:23; Exhibit E, Kroger, p.7:2-7.

[111] Exhibit E, Kroger, p.6:15-7:1; 7:7-9.

[112] Kroger, p.7:22-8:4; Exhibit H, Defendant's Objections and Answers to Plaintiff's First Set of Interrogatories, No. 3.

[113] Exhibit G, Corp. Rep., p.194:24-197:1; p.198:19-199:14.

take on outside of her primary role of working with guides.[114]  On the other hand, Kroger is so heavily involved with Defendant's day-to-day activities that her work is much more characteristic of a management-level employee rather than an independent contractor.  The second and third factors, relative investments and the degree to which opportunity for profit or loss is controlled by Defendant, weigh in favor of employee status.  Defendant furnishes the facilities in which Kroger conducts her observations and attends the meetings and engages in the other duties that form the bulk of her responsibilities as a mentor.[115]

With regard to the factor of skill, Kroger's position presumably does draw on her experience and training as a Montessori guide.  However, in regard to initiative, Kroger's work as a mentor is clearly designed to support Defendant's educational mission, rather than to function as an independent enterprise.  The permanency of the relationship factor also weighs in favor of employee status, as she is now set to begin a third year as a mentor for Defendant following after more than a decade of work for Defendant as a guide.[116]

In sum, the economic reality of the relationship between Defendant and Kroger strongly suggests that she is economically dependent upon Defendant, rather than in business for herself.  At the very least, a genuine issue of material fact exists as to her status as an employee under the FLSA.

## VI. <u>Conclusion</u>

For the reasons above, and based on the evidence showing that Defendant is in fact an "employer" as a matter of law, Plaintiff respectfully requests that the Court deny Defendant's Motion for Partial Summary Judgment.

---

[114] *Id*. at Corp. Rep., p.197:5-18; 199:21-200:9.

[115] *Id*. at p.192:25-193:24.  Kroger does work from home as well, but it is not clear that she is actually compensated for such time.  *Id*. at p.194:24-195:13.

[116] *Id*. at Corp. Rep., p.194:5-12.

Respectfully Submitted,

**THE COOK LAW FIRM**

/s/ Melissa A. Jacobs

_____

Russell Scott Cook
scook@rcooklaw.com
State Bar No. 24040724
Melissa A. Jacobs
mjacobs@rcooklaw.com
State Bar No. 24046144
919 Congress Avenue, Suite 1145
Austin, Texas 78701
Telephone: (512) 482-9556
Telecopier: (512) 597-3172

ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I hereby certify that on this 13th day of August, 2012, I filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Stephanie O'Rourke
Bryan P. Marshall
Cokinos Bosien & Young
l0999 West IH-10, Ste. 800
San Antonio, TX 78230

/s/ Melissa A. Jacobs

_____

Melissa A. Jacobs