# Exhibit A

AMS 000923

You created this PDF from an application that is not licensed to print to novaPDF printer (http://www.novapdf.com)

**DEAN,ERIN M**

AUSTIN, TX 78702
SS#:

#0215
Single/02
Salary:

| Week # | Check Date | Gross | Earnings | Rate | Hours | Amount | Federal Taxes | State/Local Taxes | Deductions | Net Pay Check # |
|--------|-----------|-------|----------|------|-------|--------|---------------|-------------------|------------|-----------------|
| 34 | 8/31/09 | | | | | | | | | |
| 36 | 9/15/09 | | | | | | | | | |
| 39 | 9/30/09 | | | | | | | | | |
| Employee Totals | | | | | | | | | | |

REDACTED



Client:  YA7
AUSTIN MONTESSORI SCHOOL INC

**Earnings Record**

Period Covered:  **07/01/2009  -  09/30/2009**   Runs: 13- 18
Check Date:  **07/30/2012**   Weeks: 28-39
Qtr:    3
Page:    56

AMS 000973

You created this PDF from an application that is not licensed to print to novaPDF printer (http://www.novapdf.com)

**DEAN, ERIN M**    #0215
Single/02
AUSTIN, TX 78702    Salary:
SS#:

| Week # | Check Date | Gross | Earnings | Rate | Hours | Amount | Federal Taxes | State/Local Taxes | Deductions | Net Pay Check # |
|---|---|---|---|---|---|---|---|---|---|---|
| 41 | 10/15/09 | | | | | | | | | |
| 43 | 10/30/09 | | | | | | | | | |
| 45 | 11/13/09 | | | | | | | | | |
| 47 | 11/30/09 | | | | | | REDACTED | | | |
| 49 | 12/15/09 | | | | | | | | | |
| 50 | 12/31/09 | | | | | | | | | |
| Employee Totals | | | | | | | | | | |



Client:  YA7
AUSTIN MONTESSORI SCHOOL INC

**Earnings Record**

Period Covered:  **10/01/2009 - 12/31/2009**    Runs: 19- 24
Check Date:  **07/30/2012**    Weeks: 41-50
Qtr:    4
Page:    49

AMS 001023

You created this PDF from an application that is not licensed to print to novaPDF printer (http://www.novapdf.com)

#0215

| Week # | Check Date | Gross | Earnings | Rate | Hours | Amount | Federal Taxes | State/Local Taxes | Deductions | Net Pay Check # |
|--------|-----------|-------|----------|------|-------|--------|---------------|-------------------|------------|-----------------|
| 02 | 1/15/10 | | | | | | | | | |
| 04 | 1/29/10 | | | | | | | | | |
| 06 | 2/12/10 | | | | | | | | | |
| 08 | 2/26/10 | | | | | | | | | |
| 10 | 3/12/10 | | | | | | | | | |
| 13 | 3/31/10 | | | | | | | | | |
| Employee Totals | | | | | | | | | | |

REDACTED

| | | | |
|---|---|---|---|
| Client: YA7 | | Period Covered: | 01/01/2010 - 03/31/2010 | Runs: 1- 6 |
| AUSTIN MONTESSORI SCHOOL INC | | Check Date: | 07/30/2012 | Weeks: 2-13 |

**Earnings Record**

Qtr: 1
Page: 49

You created this PDF from an application that is not licensed to print to novaPDF printer (http://www.novapdf.com)

AMS 001072

#0215

| Week # | Check Date | Gross | Earnings | Rate | Hours | Amount | Federal Taxes | State/Local Taxes | Deductions | Net Pay Check # |
|--------|-----------|-------|----------|------|-------|--------|---------------|-------------------|------------|-----------------|
| 15 | 4/15/10 | | | | | | | | | |
| 17 | 4/30/10 | | | | | | | | | |
| 19 | 5/14/10 | | | REDACTED | | | | | | |
| 21 | 5/28/10 | | | | | | | | | |
| 23 | 6/15/10 | | | | | | | | | |
| Employee Totals | | | | | | | | | | |



Client:   YA7
AUSTIN MONTESSORI SCHOOL INC

**Earnings Record**

Period Covered:   **04/01/2010 - 06/30/2010**     Runs:  7- 12
Check Date:       **07/30/2012**                  Weeks: 15-25
                                                  Qtr:       2
                                                  Page:      48

You created this PDF from an application that is not licensed to print to novaPDF printer (http://www.novapdf.com)

AMS 000964



| Week # | Check Date | Gross | Earnings | Rate | Hours | Amount | Federal Taxes | State/Local Taxes | Deductions | Net Pay Check # |
|---|---|---|---|---|---|---|---|---|---|---|
| 43 | 10/30/09 | | | | | | | | | |
| 45 | 11/13/09 | | | | | | | | | |
| 47 | 11/30/09 | | | | | | | | | |
| 50 | 12/31/09 | | | | | | | | | |
| 50 | 12/31/09 | | | | | | | | | |
| Employee Totals | | | | | | | | | | |

MIRANDA,GILBERTO F
AUSTIN, TX 78703
SS#:
#0205
Single/02
Rate:

REDACTED

| | | |
|---|---|---|
| Client: YA7 | | Period Covered: **10/01/2009** - **12/31/2009** Runs: 19- 24 |
| AUSTIN MONTESSORI SCHOOL INC | | Check Date: **07/30/2012** Weeks: 41-50 |
| | **Earnings Record** | Qtr: 4 |
| | | Page: 40 |

# Exhibit B

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| CAROLINE CLARK, Plaintiff, | § § § | |
| V. | § § | CIVIL ACTION NO. A-12-CA-007-SS |
| AUSTIN MONTESSORI SCHOOL, INC., Defendant. | § § § § § | JURY TRIAL DEMANDED |

## PLAINTIFF'S NOTICE OF INTENTION TO TAKE ORAL DEPOSITION OF THE CORPORATE REPRESENTATIVE OF AUSTIN MONTESSORI SCHOOL, INC.

To:    Defendant Austin Montessori School, Inc., by and through its attorneys of record, Stephanie O'Rourke and Bryan P. Marshall, Cokinos Bosien & Young, 10999 IH 10 West, Ste. 800, San Antonio, TX 78230.

Please take notice that pursuant to Federal Rule of Civil Procedure 30, Plaintiff will take the deposition of the following:

| | |
|---|---|
| **Witness:** | Corporate Representative of Austin Montessori School, Inc. |
| **Time of Deposition:** | 10:00 am |
| **Date of Deposition:** | July 26, 2012 |
| **Location of Deposition:** | The Cook Law Firm |
| | 919 Congress Avenue, Ste. 1145 |
| | Austin, TX 78701 |

Plaintiff intends to depose Austin Montessori School, Inc. ("Defendant"), pursuant to Federal Rule of Procedure 30(b)(6), through one or more representatives testifying on behalf of Defendant, on the following matters:

1.    Defendant's policies, guidelines, and procedures for classifying individuals who received any compensation from Defendant as employees or independent contractors in 2009 and 2010;

2.    The names of each individual on Defendant's payroll in each week of 2009, the classification of those individuals by Defendant as employees or independent contractors, and the facts on which those classifications were based;

3.    The names of each individual on Defendant's payroll in each week of 2010, the

1

classification of those individuals by Defendant as employees or independent contractors, and the facts on which those classifications were based:

4.   For each of the following individuals, state which, if any weeks of 2009 and 2010 that he or she was on Defendant's payroll:

| | | | | |
|---|---|---|---|---|
| a) | Socorro Aguilar | | oo) | E.B. Larson |
| b) | Adam Aguirre | | pp) | Gwen Logan |
| c) | Joseph Aken | | qq) | Thomas Logan |
| d) | Janna Banks | | rr) | Natalie London |
| e) | Kadie Beasley | | ss) | Amy Mahnken |
| f) | Sonal Bowness | | tt) | Cleotilde Maldonado |
| g) | Erin Boardman | | uu) | Sasha Marble |
| h) | Margie Breckwoldt | | vv) | Veronique Mareen |
| i) | Eric Breeding | | ww) | Melanie Matkin |
| j) | Amanda Brown | | xx) | Paula J. McDermott |
| k) | Naomi Caballero | | yy) | Cheryl McGee |
| l) | Calvin Carter | | zz) | Amber Miller |
| m) | Lucinda Castillo | | aaa) | Gilberto F. Miranda |
| n) | Caroline Clark | | bbb) | Valerie Monda |
| o) | Mary Ann Collins | | ccc) | Daniel Murphy |
| p) | Rachel Davison | | ddd) | Sheilah Murphy |
| q) | Erin Dean | | eee) | Lois O'Brien |
| r) | Johnnie Denton | | fff) | Patricia Oriti |
| s) | Angela Eagle | | ggg) | Callie Osborne |
| t) | Brandi Fischer | | hhh) | Elizabeth Padron |
| u) | Lori Friedman | | iii) | Jerry Pippins |
| v) | Mary Long Geil | | jjj) | Nick Pippins |
| w) | Jesse Gevirtz | | kkk) | Donald E. Porter |
| x) | Dawn Glasgow | | lll) | Lindsay Porter |
| y) | Donald Goertz | | mmm) | Miguel Reyes |
| z) | Donna Goertz | | nnn) | Erik Rivas-Rivas |
| aa) | Caroline Golden | | ooo) | Donna Romine |
| bb) | Leslie Grove | | ppp) | Margarita Ruiz |
| cc) | Megan Haley | | qqq) | Francois Sansoni |
| dd) | Alexis Harper | | rrr) | Jennifer Schiller |
| ee) | Kate Hearne | | sss) | Nancy Scott |
| ff) | Jackie Howard | | ttt) | Bill Sneed |
| gg) | Lynn Hunt | | uuu) | John Snyder |
| hh) | Jesse Jahnke | | vvv) | Yvonne Solorio |
| ii) | Kelly Jarrell | | www) | Jennifer Suarez |
| jj) | Judy Johnson | | xxx) | Elizabeth Suggs |
| kk) | Rebecca Kaiser | | yyy) | Kate Swope |
| ll) | Jancie Kearley | | zzz) | Francisca Tejeda |
| mm) | Mandy Klein | | aaaa) | Juan Tejeda |
| nn) | Charlotte Kroger | | bbbb) | Amanda E. Weeks |

2

cccc)  Kjersti Wheeler                               dddd)  Barbara Weis

5.  The job title, duties and responsibilities, schedule, if any, or days and hours worked, supervisor, location(s) for performing work, and compensation, for each of the individuals listed in Number 4;

6.  The names of the individuals paid by Defendant as independent contractors in 2009 and 2010; their job title, duties and responsibilities, schedule or days and hours worked in 2009 and 2010, supervisor, location(s) for performing work, and compensation;

7.  For all individuals to whom Defendant issued Internal Revenue Service ("IRS") Form W-2s for tax years 2009 and 2010, the schedule or days and hours worked in 2009 and 2010, the location(s) at which those individuals performed work for Defendant, the job title, supervisor, and job duties and responsibilities of those individuals, and compensation;

8.  For all individuals to whom Defendant issued IRS Form 1099s for tax years 2009 and 2010, the schedule or days and hours worked in 2009 and 2010, the location(s) at which those individuals performed work for Defendant, the job title, supervisor, and job duties and responsibilities of those individuals, and compensation;

9.  The number listed by Defendant in its Texas Workforce Commission ("TWC") Quarterly Reports regarding the number of employees for each quarter of 2009 and 2010;

10.  The names of the individuals included in the number listed by Defendant in its TWC Quarterly Report (regarding the number of employees) for each quarter of 2009 and 2010, and the reasons for including each of those individuals in that number;

11.  The number listed by Defendant in response to Item No. 1 of Part 1 of IRS Form 941 (regarding the number of employees) for each quarter of 2009 and 2010;

12.  The names of the individuals included in the number listed by the School in response to Item No. 1 of Part 1 of IRS Form 941 (regarding the number of employees) for each quarter of 2009 and 2010, and the reasons for including each of those individuals in that number;

13.  If any individuals for any quarter of 2009 and 2010 were included in Defendant's report on IRS Form 941 but excluded from the TWC Quarterly Report for the corresponding quarter, the names of said individuals and the reason for including them in the IRS Form 941 but not the TWC Quarterly Report;

14.  If any individuals for any quarter of 2009 and 2010 were included in the TWC Quarterly Report but excluded from the report on IRS Form 941 for the corresponding quarter, the names of said individuals and the reason for including them in the TWC Quarterly Report but not the IRS Form 941;

15.  The names of individuals included on any staff list issued by Defendant in 2009 and

3

2010, the classification of those individuals by Defendant as employees or independent contractors, and the facts on which those classifications were based;

16. The names of any individual or entity who received compensation for services performed in 2009 and 2010 and the services performed for such compensation;

17. The number of hours Plaintiff worked for Defendant in 2009 and 2010 and the manner of calculating that number;

18. Defendant's policies, procedures, and training related to preventing discrimination against employees on the basis of sex, including pregnancy, from 2005 to the present;

19. Defendant's policies and procedures related to requests, and Defendant's decision-making with respect to such requests, for maternity leave and leave for medical treatment, from 2005 to the present;

20. Facts supporting Defendant's asserted defense in ¶ 15 of Defendant's First Amended Answer that "Defendant denies that Plaintiff has met all conditions precedent; Plaintiff has failed to exhaust all administrative procedural requirements.";

21. Facts supporting Defendant's asserted defense in ¶ 16 of Defendant's First Amended Answer that "Defendant denies that Plaintiff is a qualified employee under the Family Medical Leave Act.";

22. Facts supporting Defendant's asserted defense in ¶ 16 of Defendant's First Amended Answer that "Defendant denies that the Family Medical Leave Act is applicable to this Defendant.";

23. Facts supporting Defendant's asserted defense in ¶ 17 of Defendant's First Amended Answer that "Defendant denies that Plaintiff ever requested the benefits under Family Medical Leave Act.";

24. Facts supporting Defendant's asserted defense in ¶ 18 of Defendant's First Amended Answer that "This Defendant would also assert that Plaintiff is not an eligible employee.";

25. Facts supporting Defendant's asserted defense in ¶ 18 of Defendant's First Amended Answer that "Plaintiff was not eligible for Family Medical Leave Act.";

26. Facts supporting Defendant's asserted defense in ¶ 19 of Defendant's First Amended Answer that "Plaintiff suffered no adverse employment decision as a result of her pregnancy.";

27. Facts supporting Defendant's asserted defense in ¶ 20 of Defendant's First Amended Answer that "Plaintiff was offered a comparable position to accommodate her leave request.";

4

28. Facts supporting Defendant's asserted defense in ¶ 21 of Defendant's First Amended Answer that "Plaintiff did not suffer from an adverse employment decision as a result of her pregnancy.";

29. Facts supporting Defendant's asserted defense in ¶ 22 of Defendant's First Amended Answer that "Defendant's actions were not adverse employment actions.";

30. Facts supporting Defendant's asserted defense in ¶ 23 of Defendant's First Amended Answer that "Defendant's acts of offering plaintiff an alternative placement to accommodate her pregnancy and extended leave did not constitute an unlawful employment practice because it did not constitute an 'ultimate employment decision'.";

31. Facts supporting Defendant's asserted defense in ¶ 24 of Defendant's First Amended Answer that "Plaintiff was treated the same as any teacher planning to take an extended leave of absence for any purpose.";

32. Facts supporting Defendant's asserted defense in ¶ 25 of Defendant's First Amended Answer that "Plaintiff was not treated any differently than any other similarly situated employee.";

33. Facts supporting Defendant's asserted defense in ¶ 26 of Defendant's First Amended Answer that "Austin Montessori had a legitimate non-discriminatory reason for offering Plaintiff a contract or the position of campus coordinator.";

34. Complaints, comments, and/or questions of Defendant's employees to Dawn Glasgow related to the compliance or alleged non-compliance of Defendant with the FMLA;

35. Questions and/or comments of Defendant's employees to Dawn Glasgow regarding the applicability of the FMLA to Defendant;

36. Promises and offers to parents by Defendant concerning any of Plaintiff's claims and Defendant's defenses in this action, from 2007 through the present;

37. For the period of 2005 through the present, the name of each employee of Defendant who took more than seven days of leave during a school year, whether the need for such leave was known at the time the employee's contract was renewed, and the number of days of leave the employee took;

38. If any of the employees listed in response to Number 37 were guides, any concerns, questions, or comments about such leave expressed by any parent of a student in that classroom of which Defendant is aware, the names of such parents, whether the comment, question, or concern occurred prior to, during, or after the leave, and the employee of Defendant to whom such concern, question or comment was expressed, action taken by Defendant in response to the concern, question, or comment, and whether the parent removed his or her child from Defendant as a result of the leave;

5

39.　Prior lawsuits filed against Defendant under the FMLA, from 2006 through the present, including cause number, court (including district and division for federal cases and city or county and state for state cases), and outcome;

40.　Prior lawsuits filed against Defendant involving sex discrimination claims, including but not limited to pregnancy-related claims, under the Texas Commission on Human Rights Act, from 2006 through the present, including cause number, court (including district and division for federal cases and city or county and state for state cases), and outcome;

41.　Names of individuals with Defendant with knowledge of facts relevant to the claims and defenses asserted in this case;

42.　With respect to the individual(s) testifying on behalf of Defendant, their current and former positions with Defendant, their job duties performed for Defendant, and the preparation undertaken for the deposition;

43.　With respect to any individual identified in response to the topics mentioned herein, their current and former positions with Defendant, and their current address;

44.　Defendant's document retention policy; and

45.　The existence, identity, location, and description of any documents concerning the matters Nos. 1 through 44 listed above.

The deposition will be recorded by stenographic means by Integrity Legal Support Solutions, Austin, Texas (512) 320-8690, or some other officer duly authorized by law to take depositions. The deposition may also be videotaped.

Respectfully Submitted,

THE COOK LAW FIRM

Russell Scott Cook
State Bar No. 24040724
Melissa A. Jacobs
State Bar No. 24046144
919 Congress Avenue, Suite 1145
Austin, Texas 78701
Telephone: (512) 482-9556
Telecopier: (512) 597-3172

ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

I hereby certify that on this 3rd day of July, 2012, I sent a true and correct copy of the above and foregoing to counsel of record as follows:

Stephanie O'Rourke                                         *Via Certified Mail, RRR*
Bryan P. Marshall
Cokinos Bosien & Young
10999 IH 10 West, Suite 800
San Antonio, TX 78230

_____
Melissa A. Jacobs

7

# Exhibit C

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

CAROLINE CLARK,                    ❖
          Plaintiff,               ❖    CIVIL ACTION
                                   ❖
VS.                                ❖    NO. A-12-CA-007-SS
                                   ❖
AUSTIN MONTESSORI SCHOOL,          ❖    JURY TRIAL DEMANDED
INC.,                              ❖
          Defendant.               ❖

*****************************************************

ORAL DEPOSITION OF THE CORPORATE REPRESENTATIVE

OF AUSTIN MONTESSORI SCHOOL, INC.,

DAWN GLASGOW

JULY 26, 2012

*****************************************************

          ORAL DEPOSITION OF DAWN GLASGOW, produced as a witness at the instance of the Plaintiff, and duly sworn, was taken in the above-styled and numbered cause on the 26th day of July, 2012, from 10:00 a.m. to 4:05 p.m., before Cynthia Warren, Certified Shorthand Reporter in and for the State of Texas, reported by machine shorthand, at the offices of The Cook Law Firm, 919 Congress Avenue, Suite 1145, Austin, Texas 78701, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

Case 1:12-cv-00007-SS    Document 39-1    Filed 08/13/12    Page 17 of 43

Dawn Glasgow as Corp. Rep. - 7/26/2012

APPEARANCES

FOR THE PLAINTIFF:

MR. RUSSELL SCOTT COOK
MS. MELISSA A. JACOBS
THE COOK LAW FIRM
919 Congress Avenue, Suite 1145
Austin, Texas  78701
Telephone:  512-482-9556
Fax:  512-597-3172
E-mail:  scook@rcooklaw.com

FOR THE DEFENDANT:

MR. BRYAN P. MARSHALL
COKINOS, BOSIEN & YOUNG
10999 IH-10 West, Suite 800
San Antonio, Texas  78230
Telephone:  210-293-8700
Fax:  210-293-8733
E-mail:  bmarshall@cbylaw.com

ALSO PRESENT:
Ms. Jordan Warshauer

INDEX

| | PAGE |
|---|---|
| Appearances | 2 |
| DAWN GLASGOW | |
| Examination by Mr. Cook | 5 |
| Examination by Mr. Marshall | 209 |
| Further Examination by Mr. Cook | 210 |
| Changes and Corrections | 211 |
| Signature | 212 |
| Reporter's Certificate | 213 |

EXHIBITS

NO. DESCRIPTION                              PAGE REFERENCED

Exhibit 1...................................    5
Plaintiff's Notice of Intention to Take
Oral Deposition of the Corporate
Representative of Austin Montessori
School, Inc.

Exhibit 2...................................    12
Defendant's Objections and Answers to
Plaintiff's Third Set of Interrogatories

Exhibit 3...................................    34
Payroll Registers, Bates Nos. AMS 000766 -
000835

Exhibit 4...................................    38
Listing of employees and independent
contractors, January - June 6, 2009

Exhibit 5...................................    104
Expenses by Vendor Summary, August 2009
through July 2010

EXHIBITS (cont'd)

NO. DESCRIPTION                              PAGE REFERENCED

Exhibit 6...................................    114
TWC Employer's Quarterly Report, 3/28/11

Exhibit 7...................................    190
TWC Employer's Quarterly Report, 3/28/11

Exhibit 8...................................    207
Annual Report, 2010-2011

Exhibit 9...................................    208
Annual Report, 2009-2010

Exhibit 10...................................    209
Annual Report, 2008-2009

(Exhibit No. 1 marked.)

DAWN GLASGOW,
having been first duly sworn, testified as follows:

EXAMINATION

QUESTIONS BY MR. COOK:

Q.   Hi, Ms. Glasgow.  Will you please state your full name for the record?

A.   Dawn Delise Glasgow.

Q.   And what is your position with Austin Montessori School?

A.   Administrative executive.

Q.   Ms. Glasgow, you understand you've been designated as a corporate representative on behalf of Austin Montessori School, Inc. here today; is that correct?

A.   Yes.

Q.   And you've been designated to testify on a number of topics; is that correct?

A.   Yes.

Q.   Do you have some understanding of what the Federal Rules of Civil Procedure obligate you to testify about here today?

A.   I don't think so.

Q.   Okay.  I'm going to give you what's been marked as Exhibit 1.  And let me ask you this.  Do you

understand that you've been designated to speak on the topics in Exhibit No. 1? Go ahead and take your time and read through it.

A. Yes.

Q. And are you able and prepared to speak on behalf of the corporation on the topics listed in Exhibit 1?

A. The ones I understand.

Q. Okay. Are there some that you don't understand?

A. Quite a few. I guess we'll get to them.

Q. Okay. Well, I can do that, I guess, as we go through specifically, but is there a general category of topics that you didn't understand that you're not able to testify on behalf of the corporation here today?

A. All the ones that sound like some kind of legal jargon.

Q. Okay.

A. Like "Facts supporting Defendant's asserted defense in paragraph 16." I'm not -- maybe I can answer the question. I'm not sure.

Q. Are you talking about basically starting around number 20 through 33?

A. Yes.

Q. Okay. Besides those, are you able and prepared

to speak on the other topics listed in this Exhibit 1?

A. Yes.

Q. Okay. What efforts have you made to be able to testify on behalf of the corporation here today?

A. I looked over these to see if I would be the right person to -- I mean, the right person in the company.

Q. Did you make any other preparations besides looking over Exhibit 1?

A. Yes.

Q. What specific preparations?

A. Looking to see if I had -- if I was clear what these things were, like the quarterly reports and who the individuals were, when they worked, those things.

Q. Did you review any records to prepare for today?

A. Some.

Q. Which records did you review to prepare for today?

A. I looked at some payroll reports, like online payroll reports.

Q. And where did you look at the online payroll reports?

A. On my computer.

Q. Is this QuickBooks, some other computer

program? How did you access the online payroll reports?

A. It's a program that the payroll company provides.

Q. Do you know the name of the program?

A. No. I can't remember.

Q. Do you know the name of the payroll company?

A. AmCheck.

Q. Okay. Does AMS do payroll on a biweekly basis?

A. Twice a month.

Q. Okay. And when AMS processes payroll, I assume that AmCheck sends them a report; is that correct?

A. That's correct.

Q. And then if it's like the system I use, I assume they send you a quarterly report also?

A. Yes.

Q. And they send an end-of-the-year report as well?

A. Yes.

Q. And those reports that AmCheck sends will list the employees that were paid --

A. Yes.

Q. -- during the relevant time periods?

A. Yes.

Q. One thing, I saw this from rereading the deposition I took of you last time is that we have a

tendency to talk over each other. Let's try to pause and let each other finish before we answer questions or before I ask them.

A. Okay.

Q. Thank you.

What payroll reports did you review from AmCheck online?

A. It's like a payroll register, but it wasn't the payroll register; it's just a report.

Q. Are these online versions of the physical reports that they send to AMS?

A. They send a file with an extension for the software. I rarely open that file unless I need to. And then I went -- I can go to their website and pull a specific report that has just employee name, for instance, and the date that they received a check.

Q. Okay.

A. So that's kind of what I looked at.

Q. How many years back does the AmCheck system go back?

A. July of 2010.

Q. So it keeps records for a year -- two years, excuse me?

A. That's as far back as we go with them and then prior to that was ADP. I can't view things online with

them anymore because we're not clients.

Q. ADP, when you were a client of ADP they would have sent you written reports with payroll, correct?

A. Yes.

Q. And ADP would have sent quarterly reports, correct?

A. Yes.

Q. And ADP would have sent end-of-year reports; is that correct?

A. Yes.

Q. And it's true that those records would have indicated basically every paycheck that went to the employees of AMS; is that correct?

A. Yes.

Q. And when I say AMS today, you know what I'm talking about?

A. Yes.

Q. Austin Montessori School, Inc., correct?

A. Yes.

Q. Did you go back and look at any of the written reports that ADP had issued to AMS?

A. Yes.

Q. Does AMS have complete copies of the reports that ADP sent in 2009 and 2010?

A. No. We were missing some.

Q. And what reports was AMS missing during that time period?

A. I can't remember. Some from 2009.

Q. And when you say the reports were missing, are you talking about the bimonthly payroll reports or any of the quarterly reports?

A. Bimonthly. Maybe the quarterly. I didn't look at all the quarterly reports.

Q. Okay. In 2009 and 2010 did ADP pay independent contractors through either ADP or AmCheck?

A. No.

Q. It's fair to say that individuals that were paid through AmCheck or ADP AMS considered to be employees of AMS?

A. Correct.

Q. To be clear, that was for the time period 2009 and 2010, correct?

A. Yes.

Q. Besides looking at payroll reports from ADP and AmCheck, what other documents did you review in preparation for your testimony here today?

A. I can't recall any other documents.

Q. Did you review any 941 reports filed with the IRS?

A. No.

Q. Did you review any TWC quarterly reports filed with the TWC?

A. No.

Q. And you know what TWC stands for, Texas Workforce Commission?

A. Yes.

(Exhibit No. 2 marked.)

Q. Ms. Glasgow, I'm going to hand you what's been marked as Exhibit 2. And before I get to that, I'll put that aside for a second. Were there any other preparations that you made for your testimony here today besides reviewing the documents that you've already told me about?

A. Well, I talked to my attorney.

Q. Did you talk to anyone else besides your attorney in preparation for your testimony here today?

A. No.

Q. So you reviewed payroll reports from AMS, from ADP, and AmCheck, and you talked to your attorney. That was the scope of your preparation for your testimony here today?

A. That's what I remember.

Q. Okay. Now you can take a look at Exhibit 2. I want you to turn to the -- do you recognize what Exhibit 2 is?

A. Yes.

Q. And if you turn to the last page, I believe it's a document with your signature stating that the answers provided in Exhibit 2 are true and correct to the best of your knowledge; is that correct?

A. Yes.

Q. Do you remember signing off on these answers?

A. I remember signing this. I'd have to look to see what the questions were.

Q. Okay. Well, why don't you do that briefly because I'm going to ask a question about Interrogatory No. 24.

(Witness peruses document.)

Q. Have you had a chance to review the answer to Interrogatory No. 24?

A. Yes.

Q. And the answer which you signed to the best of your knowledge as true and correct was that the defendant is not an employer as that term is defined by the Family Medical Leave Act because it did not have 50 or more employees in each of 20 or more calendar weeks in 2009 or 2010; is that correct?

A. Yes.

Q. And that answer is correct to the best of your knowledge?

Dawn Glasgow as Corp. Rep. - 7/26/2012

30

you aware of any mistakes in the TWC reports?

A. No.

Q. And you had a chance to review those in the last few days; is that correct?

A. I had the chance. I always have the chance to review them, but I did not review them.

Q. You did not review the TWC reports in preparation for this deposition?

A. No, I just familiarized myself with what FMLA was.

Q. On behalf of the corporation, does the corporation define employee differently when it's reporting the number of employees to the IRS and when it's reporting the number of employees to the TWC?

A. No. We don't report either one of those things directly from -- it goes through our payroll company.

Q. On behalf of the corporation, though?

A. Right. Right. No.

Q. Ultimately the corporation is responsible for the papers that get filed with the IRS and the TWC, correct?

A. Yes. There's no -- I guess I was saying that because there's no opportunity for error because only employees are reported to the payroll company and they report to the TWC and to the IRS that information. So

31

it's not me sitting in my office filling out a form incorrectly.

Q. Besides getting advice from the accountant on whether certain individuals are employees or independent contractors, has the corporation sought any other professional advice as far as those classifications?

A. No.

Q. If you'll turn to Exhibit 1. If you look at number 2 in the notice of deposition, you've been designated to testify as to the names of each individual in defendant's payroll in each week of 2009, the classification of those individuals by defendant as employees or independent contractors, and the facts on which those classifications were based. Do you see that?

A. Uh-huh. Yes.

Q. Are you prepared and able to testify as to number 2 on Exhibit 1?

A. To the best of my memory.

Q. Okay. Well, does your memory allow you to testify to all those individuals that were on the payroll in 2009?

A. I will not be able to recall all of the names of the individuals on the payroll in 2009.

Q. Well, did you make efforts to look at documents

32

that would enable you to testify to number 2?

A. Yes, I looked at the documents, but I can't remember all of the names.

Q. I want you to name the individuals on -- are you going to be able to testify as to which individuals were on the payroll for each week in 2009?

A. No.

Q. Did you make any preparations or efforts that you can testify as to that today?

A. Not -- I cannot recall specifically every person that was on the payroll for each week in 2009.

Q. Did you look at information in preparing for this deposition which provided you with the names on defendant's payroll for each week in 2009?

A. I looked at information and -- but it's not in a way that I could remember all of -- that wasn't -- I was familiarizing myself with it, not trying to commit it to memory.

Q. What documents did you look at that showed you the individuals on defendant's payroll for each week of 2009?

A. The payroll register reports that I was telling you about.

MR. COOK: And we can talk about this after a break, but I think those need to be produced.

33

MR. MARSHALL: Uh-huh.

MR. COOK: As soon as possible.

MR. MARSHALL: I've got a -- I actually have a copy. We had to get them from -- we didn't have them -- well, we had a bad copy in our possession, but we got a brand-new copy. There's a gap in it, though. I've got a copy here today, which I can give you.

MR. COOK: That would be great, especially if she used it to refresh her memory.

MR. MARSHALL: She used it -- so there is a gap in it, though. It's a small gap.

MR. COOK: We'll deal with that during a break.

MR. MARSHALL: Now, these are Bates'd, and I want to put on the record that I don't think the Bates are going to remain the same.

MR. COOK: That's fine.

MR. MARSHALL: So just for the record --

MR. COOK: The record, the Bates labels --

MR. MARSHALL: Are inaccurate. Are not official yet.

MR. COOK: Let's go off the record for a few minutes.

(Recess taken from 10:39 a.m. to 10:56 a.m.)

34

(Exhibit No. 3 marked.)

Q. (By Mr. Cook) Ms. Glasgow, we're back from break. Before break your attorney handed me what I've marked as Exhibit 3 and these are payroll records from ADP; is that correct?

A. That's correct -- well, this is a report from AmCheck at the back.

Q. And I know these aren't going to be the actual Bates labels we use, but for the purposes of asking about this document you're talking about AMS 823 to 835?

A. Yes.

Q. That's from AmCheck?

A. Yes.

Q. And what does that show, 823 to 835?

A. It shows the checks that were issued to employees from the time AmCheck starting doing our payroll through 2010. So it looks like 7/30 to 12/31 of 2010.

Q. Is this a complete record from AmCheck?

A. For this report. This is one of the ones I requested that shows the employee, the check number, the check date and the pay, the gross pay for that that's blacked out.

Q. Does 823 to 835 reflect employees as defined by the corporation that were paid during these time

35

periods?

A. These -- yes, these were the employees.

Q. In simple terms, this doesn't reflect independent contractors or non-employees that were getting paid?

A. Correct.

Q. Correct meaning no, it's not paying independent contractors or non-employees?

A. It's not -- there are no independent contractors or non-employees listed on this report.

Q. Thank you. And how did you get 823 to 835?

A. I went to the AmCheck website and pulled a report.

Q. Okay. So you have the ability to pull this report for every week after -- every payroll period after you became a client of AmCheck?

A. Correct.

Q. So if there's gaps in 823 to 835, and I don't have a chance to look at it right now, you would be able to fill those gaps easily from your computer?

A. Yes.

Q. AMS 766 through AMS 822 are payroll reports from ADP, correct?

A. Yes.

Q. And how did you get these?

36

A. I called ADP service center and they -- I requested these reports and they sent me an e-mail where I could download a file.

Q. Okay. What did you specifically request?

A. The payroll register reports.

Q. Okay. Is the payroll register reports the bimonthly payroll report --

A. Yes.

Q. -- which is exhibited in part by page 1 of this 766?

A. Yes.

Q. Okay. So you got what you requested?

A. Well, it sounds like there are gaps, so --

Q. But I'm talking about the form of the document is what you specifically requested?

A. Yes.

Q. Okay. And they provided you with some but not all of the relevant data for the relevant time period?

A. I'm assuming they have. I didn't review these in detail. I'm assuming it's all there. I asked for the payroll register reports and I've gotten some of them.

Q. You asked for 2009 and 2010?

A. Yes.

Q. Okay. And you did that by contacting ADP?

37

A. Yes.

Q. Did they charge you for this?

A. They told me they typically do but she wouldn't this time, so. . .

Q. Sounds very much like ADP.

A. I know. So I didn't feel like I could rush her too much when I wasn't getting it, but --

Q. You said they e-mailed you. Was it a link with a password?

A. Yes, it was a link where I had to go in and create a password and retrieve the document.

Q. Did you actually get access through that link to the database?

A. No, just this document.

Q. And was it a PDF?

A. It was a TIFF file and I converted it to a PDF.

Q. The whole thing was one TIFF file?

A. Yes, I think so. Yes.

Q. Okay. You converted to a PDF, pressed print?

A. Uh-huh.

Q. I'm just trying to make sure how we got from there to here.

A. Yes.

Q. Okay. And so if they sent you incomplete information, the original TIFF file was incomplete?

38

A. That's right.

Q. And did you review this document or these documents in preparation for your testimony here today?

A. No.

Q. Have you looked through them at all?

A. Briefly, like -- yes, briefly.

Q. Does it change -- do these documents change any of your positions on behalf of the corporation as to whether or not AMS is covered by the FMLA during 2009 and 2010?

A. No.

Q. No, okay. You've testified you're unable to testify sitting here today as to which employees were paid as employees for every work week in 2009 and 2010; is that correct?

A. That's correct.

Q. I may have a tool that may help us, maybe not.

(Exhibit No. 4 marked.)

Q. I hand you what's been marked as Exhibit 4 to the deposition, Ms. Glasgow. Do you recognize Exhibit 4?

A. Yes.

Q. This is a document that was produced by your lawyers in this case to our side; is that correct?

A. I did it.

39

Q. You did it. I assume you gave it to your lawyers and they produced it to our side of this case; is that correct?

A. Yes. Yes.

Q. You created Exhibit 4; is that correct?

A. Yes.

Q. What is Exhibit 4 then?

A. I think I took all -- I think there was a question about who were the people on the list, on the contact list that we distribute stuff on it, and I think what I did is I took all of them and said what they did and what their position was. So during January to June these were the people that showed up on the list and what -- then what they did. It doesn't mean that everyone worked all of those weeks; it just means these are people that are on the list so they worked at some point.

Q. When you say they're on the list, what list are you talking about?

A. We distribute a contact list for -- to all of our staff and it has -- just has staff members and it has people who they might need to have the phone number for, if that makes sense.

Q. Well, let me ask you this. On Exhibit 4 we're looking at the first page, it's January to June 6 of

40

2009.

A. Right.

Q. There's 49 individuals listed in the category as employee; is that correct?

A. On this list, yes.

Q. Is it correct in general?

A. Oh, let me make sure.

MR. MARSHALL: Take your time.

A. The only two things I see on this page that don't look correct is Mandy Klein never really changed her name so she's really Amanda Weeks, but she was listed on that list -- contact list. And then Kjersti Burkham, I have her listed as employee because that's the way we were paying her during that time, but she's that shuttle driver thing that we probably should have had her as -- but we had her as employee, but we probably should have had her as a contractor based on our information from our CPA.

Q. Okay. Well, let's leave out Ms. Burkham. For the other 48 individuals listed as employee, the corporation would agree that those were employees for the corporation between January and June 6 of 2009?

A. I don't know that it was every week. Sometime during that period.

Q. So let me ask it a little bit differently then.

41

For the periods they worked, whether it was every week or not every week, the individuals with the except [sic] of Ms. Burkham listed between 1 and 49 on here were employees of the corporation?

A. For some period during January to June of 2009, yes.

Q. Okay. None of these employees with the exception of maybe Ms. Burkham were independent contractors that provided services for the corporation between January and June 6 of 2009. And when I say -- the people I'm talking about between 1 and 49.

A. None of them except for Ms. Burkham. I just -- I remembered Adam. I don't think he was an employee. Adam Aguirre, I think he left in December and I mistakenly put him on here. I was going to look at the payroll record here. Adam Aguirre, he graduated. Yes. See, that's an example of one of those people. He never worked in January, Aguirre, Adam Aguirre, number 2.

Q. He was replaced by someone; is that correct?

A. Yes. Let's see, who was he replaced by?

Q. Is it Gilberto Miranda?

A. Okay, maybe so. Well, I don't -- let me look, hold on. Possibly. That sounds right.

Q. I'm sorry to take everyone's time, but I think we have to do this for the record. And what I want to

82

up, $200 per room per month, something like that.

Q.   And he would engage in an oral contract with the corporation?

A.   He would, yes.

Q.   And it would be for the entire school year, correct?

A.   Yes.

Q.   Did he ever interact with the children?

A.   No.

Q.   Was he told not to interact with the children?

A.   He wasn't there when the children were there.

Q.   Did Mr. Carter own his own business?

A.   I'm not aware of that.

Q.   Did he work for someone else?

A.   I know that he worked for the University of Texas for a period of time, but I don't know if he was still working for them when I started working at the school.

Q.   Let me ask it this way.  When he worked for the corporation, were you aware of him working for anyone else?

A.   I was not aware of that.

Q.   Did Mr. Carter ever get sick or have to miss work for any reason?

A.   He got sick and he would usually have a

83

relative or someone come do it.  I wouldn't always be aware of that, maybe the maintenance director would be. He actually did have a business where he mowed lawns too.  I don't know how I knew that.

Q.   When did he do that?

A.   At some period while he was working for us.

Q.   In 2009 or 2010?

A.   Yes.

Q.   Did Calvin Carter ever get bonuses?

A.   Not that I can remember.

Q.   Was there any way for him to earn anything more than whatever the set rate was that he would get paid in a month?

A.   Not that I remember.  I mean, no.

Q.   Okay.  I assume he used cleaning supplies?

A.   Yes.

Q.   Does the AMI have standards for supplies or materials that are used in schools?

A.   No.

Q.   They do not?  Does AMS?

A.   Oh, I'm sorry, I was referring to cleaning supplies.  They do have standards about materials that are used.  They don't have standards about cleaning supplies that are used.

Q.   Does AMS have standards about cleaning

84

supplies, like organic or --

A.   Yes, but it's not documented that we do.

Q.   And how do you know they have standards then?

A.   Because I know that like Amber or Donna would go through and look at what cleaning products -- this happened some years ago and they'd say he can't use this, and so we had to spend some amount of time finding out what health department requirements for child care centers and still complied with what they thought was reasonable to have in an environment around children.

Q.   Is it fair to say that the corporation determined which materials -- which cleaning materials would be used at the schools?

A.   Which cleaning materials we would purchase to use at the school, yeah.

Q.   And those were the materials that were used by individuals like Mr. Carter?

A.   Well, no.  What the cleaning people -- this is why I say kind of specialized.  They would from time to time decide that whatever it was we were providing wasn't working well enough and they would use their own things to get it more thoroughly cleaned.

Q.   Okay.

A.   And we would notice this sometimes because it smelled and sometimes just because they would say, oh,

85

we can't use that all the time.  We'd say no, we don't want to use bleach or whatever around them.

Q.   So you had approved materials for them to use, but sometimes they would use what they wanted to; is that correct?

A.   That's right.  That's right.

Q.   And on occasion if you didn't like that you would tell them no, don't use that?

A.   Like I wouldn't tell them.  It might be the maintenance director.

Q.   Someone would tell them we don't want you using that material?

A.   Right.

Q.   Did they follow your -- the school's instructions?

A.   Probably not.  Probably not.

Q.   Were they ever reprimanded or threatened with not following the school's instructions?

A.   No.

Q.   Did you ever worry about health code guidelines being --

A.   They were never violating health code guidelines.

Q.   Okay.  Well, did the school not care that they were telling them to do one thing and they were doing

86

something else?

A. Not everybody cared as much about the materials that were used to clean as other -- as some.

Q. But some did?

A. Uh-huh. If they cared enough, then they would put a stop to it, but they didn't.

Q. They didn't put a stop to it?

A. Right.

Q. But they tried to put a stop to it?

A. They tried to make it be that the materials they would prefer to be used for cleaning was used most of the time.

Q. And was that the case?

A. Yes.

Q. And that was because they instructed the janitorial service that this is what we prefer you use most of the time?

A. It's because that's what was available.

Q. That's what they bought for the janitorial services?

A. Right.

Q. And on occasion they would get outside those guidelines and someone from the school would tell them no, you need to use what we approved?

A. Not always, sometimes.

87

Q. That wasn't the general rule?

A. No.

Q. The general rule is that they used the products that the school provided for them, correct?

A. Right.

Q. And that includes Mr. Carter?

A. Yes.

Q. Did Mr. Carter buy the products he used at the school?

A. Only if he wanted to use something different.

Q. Which you said is an exception to the general rule?

A. Right.

Q. And would he get reimbursed if he purchased that?

A. No.

Q. There wasn't a lot of incentive for them to use their own products if they weren't getting paid back for them; is that correct?

A. Well, they wanted -- well, you would think, but they wanted it to be clean. Like they were -- they wanted to use the product that they knew worked, so that's why they would use their own products.

Q. Well, I assume they had the ability to come ask you-all to use a different product; is that correct?

88

A. Certainly they could come and tell us, but they didn't. That's not the way they worked. They just did it in secret so that they could get it clean.

Q. Okay. They spent money out of their own pocket in secret?

A. Yeah.

Q. Without seeking reimbursement?

A. Well, bleach, like a dollar a gallon. Yes, they did.

Q. And how do you know that?

A. How do I know that they used it?

Q. In secret.

A. Because they would -- you could smell it some of the time.

Q. And would you go talk to them when you could smell it?

A. I didn't.

Q. Did someone in the corporation go talk to them?

A. I think Jerry Pippins did and then he would say well, they want to use it because it's what works.

Q. And what would the school do in response to that?

A. Probably tell them to use what was in the cabinet but not -- I wanted it to be clean too, and if they used it every now and then and it wasn't harmful

89

for children or it wasn't anything that was against any health guidelines I didn't care.

Q. How did you ensure that it wasn't harmful -- what they were using wasn't harmful to children and wasn't against health guidelines, especially if they were using materials in secret?

A. How did I ensure that? They cleaned for other schools and a couple of them were janitors at -- for AISD. They knew what was acceptable and bleach is not harmful. I mean, over time, like if a child is coming into contact with it, yes, but they weren't. They weren't there at the same time.

Q. Mr. Carter didn't work for any other schools?

A. No.

Q. How did you ensure that the materials that Mr. Carter was using were within code and were not harmful to the children?

A. We provided -- we gave him instruction on what to use and we provided it. We weren't there when he used it. I happened to know that he used other things.

Q. Those other things that he used, how did you ensure that they weren't against code and didn't harm the children?

A. I couldn't be sure.

Q. Is there a possibility that he has used things

90

which have harmed the children or have been against code over the last two years?

A. There's no possibility that he used things that harm the children.

Q. How do you know that?

A. Because none of the children were harmed.

Q. Okay. Did Mr. Carter ever provide less than satisfactory work for the school? I'll put this in more simple terms. Was it ever not cleaned up well?

A. Sometimes there would be things like, oh, you didn't put a liner in the trash can and like everybody wanted liners in the trash can. So if there wasn't a liner in the trash can you would hear about it. So we would just make sure there were more liners or whatever it was.

Q. Was there ever like a checklist or anything about what he was supposed to do?

A. There was a checklist that was provided by a cleaning contracting company that we went over with -- like with the maintenance director to say what are the things in here we want to be done and so we would have that. Really, we had it more for the staff so that they knew what was expected to be done and what wasn't because sometimes they would say the window is all dirty. Well, they don't do the windows, you do the

91

windows.

Q. Sure.

A. So I think that's why we created it, because there was this confusion with the staff of some things like that.

Q. My question is, how did Calvin Carter know what he was supposed to do?

A. He was working there when I started, so I don't know.

Q. Is it safe to assume that someone told him what he was expected to do?

A. Yes.

Q. Was there anyone that was specifically in charge of making sure Mr. Carter did his work?

A. Jerry Pippins was responsible for communicating with him if things -- if there was something that he needed to know about, like, oh, a meeting is going to be really early today, is it possible for you to come early or things like that or if he was out of supplies or if there was some question. So Jerry Pippins was the one that communicated.

Q. Were there guidelines on when Mr. Carter could work at the school?

A. Just after the children left.

Q. Which was what time?

92

A. 5:30.

Q. So he could work at the school any day after 5:30?

A. Yeah, prior to the next morning.

Q. But not every day because sometimes the school had functions after 5:30; is that correct?

A. Right.

Q. And then the school would inform him you can't come in until a later time?

A. No, just that either don't clean this classroom because we wouldn't use the whole campus.

Q. Why is Mr. Carter no longer working for the company?

A. He was really retiring.

Q. But he was a long-term worker?

A. Uh-huh.

Q. Ten years for the corporation?

A. Yeah.

Q. Okay.

A. Yes.

Q. Why -- on behalf of the corporation, why does Austin Montessori School, Inc. consider Mr. Carter to have been an independent contractor?

A. He controlled his own work. He was the expert in cleaning.

93

Q. Any other reasons why the corporation considers Mr. Carter to have been an independent contractor?

A. That's what I -- that's enough.

Q. Did you discuss -- I guess he was classified as an independent contractor before you came to the corporation?

A. Yes.

Q. Do you know who was involved in making the initial decision that he should be classified as independent contractor rather than an employee?

A. No.

Q. Has your accountant ever reviewed whether this classification is correct or incorrect?

A. I believe she has, not for Calvin but for other people. For instance, Francesca Tejeda and her husband have the company. I can't remember the name of it, but -- so we pay them in the summer when they do the floors as a company and she's contracted to do the cleaning.

Q. Why did the accountant review those two individuals and not Mr. Carter?

A. I think because anytime somebody is paid in two different ways like an employee and a -- for instance, Jerry Pippins is an employee but he also has a -- in the summers he does contracting work with a building

213

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

CAROLINE CLARK,                    �
        Plaintiff,                 �    CIVIL ACTION
                                   �
VS.                                �    NO. A-12-CA-007-SS
                                   �
AUSTIN MONTESSORI SCHOOL,          �    JURY TRIAL DEMANDED
INC.,                              �
        Defendant.                 �

REPORTER'S CERTIFICATION
DEPOSITION OF THE CORPORATE REPRESENTATIVE
OF AUSTIN MONTESSORI SCHOOL, INC., DAWN GLASGOW
JULY 26, 2012

I, Cynthia Warren, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, DAWN GLASGOW, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the deposition transcript was submitted on _____, to the witness or to the attorney for the witness for examination, signature and return to me by _____;

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes counsel for all parties of record:

214

Mr. Russell Scott Clark and Ms. Melissa A. Jacobs, Attorneys for the Plaintiff;

Mr. Bryan P. Marshall, Attorney for the Defendant;

That $_____ is the deposition officer's charges to the Plaintiff for preparing the original deposition transcript and any copies of exhibits;

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Certified to by me this 30th day of July, 2012.

_Cynthia Warren_

_____
CYNTHIA WARREN, Texas CSR 4597
Expires 12/31/13
INTEGRITY LEGAL SUPPORT SOLUTIONS
Firm Registration No. 528
3100 West Slaughter Lane, Suite A-101
Austin, Texas  78748
512-320-8690
512-320-8692 (Fax)

# Exhibit D

## Music

The music program at Austin Montessori School consists of daily or every other day string instrument (violin, viola, cello, and guitar) and piano lessons. Lessons are given throughout the day to students who have enrolled in this optional program. The cost is $100.00 per month. Students give two performances yearly and often perform for their class, etc. The string orchestra meets after school once or twice a week and performs several times a year.  Information about the music instructors is available in the office.

## Elementary Read-Aloud Book Club

### PURPOSE

The Read-Aloud Book Club provides parents with convenient and inexpensive access to a large, carefully chosen collection of books for reading aloud. These are books selected to:

> ---Generate a high level of interest;
> ---Stimulate the exploration of values;
> ---Promote the development of thinking abilities;
> ---Support interesting language usage; and
> ---Develop a sense of literary aesthetics

### BENEFITS

*Members have checkout privileges from a special collection of books for parents to read aloud to their children.

*The books are housed in a special section of the Austin Montessori School Library for easy access by children.

*Books are conveniently-sized, lightweight paperbacks with covers reinforced inside and out with self-adhesive plastic.

*The collection is selected from books listed in *The Read Aloud Handbook* by Jim Trelease, *Classics To Read Aloud To Your Children* by William E. Russell and the sequel *More Classics To Read Aloud To Your Children* as well as *The New York Times Parent's Guide To The Best Books For Children.*

### PROCEDURE

*Parent will request Read-Aloud Book Club packet, read through description, and request 1st, 2nd, and 3rd choice. The packet should be returned within 3 days.

*The book checked out will be sent home with child in a mailing envelope.

AMS 000581

AMS Community Handbook                              Policies & Procedures
                                                   The Children's House

- Peanut butter on apples – peanut butter with no additives
- Mini pizzas on whole wheat English muffins or bagels
- Whole wheat bread sticks
- Raw, organic vegetables with sour cream and yogurt dip
- Corn

To feed the aesthetic appetite, please feel free to send a bunch of flowers, for arranging, when bringing snack.

We appreciate your support on providing the snack ingredients. If you have any questions, please feel free to leave a message with the Casita Leader, and he/she will return your call after 5:30pm.

## Music

The music program at Austin Montessori School consists of daily or every other day string instrument (violin, viola, cello, and guitar) and piano lessons. Lessons are given throughout the day to students who have enrolled in this optional program.. Students give two performances annually and often perform for their class, etc. The string orchestra meets after school once or twice a week and performs several times a year. Information about the music instructors and the monthly cost of these music lessons is available from the main office.

AMS 000559

| | |
|---|---|
| **Donna Bryant Goertz**<br>Founder; Director of Pedagogy<br>892-0253 ext. 14<br>donnabgoertz@austinmontessori.org | • Montessori pedagogy across all planes of development |
| **Donna Romine**<br>Campus Coordinator, Sunset Trail/Jones Road Campus<br>892-0253 ext. 22<br>donnar@austinmontessori.org | • Arrival / departure protocol, including late arrival/early departure (Sunset/Jones campus)<br>• Outdoor Environment Day, Sunset/Jones campus<br>• *Conversations With Donna Bryant Goertz* series<br>• Hearing & vision screening<br>• After-School Sports programs (Soccer Shots; Marathon Kids; etc.)<br>• Reserving the Community Center for events |
| **GNPA Representatives**<br>(Call the GN Campus Coordinator for current list of representatives) | • GNPA (north campus parent assoc.) |
| **Janna Banks**<br>Director of Development<br>892-0253 ext. 12<br>jannab@austinmontessori.org | • Annual Report<br>• Annual Fund donations<br>• Fundraising events<br>• Fundraising strategies<br>• Grandparent relations<br>• Alumni relations |
| **John Snyder**<br>Elementary Level Coordinator<br>892-0253 ext. 26<br>johns@austinmontessori.org | • Elementary curriculum/program questions<br>• Observations by outside professionals/consultants<br>• Requests for standardized test scores<br>• Questions about standardized testing<br>• *Study of the Child* (Upper Elementary)<br>• *New Life program* (Early Elementary)<br>• *Study of Human Development* (Upper Elementary)<br>• Referral to school counselor (elementary only) |
| **Lois O'Brien**<br>Office Manager<br>892-0253 ext. 11<br>loiso@austinmontessori.org | • "How to Talk" & "Siblings" series registration<br>• Tuition payment and billing<br>• Transfer of records<br>• Student medical records<br>• School forms (including allergy form)<br>• Parent contract updates<br>• Emergencies<br>• Shuttle service registration<br>• Enrolling in music lessons (you may also contact the music teacher directly)<br>• Departure changes w/o prior notice (Sunset/Jones campus) |

AMS 000529

Exhibit E

NO. D-1-GN-11-000096

| | | |
|---|---|---|
| CAROLINE CLARK,<br>Plaintiff, | §<br>§<br>§ | IN THE DISTRICT COURT |
| V. | §<br>§ | 419th JUDICIAL DISTRICT |
| AUSTIN MONTESSORI SCHOOL, INC.,<br>Defendant. | §<br>§<br>§<br>§ | OF TRAVIS COUNTY, TEXAS |

## PLAINTIFF'S SECOND REQUEST FOR PRODUCTION OF DOCUMENTS TO DEFENDANT AUSTIN MONTESSORI SCHOOL, INC.

To:    Defendant Austin Montessori School, Inc., by and through its attorneys of record, Stephanie O'Rourke, Cokinos Bosien & Young, 10999 West IH-10, Ste. 800, San Antonio, TX 78230, and W. Patrick Garner, Cokinos Bosien & Young, Four Houston Center, 1221 Lamar, 16th Floor, Houston, Texas 77010.

Pursuant to Rule 196, Texas Rules of Civil Procedure, Defendant Austin Montessori School, Inc. is hereby requested to produce for inspection and copying, within thirty (30) days following service of this Request for Production, at The Cook Law Firm, 919 Congress Ave., Suite 1145, Austin, TX, 78701, or at such other time and place as counsel for the parties may agree to, every document specified herein that is within your possession, custody or control in accordance with all of the provisions of TEX. R. CIV. P. 193 and 196. Defendant is also requested to supplement its production fully and timely, as such supplementation is required by the Texas Rules of Civil Procedure. TEX. R. CIV. P. 193.5.

1

Respectfully Submitted,

**THE COOK LAW FIRM**

Russell Scott Cook
State Bar No. 24040724
Melissa A. Jacobs
State Bar No. 24046144
919 Congress Avenue, Suite 1145
Austin, Texas 78701
Telephone: (512) 482-9556
Telecopier: (512) 597-3172

ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I hereby certify that on this 30th day of September 2011, I sent by facsimile a true and correct copy of the above and foregoing document to counsel as follows:

Stephanie O'Rourke
Cokinos Bosien & Young
10999 West IH-10, Ste. 800
San Antonio, TX 78230
*Facsimile (210) 293-8733*

W. Patrick Garner
Cokinos Bosien & Young
Four Houston Center
1221 Lamar, 16th Floor
Houston, Texas 77010
*Facsimile (713) 535-5533*

Melissa A. Jacobs

2

## INSTRUCTIONS AND DEFINITIONS

1.    "You," "Your," "Austin Montessori School" and "Defendant" means Austin Montessori School, Inc., as well as its agents, employees, officers, directors, divisions, or any other persons or entities acting or purporting to act on its behalf.

2.    "Plaintiff" means Plaintiff Caroline Clark.

3.    "Communication" and "correspondence" mean any contact whatsoever or any transmission or exchange of words, numbers, graphic material, or other information, either orally, electronically, or in writing, whether made, received, or participated in, and includes, but is not limited to, any conversation, correspondence, letter, notes, memorandum, inter-office or intra-office correspondence, telephone call, telegraph, telegram, telex, telecopy, facsimile, E-mail, Internet communication, instant message, text message, telefax, cable, electronic message, audio or video recording, discussion, face-to-face meeting, or conference of any kind (whether in person, by audio, video, telephone, or in any other form).

4.    "Document" means and includes all written, printed, typed, recorded, or graphic matter of every kind and description, both originals and copies, including all attachments and appendices. "Document" includes all agreements, contracts, Communications (as defined above), correspondence, letters, notes, opinion letters, messages, telegrams, telexes, telefaxes, telegraphs, telecopies, facsimiles, E-Mails, Internet communications or other electronic messages, audiotapes, videotapes, memoranda, records, reports, books, summaries of the records of telephone conversations or interviews, summaries or other records of personal conversations or interviews, minutes, summaries, or other records of meetings and conferences, statements obtained from witnesses or other persons, summaries or other records of negotiations, other summaries, diaries, diary entries, calendars, appointment books, time records, instructions, work

3

assignments, forecasts, progress reports, statistical data, statistical statements, financial statements, work sheets, work papers, drafts, graphs, charts, tables, accounts, analytical records, consultants' and experts' reports, appraisals, bulletins, notes, notices, marginal notations, notebooks, telephone records, bills, statements, records of obligation and expenditure, invoices, receipts, envelopes, lists, journals, printouts, compilations, tabulations, analyses, studies, surveys, expense records, microfilm, microfiche, tape or disc recordings, sound recordings, video recordings, film, tape, photographs, programs and data compilations from which information can be obtained (including matter used in data processing), and other printed, written, handwritten, typewritten, recorded, stenographic, computer-generated, computer-stored, or electronically stored matter, however and by whomever produced, prepared, reproduced, disseminated, or made. "Document" also includes all copies of documents by whatever means made, except that when a document is produced, identical copies of it that do not contain any markings, additions, or deletions different from the original or the document do not have to be separately produced.

5.      "Person" means any individual, entity, or association of individuals or entities of any kind, and includes but is not limited to partnerships, limited partnerships, corporations, joint ventures, joint enterprises, trade associations, regulatory bodies, government agencies, sole proprietorships, "d-b-a's," or government entities of any kind.

6.      "Relating to," "regarding," "referring to," "demonstrating," and "reflecting" are used in their broadest possible sense, and mean anything that, directly or indirectly, generally or specifically, regards, relates to, refers to, concerns, contains, constitutes, contradicts, evidences, embodies, comprises, reflects, mentions, identifies, states, deals with, comments on, responds to, describes, demonstrates, analyzes or is in any way whatsoever, directly or indirectly, relevant to the subject.

4

7.    "Representative" means (1) any officer, director, owner, official, partner, joint venturer, associate, employee, servant, agent, representative, subsidiary, or affiliate of the Person; and/or (2) any other Person or legal business entities acting for, on behalf of, or in concert with the Person, including consultants, advisors, lawyers (excluding your lawyers in this matter), investment bankers, accountants and anyone else engaged, retained, or employed by the Person.

8.    "And" and "or" are to be construed conjunctively or disjunctively as necessary to bring within the scope of the request all documents which might otherwise be construed to be outside its scope.

9.    "Any" and "all" mean "each and every."

10.    "Including" and "includes" means "without limitation."

11.    The past tense includes the present tense and vice versa.

12.    The singular includes the plural and the plural includes the singular whenever such inclusion would result in any additional documents being responsive to any request.

13.    The terms "Plaintiff" and "Defendant" as well as a party's full or abbreviated name or a pronoun referring to a party mean the party as defined earlier. This definition is not intended to impose a discovery obligation on any person who is not a party to the litigation.

14.    This request is continuing in nature. If you become aware of or acquire in your possession, custody, or control additional responsive documents or tangible things, you have a duty to produce promptly such additional documents for inspection and copying.

15.    This request requires the originals to be produced for inspection and copying, if they exist and are in your possession, custody, control, or access, including documents within the possession, custody or control of your officers, directors, employees, attorneys, agents,

5

representatives, and other persons or entities who have acted or purported to act on your behalf.

16.     You have a duty to respond when partially objecting to any of these requests. TEX. R. CIV. P. 193.2.

17.     These Requests for Production only apply to documents, electronically stored information, and things in the possession, custody, or control of the Defendant.

6

## PLAINTIFF'S SECOND REQUEST FOR PRODUCTION TO DEFENDANT

1. All Texas Workforce Commission quarterly reports for Defendant for 2009 and 2010.

RESPONSE:

2. All Internal Revenue Service form W-2s issued to any individual by Defendant for tax years 2009 and 2010.

RESPONSE:

3. For all individuals to whom Defendant issued Internal Revenue Service form W-2s for tax years 2009 and 2010, all documents for the time period of 2009 and 2010 reflecting the hours those individuals worked for Defendant, the location at which those individuals performed the work for Defendant, and the job duties and/or requirements of those individuals.

RESPONSE:

4. All Internal Revenue Service form 1099s issued to any individual by Defendant for tax years 2009 and 2010.

RESPONSE:

5. For all individuals to whom Defendant issued Internal Revenue Service form 1099s for tax years 2009 and 2010, all documents for the time period of 2009 and 2010 reflecting the hours those individuals performed work and/or services for Defendant, the location at which those individuals performed the work and/or services for Defendant, and the job duties and/or requirements of those individuals.

RESPONSE:

6. All of Defendant's Internal Revenue Service form 941s for tax years 2009 and 2010.

RESPONSE:

7. Any and all of Defendant's policies, guidelines, and procedures for classifying individuals as employees or independent contractors in 2009 and 2010.

RESPONSE:

8. Any and all payroll reports of Defendant for 2009 and 2010.

RESPONSE:

7

9.    Any and all staff lists issued by Defendant in 2009 and 2010.

**RESPONSE:**

10.    All documents reflecting compensation for services paid to any individual or entity by Defendant in 2009 and 2010.

**RESPONSE:**

8

# Exhibit F



**COKINOS BOSIEN & YOUNG**
*Attorneys at Law*

BRYAN P. MARSHALL
bmarshall@cbylaw.com

10999 West IH-10
Suite 800
San Antonio, Texas 78230

210.293.8700
Fax: 210.293.8733
www.cbylaw.com

July 31, 2012

*Via Fax: 512-597-3172*
R. Scott Cook
THE COOK LAW FIRM
919 Congress Avenue, Suite 1145
Austin, Texas 78701

Re:   Civil Action No. 1:12-cv-007-SS; *Caroline Clark v. Austin Montessori School, Inc.*; In
      the United States District Court for the Western District of Texas, Austin Division

Dear Scott:

Your accusatory letter to us from yesterday regarding our production of payroll documents is quite misleading and it disregards the ethical duties owed by attorneys to their clients. First, because our client did not have possession, custody, or control of the documents until yesterday, it has never had any duty to produce them to you. *See* FRCP 34. In your letter, you asked why we were producing these documents at the end of discovery in a case that has been pending for more than a year. The answer is quite simple: until yesterday, we did not have possession, custody, or control of them. I explained this to you during Ms. Glasgow's deposition last week. To date, we have produced all payroll records in our possession. Moreover, as you are well aware, the documents I gave to you during Ms. Glasgow's deposition were incomplete; otherwise, I would have produced them to you sooner than I did. As we explained to you, we had great difficulty obtaining a complete copy of the records from the payroll service, and it is not our practice to knowingly produce incomplete records.

Second, the additional payroll records consist of 435 documents. To simply produce them to you without us first reviewing them ourselves and redacting private and irrelevant information from them would not only be a disservice to our client, it could also be a breach of our ethics.

This litigation involves over a thousand documents. As I am sure you can appreciate, locating and organizing all of them can be quite difficult. We have made every effort to produce all documents *within our possession, custody, and control* in a timely manner. And, while we have inadvertently failed to produce one or two documents in the past, once you made us aware of that fact, we located and produced them as expeditiously as possible.

Houston   713.535.5500   •   Dallas-Ft. Worth   817.635.3600   •   Beaumont   409.892.1515

A Professional Corporation

I trust this letter addresses the issues and concerns you raised in your letter. However, if it does not, let me know.

Sincerely,

COKINOS, BOSIEN & YOUNG

Bryan P. Marshall

/lap
4087-002/AMS/Clark/Correspondence/
Counsel - ltr re production of payroll docs

Enclosures