# EXHIBIT G

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

CAROLINE CLARK,          )
    Plaintiff          )
               )
vs.          )   CIVIL ACTION NO.
               )   A-12-CA-007-SS
AUSTIN MONTESSORI SCHOOL,          )
INC.,          )
    Defendant          )

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF

SHEILAH MURPHY

FEBRUARY 27, 2012

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF SHEILAH MURPHY, produced as a witness at the instance of the Plaintiff and duly sworn, was taken in the above-styled and numbered cause on the 27th day of February, 2012, from 12:53 p.m. to 2:24 p.m., before Kim Furr, RPR, Certified Shorthand Reporter in and for the State of Texas, reported by computerized stenotype machine at the offices of The Cook Law Firm, 919 Congress Avenue, Suite 1145, Austin, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

10

taught Italian last year. You know, there were a number of -- a couple of times, I came in and drove for field trips that the students did. And the teachers were working with me so that I could get the full 400 hours during the school year. Yeah, things like that.

But the main reason I was hired was for those -- Their need was specifically to teach those four Occupations and Humanities units.

Q.    **When you're referring to four units --**

A.    Each one was about six weeks long. And let's see, what did I teach? The first one was on health and fitness, the second one was farm economy, the third one was composting, and the fourth one was a humanities unit.

And I had a lot of freedom to design the courses as I wanted, with the understanding of how -- you know, what their philosophy was and how they worked with the students.

So I would get paid for my hours -- those 400 hours included my time preparing the classes at home. They gave me -- we had agreed upon a certain number of hours. I think it was 15 hours' prep time for each of those six-week units, but if I needed a little more time or whatever, I -- they -- so anything extra that I did beyond those four units, we agreed together,

A.    Well, they told me that what they most needed another part-time teacher for was to teach the Occupations and the Humanities, and those were on Tuesday, Wednesday, Thursday afternoons at a set time, so that part was fixed and that worked for me.  I told them that that was convenient for me; that was the time that I wanted to teach.

And then beyond that, for the remaining hours, they asked -- they were very open, asking me when I wanted to teach, and then they would try to come -- you know, then they would work with me to find areas where they needed me to help, such as teaching some of the Friday afternoon PE classes or staying after the class -- the actual class time of the Occupations or Humanities was over, for that last 45 minutes to do prep work, grading, and then also to do the departure with the students.

MR. GONZALES:  To the extent that the last answer included information that was nonresponsive, I'll object.

Q.    (By Ms. Jacobs) For the times that you would stay for the 45 minutes after teaching the Occupations unit, were you actively supervising the children or were you only working on your prep work?

A.    Most of the time -- it was up to me, actually.

22

teaching that you did in the Occupations unit but prior to the departure.  Did you have any other designated time to do prep work?

A.    Yes.   They had me coming in a half hour before I started teaching -- which was considered prep time -- if I wanted.  Or I could -- if I didn't need that prep time, I could -- it was my choice how to spend that time.  And then I was also paid, as I told you, to do prep time, as needed, at home.

Q.    Did you have to follow any particular procedures during departure of the students?

A.    Let's see.  I was -- it was explained to me that I was to keep an eye on the students, make sure they stayed in this particular space that was designated for waiting for their parents to pick them up.  And then at a certain point, if there were any students who hadn't been picked up yet, I was to walk back with them to another bench area where they were to wait for their parents.  And that was it.

Q.    And if you had to walk a student to the other area, did you have to stay with that student?

A.    No, because that was at the end of the school day, after the school day was over.

Q.    Were there any other procedures you followed with respect to departure of the students?

38

me while I was teaching.  There was one time when Don Goertz was bringing a visitor to the school to show them around and I happened to be there with the students doing the fitness boot camp and so they came in.  But there was never a time when one of the administration came in for the purpose of observing my teaching.

Q.    (By Ms. Jacobs) Did any of the other teachers in the Adolescent Community ever observe your teaching expressly for the purpose of observing and not just because they also happened to be in the classroom?

A.    No.

Q.    Okay.  Did you receive any kind of an evaluation of your performance?

A.    Informally, they would tell me periodically what a good job they thought I was doing and how much they appreciated that I was there.  And at the end of the year, I had a meeting with them where I was invited to give them my feedback about how the year had gone and they all gave me a lot of positive feedback about how I had done.  But the meeting wasn't set up as an evaluation meeting; I had asked for it.  So, no.

Q.    And who was at that meeting?

A.    The three other teachers -- the four other teachers, sorry.

A.   No.

Q.   Or any other sort of -- what somebody might call an "employee benefit," that you can think of. Correct?

A.   No.

Q.   Now, while you were working in those six-week projects, were you able to take on other work?

A.   I could have if I wanted to.

Q.   And could that have been similar-type work as what you were performing for Austin Montessori School?

A.   I could have done any work I wanted to.  They had no say.

Q.   So is that a yes?

A.   Yes.

Q.   You testified earlier that you discussed some of your opinions regarding some of the students and some of the procedures for the students.  Correct?

A.   Uh-huh.

Q.   Is that a yes?

A.   Yes.

Q.   Okay.

A.   I'm sorry.

Q.   And I'm sorry, it's important for the court reporter.

A.   Okay.

54

A.   Yes.

Q.   And you designed the curriculum for the Occupations and Humanities units?

A.   Yes.

Q.   But in doing so, you followed guidelines for the Occupations and Humanities units that were given to you by the other Adolescent Community teachers?

MR. GONZALES:   Objection; form.

A.   There was a basic -- a general framework for the Occupations and Humanities.

Q.   (By Ms. Jacobs) And you also --

A.   And goals.

Q.   And the rules that applied to the students in the Adolescent Community during other classes during their school day also applied during the classes that you were teaching?

A.   Sure.

Q.   Okay.  Did you do anything to prepare for your deposition today?

A.   No.

Q.   Did you speak with anyone about the deposition today?

A.   Yeah.  I spoke with Dawn and Roland.

Q.   Okay.  Is Mr. Gonzales your attorney?

A.   No.

55

Q.   Can you tell me what you and Mr. Gonzales spoke about?

A.   Yeah.  He told me that, if you, like, spoke a lot of questions quickly, that I could ask you to slow down and that I should take my time and not answer until I felt like I understood what was being asked and just to tell the truth and...

Q.   Was this conversation that you had with Mr. Gonzales in Austin?

A.   Yes.

Q.   And where did that meeting take place?

A.   Starbucks across the street.

Q.   And at what time?

A.   12:30.

Q.   For about how long did you meet?

A.   Fifteen minutes, 20 minutes.

Q.   Did you speak with anyone else about the deposition?

A.   Dawn.

Q.   And what did you and Dawn talk about in regard to the deposition?

A.   Well, I ran into her one time at the office when I was doing something for my daughter at the school, and she had heard I had been deposed.  And I didn't even know what the case was or who this teacher

59

times I was there was really to help me get the extra hours.

Q.    And did anybody tell you that you -- did anybody tell you when to show up and when to leave?

A.    No.  They suggested a schedule to me that included the hours of the Occupations and Humanities and had some extra time at the beginning and the end, and they asked if that would work for me and I said yes.

Q.    So you were in control of that schedule, then?

A.    Yes.

Q.    Have you told the truth today?

A.    Yes.

MR. GONZALES:  I'll pass the witness.

EXAMINATION

QUESTIONS BY MS. JACOBS:

Q.    If you had not been available to teach the Humanities or an Occupations unit in the afternoon, could the school have shifted it to the morning?

A.    No.

Q.    So if you were going to teach for the school an Occupation and Humanities unit, you had to teach during the times that they already had set for those courses?

A.    Yes.  Those hours that I taught for the Occupations and Humanities were nonnegotiable.

64

I further certify that I am neither attorney or counsel for, related to, nor employed by any parties to the action in which this testimony was taken and, further, I am not a relative or employee of any counsel employed by the parties hereto or financially interested in the action.

SUBSCRIBED AND SWORN TO under my hand and seal of office on this the 5th day of March, 2012.

Kim Furr, CSR, RPR
Texas CSR 6997
Expiration: 12/31/2013
Integrity Legal Support Solutions
Firm Registration No. 528
3100 West Slaughter Lane, Suite 101
Austin, Texas   78748
(512) 320-8690
(512) 320-8692 (Fax)