# Exhibit A

AMS 001204

## The schedule of Janice's work before, during and after her baby is born for the school year 2007-2008

I will start the year, stay until it is time for the baby to arrive (my due date is November 1st) and will:

- Attend Orientation, First Aid, CPR
- Set up the classroom
- Have pre-visits
- Help the new children become established in the community
- Help Natalie to become versed in the ways of our community
- Attend the 40 year anniversary celebration
- Give the first and second parent gatherings on August 20th and October 25th.
- Have first semester observations and conferences starting in late September and into October
- I will be able to train in the assistant who will be with Natalie when I am gone.
- Have the outdoor environment day on October 6th.
- Attend Fall Festival on October 20th
- I will have an observation and consultation with Patricia on ……..
- Attend staff meetings on October 8th
- Attend children's house guide meetings on


While I am gone for at most three months with the baby I will:

- Confer with Natalie over the phone and in person at least two days a week at 4pm. We will discuss and do record keeping and any issues that come up with the general running of the community.
- Come to the CD day at the beginning of the second semester. January 7th
- Attend staff meetings while I am out of the classroom.

When I return after the three month sabbatical I will:

- Return to work in the mornings from 8am to 12:30pm
- Continue to confer with Natalie as stated above.
- For the first month or two that I am back my mom will be with the baby in the sun room while I work.  After a month or two the baby and my mom will be at my home while I work.
- Have second semester observations and conferences from mid March through April.  I will have some conferences after 12noon in the sunroom.
- Give fourth and fifth parent gatherings on March 27th and May 8th
- Close out the classroom at the end of the year during the contract week.
- Attend staff meetings on March 24th
- Attend Children's House Guide Meetings on…

You created this PDF from an application that is not licensed to print to novaPDF printer (http://www.novapdf.com)

AMS 001205

Dear Laurel Cottage Parents,                                    February 7, 2008

I am eagerly anticipating my return for mornings in our community next Monday February 11th!  In collaboration with the school consultants and counselors, I have been thinking and planning quite a bit about how best to make the transition back to the classroom and would like to update you on the plans we've made together.  Our priority is for your children to continue to have their same purposeful experience of being in a Montessori environment, pursuing their usual meaningful and enjoyable work..

We have planned a way for my baby, Ruth, to be close by in the care of my mother, Gerre Boardman.  We are setting up two spaces for Ruth and my mother on campus, a space in the Clubhouse and a small area in the classroom in front of the bay window.

Gerre will be her primary caregiver every morning, whether Ruth is in our community or using the space in the Clubhouse for napping and such.  Gerre has over ten years of experience as an assistant at Austin Montessori School:  first with Patricia Oriti many years ago and most recently as my assistant for four years.  She will once again serve as an assistant to Natalie and your children in the moments while I am nursing.

This Friday, February 8th, I will come to the classroom in the morning, during the gathering, and share with the children our plan for the coming weeks.  I will speak to them about Ruth and where she is in her development and what it will be like when she is here.  I will let them know that her work is to observe, listen and rest.

On Monday, February 11th, Ruth, Gerre and I will arrive at school before arrival.  When the children arrive, I will ask them to change their shoes, prepare their wrap, and join me in a gathering.  I will give them a tour of the small area Ruth will inhabit while she is in the classroom and then they will begin their work for the day.

After a few days and once we are settled in, I will show the children how they can choose to observe Ruth as an individual work choice.  The children's work with Ruth will be done in a way that is true to the culture of our community.   It will be work that is done after receiving a presentation.

I feel so blessed to be able to share such an important time with you and your children.  I have met with and received advice from our consultants, administrators, Austin Montessori School guides and other Montessorians who have done this and I am so thrilled that our community has this opportunity.

Thank you and I look forward to being with your children once again.

Sincerely,

Janice Kearley

You created this PDF from an application that is not licensed to print to novaPDF printer (http://www.novapdf.com)

AMS 001206

August 6, 2009

Greetings Butterfly Garden Families,

Welcome to another school year!  I hope that you have had an amazing summer break with your children and that you are looking as forward to the beginning of school as we are!  Amy and I have been diligently working in the classroom these past couple of weeks preparing it for the children's return on August 17th.  Janna will soon be joining us after she completes her training in Denver and is very excited to be working with your children the first part of this year as my family welcomes our newest addition any day now.

Your child should receive an invitation in the mail very soon, if they have not already, inviting them to school on Friday, August 14th for a brief visit to get reacquainted with the environment and to see Janna and Amy before the first day of school the following Monday.  We will also at that time be asking parents to sign up for weeks to contribute groceries and flowers until my return in early to mid-October.  We appreciate all of your contributions so much!!

On Monday, August 17th, we will start school with a normal arrival from 8:30 to 8:45. Janna will greet the children at the car and Amy will assist them once they get inside. Your child may experience some after summer transition anxiety so please remember to keep goodbyes short and sweet and know that Amy or Janna will call you if the need arises.

On the first day of school, please be sure to send the following items in your child's school bag:

- Your child's ditty bag (if it came home over the summer)
- A pair of Robeez slippers – these can be purchased at a discount from Lois in the main office if your child has outgrown them (make sure to try them on before the first day of school)
- Five pair of thick cotton underwear
- Five pair of elastic waist shorts that do not restrict movement
- Three shirts
- Three pairs of socks with slip-proof soles
- Your child's journal with updated contact numbers printed inside the front cover and if you would like, a brief description of their summer
- If your child's appearance has changed dramatically since they began school last year, an updated photo for their cubby might be nice as well but is not required (4x6 please if you send one)

Remember to keep in mind simplicity and the school's culture when you are choosing clothing items to send.  Any pictorial representations on clothing should be reality based - no cartoon characters please.  Elastic waist shorts and large, stretchy neck holes work best for the youngest children.  Also, please be sure to <u>label everything</u> with your child's name to help us ensure things stay in the right cubbies.  Children love to dress and

You created this PDF from an application that is not licensed to print to novaPDF printer (http://www.novapdf.com)

AMS 001207

undress as an activity in and of itself, so labeling is a big help.  Also, please send your child in appropriate shoes for playing outdoors avoiding open toes and Crocs.

It would be very helpful if you begin now easing your child into a comfortable sleep schedule that will allow him/her to wake up (preferably on their own), get dressed and have breakfast with enough time to leave the house and get to school by 8:30.  If they are in a summer routine of getting up later in the morning, try waking them 10-15 minutes earlier each day until they reach the point where they can have a leisurely morning and not be rushed getting out the door and to school.  This small bit of preparation will make the transition back to school so much smoother for all of you.

Due to the fact that I will not be back in the classroom until October, we are delaying our first formal parent meeting until then.  We will also begin welcoming new families into our community after my return.

I can hardly wait to see all of your children – I missed them so much over the summer.  I plan to drop by the community once "Dottie" is old enough to let them meet her and see why I have not been at school.  Until then, I know that Janna and Amy are eager and excited to be working together with your children for a beautiful start to the year!  Please let me or Janna know if you have any questions or need anything!!

Enjoy the last days of summer with your children and we will see you soon!

Affectionately,


Kadie Beasley

You created this PDF from an application that is not licensed to print to novaPDF printer (http://www.novapdf.com)

# Exhibit B

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

CAROLINE CLARK,                  �
        Plaintiff,               �    CIVIL ACTION
                                 �
VS.                              �    NO. A-12-CA-007-SS
                                 �
AUSTIN MONTESSORI SCHOOL,        �    JURY TRIAL DEMANDED
INC.,                            �
        Defendant.               �

*****************************************************

ORAL DEPOSITION OF THE CORPORATE REPRESENTATIVE

OF AUSTIN MONTESSORI SCHOOL, INC.,

DAWN GLASGOW

JULY 26, 2012

*****************************************************

ORAL DEPOSITION OF DAWN GLASGOW, produced as a witness at the instance of the Plaintiff, and duly sworn, was taken in the above-styled and numbered cause on the 26th day of July, 2012, from 10:00 a.m. to 4:05 p.m., before Cynthia Warren, Certified Shorthand Reporter in and for the State of Texas, reported by machine shorthand, at the offices of The Cook Law Firm, 919 Congress Avenue, Suite 1145, Austin, Texas 78701, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

Case 1:12-cv-00007-SS    Document 51-1    Filed 09/14/12    Page 8 of 16

Dawn Glasgow as Corp. Rep. - 7/26/2012

**2**

APPEARANCES

FOR THE PLAINTIFF:

MR. RUSSELL SCOTT COOK
MS. MELISSA A. JACOBS
THE COOK LAW FIRM
919 Congress Avenue, Suite 1145
Austin, Texas  78701
Telephone:  512-482-9556
Fax:  512-597-3172
E-mail:  scook@rcooklaw.com

FOR THE DEFENDANT:

MR. BRYAN P. MARSHALL
COKINOS, BOSIEN & YOUNG
10999 IH-10 West, Suite 800
San Antonio, Texas  78230
Telephone:  210-293-8700
Fax:  210-293-8733
E-mail:  bmarshall@cbylaw.com

ALSO PRESENT:
Ms. Jordan Warshauer

**3**

INDEX

PAGE
Appearances............................... 2
DAWN GLASGOW
Examination by Mr. Cook................ 5
Examination by Mr. Marshall............. 209
Further Examination by Mr. Cook......... 210
Changes and Corrections..................... 211
Signature................................. 212
Reporter's Certificate..................... 213

EXHIBITS

NO. DESCRIPTION                PAGE REFERENCED

Exhibit 1.................................. 5
Plaintiff's Notice of Intention to Take
Oral Deposition of the Corporate
Representative of Austin Montessori
School, Inc.

Exhibit 2.................................. 12
Defendant's Objections and Answers to
Plaintiff's Third Set of Interrogatories

Exhibit 3.................................. 34
Payroll Registers, Bates Nos. AMS 000766 -
000835

Exhibit 4.................................. 38
Listing of employees and independent
contractors, January - June 6, 2009

Exhibit 5.................................. 104
Expenses by Vendor Summary, August 2009
through July 2010

**4**

EXHIBITS (cont'd)

NO. DESCRIPTION                PAGE REFERENCED

Exhibit 6.................................. 114
TWC Employer's Quarterly Report, 3/28/11
Exhibit 7.................................. 190
TWC Employer's Quarterly Report, 3/28/11

Exhibit 8.................................. 207
Annual Report, 2010-2011
Exhibit 9.................................. 208
Annual Report, 2009-2010

Exhibit 10................................. 209
Annual Report, 2008-2009

**5**

(Exhibit No. 1 marked.)

DAWN GLASGOW,
having been first duly sworn, testified as follows:

EXAMINATION

QUESTIONS BY MR. COOK:

Q.  Hi, Ms. Glasgow.  Will you please state your full name for the record?

A.  Dawn Delise Glasgow.

Q.  And what is your position with Austin Montessori School?

A.  Administrative executive.

Q.  Ms. Glasgow, you understand you've been designated as a corporate representative on behalf of Austin Montessori School, Inc. here today; is that correct?

A.  Yes.

Q.  And you've been designated to testify on a number of topics; is that correct?

A.  Yes.

Q.  Do you have some understanding of what the Federal Rules of Civil Procedure obligate you to testify about here today?

A.  I don't think so.

Q.  Okay.  I'm going to give you what's been marked as Exhibit 1.  And let me ask you this.  Do you

150

trained AMI guides in that role. And they also have responsibility for coordinating school-wide events, like the outdoor environment day. So they interact with all the communities on getting ideas for what to do and approving them and things like that, facilitating parent volunteers and getting parents in.

They do a program called study of the child with the elementary children where they come and observe younger children and learn about child development. Depending on the interest and the expertise of the person in that position, they've done a lot of other things, like started a reading buddies program at the elementary school next door, they participated in the study of human development program for the elementary children. There's material making that they do, organizing the online materials and communications that are available for all of the classrooms.

Q.   What about any administrative roles?

A.   Well, some of those things are.

Q.   Which of those are administrative roles?

A.   Organizing the communication and -- that's available to the guides and all of the resources that are available.

Q.   What percentage of the administrative work do

151

you think the campus coordinator performs?

A.   It would be hard to -- it would be hard to guess. It's -- depends on the day and it also depends on the expertise of the person. We've had the person who was in that position prior to us offering the position to Caroline was very quick with a lot of the administrative duties so she's one that was much more involved in establishing programs for the children.

Q.   Have you ever had campus coordinators that were not certified guides?

A.   Yes.

Q.   And when did you have them and who were they?

A.   Okay. I'm going to have to think about this. Let's see, prior to Donna Romine we had -- we had -- I think it was -- it was Kendall Barnard and she was actually AMS trained. AMS is American Montessori Society, so she was an elementary trained person for AMS. I think there was somebody between her and Donna Romine, but I can't remember who it is.

Q.   But there was an individual before Donna Romine that was in the campus coordinator position that was not AMI certified?

A.   Yes.

Q.   And was not AMS certified?

A.   I think so, but I can't remember who it is now.

152

Q.   Okay. Do you consider the campus coordinator position and the guide roles to be identical?

A.   No.

Q.   Do you consider them to be different?

A.   Yes.

Q.   How different?

A.   The children's house guide role is isolated to that classroom and that community. The campus coordinator you have many more interactions with all of the communities, many more -- much more insight into what's happening in the other communities and much more involvement with the parent community as a whole. And what's nice about have a guide -- somebody who's experienced as a guide is because they have so many interactions with the parents you can trust that they're going to have appropriate interactions with the parents, they're going to give good information, they're going to receive information, and they're going to direct them to the right place. They're also very good at going into -- children's house trained people are more adaptable to going into other environments to sub for a day and having it go well.

Q.   But the job duties between guide and campus coordinator are different?

A.   Yes.

153

Q.   How much time do they spend -- does a campus coordinator spend substituting?

A.   Early in the school year not much because everybody is healthy and then later in the year it could be as much as three times a week. I mean, it could be a whole week if somebody is out with the flu or something. It could be more often. There are other people who sub too. So if multiple people are out in a day, we have other people on staff that do it.

Q.   So the campus coordinator, you're not saying the campus coordinator position switches into a guide role by the end of the semester?

A.   No.

Q.   Okay. It's just something they may fill in for; is that correct?

A.   Yes.

Q.   Who are the other people that substituted?

A.   The assistant to the director of admissions. Her name is Lori Friedman, she subs. She was a public school teacher prior to coming to have that position. Just means she has experience in working with children.

Q.   Is she AMI certified?

A.   No.

Q.   Who else? I'm sorry.

A.   Some of our after-school leaders might be

154

willing to come in early because they don't have to go until after school so we'll call them.

Q. Are they AMI certified?

A. Angela is; Mandy is not.

Q. What's Angela's last name?

A. Eagle.

Q. And so she's an after-school person?

A. Uh-huh.

Q. What does she do during the day?

A. Whatever she wants. So sometimes she's willing to come in early.

Q. Any other substitutes?

A. Sometimes there are people like Elizabeth Suggs, when she was out not wanting to work full-time, who was willing to come in if we needed someone. Same for Janice Kearley. There was a long-time employee in the past named Jerry Boardman and she would come in and sub. We don't like to call her because she won't take money so it kind of feels wrong. But just different people that we know.

Q. Have you ever had to have a substitute teacher for a month or two months?

A. We did that time -- it wasn't a substitute but it was the assistant that was in the room who was AMI trained and we did that in the Laurel Cottage. I think

155

we've talked about that quite a bit.

Q. What was the name of the teacher that was out?

A. Janice Kearley.

Q. And the assistant became the main guide for that classroom?

A. Yes. She was AMI trained.

Q. Besides that, have there been any other substitute teachers for multiple weeks?

A. In our elementary class a person went out for a few weeks,          , and she discovered sometime in the school year she had cancer and had surgery and I think she was out three or four weeks and the guide who was in the community immediately before her was -- John Snyder was working as our elementary coordinator and he went in.

Q. And she was allowed to return after her leave was up?

A. Yes.

Q. Okay.

A. That was an upper elementary, nine to 12-year-olds.

Q. When the corporation determined that Caroline Clark was pregnant and assumed that she was going to take leave, did it make any efforts to search for a substitute teacher for Ms. Clark?

156

A. I don't remember initially. I know there were discussions about -- we didn't know when she was due, until that conversation happened about when she was due and when she would be out. I just had a lot of things going on.

Q. After the conversation of when she was due and whether she was going to be out or not, did the school look for a substitute teacher for Ms. Clark?

A. We didn't look for sure for outside the school. I think there might have been some discussion about could it possibly work with Elizabeth Suggs, but already by that point, because we had already had this experience with that children's house class, with the very established children's house class with a very experienced guide who had been there for, I don't even know, 11 or 12 years, and with her absence in the room it was a really significant impact on what we were able to offer for the children, that we were not -- we were not thinking it was going to be a possibility of providing consistency for the children with somebody being out for 12 weeks or whatever it was.

Q. Meaning a substitute teacher wasn't going to work?

A. Wasn't going to be able to help -- wasn't going to make it possible for us to meet the needs of the

157

students.

Q. And for that reason the school didn't even look to see if there was a substitute that could fit into Ms. Clark --

A. We didn't look the first time we had somebody. We don't really -- we wouldn't conceive of hiring somebody from the outside to come in as a substitute that isn't familiar with our school. That would not work. It doesn't work -- it's very, very difficult even when you bring somebody in for the whole year. You have to provide a lot of information and oversight. So we wouldn't plop somebody in in the middle of the year. It would not be good.

Q. Well, this wouldn't have been in the middle of the year; is that correct? It would have been at the start of the semester, correct?

MR. MARSHALL: Objection, vague.

A. No. It was in October.

Q. (By Mr. Cook) Okay. Yeah, it would have been in the middle of the semester.

A. Yeah, but --

Q. So are you saying that it was school policy that you couldn't search for substitute teachers anywhere but within the school?

A. No, there was no written school policy. It was

158

just kind of known.

Q. Okay. Are you saying it was inconceivable that anyone in the rest of the country could have served as a substitute teacher at your school for Ms. Clark?

A. Okay. I might have said inconceivable, but it -- certainly not. I mean, if some trainer had come in, especially her trainer, okay, that would have been, but that doesn't happen.

Q. But did the school search for any substitutes outside the school?

A. Not that I know of.

Q. Did the school search for any substitutes within the school?

A. We talked about it.

Q. You may have talked about it. Did the school search for any substitutes for Ms. Clark?

A. Well, you don't have to look far. I mean, do we -- we already had conversation with the one person who was available to be -- who was trained who did not want to be in the classroom at all.

Q. And that was Ms. Suggs?

A. Yes.

Q. Did you talk to any of the other substitutes that substituted on other occasions?

A. They weren't trained to be in there. Like

159

Angela's children were in there. She couldn't be in there in the classroom.

Q. Ms. Eagle's children were within that classroom?

A. Yes.

Q. Is there a rule against teaching your own children?

A. Yeah, it is, especially that age.

Q. What about Lori Friedman?

A. She doesn't have any training or expertise at that level. In fact, her as a substitute, she would be the last person you would call for that age. You would call her for elementary possibly.

Q. Is your campus coordinator at the present time AMI certified?

A. Let's see, we had someone in there and then she left to move to London and we put somebody in temporarily who wasn't at the end of the year, but we're going back to an AMI certified guide this next school year.

Q. So this past school year for a portion of the year you had a campus coordinator that was not AMI certified?

A. Yes.

Q. Did that cause any problems?

160

A. It just made it a little harder because --

Q. Is she leaving?

A. Is that person leaving?

Q. Yes.

A. She's going to do something else.

Q. At the school?

A. Uh-huh.

Q. What is she going to do?

A. She's going to be an after-school assistant.

Q. When did you have the conversation with Ms. Suggs as to her interest to substitute for Ms. Clark?

A. It wasn't a conversation like that. It was about being in the room. There are often opportunities she didn't want to -- she didn't want to be in the classroom. I don't know that we had a direct conversation about subbing for Ms. Clark.

Q. Did you have an indirect conversation with her about subbing in the classroom?

A. Yes.

Q. And what was that indirect conversation and when did it happen?

A. I can't remember.

Q. Do you remember any of the contents of the indirect conversation?

161

A. She didn't want to be in the classroom. She didn't want to have that responsibility, so. . .

Q. But did you ever present her with the offer to substitute for Ms. Clark?

A. I didn't.

Q. Did anyone at the school?

A. Not that I know of. She wasn't there, for one. She was still in training so she wasn't back yet. We just had conversations with her like over the phone about what she was going to do when she came back.

Q. And what did she say about not wanting to be in the classroom?

A. She wanted to be able to be with her daughter and have another baby during that year. She didn't want to be in the room.

Q. Did she want to work for the school?

A. She wanted to work if she could in a part-time capacity, but if we didn't have anything she would just be a sub.

Q. A sub in what capacity?

A. What do you mean?

Q. You said that she would be a sub. What would she be subbing for?

A. Like you would call her occasionally to see if she could come in.

Dawn Glasgow as Corp. Rep. - 7/26/2012

162

Q.  And that would entail being in the classroom?
A.  Yeah, a day here and a day there.  Being in a classroom and being responsible for it is different than being in the classroom as a sub.
Q.  Did she ever say that specifically that she --
A.  Yes.
Q.  So she said she didn't want to work permanently but she would work as a sub?
A.  Yeah, an on-call sub so that we could call her in the morning and say can you come and she could say no, she didn't want to.  She just wanted to have more time without all that responsibility.
Q.  Is it AMS's position that it's impossible to get subs from outside its own community for teachers that go on leave?
A.  Impossible.  It's difficult, especially at the children's house level.
Q.  Okay.  So therefore, if a teacher goes on leave, their contract is not going to be renewed, period?
A.  That's not true.
Q.  Okay.  Under what circumstances could a teacher go on leave and have their contract renewed?
A.  If they were -- depending on how short the leave was or if it was like, say, it was at the very end

163

of the year.
Q.  So under some circumstances leave would be acceptable to the school?
A.  If it's short enough, the class was stable enough.
Q.  What is the definition of short enough?
A.  It depends on the class.  I couldn't even say.
Q.  Okay.  Do you tell guides before they begin work for your school that if they're going to go on pregnancy leave their contract is not going to be renewed?
A.  No.
Q.  Why not?
A.  Because that's not always the case.  They might go on leave, I just told you, at the end of the year and that's fine.  We do want people to make a three-year commitment to be in the classroom when they accept a contract -- I mean, accept working because that's a three-year cycle for the children in the room and we think it takes that long, especially if they're new, to have three years of experience.
Q.  Okay.  Is the continuity of one teacher over the three-year period important to the school?
A.  It is important, but it's most -- it's really important during the year to not have interruption.

164

Q.  But the three-year continuity is important?
A.  It is.
Q.  It's AMS's position that under some circumstances pregnancy leave will be acceptable for guides?
A.  What does that mean, will be acceptable?
Q.  Will not interfere with their employment opportunities after they take the leave.
A.  That if -- well, it's really not pregnancy leave, is it?  You mean the time that they take away that they're not at work after they have a child?
Q.  Sure.
A.  That's what you're calling it?
Q.  Or while they're having a child or before.
A.  Okay.  Wait, ask the question again.
Q.  Sure.  Is it AMS's position that under some circumstances pregnancy leave will be acceptable for guides as far as obtaining employment after the leave or retaining employment after the leave?
A.  Oh, we always have employment after a leave.
Q.  In the same position as they were before the leave?
A.  That does work from time to time depending on the level, the amount of time out, the stability of the classroom.

165

Q.  So some leave is permissible based on those factors which you just stated?
A.  Leave is always permissible.  You said would they have the exact same position when they come back.
Q.  Sure.  In this case, there's been talk about what is promised to the parents in regards to stability of the school.  What is that promise that's made to parents regarding stability?
A.  I don't know if it's stability as much as consistency with what we say we offer at our Montessori school, which is your children will get lessons consistent with AMI, they will progress through the curriculum in a peaceful environment where all the children are safe, and you'll get a better understanding of your child's development in a Montessori system.
Q.  Are there any promises made to parents about the continuity of the guides?
A.  It's for that year and that we aim to have guides stay at least three years.
Q.  And where are those promises or how are those promises made to parents?
A.  Mostly when their children are moving up to another level or entering the school for the first time, how long -- they ask questions like how long has this guide been here, what's the likelihood of continued

Dawn Glasgow as Corp. Rep. - 7/26/2012

166

employment, that kind of thing.

Q. Do you ever tell parents that teachers' contracts will not be renewed if they take too long of a leave?

A. No.

Q. Why not?

A. It's not something that comes up.

Q. Have any clients ever left the school or any families left the school because the guides went on leave?

A. I'm not aware of any.

Q. Have any clients or families left the school because they claim that there was too much instability in the classroom?

A. People have requested other classes.

MR. COOK: Objection, nonresponsive.

Q. (By Mr. Cook) Have any schools [sic] or families ever left the school because of their complaints of instability within the classroom?

A. I don't know.

Q. On how many occasions have families requested a change of classroom due to instability?

A. You said have they ever left because of instability in the classroom, not because of leave, just any instability? Yes, yes, certainly they have.

167

Q. On what occasions?

A. When you have a guide that's not operating in a consistent way with the rest of the school. So the parents who have been in the school for a number of years, whether because they have older children or not, know the way it's supposed to go and whenever it's not going that way they know and they don't want their children experiencing that. So if they don't -- if they don't have any other recourse, they leave.

Q. How many times has that happened in the last five years?

A. I don't know the number.

Q. Can you name one family that's left in the last five years specifically because of instability in the classroom?

A. Yes.

Q. Okay.

A. Tish Phillips. Sheila Murphy took her older children out because of instability. I mean, there -- Huntington. There's people that do.

Q. Besides those three families, can you think of others?

A. I mean, I just can't think of them. There are many families.

Q. Okay. And their specific complaint is about

168

instability in the classroom?

A. Uh-huh.

Q. Is that yes?

A. Yes.

Q. Okay. Have those complaints about instability ever been tied to the leave of a teacher or a guide?

A. The ones that I named have to do with the particular classroom. It was just coming off the top of my head. But yes, the leave of a guide or the guide leaving, yes.

Q. Okay. Well, I want to ask specifically the leave of the guide. Has any families left your school because a guide was on leave?

A. I can't remember, but I think someone left when Janice was on leave in that whole mess.

Q. But you don't have personal knowledge of anyone leaving?

A. I have no personal memory of it.

Q. Okay. Do you think a teacher or a guide going on leave harms the children in that classroom?

A. They don't get the same experience that the children in the other classes do.

MR. COOK: Objection, nonresponsive.

A. Yes.

Q. (By Mr. Cook) My question, and let me ask it

169

again, specifically is, do you think when a teacher goes on leave that harms the children in the classroom?

A. In that --

MR. MARSHALL: Objection, vague.

A. Yeah, it depends on the classroom and the age of the children and if harm is less than optimal, then yes.

Q. (By Mr. Cook) What is your definition of harm?

A. Well, we know that children during the period of three to six years have this absorbant mind and this is the time for them to be experiencing these lessons that were set up in a certain way to be given with consistency in a peaceful environment and that's not happening, then that's harmful, especially when we know that it can be done.

Q. How is it harmful?

A. Because it's missed opportunity.

Q. Does it harm the development of the children?

A. The optimal development, yes.

Q. Does it harm the overall development of the children?

A. Well, I mean, children are very resilient on a whole, but that doesn't mean that our job when we operate a Montessori is to make sure we don't harm the overall development of the children. We want much more

210

payroll registers are for bimonthly.

MR. MARSHALL: Pass the witness.

FURTHER EXAMINATION

QUESTIONS BY MR. COOK:

Q. The payroll registers your counsel is talking about is Exhibit No. 3?

A. Yes.

Q. Or is exhibited by Exhibit No. 3?

A. Yes.

MR. COOK: Pass the witness.

MR. MARSHALL: No questions.

(DEPOSITION CONCLUDED)

211

CHANGES AND CORRECTIONS

WITNESS NAME: DAWN GLASGOW        DATE: JULY 26, 2012

Reason Codes: (1) to clarify the record; (2) to conform to the facts; (3) to correct a transcription error; (4) other (please explain).

PAGE   LINE   CHANGE            REASON CODE

212

SIGNATURE

I, DAWN GLASGOW, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted on the previous page.

_____

DAWN GLASGOW

STATE OF _____

COUNTY OF _____

Before me, _____, on this day personally appears DAWN GLASGOW, known to me (or proved to me under oath or through _____) (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this _____ day of _____, 2012.

_____

NOTARY PUBLIC IN AND FOR

THE STATE OF _____

COMMISSION EXPIRES: _____

213

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

CAROLINE CLARK,

Plaintiff,        CIVIL ACTION

VS.        NO. A-12-CA-007-SS

AUSTIN MONTESSORI SCHOOL,   JURY TRIAL DEMANDED
INC.,

Defendant.

REPORTER'S CERTIFICATION
DEPOSITION OF THE CORPORATE REPRESENTATIVE
OF AUSTIN MONTESSORI SCHOOL, INC., DAWN GLASGOW
JULY 26, 2012

I, Cynthia Warren, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, DAWN GLASGOW, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the deposition transcript was submitted on _____, to the witness or to the attorney for the witness for examination, signature and return to me by _____;

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes counsel for all parties of record:

Dawn Glasgow as Corp. Rep. - 7/26/2012

213

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

CAROLINE CLARK,                    ☐
        Plaintiff,                 ☐   CIVIL ACTION
                                   ☐
VS.                                ☐   NO. A-12-CA-007-SS
                                   ☐
AUSTIN MONTESSORI SCHOOL,          ☐   JURY TRIAL DEMANDED
INC.,                              ☐
        Defendant.                 ☐

REPORTER'S CERTIFICATION
DEPOSITION OF THE CORPORATE REPRESENTATIVE
OF AUSTIN MONTESSORI SCHOOL, INC., DAWN GLASGOW
JULY 26, 2012

        I, Cynthia Warren, Certified Shorthand Reporter

in and for the State of Texas, hereby certify to the

following:

        That the witness, DAWN GLASGOW, was duly sworn

by the officer and that the transcript of the oral

deposition is a true record of the testimony given by

the witness;

        That the deposition transcript was submitted on

July 31, 2012      , to the witness or to the attorney for

the witness for examination, signature and return to me

by  August 30, 2012 ;

        That pursuant to information given to the

deposition officer at the time said testimony was taken,

the following includes counsel for all parties of

record:

Dawn Glasgow as Corp. Rep. - 7/26/2012

214

Mr. Russell Scott Clark and Ms. Melissa A. Jacobs, Attorneys for the Plaintiff;
Mr. Bryan P. Marshall, Attorney for the Defendant;

That $ 2,148.80 is the deposition officer's charges to the Plaintiff for preparing the original deposition transcript and any copies of exhibits;

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Certified to by me this 30th day of July, 2012.


_Cynthia Warren_
CYNTHIA WARREN, Texas CSR 4597
Expires 12/31/13
INTEGRITY LEGAL SUPPORT SOLUTIONS
Firm Registration No. 528
3100 West Slaughter Lane, Suite A-101
Austin, Texas  78748
512-320-8690
512-320-8692 (Fax)